IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT      )
OPPORTUNITY COMMISSION,  )
                            )
             Plaintiff    )   C.A. No. 05-697-KAJ
       v.               )
                            )
BE&K ENGINEERING COMPANY  )
(subsidiary of BE&K, Inc.),     )
             Defendant  )

## DEFENDANT BE&K ENGINEERING COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

      Defendant BE&K Engineering Company, by and through its undersigned counsel

hereby moves for summary judgment in the above-captioned action pursuant to Federal

Rule of Civil Procedure 56.  The grounds for this Motion are set forth in Defendant's

Opening Brief, which is filed simultaneously herewith.


            YOUNG CONAWAY STARGATT & TAYLOR, LLP

            /s/ Margaret M. DiBianca
            Teresa A. Cheek (Bar I.D. 2657)
            Margaret M. DiBianca (Bar I.D. 4539)
            The Brandywine Building, 17th Floor
            1000 West Street
            P.O. Box 391
            Wilmington, Delaware 19899-0391
            Telephone: (302) 571-6676; 571-5008
            Facsimile: (302) 576-3286; 576-3476
            Email: tcheek@ycst.com; mdibianca@ycst.com
            Attorneys for Defendant


DATE:  September 5, 2006

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff | ) | C.A. No. 05-697-KAJ |
| v. | ) | |
| | ) | |
| BE&K ENGINEERING COMPANY | ) | |
| (subsidiary of BE&K, Inc.), | ) | |
| Defendant | ) | |

**DEFENDANT BE&K ENGINEERING COMPANY'S OPENING BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

/s/ Margaret M. DiBianca
Teresa A. Cheek (Bar I.D. 2657)
Margaret M. DiBianca (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6676; 571-5008
Facsimile: (302) 576-3286; 576-3476
Email: tcheek@ycst.com; mdibianca@ycst.com
Attorneys for Defendant

DATE:  September 5, 2006

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................. viii

SUMMARY OF ARGUMENT ..................................................................................... ix

STATEMENT OF FACTS ............................................................................................. 1

    A.    The Nature of BE&K's Business ....................................................................... 1

        1.    Contract Engineering Is a Project-Based Industry Susceptible to
            Layoffs ....................................................................................................1

        2.    Department Managers Closely Monitor the Project Landscape to
            Prevent the Need for Layoffs ..............................................................2

        3.    The Use of Contract Engineers Reduces the Need for Layoffs ........3

        4.    The Shift From Large Project Work to Small Project Work Increased
            the Risk of Layoffs ...............................................................................5

    B.    Juan Obed Perez's Employment History With BE&K ...................................... 6

        1.    Perez Worked for BE&K in 1993 and Was Laid Off for Lack of Work .........6

        2.    Perez Was Re-hired by Peter Howe in 2000 ....................................7

    C.    Perez's Performance Was Average at Best ....................................................... 8

        1.    Perez Was Removed from the White Pigments Project for Poor
            Performance ...........................................................................................8

        2.    Perez Went Overbudget and Fell Behind Schedule on the Motiva CCR
            Vent Scrubber Project ...........................................................................9

        3.    Perez Left Tosco, His Last Full-Time Project, and Returned to the
            BE&K Office With No Prospects of New Work .................................11

        4.    BE&K Assigned Perez to Short-Term Filler Projects in an Attempt to
            Avoid Laying Him Off ...........................................................................12

    D.    The 2003 Reduction-in-Force ....................................................................... 13

i

1.    Low Profit Margins Necessitated Maximum Reimbursability ...................... 13

2.    The Utilization Rate Dropped to an Unsustainable Level ............................ 15

3.    The Hiring Freeze in the Process Department ................................................ 16

ARGUMENT ......................................................................................................................... 18

I.    BE&K DID NOT DISCRIMINATE AGAINST JUAN OBED PEREZ
      BASED ON HIS AGE AND, THEREFORE, SUMMARY JUDGMENT
      SHOULD BE GRANTED TO DEFENDANT ...................................................... 18

   A.    Summary Judgment Standard .......................................................................... 18

   B.    ADEA Analytical Framework .......................................................................... 18

II.   THE EEOC CANNOT ESTABLISH A *PRIMA FACIE* CASE OF AGE
      DISCRIMINATION ............................................................................................. 20

   A.    Perez Was Not Qualified for Another Project .................................................. 20

III.  PEREZ WAS SELECTED FOR LAYOFF FOR LEGITIMATE, NON-
      DISCRIMINATORY REASONS, WHICH THE EEOC CANNOT
      DEMONSTRATE WERE MERELY PRETEXT FOR DISCRIMINATION ...... 22

   A.    BE&K Selected Perez for Layoff For Legitimate Business Reasons .............. 22

   B.    The EEOC Cannot Produce Any Evidence that BE&K's Proffered Reasons Did
         Not Actually Motivate Perez's Layoff ............................................................. 24

      1.    The EEOC Has Failed to Produce Any Evidence to Dispute that Perez
            Was Laid Off for Lack of Work When His Project Ended ........................... 25

      2.    The EEOC Has Failed to Produce Any Evidence that the Relevant
            Decisionmakers Harbored Any Discriminatory Animus Towards Perez ...... 28

      3.    The EEOC Has Failed to Produce Any Evidence that Ageist
            Comments Were Made by Any BE&K Employee ........................................ 32

      4.    The EEOC Has Failed to Produce Any Evidence that BE&K's Pre-RIF
            Hire of an Entry-Level Engineer Was Prextext for Perez's Layoff .............. 35

CONCLUSION ...................................................................................................................... 38

ii

# TABLE OF AUTHORITIES

**Cases**                                                              **Page No.**

Alegre v. Schering Plough Del Caribe, Inc.,
    975 F. Supp. 153 (D.P.R. 1997)....................................................... 34

Anderson v. CONRAIL,
    297 F.3d 242 (3d Cir. 2002).................................................. 21, 28

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986).......................................................... 19

Beaird v. Seagate Tech., Inc.,
    145 F.3d 1159 (10th Cir. 1998) ............................................ 25, 36

Birkbeck v. Marvel Lighting Corp.,
    30 F.3d 507 (4th Cir. 1994) ................................................. 21, 26

Bradley v. Harcourt, Brace & Co.,
    104 F.3d 267 (9th Cir. 1996) .................................................... 31

Brewer v. Quaker State Oil Ref. Corp.,
    72 F.3d 326 (3d Cir.)..................................................... 19, 20, 21

Brodsky v. Hercules, Inc.,
    966 F. Supp. 1337 (D. Del. 1977) ............................................. 20

Brooks v. Leake & Watts Org., Inc.,
    02-Civ-9865, 2005 U.S. Dist. LEXIS 16229 (S.D.N.Y. Aug. 2, 2005)....................... 32

Burton v. MBNA Amer. Bank, N.A.,
    C.A. No. 03-915-GMS, 2005 U.S. Dist. LEXIS 12154 (D. Del. June 22, 2005)......... 29

Carlton v. Mystic Transp., Inc.,
    202 F.3d 129 (2d Cir. 2000)................................................... 31

Carson v. Bethlehem Steel Corp.,
    82 F.3d 157 (7th Cir. 1996) ................................................... 21

Carter v. Newman Mem. County Hosp.
    Case No. 98-41-5-SAC, 2001 U.S. Dist. LEXIS 12976 (D. Kan. July 20, 2001) ........ 37

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).......................................................... 19

Cummings v. Pearson Educ., Inc.
    C.A. No. 03-12183-DPW, 2006 U.S. Dist. LEXIS 2118 (D. Mass. Jan. 18, 2006) ..... 36

Danzer v. Norden Sys., Inc.,
    151 F.3d 50 (2d Cir. 1998) ............................................................................ 24

Doan v. Seagate Tech., Inc.,
    82 F.3d 974 (10th Cir. 1996) ......................................................................... 37

EEOC v. Our Lady of the Resurrection Med. Ctr.,
    77 F.3d 145 (7th Cir. 1996) ........................................................................... 31

EEOC v. Tex. Instruments, Inc.,
    100 F.3d 1173 (5th Cir. 1996) ....................................................................... 24

Elwell v. PP&L, Inc.,
    No. 01-4512, 2002 U.S. App. LEXIS 20702 (3d Cir. Sept. 30, 2002) .......... 32

Ercegovich v. Goodyear Tire & Rubber Co.,
    154 F.3d 344 (6th Cir. 1998) ......................................................................... 25

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
    983 F.2d 509 (3d Cir. 1992) ........................................................................... 26

Fairchild v. Forma Scientific, Inc.,
    147 F.3d 567 (7th Cir. 1998) ......................................................................... 25

Feldman v. Looms,
    No. 98-9680, 1999 U.S. App. LEXIS 25092 (2d Cir. Oct. 4, 1999) ............. 32

Fuentes v. Perskie,
    32 F.3d 759 (3d Cir. 1994) ...................................................................... 23, 26

Gangne v. Northwestern Nat'l Ins. Co.,
    881 F.2d 309 (6th Cir. 1989) ......................................................................... 34

Glanzman v. Metro Mgmt. Corp.,
    391 F.3d 506, 512 (3d Cir. 2004) .................................................................. 20

Grady v. Affiliated Central, Inc.,
    130 F.3d 553 (2d Cir. 1997) ........................................................................... 31

Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.
    865 F.2d 1461, 1466n.1 (5th Cir. 1989) ....................................................... 35

Hazen Paper Co. v. Biggins,
    507 U.S. 604 (1993) ................................................................................. 34, 35

Healy v. NY Life Ins. Co.,
    860 F.2d 1209 (3d Cir. 1988) cert. denied 490 U.S. 1098 (1989) ................ 29

iv

Henson v. Liggett Group, Inc.,
    61 F.3d 270 (4th Cir. 1995) ........................................................................ 22

Irizarry v. Fortuno,
    Civ. 96-3617 (HB), 1997 U.S. Dist. LEXIS 7005 (S.D.N.Y. May 19, 1997) ............. 34

Jackson v. E.J. Brach Corp.,
    176 F.3d 971 n.2 (7th Cir. 1999) ................................................................. 32

Jones v. Unisys Corp.,
    54 F.3d 614 n.6 (10th Cir. 1995) ................................................................. 28

Kappes v. DuPont,
    C.A. No. 97-443-SLR, 1999 U.S. Dist. LEXIS 3580 (D. Del. March 18, 1999) ........ 35

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005)......................................................................... 26

Keller v. Orix Credit Alliance, Inc.,
    130 F.3d 1101 (3d Cir. 1997)....................................................................... 26

Kelly v. Drexel Univ.,
    94 F.3d 102 (3d Cir. 1996)........................................................................... 21

Kidd v. MBNA Amer. Bank, N.A.,
    No: 02-4011, 2004 U.S. App. LEXIS 5694, at *5 (3d Cir. March 25, 2004).............. 21

Kowalski v. L&F Prods.,
    82 F.3d 1283 (3d Cir. 1996).......................................................................... 20

LeBlanc v. Great Amer. Ins. Co.
    6 F.3d 836 (1st Cir. 1993)............................................................................. 38

Lewis v. Aerospace Commun. Credit Union,
    934 F. Supp. 314 (E.D. Mo. 1996), aff'd, 114 F.3d 745 (8th Cir. 1998) ..................... 24

Marione v. Metropolitan Life Ins. Co.,
    No. 05-2359, 2006 U.S. App. LEXIS 19345 (3d Cir. July 31, 2006) ................... 24, 25

Maull v. Div. of State Police,
    141 F. Supp. 2d 463 (D. Del. 2001) ............................................................. 26

Mauro v. S. New Eng. Telecomms.,
    208 F.3d 384 (2d Cir. 2000)......................................................................... 23

McDonnell-Douglas Corp, v. Green,
    411 U.S. 792 (1973).............................................................................. 19, 20

DB02:5488189.1                                                064649.1001

Mereish v. Walker,
    359 F.3d 330 (4th Cir. 2004) ................................................................ 22

Mitchell v. USBI Co.,
    186 F.3d 1352 (11th Cir. 1999) ............................................................ 28

Monaco v. Am. Gen. Assurance Co.,
    359 F.32 296 (3d Cir. 2002)................................................................. 21

Moss v. Ameritech Servs., Inc.,
    No. 05-1270, 2006 U.S. App. LEXIS 713, at *3-4 (7th Cir. January 11, 2006) .......... 24

Paluck v. Gooding Rubber Co.,
    221 F.3d 1003 (7th Cir. 2000) ............................................................. 29

Proud v. Stone,
    945 F.2d 796 (4th Cir. 1991) .............................................................. 31

Randolph v. Ind. Reg'l Council of Carpenters & Millwrights,
    453 F.3d 413 (7th Cir. 2006) .............................................................. 35

Ransom v. CSC Consulting, Inc.,
    217 F.3d 467 (7th Cir. 2000) .............................................................. 34

Reeves v. Sanderson Plumbing Prods.,
    530 U.S. 133 (2000)....................................................................... 20

Regel v. K-Mart Corp.
    190 F.3d 876 (8th Cir. 1999) .............................................................. 38

Richmond v. Univ. of Minn.,
    957 F.2d 595 (8th Cir. 1992) .............................................................. 21

Rooks v. Girl Scouts,
    No. 95-316, 1996 U.S. App. LEXIS 20389 (7th Cir. Aug. 9, 1996) ......................... 32

Rowe v. Marley,
    233 F.3d 825 (4th Cir. 2000) .............................................................. 22

Schoch v. First Fidelity Bancorporation,
    912 F.2d 654 (3d Cir. 1990)............................................................... 19

Smith v. Phoenix Cardiovascular, Inc.,
    Case No. 4:04cv937, 2005 U.S. Dist. LEXIS 33545, at *22 (M.D. Pa. July 19, 2005) 24

Sondhi v. Lockheed Missiles & Space Co., Inc.
    62 F.3d 1271 (9th Cir. 1995) .............................................................. 38

DB02:5488189.1                                    064649.1001

Speed v. Adidas America, Inc.,
    No. 04-CV-1430-PK, 2006 WL 897978 (D. Or. Apr. 6, 2006) ............................ 30, 31

Sterry v. Safe Auto Ins. Co.
    2003 U.S. Dist. LEXIS 17363 (S.D. Ohio Aug. 25, 2003) ........................................... 36

Torre v. Casio, Inc.,
    42 F.3d 825 (3d Cir. 1994) ........................................................................................... 20

Waldron v. SL Indus., Inc.,
    56 F.3d 491 (3d Cir. 1995) ........................................................................................... 20

Watkins v. Sverdrup Technology, Inc.,
    153 F.3d 1308 (11th Cir. 1998) ............................................................................... 22, 23

Webb v. Communs., LLC,
    No. 05-1051, 2006 U.S. App. LEXIS 1993  (10th Cir. Jan. 26, 2006) ........................ 24

White v. Westinghouse Elec. Co.,
    862 F.2d 56 (3d Cir. 1988) ........................................................................................... 34

Williams v. Borough of West Chester,
    891 F.2d 458 (3d Cir. 1989) ......................................................................................... 19

Woodhouse v. Magnolia Hosp.,
    92 F.3d 248 (5th Cir. 1996) .......................................................................................... 24

Ziegler v. Del. County Daily Times,
    128 F. Supp. 2d 790 n.47 (E.D. Pa. 2001) ................................................................... 32

**Rules**
Fed. R. Civ. P. 56(c) ........................................................................................................ 19

## NATURE AND STAGE OF THE PROCEEDINGS

Juan Obed Perez was hired by Defendant, BE&K Engineering Company ("BE&K"), on February 9, 2000, as a Senior Engineer in the Process Department. He was selected for layoff during a reduction-in-force in 2003 and terminated on November 21, 2003. Perez initiated the present case by filing a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC" or the "Commission") on April 2, 2004, alleging age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"). (A38). On September 20, 2005, the EEOC filed a Complaint on behalf of Perez. (D.I. 1). The parties have completed discovery and BE&K has filed for Summary Judgment. This is its Opening Brief in support thereof.

## SUMMARY OF ARGUMENT

BE&K is entitled to summary judgment because no genuine issues of material fact exist with respect to any of EEOC's claims that must be resolved by a jury.

      1.      The EEOC has failed to establish a *prima facie* case of age discrimination through either direct or circumstantial evidence.

      2.      The EEOC cannot prove that Perez was qualified for another project.

      3.      The EEOC cannot prove that Perez was replaced by a significantly younger person to permit an inference of age discrimination.

      4.      Assuming, *arguendo*, that Plaintiff has made out a *prima facie* case of age discrimination by direct or circumstantial evidence, Plaintiff cannot prove that Defendant's legitimate, nondiscriminatory reason for Perez's termination is unworthy of credence, such that it is a mere pretext for age discrimination or that age discrimination was more likely than not a determinative cause of Perez's termination.

## STATEMENT OF FACTS

### A.   The Nature of BE&K's Business

In the present case, Juan Obed Perez alleges that his former employer, BE&K

Engineering Company, ("BE&K"), selected Perez for layoff because of his age in

violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (the

"ADEA").  BE&K contends that it selected Perez for legitimate, nondiscriminatory

reasons unrelated to his age.  BE&K maintains that Perez was laid off because the project

to which he was assigned ended and there were no other available projects that matched

Perez's skills.  In order to best understand the legitimate, nondiscriminatory reasons for

BE&K's decision, some industry background is appropriate.

### 1.   Contract Engineering Is a Project-Based Industry Susceptible to Layoffs

BE&K is a contract engineering company.  The contract engineering industry is

highly cyclical.  (A192-193;214).  The "roller coaster" nature of the business frequently

results in layoffs of engineers for lack of work.  (A120).

Contract engineering, which is a project- or service-based industry, requires

BE&K to provide its clients with a selection of engineers who have significant

experience and who can "hit the ground running" on a project without much training.

(A336; 181).  There are very few opportunities for entry-level engineers who require

close client supervision and mentoring.  (A417-420; 317-318; 321; 369-370).  As a result,

the BE&K engineer population consists largely of experienced engineers.  (A182; 416;

336).  Approximately 77% of the engineers working in the Process Department in

November 2003 were forty or older.  (A283).

BE&K contracts with other companies to provide engineering services on a per

project basis.  Each contract lasts only as long as the corresponding project.  To secure a

1

contract, BE&K submits a bid to the potential client. The bid may include a variety of information, such as the estimated length of time required to complete the project, the skills and experience of the engineers being suggested for the project, the availability of personnel at the time the project is set to begin, (A102), and, most importantly, the estimated cost. (A100-101). Essentially, BE&K acts as a temporary agency to companies in need of project-based engineering services.

Because the nature of the industry is project-based, BE&K's staffing needs are wholly dependent on the number and scope of its upcoming and current projects. (A221-222). Once a project ends, there is no guarantee that a new project will be won to replace it. (A298-299). New projects can be awarded only a few weeks before the scheduled start date, mandating a sudden need for new staff. (A221-222). Adding to the tumultuous nature of the industry, the client may change the scope of a project because of budget constraints or other changed circumstances. (A101). In the worst case, a project may cancelled with little or no notice, requiring layoffs of the employees who had been designated for the work. (A355-356; 61). Those same cancelled projects could later be restarted, in which case the terminated engineers would be recalled. (A355; 356; 362).

BE&K's staffing needs are directly dependent on the number and scope of its projects. (A420-421; 361). The extent and availability of projects is determined entirely by the client. (A362). Because a project can be won or lost right up to the actual start date, and the scope of the project can be subsequently reduced or modified, staffing decisions must be made quickly and often to accommodate the rapidly changing landscape of work. (A243).

### 2. Department Managers Closely Monitor the Project Landscape to Prevent the Need for Layoffs

At the conclusion of a project, the engineers that had been assigned to the project must be reassigned to a different program of work. If no suitable work is available, the

2

engineer may be subject to layoff. (A337-338). In order to prevent layoffs, the Department Manager must be constantly aware of when the current projects will end and when new projects are expected to begin. (A108).

Managers must keep a close eye on who is running out of work and what new projects are scheduled to begin. If he expects an engineer to have a gap between projects, the manager will look for filler or temporary work to keep the engineer employed until a new project begins. (A413). The goal, then, is to assign engineers to new projects almost immediately after their current project ends.

Engineers, however, are not "modular." (A363). The specific background, area of expertise, prior experience, and skill sets of the engineer must fit the needs of the project. (A363; 273-274). Often, the client may request that a specific engineer be assigned to the project because of a prior positive experience.

This balancing act, with its many variables, is very difficult and requires constant monitoring by Management. (A56). Perez testified that his Manager, Peter Howe, handled this balancing act "very well." (A108).

### 3.    The Use of Contract Engineers Reduces the Need for Layoffs

One way that BE&K reduces the likelihood of layoffs is through the use of contract engineers from AllStates Technical Services Inc., ("AllStates"). AllStates is a BE&K subsidiary that recruits, hires and helps staff positions for BE&K and other professional businesses, (A173-174; 236), acting as a placement company for contracted professional employees. (A60). AllStates engineers are used to fill spots on projects when the forecast does not warrant a direct hire of full-time employees, thereby providing added flexibility in scheduling and acting as a buffer against layoffs, as well as enabling BE&K to offer its clients engineers with a broader scope of marketable skills. (A346-47).

3

Between 2002 and 2005, the number of AllStates employees at BE&K doubled, accounting for nearly one-third of BE&K's personnel.  (A178; 236).  This influx in the use of contract engineers was caused, in large part, by globalization and an increased demand for the outsourcing of work.

Functionally, AllStates personnel do the same work as BE&K employees.  (A).  They work side-by-side with BE&K employees in the BE&K office and are supervised by BE&K leads and managers. (A236-237; 177).  AllStates engineers are retained on an hourly basis to fill a designated spot on a designated project with the expectation that, after the project is complete, their employment will end, (A344; 176; 272; 300; 301), though some AllStates employees remain employed on BE&K projects for years at a time.  (A271-272; 299).  AllStates employees can be converted to full-time employment with BE&K if the project forecast permits it. (A407; 408).

AllStates employees are offered fewer benefits than salaried BE&K employees.  (A60-61).  As hourly employees, they do not receive paid vacation, a health plan, or sick or personal days. (A135).  However, AllStates employees earn a higher hourly wage, which enables them to purchase benefits. (A345; 176).  AllStates employees are offered all of the benefits offered to BE&K employees except for the profit-sharing program.  (A174-175).

Unlike BE&K, AllStates employs part-time engineers. (A405).  BE&K eliminated part-time schedules in mid-2003.  (A275-276).  Employees who wanted to work less than forty hours per week were given the opportunity to switch to AllStates. (A275).  The flexibility of a part-time schedule is an important benefit to engineers such as Andrea Gerwig and Jack Baker, who converted from BE&K to AllStates so that they could continue to work less than forty hours per week.  (A174-175).

BE&K employees who are terminated for lack of work are eligible for rehire through AllStates.  (A345; 351).  At his exit interview, the laid off employee is told to submit his

4

résumé to AllStates for consideration should temporary work become available with BE&K or another engineering company. All of the employees laid off in the 2003-2004 reduction-in-force who applied to AllStates were recalled. (A47)

### 4. The Shift From Large Project Work to Small Project Work Increased the Risk of Layoffs

Beginning in 2000, BE&K experienced a serious economic downturn triggering concerns about potential layoffs. (A193; 180). Between 2000 and 2003, the number of BE&K employees dropped from 630 to 310. (A338-339). In the Process Department alone, the number of employees dropped from 38 to 18. (A190-191; 194-195).

The concern about potential layoffs was, in large part, caused by a shift in the nature of the available work. Prior to 2000, BE&K's business consisted mostly of large projects, (A189; 192; 358-359), which typically lasted at least nine months, (A190; 285; 403), involved several engineers from multiple disciplines, (A189; 402), and had budgets of upwards of $100 million. (A189; 186). By 2000, the work had shifted to small projects (A196), which required only one or two Process engineers, (A191), and had budgets of $5 million or less. (A191).

The shift to small project work greatly impacted the types of skills required for engineers. Engineers on small projects had to handle responsibilities that, in large projects, would be handled by engineers from other disciplines. (A284-286). Smaller projects also required more direct contact between the engineer and the client, requiring more interpersonal and leadership skills. (A187).

The decline in large projects also made staffing more difficult to manage. Engineers assigned to large projects could expect to have work for the duration of the project, which often lasted for several years. (A179). However, because small projects begin and end very quickly, sometimes lasting only a few weeks, it became more difficult to ensure that

engineers would have continuous project work.  As the large project work decreased, concerns about layoffs became more serious.  (A187).

### B.   Juan Obed Perez's Employment History With BE&K

#### 1.   Perez Worked for BE&K in 1993 and Was Laid Off for Lack of Work

Juan Obed Perez was first hired by BE&K in 1993. (A59).  At the time, Perez was forty-two years old. (A59).  Perez came to BE&K when his prior employer, Bechtel Corporation was taken over by Sun Oil Corporation and began a reduction-in-force. (A57-58).  Perez contacted John Trexler, a former co-worker at Bechtel who left shortly after the takeover to work for BE&K. (A374).  Trexler put Perez in touch with the Process Department Manager, Walter Fraiser, who hired Perez on February 22, 1993. (A59; 378).  Perez worked as a Lead Engineer in the Process Department for approximately seven months before being laid off for lack of work in September 1993. (A62-63).

During this time, Perez worked on two projects.  (A6363).  The first project was the DuPont Corpus Christi F60 Manufacturing Facilities project, (the "Corpus Christi Project").  (A379).  The project had already started when Perez became the "Environmental Area Lead."  (A63).  John Trexler was the Distillation Area Lead on the project.  (A64; 379-380).

After the Corpus Christi Project concluded, Perez was assigned to another project where he worked with one other Process engineer. (A64).  In August 1993, when the second project ended, Perez's co-engineer was laid off for lack of work.  (A67).  Perez assumed that he would be reassigned to a new project after his work on the second project had been completed, though he did not know of any positions that were available.  (A67).

After the second project ended, no new projects had been started and none were expected to begin that would be suitable for Perez.  There was, in short, no available work.  For a month after the second project ended, Perez billed to "general overhead" instead of billing to a reimbursable project or client.  (A65-66).  After one month of being non-

6

reimbursable, Perez was laid off for lack of work.  (A66; 65; 68).  At the time of the layoff, Perez was forty-two years old.  (A66).

Perez told Fraiser that he would pick up work on recall and asked that he be kept in mind if new projects became available.  (A69).  In fact, Fraiser did attempt to recall Perez, offering him a position on an upcoming project for DuPont.  (A70).  At the time, Perez had found other work and declined Fraiser's recall offer.  (A70).

### 2.    Perez Was Re-hired by Peter Howe in 2000

Perez re-applied for employment at BE&K in 2000.  (A68).  Perez again called Trexler to ask whether BE&K had any job opportunities available.  (A72).  Perez was interviewed by Peter Howe, the Process Department Manager.  (A72; 73).  Howe asked Trexler for his opinion about Perez's engineering skills.  (A381-382).  Trexler told Howe that DuPont had been dissatisfied with Perez's performance on the Corpus Christi project, but that there may have been some extenuating circumstances that were not within Perez's control.  (A383).  Trexler thought that Perez was a reasonably competent Process engineer but not well-suited to be the lead engineer on a project.  (A381-382; 383).

Peter Howe hired Perez in February 2000 (A84-85; 86) as a Senior Process Engineer in BE&K's Newark, Delaware office.  (A88).  At the time he was re-hired, Perez was 51 years old.  (A74-75).  Howe was Perez's supervisor until Perez was laid off in a reduction-in-force on November 21, 2003.  (A25)

Perez testified that Howe was an "honest," "straightforward person," who "had a very good relationship with everybody that worked for him" and that he was a "person that encouraged people [who worked for him]."  (A112-113).  Howe recommended Perez for a yearly raise for each of his three years of employment.  (A89-92; 111; 249).  Howe was also responsible for completing Perez's annual performance evaluations, which Perez felt were "generally fair" assessments of his work.  (A113).

7

### C.  Perez's Performance Was Average at Best

#### 1.  Perez Was Removed from the White Pigments Project for Poor Performance

In April 2002, after completing his previous project, Howe assigned Perez to the DuPont White Pigments project.  ("White Pigments").  (A76; 77; 287-288; 309-310).  Perez replaced Narayan Swamy, who had been removed from the project for poor performance.  (A287-288).  Daniel Dayton was the DuPont liaison for White Pigments and supervised the engineers on the project. (A225).  Dayton was not involved in the selection of the White Pigments engineers, (A316) but, by reviewing all completed work and holding weekly meetings, he was able to accurately assess how the engineers were performing.  (A320; 308).

White Pigments involved various types of production design engineering, but Perez's assignment was limited to relief device work.  (A325; 332; 334).  Production design involves various tasks required to construct a new facility.  (A315).  Relief device calculations, which are a type of production design, are done to prepare relief valves for various equipment.  (A323).  Production design, which requires a much broader range of skills than relief devices, is more complex work.  (A332).  Perez had done relief device calculations many times during his career. (A248).

A lead engineer from BE&K supervised the day-to-day work and reported to the Department Manager, Peter Hall.  (A312-313).  As the liaison, Dayton held weekly meetings where he reviewed the progress of the project and assigned responsibilities for outstanding work.  (A312-315; 208).  All engineers assigned to the project were present at the weekly meetings.  (A314).

Within months after being assigned to White Pigments, Perez began to have performance problems.  Initially, Dayton observed that Perez had arbitrarily decided to re-do certain calculations instead of using them to complete the documentation as Dayton had requested.  Perez's unnecessary calculation cost DuPont extra expense.  (A323; 311).

8

Dayton then began to notice errors in Perez's work. (A324; 311). Dayton, who reviewed the work of all of the White Pigments engineers, spoke to Perez about the deficiencies. (A326-327; 311). Dayton reviewed the errors and explained what Perez needed to do to correct the work. (A326-327). Shortly thereafter, Perez was assigned to call a supplier to get information critical to the project. (A324-325). Perez never made the call and Dayton had to step in to prevent the project schedule from being delayed. (A324-325; 330).

After this third deficiency, Dayton met with Pete Hall to discuss his concerns about Perez's performance. (A328-329; 331). Hall agreed that there had been too many problems with Perez's work and, to avoid having the project schedule suffer any further delays, Hall removed Perez from White Pigments in June 2002. (A310; 311).

Shortly after Perez was removed from the project, Dayton met with Peter Howe to discuss his concerns about the quality of Perez's work and the accuracy of his calculations. (A225-226). When asked about the meeting, Howe commented that Perez's inaccuracies and inefficiencies were too serious to ignore and that he would discuss them with Perez. (A227; 245). During his deposition, Dayton "had a hard time describing anything good" about Perez's performance because the White Pigments work was so limited and, yet, Perez did so poorly in it. (A334).

### 2. Perez Went Overbudget and Fell Behind Schedule on the Motiva CCR Vent Scrubber Project

After he was removed from White Pigments for poor performance in June 2002, Perez was assigned to a project for the Motiva refinery called the CCR Vent Scrubber project, until its completion in January 2003. (A386). Perez was the only process engineer on the project, but Trexler helped him get it started and then provided assistance as an informal supervisor for the first several weeks of the nine-month project. (A386-87).

Perez was selected for the role of lead engineer for several reasons. (A388). First much of the process engineering design had already been completed by another company,

9

leaving few open issues to be resolved. (A388).  This meant that there were very few technical issues associated with the work. (A388).  Second, the size of the project lent itself to being managed by a single engineer, which meant that Perez would not have to supervise others, (A388-389), a skill he admittedly lacked. (A39).  This was Perez's first significant project as a lead engineer, which is why Trexler was assigned to supervise the work until the project was established. (A389).

Trexler was less than impressed with Perez's performance.  Perez had delayed part of the assignment for too long, requiring Trexler's assistance to complete it in a timely manner. (A414).  Because of Perez's delay, the client had to wait for a long time for the work. (A392). Even with the delay, Perez still exceeded the budget by 72 hours in a 194-hour project. (A260-261; 7-8).

Trexler concluded that Perez required all design problems to be well-defined and that his skills for analyzing new and unusual problems, for developing alternative design options, and presenting them clearly for client review were strictly limited. (A390-392).  Based on his observations, Trexler determined that Perez required close supervision, that he worked slowly and that he had frequent errors in his work which often had to be reworked by others. (A390-392).  Finally, Trexler determined that Perez showed little skill in working on a schedule or managing a work-hour budget.  (A390-392).

From his observations, Trexler concluded that Perez was not an effective lead.  Perez admits that he is better with technical work than project management. (A133-134; 26). According to Trexler, an effective lead engineer is proactive in working with the client to get decisions made. (A390; 384-385).  Perez, however, had difficulty reviewing the issue with the client in such a way that the client was able to make a decision on how to proceed. (A390-391).

Howe concurred with Trexler's observations. When Perez was the only engineer on the project, the project went over budget. (A228-229; 250-251). Perez had also slipped schedules, which Howe had previously discussed with him. (A228-229; 250-251). In his annual performance review, Perez was rated as a C+ performer. (A6). Howe commented that Perez needed to improve his budget management and work efficiency, as demonstrated when he exceeded the budget at the CCR Scrubber project. (A7-8). Howe also stated that Perez needed to improve his time management in relationship to the client's expectations, his budget management, and his document management skills. (A7-8). Perez admits that Howe told him that his performance was average, (A39), and that he had received a negative performance review because project costs had gone over the estimated value and his performance was "not considered good." (A26; 114).

### 3. Perez Left Tosco, His Last Full-Time Project, and Returned to the BE&K Office With No Prospects of New Work

Perez's last full-time project was an on-site project at Tosco Refining Company, ("Tosco"). (A120). Perez helped BE&K obtain the Tosco project (A82-83; 252) by facilitating a meeting between Tosco's project submissions team and BE&K's marketing team. (A80-82).

Perez was "on loan" to Tosco, working with the Tosco team executing various small projects and calculations, for approximately six months. (A79; 78; 240). In August, Tosco told Perez that there was only a few weeks of work left to be done on the project. (A125). Tosco notified Howe that they would be finished with Perez shortly thereafter. (A124).

Perez asked to finish the work from the BE&K office instead of staying at the Tosco site through the project's completion. (A269-270). Howe spoke with the Tosco supervisor about the request. (A269-270). Initially, Perez's supervisor did not want him to leave the site until the close of the project but eventually he agreed. (A269-270).

Perez took a week of vacation (A10) and returned to the BE&K office to finish the Tosco calculations. (A125-126). August 24, 2003 was the last day Perez billed time to Tosco. (A255-256; 423-424; 258; 10-21).

Shortly after Perez left the Tosco site, Deke Lincoln, from BE&K's Sales & Marketing department received a call from Perez's on-site supervisor, Kevin Morris. (A423-424). Morris told Lincoln that Perez had made some errors his calculations. (A423-424). Morris said that Mike Berlyant, the assigning Tosco engineer, would need to meet with Perez to review and correct Perez's errors. (A423-424). Morris stated that he would need Perez to provide some backup documentation to get the issue resolved. (A423-424). Lincoln communicated Tosco's concerns to Howe, who discussed them with Perez. (A240; 241).

When Perez finished the Tosco work in late August 2003, no other long-term projects were available. (A262). Perez testified that he did not know what project he would be given after the Tosco work was finished, but that he relied on Howe to "work something out." (A123-124). Howe was concerned that, because of the declining workload, there was not enough work to keep Perez employed. (A270; 341). Howe knew that layoff was inevitable if he could not find a permanent project for Perez. (A242).

### 4.   BE&K Assigned Perez to Short-Term Filler Projects in an Attempt to Avoid Laying Him Off

After finishing Tosco, Perez charged to general overhead for at least some part of every week for the next 10 weeks. (A10-21). For the two weeks following Tosco, Perez did not have any billable time. (A10-21). For the next two weeks, ending September 14 and 21, Perez billed roughly half his time assisting on a small DuPont project and the other half to general overhead. (A10-21).

In late September, Motiva asked that databooks be assembled for the CCR Vent Scrubber. (A393). The purpose of the project was to collect all relevant documentation for the CCR Vent Scrubber project. (A393). Howe assigned Perez to the project because of his

12

involvement with the original project.  (A294-395).  Perez billed to the databooks project from September 22 through approximately October 1, 2003, when he again became non-reimbursable for a week (A10-21; 24).  Trexler, who was the Lead Process Engineer, told Howe that he could provide work for Perez on another Motiva project, through the end of October. (A24).  Perez billed to the Motiva Hydrocracker project until November 14, when he again became non-reimbursable. (A10-21).  Perez was laid off a week later on November 21, 2003. (A25)

### D.  The 2003 Reduction-in-Force

#### 1.  Low Profit Margins Necessitated Maximum Reimbursability

BE&K's profit margin also affected staffing decisions through the utilization rate. The utilization rate is the percentage of the work that must be billable in order for BE&K to remain profitable.  (A259).  As profit margins decrease, the utilization rate must increase to ensure profitability.  The utilization rate is set by the company with an eye to the current profit margins. (A259).

Utilization rates are directly affected by the amount of time being charged to "general overhead."  Because the industry is project-based, engineers bill their time to a specific project. (A87).  Any time an engineer is working on a billable project, they are considered "reimbursable" or "billable" because the client will "reimburse" BE&K for the amount of time the engineer spent on the project. (A86).  Conversely, if an engineer is not assigned to a project, they are considered non-reimbursable or non-billable. (A103; 104; 364-365).  Non-reimbursable time is charged to "general overhead," and paid for out of the department's budget instead of being reimbursed by the client. (A364-365; 398).  The goal is to minimize the amount of time charged to general overhead and, in turn, maximize the utilization rate. (A277).

The utilization rate, then, is determined by the number of billable hours, divided by the total number of hours worked, thereby showing the effectiveness. (A259). When engineers are non-reimbursable, the company is less effective and the utilization rate drops. Conversely, the more engineers who are working on reimbursable projects, chargeable to a client, the more effective the company and the higher the utilization rate. The amount of time that is not utilized is charged to general overhead and paid absorbed by BE&K (A217-218; 398).

Employees charging to general overhead are vulnerable to layoffs. (A365-366). Although there is no set time for how long an engineer will be permitted to charge to general overhead before being laid off, (A262), times of economic decline and lower profit margins demand a lower tolerance for general overhead charges. (A398-399). If an employee is on general overhead, but there is an upcoming project suitable for their skills, BE&K may absorb the non-reimbursable charges and avoid laying off the employee. (A262). However, if there is not a new project starting within a reasonable time that would be a suitable fit for the employee's skills, the employee is laid off. (A277-278). By late 1999 and early 2000, the engineering industry has gotten more competitive and, as a result, the profit margins decreased. (A220-221). This resulted in less tolerance for employee charges to general overhead. (A398-399).

The only time that an employee is permitted to charge to general overhead for any extended period is when the Process Department Manager is "absolutely assured that work was forthcoming and that the employee was critical to perform the new work." (A400). In 2006, for example, there have been very few charges to general overheard by Process Department employees, with only an hour or two charged at any time. No one has charged to general overhead for more than a day or two. (A400-401).

14

A rare exception to this process exists in the case of outstanding employees with highly specialized skills.  It is too great a business risk to lay off these employees because of the difficulty in finding comparable replacements.  (A279).  Even with highly specialized engineers, BE&K can afford only a small window of non-reimbursable time before the economic needs of the business dictate that non-reimbursable engineers be laid off.  (A366).

As BE&K began losing large project work, and less small projects were being obtained, layoffs were necessary.  (A193).  The concern about lack of work was serious.  (A187).  At weekly meetings, a utilization report was circulated, showing the department managers what percentage of all hours worked were reimbursable.  (A216; 217).  Though the required utilization rate would fluctuate with the company-wide profit margins, the required utilization rate for the Process Department between 2000 and 2003 was 96-98%.  (A217-218; 220-221).

## 2.  The Utilization Rate Dropped to an Unsustainable Level

When the utilization rate dropped below 96%, Peter Howe, the Process Department Manager, became very concerned about possible layoffs.  (A215; 218).  In 2000, just after being promoted to Department Manager, Howe spoke with Process Department engineers about their concern regarding the lack of work.  (A197).  In 2002, the profit margins dropped substantially and BE&K became more focused on achieving the required utilization rate.  (A221).  The Chief Engineer, Robert Shoemaker, held weekly meetings with the Department Managers where he would review the utilization rates for each department.  (A215-216).  When the utilization rate was too low for an extended period with no real prospects for new projects, layoffs were required.  (A213).

Determining when layoffs are required, however, is not as simple as whether the utilization rate fell below 96%.  The Department Manager must consider what new projects may be coming in and whether the currently non-reimbursable engineers can be placed on the

15

new work.  (A218-219).  The utilization rate rises and falls based on the current project schedule and may be low for a period of weeks. (A219-220).  So long as new work is anticipated, layoffs can be avoided.

By the first week of November 2003, Peter Howe knew that that a layoff was inevitable.  For several weeks, the utilization rate had been consistently below 96%, (A219-221), with no indication that it would improve.  (A230-231).

### 3.    The Hiring Freeze in the Process Department

In the fall of 2002, the White Pigments project began to expand.  By this point, the project had become exclusively relief device calculations and the equipment documentation element had been removed.  (A333).  Dayton told Howe that the new Relief Devices project, may require additional staff.  (A243-244).  After discussions with Dayton, Howe decided to hire a new engineer in the Spring of 2003.  (A202-203; 192).

Howe approached Dayton and inquired whether Dayton felt that the Relief Devices work could be performed by an entry-level candidate. (A206).  Dayton felt that an engineer with little or no experience would be able to perform the calculations required for the project, especially if he or she received some mentoring from a more experienced engineer.  (A271; 206).

Expecting to add one to two new hires to the Relief Devices project, Howe began to interview candidates in the spring of 2003.  (A201; 202; 204).  Christopher Guttridge was interviewed (A201), and hired in April  (A26) but, because of a planned vacation, could not start to work until July 2003. (A265-266).  Guttridge interviewed for, (A152; 207), was assigned to, (A202), and worked on the Relief Devices  project since he started in July. (A153-154).

Guttridge's performance on the Relief Devices project was exemplary by all accounts. (A246-247; 254; 319-320).  At first, he was only able to perform simple

16

calculations.  (A288; 155-156).  As an entry-level engineer, Guttridge was not able to perform some of more complex tasks that Senior Engineers were assigned.  (A95-96; 141-142; 168; 372).  However, with guidance from more experienced members of the team, (A375-376; 369; 188; 131; 94-95),  Guttridge quickly learned the necessary skills, becoming lead engineer on the project in August 2005.  (A157-158).

Guttridge, who was hired as an entry-level Engineer I in the Process Department in April 2003, was the first new hire in eight months.  Prior to Guttridge, the last hire was Jennifer Lin was hired in October 2002 as Senior Engineer.  (A198-199).  Guttridge was the only new hire in 2003.  (A211).  After Guttridge, the Process Department did not hire anyone for nearly a year.  Even then, the first new hire in June 2004 was a college intern, who was hired only for the summer.  (A263-264).  BE&K's first full-time new hire after Guttridge in April 2003 was not until April 11, 2005, two year's later, when Charlene Emlet was hired as an Engineer.  (A406).

17

## ARGUMENT

### I.    BE&K DID NOT DISCRIMINATE AGAINST JUAN OBED PEREZ BASED ON HIS AGE AND, THEREFORE, SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANT

The EEOC cannot establish the essential elements of its discrimination claims under the McDonnell-Douglas Corporation v. Green standard.  411 U.S. 792 (1973) (detailing the burden-shifting framework to be used in Title VII discrimination claims); see also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir.)  ("The ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under the ADEA").  Because the EEOC cannot satisfy the required elements, the claim is unmeritorious as a matter of law and should be dismissed.

#### A.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In performing this analysis, the evidence is to be construed in the light most favorable to the non-moving party.  However, if the evidence presented by the EEOC is nothing more than a reassertion of unsupported allegations, summary judgment is appropriate.  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  To that end, "[m]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials."  Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

#### B.    ADEA Analytical Framework

In a disparate treatment case brought under the ADEA, the plaintiff is required to prove that his age "'actually motivated' and 'had a determinative influence' on the

18

employer's decision" to terminate the plaintiff.  Glanzman v. Metro Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 141 (2000)).  Plaintiff may demonstrate age discrimination by a showing of either direct or indirect evidence.  Glanzman, 2004 U.S. App. LEXIS at *12.  Because the EEOC has not alleged any direct evidence[1] in support of Perez's claim, the analysis must proceed under the McDonnell-Douglas standard.  Id.

Thus, the EEOC must prove its *prima facie* case by a preponderance of the evidence before the burden of production shifts to BE&K to "articulate a legitimate, non-discriminatory reason"  for terminating Perez.  McDonnell-Douglas, 411 U.S. 792.  BE&K's burden at this stage is extremely light; it need only state a non-discriminatory explanation for its action, and come forward with some evidence.  Kowalski v. L&F Prods., 82 F.3d 1283, 1289 (3d Cir. 1996).

Thereafter, Plaintiff must prove that "the employer's proffered reason or reasons were pretextual – that is, they are false and that the real reason for the employment decision was discriminatory."  Waldron v. SL Indus., Inc., 56 F.3d 491 (3d Cir. 1995). The EEOC always bears the ultimate burden of persuasion that discriminatory reasons were motivated in the employment decision.  See Brodsky v. Hercules, Inc., 966 F. Supp. 1337 (D. Del. 1977).  The EEOC must provide additional evidence to demonstrate that discrimination was the real reason for Perez's termination or that will otherwise "cast doubt on the employer's stated reasons by identifying such weaknesses, inconsistencies, incoherencies, or contradictions" in the proffered reasons that a reasonable fact finder "could rationally find them unworthy of credence.  Brewer, 72 F.3d at 331.

---

[1] The Third Circuit has explained that direct evidence is that, which "if believed, would prove the existence of the fact (in issue) *without inference or presumption*."  Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994) (emphasis supplied).

## II.    THE EEOC CANNOT ESTABLISH A *PRIMA FACIE* CASE OF AGE DISCRIMINATION

The EEOC must make out a *prima facie* case by proving by a preponderance of the evidence that Perez: (1) was 40 years old or older; (2) was qualified to hold the position; (3) suffered an adverse employment decision; and (4) was replaced by a significantly younger individual to permit an inference of discrimination.  See Brewer, 72 F.3d at 330.   To satisfy the fourth element in a reduction-in-force case such as this, the EEOC must show that BE&K retained a sufficiently younger similarly situated employee.  Anderson v. CONRAIL, 297 F.3d 242-249-50 (3d Cir. 2002) (cited in Monaco v. Am. Gen. Assurance Co., 359 F.32 296, 304-05 (3d Cir. 2002)).  Plaintiff's case will fail where he cannot point to such a comparator. Kidd v. MBNA Amer. Bank, N.A., No: 02-4011, 2004 U.S. App. LEXIS 5694, at *5 (3d Cir. March 25, 2004).

The court will not substitute its judgment for that of the employer when business decisions are made.  See Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996).  The employer is entitled to make a business decision without fear of second guessing.  Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994). The question is not whether the employer made the best, or even a sound, business decision: it is whether the real reason is [discrimination]."  Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996).

### A.   Perez Was Not Qualified for Another Project

The EEOC cannot prove that Perez was qualified for the position as is required for a prima facie case.  It is undisputed that Perez had received below-average performance reviews, had been removed from a project due to poor performance, and had fallen behind schedule and overbudget.  Perez's "average" performance demonstrated that he was not qualified as a Senior Engineer.  Richmond v. Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992) (record of poor performance demonstrated lack of qualification).

BE&K's legitimate business decision cannot form the basis of a claim of unlawful discrimination, regardless of whether Perez agrees with its conclusion.  See Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); see also Rowe v. Marley, 233 F.3d 825 (4th Cir. 2000) (court would not substitute its judgment for employer's rationale on choosing certain employees for termination during RIF).  When faced with an average employee who was nonreimbursable with no expected projects on the horizon, BE&K executed its legitimate business discretion by selecting Perez for layoff.  The ADEA was not intended to obstruct the ability of businesses to adjust the economic and strategic challenges they face. See Mereish v. Walker, 359 F.3d 330 (4th Cir. 2004).

Even if Perez was considered qualified in the general sense, he has failed to point to a project to which his qualifications could have been applied.  Qualifications are meaningless in the abstract.  It bears no legal significance for the EEOC to assert that Perez may have been qualified if a project had come along.  Instead, the EEOC must demonstrate that there was a specific project or other work for which Perez was qualified in order to satisfy its *prima facie* burden.

In Watkins v. Sverdrup Technology, Inc., the employer articulated three reasons for including the plaintiffs in its RIF: (1) excessive amounts of overhead time; (2) no long-term projected work; and (3) poor performance.  153 F.3d 1308, 1317 (11th Cir. 1998).  The Court of Appeals upheld the district court's award of summary judgment to the employer, finding that the plaintiffs had failed to "sufficiently impeach the contention

that [the employer] possessed no long-term work for them at the time of the RIF" and, therefore, had failed to establish a *prima facie* case of discrimination.  Id.

The mere fact that Perez may have been qualified to work on some of the other projects, which were already staffed and operating, is irrelevant.  As the Eleventh Circuit stated in Watkins, the fact that "the plaintiffs were not able to point to any other type of long-term projected work that they could perform just as well or better than [other employees]" further demonstrated that they were not qualified for the positions.  Id. Similarly, the EEOC cannot dispute that there was no project available for Perez. Without such evidence, Perez cannot be deemed "qualified," as required for a *prima facie* case.

## III.  PEREZ WAS SELECTED FOR LAYOFF FOR LEGITIMATE, NON-DISCRIMINATORY REASONS, WHICH THE EEOC CANNOT DEMONSTRATE WERE MERELY PRETEXT FOR DISCRIMINATION

Even assuming, *arguendo*, that the EEOC is able to meet its burden in the *prima facie* phase of the analysis, its claim must still be dismissed because BE&K is able to demonstrate that it selected Perez for layoff for reasons that were legitimate and non-discriminatory and the EEOC is unable to rebut those reasons.  See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (describing the burden-shifting framework).  Summary judgment for the defendant is appropriate where the plaintiff cannot raise genuine questions about the legitimacy of the employer's articulated reason.  See Mauro v. S. New Eng. Telecomms., 208 F.3d 384, 388 (2d Cir. 2000).

### A.  BE&K Selected Perez for Layoff For Legitimate Business Reasons

Perez was selected for layoff during a reduction-in-force.  (A172; 215).  Howe determined that layoffs would be necessary because the department's utilization rate had dropped to an unacceptable number and no new projects were anticipated.  (A221).  Howe

selected Perez for layoff because he was the only Process engineer without a full-time project and there were no new projects to which he could be assigned. (A267-268; 230-231; 337).

Perez became non-reimbursable and charged to general overhead. (A337, 338). Engineers could not charge to general overhead without being susceptible to termination. With no new projects coming in, there was no reasonable expectation that Perez would become reimbursable within any reasonable period of time. (A267). Perez testified that an abundance of overhead charges would cause the department to go over budget and, in turn, facilitate the need for layoffs. (A115-116). In short, Perez was terminated for lack of reimbursable work. (A337; 224, 232).

The Third Circuit has held that termination for lack of work satisfies an employer's burden to articulate a legitimate non-discriminatory reason for a plaintiff's termination. Marione v. Metropolitan Life Ins. Co., No. 05-2359, 2006 U.S. App. LEXIS 19345, at *5 (3d Cir. July 31, 2006). Termination for lack of work during a RIF is, as a matter of law, a legitimate non-discriminatory reason for Perez's layoff. See, e.g., Webb v. Communs., LLC, No. 05-1051, 2006 U.S. App. LEXIS 1993, at *5 (10th Cir. Jan. 26, 2006); Moss v. Ameritech Servs., Inc., No. 05-1270, 2006 U.S. App. LEXIS 713, at *3-4 (7th Cir. January 11, 2006); Smith v. Phoenix Cardiovascular, Inc., Case No. 4:04cv937, 2005 U.S. Dist. LEXIS 33545, at *22 (M.D. Pa. July 19, 2005).

Indeed, in RIF cases, the employer is given extensive discretion in selecting which employees to terminate as an exercise of its business judgment. See EEOC v. Tex. Instruments, Inc., 100 F.3d 1173, 1187 (5th Cir. 1996); Lewis v. Aerospace Commun. Credit Union, 934 F. Supp. 314 (E.D. Mo. 1996), aff'd, 114 F.3d 745 (8th Cir. 1998). The court's inquiry is limited to whether the employer's selection of a particular employee for termination was based on inappropriate considerations. Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998); Woodhouse v. Magnolia Hosp., 92 F.3d 248, 253 (5th Cir. 1996). In making its

selection, the employer may use skill, performance, and future job potential as the bases for layoff.  See Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 573 (7th Cir. 1998).  Further, an employer's RIF selection based on economic considerations is deemed proper.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 351 (6th Cir. 1998) (elimination of the plaintiff's position in reorganization because it was "cost-effective" is legitimate business reason).

BE&K has met its burden of persuasion by articulating the RIF as its legitimate, non-discriminatory reason for terminating Perez.  Marione, 2006 U.S. App. LEXIS at *15; see also Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1167 (10th Cir. 1998) (finding that the burden on the defendant is not onerous and is generally met by the employer's assertion that operational requirements led to the decision to reduce the number of employees or to the elimination or consolidation of certain functions or positions).  Therefore, to defeat summary judgment, EEOC must produce evidence from which a fact finder could reasonably disbelieve BE&K's stated reasons for terminating Perez or find that BE&K was more likely than not motivated by discrimination.  Marione, 2006 U.S. App. LEXIS 19345 at *15.  To this end, the EEOC's proffered evidence must reasonably infer that "*each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."  Id. (emphasis in original) (internal citations omitted).   The EEOC is unable to produce any evidence that BE&K selected Perez for layoff for a discriminatory reason or that the lack of work did not actually motivate the layoff.  Summary judgment should, therefore, be granted to BE&K.

### B.  The EEOC Cannot Produce Any Evidence that BE&K's Proffered Reasons Did Not Actually Motivate Perez's Layoff

The record in the present case is bereft of evidence from which a reasonable juror could infer that BE&K discriminated against Perez on the basis of his age.  The EEOC cannot meet its burden of establishing pretext simply by disagreeing with BE&K's action.

24

Fuentes, 32 F.3d at 765; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d

Cir. 1992).  The employer is entitled to make a business decision without fear of second

guessing.  Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994).  The

question is not whether BE&K made the best, or even a sound, business decision; it is

whether its real reason for selecting Perez for layoff was discrimination based on Perez's age.

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1009 (3d Cir. 1997).

Because BE&K is able to demonstrate legitimate, non-discriminatory reasons for

Perez's layoff, the burden shifts back to the EEOC to show pretext.  Maull v. Div. of State

Police, 141 F. Supp. 2d 463, 470 (D. Del. 2001).  The EEOC is unable to point to any

evidence that Howe was in fact subjectively motivated by discriminatory animus toward

Perez based on his age, nor any evidence that would support a reasonable inference of

pretext.  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (holding that plaintiff's

burden is to proffer evidence "contradicting the core facts put forward by the employer as the

legitimate reason for its decision").  Therefore, under the McDonnell-Douglas test, BE&K is

entitled to summary judgment.

### 1.    The EEOC Has Failed to Produce Any Evidence to Dispute that Perez Was Laid Off for Lack of Work When His Project Ended

It is undisputed that, when an engineer's project ends, there is a limited window

of time before he must be assigned to another suitable project or else be subject to

layoffs.  In 1993, Perez's co-worker was laid off when he completed his portion of the

project.  (A67).  Perez faced the same fate when, after he finished the project, there were

no other assignments available.  (A74).  An engineer's employment is directly tied to the

duration of his project and the projects that become available when his current work is

completed.  (A303-304).  In short, "no project, no work."

After leaving Tosco, there were no available projects for Perez. (A230-231). Perez admits that he did not know of another project that matched his skills, but felt that Howe would find something for him to do. (A67). Perez also testified that Howe had a good handle on the delicate balancing act of assigning work.

> By Ms. DiBianca:
> Q: And then when you're getting near the end of the project, the work, the scope is being completed, what happens then? Do you let the engineers go to Pete Howe or whoever the manager is and let them know?
>
> By Mr. Perez:
> A. Pete Howe is pretty much in, you know, in contact on what's going on. Managers have daily meetings or weekly meetings, so they know what's going on between each other.
>
> Q. Okay. So that's something that's just left to management to balance?
> A. Yes.
>
> Q. Okay. Did Pete Howe, did he handle it pretty well as far as balancing the work? It seems pretty complicated.
> A. Very well, very well.

(A108). Indeed, Howe did find work for Perez. Howe contacted the various leads, asking if they could provide temporary work for Perez until a suitable project became available. (A272; 396). Trexler responded that he could provide part-time work for Perez on the Motiva CCR Vent Scrubber Project. After that was completed, Howe assigned Perez to the short-term Databooks Project, which kept Perez partially reimbursable until November. At the completion of these filler assignments, there was no other work for Perez. (A397) Perez was laid off for lack of work. (A230)

The EEOC cannot dispute this evidence. The record shows (A10-21) and Perez agrees (127-128; 105-107) that he billed to general overhead for several weeks after finishing Tosco. Perez was not aware of any available projects (A118), and, indeed, there were none suitable for his skills. (A272).

### a.    Substituting Perez for Another Engineer Was Not Possible

The EEOC cannot assert that another engineer should have been pulled from his current project as a reasonable method of finding work for Perez. Perez himself admits that substituting engineers on a project is an unacceptable business practice. (A109). When asked whether he should have been substituted for another engineer, Perez responded, "No, that's not a practice from any company." (A143).

Perez explained that there will necessarily be a learning curve when an engineer is first assigned to a project and, by replacing him midway through the project, the client would incur extra costs while the new engineer developed the necessary skills. (A109). The client would incur additional costs while the new engineer gets up to speed and, potentially, the deadline could be extended. (A110).

Nor does an employer have an obligation to allow senior employees to displace less senior employees. Mitchell v. USBI Co., 186 F.3d 1352 (11th Cir. 1999); Jones v. Unisys Corp., 54 F.3d 614, 630-31 n.6 (10th Cir. 1995). The ADEA is not a "bumping statute." Accordingly, "a plaintiff cannot prevail merely by pointing to other positions for which [he] was qualified and claim that the employer should have allowed [him] to 'bump' the occupant out of that position." Anderson, 297 F.3d at 250 (internal citations omitted).

### b.    Allowing Continued Non-Reimbursable Charges was Not Possible

In rare circumstances, BE&K will permit an engineer to charge to general overhead for more than a week or two. Perez, however, did not qualify for this exception. If an employee has skills that are so highly specialized that he is hard to replace, or where an employee is so outstanding a performer that it would be too great a

27

business risk to lay him off, he may be permitted to bill to general overhead while working on filler projects for a slightly longer period of time. (A278).

John Trexler, for example, was given filler work until a new project started because he was highly valued as an outstanding performer and was considered too valuable to lose in a layoff. (A278). Trexler was such an outstanding employee, in fact, that he replaced Howe as the Process Department Manager when Howe left in 2005. (A377; 404).

Perez cannot be compared to Trexler as an outstanding performer. Perez, who was an average performer at best, had a track record of marginal performance on his last several projects. The ADEA permits an employer to discharge an employee deemed to be poor or "marginal" when the company faces financial difficulties. See, e.g., Healy v. NY Life Ins. Co., 860 F.2d 1209 (3d Cir. 1988) cert. denied 490 U.S. 1098 (1989); Paluck v. Gooding Rubber Co., 221 F.3d 1003 (7th Cir. 2000). Perez, who was rated a "C+" employee at his last performance review, was certainly not so outstanding a performer that BE&K could afford to keep him through a non-reimbursable period.

### 2. The EEOC Has Failed to Produce Any Evidence that the Relevant Decisionmakers Harbored Any Discriminatory Animus Towards Perez

The EEOC has failed to proffer any evidence that any of the decisionmakers involved in Perez's layoff harbored any discriminatory animus toward Perez because of his age. Perez cannot "'cherry pick' the best evidence in an effort to distort the record." Burton v. MBNA Amer. Bank, N.A., C.A. No. 03-915-GMS, 2005 U.S. Dist. LEXIS 12154, at *24 (D. Del. June 22, 2005). The undisputed evidence demonstrates that Howe was the decisionmaker who selected Perez for layoff. Perez testified that Howe made the decision to lay him off (A111-112) and that Howe's decision would have required Shoemaker's approval. (A116).

28

The evidence demonstrates that Perez and Howe enjoyed an amiable relationship throughout Perez's employment, thereby rebutting any inference of pretext.  Perez testified that Howe was an "honest" and "straightforward person."  Perez testified that Howe "had a very good relationship with everybody that worked for him" and that he was a "person that encouraged people [who worked for him]."  (A112-113).  Every year of his employment, Perez received yearly raises at Howe's recommendation.  (A111).  Howe also completed Perez's yearly performance evaluations, which Perez believes were "generally fair."  (A113).

> By Ms. DiBianca:
> Q:  What's your opinion of him, his character?
>
> By Mr. Perez:
> A. Oh, he's fine. He's a very straightforward person, very good relationship with everybody that works for him, and a person that encouraged people to, when the person has done well mostly.
>
> Q. Is he honest?
> A. Yes, I would say so.
>
> Q. Okay. And did you work well with Mr. Howell?
> A. Yes.
>
> Q. And do you feel like he treated you fairly?
> A. I would say so.
>
> Q. Okay. Did he do your performance evaluations or reviews?
> A. Yes.
>
> Q. Did you feel that they were fair?
> A. In general, yes.
> [(A112-113)].

In Speed v. Adidas America, Inc., the plaintiff gave opinion testimony about his supervisor, who made the decision to terminate him.  No. 04-CV-1430-PK, 2006 WL 897978, at *7 (D. Or. Apr. 6, 2006).  The plaintiff testified that he did not consider his supervisor to be racist and "expressed respect for his attitude and work ethic."  Id.  The court gave "significant" weight to this testimony, holding that it was "illogical to assume" that the supervisor "would suddenly turn against [plaintiff] and fire him based on race."  Id.  The

district court granted summary judgment to the employer, finding that the plaintiff had not carried his burden to show pretext in the decision to terminate his employment.  Id.

"In cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991).  Here, Howe filled both roles—he was the hirer and the firer.  The fact that Howe made the decision to hire Perez and then, three years later, made the decision to layoff Perez , therefore, forcefully rebuts any inference of pretext.  Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996) (giving "significant weight" to the same actor inference—where the same actor is responsible for hiring and firing a discrimination plaintiff)  Instead, this evidence "strongly suggest[s] that invidious discrimination was unlikely." Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997); see also EEOC v. Our Lady of the Resurrection Med. Ctr., 77 F.3d 145, 152 (7th Cir. 1996).

In Lowe v. J.B. Hunt Transportation, Inc., the Eight Circuit Court of Appeals, affirming a directed verdict for the employer defendant explained, "It is simply incredible . . . that the company official[] who hired [the plaintiff] at age fifty-one had suddenly developed an adversion to older people less than two years later." 963 F.2d 173, 175 (8th Cir. 1992). Under a strikingly similar set of facts, Howe hired Perez at age fifty-one, (A74-75; 86), in February 2000.  It is illogical to conclude that Howe harbored an age-based animus towards Perez three years later.  See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire.") (internal quotations omitted).

30

Howe was forty years old at the time he selected Perez for layoff. That Howe was also in the protected age group seriously undermines any inference of pretext. The Third Circuit recognizes that a plaintiff's claim of age discrimination is weakened significantly by the fact that the decisionmaker was in the protected class at the time of the decision. Elwell v. PP&L, Inc., No. 01-4512, 2002 U.S. App. LEXIS 20702, at *15 (3d Cir. Sept. 30, 2002).

Even the secondary decisionmakers, Shoemaker and Abrams, were in Perez's age group. Shoemaker was 63 years old at the time he approved Howe's decision to layoff Perez. (A366-367). Sharon Abrams, who reviewed Howe's decision, was 52. (A1771). There can be no compelling inference of age discrimination because all three of the decisionmakers were in the protected age group. Rooks v. Girl Scouts, No. 95-316, 1996 U.S. App. LEXIS 20389, at *14 (7th Cir. Aug. 9, 1996); see also Brooks v. Leake & Watts Org., Inc., 02-Civ-9865, 2005 U.S. Dist. LEXIS 16229, at *13-14 (S.D.N.Y. Aug. 2, 2005) (explaining that the fact that the decisionmaker was in the plaintiff's age group was a significant factor in finding no inference of discrimination).

Equally as compelling is the fact that two of the three decisionmakers were older than Perez at the time of the layoff. This evidence, while not dispositive, is significant in evaluating a claim of age discrimination. See Jackson v. E.J. Brach Corp., 176 F.3d 971, 985 n.2 (7th Cir. 1999) (noting that the plaintiff was "fighting an uphill battle because the decisionmakers who terminated [him] were older than he was at the time of termination") (internal citations omitted); Ziegler v. Del. County Daily Times, 128 F. Supp. 2d 790, 812 n.47 (E.D. Pa. 2001). Invidious discrimination is "unlikely" where, as in the present case, the decisionmakers were older than the terminated employee. Feldman v. Looms, No. 98-9680, 1999 U.S. App. LEXIS 25092, at *8 (2d Cir. Oct. 4, 1999).

### 3.    The EEOC Has Failed to Produce Any Evidence that Ageist Comments Were Made by Any BE&K Employee

In its Complaint, the EEOC alleges that Howe told Perez that BE&K "needed to start hiring younger people to rejuvenate the workforce."  (D.I. 1 at ¶7(g)).  Presumably, this language was taken from the EEOC Questionnaire Perez completed when he filed his Charge of Discrimination. (A26).  In a typed statement attached to the Questionnaire, Perez wrote:

> In a conversation with my manager, [Howe], I addressed the issue of BE&K hiring a recent college graduate when there was hardly any work for me. **I was told that BE&K needs to start hiring younger people to rejuvenate the working force.** (I am paraphrasing what I was told).  It was emphasized that I was laid off because the lack of work.

(A26) (emphasis in original).  When asked about this statement during his deposition, Perez again explained that he was "paraphrasing" Howe's response, that he "couldn't recall exactly the words" Howe used.  (A137, 140).   Perez explained that he believed that BE&K was going to hire "young people" for "entry level positions," with the goal of "molding them to the BE&K way of doing things and [grooming them to be] future managers."  (A139).  This evidence is plainly insufficient to be considered evidence of an ageist comment sufficient to support an inference of pretext.

First, there is no evidence that "rejuvenate" or other similar words were ever used in the context of hiring.  Perez himself does not even allege that the word "rejuvenate" was used in the context of BE&K's workforce.  Perez has consistently stated that he was merely paraphrasing the conversation. (A26; 137-140).  Nor was there testimony by any other witness to indicate that the word "rejuvenate" was used in regards to BE&K's hiring strategies.  Shoemaker and Trexler both testified that they never heard the word used in this context.  (A368; 409).

Second, even if the word "rejuvenate" or other similar word was used, it does not establish any inference of age bias.  See Irizarry v. Fortuno, Civ. 96-3617 (HB), 1997 U.S.

Dist. LEXIS 7005, at *7-8 (S.D.N.Y. May 19, 1997) (finding that the fact that the supervisor-defendant regarded his mission as the "rejuvenation" and "reinvigoration" of the agency was insufficient in and of itself to infer a discriminatory animus) (cited by Alegre v. Schering Plough Del Caribe, Inc., 975 F. Supp. 153, 158 (D.P.R. 1997)). Howe stated that he did not recall ever using the word "rejuvenate," but that he did talk to Perez about how, in order to remain competitive, BE&K had to hire employees who billed at lower rates. (A209-210; 2334-335).

Third, age-related statements referring to hiring are distinguishable from those referring to termination for the purposes of imputing evidence of age-based animus. White v. Westinghouse Elec. Co., 862 F.2d 56, 61 (3d Cir. 1988) abrogated on other grounds by Hazen Paper Co. v. Biggins, 507 U.S. 604, 608 (1993); see also Gangne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir. 1989) (statement that supervisor needed "younger blood" was not sufficient to create a material issue of fact regarding age discrimination). If it is to be believed that Howe said that BE&K needed to hire engineers who could be billed at a lower rate, thereby reducing the average billing rate overall, such statements relate to hiring decisions only. Even in the light most favorable to the EEOC, evidence relating to hiring prerogatives, without more, cannot be linked to infer some sort of discrimination in terminated decisions. this cannot be considered evidence of pretext. See Ransom v. CSC Consulting, Inc., 217 F.3d 467 (7th Cir. 2000) (CEO's testimony regarding efforts to retain younger lower-level individuals was not evidence of discrimination against older management employees.)

Fourth, Perez's vague accusation that BE&K wanted to hire younger people to train them in "the BE&K way," is unsupported by any factual evidence. Perez alleges that BE&K somehow "manipulates" the lack of work as a "strategy to hire younger people" while, at the same time, admitting that BE&K's workload had been slow for at least a year due, in part, to

the delayed start of anticipated DuPont projects.  (A97; 129-130; 139).  Perez points to no

facts in support of his "conspiracy theory."

Perez's unsupported speculations and suspicions are insufficient to demonstrate

pretext.  See Randolph v. Ind. Reg'l Council of Carpenters & Millwrights, 453 F.3d 413 (7th

Cir. 2006).  The EEOC's burden requires production of evidence other than Perez's own

"subjective beliefs of discriminatory conduct."  Id.  Such self-interested opinion testimony is

insufficient to create an issue of material fact.  Kappes v. DuPont, C.A. No. 97-443-SLR,

1999 U.S. Dist. LEXIS 3580 (D. Del. March 18, 1999) ("Conclusory assertions of fact cannot

overcome a motion for summary judgment.")

The unsupported nature of Perez's allegations is further illustrated by his inability to

identify any competent factual support for his belief that BE&K wanted to hire "younger"

workers.  No witness indicated that he had ever heard that BE&K preferred "younger"

engineers.  (A410; 415; 147; 151; 368).  Instead, the testimony shows that Howe wanted to

hire a recent college graduate for the Relief Devices project and that he told Guttridge this

during his interview.  (A205-206; 235; 146; 147; 149; 169; 170).  Howe explained that he

had discussed the idea with Dayton, the client liaison, and they had agreed that an entry-level

engineer would be able to perform well on the Relief Devices project and would help bring

the project's average billing rate down.  (A207-206).

That Howe intended to and did hire a recent college graduate, however, is not

evidence of discrimination based on age.  Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.,

865 F.2d 1461, 1466n.1 (5th Cir. 1989); see also Grossmann v. Dillard Dep't Stores, 109

F.3d 457, 459 (8th Cir. 1997) ("That [the defendant] recruits recent college graduates is not

evidence it discriminates against older workers.").  The Supreme Court has observed that "an

employee's age is analytically distinct from his years of service."  Hazen Paper Co. v.

Biggins, 507 U.S. 604, 611 (1993).  "Recent college graduates" can be any age and,

therefore, courts have rejected that a "recent college graduate requirement is a proxy for age discrimination." Sterry v. Safe Auto Ins. Co., 2003 U.S. Dist. LEXIS 17363 (S.D. Ohio Aug. 25, 2003); see also Cummings v. Pearson Educ., Inc., C.A. No. 03-12183-DPW, 2006 U.S. Dist. LEXIS 2118, at *4-5 (D. Mass. Jan. 18, 2006).

The accuracy of this premise can be seen even in BE&K's employee roster.  Howe hired Michael Tweed as a recent college graduate when Tweed was 39.  (A233).  Shoemaker was 31 when he graduated with his engineering degree.  (A366).   Indeed, Howe testified that he did not associate recent college graduates with young people.  (A233).  Without some other evidence that would allow the factfinder to infer an age-based animus, Howe's intention to hire a recent college graduate for the Relief Devices Project does not constitute evidence of pretext.  EEOC v. Francis W. Parker Sch., 41 F.3d 1073, 1076 (7th Cir. 1994) ("The ADEA requires the employer to ignore an employee's age. . . . it does not specify further characteristics that an employer must also ignore.").

### 4. The EEOC Has Failed to Produce Any Evidence that BE&K's Pre-RIF Hire of an Entry-Level Engineer Was Prextext for Perez's Layoff

Evidence of pre-RIF hiring for positions similar to the plaintiff's position can support a finding of pretext in certain limited circumstances.  See Beaird v. Seagate Tech., Inc. 145 F.3d 1159, 1170 (10th Cir. 1998).  No such circumstances are present in this case.  No Senior Engineers were hired for more than a year before Perez's layoff.  No Senior Engineers were hired for nearly two years after Perez's layoff.

BE&K hired Jennifer Linn as a Senior Engineer in the Process Department in September 2002, more than a year before Perez's layoff.  (A9).  Dan Poprik was hired as a Senior Engineer in July 2005, twenty months after Perez's layoff.  (A54).  No other Senior Engineers were hired during this time.  In fact, for the two years surrounding Perez's layoff,

between November 2002 and November 2004, only two employees were hired in the Process Department, neither of which were hired for positions similar to Perez's.

Christopher Guttridge was hired as an entry-level Engineer I approximately seven months before Perez's layoff. (A26). After Perez was laid off, the next employee hired was Candace Yee, a summer intern, who worked during the summer of 2003. (A212). In April 2005, Charlene Emlet, an Engineer III, was the first full-time employee hired in the Process Department since Perez was laid off. (A54). The undisputed evidence demonstrates that BE&K did not replace Perez. Instead, the evidence shows that BE&K's hiring decisions were consistent with its current business needs and, in no way, pretext for discrimination.

Perez, however, points to Guttridge's hire in April 2003 as evidence supportive of pretext. (A26). The decision to hire an entry-level engineer for the DTT Relief Devices project was made in the Spring of 2003, months before Perez was laid off. (A202-203). At the time, Perez was working at the Tosco site where he was fully reimbursable and could not have accepted additional work. "The fact that a significantly younger person was hired before the RIF to perform some of the duties plaintiff had previously performed fails to show the pretextual nature of the RIF." Carter v. Newman Mem. County Hosp., Case No. 98-41-5-SAC, 2001 U.S. Dist. LEXIS 12976, at *19-20 (D. Kan. July 20, 2001) (citing Doan v. Seagate Tech., Inc., 82 F.3d 974, 977 (10th Cir. 1996) (pre-RIF hiring is not evidence of pretext where the defendant's managers were unaware of the upcoming RIF when they hired the new employees)).

Further, Perez was not qualified to work on the DTT Relief Devices project due to his prior performance problems on the White Pigments project. The client liaison, Daniel Dayton, had expressly requested that Perez be removed from DTT work. (A425). Howe knew that Dayton would not have accepted Perez for the DTT Relief Devices project. (A253). In his deposition, Dayton agreed with Howe's conclusions. Dayton testified that he

would not have accepted Perez for the Relief Devices project because of Perez's demonstrated inability to perform the required relief device calculations.  (A335).

The simple reality is that the DTT program was expanding and required the addition of one to two new engineers.  (A201-202).  The creation of a new position to accommodate the expanding needs of the project is a business decision and is not evidence of pretext.  See Regel v. K-Mart Corp., 190 F.3d 876 (8th Cir. 1999); Sondhi v. Lockheed Missiles & Space Co., Inc., 62 F.3d 1271, 1286 (9th Cir. 1995).  The decision to hire an entry-level engineer for the DTT Relief Devices project was made months before Perez's layoff.  Perez was not qualified nor available for this project.  Therefore, the hiring of Guttridge cannot be considered evidence of pretext where there is no evidence that the decision was tied in any way with the decision to layoff Perez.  See LeBlanc v. Great Amer. Ins. Co., 6 F.3d 836, 846 (1st Cir. 1993) (holding that "[c]ourts are likely to reject arguments that the hiring of younger employees for plaintiff's position or territory demonstrated pretext where there is no evidence that the employer's hiring and termination decisions were somehow connected.").

Indeed, even competent employees are discharged when an employer is forced to downsize due to lack of work.  And, similarly, new employees may be hired during times of economic decline when there is a specific need that must be filled.  The EEOC cannot present any evidence that BE&K selected Perez for layoff for discriminatory reasons.  Because the EEOC is unable to satisfy its burden to establish that Perez's layoff was a mere pretext for age-based discrimination, summary judgment should be granted.

## CONCLUSION

For the reasons and authorities cited herein, Defendant's motion for summary judgment should be granted, and the Plaintiff's complaint dismissed in its entirety.

Respectfully submitted,

/s/ Margaret M. DiBianca
Teresa A. Cheek (Bar I.D. 2657)
Margaret M. DiBianca (Bar I.D. 4539)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6676; 571-5008
Facsimile: (302) 576-3286; 576-3476
Email: tcheek@ycst.com; mdibianca@ycst.com
Attorneys for Defendant

DATE:  September 5, 2006

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff | ) | C.A. No. 05-697-KAJ |
| v. | ) | |
| | ) | |
| BE&K ENGINEERING COMPANY | ) | |
| (subsidiary of BE&K, Inc.), | ) | |
| Defendant | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Margaret M. DiBianca, Esq., hereby certify that on Tuesday, September 5, 2006 I

electronically filed a true and correct copy of the foregoing **Defendant BE&K Engineering**

**Company's Opening Brief In Support Of Its Motion For Summary Judgment**, with the

Clerk of the Court using CM/ECF, which will send notification that such filing is available

for viewing and downloading to the counsel of record, and further certify that I caused a copy

of such filing to be served by U.S.P.S. First Class Mail on the following counsel of record:

Woody Anglade
U.S. Equal Employment
Opportunity Commission
21 South 5th Street
Suite 400
Philadelphia, PA 19106-2515

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Margaret M. DiBianca
Teresa A. Cheek (Bar I.D. 2657)
Margaret M. DiBianca (Bar I.D. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6676; 571-5008
Facsimile: (302) 576-3286; 576-3476
Email: tcheek@ycst.com; mdibianca@ycst.com
Attorneys for Defendant