Burton (e.g., striking her in the buttocks with his knee, writing [*4] on her hand with an ink pen, touching the neckline of her blouse in such a way that she felt the need to cover her breasts with her arms, tripping her, etc.). (Id. at A11-A12.) On one occasion in November 2001, Marvel asked Burton which of a few African-American, female, upper-management MBNA employees she wanted to be like. (D.I. 41 at B5.) He further suggested that in order for Burton to achieve similar success, she would need to "learn to do things the MBNA way." (Id.) Burton believes this was a proposition for sexual favors in exchange for favorable job opportunities. (D.I. 31 at 12-13.) Marvel's inappropriate behavior was not limited to Burton, either. In February 2002, he struck another female employee, which resulted in a Corrective Action Report and a "final warning." (D.I. 29 at A1.) As a further consequence of his actions. Marvel was reassigned to another department on March 6, 2002. (D.I. 41 at B9.) Within two weeks he was replaced by Karen Yanick, who then became Burton's direct supervisor. (Id.)

As of that time, Burton had not yet reported the harassment she suffered at the hands of Marvel. However, during a March 19 discussion between Burton and Teresa Mason, MBNA's Affirmative [*5] Action Officer, Burton mentioned that she "was so glad that Craig [Marvel] was in a new department because [she] was tired of him hitting [her] and talking so abusively to [her]." (Id. at B10.) Although Burton initially discouraged Mason from taking any action, she was eventually persuaded that filing a complaint against Marvel was the right thing to do. (Id. at B10-B11.) Yanick learned about Marvel's harassment of Burton on March 20. (Id. at B10.) Burton's complaint resulted in an addendum to Marvel's Corrective Action Report on May 13, 2002. (Id. at B35.)

In May and June 2002, Burton was promoted to a higher job grade level and she received a 13.5% raise. (Burton Dep. at 65:3-13.) However, by August 2002, Burton felt "isolated" and she believed her work was being "streamlined" because Yanick was spending more time developing the career of one of Burton's co-workers, Maureen Flynn-Wildt. (Id. at 118:23-119:19.) Since Burton felt "out of the loop," she "decided to go back to school and obtain [her] M.B.A." (D.I. 41 at B13.) In September 2002, with Yanick's approval, Burton became one of seven people chosen to participate in MBNA's pilot education program. MBNA agreed to [*6] pay $ 15,000 of Burton's tuition, and she was responsible for the remaining balance of $ 3,000. (Id.) Around the same time, an MBNA employee named Chris Dollard was transferred from another department into the Foundation. (Id. at B13.) MBNA says he was brought in to automate the Foundation's processes. (D.I. 37 at C6-C7.) However, Burton suspects he was brought in to replace her because she had to train him on her projects. n1 (D.I. 41 at B13.)

> n1 Regarding counsel's uncited assertion that Dollard was not "technologically savvy" (D.I. 31 at 19), *see infra,* note 2.

Then, in January 2003, Yanick informed Burton of an opportunity for her to transfer to the Foundation's Special Services division and assume a supervisory role managing MBNA's disabled employees. (Id. at B14-B15.) But because Burton had previous personal experiences that she felt would make it difficult for her to work with the mentally and physically challenged, she turned down the opportunity. (Id. at B15.) In further explaining her decision to [*7] Yanick, she said, "you are not treating me fairly because you are not allowing me to move on my right career path and you are setting me up to fail." (Burton Dep. at 75:4-6.) Although MBNA employees generally "do not have a choice about accepting [a] position or not," an exception was made in Burton's case because of a concern "that an unwilling manager would not do well in Support Services." (D.I. 29 at A45.)

Shortly thereafter, MBNA began to "refocus attention on its operations areas," which caused "a need for additional people to be transferred to the customer contact areas." (Id.) Along these lines, Burton recalls that on January 28, 2003, Craig Schroeder, one of the Foundation's supervisors, called a meeting and "explained how the bank's delinquencies were high and outstandings were low." (D.I. 41 at B16.) She also recalls Schroeder saying that "various people will be moved around the bank to assist with MBNA's new goal. He said if you are asked to transfer you must; there are no options." (Id.) In February 2003, a position opened up in Business Development for Colleges & Universities. (Id.) Although Burton was qualified, she was not given an opportunity to express interest [*8] in the position. (D.I. 41 at B16-B17.) Instead, the less-qualified Flynn-Wildt was given the position, and Burton was involuntarily reassigned as a Credit Analyst in the Credit Department. (Id. at B16-B18.) Although the job of Credit Analyst involved entry-level work and a less-desirable schedule (id. at B18), Burton's pay was not decreased (Burton Dep. at 81:16-82:19). n2

> n2 In her Answering Brief, Burton asserts that she "lost her exempt status and was required to sign in and out" as a result of this reassignment. She further asserts that if she "missed work or was late, she was docked," and that she "lost

her bonuses and was required to meet incentive based quotas." (D.I. 31 at 20.) This is but one example in her brief where she makes a factual representation, but fails to cite to the record. In its effort to insure a fair result, the court searched the record for evidence to support these assertions and found only vague references to the job status known as "exempt," and to Burton becoming "an hourly employee." As far as the court can tell, no record evidence specifically explains what it means to be "exempt." Even if such an explanation exists and the court simply missed it, it is unreasonable for a party represented by counsel to expect the court to expend its scarce resources scouring the record in an effort to determine the existence of facts to support that party's contentions. Therefore, the court will disregard these assertions.

[*9]

On March 13, 2003, Burton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), more or less alleging the facts stated thus far. (D.I. 29 at A22.) Burton commenced the present action in this court on September 29, 2003. (D.I. 1.) Subsequently, in November 2003, Burton was once again involuntarily reassigned to the Portfolio Risk Management/Credit Bureau Disputes Department as a Credit Dispute Representative. (D.I. 41 at B 19.) n3 Leading up to this reassignment, Burton had been suffering from mild depression. (Burton Dep. at 95:4-5.) By November 26, her depression was so severe that her physician told her he was "taking [her] out on disability." (Id. at 95:14-20.) Upon receiving her doctor's orders not to return to work, Burton took time off under the Family Medical Leave Act ("FMLA"). (Id. at 96:9-12.) She informed MBNA that her estimated return-to-work date would be sometime in December. (Id.) However, pursuant to her doctor's orders, Burton pushed back her return-to-work date on more than one occasion. (Id. at 96:12-16.) On February 20, 2004, Burton was informed that her leave time, both FMLA time and Personal Time Off, would expire on March [*10] 22. (D.I. 41 at B27.) Thus, MBNA scheduled Burton to return to work by March 23. n4 (Id.) As of April 8, n5 Burton had not returned to work and she was terminated. (Id.)

n3 It is unclear from the record whether this transfer was in June or November of 2003. (See D.I. 41 at B19.) In her Answering Brief, Burton asserts that the transfer was in November 2003. (D.I. 31 at 20.) Thus, the court will assume that is the correct date.

n4 In support of her opposition to MBNA's motion for summary judgment, Burton submitted the letter she received informing her that she had been terminated for failing to return to work by March 23, 2004. (D.I. 41 at B27.) The court notes that this document is fraught with hearsay, particularly with regard to dates and leave time. However, the letter is one of Burton's proposed trial exhibits, and MBNA has no objection to its use at trial. (Schedule (c) of the Pretrial Order, Plaintiff's Exhibit 6.) Therefore, the court assumes the matters asserted therein are uncontested.

n5 Burton's Answering Brief asserts on page 9 that she was terminated on April 8, 2004. (D.I. 31 at 9.) However, the very same brief asserts on page 18 that she was terminated on February 23, 2004. (Id. at 18.) The court assumes the latter date is merely an oversight by counsel since the termination letter submitted by Burton is dated April 8, 2004. (D.I. 41 at B27.)

[*11]

## V. DISCUSSION

### A. *Quid Pro Quo* Sexual Harassment and Hostile Work Environment

Pursuant to statute, a victim of sexual harassment has at most three hundred days "after the alleged unlawful employment practice occurred" to file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1). In this case, Burton's *quid pro quo* sexual harassment is based on the actions of Marvel alone (Tr. at 5:1-5), n6 and both parties "are in agreement that the last issue of harassment with respect to Craig Marvel was in January of 2002." (Tr. at 4:13-15.) It is similarly undisputed that Burton did not file a charge of discrimination until March 13, 2003. Thus, since more than three-hundred days elapsed between January 2002 and March 2003, Burton's *quid pro quo* claim must be dismissed.

n6 "Tr." refers to the transcript of a pre-trial conference held before the court on June 2, 2005.

The same time limitation applies to Burton's hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). [*12] However, at the pre-trial conference held before the court on June 2, 2005, counsel for Burton advanced the following theory in an attempt

to save her hostile work environment claim from the same fate as her *quid pro quo* claim:

> Our belief is that although we are in agreement that the last issue of harassment with respect to Craig Marvel was in January of 2002, that the hostile work environment continued on based on how she was treated by the other supervisors, in particular Karen Yanick, within the department. And based upon that, that although Craig Marvel had been removed from the department -- again, we don't dispute that -- but as a result of her reporting these things to MBNA, that then there was a course of action that continued on, which still is the hostile work environment.
>
> Merely because it is not sexual in nature by Craig Marvel, it's still a hostile work environment in and of itself by how she is being treated within the department.

(Tr. 4:13-25.)

The court declines to address the merits of Burton's new theory because it is an unbriefed departure from her previously-articulated theory of hostile work environment. The section of Burton's brief which discusses [*13] this claim addresses only Marvel's behavior. (D.I. 31 at 13-16.) Nary a word can be found regarding the actions of Yanick in the context of hostile work environment. (See id.) It was not until the pre-trial conference -- a mere three-and-a-half weeks before trial -- that counsel announced Burton's new theory. With trial looming, it is simply too late in the process to set forth a new theory of liability. Thus, the court holds that Burton cannot save her contentions of exposure to a hostile workplace on this basis. Therefore, Burton's hostile work environment claim, which is based only upon Marvel's actions, is also time barred and must be dismissed.

**B. Retaliation**

The statutory prohibition against retaliation reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The proper mode of analysis for a claim of retaliation under this provision is the familiar burden-shifting framework [*14] of *McDonnell Douglas Corp. v. Green*, in which the plaintiff bears the initial burden of establishing a prima facie case of retaliation, the defendant bears the subsequent burden of proffering a non-discriminatory reason for its actions, and the plaintiff bears the final burden of undermining the defendant's proffered reason. 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). At stage one, the plaintiff's prima facie case of retaliation consists of three elements: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). n7 If the plaintiff is unable to raise a genuine issue of material fact as to each element of the prima facie case, summary judgment must be granted in favor of the defendant. *Krouse*, 126 F.2d at 501.

> n7 Although *Krouse* involved the retaliation provision of the American's with Disabilities Act (ADA), the court explicitly noted that the analysis is identical under the retaliation provision of Title VII. 126 F.3d at 500.

[*15]

In adducing evidence of causation, the plaintiff may not rely "merely on a post hoc, ergo propter hoc inference from the fact that the restriction was imposed after [she] filed her complaint." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997). "If timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred. *Robinson*, 120 F.3d at 1302; see, e.g., *Jalil [v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)] (causal link established where 'discharge followed rapidly, only two days later, upon Avdel's receipt of notice of Jalil's EEOC claim')." *Krouse*, 126 F.3d at 503. On the other hand, "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Id.* at 503-04. Evidence of retaliatory animus may be either direct, *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 178-79 (3d Cir. 1997), or indirect, *Robinson v. S.E. Pa. Transp. Auth.*, 982 F.2d 892 (3d Cir. 1993) [*16] ("SEPTA"); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000).

Direct evidence of retaliatory animus, though perhaps rare, permits a direct inference that the defendant "placed 'substantial negative reliance on an illegitimate criterion in reaching [his] decision.'" *Kachmar,* 109 F.3d at 179 (quoting *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir. 1995)). For example, in *Kachmar,* the plaintiff's supervisor told her that "she was not on the management track because of her complaints concerning her salary, her 'campaigning on women's issues,' and her handling of [a] female employee matter, which [the manager] cited as an additional example of feminist campaigning." 109 F.3d at 178. Since these statements "would permit a factfinder to infer that [the plaintiff] was being taken off the management track because of her opposition to the manner in which [the defendant] was treating her and other women in the organization, and that her final dismissal was just a matter of time," the Third Circuit held that the plaintiff had "alleged enough direct evidence of a retaliatory animus" [*17] to survive summary judgment on the issue of causation. *Id.*

In the absence of direct evidence, the plaintiff may nevertheless prove retaliatory animus with indirect evidence. Two evidentiary scenarios are common: (1) evidence of an intervening pattern of antagonism by the defendant, *SEPTA,* 982 F.2d at 895, or (2) evidence of the defendant's inconsistent explanation of its actions, i.e., that its explanation is pretextual, *Farrell,* 206 F.3d at 286. In *SEPTA,* although two years had elapsed between the protected conduct and the adverse action, the plaintiff successfully demonstrated an intervening pattern of antagonism by adducing evidence that his supervisors "repeatedly disciplined him for minor matters, miscalculated his points for absences from work, and generally tried to provoke [him] to insubordination." 982 F.2d at 895. Likewise, in *Woodson v. Scott Paper Co.,* where there was a similar two-year gap, the Third Circuit upheld the district court's finding of a causal link where the defendant (1) set the plaintiff up to fail "by hiring him as a product system leader in [a] poorly performing . . . division and then refusing [*18] to provide him with adequate resources," (2) failed "to respond appropriately to racist graffiti in its plant" that was directed at the plaintiff, and (3) terminated the plaintiff "pursuant to a 'sham' ranking process performed by individuals who were not familiar with his employment record, but only with his charges of discrimination." 109 F.3d 913, 921 (3d Cir. 1997). Characterizing it as a "very close" question, *id.* at 924, the *Woodson* court reasoned that "while each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient," *id.* at 921.

In contrast, in *Weston v. Pennsylvania,* 251 F.3d 420 (3d Cir. 2001), the Third Circuit upheld the district court's dismissal of a plaintiff's retaliation claim, in part due to the absence of an intervening pattern of antagonism. In *Weston,* the plaintiff, a prison employee, was subjected to inappropriate physical touching, leading to "comments, jokes and jibes made by employees [including managers] and inmates who had learned of the incidents." 251 F.3d at 423. The [*19] plaintiff alleged that these comments, jokes, and jibes were made partially in retaliation for his filing of a grievance against his supervisor. *Id.* at 428. The plaintiff also suffered two written reprimands, and he was eventually suspended on two occasions for attendance problems. *Id.* at 430. The court held that there was no clear evidence of a pattern of antagonism because the alleged pattern "did not portend any future retaliation [i.e., suspension]." *Id.* at 432. "Instead," the court wrote, "the adverse employment actions were discrete responses to particular occurrences." *Id.*

Other cases look to inconsistencies in the defendant's explanation of its actions in deciding the sufficiency of the plaintiff's causation evidence. In *Farrell,* for example, the plaintiff challenged the defendant's assertion that she had been terminated due to a position elimination resulting from economic concerns. 206 F.3d at 285. She adduced evidence that only a few weeks prior to her termination the defendant had purchased her house in Maryland, and moved all of her possessions to her new home in North Carolina. *Id.* The plaintiff [*20] also pointed to a memo written by the very supervisor who had harassed her, in which he purported to have terminated her solely for her lack of interpersonal skills, rather than for economic reasons. *Id.* Moreover, the memo was written just a few weeks after its author had praised the plaintiff and asked her if she would be interested in a promotion. *Id.* The plaintiff adduced further evidence that at least one of her managers commented that she was helpful, not that she lacked interpersonal skills. *Id.* at 286. The Third Circuit held that these inconsistencies, together with evidence that her supervisor changed his demeanor (as well as his flight plans) after she rebuffed his sexual advances, were sufficient for the plaintiff to demonstrate causation. n8

---

n8 In *Farrell,* the Third Circuit explicitly recognized that by permitting evidence of inconsistencies to prove retaliatory animus, it was running the risk of "conflating the test for causation under the prima facie case with that for pretext." *Farrell,* 206 F.3d at 286. Nevertheless, because such a danger is inherent to the similarity of the inquiries at those distinct stages of the *McDonnell Douglas* analysis, the court essentially concluded that the potential for overlap is unavoidable and must be tolerated. *Id.*

[*21]

In the present case, MBNA must prevail on its motion for summary judgment because Burton is unable to raise a genuine issue of material fact as to causation. The relevant time frame over which Burton must show causation is the period beginning with her March 2002 internal complaint about Marvel, and ending with her April 2004 termination. Since Burton presents no direct evidence of retaliatory animus, she must prove it with indirect evidence. As previously mentioned, however, she may not rely "merely on a post hoc, ergo propter hoc inference." *Robinson*, 120 F.3d at 1302. Rather, in the absence of unusually suggestive timing, n9 Burton must adduce other evidence from which to infer causation. Indeed, it is Burton's contention that the evidence in the record supports both a finding of an intervening pattern of antagonism, and a finding that MBNA's explanation of its actions is pretextual. n10

n9 Burton concedes that there was a "lack of temporal proximity" between her protected activity and her termination. (D.I. 31 at 21.)

n10 In her Answering Brief, Burton only explicitly argues pretext in the context of the final stage of the *McDonnell Douglas* analysis. However, the "Causal Link" section of her brief includes reference to Dollard's transfer to the Foundation, which -- as the court's discussion of Dollard, *infra*, should make clear -- only makes sense if Burton is implicitly arguing that pretext proves causation. Therefore, the court will address pretext as it relates to causation.

[*22]

Burton's argument is summarized as follows: In August 2002, five months after she complained about Marvel, Burton began to feel that she was isolated and that her work was being streamlined because Yanick was spending more time developing Flynn-Wildt's career. Then, in September 2002, Dollard was transferred to the Foundation, ostensibly to automate certain projects. However, because Burton had to train him on her projects, she argues it would be reasonable to infer that the real reason for his transfer was to replace her. Yanick's first attempt to reassign Burton was in January 2003, when she pressured Burton to assume a supervisory role as an assistant manager in Support Services within the Foundation. Burton declined the reassignment, but in February 2003, after failing to offer Burton the desirable position given to the less-qualified Flynn-Wildt, Yanick informed Burton that she was being involuntarily reassigned as a Credit Analyst in the Credit Department.

Burton's pay remained unchanged after the reassignment, but her new position was a functional demotion because it involved entry-level duties.

Although Burton was told in the meeting with Schroeder in January 2003 that the [*23] upcoming transfers were part of an attempt by MBNA to solve its financial problems, she argues that MBNA's "economic downturn" explanation is pretextual. In particular, she questions whether a company experiencing an economic downturn would promote Marvel to a $ 205,000 salary (D.I. 29 at A50); she questions why she would be transferred out of the Foundation in the name of an economic downturn, only to be replaced by Dollard; and she questions whether a company experiencing an economic downturn would promote the under-qualified Flynn-Wildt. Presumably, Burton's argument is that, assuming these rhetorically-phrased questions sufficiently undermine MBNA's "economic downturn" explanation, it would be reasonable to infer that retaliation was the true motivation for her being involuntarily reassigned and passed over for the position given to Flynn-Wildt.

Subsequently, eight months after Burton filed her EEOC complaint and two months after she instituted the present action, she was once again involuntarily reassigned to the Portfolio Risk Management/Credit Bureau Disputes Department as a Credit Dispute Representative. MBNA's final act of retaliation was terminating Burton in April 2004, [*24] in spite of her doctor's order that she remain out of work. n11 Taken together, Burton asserts that this evidence is sufficient to infer that her termination was causally related to her complaints in March 2002, March 2003, and September 2003. (D.I. 31 at 19-22.)

n11 Plaintiff's tenth Contested Issue of Fact in the Pretrial Order.

The court disagrees. One major problem with Burton's argument is that she implicitly asks the court to ignore crucial undisputed evidence. Although the court is obliged to view the evidence in the light most favorable to Burton, and to draw all reasonable inferences in her favor, the court also has a duty to prevent Burton from "cherry picking" the best evidence in an effort to distort the record. Indeed, that is what Burton has attempted to do in opposing MBNA's motion. For example, her argument omits the fact that shortly after her initial internal complaint against Marvel, she was promoted and her pay was increased by 13.5%. She also fails to mention that beginning in September 2002, [*25] contemporaneous with Dollard's transfer to the Foundation, she began the M.B.A. program at Wilmington College. Of the total tuition, Burton was responsible for $ 3,000, whereas

MBNA agreed to pay the remaining $ 15,000. Moreover, Burton's participation in this pilot program required the approval of Yanick -- the very person at the center of Burton's retaliation claim. And perhaps most important, Burton leaves out the undisputed fact that she was terminated after she ran out of leave time.

Thus, the full record reflects that although Burton was passed up for one job opportunity and forced into a demotion (in function only), she was also promoted, offered a supervisory position, and sent to business school during the alleged retaliation period. Furthermore, all of these positive employment actions n12 occurred in the eleven months *before* the first arguable acts of antagonism. n13 Furthermore, even after Burton filed an EEOC charge in March 2003 and the present lawsuit in September 2003, her second involuntary transfer was not until November 2003. In the interim, Burton does not allege that any antagonism occurred. In the end, Burton was terminated after an absence of over four months. [*26] While Burton does not appear to dispute that she was out of leave time at the time of her termination, she contends that MBNA's decision to override her doctor's orders not to return to work was retaliatory. Yet, the court is aware of no rule of law that requires an employer to indefinitely retain an ill employee as long as she is following her doctor's orders. More to the point, aside from her involuntary transfer in November 2003, Burton has not adduced any evidence of retaliatory animus in the time between her September 2003 complaint in this court, and her April 2004 termination. Given this progression, it would be unreasonable to conclude that any of those events "portend any future retaliation." *Weston,* 251 F.3d at 432.

---

n12 Burton may not agree with the court's characterization of the offer of a supervisory position in Support Services as a positive employment action because it was not on her "right career path." But at her deposition, Burton denied that the new position was not a good one. Instead, she simply said it "was not the opportunity for" *her.* (Id. at 73:5-6.) At worst, then, it is a neutral employment action.

[*27]

n13 The court notes that these acts -- the February 2003 involuntary reassignment and the promotion of Flynn-Wildt -- might also be fairly characterized as adverse employment actions. However, they were not briefed as such. Thus, the court has only considered them as evidence of retaliatory animus.

---

Even if the court were to view the record through the prism urged by Burton, the evidence she sets forth to prove retaliatory animus is insufficient. Her feeling that she was isolated and that her work was being streamlined is only half supported by the record. Burton explained in her deposition that she began feeling isolated in August 2002 because Yanick was spending more time developing the career of Burton's co-worker, Flynn-Wildt. That testimony certainly supports her feeling of isolation, but as far as the court can discern, the record contains no specific evidence of any changes in Button's workload to support her claim that her work was being streamlined. Even if the record did contain such evidence, neither a feeling of isolation, nor a streamlining of work rise to the level of antagonism. [*28] *See, e.g., Weston,* 251 F.3d at 432 ("comments, jokes, and jibes" made partially in retaliation for the plaintiff's filing of a grievance against his supervisor was insufficient to establish causation); *Woodson,* 109 F.3d at 921 (standing alone, setting the plaintiff up to fail by putting him in a poorly performing division and then withholding adequate resources was "not sufficient to support an inference of a pattern of antagonistic behavior").

As to Dollard's transfer into the Foundation, the record does not support Burton's assertion that MBNA's proffered reason for his transfer is pretextual. The fact that Burton had to train him on her projects is perfectly consistent with MBNA's explanation that Dollard was brought in to automate the Foundation's projects. It is axiomatic that he would need to gain a familiarity with the projects before he could set about automating them. Therefore, there is no evidentiary reason to doubt MBNA's explanation.

Likewise, there is no evidentiary reason to believe that Yanick's pressuring of Burton to take the position in Support Services was antagonistic. Burton characterizes this as Yanick "setting [her] up to [*29] fail" (Burton Dep. at 75:4-6), which is similar to the language used in *Woodson.* However, in *Woodson,* the plaintiff was "set up to fail" because he was hired into a poorly-performing division and subsequently denied the resources necessary to succeed. 109 F.3d at 921. Burton, on the other hand, was "set up to fail" because she was not allowed to pursue her "right career path." The following excerpt from Burton's deposition is particularly enlightening in this regard:

Q. Would it be fair to say that this, the job that was offered to you was regarded as a good job by at least some people at MBNA?

> A. I never said it wasn't a good job, Mr. Sandler. I said it was not the opportunity for Alberta [Burton].

(Id. at 73:5-6.) Thus, any similarity to *Woodson* is only skin deep. Importantly, even if Burton had been set up to fail in a similar fashion, the *Woodson* court held that such evidence is insufficient standing alone to support an inference of antagonism. 109 F.3d at 921. Consequently, it was not antagonistic for Yanick to pressure Burton to accept a supervisory position that did not suit her preferences.

Finally, the court [*30] disagrees with Burton's argument that an inference of retaliatory animus can reasonably be drawn from the allegedly pretextual nature of MBNA's "economic downturn" explanation. Marvel's promotion does not undermine MBNA's explanation because his promotion was approximately one year before the January 2003 meeting in which Schroeder announced MBNA's need to make changes due to economic concerns. n14 Business fortunes can change radically in that amount of time, so Marvel's early 2002 promotion is not probative as to MBNA's financial condition in early 2003. Dollard's transfer to the Foundation in September 2002 suffers a similar temporal flaw. Additionally, Burton has adduced no evidence that Dollard was not in fact brought in to automate the Foundation's projects. Certainly, automation is consistent with reducing costs. As to Flynn-Wildt's promotion, no evidence adduced thus far indicates that the position was newly created for her. Such evidence, if it existed, might belie MBNA's explanation because it would demonstrate expansion in a time of alleged financial straits. However, the only record evidence apparent to the court indicates that Flynn-Wildt was promoted to fill a newly-vacant [*31] position, not a newly-created position. (D.I. 29 at A45.) Therefore, Burton has failed to demonstrate that MBNA's explanation is pretextual.

n14 The record is unclear as to precisely when Marvel was promoted. According to MBNA's responses to Burton's written interrogatories, however, it appears that Marvel had a $205,000 salary at least as early as March 2002. (D.I. 29 at A49-A50.)

Thus, after careful consideration of the entire summary judgment record, the court holds that it would be unreasonable to infer that Burton's termination was anything but a discrete response to the fact that she did not return to work after running out of leave time. Consequently, Burton cannot bear her burden of establishing a prima facie case of retaliation, and summary judgment in favor of MBNA is appropriate.

## IV. CONCLUSION

For the foregoing reasons, the court will grant summary judgment in favor of MBNA and dismiss Burton's complaint in its entirety.

Dated: June 22, 2005

/s/ Gregory M. Sleet

UNITED STATES [*32] DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The defendant's motion for summary judgment (D.I. 27) be GRANTED; and

2. The plaintiff's complaint be DISMISSED on all counts.

Dated: June 22, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE

IYLA M. CARTER, Plaintiff, Vs. NEWMAN MEMORIAL COUNTY HOSPITAL, QUORUM HEALTH RESOURCES, INC., Defendants.

Case No. 98-4105 SAC

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

2001 U.S. Dist. LEXIS 12976

July 20, 2001, Decided

**DISPOSITION:** [*1] Defendant's motion for summary judgment (Dk. 47) granted.

**COUNSEL:** For IYLA M CARTER, plaintiff: David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS.

For NEWMAN MEMORIAL COUNTY HOSPITAL, QUORUM HEALTH RESOURCES, INC., defendants: Craig C. Blumreich, William A. Larson, Gehrt & Roberts, Chartered, Topeka, KS.

**JUDGES:** Sam A. Crow, U.S. District Senior Judge.

**OPINIONBY:** Sam A. Crow

**OPINION:** MEMORANDUM AND ORDER

This age discrimination case comes before the court on defendants' motion for summary judgment. The sole claim presented is whether the plaintiff's employment with or termination from employment by the defendants violated the Age Discrimination in Employment Act (ADEA)

**Summary Judgment Standards**

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

Summary judgments "'should seldom be used in employment discrimination cases.'" *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quoting *Smith v. St. Louis University*, 109 F.3d 1261, 1264 (8th Cir. 1997)). [*2] Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment inappropriate. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994); see *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994) ("The summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.*, 969 F.2d 250, 253 (7th Cir. 1992), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir. 1988), *overruled on other grounds*, *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995).

**Facts**

Some facts relevant to the motions are set forth herein as background. Others are included as necessary in the analysis which follows. Controverted facts have been construed in the light most favorable to plaintiff as the non-moving party.

Plaintiff [*3] began working at Newman Memorial Hospital in 1981. During the last several years of plaintiff's employment she worked as a sterile processing department ("SPD") technician. As a sterile processing technician, plaintiff's immediate supervisor was Marlene Hanson, who was in charge of the sterile processing division. Hanson's supervisor was Linda Hacker.

The SPD takes care of instrument trays that are used in surgery, in the emergency room and in labor and delivery. Employees of the department pick them up from various rooms in the hospital, take them back to the department, clean them, decontaminate them, check them

Page 1

to make sure they are all intact and nothing is broken, and then wrap them and sterilize them for reuse. Employees in SPD rotated the three primary duties of tracking the equipment, decontaminating it and sterilizing it. Tracking the equipment was done by going to patient's rooms, finding the equipment used during routine patient care, and using a hand held unit with a light, (the tracker) which would read a bar code on the equipment.

Prior to June of 1995, there were four full time employees in the Sterile processing department, including supervisor Hanson. In [*4] June of 1995, Hacker had heard that plaintiff had discussed retirement with the personnel director. Hacker decided that she would like to "stretch her staff" and one possibility of doing that was to develop two part time positions.

Accordingly, Hacker approached plaintiff about a part time position in which plaintiff would no longer be part of the rotation but would be primarily responsible for the equipment tracking. After considering the offer, plaintiff accepted the part-time tracking position, and began in June of 1995. When plaintiff shifted to the part time job, Sara Munich, a 22 year old college student, was hired to work part time in the regular rotation of the other employees in SPD.

Plaintiff's evaluations were generally satisfactory over the years, but repeatedly noted either her need to speed up to complete her work or her difficulty in completing the work she was assigned. After plaintiff moved to the part time position, Hacker and Hanson observed that Plaintiff could not get the work done within the time alotted. Among other problems, plaintiff had difficulty in downloading the information from the tracker into the computer system. Attempts to assist plaintiff [*5] in this task were unsuccessful. Hacker placed plaintiff on job probation on September 20, 1996, and revised expectations for her job were issued on October 25, 1996.

Mr. Terry Lambert, the Chief Executive Officer for defendant, is employed by Quorum Health Resources, a hospital management company. Defendant's board of directors has a management agreement with Quorum to manage the day-to-day operations of the hospital. Quorum supplies the Chief Executive Officer and the Chief Financial Officer to the hospital. Quorum did not employ plaintiff.

In 1996, the hospital instituted a staff reduction plan because income from the area of hospital operations had dropped substantially. The plan resulted from the leadership team's examination of all areas of the hospital and its operations to see how it could be run more profitably without affecting patient care or services.

Defendant's personnel policy provides that for a reduction in force the factors taken into account will be the job classification, job performance and seniority. As a result of the plan, approximately eleven to twelve full time equivalent positions were eliminated. Many of these full time equivalents consisted [*6] of two part time jobs. The department managers looked at their part time positions to determine whether they could be eliminated and their job duties consolidated into other full time positions.

The decision to eliminate plaintiff's position was primarily that of Linda Hacker. In response to the staff reduction program, Hacker submitted her proposed changes to the leadership team. This proposal suggested the elimination of plaintiff's position to save approximately $ 8,000 a year. Hacker would not have terminated Plaintiff but for the reduction in staff.

The leadership team followed Hacker's recommendation and plaintiff's position was eliminated in November of 1996. Plaintiff's immediate Supervisor, Hanson, played no part in the decision to eliminate plaintiff's position. After plaintiff left, the equipment tracking duties were absorbed by another department, the General Stores Department, which used a a different tracking system. SPD did not hire another employee to replace plaintiff after it eliminated her part time position.

**Proper Party Defendant**

Defendant Quorum Health Resources, Inc., has moved for summary judgment based upon the fact that it did not [*7] employ the plaintiff. Plaintiff has not responded to this motion, or otherwise shown that Quorum Health Resources, Inc. was plaintiff's "employer" within the meaning of that term in the ADEA. This motion will therefore be granted. n1

> n1 This memorandum hereafter uses the term "defendant" in reference solely to defendant Newman Memorial County Hospital.

**Procedural Objection**

Plaintiff objects that defendant's facts are not supported by the record as required by the Local Rules for the District of Kansas. Yet plaintiff specifies neither the rules which defendant has allegedly violated, nor the manner in which defendant's brief allegedly violates them. The court finds that defendant's memorandum and facts stated

therein fully comply with D.Kan. Rule 56.1. Plaintiff's vague objection is thus overruled.

Analysis

**I. Termination**

The ADEA provides in pertinent part that it is "unlawful for an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C. § 623 [*8] (a)(1). Plaintiff's case is not based upon direct evidence. The court evaluates ADEA claims based on indirect evidence of discrimination under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Beaird v. Seagate Technology Inc., 145 F.3d 1159, 1165 (10th Cir.), cert. denied, 525 U.S. 1054, 142 L. Ed. 2d 556, 119 S. Ct. 617 (1998).

Defendant concedes, for purposes of the McDonnell Douglas analysis, that plaintiff has presented evidence establishing a prima facie case of age discrimination. The burden thus shifts to the defendant to provide a legitimate, non-discriminatory explanation for its discharge decision. E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). This burden is merely to show a facially nondiscriminatory reason for the termination. At this stage of the proceedings defendant does not need to litigate the merits of the reasoning, or prove that the reason relied upon was bona fide, or prove that the reasoning was applied in a nondiscriminatory fashion. Id. at 1316 (footnote omitted).

Defendant [*9] has come forward with such an explanation-- a reduction in force ("RIF"). The evidence shows that a RIF occurred around the time of plaintiff's termination, which involved about eleven or twelve full time equivalent positions. Most of those positions were part-time positions, with only one or two being full time employees. (Lambert depo., p. 14-15).

Although this number is not great, "an employer need not dismiss any particular number of employees, or terminate a set percentage of the work force, to institute a reduction in force." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 845 (1st Cir. 1993) (three employees out of 212), cert. denied, 511 U.S. 1018, 128 L. Ed. 2d 72, 114 S. Ct. 1398 (1994); see Roger v. Yellow Freight Systems Inc., 21 F.3d 146, 151 (7th Cir. 1994) (rejecting claim that a reduction of 4.67% of the workforce is per se not a legitimate RIF); Rhymes v. St. Joseph Regional Medical Center of Northern Oklahoma Inc., 87 F.3d 1327, 1996 WL 346585 at *3 (10th Cir. 1996) (Table) (rejecting claim that twelve employees out of 532 is too small to be a RIF).

After the defendant meets the [*10] burden of producing a facially nondiscriminatory reason for the employment decision, as defendant has done here, the presumption of discrimination established by the prima facie showing "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

Thus, it is plaintiff's task to show that the defendant's justification was pretextual. This is done by establishing "either that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999) (quotation omitted). Three common yet non-exclusive methods are used to demonstrate pretext in the RIF context: (1) evidence that the termination of the employee is inconsistent with the employer's RIF criteria; (2) evidence that the employer's evaluation of the employee was falsified to cause termination; or (3) "evidence that the RIF is more generally pretextual." Beaird, 145 F.3d at 1168. Plaintiff has not articulated any of these three, but makes allegations that may fall generally [*11] within the third catch-all method.

*A. Age Related Comments*

Defendant relies heavily upon age related comments from plaintiff's immediate supervisor, Hanson, and department head, Hacker. Those comments are as follows.

Plaintiff testified that before June of 1995 when plaintiff took the part-time position, department head Hacker asked her whether she planned to retire that year. Plaintiff replied that she did not. Hacker asked Hanson the same question about plaintiff sometime in 1995 or 1996.

Marlene Hanson, the supervisor of Sterile Processing Department (SPD) and plaintiff's then immediate supervisor, told plaintiff in December of 1994 or 1995 that plaintiff had to make up her mind what she was going to do, or the hospital was going to make it up for her. (Plaintiff's depo., p. 65). Plaintiff believed that Hanson was referring to retirement. On some unspecified date, Hanson spoke to plaintiff about the advantages of taking Social Security early, and told plaintiff that she was going to have a health break down if she didn't slow down. In March of 1996, Hanson told plaintiff's daughter that she had been trying for a long time to get plaintiff to retire. (Plaintiff's [*12] depo. p. 61-62.)

In some instances, evidence of discriminatory comments may be relevant to the issue of pretext. See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir.

1999). To be significant evidence of pretext, however, the objectionable conduct or remarks should be attributable to an individual responsible for the employment decision. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000) (evaluating age-based comments made by the individual "principally responsible" for plaintiff's firing); *Kendrick v. Penske Trans. Services Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000); *Cone*, 14 F.3d at 531(to raise inference of discrimination, age-related comments must have been made by decisionmaker, and must have some nexus to plaintiff, his position, or the employment decision).

Under the circumstances of the present case, supervisor Hanson's comments do not suffice to raise an inference of pretext. Hanson was not involved in the recommendation or decision to eliminate plaintiff's position, and her comments had no nexus to that decision. The fact [*13] that Hanson was plaintiff's supervisor does not automatically establish the requisite nexus. See *Shorter*, 188 F.3d at 1210. n2

> n2 Plaintiff additionally alleges that two other female employees mentally and verbally harassed her because of her age. Plaintiff admits, however, that neither made comments about her age. (Plaintiff's depo., p. 66-67).

Although Hacker's recommendation carried enough weight with the leadership group that the court may consider her to have been a decisionmaker, her one time question to plaintiff before June of 1995 regarding plaintiff's intent to retire is nothing but an isolated question, not shown to be related to the decision made over a year later to eliminate plaintiff's position. "Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Cone*, 14 F.3d at 531. Compare *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1474, 1479 (10th Cir. 1996). The [*14] same is true for Hacker's question to Hanson regarding plaintiff's intent to retire. *B. Necessity of RIF*

Plaintiff challenges the necessity of the RIF by alleging that defendant was financially healthy and profitable. Plaintiff points to the testimony of Hacker, plaintiff's department head. Hacker stated her belief, based upon articles shown to her at her deposition by plaintiff's attorney, that the hospital was not losing money in 1996, 1997 or 1998. (Hacker depo., p. 103-106). This testimony, based upon unidentified articles, and given by a department head not shown to have personal knowledge of defendant's financial state, has little, if any, probative value.

Plaintiff also directs the court to testimony of Lambert, defendant's CEO since April of 1996. Lambert testified that during 1996, defendant was actively hiring employees in certain job classifications, such as a laboratory director to replace the one who retired. (Lambert depo. p. 30). Absent evidence that defendant sought or hired others in the same department as the plaintiff, or who were similarly situated, the cited testimony lacks probative value.

The record shows that defendant's finance committee [*15] and board determined that a RIF was necessary. See Lambert depo., p. 13-19. Unlike department heads, the finance committee and board had personal knowledge of the financial condition of the defendant. As the Tenth Circuit has stated: "the wisdom of a RIF is not for a court or jury to decide. A RIF is a business decision, and the ADEA is not a vehicle for reviewing the propriety of business decisions." *Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) (internal quotation marks and citation omitted). Accordingly, plaintiff's speculations about the financial status of the defendant are not probative.

*C. Susceptibility of RIF for Discrimination*

Plaintiff relies upon the testimony by Karen Shumate, defendant's Director of Quality and Risk Managment, to show that the RIF selection procedures did not contain safeguards against unlawful discrimination. Shumate stated that to her knowledge there was no built-in system or procedure to ensure that the department heads, who recommended to the leadership group specific positions within their departments for elimination, were not selecting employees for discriminatory reasons. Although the leadership [*16] group, which made the ultimate decision to terminate positions, had no knowledge of an employee's age, and spoke only about positions instead of particular persons, the department heads had such knowledge. The leadership group would not have known if a department head had recommended the elimination of a particular position because of discriminatory reasons. (Shumate depo., p. 24-25, 51).

The above testimony fails to raise an inference that the decision to eliminate plaintiff's position, or the recommendation to do so, was based even in part upon plaintiff's age. To show that a procedure is not discrimination-proof is a far cry from showing that the procedure was applied to this plaintiff in a discriminatory fashion.

*D. Deviation from RIF Criteria*