Plaintiff infers that defendant deviated from its published RIF criteria, in alleging: "Lambert agrees that seniority of employees is a consideration when eliminating position, (sic) however in [plaintiff's] case, he did not look at the seniority list." (Dk. 58, p. 9). It is undisputed that seniority was one of the three factors to be considered in a RIF.

The fact that Lambert did not consider a person's seniority [*17] when he reviewed the department head's recommendation does not mean that seniority was not considered by the department head in deciding which position to recommend for elimination. The record cited thus fails to support the proposition that defendant deviated in any way from its published RIF criteria in determining to eliminate plaintiff's position.

To the extent that plaintiff may be asserting that defendant's RIF criteria and/or its application had a disparate impact upon older workers, generally, or on plaintiff, specifically, it fails to state a claim. "Disparate impact claims are not cognizable under the ADEA. *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1007 (10th Cir. 1996)." *Furr v. Seagate Technology Inc.*, 82 F.3d 980, 987 (10th Cir. 1996).

E. *Ongoing Scheme or Conspiracy*

Plaintiff contends that defendant assigned her to a redundant and expendable part-time job in June of 1995, hired a 22 year old to replace her part-time in the valuable full-time job she previously held, and then used an unnecessary RIF to effectuate its scheme to terminate her because of her age in November of 1996. She argues that she was doing a good [*18] job when she was laid off, that she was the oldest and most senior employee in her department, that she was the sole employee terminated in her department, and that her job duties were performed by younger employees after her termination, providing a reasonable inference that defendant terminated her because of her age.

The court finds no credible evidence of age discrimination to support plaintiff's conspiracy theory. Although defendant approached plaintiff in the summer of 1995 about working part-time instead of full time, plaintiff was offered the part-time position, and was not "assigned," involuntarily transferred, or otherwise coerced into accepting it.

Additionally, the record is void of evidence that defendant planned in the summer of 1995 to eliminate plaintiff's part-time position or terminate her employment. No evidence shows the RIF was even being considered at that time, or if it was, that Hacker, who offered plaintiff the part time position, knew the RIF was impending or the potential impact it could have upon plaintiff.

Plaintiff seems to allege that defendant set her up to fail in her part-time position, in alleging that plaintiff was assigned to "a job [*19] that was so complicated [plaintiff] wouldn't be able to do it." (Dk. 58, p. 10). The record shows, however, that plaintiff's part-time job consisted primarily of one of the same duties that she had been previously performing in her full time position. (Plaintiff's depo., p. 54-59). Instead of doing the tracker, sterilization, and decontamination duties she had done when full-time, plaintiff did only the tracker duties in her part-time position. (Id.); Hacker depo., p. 21-23). Accordingly, the record provides no support for plaintiff's assertion that her part-time job consisted of new, different, or more difficult tasks, or that the duties of the part-time position were so complex that she would necessarily fail in attempting to perform them.

Further, plaintiff has failed to show that defendant's managers were aware of the upcoming RIF when they hired 22 year old Munich in 1995. The fact that a significantly younger person was hired before the RIF to perform some of the duties plaintiff had previously performed fails to show the pretextual nature of the RIF. *See Doan*, 82 F.3d at 977 (pre-RIF hiring is not evidence that a RIF "was merely a pretext for pruning [*20] away unwanted employees" where the defendant's managers were unaware of the upcoming RIF when they hired the new employees). The record confirms that Munich was hired as a part-time employee over a year before the RIF, and remained a part-time employee after plaintiff's position was eliminated. (Hanson depo., p. 33).

Plaintiff additionally implies that she should have been given an option to take another position, according to defendant's policy. (Dk. 58, p. 13). Defendant's policy was to give an employee who was separated due to staff reduction an option to take another position if one became available within three months. Dk. 47, Exh. E; (Hacker depo., p. 75-76). Plaintiff was aware of this policy, as evidenced by her signature on a written copy of the policy. (Id., p. 76). Assuming, arguendo, that this recall policy applied to plaintiff, no evidence has been presented to show that any position became available within three months after plaintiff's position was eliminated. Without such a showing, no inference of pretext arises based upon the fact that plaintiff was not recalled.

F. *Selection of Plaintiff's Position*

The reasons articulated by defendant for eliminating [*21] plaintiff's part-time job as a separate position are,

generally, its ongoing effort to downsize the workforce, and, specifically, Hacker's belief that of all the jobs in the departments which she supervised, the duties performed by the plaintiff could most easily be incorporated into the duties of other employees. (Hacker depo., p. 113). Although Hacker could have selected any other position in her departments for elimination, she also had the discretion to determine which one to select. The reasons Hacker testified to for selecting plaintiff's position have been factually substantiated in the record, and have not been shown to be pretextual. After plaintiff's position was eliminated, her duties were performed by existing employees in another department, by use of another method. (Hanson depo., p. 22,23, 32-33).

### G. Plaintiff's Work Performance

It is undisputed that plaintiff would not have been terminated in the absence of the RIF. Plaintiff relies upon her satisfactory job performance as evidence that the decision to terminate her position was pretextual. Plaintiff's evidence of her satisfactory work performance is not probative because in a reduction in force case, [*22] "someone has to be let go," _Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991)._

Although plaintiff was performing her job adequately at the time of her termination, her lack of proficiency is not prohibited for use as a RIF selection criterion. See _Furr, 82 F.3d at 988_ ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.") Plaintiff testified that at the time of her termination, she was able to do her job well. Hacker testified, however, that at the time of plaintiff's termination, she believed plaintiff could not remember the steps required for using the tracker. (Hacker depo., p. 37-38). In order to show pretext, plaintiff must show that her employer did not hold this belief in good faith. See _McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998)_ (discussing employer's good faith belief). No such showing has been made.

### H. Other Employees

Plaintiff states that it "has presented evidence from a number of other older employees that were fired, forced to retire or their work conditions [*23] were made difficult." (Dk. 58, p. 24). Plaintiff makes no other reference to or analysis whatsoever of such evidence or the impact plaintiff believes it may have upon the issue in this case, n3 and the court declines to make plaintiff's arguments for her.

n3 This is not a "pattern and practice" case. See Final Pretrial Order.

Plaintiff has failed to show evidence upon which a factfinder could conclude that the defendant's alleged non-discriminatory reasons for the employment decisions are pretextual. In sum, the record reflects an employer's legitimate business decision regarding the elimination of a position. Plaintiff's criticisms of that decision do not render it unworthy of belief. At most, they challenge the employer's wisdom, which is beyond the court's purview here. See _Furr, 82 F.3d at 986_ ("The ADEA is not a vehicle for reviewing the propriety of business decisions.").

This case lacks a showing of any disturbing procedural irregularity in defendant's application of the RIF, any [*24] evidence that another person was hired during the RIF or soon thereafter in a position similar to plaintiff's, or evidence that other younger employees whose positions were slated for elimination were given opportunity to transfer instead of be terminated. Nor has other evidence raising a material question of fact regarding pretext been shown. Summary judgment is thus warranted on plaintiff's claim of discriminatory termination.

### II. Hostile Work Environment

Plaintiff alleges in the pretrial order, and argues in her summary judgment response brief, that she was verbally and mentally harassed because of her age, while employed with the defendant. In an abundance of caution, the court will construe this as a hostile work environment claim. Although the Tenth Circuit has not expressly recognized a "hostile work environment" theory under the ADEA, the court will presume the viability of such a claim.

For such a claim to survive a summary judgment motion, "'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [*25] victim's employment and create an abusive working environment.'" _Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1264 (10th Cir. 1998)._ The statements and acts of which plaintiff complains, including those of Hanson, Hacker, Debbie Bruno and Grace Brunett, were neither severe nor pervasive, and did not alter the conditions of plaintiff's employment. To the extent plaintiff seeks to pursue a claim for hostile work environment pursuant to the ADEA, summary judgment is warranted.

LEXSEE

**MARGARET A. CUMMINGS, Plaintiff, v. PEARSON EDUCATION, INC., JUDI GROSSMAN, and ELIZABETH CARON, Defendants.**

**CIVIL ACTION NO. 03-12183-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

**2006 U.S. Dist. LEXIS 2118**

**January 18, 2006, Decided**

**PRIOR HISTORY:** Cummings v. Pearson Educ., Inc., 2004 U.S. Dist. LEXIS 24831 (D. Mass., Dec. 6, 2004)

**COUNSEL:** [*1] For Margaret A. Cummings, Plaintiff: Pro se, Malden, MA.

For Pearson Education, Inc., Judi Grossman, Human Resources Director, Elizabeth Caron, Human Resouces Generalist, Defendants: Sharon R. Burger, Nutter, McClennen & Fish, LLP, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

January 18, 2006

**I. INTRODUCTION**

The Plaintiff, Margaret A. Cummings, applied for various Editorial Assistant positions at Pearson Education, Inc. ("Pearson") from April 2002 through August 2002. Throughout the application period, Ms. Cummings interacted with Elizabeth Caron, a Pearson Human Resources Generalist. Pearson did not hire or interview Ms. Cummings.

Ms. Cummings claims that Pearson did not hire or interview her because Ms. Caron and Ms. Caron's supervisor, Judi Grossman, Pearson's Human Resources Director, impermissibly discriminated against her based on her age. Ms. Cummings brings this action under the Age Discrimination in Employment Act (the "ADEA") against Pearson, Ms. Grossman, and Ms. Caron (collectively "the Defendants").

**A. The Federal Rules of Civil Procedure and Evidence**

On September 16, 2005, Ms. [*2] Cummings filed a "Motion 56". Federal Rule of Civil Procedure 56 deals with motions for summary judgment. Consequently, I will treat "Motion 56" as one for summary judgment. The Defendants have also filed a motion, more conventionally denominated, under Fed. R. Civ. P. 56. Thus, I confront cross-motions for summary judgment.

Given certain idiosyncracies in Plaintiff's motion, it will be useful to outline the governing principles.

Rule 56 provides in pertinent part that:

> (a) A party seeking to recover upon a claim . . . may, . . ., move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.
>
> . . . .
>
> (e) Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, [*3] answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may

not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Local Rule 56.1 of this court further requires that:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion. . . . Copies of all referenced documentation shall be filed as exhibits to the motion or opposition.

Local Rule 56.1 and Rule 56(e) mean that the Court is restricted to certain forms of pleadings and evidence when considering a motion for summary judgment. In particular, the [*4] evidence adduced must be shown admissible. The Federal Rules of Evidence provide that "hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Fed. R. Evid. 802. I have examined certain of Plaintiff's evidence in light of the hearsay rules. n1

> n1 "Hearsay" "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In this case, the Defendants have said that for purposes of these summary judgment motions only, they do not, as a general proposition, object on hearsay grounds to Plaintiff's description of the contents of certain emails that have not been produced, unless they have specifically noted an objection in their submissions.

"A pro se litigant, like any litigant, is guaranteed a meaningful opportunity to be [*5] heard." Eagle Eye Fishing Corp. v. United States Dep't of Commerce, 20 F.3d 503, 506 (1st Cir. 1994). As a result, I will view Ms. Cummings's submissions "less stringently". However, a party who elects to proceed pro se must nonetheless comply with the governing rules. Lefebvre v. Commission of Internal Revenue Service, 830 F.2d 417, 419 (1st Cir. 1987); Rivera v. Riley, 209 F.3d 24, 28 n. 2 (1st Cir. 2000). Consequently, while I deny the Defendants' Motion to Strike Plaintiff's Statement of Undisputed Facts, I will consider the concerns raised in that motion and will disregard "facts" that are not presented according to the governing rules for the purpose of the summary judgment motions.

### B. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When both parties file a motion for summary judgment, the [*6] basic summary judgment standard still applies and the court must determine whether either of the parties deserves judgment as a matter of law based on the facts that are not disputed. Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). Just because both sides move for summary judgment, does not mean that the court must grant judgment to one side or the other. Schwabenbauer v. Board of Education, 667 F.2d 305, 313 (2d Cir. 1981).

When considering a single motion for summary judgment, the court must view all of the admissible facts and draw all reasonable inferences from those facts in the light most favorable to the party who did not file the motion (ie. the non-moving party). Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997). But, on issues where the non-moving party bears the burden of proof, that party must reliably demonstrate that there are facts sufficient to create an authentic dispute on those issues. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-26, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In deciding a cross-motion [*7] for summary judgment, courts must consider each motion separately, drawing inferences against each party in turn. Reich, 126 F.3d at 6.

To oppose a motion for summary judgment successfully, the non-moving party must present evidence with "substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." LeBlanc v. Great American Insurance Co., 6 F.3d 836, 841-42 (1st Cir. 1993) (internal citations omitted).

But, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)(emphasis in original)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)(citations omitted)). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law", Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported [*8] by evidence such that "a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz, 896 F.2d at 8.

### C. The Facts

I now recite the facts, noting the more important factual disputes and keeping in mind the relevant standards and rules discussed above.

Ms. Cummings was born in 1939. She earned a Bachelor of Arts degree from the University of Massachusetts Boston in 1974. From 1980-82, Ms. Cummings took two graduate classes (8 credits) in the Mass Communications Program at Boston University and then several semesters in the Professional Writing and Publishing Program at Emerson University. In total, she completed thirty-six (36) graduate credits out of the forty (40) required for a master's degree [*9] at Emerson, but never completed that degree. The resumes sent to Pearson reflect this educational background. In addition, the initial resume submitted to Pearson includes a reference to the 2002 Certificate she earned for taking a workshop on Microsoft XP Desktop Technology in 2001 from the Veterans' Technical Institute.

Both of the resumes Ms. Cummings submitted to Pearson only reflect employment from 1987 to 1994, where she worked full-time under temporary placements, first through Office Specialist and then through Talent Tree Staffing Services.

From 1995 through 2002, Ms. Cummings looked for full-time regular employment in the proofreading and publishing field. Towards the end of the computer workshop Ms. Cummings completed in 2001, Mary Westropp, the coordinator of the workshop, offered to help Ms. Cummings find a job in publishing. She put Ms. Cummings in contact with Mark Dalton, who had worked at Pearson until October 31, 2001.

In early April 2002, Mr. Dalton sent Ms. Cummings a brief email mentioning a job vacancy posted on Monster.com and Pearson's website. Even though Mr. Dalton had not given her the name of the job title, Ms. Cummings tried searching on Monster.com. [*10] After finding nothing, she decided to look up Pearson instead. Sometime between April 6 and 9, 2002, she found the Pearson website and located a link titled "9 Editorial Assistant". On the webpage with the email address resumestaffing@pearsoned.com, she electronically submitted her resume and a message in the cover letter section stating that she was interested in an Editorial Assistant position and that she was qualified, and requesting acknowledgment of receipt. Ms. Cummings cannot remember whether the webpage included a job description or just a series of entrance requirements or whether the webpage listed in which departments the positions were available. But she does remember that she consciously applied to nine (9) positions, that the first one only required a bachelor's degree, and that the job description shown below, which she printed from the website in the fall of 2002, resembled what she saw on the website in April 2002.

> Editorial Assistant: This position is responsible for assisting the Editor with contracting and developing the manuscripts, releasing them to production, and working with sales and marketing to increase overall sales. Also responsible to prepare [*11] presentations of new books to sales force and help present the presentations to selected professional associations and conventions. Qualifications: BA/BS preferred. Excellent written and verbal communication skills required.

Ms. Cummings does not know what became of the resume she sent through the website. A day or two later she sent another electronic copy of her resume from her personal Yahoo! email account to Ms. Caron's email address, which she had obtained from the Pearson website. The email to Ms. Caron included a message similar to the one accompanying the resume she sent to resumestaffing@pearsoned.com. In Ms. Cummings's email to Ms. Caron she did not write that she was applying for all nine editorial positions posted on the website because she believed that was understood since they were advertized in a collective fashion. Ms. Caron, a Pearson Human Resources Generalist, acknowledged the receipt of the emailed resume.

According to Ms. Caron, her initial response was that the resume was not well-written or well-presented. She observed that it was not accompanied with a cover letter and it did not reflect any relevant employment experience, and that the "Introduction" section [*12] showed that the applicant was not motivated and ambitious. n2 Accordingly, Ms. Caron placed Ms. Cummings's resume in the "B" pile. n3

n2 Pertinent to Ms. Caron's view was that in the "Introduction" section, Ms. Cummings's resume stated that she was "a former Temp' who stayed the longest on the worst of assignments."

n3 According to Ms. Caron, she "typically received fifty to one hundred resumes a day, in aggregate, for the positions for which [she] recruited. Due to the volume of resumes, [she] would initially review resumes by separating them into two groups, "A" and "B." Group A consisted of resumes that appeared highly professional and included a well-written cover letter . . . Group A also included resumes from candidates who were referred by current Pearson employees. In contrast, Group B consisted of resumes that appeared less professional, organized, and well written, and resumes that were not accompanied by a well written cover letter or other information expressing an interest in the particular position and relevant experience." Caron would then "review the resumes in Group A more closely and select the most qualified candidates to be forwarded on to the manager of the department looking for an Editorial Assistant. After reviewing the selected resumes, the manager would return them to [Caron], indicating in which candidates he or she was interested. [Caron] would then interview those candidates over the telephone, select the three to five top candidates, and schedule in-person interviews with the hiring manager, who made the final decision." [Caron Aff., P 10.] "Due to the volume of candidates, [Caron] typically did not respond to applicants who were not ultimately hired, unless the applicant had received an interview or was referred by a Pearson employee." Typically, Caron did not reconsider Group B resumes because Group A was usually large enough to furnish excellent candidates.

[*13]

About a week to ten days after receiving Ms. Caron's acknowledgment of receipt, Ms. Cummings sent Ms. Caron an email asking for a status report. Ms. Caron replied with a short email requesting another copy of Ms. Cummings's resume. According to Ms. Caron, she made the request because it was difficult to determine with whom she was corresponding given the large number of emails and resumes she received.

After that, Ms. Cummings sent another email to Ms. Caron asking if the two could meet. Ms. Cummings heard nothing back. About a week or so later, Ms. Cummings sent Ms. Caron another email asking for a status report. Ms. Caron replied with a short email again requesting another copy of Ms. Cummings's resume. According to Ms. Caron, she made this request again because she was still not yet familiar enough with Ms. Cummings name or email address to realize with whom she was corresponding. According to Ms. Cummings, when asked why she needed the additional copies, Ms. Caron simply emailed the response "Need several copies." n4 Ms. Cummings then emailed Mr. Dalton to express bewilderment. Mr. Dalton did not reply.

n4 At this point, Ms. Caron claims that "[g]iven Ms. Cummmings's persistence in seeking employment; I prepared to interview her by telephone and assess if there were any other jobs that might be appropriate for her, even though she had not made the cut for an Editorial Assistant position. I sent an email to Ms. Cummings, offering to speak with her by phone and asking plaintiff to suggest a convenient time for doing so. I could not call her directly, as Ms. Cummings included no telephone number on her resume. Ms. Cummings responded by email indicating she could not participate in a telephone call. She offered no alternative." However, Ms. Cummings argues that Ms. Caron "concocted a tale that she had offered Plaintiff a telephone interview,'" and that this is part of the evidence demonstrating Pearson's attempt to cover up the age discrimination. At the summary judgment stage, I do not resolve the question of whether there was an offer of a telephone interview.

[*14]

Ms. Cummings again emailed Ms. Caron for a status report after noticing that Pearson had removed the ad from its website. When Ms. Caron failed to reply, Ms. Cummings sent a follow-up email suggesting the jobs must be filled by now and mentioning Mr. Dalton's name. A few days later, Ms. Caron replied that the jobs had been filed. Ms. Cummings replied in an email that she expected an interview "at least". According to Ms. Cummings, Ms. Caron replied in an email that she only

passes on papers and that it might have been because she did not have a phone number on her resume. In response, Ms. Cummings emailed Mr. Dalton the following, which was copied to Ms. Caron:

> Mark. It's apparent that EC [Elizabeth Caron] is not fully grown yet. I got one too many "Hi Margarets," accompanied by still another request for a resume.
>
> At the outset, I specifically requested that I be contacted by em-mail [sic]. I could not have been more clear as to why. Perhaps I was simply passed over. But if this had to do with not having a telephone number, that is quite something else. Ms. Caron is employed, I am not.
>
> If it is any comfort to you, neither your name nor Gina's was mentioned until [*15] after I heard from Gina last weekend. I somehow sensed all was lost.
>
> I have no regrets about my dealings with Ms. Caron; if she took it the wrong way then she shouldn't be dealing with people. (I used to be a public information officer.)
>
> By a copy of this being sent to Ms. Caron, I hope this absolves you. I have always been appreciative; I don't grovel, however. Thank you. Margaret Cummings.

[Caron Aff., Ex. 3.]

At some point, Ms. Caron contacted Mr. Dalton, since he was named in one of Ms. Cummings's email, in order to obtain more information about Ms. Cummings. Mr. Dalton informed Ms. Caron that he had met Ms. Cummings through the Boston placement firm New Directions. Ms. Caron then called New Directions where she spoke with Ms. Westropp about what Ms. Caron called Ms. Cummings's "unprofessional approach to her efforts to obtain employment with Pearson." Ms. Westropp made Ms. Cummings aware of this conversation in an email.

Sometime around early June 2002, Ms. Cummings saw a posting on the pearsoned.com webpage for "2 Editorial Assistant" vacancies. Ms. Cummings remembers that these postings called for a BA/BS and a writing sample. Ms. Cummings emailed Ms. Caron [*16] about these positions and asked whether she needed to send another resume. Ms. Caron replied that she had her resume on file and that there was no need to send another. Ms. Cummings never forwarded Ms. Caron a writing sample, and Ms. Caron never requested one. About a week later, having heard nothing, Ms. Cummings emailed Ms. Caron asking for a status report. At the suggestion of Ms. Grossman, Pearson's Human Resources Director, Ms. Caron replied that a "very qualified candidate" had been hired, even though Ms. Caron was uncertain about which Editorial Assistant position(s) Ms. Cummings was inquiring about.

At some point in early June, Ms. Cummings also sent Ms. Caron a revised resume for "future use". The revised resume included a few formatting changes and a couple of changes in the introduction and the proven skills and abilities sections.

In July or early August Ms. Cummings emailed Ms. Caron again about a "1 Editorial Assistant" position advertized on pearsoned.com. This time the position required a BA/BS with good organizational skills. Ms. Caron did not respond to this email or Ms. Cummings's subsequent request for a status report. Consequently, Ms. Cummings emailed Ms. Caron [*17] requesting that Pearson's affirmative action/equal opportunity officer review the Editorial Assistant hires because Ms. Cummings suspected discrimination. Again, Ms. Cummings received no reply.

Finally, in September 2002, Ms. Cummings emailed Ms. Caron advising her that she intended to file a complaint with the Equal Employment Opportunity Commission (EEOC). Ms. Cummings did in fact file such a complaint on March 14, 2003. In response to the complaint, Pearson submitted a Position Statement on July 28, 2003. The EEOC dismissed the complaint on September 10, 2003 finding that it "is unable to conclude that the information obtained establishes violation of the statutes." But "[t]his does not certify that the respondent is in compliance with the statutes." On November 4, 2003, Ms. Cummings brought this action against Pearson, Ms. Grossman, and Ms. Caron.

Pearson hired six full-time Editorial Assistants between April and August 2002. n5 Pearson hired Marlana M. Voerster on April 8, 2002 as an Editorial Assistant for Allyn & Bacon's Psychology texts; Elizabeth E. Lee on April 22, 2002 as an Editorial Assistant for Allyn & Bacon's Criminal Justice and Anthropology text; Christine Lyons [*18] on May 1, 2002 as an Editorial Assistant for Allyn & Bacon's Education texts; Bernard Gaffney on May 8, 2002 as an Editorial Assistant for Addison Wesley Professional's Computing/Information Technology texts; Leah Prebluda on June 17, 2002 as an Editorial Assistant for the Editorial Director for all Allyn & Bacon texts; and Keren Blankfeld on June 17, 2002 as an Editorial Assistant for Addison Wesley's Mathematics and Statistics texts. However, during the April through

August 2002 time period there were in fact more than nine Editorial Assistant vacancies in a variety of departments, including both Regular Full-Time and Term of Project positions. n6 Since Ms. Cummings does not remember what departments the Editorial Assistant postings referred to and since she did not specify the departments when she emailed Ms. Caron indicating her interest, Pearson cannot determine which positions she applied for. Nonetheless, I proceed on the understanding that Ms. Cummings applied for at least some of the Editorial Positions advertised and filled between April and August 2002, but that she was not interviewed for any.

n5 The persons identified in Pearson's Position Statement to the EEOC are the six individuals hired by Pearson for full-time positions, as opposed to part-time or term of project positions, during the relevant period.

[*19]

n6 Ms. Cummings believes that there were nine "interviewees-hires" hired during the April-August 2002 period because the original posting on the pearsoned.com website indicated "9 Editorial Assistant". While Pearson may have initially advertised for nine or more Editorial Assistant positions during the relevant period, the evidence indicates that it only filled the six specific full-time positions listed above during the April to August 2002 period. Given the immateriality of such evidence to my disposition of the summary judgment motions, I will not order Pearson to provide the names and resumes of all individuals eventually hired for vacancies posted on pearsoned.com between April and August 2002. Consequently, I deny Ms. Cummings's Motion to Order Defendants to Account for the 3-to-all Editorial Assistant Hired from 18 June to 31 August 2002.

## II. DISCUSSION

### A. Individual Liability

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), prohibits employers from failing or refusing to hire a potential employee because of the candidate's [*20] age. "Employers" are defined as a "person engaged in an industry affecting commerce who has twenty or more employees . . . " The term also includes "any agent of such a person." 29 U.S.C. 630(b). The term "person" means "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. 630(a).

Ms. Cummings has sued Ms. Grossman and Ms. Caron in addition to Pearson. One could make the argument that Ms. Grossman and Ms. Caron were acting as agents of Pearson when they refused to interview or hire Ms. Cummings. However, although the First Circuit has declined to determine whether individuals can be held liable under the federal anti-discrimination statutes such as the ADEA, most courts that have addressed the issue have determined that these statutes do not create individual liability. Orell v. U. Mass. Mem'l Med. Ctr., Inc., 203 F.Supp.2d 52, 64 (D. Mass. 2002). See also Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 444 (1st Cir. 1997)(declining to answer the question of whether a corporate [*21] supervisor can be sued as the "agent of such a person"); cf. Healy v. Henderson, 275 F. Supp.2d 40, 44-45, 45 n. 39 & n. 40 (D. Mass. 2004) (collecting cases) ("[E]very circuit court that has interpreted Title VII's definition of 'employer' and the majority of District Courts in the First Circuit . . . have concluded that Congress did not intend to impose individual liability upon agents of an employer.") I too conclude that the ADEA does not provide a basis for individual liability for employees. See, e.g., Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 686 (5th Cir. 2001); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir. 1994), cert. denied, 513 U.S. 1058, 115 S. Ct. 666, 130 L. Ed. 2d 600 (1994)(Imposing "personal liability would place a heavy burden on those who routinely make personnel decisions for enterprises employing twenty or more persons, and we do not read the statute as imposing it. Instead, we read § 630(b) as an unremarkable expression of respondeat superior -- that discriminatory personnel actions taken by an employer's agent may create liability for the employer."); Miller v. Maxwell's International Inc., 991 F.2d 583, 587 (9th Cir. 1993), [*22] cert. denied, 510 U.S. 1109, 114 S. Ct. 1049, 127 L. Ed. 2d 372 (1994)(Although the alternative statutory construction argument is not without merit, the obvious purpose of the agent provision in the definition of "employer" was to incorporate respondeat superior liability into the statute. Furthermore, since "Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees.") I find no reason to depart from the clear weight of authority on this issue. Consequently, I grant the Defendants' motion for summary judgment as to the claims against Ms. Grossman and Ms. Caron and turn now to the claim against Pearson.

### B. Employer Liability

Congress enacted the ADEA in 1967 to enable legal recourse by private sector employees subjected to age

discrimination in the workplace. Nowd v. Rubin, 76 F.3d 25, 26 (1st Cir. 1996). In a failure to hire discrimination suit under the ADEA, the plaintiff bears the ultimate burden of persuading the factfinder that the employer illegally discriminated against her by refusing to hire the plaintiff on the basis of her age. Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994). [*23] Where, as here, the potential employee cannot prove age discrimination through direct evidence, a three-step test drawn from the Supreme Court's decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), is employed.

Under the McDonnell Douglas test, the plaintiff first has the burden of establishing a prima facie case. To meet this burden in this setting, the plaintiff must show that four things are true:

> (1) s/he is a member of a protected class, (2) s/he applied and was qualified for the position in question, (3) that despite his/her qualifications, s/he was rejected, and (4) that, after rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications.

Woods, 30 F.3d at 259 citing McDonnell Douglas, 411 U.S. at 802.

If the plaintiff can establish her prima facie case, the burden shifts to the employer to show that it had a legitimate, non-discriminatory reason for choosing not to hire the candidate. If the employer can do that, then the presumption of discrimination created by the plaintiff's initial showing disappears and the burden [*24] returns to the plaintiff. At this stage, the plaintiff must produce sufficient evidence to show that the reasons advanced by the employer constitute a mere pretext for unlawful discrimination. Id. at 260. In the context of a summary judgment proceeding, this means that "once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder to reasonably conclude that the employer's decision to discharge him or her was wrongfully based on age." Id. citing LeBlanc v. Great American Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993).

**1. Prima Facie Case**

Pearson concedes that Ms. Cummings can show that she is a member of a protected class (she was over 40 years old when she applied for the positions) and that Pearson did not hire her. However, Pearson argues that no reasonable fact finder could conclude (1) that she was qualified for an Editorial Assistant position at Pearson, and (2) that the position(s) for which she applied remained open while Pearson sought candidates with similar qualifications. [*25] I disagree.

Under either of the descriptions of the qualifications required for Pearson Editorial Assistants -- namely, the one printed from the pearsoned.com website by Ms. Cummings in the fall of 2002 or the position description for an Editorial Assistant that was used in May 2002 according to Pearson -- I find that there is "at least a genuine issue as to [Ms. Cummings's] ability to meet the employer's legitimate expectations." Woods, 30 F.3d at 261.

The only objective criterion set out in both of the descriptions is the requirement of a Bachelor's degree. Ms. Cummings was awarded a Bachelor's degree in 1974 from the University of Massachusetts and this achievement was reflected in her resumes submitted to Pearson. The Editorial Assistant Job Description produced by Pearson also includes the requirement of computer literacy including wordprocessing, spreadsheets, and the internet. The resume Ms. Cummings initially submitted indicated that she had recently earned a certificate for training in Microsoft Office XP.

While Pearson is certainly entitled to require that candidates possess excellent written and verbal communication skills, I cannot conclude as urged [*26] by Pearson, that Ms. Cummings "lacks effective written communications skills." On summary judgment I am to resolves questions of law, not such issues of fact. The degree to which Ms. Caron was unimpressed with the resume itself does not mean that Ms. Cummings is unqualified. Similarly, neither of the qualification descriptions required particular experience. Thus, the fact that Ms. Cummings might not be hired because she lacks experience in publishing compared to others does not mean that she was not qualified for the entry-level position as advertised by Pearson.

Pearson next argues that since "Cummings cannot identify for which vacancies she applied, . . . it is not possible to know for how long the specific positions for which Cummings applied remained open or whom Pearson interviewed or hired for those jobs. Thus, Cummings cannot satisfy her burden with regard to the fourth prong of a prima facie case." Although there is a dispute as to which Editorial Assistant positions Ms. Cummings applied for, it is clear that Pearson hired at least five and maybe six, full-time Editorial Assistants after Ms. Cummings indicated her interest in early April. n7 Conse-

quently, Ms. Cummings [*27] has met her burden at the first stage.

n7 Ms. Voerster submitted her resume on January 16th and was hired on April 8th, while Ms. Cummings appears to have sent an email to Ms. Caron sometime around April 8th. The other five successful candidates applied between March 31st and May 21st and were hired between April 22nd and June 22nd, which is clearly after Ms. Cummings indicated her interest.

### 2. Pearson's Reasons

Because Ms. Cummings has adequately presented a prima facie case, Pearson must rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its decision not to hire Ms. Cummings. Pearson argues that Ms. Caron initially relegated Ms. Cummings's resume into Group B because her submission was not of the quality or substance that Pearson expects from successful applicants. Ms. Caron reported in her Affidavit that:

Upon reviewing Ms. Cummings's resume, I concluded that it [was] [sic] not well written; saw that it was not accompanied by a cover [*28] letter; and observed that it did not reflect any relevant employment experience. The "Introduction" alone showed that Ms. Cummings was not a competitive candidate for an Editorial Assistant position, one that is entry-level but highly desired by motivated and ambitious people with a recognizable interest, and some type of work experience, in publishing, education or both.

Given Pearson's recruiting procedures described in footnote 3 above and given the competition for the Editorial Assistant positions, I find that Ms. Caron's impressions are a sufficient non-discriminatory reason for her decision not to pass on the resume to a department manager, effectively ending Ms. Cummings's quest to be hired at Pearson.

As for the applications in June and July/August, it appears that Ms. Caron decided that, in addition to her view that Ms. Cummings's resume was unimpressive and lacking an effective cover letter, Ms. Cummings was not a viable candidate because the emails from Ms. Cummings "reflected poorly on her interpersonal skills." I find that this is an additional non-discriminatory reason for Ms. Caron and Ms. Grossman's handling of the later applications from Ms. Cummings. Consequently, [*29] the burden of production returns to Ms. Cummings.

### 3. Pretext

At this stage, I must determine whether Ms. Cummings "has produced sufficient evidence to raise a genuine issue of material fact such as would permit a reasonable factfinder to conclude that" Pearson did not really rely on its articulated reasons in deciding not to hire Ms. Cummings and that Pearson unlawfully discriminated against Ms. Cummings because of her age. Woods, 30 F.3d at 262. Ms. Cummings "must do more than cast doubt on the rationale proffered by [Pearson], the evidence must be of such strength and quality as to permit a reasonable finding that the . . . [refusal to hire] was *obviously or manifestly unsupported.*" Ruiz v. Posadas de San Juan Associates, 124 F.3d 243, 248 (1st Cir. 1997)(internal citations and quotations omitted)(emphasis in original). With the evidence before me, I must agree with Pearson; Ms. Cummings cannot show that Pearson's reasons for not interviewing or hiring Ms. Cummings were a pretext for age discrimination.

Ms. Cummings makes several arguments why Ms. Caron's explanation of her impressions were pretext for age bias. I will address [*30] them in turn, starting with what I believe is the strongest argument.

Ms. Cummings argues that age bias is evident because the six individuals hired by Pearson between April and August 2002 were all born between 1975 and 1979, whereas Ms. Cummings was born in 1939. n8 Even in a discrimination charge based on a disparate treatment theory, the plaintiff must prove that the employer harbored a discriminatory motive when it decided not to hire the plaintiff. See, e.g., Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 1705, 123 L. Ed. 2d 338 (1993)(proof of discriminatory motive is critical); Holt v. Gamewell Corp., 797 F.2d 36, 37 (1st Cir. 1986)(similar). Given the totality of the circumstances, the ages of successful candidates are not enough. While Ms. Cummings may be right that some employers looking to fill entry-level positions might prefer someone who is fresh out of college, there is no evidence here that Ms. Caron's articulated impressions were a pretext for discrimination. While use of words like "relevant" and "viable" by Ms. Caron and Ms. Grossman does not add support to Ms. Cummings's claims, Pearson's counsel's post-litigation statement that Ms. Cummings's [*31] education was "stale" was improvident. However, the ADEA does not necessarily prevent employers from seeking out recent college graduates for entry-level positions, providing that the employer does not discriminate

Page 8

based on age. Sack v. Bentsen, 51 F.3d 264, 1995 WL 153645, *4 (1st Cir. 1995)(unreported) citing E.E.O.C. v. Francis W. Parker School, 41 F.3d 1073, 1076 (7th Cir. 1994)("The ADEA requires the employer to ignore an employee's age. . . . it does not specify further characteristics that an employer must also ignore.'") "To be sure, it may be more likely that most of the applicants eligible for additional [consideration] because they recently completed [undergraduate degrees] will be under forty. But decisions based on criteria which merely tend to affect workers over the age of forty more adversely than workers under forty are not [necessarily] prohibited.'" Sack, 51 F.3d 264, 1995 WL 153645, *5 citing Francis W. Parker School, 41 F.3d at 1077.

> n8 I note, however, that as Ms. Cummings herself admits, Pearson had no way of knowing her precise age. In fact, Ms. Cummings suggests that Ms. Caron would have probably deduced that Ms. Cummings was 48 or so years old when she applied, as opposed to over 60, given her graduation date from the University of Massachusetts. Of course, the age discrimination statute places all those over 40 in the protected class. 29 U.S.C. § 631(a).

[*32]

Ms. Cummings argues that she was the "most credible candidate" and her resume was "far better" than any of the disclosed resumes of those hired by Pearson in 2002. While "[a]n employer's asserted strong reliance on subjective feelings about candidates may mask discrimination," Koster v. Trans World Airlines, Inc., 181 F.3d 24, 32 (1st Cir. 1999), I disagree that a reasonable factfinder would necessarily find that Ms. Cummings was without a doubt more qualified than those hired and thus that Ms. Caron's impressions had to pretextual. The six individuals hired by Pearson in the relevant period were at least as qualified as Ms. Cummings. They all had bachelor's degrees and some experience in related fields. While they were not all hired for departments corresponding exactly to their educational background, n9 there is nothing irrational about their selection over Ms. Cummings.

> n9 For instance, Pearson hired Keren Balkfield for Addison Wesley's Mathematics and Statistics texts, even though she received a Bachelor of Arts in English, whereas Bernard Gaffney was hired for Addison Wesley's Professionals' Computing/ Information Technology texts, even though he received a Bachelor of Mathematics.

[*33]

Ms. Cummings also argues that Pearson added experience and study requirements where there were none. As Ms. Cummings points out, a factfinder might infer that an employer's decision not to hire someone based on lack of experience was pretextual if the experience was not necessary. See, e.g., Hodgson v. First Federal Sav. & Loan Ass'n of Broward County, 455 F.2d 818, 824 n. 14 (5th Cir. 1972). However, since Ms. Caron was receiving a significant number of resumes for each advertized position and since hiring managers prefer candidates with experience and a strong interest in certain fields, it was reasonable for Ms. Caron to prefer candidates with one or two years of relevant experience.

In addition, Ms. Cummings argues that Pearson misled her when Ms. Caron asked for her resume twice and because Ms. Caron never informed her that she would not be considered. While it may be a best practice for a recruiter promptly to inform every declined applicant of his or her rejection, there is no legal requirement that recruiters do so, especially when they receive the volume of applications for each position that Ms. Caron apparently does. n10 Similarly, while it may create [*34] difficulties for people trying to get into a new field or a new firm, there is nothing improper about Pearson favoring its own employees, or individuals referred by Pearson employees, for new openings. Today's job market is highly competitive. Even entry-level positions in many fields are hard to come by.

> n10 Ms. Cummings also applied for other jobs elsewhere she received no response.

Finally, Ms. Cummings argues that pretext is evident from Ms. Caron's fabrication of the offer of a telephone interview, Pearson's incompetent online recordkeeping, Pearson's refusal to allow its affirmative action/equal employment opportunity officer to examine Ms. Cummings's complaint, and Ms. Caron's decision to call Mr. Dalton and New Directions on her own initiative. I decline to find that any of these actions evidence Pearson's age bias. The first two are the result of the lack of recordkeeping by both parties prior to the escalation of the conflict between Ms. Caron and Ms. Cummings; the last two are the result of Pearson's [*35] understandable reaction to the conflict that developed between Ms. Caron and Ms. Cummings. None of these actions evidence age discrimination.

In sum, none of the reasons advanced by Ms. Cummings satisfy her burden of providing evidence of such strength and quality as to permit a reasonable finding that Pearson's refusal to interview or hire Ms. Cummings for