UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
            Plaintiff,            )
                                  )        CIVIL ACTION NO. 05-697
      v.                          )        (SLR)
                                  )
BE&K ENGINEERING COMPANY,         )
(Subsidiary of BE&K, Inc.)        )
                                  )
            Defendant.            )
_____

PLAINTIFF EEOC'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

<div style="margin-left:40%">

Jacqueline H. McNair
Regional Attorney
Judith O'Boyle
Supervisory Trial Attorney


_____/S/_____
Woody Anglade
Trial Attorney
Equal Employment Opportunity
Commission
Philadelphia District Office
21 S. 5th Street, Suite 400
Philadelphia, PA  19106
(215) 440-2814


COLM F. CONNOLLY
United States Attorney


Douglas McCann
Civil Chief
Delaware Bar I.D. No. 2901
The Nemours Bldg.
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

</div>

Dated:  September 27, 2006

## TABLE OF CONTENTS

TABLE OF CITATIONS...…………………………………………………..……………………..……iii

SUMMARY OF ARGUMENT ……… .…………………………………………………………iv

PROPOSED ORDER……….. .…………………………………………………………………..v

I.      NATURE AND STAGE OF THE PROCEEDING……………………………………………1

II.     PLAINTIFF EEOC'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS…..……2

III.    COUNTERSTATEMENT OF MATERIAL FACTS…..……………………………………10
                        Juan Obed Perez's First Tenure with BE&K…………….………….10

                        Perez's Second Tenure with Defendant……………………….…..11

                        Perez Helps Secure New Contracts for Defendant…...…..…………12

                        Concerns about Layoffs……………………………………13

                        Perez is Terminated……………………………………..……15

IV.     ARGUMENT……………………………………………………………...16

        A.      Summary Judgment is Not Appropriate Because There Exist Genuine Issues
                of Material Fact as to Whether Defendant Discharged Perez Because of His Age….16

        B.      Overview of Relevant Law Governing the Pretext Analysis……….…………….19

        C.      The Commission Has Offered Evidence From Which a Reasonable Jury Could
                Conclude that the Defendant's Articulated Reasons for Perez's Discharge
                Were a Pretext for Age Discrimination……………………………….…………..21

        D.      Plaintiff Can Establish a Prima Facie Case of Age Discrimination……..…………..21

        E.      Defendant's Legitimate Non-Discriminatory Reasons are Not Worthy of Belief…....24
                (1)     Perez Was Qualified to Work on Available Projects…………………………24

                (2)     Defendant's Actions Show Discriminatory Animus Toward Perez…….……28

                (3)     Ageist Comments Could be Probative of Age Discrimination……………….31

                (4)     Hiring of Guttridge Smacks of Pretext……………..……...…………………32

        V.      CONCLUSION…………………………………… …………………………...……………34

## TABLE OF CITATIONS

**Federal Cases**

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3rd Cir. 1996)                                                19

Anderson v. Consolidated Rail Corporation, 297 F.3d 242 (3rd. Cir 2002)                                          16,17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)                                                        22, 23

Baker v. Tooling Science, 2005 U.S. Dist. 03-5310 WL 2105504 (D. Minn. Aug. 26, 2005)                            29, 33

Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358 (3d Cir. 1992), cert. denied, 530 U.S. 912 (1993)   16

Brodsky v. Hercules, Inc., 966 F. Supp. 1337 (D. De. 1997)                                                       23,26, 32

Brown v. Delaware & Hudson Railway, No. 91-3203 U.S. Dist. WL 330320 (E.D. Pa. Nov. 3, 1992)                     28

Cardona v. Aetna Life & Casualty, No. 3: 96-1009 U.S. Dist. WL 246634 (D. Conn. May 9, 1998)                     21

Carlton v. Mystic Transp., Inc., 202 F.3d 129 (2d Cir. 2000), cert. denied, 530 U.S. 1261 (2000)                 24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)                                                                    16

Danzer v. Norden Systems, Inc., 151 F.3d 50 (2nd Cir. 1998)                                                      24, 28, 29

Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)                                                                   18, 19, 20

Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)                                                                  19

J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991)       16

Jones v. Unisys Corp., 54 F.3d 624 (10th Cir. 1995)                                                              18

Kern v. Westinghouse Electric Corp., No. 95-49 U.S. Dist. WL 813157 (W.D. Pa. Dec. 19, 1995)                     27

Marx v. Schnuck Markets, Inc., 76 F.3d 324 (10th Cir. 1996), cert. denied, 518 U.S. 1019 (1996)                  18

Maxfield v. Sinclair, Int'l, 766 F.2d 788 (3d Cir. 1985), cert. denied, 424 U.S. 1057 (1986)                     22

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)                                                            17

Palmisano v. Electrolux, LLC, No. 99-426, 2000 U.S. Dist. WL 1100785, *5 (E.D. Pa.. Aug 7, 2000)                 18

Peterson v. Knight Architects, Engineers, No. 97 C 1439 WL 1313696, at *16 (N.D. Ill. Nov. 4, 1999)              23, 24

Phelps v. Yale Security, No. 3-90-545 U.S. Dist. WL 236591, at *2 (E.D. Tenn. June 26, 1991)                     27

Pivirotto v. Innovative Systems, Inc., 191 F.3d 344 (3d Cir. 1999)                                               22

Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991)                                                                30

Ray v. Iuka Special Mun. Separate Sch. Dist., 51 F.3d 1246 (5th Cir. 1995)                                       38

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)                                                   17

Riordan v. Kempiners, 831 F.2d 690 (7th Cir. 1987)                                                               19

Roebuck v. Drexel University, 852 F.2d 715 (3rd  Cir. 1988)                                                       20

Russell v. Acme-Evans Co., 51 F.3d 64 (7th Cir. 1995)                                                            20

Schiwall v. American Packaging Corporation, U.S. Dist. 95-7190 1997 WL 36971, * 3 (E.D. Pa. Jan. 30. 1997)       17

Scott v. IBM Corp., 196 F.R.D. 233 (D.N.J. 2000)                                                                 18

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)                                                            17, 18

Wexler v. White's Fine Furniture, Inc., 317 F.3d 564 (6th Cir. 2003)                                           30

Yates v. Rexton, Inc., 267 F.3d 793 (8th Cir. 2001)                                                              33

Zielonka v. The First National Bank of Chicago, U.S. Dist. WL 568696 (N.D. Ill. Oct. 12, 1994)                  31

**Federal Statutes**

29 U.S.C. § 623(a)                                                                                               23

29 U.S.C. § 623(a)(1)                                                                                            1, 17

**Federal Rules**

Rule 56(c)                                                                                                       16

## SUMMARY OF ARGUMENT

Defendant's summary judgment motion should be denied because there are genuine issues of material fact which exist with respect to whether Defendant discharged Mr. Perez because of his age.

1.    Plaintiff EEOC can establish a prima facie case of age discrimination.

2.    The EEOC can show that Defendant's alleged legitimate non-discriminatory reasons are not worthy of belief.

3.    The Commission can produce evidence showing that there are genuine issues of material fact regarding whether: (1) Perez was qualified to work on available projects; (2) Defendant's actions show discriminatory animus toward Perez; (3) ageist comments are probative of age discrimination; and (4) Christopher Guttridge's hiring is pretextual for age discrimination.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05-697 |
| v. | ) | (SLR) |
| | ) | |
| BE&K ENGINEERING COMPANY, (Subsidiary of BE&K, Inc.) | ) ) | |
| | ) | |
| Defendant. | ) | |

_____

## **ORDER OF COURT**

AND NOW, this _____ day of _____, 2006, upon consideration of the Defendant's Motion for Summary Judgment and the Plaintiff EEOC's Response in Opposition thereto,

IT IS HEREBY ordered, adjudged and decreed that Defendant's said motion is DENIED in its entirety.

_____
KENT M. JORDAN
UNITED STATES DISTRICT JUDGE

v

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05-697 |
| v. | ) | (SLR) |
| | ) | |
| BE&K ENGINEERING COMPANY, | ) | |
| (Subsidiary of BE&K, Inc.) | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF EEOC'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff EEOC opposes Defendant BE&K Engineering Company's Motion for Summary Judgment because the Commission can establish that Defendant's articulated reasons for terminating Juan Obed Perez were pretextual for unlawful age discrimination. Defendant asks this Court to grant summary judgment in its favor based upon material facts that are in dispute. The evidence shows that Plaintiff EEOC can withstand a summary judgment motion and is entitled to go to trial.

## I.    NATURE AND STAGE OF THE PROCEEDING

On or about September 23, 2005, Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Commission") filed a Complaint against Defendant BE&K Engineering Company ("Defendant" or "BE&K") alleging that Defendant laid off Juan Obed Perez, then age 54, on the basis of his age in violation of the Section 4(a)(1) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1). (B 30-36). On September 5, 2006, Defendant moved for summary judgment arguing that BE&K did not discriminate against Mr. Perez based on his age and therefore summary judgment should be granted to Defendant.

In this Opposition to the Motion for Summary Judgment, the Commission submits that there are genuine issues of material fact which preclude summary judgment and require submission of this matter to a jury trial. The Commission submits that it can prove all elements to substantiate its claim for age

discrimination in violation of the ADEA, including evidence to prove that Defendant's articulated reasons for terminating Juan Obed Perez are unworthy of belief. Accordingly, for reasons set forth in detail below, the Commission requests that the Court deny Defendant's Motion for Summary Judgment.

## II.    PLAINTIFF EEOC'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

### Pages 1 & 2 of Defendant's Statement of Facts

#### A.    The Nature of BE&K's Business

¶1    Facts herein controverted in part by Plaintiff EEOC. The EEOC disputes that Perez was laid off because the project to which he was assigned ended and there were no other available projects that matched Perez's skills. He could have been placed on current, as well as new incoming projects. (B 207, 273).

##### 1.    Contract Engineering Is a Project-Based Industry Susceptible to Layoffs

¶1    Facts disputed in that Mr. Perez never testified that the nature of the business frequently results in layoffs of engineers for lack of work. (B 108).

¶2    Facts herein controverted in part by the EEOC. It is disputed that the BE&K engineer population consists largely of experienced engineers. Christopher Guttridge testified it appears that majority of people recently hired have little experience. (B 131). The 77% calculation is incomplete because it did not account for the ages of process engineers such as Mark Beitler, Dan Poprik and other engineers who were working at a site. (B 166-169, 199-201).

¶3    Facts herein controverted in part by Plaintiff EEOC. There is no evidence which indicates that Defendant acts as a temporary agency to companies in need of project-based engineering services.

¶4    Facts not in dispute.

¶5    Facts not in dispute.

**Pages 2 & 3 of Defendant's Statement of Facts**

      **2.**    **Department Managers Closely Monitor the Project Landscape to Prevent the Need for Layoffs.**

¶1    Facts herein not controverted by Plaintiff EEOC.

¶2    Facts not in dispute.

¶3    Facts herein controverted in part by Plaintiff EEOC.  Process department engineers are all expected to do the same type of duties regardless of experience, title classification, complexity, and project size.  (B 138-140, 144, 203).

¶4    Facts herein not controverted by Plaintiff EEOC.

**Pages 3-5 of Defendant's Statement of Facts**

      **3.**    **The Use of Contract Engineers Reduces the Need for Layoffs**

¶1    Facts herein controverted in part by Plaintiff EEOC.  Denied that any Defendant official indicated that one way it reduces the likelihood of layoffs is through the use of contract engineers from Allstates.

¶2    Facts herein controverted in part by Plaintiff EEOC.  There is no evidence that the number of Allstates employees at BE&K doubled.  (B 149, 192).

¶3    Facts not in dispute.

¶4    Facts herein controverted in part by Plaintiff EEOC.  It is disputed that Allstates Technical Services' ("Allstates")[1] employees are offered all of the benefits made available to BE&K employees except for the profit-sharing program.  Benefits at Allstates are limited as compared to Defendant.  (B 242).

¶5    Facts herein controverted in part by Plaintiff EEOC.  Andrea Gerwig was terminated by BE&K on June 30, 2004.  During the EEOC's investigation, Defendant claimed that Ms. Gerwig was brought back to work on Defendant's projects as an employee of Allstates because the client needed her specific expertise in relief device documentation.  "Workload in Relief Device Documentation picked up for a

---

[1] Allstates is a Defendant subsidiary, which provides contracting services for Defendant's affiliates.  (B 147, 241).  Allstates' employees are hourly employees, unlike BE&K salaried employees.  (B 114, 228-229).

limited period, and so Andrea was hired to do this work on an hourly contract for the duration of this effort." (B 25-27).

¶6    Facts herein not controverted by Plaintiff EEOC.

## Pages 5& 6 of Defendant's Statement of Facts

### 4.    The Shift From Large Project Work to Small Project Work Increased the Risk of Layoffs

¶1    Facts not in dispute.

¶2    Facts disputed in part because engineers worked on large and small projects. (B 141-142).

¶3    Facts herein controverted in part by Plaintiff EEOC. Engineers at BE&K are capable of working on both large and small projects. (B 144).

¶4    Facts herein controverted in part by Plaintiff EEOC. Engineers at BE&K are capable of working on both large and small projects. (B 144). It is disputed that engineers work for the duration of large projects. Some engineers split their time between projects. (B 132-133, 267).

## Pages 6 & 7 of Defendant's Statement of Facts

### B.    Juan Obed Perez's Employment History with BE&K

### 1.    Perez worked for BE&K in 1993 and Was Laid Off for Lack of Work

¶1    Facts herein not controverted by Plaintiff EEOC, except to add Mr. Perez was 44 years old at the time he started working for Defendant in 1993. (B 38).

¶2    Facts herein not controverted by Plaintiff EEOC.

¶3    Facts herein not controverted by Plaintiff EEOC.

¶4    Facts herein controverted in part by Plaintiff EEOC. Disputed that there was no suitable work for Mr. Perez. Perez noticed that the company had hired 3-4 very young engineers at the time he was terminated. (B 50-54, 55-58). Perez was 44 years old at the time of his 1993 termination. (B 38).

¶5    Facts herein not controverted by Plaintiff EEOC.

**Page 7 of Defendant's Statement of Facts**

      **2.**      **Perez was Re-Hired by Peter Howe in 2000**

¶1      Facts herein controverted in part by Plaintiff EEOC. Trexler indicated that there were extenuating circumstances that led to a poor performance with the Corpus Christie project. Some of the problems was that the client did not get timely information to Perez and the designer Bill Robinson did a poor job. (B 248-256). Trexler admitted that there have been many times when he did not get timely information from a client and that he was aware that the client was dissatisfied with Bill Robinson's performance on the Corpus Christie project. (B 248-256, 259-260).

¶2      Facts not in dispute.

¶3      Facts herein not controverted by Plaintiff EEOC.

**Pages 8 & 9 of Defendant's Statement of Facts**

      **C.**      **Perez's Performance was Average at Best**

          **1.**      **Perez Was Removed from the White Pigments Project for Poor Performance**

¶1      Facts herein controverted in part by Plaintiff EEOC. It is disputed whether Narayan Swamy was removed from the White Pigments project for poor performance. Mr. Swamy maintains that Howe told him that he was being terminated because there were too many senior process engineers and not enough work for them. (B 285).

¶2      Facts herein not controverted by Plaintiff EEOC.

¶3      Facts not disputed.

¶4      Facts in dispute. Perez was not advised that Dayton was unhappy with his performance on the White Pigments project. (B 8-9).

¶5      Same as previous response.

¶6      Same as previous response.

¶7      Same as previous response.

**Pages 9-11 of Defendant's Statement of Facts**

> 2. **Perez Went Overbudget and Fell Behind Schedule on the Motiva CCR Vent Scrubber Project**

¶1    Facts in dispute.  Mr. Perez was never advised that he was removed from the White Pigments Project for poor performance.  (B 8-9).  There is nothing in the record to indicate Perez was advised that Trexler was his informal supervisor on this project.

¶2    Facts denied in its entirety.  Perez never admitted that he lacked the skill to supervise others.  Further, this was not Perez's first significant project as a lead engineer.  He had been an area lead engineer on the Dupont Corpus Christie project and the sole engineer on a small General Chemicals project.  (B 48-49, 77-78, 246-247).  Perez was also a lead process design engineer when he worked for Bechtel Corporation in the early 1990s with supervisory responsibility for three other engineers.  (B 40-41, 119-120).

¶3    Facts herein controverted in part by Plaintiff EEOC.  Trexler never gave Perez a deadline to get specific diagrams to him.  (B 257-258).  The client delayed in getting the information Perez needed in a timely manner to get the tasks accomplished, a problem which Trexler has experienced himself on many occasions while working for Defendant since 1992.  (B 257-260).

The allegation about Perez exceeding the budget is also disputed.  None of the disciplines including Perez were consulted about the hours needed to do the work for the Motiva project, as what is typically done.  This was Defendant's first project with Motiva and Defendant wanted to ensure that it was able to retain repeat business from Motiva.  Therefore, Defendant purposely bid low on the project to secure the work.  (B 99-105).

Typically, the sole process engineers on a new project will be involved and consulted about the budget.  (B 136-137, 227, 272).  Howe's comments regarding Mr. Perez's performance on the Motiva project was that the "[p]roject was completed with some engineering overruns for various reasons."  Howe never indicated to Perez or on Perez's reviews that the cost overruns were Perez's fault.  (B 8-9, 99-105).

¶4    Facts herein controverted in part by Plaintiff EEOC. Trexler never testified that he advised Perez that he observed any problems with his performance.

¶5    Facts herein controverted in part by Plaintiff EEOC. It is disputed whether Perez was an effective lead. Trexler never testified that he advised Perez that he observed any problems with his performance.

¶6    Facts herein controverted in part by Plaintiff EEOC. Disputed that Mr. Perez was a poor performer as described by Trexler and Howe. Defendant indicated that Perez was not terminated for his performance, and that he was eligible for rehire. (B 106, 239-240).

## Pages 11 & 12 of Defendant's Statement of Facts

### 3.    Perez left Tosco, His Last Full-time Project, and Returned to the BE&K Office With No Prospects of New Work

¶1    Facts herein controverted in part by Plaintiff EEOC. According to Defendant, Perez's last project he billed to was the Motiva Hydrocracker Corrosion Mitigation project. (B 207).

¶2    Facts herein not controverted by Plaintiff EEOC, except to add that Perez was initially told that that the Tosco project would be from 3-4 months. (B 112).

¶3    Denied in its entirety. Mr. Perez left the Tosco job because it was completed. There were two remaining functions that needed to be completed before Perez left: (1) performing technical support until Tosco found a permanent in house person, and (2) completing some process hazards review. Perez left the Tosco job when these two functions where completed. (B 109-111).

¶4    Facts in dispute. Perez returned to Defendant's office when the Tosco project was completed. (B 109-111).

¶5    Disputed in its entirety. Neither Howe nor any other Defendant official ever advised Perez that Tosco was dissatisfied with his performance. (B 287).

¶6    Denied in its entirety. It is disputed that there were no long-term projects for Perez after he completed the Tosco project in late August 2003. They were existing projects that other engineers were working on as well as new projects which were awarded to other engineers. (B 207, 273).

**Pages 12 & 13 of Defendant's Statement of Facts**

      **4.**      **BE&K Assigned Perez to Short-Term Filler Projects in an Attempt to Avoid Laying Him Off**

¶1      Facts herein not controverted by Plaintiff EEOC.

¶2      Facts herein not controverted by Plaintiff EEOC.

**Pages 13-15 of Defendant's Statement of Facts**

      **D.**      **The 2003 Reduction-In-Force**

            **1.**      **The Low Profit Margins Necessitated Maximum Reimbursability**

¶1      Facts herein not controverted by Plaintiff EEOC.

¶2      Facts herein not controverted by Plaintiff EEOC.

¶3      Facts herein not controverted by Plaintiff EEOC.

¶4      Facts disputed in that some engineers have been permitted to charge general overhead while waiting for their next project. (B 266). Disputed that if there is not a new project starting within a reasonable time that would be suitable for that employee's skills, the employee is laid off. (B 204-205, 229).

¶5      Facts herein not controverted by Plaintiff EEOC.

¶6      Facts herein not controverted by Plaintiff EEOC, except to add that other engineers have charged to general overhead. (B 98, 266). Disputed whether those engineers who have charged to general overhead meet this alleged rare exception articulated by Defendant.

¶7      Facts controverted in part by Plaintiff EEOC. Disputed that layoffs were necessary and the concern for lack of work was serious because Defendant hired new employees during this period. (B 21, 285). Disputed that there was a required utilization rate for the process department between 2000 and 2003, Howe had an expectation that the rate be between 96-98%. (B 186).

**Page 15 & 16 of Defendant's Statement of Facts**

      **2.**     **The Utilization Rate Dropped to an Unsustainable Level**

¶1     Facts herein controverted in part by Plaintiff EEOC.  Disputed that layoffs were necessary and the concern for lack of work was serious because Defendant hired new employees during this period.  (B 21, 285).  Disputed that there was a required utilization rate for the process department between 2000 and 2003, Howe had an expectation that the rate be between 96-98%.  (B 186).

¶2     Facts herein not controverted by Plaintiff EEOC.  Disputed layoffs are necessary when the utilization rate falls because Defendant hired a new employee during this time period.  (See Charge of Discrimination (B 21, 285).

¶3     Facts in dispute that a layoff was inevitable.  Defendant has hired employees when the utilization rate was allegedly low.

**Pages 16 & 17 of Defendant's Statement of Facts**

      **3.**     **The Hiring Freeze in the Process Department**

¶1     Facts herein not controverted by Plaintiff EEOC.

¶2     Facts herein not controverted by Plaintiff EEOC.

¶3     Facts herein not controverted by Plaintiff EEOC.

¶4     Facts herein controverted in part by Plaintiff EEOC.  It is disputed whether Guttridge's performance was exemplary when he started.  (B 134-136).  Further, there were some tasks he could not do without the assistance of a mentor.  (B 126-129; 138-140).

¶5     Facts in dispute.

## II.    COUNTERSTATEMENT OF MATERIAL FACTS

### Juan Obed Perez's First Tenure with BE&K

Juan Obed Perez was born on February 27, 1949, and is now 57 years old.  (B 38).  He graduated from Stevens Institute of Technology in 1975 with a bachelor's degree in chemical engineering.  (B 39, 119-120).  During his 30 year plus engineering career, Mr. Perez has worked for PPG Industries, Inc. from 1975-1979; Star Enterprises (Delaware City Refinery) from 1979-1990; and Bechtel Corporation from 1990-1993.  (B 119-120).  While at Bechtel, Mr. Perez was a lead process design engineer with supervisory responsibility for three engineers.  (B 40-41).  Process engineering is a branch of chemical engineering that deals with chemical processes.  (B 44).

In February 1993, Mr. Perez began working for Defendant BE&K Engineering Company in Newark, Delaware as a process engineer.  (B 1).  BE&K is an engineering design firm.  (B 121).  Perez worked on two projects for BE&K that year.  (B 46).  He worked as the area lead on a Dupont project named the Corpus Christie F manufacturing facilities project.  (246-247).  He also worked on a project for a company based in Mobile, Alabama.  (B 48).

In September 1993, then process department manager Walt Frazier advised Perez that he was being laid off because of lack of work.  (B 50).  Mr. Perez asked Frazier if his layoff had anything to do with his performance, to which Frazier answered no.  (B 50).

While he was gathering his belongings over a period of days to leave the facility, Perez saw a group of 3-4 very young engineers coming in with boxes.  (B 50, 55-56).  They were all new hires.  (B 56).  Juan Perez believed that Defendant committed discrimination by hiring the younger engineers at the same time that Perez was let go for lack of work.  (B 50-51).  Yet, he shrugged off what happened and looked for another job.  (B 50-51).

Mr. Perez then began working for Tosco Refining Company as a senior process engineer in Northern New Jersey.  (B 59).  A senior process engineer is someone who has much more experience than a process engineer.  (B 44).  It is also someone who has the capability of leading other process engineers.  (B 160-161).

He worked at Tosco from approximately December 1993 to early 2000. (B 1, 119-120). Mr. Perez worked at two different refineries for Tosco. The first one was in Linden, New Jersey from 1993-1997. (B 119-120). The second one was in Marcus Hook, Pennsylvania from 1997-2000. (B 119-120). Mr. Perez decided to leave Tosco in early 2000 to be closer to home for his family. (B 62-63).

### Perez's Second Tenure with Defendant

In 2000, Mr. Perez contacted BE&K employee John Trexler to determine if there were any openings at Defendant's Newark, Delaware facility. (B 63-64). Perez and Trexler had both worked for BE&K in 1993. (B 47-48). Trexler remained with the company after Perez was let go in 1993. (B 63-64). Trexler told Perez that there were openings and that he would put in a good word for him. (B 64). Perez applied and was hired by then process department manager Peter Howe as a senior process engineer in February 2000. (B 67-68, 92).

BE&K process department engineers performed a number of different tasks. They checked relief device functions; developed process and instrumentation diagrams; developed equipment specifications, performed safety reviews; conducted miscellaneous tests; prepared process studies; completed calculations specific to a client's request; and performed some field work at a client's site. (B 158-159, 175-176). Checking relief devices was one third of the work completed by engineers. (B 175-176). Relief devices are pieces of equipment, which are required to have to be on different pipes, vessels, and materials in a plant to protect the equipment in case of an accident. (B 122).

Defendant's expectation was that all the process department engineers be able to perform the same type of work. It did not matter if the work was low or high level. (B 203). For example, all the engineers were expected to do relief device work, regardless of their classification[2]. (B 126-129, 175-176). Even an inexperienced engineer such as a recent college graduate was still expected to perform the

---

[2] There are several different classifications of engineers at BE&K. They start from engineer I, engineer II, engineer III, engineer IV, process engineer, senior process engineer, design specialist and principal engineer. (B 160-162). The classification is based on years of experience where an engineer 1 is someone with a bachelor's of science in chemical engineering with no experience and a senior process engineer is someone who has much experience and the capability to lead other engineers. (B 159-161).

same duties as a senior engineer.  If there was a complicated or unfamiliar task that an inexperienced engineer encountered, then he or she received assistance from a mentor to complete the work.  (B 125-129, 138-140).

Large projects at BE&K are typically less than one year, have multiple engineers working on the project, and are around or over $100 million.  (B 141-143, 222-224).  Small projects are generally less than a year, have one or no process department engineers assigned to the project, and are valued less than $100 million.  (B 141-143, 222-224).  At BE&K, engineers were expected to work on both large and small projects.  (B 144).

Perez worked on both large and small projects.  Some of the projects were a Dupont Old Hickory project for less than a year in 2000, a small General Chemicals project for a few months, a small Dupont Edgemoore project for a few months, and a large Dupont White Pigments relief devices project in 2002.  (B 69-77).  He was a good solid engineer who received a raise every year he worked for Defendant.  (B 95).

### Perez Helps Secure New Contracts for Defendant

Perez played an instrumental role in Defendant's attempts to secure new projects.  BE&K had been trying to secure work from a company named Motiva for a few years, but was unsuccessful.  (B 82).  As a result of Perez's former contacts at the Motiva Delaware City Refinery when he worked there from 1979-1990, Defendant was able to "put the foot in the door."  (B 82-83).  Perez marketed himself to Motiva on behalf of Defendant, by indicating he would be available to work on one of their projects.  (B 88).  Due to Perez's efforts, Defendant was able to establish their first contract with Motiva.  (B 82, 85-88).  More Motiva projects for BE&K would follow.  (B 207).

Motiva regarded Perez so highly that they had him assigned to their first contract with Defendant.  (B 88).  The work was performed at the Delaware City Refinery in Delaware[3].  (B 286-288).  The purpose of this 2002 Motiva project was to comply with a state environmental regulation which required

---

[3] This Delaware City Refinery used to be owned by Motiva.  It was then purchased by Premcor and is now owned by Valero.  Many industry people still refer to it as the Delaware City Refinery.  (B 96-97, 286).

that whatever gases were being sent to the atmosphere would go through a piece of equipment to ensure that they would be clean of a particular contaminant. (B 89). Mr. Perez worked on this project for slightly less than a year. (B 78).

Perez was also instrumental in helping Defendant secure its first contract with Tosco Refining Company[4]. Perez had previously worked for Tosco at their Linden, New Jersey and Marcus Hook, Pennsylvania facilities in the 1990s'. (B 119-120). Perez introduced Defendant's officials to his former contacts at Tosco. (B 79-80). As a result of Perez's help, Tosco agreed to hire Defendant to work at their Linden, New Jersey facility. (B 198). Tosco requested that Perez work on the first project (B 79). Perez was initially told the project would last approximately 3-4 months. (B 112). Perez had also helped BE&K meet with Tosco officials at their Marcus Hook, Pennsylvania refinery to attempt to secure new business there. (B 91).

### Concerns about Layoffs

In 2000, Howe was concerned about possibly laying off employees due to lack of work. (B 164). He discussed his concern with his immediate supervisor and Engineering Manager Robert Shoemaker. (B 165). They discussed their concern over lack of work and the possibility of layoffs on a weekly basis. (B 165). Howe started to become more focused about the possibility of layoffs in 2001 due to steady decline in business. (B 185). According to Howe, this steady decline continued until 2003. (B 185).

In May 2002, Howe terminated senior process engineer Narayan Swamy, then age 61. Howe told Swamy that he was fired because there were too many senior process engineers in the department and not enough work for them. (B 285). Howe then hired senior process engineer Jennifer Lin, age 39, in October 2002. (B 206); (B 170-171).

In November 2002, Perez was advised that the workload was very low and there were concerns about projects for 2003 (B 113-114). In 2003, Howe was still concerned about lack of work and possibility of terminating engineers. (B 185).

---

[4] Conoco Phillips is now the owner of the Tosco Refinery. Many industry officials still refer to the Conoco Phillips Refinery as Tosco. (B 287).

In spring of 2003, Howe became aware of an opportunity to add additional engineers on a Dupont relief device project called the Dupont Titanium Technology Project (DTT). (B 172-173). DTT is the name of a DuPont business unit that manufactures white pigments. (B 173). The objective of the project was for the process engineers to complete relief device calculations for every relief device in the plants or that needed to be installed in the plants. (B 124).

Howe interviewed 2-3 individuals for a position on the DTT project. (B 177). All three were in their final year of college and significantly under the age of 40. (B 177-178). Howe eventually hired recent college graduate Christopher Guttridge, then age 23. (B 206). Howe told Guttridge during his interview that Defendant was looking to hire younger engineers. (B 274-284). Guttridge began working for Defendant in late July 2003 on the DTT project. (B 206). His initial starting salary was $50,400. (B 123).

Mr. Perez questioned Howe why Guttridge was being hired at a time when the company was experiencing financial troubles. Howe's message to Perez was that the company was looking to hire younger engineers to rejuvenate the workforce. (B 115-118).

Perez's Tosco job ended in late August 2003. (B 211). He went back to the BE&K Newark, Delaware office because the Tosco project was completed. (B 109-111, 112). Sometime after he came back to the Newark, Delaware office, Howe told Perez that he would be working on the Conoco Phillips Flare Network Modeling project. (B 288). The purpose of this project was to ensure that flare system at the Tosco (Conoco Phillips) refinery in Marcus Hook, Pennsylvania was working properly. Perez had done such work previously in his career. Howe handed him a large binder of materials to help assist Perez with the project. However, Perez never heard from Howe again about the project and did no work on it. (B 288). Perez was later assigned to do some filler and small project work and also charged some to overhead. (B 208-211).

**Perez is Terminated**

On November 21, 2003, Howe met with Perez. He told Mr. Perez that he was being laid off because of lack of work. (B 189, 239). Perez asked Howe if the lay off had anything to do with his performance. (B 106). Howe answered no. (B 106). Perez also asked Howe if he could work less hours, to which Howe answered no. (B 106, 189-190). At the time of his lay-off, Mr. Perez was age 54. (B 38). Perez was eligible for rehire. (B 14).

In 2004, Howe terminated four other engineers for lack of work, all over the age of 40: Prabhakar Sharma, then age 52, Dick Robbins, then age 64, Nasim Hassan, then age 62, and Andrea Gerwig, then age 40. (B 28). Robbins and Gerwig came back quickly to work on Defendant projects as contract employees of Allstates. (B 244-245). Hassan came back later that year, while Sharma was offered the opportunity. (B 28, 152, 193-194, 273).

Allstates is a Defendant subsidiary, which provides contracting services for Defendant's affiliates. (B 147, 241). Allstates' employees are hourly employees, unlike BE&K salaried employees. (B 114, 228-229). They do not get a guaranteed 40 hours of work a week as BE&K employees do. (B 270). Additionally, the benefits at Allstates are limited. (B 114, 228). Allstates' employees can be terminated at any time and have less job security than actual BE&K employees. (B 229).

## IV.    ARGUMENT

### A. Summary Judgment is Not Appropriate Because There Exist Genuine Issues of Material Fact as to Whether Defendant Discharged Perez Because of His Age.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Ultimately, the moving party bears the burden of showing that there is an absence of evidence to support the nonmoving party's case. See id. at 325. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. See id. at 324. A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Consistent with this principle, the non-movant's evidence must be accepted as true. J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990). Moreover, a Court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. See id. The court's inquiry at the summary judgment stage is the threshold inquiry of determining whether there is need for a trial, that is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. See Anderson, 477 U.S. at 250-252. If there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of Plaintiff, that is enough to thwart imposition of summary judgment. Id. at 248-251.

16

Here, Defendant has not met its initial burden of showing that there is an absence of evidence to support its motion. To the contrary, the record of evidence presents sufficient disagreement to require submission to the jury on the issues of whether the EEOC has failed to establish a prima facie of age discrimination through circumstantial evidence; and whether Defendant's alleged legitimate, nondiscriminatory reasons for Perez's termination was unworthy of credence, such that it is a mere pretext for age discrimination or that age discrimination was more likely than not a determinative cause of Perez's termination.

The Commission filed this action under the ADEA alleging Defendant terminated Juan Obed Perez from his position of senior process engineer because of his age, then 54.  (B 30-36).  The ADEA provides that "it shall be unlawful for an employer to...discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or provisions of employment because of such individual's age." 29 U.S.C. § 623(a).  This Court has held that a Plaintiff may establish a violation under the ADEA through either direct or circumstantial evidence. Schiwall v. American Packaging Corporation, No. 95-7190 U.S. Dist. 1997 WL 36971, * 3 (E.D. Pa. Jan. 30. 1997).

When analyzing an ADEA claim involving circumstantial evidence, Courts apply the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and refined in later cases. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). The McDonnell Douglas scheme has three steps. First, the Plaintiff must produce evidence that is sufficient to convince a reasonable fact-finder to find all of the elements of a prima facie case. See  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, (1993).  In an ADEA reduction-in-force lay off case, as in the present action, the prima facie case is established by showing the aggrieved individual: (1) belongs to a protected class; (2) is qualified for the positions in question; (3) suffered from an adverse employment action; and (4) the employer retained someone similarly situated who was sufficiently younger.  Anderson v. Consolidated Rail Corporation, 297 F.3d 242, 249-250 (3d. Cir. 2002).

If the Plaintiff offers sufficient proof of these elements, step two is reached. The burden of production, but not the burden of persuasion, shifts to the Defendant, who must then offer evidence that is

sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge. Hicks, 509 U.S. at 506-07. If the Defendant cannot satisfy this burden, judgment must be entered for the Plaintiff. Id. at 509.

On the other hand, if the Defendant employer meets this burden, the presumption of discrimination arising from the prima facie case "simply drops out of the picture." Hicks, 509 U.S. 502, 511 (1993). "'At the summary judgment stage, it then becomes the Plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual--i.e. unworthy of belief.'" Marx v. Schnuck Markets, Inc., 76 F.3d 324, 327 (10th Cir. 1996), cert. denied, 518 U.S. 1019 (1996). The Court must determine whether the evidence, interpreted in the light most favorable to the Plaintiff, "could persuade a reasonable jury that the employer had discriminated against the plaintiff." Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir. 1995). "If no material facts are in dispute concerning the pretextuality of defendant actions, summary judgment is appropriate." Id. The Plaintiff at all times bears the "ultimate burden of persuasion." See St. Mary's Honor Center, 509 U.S. at 511.

The Plaintiff may then survive summary judgment by submitting sufficient evidence from which a fact-finder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also Palmisano v. Electrolux, LLC, No. 99-426, 2000 U.S. Dist. WL 1100785, *5 (E.D. Pa.. Aug 7, 2000). Accordingly, if the Commission creates a triable issue of pretext under the first *Fuentes* prong claims, it need not satisfy the second *Fuentes* prong to sustain its ADEA claim. Scott v. IBM Corp., 196 F.R.D. 233 (D.N.J.,2000). Moreover, in proving pretext, the Commission need not prove that age was the *sole* factor in Defendant's decision to lay off Juan Obed Perez, but only that age "played a role in the [decisionmaking] process and had a determinative influence on the outcome." Fuentes citing, Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993).

**B.      Overview of Relevant Law Governing the Pretext Analysis**

In this day and age of educated and sophisticated employers, cases involving direct evidence of ageist remarks are few and far between. Though public awareness has served to prevent overtly discriminatory acts and remarks in the workplace, it has yet to eliminate biased attitudes. The result is that employment discrimination is alive, unfortunately, but just more difficult to prove. Mindful that employers rarely articulate an unlawful basis for a biased action, the Courts allow the Plaintiff to establish discriminatory intent through the satisfaction of judicially created elements, simply put, the use of circumstantial evidence.

The District Court must carefully look at the totality of the circumstances before ruling on summary judgment in discrimination cases. In Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996), the Court explained:

> Anti-discrimination laws and lawsuits have "educated" would-be violators such that extreme manifestations of discrimination are thankfully rare. Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining. Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has recognized, "defendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987). But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged. "Title VII tolerates no racial discrimination, subtle or otherwise." (citation omitted).

Aman, id. at 1081-82 (Title VII case). Similarly, the ADEA tolerates no age discrimination, subtle or otherwise. Here, the Commission will show evidence of discrimination by focusing on facts, which impugn Defendant's articulated explanations for its determination that Perez was not terminated because of his age.

The Commission need not disprove each of Defendant's articulated reasons to establish pretext. Fuentes v. Perskie, 32 F.3d 759, 765 n.7 (3rd Cir. 1994). Where a Defendant proffers two or more

alternative and independent legitimate, non-discriminatory reasons, the falsity or incorrectness of one does not necessarily impeach the credibility of the remaining articulated reasons. However, while such an inference is not mandated, it *is* permissible. <u>Roebuck v. Drexel University</u>, 852 F.2d 715, 734 (3rd Cir. 1988). As the Court recognized in <u>Fuentes v. Perskie</u>, 32 F.3d at 765 n.7:

> If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, . . . the fact finder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a fact finder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

<u>See</u> <u>also</u> <u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 70 (7th Cir. 1995), (Plaintiff refuting some but not all of Defendant's articulated reasons can survive summary judgment if "the multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them [is] so fishy and suspicious"). Both *Fuentes* and *Russell* cited in the text enunciate this principle as an exception to the rule that, if an employer articulates more than one reason for a challenged action and the plaintiff offers evidence challenging some but not all of those reasons, the plaintiff usually cannot survive summary judgment or prevail if there still remains unrefuted one or more reasons that actually motivated the employer at the time of the decision and would have resulted in the same decision even absent the refuted reasons. <u>Russell</u>, 51 F.3d at 69; <u>Fuentes</u>, 32 F.3d at 764. As the *Russell* and *Fuentes* Courts both note, however, at some point the fact finder may permissibly conclude that so many of the reasons articulated by the decision-maker have been proved pretextual that the decision-maker's testimony is no longer credible.

**C.     The Commission has offered evidence from which a reasonable jury could conclude that the Defendant's articulated reasons for Perez's discharge were a pretext for discrimination.**

Contrary to Defendant's argument, the Commission is not requesting the Court to substitute Defendant' business judgment.  Rather, the Commission challenges Defendant's decision to terminate Juan Obed Perez pursuant to a reduction in force, while retaining several significantly younger similarly-situated engineers.  A fact finder could reasonably question why Defendant chose to lay off Perez when his last project ended, as opposed to younger comparable employees whose projects were ending at the same time or shortly thereafter.  A fact finder could also reasonably question why Defendant decided to hire Christopher Guttridge, then age 23, to start working for BE&K in late July 2003, while allegedly being seriously concerned about laying off engineers for lack of work.

As previously stated, EEOC does not bear the burden of disproving or casting doubt on each and every reason posited by Defendant.  Plaintiff just needs to show some of the reasons are pretextual for the EEOC to defeat summary judgment.  The Commission will show inconsistencies and fallacies in several of Defendant's proffered reasons for its decision, thus raising issues of material fact upon which a trier of fact may base a conclusion that age animus accounted for some part of Defendant's decision.

**D.     Plaintiff Can Establish a Prima Facie Case of Age Discrimination.**

The Commission can meet its burden of production as to all four elements of its prima facie case. At the time of Perez's lay off, he was 54 years old and thus clearly a member of a protected class to satisfy the first element.  (B 206).  He was also qualified for his position as a senior process engineer to meet the second element.  Although Defendant alleges that Perez was an average engineer, they cannot argue that he was not qualified to work on their projects.  See Cardona v. Aetna Life & Casualty, No. 3: 96-1009 U.S. Dist. WL 246634, at *3 (D. Conn. May 9, 1998) (although defendant contends plaintiff was one of the lesser qualified, defendant does not argue that plaintiff was unqualified, thereby allowing plaintiff to carry her prima facie burden that she was qualified for the position).  Defendant indicated that Perez's performance had nothing to do with his termination.  (B 106, 189).  Further, Perez was eligible to work on BE&K projects after his termination as an Allstates contract employee.  (B 193).  Moreover,

Perez consistently received a raise every year, where typically raises are not awarded to poorly performing employees. (B 93-95, 240)

Defendant's position that Motiva and Tosco were dissatisfied with Perez's performance is unworthy of belief since Perez worked with the same Motiva officials as a contract employee for Allied Resources Technical for 2 years after his termination. (B 286-288). Additionally, Perez is presently working on a job at the Tosco (Conoco Phillips) Refinery in Linden, New Jersey as an employee for Jacobs Engineering. In fact, both Motiva and Tosco officials helped Perez secure his present position with Jacobs by giving him positive references. (B 286-288).

Further, Defendant's argument that Perez was not qualified because he had been removed from a relief device project by Dupont client liason Dan Dayton contradicts Defendant's own business practice. Dayton testified how he had other BE&K engineers removed from his projects including Bob Wunder (40 at the time of Perez's discharge), and Mike Tweed (42 at time of Perez's discharge). (B 206, 231-233). However, these two individuals as well as Perez were assigned to other projects. If anyone of them were not qualified for their positions as a result of being removed from a project at the request of Dayton, then they surely would have been terminated. Perez was clearly qualified for his position to satisfy this element of the prima facie case. Furthermore, the EEOC satisfies the third element because Perez suffered an adverse employment action when he was terminated.

Finally, the Commission meets the fourth element of this RIF case by showing that there were several significantly younger similarly-situated process engineers who were retained by Defendant at the time of Mr. Perez's November 21, 2003 termination. Some of these comparators were Christopher Guttridge, then age 23; Shea Taylor, then age 28; Yen Pham, then age 35; William E. Robinson, then age 38; Jennifer Lin, then age 40; Robert Wunder, then age 40; and Michael Tweed, then age 42. (B 206); see Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 356 (3d Cir. 1999) (plaintiff does not have to prove that he or she was replaced by someone outside the protected class); see also Maxfield v. Sinclair, Int'l, 766 F.2d 788, 792 (3d Cir. 1985).

Each process engineer was expected to perform the same type of tasks and work on the same projects regardless of size and complexity. (B 203). For example, Guttridge in 2003, was a recent college graduate, yet was performing the same relief device work that more senior engineers such as Jack Baker, Gladys Delgado and Nasim Hassan were doing on the DTT project. (B 125-129, 138-140, 206).

Some of the comparators had projects which were ending at or around the same time as Perez was terminated on November 14, 2003. Wunder and Tweed had projects that were ending in December 2003, and Lin had one ending in February 2004. (B 207, 273). While these workers were placed on other projects, Perez was terminated.

The comparators are also similarly-situated because Howe testified how he considered each and every engineer in his department before deciding to lay off Perez. (B 199-200) See Brodsky v. Hercules, Inc., 996 F. Supp. 1337, 1346 (D. De. 1997) (workers found to be similarly-situated in ADEA case because they were both considered candidates for termination pursuant to a reduction in force). Therefore, the fourth element is met because several significantly younger similarly-situated process engineers were retained by Defendant, while Perez was terminated. See Peterson v. Knight Architects, Engineers, 97 C 1439, No. 97 C 1439 U.S. Dist. WL 1313696, at *16 (N.D. Ill. Nov. 4, 1999) (Court denying summary judgment for defendant in case were plaintiff who was terminated for alleged lack of work was able to show that there were several substantially comparable younger employees who were retained by Defendant). Therefore, the Commission can establish a prima facie case of age discrimination.

**E.    Defendant's Legitimate Non-Discriminatory Reason are Not Worthy of Belief.**

The Commission can prove that Defendant's alleged legitimate non-discriminatory reasons are not worthy of belief. The Commission's burden is to show the pretextual nature of the explanations given by Defendant for their determination that Perez should have been terminated as opposed to another engineer. The Commission can produce evidence showing that there are genuine issues of material fact regarding whether: (1) Perez was laid off for lack of work; (2) the relevant decision makers did not harbor any discriminatory animus towards Perez; (3) ageist comments were made by a Defendant employee; and (4) the pre-RIF hire of Guttridge was pretext for Perez's layoff. Moreover, the Commission will be able to show that Defendant's alleged legitimate non-discriminatory reasons are simply a prextext for age discrimination.

**1.    Perez Was Qualified to Work on Available Projects.**

There were available projects for Mr. Perez at the time of his termination. Defendant cannot prevail simply because it asserts Perez was terminated subject to a reduction in force and there was no work for him. A reduction in force does not relieve Defendant of its obligation to ensure that Juan Perez was not discriminated against because of their age. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000), cert. denied, 530 U.S. 1261 (2000) ("[e]ven within the context of a legitimate reduction-in-force, however, an employer may not discharge 'because' of his age"); see also Danzer v. Norden Systems, Inc., 151 F.3d 50, 55 (2ⁿᵈ Cir. 1998) (Court disagreeing with defendant where plaintiff's admission that his firing took place in the context of a downsizing somehow justifies summary judgment for defendant is in effect to say that there cannot be age discrimination in a case which in which the plaintiff's position is eliminated altogether and the plaintiff is not replaced by a younger employee); see also Peterson v. Knight Architects, Engineers, Planners, Inc., No. 97 C 1439 U.S. Dist. WL 1313696, at *16 (N.D. Ill. Nov. 4, 1999) (rejecting defendant's argument that by definition, it must have terminated plaintiff due to lack of work as it was in the middle of a RIF).

The critical inquiry is why Perez was terminated and not one of the other comparators. As previously mentioned, there were several similarly-situated younger employees who were retained by

Defendant at the time of Perez's termination.  They were Guttridge, Taylor, Pham, Robinson, Lin, Wunder, Tweed.  (B 206).  It appears that the last project Perez billed to prior to his firing was the Hydrocracker Corrosion Mitigation project.  (B 207).  This project was scheduled from September – December 2003.  (B 207).  Interestingly, there were other projects scheduled to end at the same time of Perez's termination or shortly thereafter.  (B 207).

Tweed was working on a Dupont Maniti Spherical Silver expansion project that was scheduled to end in December 2003, and Wunder was working on a Motiva Gasifer Process Hazards Review project which was also scheduled to end at that time.  (B 207).  Lin was working on a Conoco Phillips Flame Network Modeling project, which was scheduled to end in February 2004.  (B 207).

In January 2004, Tweed was assigned to various other Dupont Maniti projects, and then began working on the Dupont China Fine Powders project in June 2004.  (B 273).  In January 2004, Wunder was assigned to various process hazard review small projects for approximately 9 months.  (B 273).  Lin was eventually assigned to a Dupont Code Blue project in February 2004, the China Fine Powders project in June 2004 and the Flare Networking project later in 2004.  (B 273).

All three of these comparators were placed on other projects after their last projects ended in late 2003 or early 2004, while Perez was terminated when his finished.  It is arguable that Perez should have been placed on any one of these projects as opposed to Tweed, Wunder or Lin.  Perez had more engineering experience, and more seniority with Defendant than any of them.  (B 206).  He was capable of doing any of the work in the department including the process hazard review work that Wunder was doing.  (B 288).

Further, Perez helped bring new business to Defendant through his former contacts with Motiva and Tosco (Conoco Phillips).  In fact, it was likely as a result of Perez's efforts that Lin was even able to work on the Conoco Phillips Flame Networking Modeling project.  It is also likely because of Perez that Wunder could work on the Motiva Gasifer Process Hazard Reviews project.  Perez helped Defendant secure its first projects with these companies as a result of his good performance and prior contacts there.

Howe even points out on Perez's 2002 and 2003 performance reviews his efforts in bringing new business to BE&K.  (B 3-5, 8-9).  However, neither Wunder's 2003 and 2004 review, Lin's 2003 review, nor Tweed's 2003 and 2004 reviews indicate that those individuals were instrumental in bringing new business to Defendant.  (B 6-7, 10-13, 17-20).  Therefore, it is disputed whether Perez should have been terminated while those comparators were placed on other projects.  Defendant's assertion that there were no suitable projects to put Mr. Perez on is a disputed issue of fact that should be determined by the fact finder.  See Brodsky v. Hercules, Inc., 966 F. Supp. 1337 (D. De. 1997) (material issue of fact as to whether employer's legitimate, nondiscriminatory reasons for terminating employee during RIF, that the two major projects on which employee worked were completed, that employee was not versatile, and that employee's job performance was not as strong as other candidates, were pretext for age discrimination precluding summary judgment).

Further, Howe told Perez sometime after he completed the Tosco project in late August 2003 that he was going to be working on a Motiva (Delaware City, Delaware) Flare Network project.  The purpose of that project was to ensure that the flare system at the Motiva Delaware City refinery was capable of handling the current and future pressure relief loads in the refinery.  Perez had previously done this type of work before and had worked at that particular refinery.  (B 286-288).  Howe actually provided him with a large binder of materials to help assist him with the project.  Yet, Howe never spoke to Perez again about the project and Perez never worked on it.  (B 288).  Therefore, it is disputed whether this or another project was available for Perez.

The EEOC does not disagree with Defendant and mandate that BE&K keep employees who are not billing to a client on the payroll for a significant period of time.  Again, the Commission recognizes that the Court is not permitted to substitute the business judgment of Defendant.  However, present process department manager John Trexler testified that there are engineers, including himself, who have charged to overhead.  (B 266).

Furthermore, Defendant admits that Perez could have been recalled to work on BE&K projects through Allstates as a contract worker.  This is highly suspicious.  If Defendant claims that there was no

work for Perez, then it is highly unlikely that he would be assigned to Defendant projects through Allstates. It is disputed how soon after applying for work at BE&K as an Allstates employee would Perez have been put on a Defendant project. Such a disputed question leads one to question whether there was truly a lack of work for Perez or was Defendant simply trying to get older engineers such as Perez off their employment rolls?  See Kern v. Westinghouse Electric Corp., No. 95-49 U.S. Dist. WL 813157 (W.D. Pa. Dec. 19, 1995) (genuine factual issues exist where plaintiff argued that defendant's arguments that plaintiff's "projects were finished or discontinued, and that his skills could not be applied to current work is, at best, curious.")

The record shows that protected class members Perez, Sharma, Hassan, Gerwig and Robbins were all allegedly terminated for lack of work, yet were given the opportunity to work on Defendant projects as a contract employee. (B 28). Yet, both Gerwig and Robbins returned almost immediately after their terminations, and Hassan eventually came back. (B 244-245, 273). Sharma was offered the opportunity. (B 194).

Indeed, Gerwig was terminated on June 30, 2004, but continued to work on the same project after her termination as an Allstates employee. Defendant may argue that Gerwig was moved to Allstates solely because of a policy change, which requires all part-time employees to be converted to Allstates. However during the EEOC investigation, Defendant indicated that Ms. Gerwig was brought back to work on Defendant's projects after her termination because she had a particular skill that a client needed. (B 25-27).

Robbins was terminated by Defendant for lack of work on May 21, 2004. (B 28). Yet, he came back to work for BE&K on the China Fine Powders as an Allstates employee less than two months later. (B 245). It is reasonable for the finder of fact to conclude that Defendant simply terminated Perez, Sharma, Hassan, Gerwig and Robbins on the basis of their age to remove them from their employment records as full-time employees, and have them classified as contract workers who do not have guaranteed employment.  See Phelps v. Yale Security, No. 3-90-545 U.S. Dist. WL 236591, at *2 (E.D. Tenn. June 26, 1991) (plaintiff had some evidence to indicate the real reason given for her termination was

pretextual, and that defendant was using a reduction in force as a mechanism to weed out older workers). If this was indeed Defendant's true intentions, then it is clearly age discrimination. See Brown v. Delaware & Hudson Railway, No. 91-3203 U.S. Dist. WL 330320 (E.D. Pa. Nov. 3, 1992) (one of the facts that most courts emphasize when evaluating an ADEA claim is prior treatment of protected employees).

Defendant's claims relating to Howe's attempts to find Mr. Perez permanent work is subject to dispute. Howe should not be commended for what he was required to do. See Danzer, 151 F.3d at 56 (collateral commendable behavior by an employer cannot serve as an absolute shield from an ADEA suit where defendant argued that its supposed attempt to relocate the plaintiff as opposed to firing him during an era of corporate downsizing shows it was doing its best to help the plaintiff). Howe controlled which projects engineers would receive. Perez actually assisted Howe with his duties when he helped deliver Motiva and Tosco as new clients to Defendant. Yet, Howe rewarded Perez by terminating him and placing his younger comparators on projects he was qualified to do.

**2.    Defendant's Actions Show Discriminatory Animus Toward Perez.**

It is disputed whether the relevant decision makers harbored any discriminatory animus towards Perez. Howe and Shoemaker were really individuals who terminated Perez, as Abrams was not really involved. (B 146).

The record shows that from 2002-2004, Howe terminated six individuals in the process department. They were Swamy, then age 61 in 2002; Perez, then age 54 in 2003, Sharma, then age 52 in 2004; Robbins, then age 64 in 2004; Gerwig, then age 40 in 2004; and Hassan, then age 61 in 2004. All of these individuals were over the age of 40 and in the protected class. (B 28, 206, 285).

The record also shows that Howe's last three full-time hires at the time of Perez's termination were Guttridge, age 23 in 2003; Lin, age 39 in 2002; and Yen Pham, age 32 in 2000. (B 206). All were under the age of 40. It is arguable that since Howe was the process department manager, Defendant had systemically engaged in the attempt to create a younger department by terminating or laying off employees who were over the age of 40 while at the same time hiring workers younger than 40.

Defendant apparently argues that Howe, Shoemaker and Abrams could not have possibly terminated against Perez because they are all in the protected age group, and Shoemaker and Abrams are older than Perez. Again, Abrams does not get involved in termination decisions. For Defendant to suggest that Howe and Shoemaker could not possibly discriminate against Perez because they were both in the protected class and Shoemaker was older than Perez is misguided. Courts do recognize that it is possible for someone in the protected age group to discriminate against someone in the protected class. See Danzer, 151 F.3d at 55 (the proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable).

It is also reasonable to conclude that the fact finder could find that Defendant's decision to treat Perez differently as opposed to his younger peers by denying him training opportunities could be probative of age discrimination. Defendant maintains that Perez struggled with controlling costs and leading projects. (B 22-24). Perez requested project management training on his February 2002 and March 2003 reviews. (B 3-4, 8-9). He also requested cost control training in the 2003 review. (See 2003 review (B 8-9). Yet, he never received any training. (B 113).

Wunder requested training on his 2003 review to improve his engineering skills and received it. (B 10-11, 19-20). Since the training requests were made on the reviews administered by the process manager, Howe was clearly the reason behind Perez not getting training and Wunder receiving it. It is clearly a disputed issue of fact whether Howe engaged in age bias when he chose to deny Perez training opportunities while granting them to the younger Wunder. See Baker v. Tooling Science, No. 03-5310 U.S. Dist. WL, at *4 (D. Minn. Aug. 26, 2005) (summary judgment denied where older plaintiffs alleged they were denied training opportunities to make them less subject to termination, while younger retained employees were granted such opportunities).

Defendant also argues that Howe could not have had any age bias against Perez because he hired him. The rebuttable inference against discriminatory animus applies only where the hiring and firing are accomplished by the same person. Where an "employee [is] hired and fired by the same person within a relatively short time span," there is "a strong inference that the employer's stated reason for acting against

29

the employee is not pretextual." <u>Proud v. Stone</u>, 945 F.2d 796, 798 (4th Cir. 1991). **_However such an inference is not a presumption._** It is only something for the fact finder to consider. <u>See</u> <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564 (6th Cir. 2003) (while a fact finder can infer from "same actor" a lack of discrimination, the inference is insufficient to warrant summary judgment if the claimant has otherwise raised a genuine issue of material fact). Again, the EEOC is not required to prove that each and every reason cited by Defendant to lay off Perez is a pretext for age discrimination. The Commission need only prove that some of the reasons were pretextual.

Shoemaker's role in strategically ridding Defendant of older workers should not be taken lightly. The record shows that in 2003, **_33 out of 35 employees who were terminated from BE&K pursuant to a reduction in force were over the age of 40_**. (B 15-16). In 2004, **_all 8 individuals who were terminated pursuant to a reduction in force or lack of work were over the age of 40_**. (B 29). Shoemaker was the Engineer Manager for the entire Newark, Delaware facility at this time. He met with each department manager before a decision was made to terminate someone. Therefore, Shoemaker presided over the termination of many of these individuals. Such termination numbers are clearly alarming and raise questions regarding whether Shoemaker and his department managers partnered to treat older employees adversely.

### 3.      Ageist Comments Are Probative of Age Discrimination.

It is disputed whether age comments were made by the Defendant.  First of all, the Commission is not required to show that there were ageist comments to prevail in an ADEA action.   Mr. Perez questioned Howe in 2003 as to why was Guttridge being hired at a time when the company was concerned about lack of work.   (B 115-118).  According to Perez, Howe's message to him was that the company needed to start **hiring younger engineers** to rejuvenate the work force.  (B 115-118).

During his deposition, Howe testified that he did speak to Perez about the company hiring college graduates.  (B 190.1).  Howe indicated that he presumes he said college graduates to Perez as opposed to young engineers.  (B 190.1).  However, ***Howe testified that it was possible that he did say younger engineers to Perez***.  (B 190.1-191).

The EEOC investigator interviewed Guttridge during the investigation.  (B 274-284).  According to the investigator, Guttridge stated he was told by Howe during their initial interview in 2003, that the company was interested in hiring younger engineers.  (B 274-284);  Howe's comments parallel his actions in which he hired 39 year old Lin in 2002, and 23 year old Guttridge in 2003, while letting 61 year old Swamy and 54 year old Perez go for alleged lack of work those same years.  In fact, Swamy maintains that Howe told him that he was terminated because there were too many senior engineers and not enough work for them.  (B 285).  All of these comments if believed by a fact finder could age bias by Howe.  <u>See</u> (<u>Zielonka v. The First National Bank of Chicago</u>, U.S. Dist. WL 568696 (N.D. Ill. Oct. 12, 1994) (based on the evidence submitted by the parties, however, we cannot definitively state the alleged utterances were merely stray remarks that had nothing to do with Plaintiff's termination).

Credibility determinations need to be made regarding the relevant parties to determine whose version of a particular conversation is truthful.  However, such credibility determinations should never be made at the summary judgment stage.  <u>See</u> <u>Brodsky</u>, 966 F. Supp. at 1343 (when reviewing summary judgment motions, this court should not engage in credibility determinations); <u>see</u> <u>Boeing</u>, 411 F.2d at 375 ("[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh

conflicting evidence and inferences, and determine the credibility of the witnesses). These determinations should be made by the fact finder.

Further, Defendant's explanation that Howe made the comments about college graduates because the company wanted to hire recent college graduates to lower Defendant's average billing rate is also suspect. Perez indicated that he would have accepted a lower pay rate to remain with the company, yet Howe never offered him the opportunity. (B 107). Therefore, pretext can be established because it is arguable that Howe hired Guttridge more for his youth than his lower wages.

### 4.    The Hiring of Guttridge Smacks of Pretext.

Guttridge's hiring is pretextual. It is a disputed issue of fact as to whether young Guttridge should have been hired while Howe was allegedly seriously concerned about terminating engineers for lack of work. Howe testified that he started to become more focused about layoffs in 2001. (B 185). Yet, Howe hired Lin despite this concern, just a few months after he fired Swamy for not enough work.

Howe was still concerned about lack of work and lay offs in 2003. Yet, Howe chose to hire young Guttridge in 2003 despite his concern. It appears suspicious that Defendant would hire someone in 2002 and 2003 when it was allegedly concerned about lack of work and laying off other engineers.

There was no need to hire Guttridge for the DTT project. Another current engineer could have been transferred to that project thereby decreasing the chances of someone later being laid off for lack of work. In fact, it is fairly common for the process engineers to be moved around different projects. Guttridge gave the following example during his deposition:

```
10    Q.  Now, the process engineers in the Process
11  Department, are they moved around to different projects?
12    A.  Depending on a project's needs, sometimes that
13  happens.
14    Q.  Like give me an example of like when that could
15  happen.
16    A.  For instance, the one engineer that -- okay.  One
17  person here is a good idea, Shea Taylor.  She is on --
18  right here, number 2.  Shea had been on the DTT project
19  for awhile.  I'm guessing a year or so.  Then her -- she
20  was asked to help with another project.  It was another
21  DuPont project.  And she was splitting time 50-50.
22        Then a plant within the same business unit
23  as that other project was undergoing a major project, and
```

24   they requested her specifically because she had

Christopher Guttridge                                        110
1   familiarity with the process, familiarity with the
2   business unit and their engineers, so they requested her
3   to be a lead engineer on that project.  So she left DTT
4   altogether and went to work on that other project.
5   That's like an example of what would happen.

(B 132-133)

Further, it was not unusual to see an engineer working on multiple projects at the same time.  (B 207, 262-265, 273).  For instance, Trexler testified about an engineer who was working on the White Pigments (DTT) project and for a Chambers Work site team at the same time in October 2003.  (B 267).  Another engineer could have been easily transferred to the DTT project, which would have decreased Perez's chances of termination.  Why Howe would want to hire another employee when he was already allegedly concerned about layoffs makes no sense.  See Baker v. Tooling Science, 03-5310 U.S. Dist. WL 2105504 *3 (D. Minn. Aug. 26, 2005) (prima facie case established where defendant hired new younger employees capable of doing all of plaintiff's jobs shortly before plaintiff's termination at a time when the company should have been worried about the possible need to cut costs).  See also Yates v. Rexton, Inc., 267 F.3d 793, 799-800 (8th Cir. 2001).

Guttridge's hiring is also questionable because Defendant attempted to argue the company was still hiring entry-level engineers through local colleges and particularly the Inroads program to perform work that that "is obviously very simple, low level and low compensated.  It is no way analogous to the work performed by senior engineers such as Mr. Perez and it clearly would be insulting and inappropriate to claim that Mr. Perez perform such functions."  (B 22-24).  Inroads is a program designed to provide entry level opportunities to minority engineering students.  (B 22-24). The goal of the program is that the student ultimately receives a full-time offer from the company after their graduation.  (B 179-180).

However, Defendant has never hired an Inroads student upon graduation to work full-time in the process department.  (B 183-184, ).  Further, Howe contradicted Defendant's position when he testified that it would be inappropriate for him to assume that Perez would have been insulted and that Defendant

expects "our engineers to be broadly skilled" and work on low and high level work.  (B 203).  Clearly, Defendant's inconsistencies cast doubt on Guttridge's hiring.

It is reasonable for a fact finder to conclude that Defendant simply waited for enough time to pass after Guttridge's hiring to terminate Perez to minimize the potential of an ADEA claim.  Even if Dayton would not accept Perez on the DTT project, someone else could have been put on the project creating additional opportunities to ensure engineers do not lose their jobs.  Defendant's decision to hire Guttridge, and then later terminate Perez appears to be a strong indicator of age bias and pretext.

## V.    CONCLUSION

Based on the foregoing articulated arguments in response to Defendant's Motion for Summary Judgment, Plaintiff EEOC requests that this Court promptly deny Defendant's Motion.

> Jacqueline H. McNair
> Regional Attorney
> Judith O'Boyle
> Supervisory Trial Attorney
>
> _____/S/_____
> Woody Anglade
> Trial Attorney
> Equal Employment Opportunity
> Commission
> Philadelphia District Office
> 21 S. 5th Street, Suite 400
> Philadelphia, PA  19106
> (215) 440-2684
>
> COLM F. CONNOLLY
> United States Attorney
> Douglas McCann
> Civil Chief
> Delaware Bar I.D. No. 2901
> The Nemours Bldg.
> 1007 Orange Street, Suite 700
> P. O. Box 2046
> Wilmington, DE 19899-2046
>  (302) 573-6277