53

1  information --

2    A.    No.

3    Q.    Whoa, whoa.

4    A.    Go ahead.

5    Q.    Did you have that experience working on the

6  other side of the project as far as not getting

7  information in a timely manner from the client?

8    A.    No.

9    Q.    Have you ever had that experience with a DuPont

10  client where you didn't get the information in a

11  timely manner?

12    A.    Yes.

13    Q.    Has that happened on one occasion or more than

14  one occasion?

15    A.    More than one occasion.

16    Q.    Many times?

17    A.    In terms of that's one thing that -- you know,

18  in terms of factors that really distinguishes a

19  capable lead engineer from another engineer is the

20  ability to work closely with a client and kind of make

21  sure that they really get the information to you.

22  Client personnel are often very, very busy.  And in

23  order to get their attention, it takes a lot of skill

24  on the part of our engineers to kind of work with the



B 251

```
1    client to get that information organized, get it
2    reviewed, get it approved and out.  So in terms of
3    it's -- you know, it's kind of -- so I'd say, you
4    know, getting information from the client is often
5    more the rule than the exception, but the thing that
6    distinguishes a good lead engineer is that they work
7    around that and overcome that.
8       Q.   But you have had that problem?
9       A.   Sure.
10      Q.   Okay.  Had you worked on other projects with
11   the DuPont liaison for the Corpus Christi project?
12   Was Dan McKenna -- what was that name?
13      A.   Oh.  I mentioned Mark Koenig.
14      Q.   I'm sorry.  That's who.  Mark Koenig?
15      A.   No, I have not worked with him.
16      Q.   That was the only one?
17      A.   Yeah.
18      Q.   Have you had that experience of not getting
19   information in a timely manner on other DuPont
20   projects?
21      A.   Sure.
22      Q.   Has it been on more than one occasion?
23      A.   Yeah.
24      Q.   Then you said Mr. Perez cast the blame on a
```

B 252



1   designer, William Robinson?

2      A.    Mm-hmm.

3      Q.    What did he say to you?

4      A.    He said that Bill should have done more in

5   terms of helping him figure out what needed to be

6   done.

7      Q.    Do you agree with Mr. Perez?

8      A.    No, I don't believe it's that -- at the time, I

9   guess he convinced me, but I guess I don't believe

10  that anymore.  Bill Robinson still works with us.  And

11  the designer as distinct from Bill Robinson the

12  engineer, Bill Robinson the designer still works with

13  us, and all his projects generally come out very well.

14  I would tend to discount Obed Perez's indication that

15  Bill Robinson was mostly to blame for the issues.

16     Q.    So the William Robinson on Howe 1 is different

17  than this designer Bill Robinson we were talking in

18  1993?

19     A.    Yes.

20     Q.    But at the time you believed Mr. Perez?

21     A.    Yes, I did.

22     Q.    Why did you believe him at the time.

23     A.    Because I'd had some limited experience with

24  Bill Robinson, the designer, and didn't have any



John Trexler

56

1  confidence in him, but I have since worked with

2  William C. Robinson the designer, and he's very

3  capable.

4      Q.    You didn't have confidence in him in 1993, but

5  you hadn't worked with him that much?

6      A.    That's right.

7      Q.    Have you ever had problems with his

8  performance?

9      A.    No.

10     Q.    In how many projects have you worked with the

11 designer William Robinson?

12     A.    A couple.  A little bit.

13     Q.    Like how many approximately?

14     A.    Like two.

15     Q.    Two.  When was the last one?

16     A.    It would have been at least five years ago.

17     Q.    What was the project?

18     A.    I don't remember.

19     Q.    Do you recall the first one?

20     A.    No.

21     Q.    Now, I believe you had mentioned earlier that

22 there was a problem with a Bill Robinson with respect

23 to the Corpus Christi project.  Is this the same Bill

24 Robinson?

B 254



57

1    A.    Yes.

2    Q.    The designer?

3    A.    Yes.

4    Q.    What was the problem again that you testified

5    about?

6    A.    Just that, you know, he was assigned some of

7    the blame for the poor outcome of the package being

8    one of the key team members.

9    Q.    Who told you that he was assigned some of the

10   blame?  How do you know that?

11   A.    Well, just the, you know, e-mails and/or

12   meeting comments from DuPonters.

13   Q.    About designer Bill Robinson?

14   A.    I don't recall whether he would have been

15   singled out.

16   Q.    What's your basis for saying that he was

17   assigned some of the blame?

18   A.    In terms of the engineer and designer work very

19   closely together, so it's -- if there is a poor

20   outcome, usually they both have something to do with

21   it.

22   Q.    So do you think that DuPont was dissatisfied

23   with the designer Bill Robinson's performance on that

24   project?

B 255



WILCOX & FETZER LTD.
Registered Professional Reporters

John Trexler

58

1    A.    They were dissatisfied with the team

2  performance.

3    Q.    And that includes the designer Bill Robinson?

4    A.    Sure, yes.

5    Q.    Let me ask you:  How much do you make per year

6  working for BE&K?

7    A.    $130,000.

8    Q.    Do you receive any other type of compensation

9  from BE&K?

10    A.    No.

11    Q.    What about bonuses?  Do you get bonuses?

12    A.    No.  They do have -- they do have a bonus

13  policy, but it's very -- and I have received a bonus

14  on one occasion.  But it's not something where people

15  regularly get bonuses.  They also have a profit

16  sharing plan.

17    Q.    Did you get a bonus last year?

18    A.    No.

19    Q.    When did you get a bonus?

20    A.    A couple years ago, I think.

21    Q.    Okay.  So you were still a process -- a senior

22  process engineer?

23    A.    When I was still a senior process engineer.

24    Q.    You said they have a profit sharing plan?

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

68

1  interrelations with the client personnel.

2    Q.    My question was:  Why was he supposed to get

3  you the P&I diagrams?

4    A.    That was my specific request.  One, in terms of

5  we knew this was Obed's first significant project as a

6  lead based on past issues like at Corpus Christi, we

7  weren't entirely comfortable having Obed as a lead.

8  So I thought one good way of keeping in touch with the

9  project and just getting an early understanding if

10  there were any issues was by reviewing the piping and

11  instrument diagrams.  And that's why I asked for -- in

12  terms of in lieu of, you know, spending a half an hour

13  a day with Obed asking how things are, if he gets me

14  the piping and instrument diagrams, I can review them,

15  and then it's obvious in terms of whether issues are

16  getting resolved and things are getting resolved.  So

17  it was an easy way to stay involved with the project.

18    Q.    So you asked him to get the diagrams to you?

19    A.    Yes.

20    Q.    When did you tell him that?  How early in the

21  project?

22    A.    Within the first week or two.

23    Q.    Did you tell him -- did you give him a deadline

24  to get them to you?

B 257



John Trexler

69

1    A.    No, I did not.

2    Q.    Why didn't you give him a deadline?

3    A.    I just told him that on a project getting the

4  piping and instrument diagrams complete was a high

5  priority.

6    Q.    Well, do you know if he completed them and he

7  just didn't get them to you?

8    A.    The issue was that he was having trouble

9  resolving design issues, so he didn't have all the

10  information to complete the diagrams.

11    Q.    Do you know why he didn't have all the

12  information to complete the diagrams?

13    A.    Well, you know, as I kind of mentioned before,

14  you know, one thing that distinguishes a capable and

15  effective lead engineer versus, you know, process

16  engineers just doing standard tasks is that they're

17  very proactive in working with the client and

18  developing -- and getting decisions made.

19    Q.    So --

20    A.    So he was having trouble -- I'm sorry to

21  interrupt you.

22    Q.    No.  Go ahead.

23    A.    He apparently was having difficulty reviewing

24  the issue with the client in such a fashion that he



B 258

1    could get the client to make a decision on which way

2    to proceed.

3        Q.    So was part of the issue that the client was

4    not giving him the complete information he needed?

5        A.    It was a part of it.

6        Q.    Have you ever done these P&I diagrams?

7        A.    Yes.

8        Q.    Have you ever -- were there ever any time when

9    you had to interact with clients to get information

10   that you needed to complete the diagrams?

11       A.    Yes.    Always.

12       Q.    Were there ever any times when you had to

13   interact with a client to get the information to

14   complete the P&I diagrams and the client wasn't giving

15   you the information in a timely manner?

16       A.    Yes.

17       Q.    That has happened on more than one occasion?

18       A.    Yes.

19       Q.    Or one occasion?

20       A.    Yes, more than one.

21       Q.    Has that happened throughout your career at

22   BE&K?

23       A.    Yes, it has.

24       Q.    And you started at BE&K when, 1992?



John Trexler

71

1    A.    '92, mm-hmm.

2    Q.    Did it happen as early in your tenure in 1992?

3    A.    Yes, I am sure.

4    Q.    And you became the process department manager

5    in 2005?

6    A.    Yes.

7    Q.    Up until the time you became the process

8    department manager, had you had those type of issues?

9    A.    Yes.

10   Q.    And, again, you didn't tell Mr. Perez when to

11   get you these diagrams?

12   A.    No, I did not.

13   Q.    Typically --

14   A.    In terms of --  I'm sorry.  Go ahead.

15   Q.    Typically --

16          MS. DiBIANCA:  Did you want to finish?  I'm

17   sorry.  I don't think he finished.

18   A.    In terms of for any large project, there is a

19   formal project schedule developed.  So whether I told

20   Obed or not that there was a certain deadline to

21   getting diagrams done, there was a formal published

22   schedule which showed when that activity was expected

23   to complete.  So he did know that schedule.

24   Q.    Do you know if there was a schedule for this



B 260

WILCOX & FETZER LTD.
Registered Professional Reporters

John Trexler

114

1    years you were concerned about lack of work?

2      A.    Yeah, it does happen periodically.    The

3    previous really big downturn had been the previous

4    time Obed had been let go.

5      Q.    1993?

6      A.    Yes.

7      Q.    I know you say you were focused on refinery

8    work.  Right?

9      A.    Mm-hmm.

10      Q.    Was the majority of the work you were doing

11    before you became the process department manager

12    refinery work?

13      A.    For a period of two, three years, yes.

14      Q.    Was that two, three years before you were

15    promoted?

16      A.    Actually, for the year previous to being

17    promoted, I was working on a project for Arkema

18    Chemical.

19      Q.    Was that a refinery project?

20      A.    No, it was not.

21      Q.    What type of project?

22      A.    It's a chemical plant project.

23      Q.    Did the work pick up for Motiva eventually?

24      A.    Yes.  But rather slowly.

**B 261**



**WILCOX & FETZER LTD.**
Registered Professional Reporters

115

1    Q.    When would you say it started to pick up or

2    when BE&K started getting work from Motiva?

3    A.    It's really only just starting right now.

4    Q.    2006?

5    A.    Yeah, when it became Valero.  We did not get

6    much work when it was Premcor.

7    Q.    I want to show you a document that was

8    previously introduced during Peter Howe's deposition

9    marked as Howe 3.  It's titled "BE&K Delaware -

10   Projects November 2003," stamped D03251.  Review that

11   document and let me know when you are finished.

12          I want to provide you another document that

13   was provided to EEOC.  It's titled "BE&K Delaware -

14   Project Work Late 2003 through Year End 2004."  It's

15   Bates stamped D3324.  Please review those two

16   documents and let me know when you're finished.

17          (Trexler Deposition Exhibit No. 2 was

18   marked for identification.)

19          THE WITNESS:  I am familiar with these

20   documents.

21   BY MR. ANGLADE:

22   Q.    Can you tell me what Howe 3 is?

23   A.    Howe 3, it is a summary of projects that were

24   in the office in the late 2003 time frame.

B 262



1    Q.    And you said you've seen the project before?

2    A.    I pulled some of this information together.

3    Q.    Did you create Howe 3?  Did you prepare that

4    yourself?

5    A.    Yes.

6    Q.    You did.  How did you go about creating it?

7    A.    In terms of I went through -- we have reports

8    of old time sheet records that I skimmed through to

9    discern what the projects were and their approximate

10   time frames and who was charging to those projects

11   during those time frames.

12   Q.    What did you mean, "who was charging to the

13   projects"?

14   A.    Well, in terms of the time sheet records

15   they're recording how many hours people charged to a

16   particular project during a particular week.  So, you

17   know, I could -- in reviewing those records, I could

18   see that, okay, this project had, you know, two

19   process engineers working on it during this particular

20   period.  So it's actually a record of work hours

21   against a particular project.

22   Q.    Did you also create Trexler 2?

23   A.    Yes, I did.

24   Q.    When did you create them?



117

1    A.    In terms of -- well, this -- the Howe 3 was

2  first.  That's the one we did first.

3    Q.    When did you do that?  Was it this year?

4    A.    Oh, yeah.

5    Q.    I mean, recently?

6    A.    I don't know.  Two, three months ago.

7          MS. DiBIANCA:  Do you want me to answer the

8  question.

9          MR. ANGLADE:  Excuse me?

10         MS. DiBIANCA:  Do you want me to answer?

11         MR. ANGLADE:  Sure.

12         MS. DiBIANCA:  It was done in preparation

13  for the litigation.  Whenever the other responses were

14  sent, they were turned over to him.

15         MR. ANGLADE:  Okay.

16         THE WITNESS:  Right.  So I guess this would

17  have been done a few weeks before Pete Howe testified,

18  I presume.

19  BY MR. ANGLADE:

20    Q.    When you were skimming documents or time cards,

21  did you notice if people were working on two projects

22  at the same time?

23    A.    Yeah, yeah.  You know, that would come out of

24  it.

B 264



WILCOX & FETZER LTD.
Registered Professional Reporters

John Trexler

118

1    Q.    Is that indicated on Howe 3 and Trexler 2, if

2    people were working on two projects at the same time?

3    A.    In terms of sometimes there is some overlap

4    between projects and/or -- well, for example -- a

5    couple examples here.    Item 3 here on Howe No. 3 was

6    "DuPont Spruance Small Projects."    And there, people

7    were working on lot of projects.    And rather than list

8    10 or 12 projects, I have just kind of summarized that

9    as "Spruance Small Projects" and the people that were

10   working on them.    So that was a program of work.

11   Q.    Okay.

12   A.    And rather than trying to capture every

13   individual project just to make it a little bit more

14   manageable in understanding the data, I grouped that

15   together.

16   Q.    So when you said there were 12 projects for

17   Spruance Small Projects, does that mean Poprik and

18   Wright were working on 12 different projects?

19   A.    Yes; or they had them split up between them in

20   some different fashion.    It may not be 12, but, you

21   know, it depends on the time frame.    It was always

22   changing.    The small projects, you know, come and go

23   quickly.

24   Q.    Let me ask you:    Have you ever heard the



B 265

121

1    A.    It was probably longer than two months.

2    Q.    Do you know if it was longer than six months?

3    A.    No.

4    Q.    So somewhere in between two to six months?

5    A.    Yeah.  And I think I was partly chargeable

6    during that whole time.  It's just didn't have enough

7    chargeable business to charge the 40 hours.

8    Q.    How old were you in 1993?  What was your date

9    of birth again?

10    A.    '55.  So I would have been 38.

11    Q.    Were there any other times when you charged

12    overhead for over a month?

13    A.    No.

14    Q.    Do you know if there are other BE&K employees

15    in the process department who have charged to

16    overhead?

17    A.    Yeah.  It happens from time to time.  As I

18    said, it's -- you know, in this day, the only reason

19    anyone would charge to overhead for any extended

20    period is if we were absolutely assured that work was

21    forthcoming and that this particular person was going

22    to be critical to perform the new work.

23    Q.    Has anyone charged to overhead in the process

24    department in 2006?

B 266



John Trexler

144

1    Q.    Job code, what does that mean?

2    A.    I am not sure I know.

3    Q.    Okay.  What does "R/N" mean?

4    A.    "R" means it's reimbursable work rather than

5    nonreimbursable work.

6    Q.    So "nonreimbursable" meaning charge to

7    overhead?

8    A.    Yes, yes.

9    Q.    What is "regular"?

10   A.    Regular versus overtime or premium time.  So,

11   basically, she -- for that week-ending October 3rd,

12   Shea worked four hours on the Chambers Works site team

13   work.

14   Q.    Okay.

15   A.    If you go down to the next entry, she charged

16   18 hours to this fatty acid tanks design basis.  That

17   would, basically, be one of the white pigment relief

18   device team projects.  So she was working on both

19   projects during the October 2003 period.  So she was

20   working Chambers Works site team, but she was also

21   working on some of these white pigment relief device

22   team projects.

23   Q.    How do you know that's a white pigment relief

24   device team projects, fatty acids?

**B 267**



157

1  decision?

2      A.    Yes.    Because I would be the one to make the

3  decision.

4      Q.    So you will offer her a position?

5      A.    I expect that I will.    We have to see what our

6  needs are at the time, but she's worked well for us.

7      Q.    Have you ever been convicted of a crime?

8      A.    No, I haven't.

9      Q.    When you were a process engineer, senior

10  process engineer, were there ever times you were

11  pulled off a project before the project was completed?

12      A.    Yes.

13      Q.    Did that happen on one occasion or more than

14  one occasion?

15      A.    Just one that I am remembering.

16      Q.    Can you tell me about that time?

17      A.    Yeah.    In terms of this would have been in 1995

18  and we were coming close to the end of that project

19  for DuPont Fayetteville.    And, basically, the reason I

20  was pulled off of it or freed myself up from it is

21  that there was a new project starting for DuPont

22  Washington Works that desperately needed process

23  engineering help, so I was pulled in to help out that

24  project.

**B 268**



John Trexler

164

1  folks.

2       So in this case with Arkema, it was pretty

3  good because we had come to the end of one project

4  phase and hadn't started the next project phase, so

5  they agreed that it wouldn't be too disruptive if I,

6  you know, if I, you know, came off the project.

7  Q.   Are you aware of other employees who were

8  pulled off of projects before the project was supposed

9  to be completed?

10  A.   I can't -- I'm sure it's happened.  I can't

11  think of any.

12  Q.   What do you mean when you say you are sure and

13  then you stopped?

14  A.   I am sure it's happened.

15  Q.   But you don't recall any specific examples?

16  A.   I don't recall specific examples.

17  Q.   As the process department manager, have you

18  ever pulled an employee off a project before the

19  completion of that project?

20  A.   I am not remembering any times.

21  Q.   Would you ever do that?

22       MS. DiBIANCA:  I object to the extent it

23  calls for him to speculate.  And then you can go ahead

24  and answer.

B 269



193

```
 1              MS. DiBIANCA:  Let him finish, please.
 2       A.    Go ahead.
 3       Q.    Was there ever a concern that the average
 4  billing rate needed to be lower for BE&K to be able to
 5  compete with its competitors?
 6       A.    Not that I am aware of.
 7       Q.    Never heard that?
 8       A.    No.
 9       Q.    Pete Howe never discussed that with you?
10       A.    No.
11       Q.    Have you ever heard anyone say that the work
12  force needs to be rejuvenated because the average
13  billing rate needs to be lower?
14       A.    No.
15       Q.    As the process department manager today, are
16  you concerned at all about the average billing rate in
17  your department?
18       A.    No.
19       Q.    Do you know the difference between being a BE&K
20  employee as opposed to an Allstates employee is?
21       A.    Yes.
22       Q.    What's the difference?
23       A.    An Allstates employee is not guaranteed 40
24  hours of work a week.
```

**B 270**



**WILCOX & FETZER LTD.**
Registered Professional Reporters

194

1    Q.    Any other differences?

2    A.    In terms of, you know, from a functional

3    standpoint, no, not really, in terms of the type of

4    work they do.

5    Q.    Do you believe it's more of an advantage for an

6    employee to be a full-time BE&K employee as opposed to

7    Allstates?

8    A.    For most folks, yes.

9    Q.    Why would you say "for most folks, yes"?

10   A.    Because of the benefits and such that BE&K

11   provides that Allstates doesn't provide.

12   Q.    Any other reason?

13   A.    Guaranteed 40 hours a week work.

14   Q.    Any other reason?

15   A.    That's the big ones.

16   Q.    Nothing else?

17   A.    No.

18   Q.    Were you ever involved in the bidding process

19   for projects when you were a senior process engineer?

20   A.    I sometimes prepared work hour estimates.

21   Q.    Do you know if BE&K has ever underbudgeted a

22   proposal in an attempt to secure business from a new

23   client?

24   A.    I don't think we've ever underbudgeted.



B 271

John Trexler

198

1    Q.    Typically, when you were a lead process

2    engineer and a budget was being done for a project,

3    would you be consulted on that project as far as how

4    many hours you think you need to get it completed?

5    A.    Sometimes, yes, sometimes no.

6    Q.    Were you consulted the majority of the time?

7    A.    In terms of the lead process engineers are

8    often asked to develop the work hour estimates  and/or

9    to review and approve the work hour estimate.

10   Q.    So they're often asked to do that?

11   A.    Yes.

12   Q.    I just want to show you one -- another exhibit.

13   This is going to be marked as Trexler 3.  It's Bates

14   stamped D3284 through D3288.  Please review these set

15   of documents and let me know when you're finished.   3?

16              (Trexler Deposition Exhibit No. 3 was

17   marked for identification.)

18   BY MR. ANGLADE:

19   Q.    Have you ever seen those pages before?

20   A.    No, I haven't.

21   Q.    Do you understand what any of them mean?

22   A.    I can guess.  Basically, I can't say that I

23   have really seen or studied this type of report a lot.

24   So I really don't have familiarity with this document

B 272



**BE&K Delaware –Project Work: Late 2003 through Year End 2004\***

| Client Name | Project No. | Description / Nature of Project | Start | End | Process Dept. Personnel |
|---|---|---|---|---|---|
| DuPont | DCD3S004 | Misc. Chambers Works | Oct-03 | May-04 | Robbins |
|  | DCS5T001 | China Fine Powders / Dispersion | Jun-04 | > 12/31/04 | Robbins |
| DuPont | DCD3U001 | Chambers Works Site Team | Sep-02 | > 12/31/04 | Beitler |
| DuPont | DSC32307 | Spruance Small Projects | Sep-03 | > 12/31/04 | Poprik |
|  | etc. |  | Sep-03 | > 12/31/04 | Wright |
| DuPont | DAA3T001 | White Pigments Relief Device Team | Feb-02 | > 12/31/04 | Baker |
|  | DAA3T002 |  | Feb-02 | > 12/31/04 | Gerwig |
|  | DDE3T003 |  | Feb-02 | > 12/31/04 | Guttridge |
|  | DDE3T004 |  | Feb-02 | > 12/31/04 | Hassan |
|  | etc. |  | Feb-02 | >12/31/04 | Pham |
|  | etc. |  | Feb-02 | > 12/31/04 | Taylor |
|  | etc. |  | Oct-04 | > 12/31/04 | Wunder |
| Various |  | Process Hazards Reviews / Small Proj. | Jan-04 | Sep-04 | Wunder |
| DuPont | DAA3T001 | White Pigments Relief Device Team | Feb-02 | May-04 | Delgado |
|  |  | Performance Coatings Small Projects | Jun-04 | > 12/31/04 | Delgado |
| DuPont | DEA2T087 | Edgemoor: North End Spill Diversion | May-03 | Apr-04 | Elener |
|  | DSC32307 et al | Spruance Small Projects | Jun-04 | > 12/31/04 | Elener |
| DuPont | DMF3C003 | Manati: Intermediates / Past Expansion | Sep-03 | Nov-03 | Sharma |
|  |  | Misc. Small Projects / Proposals | Dec-04 | May-04 | Sharma |
| DuPont | DMF3C004 | Manati: Spherical Silver Expansion | Jul-03 | Dec-03 | Tweed |
|  |  | Various Manati Projects | Jan-04 | May-04 | Tweed |
|  | DCS5T001 | China Fine Powders / Dispersion | Jun-04 | > 12/31/04 | Tweed |
| DuPont/Magellan | DWC32001 | Project Blue | May-03 | Sep-04 | Preston |
| DuPont | DZB5T003 | China NF3 Purification | Oct-04 | > 12/31/04 | Preston |
| DuPont | DCS3X001 | PANDA | Jan-03 | Dec-03 | Majors |
|  |  | Misc. Small Projects / Proposals | Jan-04 | May-04 | Majors |
|  | DCS5T001 | China Fine Powders / Dispersion | Jun-04 | > 12/31/04 | Majors |
| Motiva | 5040602 | Hydrocracker Corrosion Mitigation | Sep-03 | Dec-03 | Trexler |
| Motiva |  | Red Lion Acid Plant | Jan-04 | Feb-04 | Trexler |
| Sunoco |  | Eagle Point FCCU Expansion | Mar-04 | May-04 | Trexler |
| Arkema |  | F32 Project | Jun-04 | > 12/31/04 | Trexler |
| Motiva | 5040602 | Hydrocracker Corrosion Mitigation | Sep-03 | Dec-03 | Perez |
| Conoco-Phillips | 5040612 | Flare Network Modeling | Sep-03 | Feb-04 | Lin |
| DuPont/Magellan | DWC32001 | Project Blue | Mar-03 | May-04 | Lin |
| DuPont | DCS5T001 | China Fine Powders / Dispersion | Jun-04 | > 12/31/04 | Lin |
| Various |  | Process Hazards Reviews / Small Proj. | Jan-04 | Sep-04 | Wunder |
| Arkema |  | F32 Project | Jun-04 | > 12/31/04 | Robinson |

This document was prepared in response to the EEOC's Third Request for Production and did not exist prior to such Request. BE&K believes that every effort has been made to gather all the data required to make a complete and accurate response and as a result, believes that this document is an accurate representation of the requested data, BE&K makes no guarantee as to the accuracy of this document.

DEPOSITION
EXHIBIT
Trexler 2

B 273

D03324

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | **Civil Action No. 05-CV-00697 (KAJ)** |
| v. | ) ) | |
| BE&K ENGINEERING COMPANY, (SUBSIDIARY OF BE&K, INC.) | ) ) ) | |
| Defendant. | ) | |

---

## AFFIDAVIT OF JOSEPH DANESE

I, Joseph Danese, do hereby depose and state as follows:

1.      I am currently employed as a Federal Investigator with the U.S. Equal Employment Opportunity Commission ('EEOC" or "Commission") in its Philadelphia District Office. I make this affidavit for purposes of this litigation. I conducted the investigation into the above-captioned litigation and am familiar with the facts of this case (charge no. 170-2004-00390). Except as otherwise stated, I am providing this affidavit based upon my personal knowledge and on information obtained in the course of my employment.

2.      Juan Obed Perez filed his charge of discrimination with the EEOC on or about April 2, 2004 against BE& K Engineering Company ("Defendant" or "BE&K"). In his charge, Mr. Perez alleged that he was discriminated against in violation of the Age Discrimination in Employment Act (ADEA), when Defendant terminated him from his position for lack of work, while hiring younger workers. See Exhibit 1 Charge of Discrimination.

3.      During the investigation I interviewed Christopher Guttridge. Mr. Guttridge was an Engineer in Defendant's Process Department. He had been employed by Defendant BE&K

**B 274**

1

EEOC 0000000556

since July 2003. He was hired after graduating from college at the age of twenty-three (23). See Exhibit 2 Notes from Chris Guttridge Interview; Exhibit 3 Letter of Determination ("LOD").

4.      I questioned Mr. Guttridge regarding whether he was asked during his initial interview with BE&K, if BE&K was looking to hire younger people. Mr. Guttridge stated that he believes that he was told that BE&K wanted to hire younger people, but he could not recall the specific words. However, Mr. Guttridge indicated that he remembered it being said. See Exhibit 2. Towards the end of the interview, I asked him what made him decide to become an engineer and if he was good in math. Mr. Guttridge in a light-hearted manner indicated that he was okay in math. I believe that the interview was very cordial and friendly.

5.      On August 4, 2005, the Commission issued its Letter of Determination ("LOD") finding that reasonable cause existed to believe that Defendant violated the ADEA with respect to Juan Perez. See Exhibit 3 LOD.

6.      On September 13, 2005, the EEOC failed conciliation after Charging Party declined Defendant's counteroffer. See Exhibit 4 Fax.

I declare under penalty of perjury that the foregoing is true and correct.


Date: 06/20/06

JOSPEH DANESE
U.S. EEOC Investigator


Subscribed and sworn before me
this 20th day of June 2006

Notary Public

My Commission expires: April 23, 2008

**B 275**

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Amy K. Garman, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Apr. 23, 2008
Member, Pennsylvania Association Of Notaries

2

EEOC 0000000557