UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                          )
                                     )
            Plaintiff,               )
                                     )        CIVIL ACTION NO. 05-697
     v.                              )        (SLR)
                                     )
BE&K ENGINEERING COMPANY,            )
(Subsidiary of BE&K, Inc.)           )
                                     )
            Defendant.               )

_____

## COMPENDIUM OF UNREPORTED DECISIONS

Jacqueline H. McNair
Regional Attorney
Judith O'Boyle
Supervisory Trial Attorney

_____

Woody Anglade
Trial Attorney
Equal Employment Opportunity
Commission
Philadelphia District Office
21 S. 5th Street, Suite 400
Philadelphia, PA 19106
(215) 440-2814


COLM F. CONNOLLY
United States Attorney


Douglas McCann
Civil Chief
Delaware Bar I.D. No. 2901
The Nemours Bldg.
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

Dated:  September 27, 2006

i

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2105504 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
Roger BAKER, Robert Berglund, and Jan
Wroblewski, Plaintiffs,
v.
TOOLING SCIENCE, INC., Defendant.
**No. Civ. 03-5310JRTFLN.**

Aug. 26, 2005.

John J. Gores, Gores Law Office, Fridley, MN, for
plaintiffs.
Mary M.L. O'Brien and Debra L. Weiss, Meagher
& Geer, P.L.L.P., Minneapolis, MN, for defendant.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TUNHEIM, J.
*1 Plaintiffs Roger Baker, Robert Berglund, and
Jan Wroblewski are former employees of defendant
Tooling Science, Inc. ("TSI"), a company that
designs and builds plastic and die-cast molds.
Plaintiffs allege that they were terminated based on
their ages in violation of the Age Discrimination in
Employment Act ("ADEA"), the Minnesota Human
Rights Act ("MHRA"), and Minnesota Statute §
181.81. Defendant asserts that the plaintiffs were
selected for termination as part of a reduction in
force ("RIF") because they were less skilled and
less motivated than other employees. Defendant
moves for summary judgment. For the following
reasons, the Court denies defendant's motion.

### BACKGROUND

Roger Baker was hired by TSI in 1995 at the age of
57 and worked there until he was laid off on
September 2, 2001 at the age of 62.[FN1] At the time
of his termination, Baker worked in the CNC "bay,"

or department. Most of the other employees in the
CNC bay were younger than 40. Three of these
employees, Kormanik, Aguilar, and Depew, were
hired by TSI in the spring of 2001.

> FN1. On February 22, 2002, the layoff was
> retroactively changed to a termination.

Plaintiffs assert that Baker had nineteen years of
experience as a programmer and manufacturing
engineer on machines very similar to the CNC
machines he was hired to run at TSI, was able to
operate all of the CNC machines in his bay, was as
or more efficient than he was required to be,
consistently received salary increases, and, in
contrast to many of the younger employees, had no
attendance, tardiness, or extended break time
problems. According to plaintiffs, Baker was
effectively replaced by the much younger
Kormanik, Aguilar, and Depew.

According to defendant, although Baker received
two weeks of training on CNC machines, Baker was
only able to operate 2 out of 20 CNC machines and
was not able to handle precise, intricate projects.
Defendant asserts that Baker failed to make efforts
to improve his skills, and that the other employees
in the bay had additional, more advanced or more
versatile skills than did Baker. Defendant states that
the tasks formerly assigned to Baker were
redistributed among the remaining employees,
including Kormanik, Depew, and Aguilar.

Robert Berglund was hired in 1978 and worked for
TSI until he was laid off on October 12, 2001 at the
age of 52.[FN2] Berglund worked in the manual bay.
Approximately half of the other mold makers in the
manual bay were under 40.

> FN2. Berglund's layoff was also changed
> to a termination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2

Not Reported in F.Supp.2d, 2005 WL 2105504 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

According to plaintiffs, Berglund was a versatile and accomplished employee, regularly sought out training from co-workers and manuals on new or advanced features of the machines, and had a twenty-five year long positive history at the company. Plaintiffs contend that Berglund was replaced by a much younger employee from Wroblewski's bay, Jacob Demary, who, although laid off earlier, was recalled just after Berglund was terminated.

According to defendant, Berglund had very little experience when he began working at TSI, worked primarily on manual machines, worked being told at least once that he needed to learn new machines and have a better attitude, made very little effort to improve his skills or learn the new technologies becoming increasingly prevalent in the industry. Defendant asserts that Berglund was less skilled than the other workers in his bay, could not operate a number of the machines in the bay, and was not willing to work second-shift.

*2 Jan Wroblewski was hired by TSI in 1991 at the age of 45 and worked there until he was terminated on October 26, 2001 at the age of 55. Wroblewski worked in the back mold maker bay. More than half of his co-workers were under 40. One, John Michaels, was hired in the spring of 2001.

Plaintiffs claim that Wroblewski could operate all of the machines in his bay, had more than fifteen years of experience in the design, manufacture, and operation of machines, and had a positive work history with no attendance, tardiness, or job performance problems at the company. Plaintiffs contend that Wroblewski was replaced by Michaels, a much younger horizontal bar operator hired shortly before Wroblewski was terminated.

According to defendant, Wroblewski, like Berglund, had very limited skills and experience, could not operate a number of the machines in the bay, did not take advantage of opportunities to seek more training and was not willing to work second-shift. After his termination, Wroblewski's work was redistributed to other employees including Michaels.

## ANALYSIS

### I. SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

### II. CLAIMS

Claims of age discrimination under the ADEA, the MHRA, and Minnesota Statutes § 181.81 are analyzed under the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Haas v. Kelly Services, Inc.,* 409 F.3d 1030, 1035 (8th Cir.2005); *Dietrich v. Canadian Pacific Ltd.,* 536 N.W.2d 319 (Minn.1995) (holding that *McDonnell Douglas* applies to age discrimination claims under the MHRA); *Riebhoff v. Cenex/Land O'Lakes Agronomy Co.,* 1998 WL 901749 (Minn.Ct.App. Dec. 29, 1998) (analyzing MHRA and § 181.81 claims under *McDonnell Douglas* ). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case consisting of the following elements: 1) he was at least 40 years old, (2) he was terminated, (3) he was meeting defendant's reasonable expectations at the time of his termination, and (4) he was replaced by someone substantially younger. *Haas,* 409 F.3d at 1035.[FN3] The defendant must then offer a legitimate,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 2105504 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

nondiscriminatory reason for the termination. *Id.* Finally, the plaintiff must demonstrate that the nondiscriminatory reason is a pretext for age discrimination. *Id.*

> FN3. These elements are slightly different than those required in cases which indisputably involve a reduction-in-force, rather than the replacement of an older employee with a younger employee. In such a case, a plaintiff makes a prima facie case of age discrimination by establishing: (1) she is within the protected age group; (2) she met the applicable job qualifications; (3) she suffered an adverse employment action; and (4) there is some additional evidence that age was a factor in the employer's action. *Stidham v. 3M, Inc.,* 399 F.3d 935, 938 (8th Cir.2005) (citing *Bashara v. Black Hills Corp.,* 26 F.3d 820, 823 (8th Cir.1994)); *Hillebrand v. M-Tron Industries, Inc.,* 827 F.2d 363 (8th Cir.1987) (distinguishing between cases involving clearly established RIFs and disputed RIFs). In this case, defendant raises the RIF as a defense to plaintiffs' charges that they were replaced by younger employees. Plaintiff disputes that a reduction in force took place.

### A. Prima Facie Case

**\*3** Defendant asserts that plaintiffs fail to make out a prima facie case because they were not replaced by younger non-protected workers. Defendant asserts that the new employees hired in the spring of 2001, including John Michaels, Juan Aguilar, Shawn Depew, and Steve Kormanik, were hired to replace employees who left the company on short notice while an expedited project was pending. According to defendant, plaintiffs' work was redistributed among existing workers.

Viewed in the light most favorable to the plaintiffs, the evidence presented indicates that defendant hired new younger employees capable of doing all of plaintiffs' jobs shortly before plaintiffs' termination at a time when the company should

already have been worried about the possible need to cut costs, and that although the younger employees ostensibly were hired to work on one expedited project, defendant chose to terminate the plaintiffs rather than the new employees. The Court finds that the plaintiffs have adequately established a prima facie case. *See Yates v. Rexton, Inc.,* 267 F.3d 793, 799-800 (8th Cir.2001).

### B. Legitimate Reasons

Defendant asserts that it, like the rest of the mold making industry, was severely affected by the downturn in the economy in the fall of 2001 and was forced to implement a RIF. According to defendant, customer work orders dropped significantly, payroll dropped 36% from the second to the fourth quarter in 2001, and the company suffered a 43% drop in sales. Defendant states that, before resorting to the RIF, it reduced hours and wages company-wide, cut benefits, imposed salary cuts on the owners, and instituted a wage freeze that lasted through January 2004. Defendant contends that the managers of the departments laid off the plaintiffs because they were less skilled and less diverse in their skills than other employees in the departments and had demonstrated less willingness to learn new skills. If believed, these reasons present legitimate, non-discriminatory reasons for plaintiffs' termination.

### C. Inference of Age Discrimination

Plaintiffs assert that since 1997, the management at TSI has "systematically engaged in the creation of a younger workforce" by terminating, laying off, or otherwise removing from employment production employees who were over the age of 50 while at the same time hiring workers significantly younger than 50. Additionally, plaintiffs assert, TSI has routinely excluded older employees from training on new equipment and from working on special projects and has singled out older workers for subjective performance criticisms while ignoring the same or worse behavior by younger employees.

In support of their theory, plaintiffs allege that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 2105504 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

between 1997 and 2001, 75% of the new mold makers hired by the company were under 40, while seven employees over the age of 50 were terminated between 1999 and 2001 and 75% of the employees terminated in the alleged RIF were not only over 40, but over 50.

**\*4** Additionally, plaintiffs assert that, despite requests from Berglund and several other older employees, TSI did not train the older workers on a number of the machines. TSI also did not train Baker or Wroblewski on new machines purchased to replace machines they routinely worked on and did not suggest that either get any outside training. At the same time, TSI trained a number of the younger employees on this equipment.

Furthermore, plaintiffs argue that TSI did not have a formal evaluation process and, without one, could not have terminated plaintiffs based on objective criteria or records of employee skills, productivity, etc. The only objective records of employee performance relate to attendance and indicate that the younger workers retained by the company had significant tardiness and attendance problems, while the plaintiffs did not.

Finally, plaintiffs dispute all of TSI's statements in support of the proffered legitimate non-discriminatory reasons including the need for a RIF, the fact of a RIF, and the rationale for choosing plaintiffs to be part of the alleged RIF over other employees. Plaintiffs assert that TSI business records show no loss in sales between 2000 and 2001, demonstrate a significant increase in TSI's net income in 2001, and indicate that TSI neither reduced the owners' salaries nor implemented a wage freeze. Furthermore, plaintiffs claim that aside from the vacation time each took, none noticed a reduction in their hours. Additionally, according to plaintiffs, TSI, at various times, has asserted that differing numbers of employees were eliminated in the fall of 2001 as part of the RIF, without revealing that at least three were quickly recalled, at least one left voluntarily, at least one was fired for cause, and one was never a regular employee, and that TSI hired nine new employees in 2001, four of whom were production employees.

The Court finds that the above evidence, if believed, is sufficient to permit a jury to conclude that the defendant's asserted non-discriminatory reason for plaintiffs' termination is a pretext for age discrimination.[FN4] Accordingly, the Court denies defendant's motion for summary judgment.[FN5]

> FN4. Plaintiffs and defendant also presented conflicting statistical evidence. The Court finds it unnecessary to examine this evidence in detail, as it finds the non-statistical evidence raised by plaintiffs sufficient to satisfy the third prong of the test. *See Stidham v. 3M, Inc.,* 399 F.3d 935, 938 (8th Cir.2005) (noting that a plaintiff may demonstrate an inference of discrimination through adequate statistical evidence, or by providing other more anecdotal evidence of age discrimination).

> FN5. In light of the Court's determination, and because the Court has not resorted to or relied on the affidavit of Erma Frank or the exhibit is refers to, Exhibit AAAA, the Court denies as moot plaintiffs' appeal of the Magistrate Judge's Order denying plaintiffs' motion to strike the affidavit and exhibit. If this particular evidence becomes relevant at trial, plaintiffs may raise the issue with the Court at that time.

This case will be placed on the Court's next available trial calendar.

### ORDER

Based on the foregoing, all the records, files, and proceedings herein, IT IS HEREBY ORDERED that defendant's motion for summary judgment [Docket No. 40] is DENIED.

IT IS FURTHER ORDERED that plaintiffs' appeal of the Magistrate Judge's June 14, 2005 Order [Docket No. 82] is DENIED AS MOOT and the Magistrate Judge's June 14, 2005 Order [Docket No. 81] is AFFIRMED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 5

Not Reported in F.Supp.2d, 2005 WL 2105504 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

D.Minn.,2005.
Baker v. Tooling Science, Inc.
Not Reported in F.Supp.2d, 2005 WL 2105504
(D.Minn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3621644 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum in Support
of Motions in Limine (Oct. 20, 2005) Original
Image of this Document (PDF)
• 2005 WL 3621648 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Defendant Tooling Science, Inc.'s Motion in Limine
to Limit Plaintiffs' Damages (Oct. 20, 2005)
Original Image of this Document (PDF)
• 2005 WL 3621652 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Defendant Tooling Science, Inc.'s Motion in Limine
to Limit the Testimony of Joseph Hanrahan (Oct.
20, 2005) Original Image of this Document (PDF)
• 2005 WL 3621656 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Defendant Tooling Science, Inc.'s Motion in Limine
to Preclude Witnesses Plaintiff Failed to Disclose in
Discovery (Oct. 20, 2005) Original Image of this
Document (PDF)
• 2005 WL 3621635 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Trial Brief (Oct. 18, 2005)
Original Image of this Document (PDF)
• 2005 WL 3621640 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Statement of the Case
(Oct. 18, 2005) Original Image of this Document
(PDF)
• 2005 WL 1585012 (Trial Motion, Memorandum
and Affidavit) Defendant Tooling Science, Inc.'s
Memorandum in Response to Plaintiffs' Motion to
Strike Defendant's Exhibit AAAA and the Frank
Declaration (May 18, 2005) Original Image of this
Document (PDF)
• 2005 WL 1352758 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum in Support
of Motion to Strike the Frank Declaration and
Defendant's Exhibit AAAA (May 10, 2005)
Original Image of this Document (PDF)
• 2005 WL 1352755 (Trial Motion, Memorandum
and Affidavit) Defendant Tooling Science, Inc.'s
Reply Memorandum (Apr. 13, 2005) Original
Image of this Document (PDF)

• 2005 WL 1352753 (Trial Motion, Memorandum
and Affidavit) Plaintiffs' Memorandum in
Opposition to Defendant's Motion for Summary
Judgment (Apr. 5, 2005) Original Image of this
Document (PDF)
• 2005 WL 1352750 (Trial Motion, Memorandum
and Affidavit) Defendant Tooling Science, Inc.'s
Memorandum of Law in Support of Motion for
Summary Judgment (Feb. 28, 2005) Original Image
of this Document (PDF)
• 2005 WL 1352748 (Trial Motion, Memorandum
and Affidavit) Defendant's Response to Plaintiffs'
Motion to Compel and Amend Scheduling Order
(Jan. 18, 2005) Original Image of this Document
(PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1

Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
George BROWN, et al.
v.
DELAWARE & HUDSON RAILWAY
COMPANY, et al.
**Civ. A. No. 91-3203.**

Nov. 3, 1992.

Frank P. Murphy, Katz Murphy Oliver D'Aniello
and Farrell, Norristown, Pa., for plaintiffs.
Walter H. Flamm, Frank Spada, Jr., Clark, Ladner,
Fortenbaugh & Young, Philadelphia, Pa., for
Delaware & Hudson Ry. Co., Francis D. Cello.
Paul D. Keenan, Clark, Ladner, Fortenbaugh &
Young, Philadelphia, Pa., for Canadian Pacific
Railroad and Canadian Pacific Ltd.
Frank Spada, Jr., Clark, Ladner, Fortenbaugh &
Young, Paul D. Keenan, Philadelphia, Pa., for D &
H Corp.

MEMORANDUM AND ORDER
FULLAM, Senior District Judge.
*1 Plaintiffs allege that on August 1, 1990, their
employment was terminated in violation of the Age
Discrimination in Employment Act ("ADEA").
The case is complicated by the fact that The
Delaware & Hudson Railway Company ("the
Railway"), Plaintiffs' original employer, filed a
petition for reorganization pursuant to Chapter 11
of the Bankruptcy Code on June 20, 1988.
Because the ownership and the management of the
Railway changed hands a number of times in the
years surrounding the Plaintiffs' terminations, the
Railway's recent history must be explained in some
detail.

On June 27, 1988, after the Railway filed for
Chapter 11 protection, the Bankruptcy Court
appointed Defendant Francis P. Dicello ("the

Trustee") as trustee. The Trustee then requested an
emergency order from the Interstate Commerce
Commission ("the ICC") permitting another
railroad to run the Railway pending final
organization. In June of 1988, the ICC appointed
the New York, Susquehanna and Western Railroad (
"the NYS & W") to operate the Railway's lines and
facilities.

The NYS & W directed this emergency service
between June, 1988 and February, 1990. The
Trustee then resumed operations of the Railway on
February 28, 1990. The Railway's daily operations
were directed and supervised by Carl Belke and
John Parola and financial operations were
supervised by Stephen Fisk, all of whom worked
with the Trustee during his direction of the Railway.

On June 8, 1990, the Bankruptcy Court entered an
order authorizing the sale of the Railway to the
Canadian Pacific Railroad ("CP"). Pursuant to an
agreement between CP and the Trustee, CP would
become the emergency service carrier on August 1,
1990 and continue until the sale was completed.
Defendant D & H Corporation is a wholly-owned
subsidiary of CP and was incorporated on February
5, 1990.

On August 1, 1990, the same day that CP became
the emergency service carrier, the Plaintiffs were
discharged. Carl Belke, who remained on the
Trustee's payroll to facilitate the sale of the
Railway, and Tom Waiver, the General Manager for
CP, met with the employees of the Railway who
were to be terminated.

CP ran the daily operations of the railroad until
January 18, 1991, at which time D & H Corporation
acquired the assets of the Railway. One month
following the Plaintiffs' terminations, CP
established a D & H Sales and Marketing
Department which hired nine employees, all of
whom were younger than Plaintiffs. When D & H
Corporation acquired the assets of the Railway in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345
**(Cite as: Not Reported in F.Supp.)**

January of 1991, the sales network established by CP continued, and D & H Corporation itself has not hired any employees to perform these sales functions.

Now before this court is a summary judgment motion that has been filed jointly by all three defendants, the Railway, the Trustee and D & H Corporation. Previously, I granted CP's motion to dismiss because it was not subject to the jurisdiction of this court.

## I. ADEA CLAIMS IN GENERAL

**\*2** Section 623(a)(1) of the ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Since the enactment of section 623(a)(1), the Third Circuit has firmly established the analytical framework to be used in evaluating ADEA claims. This framework is an adaptation of the analysis that the Supreme Court has developed for evaluating claims of racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the ADEA, a plaintiff must prove that age was a determinative factor in his employer's decision to terminate him. Although "the plaintiff has the ultimate burden to prove that age was a determinative factor, he does not have to prove that age was the sole or exclusive reason, but rather that 'age made a difference' in the employer's decision." *Billet v. Cigna Corp.*, 940 F.2d 812, 816 (3d Cir.1991). A plaintiff may prove his case either by direct evidence or, as is more usual, by indirect evidence.

If the plaintiff is proving his case by indirect evidence, he bears the initial burden of establishing a *prima facie* case of age discrimination. In order to do so, the plaintiff must establish: (1) that he was a member of the class protected by the ADEA; (2) that he was qualified for the position from which he was discharged; (3) that he was discharged despite

those qualifications; and (4) that the position was then filled by a person sufficiently younger to permit an inference of age discrimination. *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (3d Cir.1990). The plaintiff's burden regarding the *prima facie* case is different, however, where the plaintiff's job is eliminated and he is not replaced. In that situation, "the employee need only show that he was laid off from a job for which he was qualified while other workers not in the protected class were retained." *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990). If the plaintiff meets his initial burden of proving a *prima facie* case, a presumption of unlawful discrimination is created.

The burden of production then shifts to the defendant in order to dispel this presumption. The defendant is required to articulate a "legitimate, non-discriminatory reason" for his action. If the defendant succeeds, the burden shifts back to "the plaintiff (who at all times retains the burden of ultimate persuasion) [to] prove by a preponderance of the evidence that the reasons articulated by the defendant for its actions were not the true reasons." *Siegel*, 894 F.2d at 53. In other words, the plaintiff must prove that the defendant's proffered reasons are pretext.

The Third Circuit has also clearly held that summary judgment may be appropriate in age discrimination cases. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209 (3d Cir.1988) (noting that summary judgment is appropriate in age discrimination cases, despite fact that they are inherently fact bound), *cert. denied*, 490 U.S. 1098 (1989). Although at trial the ultimate burden of proving that the employer's reasons for termination are pretextual, the employer-movant has the burden on a summary judgment motion. The Third Circuit has articulated that burden as follows:

**\*3** [T]he burden of persuasion on summary judgment remains unalterably on [the defendant] as movant. The employer must persuade the court that even if all of the inferences which could reasonably be drawn from the evidentiary record were viewed in the light most favorable to [the plaintiff], no reasonable jury could find in his favor...

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                            Page 3

Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345
**(Cite as: Not Reported in F.Supp.)**

[T]o meet its burden on summary judgment, the employer must show that the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate, or indirect evidence of that purpose by showing that the proffered reason is subject to factual dispute.... If an employee introduces " evidence of the inconsistencies and implausibilities in the employer's proffered reasons for discharge (which) reasonably *could* support an inference that the employer did not act for non-discriminatory reasons, [t]he district court may not grant an employer's motion for summary judgment."

*Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202-03 (3d Cir.1987) (citations omitted). This standard requires an inquiry into whether the evidence in the record could reasonably lead a jury to find that the employer's articulated non-discriminatory reason is unworthy of credence.

## II. *THE TRUSTEE AND THE RAILWAY*

### A. *Plaintiffs' Prima Facie Case*

Neither Plaintiffs nor Defendants dispute that all Plaintiffs fall within the protected class, that they were all qualified for the sales positions from which they were discharged, and that they were terminated despite these qualifications. Under the facts of this case, however, the alternative formula for establishing whether a *prima facie* case of discrimination, where the plaintiff's job has been eliminated, applies. Using this analysis, Plaintiffs merely need to prove that they were discharged from a job for which they were qualified, while other workers not in the protected class were retained. *See Turner,* 901 F.2d at 342.

The Trustee and the Railway argue that Plaintiffs cannot establish a *prima facie* case of discrimination because they were no longer in the railroad business at the time of the Plaintiffs' terminations. These defendants note that August 1, 1990, the day that Plaintiffs were terminated, was also the same day that CP became the railroad's emergency carrier. They maintain that as of July 31, 1990, all railroad operations under the Trustee

and the Railway ceased to exist. Therefore, they argue that on August 1, 1991, all of the Railway's employees were treated the same way-they were all immediately terminated, and thus, Plaintiffs cannot prove that any of the Railway's employees were treated more favorably than others.

Plaintiffs offer a number of arguments in response to Defendants' contention. First, Plaintiffs claim that they actually worked on August 1, 1990, and that the Railway paid them for that day, as well as for two additional weeks. Second, they maintain that the Railway did not go out of business on August 1, 1990, because it still had a railroad, although it was being run pursuant to an emergency service order. The Railway did not give up ownership of the railroad until January 18, 1991, and in fact, the Railway's bankrupt estate still exists. Therefore, Plaintiffs argue that they were fired by the Railway, although at the direction of D & H Corporation (or CP, its parent corporation), while other, younger employees were retained. They maintain that the Railway and the Trustee had the obligation to disapprove of these allegedly discriminatory discharges.

*4 I find that disputed issues of fact still exist regarding who was running the railroad at the time the Plaintiffs were terminated and that these questions are for a jury to decide. I disagree with Defendants' arguments that Plaintiffs cannot establish a *prima facie* case, and in fact, all of the defendants could possibly be liable. Therefore, summary judgment will be denied.

### B. *Pretext*

The Trustee and the Railway alternatively argue that even if Plaintiffs can establish a *prima facie* case of age discrimination, summary judgment is appropriate because Plaintiffs will not be able to prove that Defendants' stated reasons for Plaintiffs' terminations were pretext. Defendants articulate two legitimate, non-discriminatory reasons for Plaintiffs' discharges. First, they rely on the argument discussed above that because there no longer was a railroad to run after the Trustee and the Railway stopped operating the business on July

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345
**(Cite as: Not Reported in F.Supp.)**

31, 1990, there no longer was a need for employees. Second, the Trustee and the Railway maintain that the decision to terminate Plaintiffs rested on non-discriminatory, business judgment. Specifically, they claim that because D & H Corporation planned to have a joint Sales and Marketing Department, and Plaintiffs were only salesmen when they worked for the Railway, they were not qualified for any positions at D & H Corporation.

The Third Circuit has held that where the defendant-employer has proffered a legitimate reason for discharge, "the appropriate summary judgment question is whether the evidence in the record *could* support a reasonable jury finding either that the plaintiff has shown age discrimination directly or that the plaintiff has shown that the employer's proffered nondiscriminatory reason is unworthy of credence." *Sorba,* 821 F.2d at 203. The facts that most courts emphasize when evaluating an ADEA claim are:
(1) previous evaluations;
(2) statistical evidence regarding the number of protected employees fired and the number of younger employees retained;
(3) prior treatment of protected employees; and
(4) whether discharges occurred during the employer's economic reorganization.

*See, e.g., Siegel v. Alpha Wire Corp.,* 894 F.2d 50 (3d Cir.) (reversing entry of summary judgment and finding plaintiff presented jury question of pretext with evidence of good work evaluations and evidence that eight protected employees were fired within six months after new company president arrived), *cert. denied,* 110 S.Ct. 2599 (1990); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209 (3d Cir.1988) (affirming entry of summary judgment and finding plaintiff failed to show pretext where record revealed poor work evaluations of plaintiff and good work record of replacement and where statistical evidence did not show that reduction in work force had disproportionate impact on older workers); *see also Simpson v. Midland-Ross Co.,* 823 F.2d 937, 941 (6th Cir.1987) ("An ADEA plaintiff who has been terminated amidst a corporate reorganization carries a greater burden of supporting charges of discrimination than an employee who was not terminated for similar reasons.").

*5 Plaintiffs maintain that they have presented evidence that could reasonably support a jury's finding that Defendants' articulated reasons for Plaintiffs' discharges were mere pretext and that age was a determinative factor in their terminations. As discussed above, they dispute Defendants' assertion that on August 1, 1990, there no longer was a railroad for the Trustee and the Railway to run. Additionally, Plaintiffs present evidence that Defendants' decision to terminate them did not rest on non-discriminatory business judgment, noting that Defendants hired younger, less experienced workers, with no greater qualifications than Plaintiffs.

Specifically, Plaintiffs present evidence that one month after their terminations, D & H Corporation set up the D & H Sales and Marketing Department. Plaintiffs show that Defendants did not consider any of the Plaintiffs for this department, despite the fact that Defendants knew that while the railroad was operated by NYS & W, Plaintiffs' training and experience had been changed to include marketing functions. They claim Defendants never reviewed their resumes because of their ages, and instead, Defendants hired nine people each of them younger than the youngest plaintiff.

Plaintiffs also present evidence that none of the individuals hired by Defendants had better qualifications than Plaintiffs. Additionally, Plaintiffs point out that Defendants did not offer a job in the D & H Sales and Marketing Department to anyone over the age of fifty. Lastly, Plaintiffs present evidence that their ages were discussed at company meetings before their discharge. *But see Turner v. Schering-Plough Corp.,* 901 F.2d at 345 (noting fact that plaintiff's age was discussed at three meetings with legal counsel not sufficient in itself to support inference of pretext).

Although the Plaintiffs' terminations coincided with the railroad's economic reorganization, this fact in itself is not sufficient to support a finding (as the Defendants request this court to do) that Defendants' actions were within their right to make

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345
**(Cite as: Not Reported in F.Supp.)**

business judgments as to employee status, but rather it makes Plaintiffs' burden of proving pretext more difficult. Defendants cite *Billet v. Cigna Corporation,* 940 F.2d 812 (3d Cir.1991), to support their argument that "it is brutally simple" that Plaintiffs' discharges must have been a non-discriminatory business decision because they occurred in the context of a reorganization, and therefore, their previous positions (as well as the entire railroad) were eliminated.

Defendants, however, mischaracterize *Billet.* In *Billet,* the Third Circuit affirmed the district court's grant of a directed verdict for the defendant-employer because the plaintiff had not presented sufficient evidence for the jury to find pretext. The employer's reasons for discharging the plaintiff, however, consisted of more than simply a company reorganization which eliminated the plaintiff's position. In fact, the defendant prevailed in *Billet* because it presented evidence that the plaintiff was discharged, and younger employees were retained in newly created positions, because the plaintiff had poor work evaluations, had forged his supervisor's signature, and frequently had disregarded company policy.

**\*6** In the present case, Defendants have failed to present any evidence of poor work performance on the part of any of the Plaintiffs. Plaintiffs, on the other hand have presented some evidence that they were qualified for the jobs created after reorganization and that younger individuals, with no greater qualifications, were given those positions. I agree with Plaintiffs that the record contains sufficient evidence to support a rational inference that Defendants' articulated reasons are unworthy of credence. Defendants' motion for summary judgment will be denied.

### III. D & H CORPORATION

Defendant D & H Corporation argues that summary judgment should be granted in its favor for two reasons. First, it argues that Plaintiffs failed to file charges against it with the Equal Employment Opportunity Commission ("the EEOC") before litigating in federal court as required under the

ADEA. Second, it argues that D & H Corporation was never the Plaintiffs' employer, and therefore, the charge of discrimination lodged against it is improper.

I agree with Plaintiffs, however, that D & H Corporation could be liable on a successor liability theory. On January 18, 1991, D & H Corporation acquired substantially all of the Railway's assets and operations for $25 million. The closing documents expressly noted that various age discrimination claims, including those asserted by the Plaintiffs in this action, were pending against the Railway and/or the Trustee; D & H Corporation expressly assumed any and all liabilities associated with those claims and agreed to indemnify and hold harmless the Trustee and the Railway's estate from any further liability. D & H Corporation's motion for summary judgment will therefore be denied.

### ORDER

And now, this 3rd of November, 1992, upon consideration of Defendants' Motion for Summary Judgment and Plaintiffs' response, IT IS ORDERED that Defendants' Motion for Summary Judgment is DENIED.

E.D.Pa.,1992.
Brown v. Delaware & Hudson Ry. Co.
Not Reported in F.Supp., 1992 WL 330320 (E.D.Pa.), 60 Fair Empl.Prac.Cas. (BNA) 345

Briefs and Other Related Documents (Back to top)

• 2:91cv03203 (Docket) (May. 20, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Jane CARDONA, Plaintiff
v.
Aetna Life & Casualty, Defendant.
**No. 3:96CV1009(GLG).**

May 8, 1998.

*Memorandum Decision*
GOETTEL, District J.
*1 This age discrimination case is brought by plaintiff, Jane Cardona, who at the age of fifty-seven, was terminated by her employer of forty years, defendant Aetna Life Insurance Company. [FN1] Plaintiff alleges claims under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and state-law claims for breach of an implied contract, and promissory estoppel. Defendant Aetna has moved for summary judgment on all counts of plaintiff's complaint. Aetna maintains that plaintiff's job was eliminated for business reasons, as part of a corporate downsizing and reorganization, and that plaintiff was not chosen for a position in the restructured organization because she was judged be one of the least qualified based upon objective, non-discriminatory factors. Plaintiff, on the other hand, asserts that there was no reduction in force within her unit and that she was as qualified or better qualified for the position than other candidates. For the reasons discussed below, defendant's motion will be granted in part and denied in part.

FN1. Defendant's correct corporate name is Aetna Life Insurance Company.

*Background*

From June, 1954, until December, 1993, plaintiff was employed by Aetna in its pension division, most recently as a customer service representative in the customer service 800 # unit [FN2] of the benefit payments department. In this position, plaintiff serviced the needs of participants in Aetna's deferred-income retirement plans, who might, for example, require assistance in changing electronic wire transfer instructions, in changing the withholding tax, or in correcting the amount of the payments that they were receiving. Her job included taking calls on the "1-800" line.

FN2. Plaintiff refers to this as the payee services unit.

In late November, 1993, Aetna made a business decision to contract out to an independent firm the defined benefits actuarial consulting business. This had an impact on what Aetna describes as the "customer service/client team," of which plaintiff was a part.[FN3] Plaintiff, however, denies that such a team ever existed and maintains that the outsourcing of the actuarial consulting business should not have impacted on her customer services unit, since she and her co-workers dealt with existing participants' needs. Rather, according to plaintiff, at least within her department, it only affected the calculation analysts in the calculation accounts unit, who worked with corporate clients of Aetna to establish group pension plans for their employees. Three positions in the calculations accounts unit were eliminated. Nevertheless, Aetna lumped together the two units in plaintiff's department and required all eleven non-management employees to be evaluated for the eight positions in the reorganized group based upon a candidate comparison worksheet ("CCW") completed by supervisors with first-hand knowledge of the employee's performance. Of the eleven employees evaluated, plaintiff received the second lowest rating.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
**(Cite as: Not Reported in F.Supp.)**

> FN3. Aetna states that in early February,
> 1993, following a department
> reorganization, the customer services 800 #
> unit became part of the customer
> service/client team.

On December 10, 1993, Aetna informed plaintiff
that she would "no longer have a position" with the
company. She was told that this was due to "
reengineering, reorganization and/or staff reduction.
" Plaintiff states that her position was not
eliminated. There were eight customer service
representative positions before the "reorganization"
and eight after. Furthermore, she states that her
position was almost immediately staffed with a
younger man in his mid-twenties, who had
previously been with Aetna in another area and had
to be trained for plaintiff's position. She states that
her unit was still supervised by the same people,
continued to have the same job functions, and that
no duties or job titles were changed. Two other
people who were terminated were also over forty
years of age. Plaintiff states that they, too, were
told that their jobs were being eliminated when, in
fact, they were replaced by younger workers from
another unit.[FN4] Only one employee over forty
was retained.

> FN4. The three customer services
> representatives that were terminated were
> all in their late 50's and early 60's. The
> three replacements were all from another
> unit and were in their 20's and early 30's.

**\*2** Until 1991, plaintiff received consistent
performance evaluations of "meets requirements" or
better. She complains that she was not formally
evaluated for the years 1992 or 1993, and that this
lack of formal evaluations "handicapped" her
ability to compete for the "reorganized" positions.
Unsigned performance evaluations for these years
were mailed to her home after her termination.
Plaintiff alleges that defendant also violated its
written progressive discipline procedures (warnings,
probation, suspension) in terminating plaintiff
without any prior warnings or discipline. She also
maintains that her rating on the CCW directly
contradicted her last written performance evaluation.

Plaintiff's last day of work was December 10, 1993.
She received her regular pay until March 17, 1994,
and continued to receive compensation at 100% of
her salary and benefits until March 17, 1995.

Plaintiff filed a charge of discrimination and, on
March 8, 1996, received a notice of the right to sue
from the Equal Employment Opportunity
Commission. This lawsuit followed.

### Discussion

A motion for summary judgment may not be
granted unless the Court determines that there is no
genuine issue of material fact to be tried and that
the moving party is entitled to judgment as a matter
of law. Rule 56(c), Fed.R.Civ.P. The burden of
demonstrating the absence of a genuine dispute as
to a material fact rests with the party seeking
summary judgment. *Adickes v. S.H. Kress & Co.,*
398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142
(1970). In assessing the record to determine
whether there are any genuine issues of material
fact, the Court is required to resolve all ambiguities
and draw all permissible factual inferences in favor
of the party against whom summary judgment is
sought. *McLee v. Chrysler Corp.,* 109 F.3d 130,
134 (2d Cir.1997).

### Count I-Violation of the ADEA

Under the ADEA, an employer may not discharge
an employee because of her age if that employee is
at least forty years of age. 29 U.S.C. §§ 623(a)(1),
631(a); *see also Hazen Paper Co. v. Biggins,* 507
U.S. 604, 609-10, 113 S.Ct. 1701, 123 L.Ed.2d 338
(1993) (noting that Congress' promulgation of the
ADEA was prompted by its concern that older
workers were being deprived of employment on the
basis of inaccurate and stigmatizing stereotypes.
Thus, the ADEA commands that employers are to
evaluate older employees on their merits and not
their age). Claims under the ADEA are analyzed in
the same manner as claims under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. §§
2000e *et seq. See Lightfoot v. Union Carbide
Corp.,* 110 F.3d 898, 913 (2d Cir.1997).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

Under the traditional burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in order to establish a prima facie case of discriminatory discharge in violation of the ADEA, plaintiff must show, through direct or circumstantial evidence: (1) that she was within the protected age group; (2) that she was qualified for the position; (3) that she was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Burger v. New York Institute of Technology,* 94 F.3d 830, 833 (2d Cir.1996). An ADEA plaintiff is not required to show that she was replaced by a younger employee. *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). The burden that an employment discrimination plaintiff must meet to defeat a motion for summary judgment at the prima facie stage is *de minimis.* *McLee,* 109 F.3d at 134.

*3 Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of articulating a legitimate, non-discriminatory reason for its actions. *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997). The employer's burden is one of production, not persuasion. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer articulates an age-neutral reason, in order to defeat a summary judgment motion, the plaintiff must then present admissible evidence from which a rational factfinder could infer that the defendant's employment decision was false or unworthy of belief and that its decision, more likely than not, was based in whole or in part on age. *Stern,* 131 F.3d at 312; *Woroski,* 31 F.3d at 109; *Fisher v.. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

In light of the ease with which a plaintiff can establish a prima facie case of discrimination and an employer can point to downsizing to justify any termination, ADEA suits arising out of a reduction in force often turn on whether the plaintiff has established that the rationale offered by the defendant was a mere pretext for age discrimination. *Viola v. Philips Medical Systems of*

*North America,* 42 F.3d 712, 716 (2d Cir.1994). The court must analyze the evidence, along with all reasonable inferences, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. *Fisher,* 114 F.3d at 1347.

In this case, defendant initially argued that plaintiff has failed to meet her prima facie burden, although it appears that defendant may have abandoned that argument in its reply brief. In any event, we find that plaintiff has clearly met this *de minimis* burden. She was over forty years of age at the time of her termination. She was terminated. For almost forty years with Aetna, she had received satisfactory performance evaluations, and had been serving in the very position for which she was being evaluated. Although defendant contends she was one of the lesser qualified, defendant does not argue that she was unqualified. Thus, we find that she has carried her prima facie burden of showing that she was qualified for the position.[FN5] The last element of plaintiff's prima facie case is whether there is evidence giving rise to an inference of age discrimination. In making this determination, the Court must decide whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational factfinder to infer a discriminatory motive. *McLee,* 109 F.3d at 135. Plaintiff has provided a sworn affidavit that she was replaced by a younger worker who had no experience doing the type of work required by plaintiff's position. She has testified that the three employees who were terminated were in their late fifties and early sixties and that all were replaced by employees from outside their unit who were in their twenties and thirties. Plaintiff also testified that her supervisor made stereotypical comments relating to plaintiff's age to her. Plaintiff's sworn statements are sufficient to permit a rational trier of fact to infer that age was a factor in her discharge. *See Cronin v. Aetna Life Insurance Company,* 46 F.3d 196, 204 (2d Cir.1995) (holding that "a finder of fact is permitted to draw an inference of age discrimination from evidence that, in implementing such a reorganization or reduction, the employer has located new position for younger, but not older, employees"); *see also Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995); *Viola,* 42 F.3d at 716.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
(Cite as: Not Reported in F.Supp.)

Page 4

> FN5. Plaintiff has also provided memoranda from her personnel file which commend her for her performance. In 1989, plaintiff was recommended for a consulting position as part of a reorganization because "she has a lot to offer." The memo also notes that plaintiff was noted for her "strong technical plan knowledge" and that she would be involved in training new employees.

*4 Once the plaintiff meets her prima facie burden, the defendant must then proffer a legitimate, non-discriminatory reason for plaintiff's discharge. *Viola,* 42 F.3d at 717. In this case, Aetna asserts that her termination was brought about by a down-sizing and reorganization, as part of which plaintiff was selected for termination based upon a non-discriminatory assessment of her qualifications in comparison to other members of the department.

Once an employer has produced evidence of a non-discriminatory rationale for its actions, the factual inquiry proceeds to a new level of specificity. *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 516). To defeat a properly supported motion for summary judgment, plaintiff must produce sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason. *Fisher,* 114 F.3d at 1339. Plaintiff need not show that age was the only reason she was terminated, only that age was a substantial factor in the decision. *Burger,* 94 F.3d at 833; *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 317 (2d Cir.1992). At this summary judgment stage, this Court is not to resolve factual issues; we are only to determine whether there are issues of fact to be tried. *Cronin,* 46 F.3d at 203. Moreover, we are required to view the record as a whole and to draw all permissible factual inferences in favor of the plaintiff. *Stern,* 131 F.3d at 313-14.

Plaintiff's affidavit raises genuine issues of material fact as to whether involving her unit in the " reorganization" was a pretext for discrimination. She states that the number of positions did not change, nor did the job functions, nor the supervisory responsibility. Rather, the positions

that were eliminated were from another unit, which was affected by the out-placement of the actuarial services, and that younger employees from that unit, who had no training or experience as customer service representatives, were brought in to replace plaintiff and two other older workers. Additionally, at this stage of the proceedings, where the Court's function is not to decide factual issues, but simply to determine whether they exist, we cannot hold that there are no genuine issues of fact concerning whether plaintiff was chosen for termination because of her qualifications or whether her age was a substantial factor. Thus, we hold that plaintiff has produced sufficient evidence of pretext to defeat defendant's motion for summary judgment as to her ADEA count.

## II. Breach of Implied Contract

Plaintiff's second count is for breach of implied contract. Plaintiff asserts that Aetna failed to follow its own written procedures in connection with her termination and failed to provide her with formal written performance evaluations for the last two years of her employment. She further alleges that Aetna failed to treat plaintiff with good faith and with fair dealings in the same manner as it had with other employees, and in failing to make staffing decisions in a manner that excluded age as a basis.

*5 Under Connecticut law, contracts of employment are terminable at will. *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 15, 662 A.2d 89 (1995). Although the rule of employment at will can be modified by an agreement of the parties, to prevail on this claim, a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment under which the employee could not be terminated without just cause. *Id.* Relying on a company handbook entitled "Working With You," plaintiff asserts that contractual promises were made by Aetna regarding the way performance appraisals would be performed and the process for termination.

On a motion for summary judgment, the threshold

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
**(Cite as: Not Reported in F.Supp.)**

question of whether a personnel manual or employee handbook gives rise to an enforceable contract, interpreting all inferences in a light most favorable to the plaintiff, is a question of law for the Court. *Valenti v. Carten Controls Inc.,* No. 3:94CV1769(AHN), 1997 WL 766854 (D.Conn. Dec.4, 1997); *Manning v. Cigna Corp.,* 807 F.Supp. 889, 893 (D.Conn.1991). Although representations in an employee handbook may under certain circumstances give rise to an express or implied contract between an employer and employee, *Finley v. Aetna Life and Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987), *rev'd on other grounds by Curry v. Burns,* 225 Conn. 782, 626 A.2d 719 (1993), in this case the employee handbook contained an explicit disclaimer.

This handbook is presented for your general information and guidance only, and contains a summary of Aetna's current guidelines for supervisors and managers, which may be changed, in whole or in part, at any time, with or without notice. While Aetna believes wholeheartedly in the policies and procedures described herein, the handbook is not intended to create, nor should you interpret it to be, a contract or agreement of any type between the company and you.

The Connecticut Supreme Court in *Finley* noted " [b]y eschewing language that could reasonably be construed as a basis for a contractual promise, or by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." 202 Conn. at 199 n. 5, 520 A.2d 208. Numerous Connecticut state court decisions have held that contract claims based upon the terms of an employee handbook must fail if the handbook contained an effective disclaimer. *See, e.g., Marfiak v. Blue Cross and Blue Shield of Connecticut, Inc.,* No. CV 940368007S, 1997 WL 724514 (Conn.Super.Nov.3, 1997); *Schain v. Blue Cross Blue Shield of Connecticut, Inc.,* No. CV 930349216, 1996 WL 634286 (Conn.Super.Oct.21, 1996). The disclaimer in the Aetna handbook is clear and unequivocal. It was located on the second page of the handbook, and although not labeled a " disclaimer," it was sufficiently obvious as to be readily observable to any employee reviewing the manual. *See Smith v. Shoreline Care Ltd.,* No.

360206, 1996 WL 365015 (Conn.Super. May 17, 1996). No contract, express or implied, was created by the handbook.

**\*6** Plaintiff also asserts that an implied contract arose by virtue of defendant's usual and customary practice of using progressive discipline procedures with other employees before termination. The Connecticut Court of Appeals rejected a similar claim in *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn.App. 725, 673 A.2d 573, *cert. denied,* 237 Conn. 913, 675 A.2d 885 (1996). In that case the plaintiff argued that the defendant's routine and customary use of the same progressive disciplinary procedures imparted an understanding to its employees that those procedures would always be used, and that this understanding was sufficient to create a "meeting of the minds" for purposes of creating an implied contract. The court rejected plaintiff's argument, stating "contracts are not created by evidence of customs and usage." *Id.* at 732, 673 A.2d 573 (internal citations and quotations omitted). "The plaintiff's belief that he had an employment contract with the defendant, without more, is insufficient to sustain an implied contract claim." *Id.* Finding that there was a lack of factual predicate supporting the plaintiff's feelings and beliefs that an implied contract existed, the court upheld the grant of summary judgment in favor of the employer. *Id.* at 733, 673 A.2d 573. Moreover, progressive discipline procedures normally apply in cases in which an employee is terminated for cause, which is not the case here. Thus, we decline to find that an implied contract arose from the defendant's conduct.

Plaintiff also alleges that defendant breached an implied covenant of good faith and fair dealing existing between the parties by virtue of their implied contract by making staffing decisions based upon age. Connecticut courts have recognized that "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992). To establish a claim for breach of an implied covenant of good faith and fair dealing where the employment is terminable at will,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)
**(Cite as: Not Reported in F.Supp.)**

plaintiff must establish that her dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy. *Johnson v. Chesebrough-Pond's USA Co.,* 918 F.Supp. 543, 550 n. 4 (D.Conn.), *aff'd,* 104 F.3d 355 (2d Cir.1996). Plaintiff has alleged that her termination was because of her age, which, if true, would violate an important public policy embodied in the ADEA. However, because plaintiff already has an adequate means for vindicating that public policy, this Court will not recognize a separate claim for breach of a covenant of good faith and fair dealing. *Bennett v. Beiersdorf, Inc.,* 889 F.Supp. 46, 49 (D.Conn.1995) . As this Court held in *Bennett,* the public policy against age discrimination in employment cannot justify a claim based upon a breach of the covenant of good faith and fair dealing because there are already sufficient statutory remedies. *Id.* Therefore, we grant defendant's motion for summary judgment as to the second count of plaintiff's complaint.

### Count III-Promissory Estoppel

**\*7** Like the second count, plaintiff's third count for promissory estoppel is premised upon the alleged " promises" set forth in the employee handbook. Under a promissory estoppel theory, a plaintiff may maintain a cause of action for damages based upon a promise which induces the party's action or forbearance, if such action or forbearance is undertaken in reasonable reliance on the promise. *Finley,* 202 Conn. at 205, 520 A.2d 208. A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 213-14, 520 A.2d 217 (1987). As the Connecticut Supreme Court held in *D'Ulisse-Cupo,* "[w]e agree with the defendant[ ] that these representations do not invoke a cause of action for promissory estoppel because they are neither sufficiently promissory nor sufficiently definite to support contractual liability." *Id.* at 214, 520 A.2d 217. As discussed above, given the disclaimer in the handbook, the statements contained therein do not manifest a present intent

on the part of defendant to undertake immediate contractual obligations to plaintiff. *See Id.* at 214-15, 520 A.2d 217. Therefore, we find that there are no genuine issues of material fact regarding plaintiff's claim of promissory estoppel, and hold that defendant is entitled to judgment as a matter of law on the third count of plaintiff's complaint.

### Conclusion

Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment [Doc. # 9] as to Counts Two and Three of Plaintiff's Complaint and DENIES Defendant's Motion for Summary Judgment as to Count One.

The Court further notes that this case has been pending for nearly two years. The parties should immediately begin preparation for trial. A notice of pretrial conference will be issued forthwith.

SO ORDERED.

D.Conn.,1998.
Cardona v. Aetna Life & Cas.
Not Reported in F.Supp., 1998 WL 246634 (D.Conn.)

Briefs and Other Related Documents (Back to top)

• 3:96cv01009 (Docket) (Jun. 04, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1995 WL 813157 (W.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1468
**(Cite as: Not Reported in F.Supp.)**

C

United States District Court, W.D. Pennsylvania.
Edward H. KERN, Plaintiff,
v.
WESTINGHOUSE ELECTRIC CORPORATION,
Defendant.
**Civ. A. No. 95-49.**

Dec. 19, 1995.

Joel S. Sansone, Scanlon & Sansone, Pittsburgh, PA, for plaintiff.
Louise Q. Symons, Westinghouse Electric Corporation, Pittsburgh, PA, for defendant.

*OPINION*

and

*ORDER OF COURT*

AMBROSE, District Judge.
*1 Pending before the Court is the Motion of Westinghouse Electric Corporation ("Westinghouse "), for Summary Judgment pursuant to Fed.R.Civ.P. 56. Plaintiff, Edward H. Kern, initiated this civil action against his former employer on January 12, 1995. In his Complaint, Kern alleged claims pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Employment Retirement Income Security Act (" ERISA"), 29 U.S.C. § 1001 *et seq.,* specifically invoking 29 U.S.C. § 1132(e); the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.;* the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.;* and the Pennsylvania Human Relations Act (" PHRA"), Pa.Stat.Ann. tit. 43 § 951 *et seq.* ("PHRA" ). Westinghouse filed an Answer and a Partial Motion to Dismiss on March 9, 1995. On April 7, 1995, this Court granted Westinghouse's Partial Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)

, based on the representation of Plaintiff's counsel that the motion would not be opposed. Plaintiff's claims under ERISA, FLSA and the Civil Rights Act of 1991 were accordingly dismissed. Westinghouse now challenges, in its Motion for Summary Judgment, Kern's remaining age discrimination claims. For the reasons set forth below, Westinghouse's Motion for Summary Judgment will be denied.

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, . after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex,* 477 U.S. at 322.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THIS

Not Reported in F.Supp., 1995 WL 813157 (W.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1468
**(Cite as: Not Reported in F.Supp.)**

**\*2** The ADEA proscribes employers from failing to hire, discharge, or to otherwise discriminate against any individual because of such individual's age. 29 U.S.C.A. § 623(a)(1) (1985 & West Supp.1995). The individuals protected under this statute are limited to those who are at least 40 years of age. 29 U.S.C.A. § 631(a) (West Supp.1995). A plaintiff may establish a prima facie case of age discrimination [FN1] by demonstrating that he:

1) is over 40 years old;

2) was qualified for the position;

3) suffered an adverse employment decision;

4) was replaced by a sufficiently younger person to create an inference of age discrimination.

*Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995).

In a reduction in force ("RIF") case, however, the plaintiff need not prove that he was replaced by a worker outside the protected class. "Rather, to demonstrate a prima facie case in RIF cases, the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained." *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 723 n. 2 (3d Cir.1995) citing *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). *See also Torre v. Casio, Inc.,* 42 F.3d 825, 831 (3d Cir.1994).

Once a plaintiff has established a prima facie case, a presumption of age discrimination exists. *Sempier,* 45 F.3d at 728. The employer may rebut this presumption by stating a legitimate nondiscriminatory reason for the adverse employment decision. *Id.* citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2747 (1993) and *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987). If the employer meets this burden, a plaintiff is then "given the opportunity to prove by a preponderance of the evidence that the legitimate reasons proffered by defendant were not its true reasons, but rather, a pretext [FN2] for discrimination." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993).

"[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered

legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir.1994). *See also Johnson v. Resources for Human Dev.,* 878 F.Supp. 35, 38 (E.D.Pa.1995) (a plaintiff may show "that each reason is a recent fabrication *or* that discrimination is more likely than not a motivating or determinative cause for the actions.") Importantly, it should be noted that to survive a motion for summary judgment, a plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case. *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 493 (3d Cir.1995).

Nevertheless, if a plaintiff attempts to show fabrication in order to discredit the employer's proffered reasons, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken . .. [but rather,] the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes,* 32 F.3d at 765.

**\*3** I find that there are genuine issues of material fact which preclude the entry of summary judgment. While Kern comes forward with no direct evidence of discrimination, and Kern's indirect evidence of discrimination is far from overwhelming, when the facts are viewed in a light most favorable to Kern and all reasonable inferences are drawn in his favor, it is clear that summary judgment is inappropriate. Based on this disposition, I will only briefly summarize the facts as presented by the parties in their submissions.

Kern's allegations of age discrimination actually concern two events during his employment with Westinghouse. The first was a demotion Kern suffered in August, 1992, from his position as Manager of Engineering to a position as a professional employee. Although Kern's salary was not decreased, his job grade code was reduced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3

Not Reported in F.Supp., 1995 WL 813157 (W.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1468
**(Cite as: Not Reported in F.Supp.)**

from a code 35 to a code 33. At the time of the demotion, Kern was 55 years old. Apparently, Kern was the only one of four section managers to be demoted at that time. One of the section managers was older than Kern, but two were younger. Kern asserted at the time of his demotion that he believed the demotion to be based on his age. FN3

The next event occurred in January, 1994. At that time, Westinghouse notified Kern that he was one of the employees who had been selected for layoff. Kern was then 57 years old and had worked for Westinghouse for thirty-one years. The reason given by Westinghouse for Kern's layoff was lack of funding for projects on which Kern and the members of his group (the Commercial Canned Motor Pump Group) were working. Specifically, Westinghouse alleges that "management of Cheswick determined that it was no longer willing to fund any of Plaintiff's work through Westinghouse developmental funding. Customers' orders for these products did not materialize, and work on these projects ceased." (Defendant's Brief, p. 3) Therefore, a "reorganization" was instituted. As a result of this "reorganization", approximately fifty jobs were eliminated, according to Westinghouse. A specific result of the "reorganization" was that the Commercial Canned Motor Group was eliminated. Apparently, not all of those persons employed by the Canned Motor Pump Group were terminated as a result of the "reorganization." (See e.g. 8/18/95 Deposition of Dennis W. Salak, p. 52)

Westinghouse argues in its motion for summary judgment that Kern has not met his prima facie case of age discrimination because he was not "qualified for a position as a principal engineer dealing with commercial applications of canned motor pumps as no such job existed subsequent to Plaintiff's layoff." (Defendant's Brief, p. 7) Westinghouse further argues that Kern's job was abolished. Westinghouse also alleges that "[t]here is no question that some of the people in Plaintiff's former department who were younger were retained, but they were not performing the same work as Mr. Kern." (Defendant's Brief, p. 8) Finally, Westinghouse argues that Kern has come

forward with no evidence of age discrimination.

*4 Kern argues that not only has he established a prima facie case of age discrimination, but that he has also established that Westinghouse's reason for his termination is pretextual. Specifically, Kern argues that "Defendant targeted the oldest, most experienced employees for termination. In addition to the fact that older individuals were targeted for termination, Mr. Kujawski's testimony that the Plaintiff's projects were finished or discontinued, and that his skills could not be applied to current work, is, at best, curious." (Plaintiff's Brief, p. 8)

After carefully considering the facts in light of the summary judgment standard for age discrimination cases, I find that there are genuine issues of material fact with respect to Kern's prima facie case and with respect to the issue of pretext so as to preclude the entry of summary judgment. I do not find *McCambridge v. Bethlehem Steel Corp.,* No. 93-7002, 1995 U.S.Dist. LEXIS 10003 (E.D.Pa. July 12, 1995), cited by Westinghouse, to require a different result. Defendant's Motion for Summary Judgment will be denied.

### ORDER OF COURT

AND NOW, this 19th day of December, 1995, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is hereby ORDERED that the Defendant's Motion for Summary Judgment (Docket # 8) is hereby DENIED.

> FN1. The PHRA claim is analyzed using the same standard employed in ADEA claims. *Bernard v. Bethenergy Mines, Inc.,* 837 F.Supp. 714, 715 (W.D.Pa.1993), *aff'd w/o opinion,* 31 F.3d 1170 (3d Cir.1994).

> FN2. Kern does not dispute that this is a pretext case.

> FN3. Westinghouse argues in its Reply

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4

Not Reported in F.Supp., 1995 WL 813157 (W.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1468
**(Cite as: Not Reported in F.Supp.)**

> Brief, "Plaintiff failed to file an Equal
> Employment Opportunity complaint at the
> time he was demoted, so a complaint now
> is untimely." (Defendant's Reply Brief, p.
> 4) I find that the demotion may
> nevertheless be considered in this action.
> *See Sempier,* 45 F.3d at 730, n. 5.

W.D.Pa.,1995.
Kern v. Westinghouse Elec. Corp.
Not Reported in F.Supp., 1995 WL 813157
(W.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1468

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d                                                        Page 1

Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Patrick S. PALMISANO,
v.
ELECTROLUX LLC, f/k/a Electrolux Corp.
**No. CIV. A. 99-426.**

Aug. 7, 2000.

*MEMORANDUM*

O'NEILL

**\*1** Plaintiff Patrick S. Palmisano filed this action against his former employer Electrolux LLC (" Electrolux") alleging unlawful disability and age discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* He also alleges that Electrolux unlawfully retaliated against him for filing charges with the Equal Employment Opportunity Commision ("EEOC") in violation of both the ADA and the ADEA.

I have subject matter jurisdiction over Palmisano's claims pursuant to 28 U.S.C. § 1331. Presently before me are Electrolux's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Palmisano's response thereto. Electrolux contends that summary judgment is appropriate because Palmisano: (1) is not " disabled" within the meaning of the ADA; (2) has failed to produce sufficient evidence of age discrimination under the ADEA; and (3) has failed to produce sufficient evidence to establish a prima facie case of retaliation.

I.

Palmisano began working for Electrolux on December 8, 1967 at the age of thirty. Pl.'s Aff. at ¶ 1-2. From 1967-1973, Palmisano worked as a sales

representative and consistently performed within the top one percent of the company salesforce. Pl.'s Aff. at ¶ 2-3. In 1973, Palmisano was promoted to branch manager of the Jersey City, New Jersey office where he remained for four years. Pl.'s Dep. of Sept. 17, 1999 at 48-49 (hereinafter "Pl.'s Dep. I" ). Thereafter, Palmisano went on to hold branch manager positions in several other offices and a division manager position encompassing five Philadelphia area offices and one Delaware office. *Id.* at 50-76. In 1992, Palmisano received the branch manager position in Allentown, Pennsylvania. *Id.* at 77-80. The Allentown branch manager position was a valuable assignment because the office historically grossed one million dollars a year in sales which gave the branch manager the potential to earn a six figure income. Pl.'s Aff. at ¶ 11; Vastardis Dep. at 9.

When Palmisano was fifty-seven years of age, he injured himself at work on September 6, 1995. Pl.'s Aff., Ex. 2. Due to this work-related injury, Palmisano had to take a medical leave of absence from October 5, 1995 to February 5, 1996. *Id.* at ¶ 30. To avoid further injury, Palmisano was instructed by Dr. Richard Hodosh not to lift more than twenty-five pounds at one time or to drive over fifteen miles without a break. *Id.,* Ex. 4. Palmisano remains under these restrictions. Pl.'s Dep. I at 13.

At the start of Palmisano's leave, Dwight Musselman, who was thirty-two years of age, assumed Palmisano's responsibilities as branch manager. Musselman Dep. at 5. Musselman was Palmisano's supervisor and division manager of the division encompassing Allentown. *Id.* at 32.

In December 1995 the branch manager responsibilities were passed on to Anthony Costantino who was thirty-four. Constantino Dep. at 7. During this time Palmisano telephoned the area vice president, Richard Luisi, three to five times requesting that he be returned to his former position in Allentown. Pl.'s Dep. of October 25, 1999 at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

36-37 (hereinafter "Pl.'s Dep. II"). Luisi offered Palmisano a position in New Jersey and Palmisano accepted a branch manager position in Denville, New Jersey. *Id.* at 38. Palmisano made clear he only wanted the Denville branch manager position until such time as he could be reinstated in Allentown. *Id.* at 37.

**\*2** In February 1997, Palmisano wrote Luisi a letter requesting that he be reinstated as Allentown branch manager. Pl.'s Aff., Ex. 8. In March and April of 1997, Palmisano wrote two letters to Charles A. Malone, vice president of human resources, also requesting that he be returned to his former position as Allentown branch manager. *Id.,* Ex. 9, 11.

In March 1997, Richard Ferris, a sales manager in his late twenties to early thirties assumed the duties of Allentown branch manager. Constantino Dep. at 54. Shortly thereafter, in May 1997 Michael Ellis, age forty, assumed the responsibilities of branch manager. Ellis Dep. at 5.

After four or five months as Denville branch manager, Electrolux removed Palmisano from this position. Pl.'s Dep. II at 44. Electrolux offered Palmisano at least two other branch manager positions, but Palmisano chose to take a demotion and work as a sales representative in Springfield, New Jersey. Pl.'s Dep. II at 48-51. Sales representatives were required to meet certain earning requirements to maintain insurance coverage under the Electrolux Group Medical Plan. Pl.'s Dep. II at 60-63. Palmisano was aware of these requirements. When Palmisano did not meet the earnings requirement for the last quarter of 1997, he was removed from the group policy effective January 31, 1998. Pl.'s Aff., Ex. 11.

Palmisano sent a letter dated April 9, 1998 to the chief executive officer Thomas Albani requesting his former position as Allentown branch manager. *Id.,* Ex. 15. After discovering Joseph Urso had replaced Albani as chief executive officer, Palmisano sent another letter again requesting that he be returned to the position of Allentown branch manager. *Id.,* Ex. 19. In addition, Palmisano's attorney, Richard J. Orloski, sent a letter to Electrolux's general counsel Steve Cooper

requesting that Palmisano be reinstated as Allentown branch manager. *Id.,* Ex. 21.

In a letter to Urso dated May 12, 1998, Palmisano requested that if he could not be reinstated as Allentown branch manager that Electrolux terminate his employment. Pl.'s Aff., Ex. 19. Electrolux terminated Palmisano's employment on June 30, 1998.

Since leaving Electrolux, Palmisano has worked as a sales representative for Financial Network, Weichert Realtors, Mark Four Enterprises, Terminix Commercial, and Oreck. Pl.'s Dep. I at 5-6, 28-29; Pl.'s Dep. II at 5.

II.

Summary judgment is appropriate if the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Thus, a court's responsibility is not to resolve disputed issues of fact but to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986). The moving party bears the initial burden of identifying those portions of the record which it believes indicate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party must then point to specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). It must raise "more than a mere scintilla of evidence in its favor" to defeat the summary judgment motion; it must produce evidence on which a jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251. Though the non-moving party may not rely upon unsupported allegations or mere suspicions, *id.* at 248, it is entitled to have all reasonable inferences drawn in its favor. *Id.* at 255.

III.

**\*3** The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, an individual is defined as disabled if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2). Palmisano alleges that he is disabled under all three definitions of the term "disability."

I will first examine whether Palmisano has a physical or mental impairment that substantially limits one or more of the major life activities. Here, Palmisano alleges that he is substantially limited in the major life activity of working. According to the regulations promulgated by the EEOC, an individual is substantially limited in his ability to work if he is "significantly restricted in the ability to perform either a class or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *see also Murphy v. United Parcel Service, Inc.,* 119 S.Ct. 2133, 2138 (1999).

As evidence of his physical impairment, Palmisano points to Dr. Hodosh's warning not to lift over twenty-five pounds at one time and not to drive over fifteen miles without rest. Pl.'s Aff., Ex. 4. However, numerous court have held that a moderate lifting restriction of twenty-five pounds does not act as a significant limitation on an individual's ability to work or to perform any other major life activity. *See Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996); *Aucutt v. Six Flags Over Mid-America,* 85 F.3d 1311, 1319 (8th Cir.1996); *see also Morrone v. UGI Utilities, Inc.,* No. CIV.A.99-36, 2000 WL 92341 (E.D.Pa.2000). Moreover, no reasonable jury could find that Palmisano's fifteen mile driving restriction is a substantial limitation on his ability to work. *See Sinkler v. Midwest Property Management Limited Partnership,* 209 F.3d 678 (7th Cir.2000) (holding

that a phobia which restricted a saleswomen from driving in new or unfamiliar areas did not substantially limit her major life activity of working). Palmisano provides no evidence as to how a fifteen-mile driving restriction would limit him from an entire class or broad range of jobs. Since leaving Electrolux, Palmisano has been able to utilize his training, knowledge, skills, and abilities to obtain five different sales positions within fifteen miles of his Florham residence and which do not require lifting over twenty-five pounds. Pl.'s Dep. I at 5-6, 28-29; Pl.'s Dep. II at 5.

**\*4** Likewise, Palmisano fails to offer sufficient evidence that he has a record of impairment. A record of impairment means that an individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). As Palmisano's impairments do not substantially limit a major life activity, a history of these same impairments cannot constitute a record of impairment. Palmisano does not put forth evidence or even contend that he has been misclassified as having some other impairment.

Finally, Palmisano has not offered any evidence that he was viewed as suffering from a substantial impairment. To the contrary, the fact that Electrolux permitted Palmisano to work as an outside sales representative suggests that Electrolux did not view Palmisano as suffering from such an impairment. Since I find that Palmisano has failed to provide evidence that he is "disabled" within the meaning of the ADA, I will grant judgment for Electrolux on the ADA discrimination claim.

IV.

The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Courts apply the evidentiary framework first laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to ADEA claims. *See Reeves v. Sanderson*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Plumbing Products, Inc.,* 120 S.Ct. 2097 (2000); *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308 (1996). Under that framework Palmisano must first establish a prima facie case of age discrimination by providing evidence that: "(1) [he] was over 40 at the time [he] applied for the position in question; (2)[he] was qualified for the position in question; (3) despite [his] qualifications [he] was rejected; and (4) the employer ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination." *Narin v. Lower Merion School District,* 206 F.3d 323, 331 (3d Cir.2000) (citations omitted).

Here, it is uncontested that Palmisano has set forth a prima facie case. At all times Palmisano requested to be reinstated as Allentown branch manager, he was over forty years of age. He made several phone calls and wrote five letters requesting that he be reinstated as Allentown branch manager. Pl.'s Aff., Ex. 8, 9, 11, 15, 19; Pl.'s Dep. II at 36-37. In addition to managing other branches, Palmisano managed the Allentown branch for several years. To date Palmisano has been denied reinstatement as Allentown branch manager while the branch manager responsibilities have been passed along to four different people. Lastly, all four replacements were at least nineteen years younger than Palmisano which is more than sufficient to permit an inference of age discrimination. *See Barber v. CSX Distribution Services,* 68 F.3d 694, 699 (3d Cir.1995) (holding that an eight year difference was sufficient to establish a prima facie case).

**\*5** By satisfying all four parts of the prima facie case, Palmisano raises a rebuttable presumption that Electrolux unlawfully discriminated on the basis of age. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993), *citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981). Electrolux can rebut this presumption by offering a legitimate nondiscriminatory reason for not reinstating Palmisano as Allentown branch manager. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995). Because of the difficulties in ascertaining the true reasons and individual responsible for making a business decision, I must presume in employment

discrimination cases that unexplained acts are based on impermissible factors. *Sempier,* 45 F.3d at 728, *citing Furnco Construction Co. v. Waters,* 438 U.S. 567, 577 (1978). Here, Electrolux contends that since the Allentown branch manager position was no longer in existence, Electrolux was unable to reinstate Palmisano to that position. Electrolux claims the position was phased out and that the responsibilities were carried out by division managers and sales managers. Luisi Dep. at 100-110.

As Electrolux has proffered a legitimate nondiscriminatory reason for its actions, Palmisano must now provide "some evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). Palmisano needs only sufficient evidence to discredit Electrolux's proffered reason. Therefore, if the evidence used to establish the prima facie case is also sufficient to discredit the employer's explanation, the defendant is not required to produce additional evidence of discrimination. *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995) (*citing Fuentes,* 32 F.3d at 764). However, Palmisano's evidence of pretext must be relevant to the hiring process and suggest that the allegedly unfair employment practices at Electrolux were a result of his age. *Narin,* 206 F.3d at 331, 333.

There is evidence that the Allentown branch manager position was later restored and that despite Palmisano's repeated requests for the job it was given to another Electrolux employee. *See* Luisi Dep. at 105. In addition, the area vice president Richard Luisi allegedly made several defamatory age-related remarks including one about Palmisano being too old for the Allentown branch manager position. Vastardis Dep., Ex. 1; Vastardis Dep. at 22-23. Although it is unclear who made the decision or decisions not to reinstate Palmisano as Allentown branch manager, Luisi is a high-level company executive capable of effectuating a policy of age discrimination in regard to personnel that must answer to him. Therefore, ageist comments by Luisi have probative value as to the attitudes of Electrolux management in its hiring practices. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Ryder v. Westinghouse Electric Corporation,* 128 F.3d 128, 132 (3d Cir.1997). Based on the restoration of the Allentown branch manager position and the evidence of ageist remarks, there is ample evidence for a reasonable fact finder to conclude that Electrolux's stated reason is unworthy of belief. Accordingly, I will deny Electrolux's motion for summary judgment with respect to the ADEA discrimination claim.

### V.

**\*6** Palmisano has also alleged that Electrolux unlawfully retaliated against him by terminating his insurance coverage and later his employment at the company. In order for Palmisano "to establish a prima facie case of retaliation, [Palmisano] must show: (1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action." *Barber,* 68 F.3d at 701, *citing Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989).

The record before me contains no evidence of the requisite causal link between his allegedly protected activities and the subsequent termination of his insurance coverage. Palmisano himself testified that sales personnel unlike management are required to meet a minimum amount of earnings to maintain coverage under the Electrolux Group Medical Plan. He chose to work as a sales representative and turned down management positions with full knowledge of that earnings requirement. Pl.'s Dep. II at 60-63. He has not provided any evidence of Electrolux waiving the minimum earnings requirement for other employees nor has he pointed to past instances where Electrolux waived the earnings requirement for him. As such, Palmisano has failed to provide evidence from which a reasonable fact finder could establish a causal connection between his filing of the EEOC charges and the termination of his health insurance.

With respect to Palmisano's employment at Electrolux, it was Palmisano who requested in a letter to Electrolux's chief executive officer that his

employment be terminated. Pl.'s Aff., Ex. 19. Palmisano cannot submit what is effectively a letter of resignation and then claim that he suffered an adverse employment action when that "resignation" is accepted. For these reasons, I will grant judgment for Electrolux on the unlawful retaliation claims under the ADA and the ADEA.

An appropriate Order follows.

### *ORDER*

AND NOW this __ day of August, 2000, upon consideration of the defendant's motion for summary judgment and plaintiff's response thereto, IT IS HEREBY ORDERED that defendant's motion is GRANTED IN PART and DENIED IN PART.

Judgment is entered in favor of defendant Electrolux LLC and against plaintiff Patrick S. Palmisano with respect to the unlawful discrimination and unlawful retaliation claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.,* and the unlawful retaliation claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

With respect to the unlawful discrimination claim under the Age Discrimination in Employment Act, the motion is DENIED.

E.D.Pa.,2000.
Palmisano v. Electrolux LLC
Not Reported in F.Supp.2d, 2000 WL 1100785 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Kenneth J. PETERSON Plaintiff,
v.
KNIGHT ARCHITECTS, ENGINEERS,
PLANNERS, INC., Defendant.
**No. 97 C 1439.**

Nov. 4, 1999.

*MEMORANDUM AND ORDER*

MANNING, J.

*\*1 Plaintiff Kenneth J. Peterson claims that his former employer, Knight Architects, Engineers, Planners, Inc., violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), by: (1) discriminating against him and terminating him based on his age; (2) retaining younger, less qualified employees while placing him on leave of absence and terminating him; and (3) failing to promote him, but promoting less qualified, younger employees. On the other hand, Knight asserts that it terminated Peterson due to a reduction in force (" RIF"), lack of work, and the fact that it no longer needed to retain someone with his skills. Knight's motion for summary judgment and Peterson's motion to strike portions of Knight's Local Rule 12(M) statement are before the court.[FN1] For the reasons discussed below, both motions are denied.*

> FN1. On September 1, 1999, the Northern District of Illinois revised its Local Rules. Local Rule 12(M) and 12(N) are now Local Rule 56.1 and 56.2, respectively. Since the parties filed their briefs prior to the revision of the Local Rules, this opinion will use the numbering system of the Local Rules in force before September

1, 1999.

**I. Background**

The following facts are derived from the parties' Local Rule 12 Statements, and are undisputed unless otherwise indicated.

**A. Peterson's Motion to Strike Portions of Knight's 12(M) Statement**

As an initial matter, the court must first consider Peterson's motion to strike paragraphs or portions of numerous paragraphs in Knight's Rule 12(M) statement. According to Peterson, the specified paragraphs in Knight's Rule 12(M) statement are irrelevant and fail to "allege facts upon which the relief sought may be granted." A motion to strike based on irrelevance "serves no useful purpose" as, if the material is actually irrelevant, then "the nonmovant should simply argue as much in its response to the summary judgment motion." *Evergreen Media Corp. v. Radio & Television Broad. Eng'rs,* No. 96 C 6661, 1997 WL 282597 at \* 5, n. 5 (N.D.Ill. May 19, 1997); *see also Neal v. Honeywell, Inc.,* 942 F.Supp. 388, 395-96 (N.D.Ill.1996) (the determination of whether a fact does or does not support summary judgment is one for the court, not the parties), *reconsideration granted on other grounds,* 958 F.Supp. 345 (N.D.Ill.1997). Accordingly, Peterson's motion to strike is denied.

**B. Background**

**1. The Parties**

Plaintiff Kenneth Peterson was born on August 26, 1941, and maintains residences in Illinois and New Mexico. Defendant Knight Architects, Engineers, Planners, Inc. is a Delaware corporation with its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

principal place of business in Chicago, Illinois, and is a subsidiary of Lester B. Knight & Associates. Other subsidiaries of Lester B. Knight & Associates include Keller & Gannon, which is located in San Francisco, California, and Knight Advanced Technology, which is located in Phoenix, Arizona. Knight hired Peterson in 1979. Peterson worked for Knight as an architectural designer in Knight's architectural division until Knight placed Peterson on a leave of absence in September of 1992 and terminated him in February of 1993.

### 2. Peterson's Education and Experience Prior to Joining Knight

Peterson earned an Associate of Arts degree from Wilson Junior College in 1962 after approximately one and one-half years of studies there. He subsequently transferred his credits to the University of Illinois. As a transfer student, he was automatically placed on academic probation. Peterson then completed an additional two years of the architecture curriculum at the University of Illinois. Although he excelled in his architecture classes, he had difficulty with English and mathematics classes and thus was unable to maintain a grade point average high enough to be taken off probation. Hence, Peterson was unable to complete his studies at the University of Illinois. Peterson later learned that his academic problems were due to dyslexia.

*2 In 1964, Peterson was hired by DeLeuw Cather Engineers, an engineering firm, and worked there for approximately five and one-half years. While he was employed there, in 1966 and 1967, Peterson took classes at the Illinois Institute of Technology in urban and regional planning. He also completed two years of an industrial and product design program at the Art Institute of Chicago, from 1968 and 1969, until the program was canceled. While at DeLeuw Cather Engineers, he advanced from his initial position of engineering technician to the position of urban designer.

Peterson next worked at Loebl, Schlossman, Bennett & Dart, an architectural firm, from 1969 to 1970, when he was laid off due to lack of work. At Loebl, Schlossman, Peterson worked as an architectural job captain and an assistant designer. From 1970 to 1978, Peterson worked at Consoer, Townsend & Associates, an architectural firm. At Consoer, Townsend, Peterson began as an architectural job captain and worked his way up to a position as an Associate with the firm. He also held the titles of Project Architect and Director of Design. In these capacities, he coordinated the five " design pods" at Consoer, Townsend, and met with the design pod leaders and clients in connection with the design development process. He also developed designs, sometimes as the sole designer and sometimes with an assistant designer working under his direction. In 1978, Consoer, Townsend terminated Peterson after he became angry at a subordinate who habitually came back from lunch intoxicated and unable to do his work.

While Peterson was employed at Consoer, Townsend, he completed the requirements necessary to become a registered architect and received his license. In the profession of architecture, an individual earns an architecture license by either working under a registered architect as an intern for eight years or completing a five year academic curriculum and completing a three year internship, and passing an examination. Peterson also developed a specialization in architectural design. An architectural designer has an architect's general skills, as well as the ability to express aesthetics in a building and to solve three-dimensional space planning problems.

In 1978, Peterson moved to Bank Builders Associates, a designer and builder of bank buildings. He stayed there for six months, until Bank Builders closed its Chicago office. He then commenced employment with Knight in April of 1979.

### 3. Peterson's History with Knight

While employed by Knight, Peterson held the positions of project designer, project architect, project manager, and computer aided design manger. With regard to any particular construction project, a number of different managers oversee the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

architectural work. Project managers plan schedules and review project costs; project architects interact with the client, interface with the individuals working on the project, and oversee the project's technical aspects; and project designers (who can, but are not required to, also act as the project architect) also interact with the client and are responsible for the project's overall design and aesthetics.

**\*3** Peterson worked on a variety of projects at Knight. Examples of his projects include: a 16,000 foot Cornell University's Submicron Research Facility in Ithaca, New York (project architect/project designer/project manager); a 27,000 square foot battery test facility for the U.S. Navy in Crane, Indiana (project designer/architect and computer aided design manger); a 23,000 square foot fire fighting training facility at the U.S. Naval Training Center in Great Lakes, Illinois (project designer/architect and computer aided design manger); Building 114, a 250,000 square foot light industrial and office building in Rochester, Minnesota (project designer/architect); a 1.1 million foot automotive manufacturing and assembly plant and related support facilities in Rome, Georgia (project designer/architect); a 285,000 square foot industrial printing facility and related facilities in Reno, Nevada (project architect/designer); and a below-grade combat operations intelligence center for the U.S. Army Corps of Engineers in the Republic of Korea (project architect/designer). From 1983 to 1985, Peterson also developed and managed Knight's computer aided design group, in addition to his responsibilities on other projects.

In addition, Peterson played an instrumental role in Knight's attempts to secure projects. For example, in 1985, Knight conducted conceptual design studies for Argonne National Laboratories' Advanced Photon Source ("APS") project because he was Knight's senior designer, had expertise with computer aided design work, and had worked on the Cornell submicron facility as well as other laboratories. The APS is a high-energy particle accelerator which produces the world's brightest x-rays. The plans called for it to be housed in a facility consisting of eighteen to twenty buildings.

Knight made the short list of firms considered by the Department of Energy for this major project. After a presentation by Peterson, Knight won the contract. Members of Argonne's design team recognized Peterson's influence in Knight receiving the contract for the APS project. Knight selected Peterson to work on this project in February of 1989. The contract for the APS project identified Peterson as "key personnel" and "project architect." Peterson worked on the APS project as project architect/project designer from 1989 to 1992.

In the meantime, Knight hired a number of new architects: Warren Hendrickson (March of 1989); Steven Riojas (July of 1989); Curt Finfrock (May of 1991); and Gene Schnair (June of 1991). Hendrickson was born on September 10, 1955. Before joining Knight, Hendrickson had over fourteen years of design experience with various architectural firms. Hendrickson was brought in as a Vice President, and understood that Knight hired him to help it develop an architectural and engineering practice with an increased emphasis on design and to promote buildings with a contemporary image.

According to Peterson, when Hendrickson hired new, younger architects, Hendrickson called Peterson "part of the old Knight staff" when he introduced them to Peterson. In January of 1990, Knight promoted Hendrickson to Senior Vice President, and in January of 1995, it promoted him again to Managing Director. In this position, he was responsible for Knight's marketing efforts.

**\*4** Steven Riojas was born on August 24, 1955. In July of 1989, Knight hired him as an Associate. Prior to joining Knight, Riojas was a Senior Designer with the architectural firm of Giffels Associates in Michigan. As the Senior Designer, Riojas worked as a programmer, designer, and master planner on a variety of projects. He holds a B.S. in architecture from the Lawrence Institute of Technology and masters degrees in architecture and urban planning from the University of Michigan. While at Knight, Riojas reported to Hendrickson. The parties dispute whether Riojas supervised Peterson, and have each pointed to evidence supporting their position.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Curt Finfrock, who was born on March 31, 1955, joined Knight in May of 1991 as an Associate in the Architectural Division and reported to Hendrickson. Before joining Knight, Finfrock, among other things, taught a design studio course at Miami University in Ohio and undergraduate design course at the University of Kansas. Finfrock left Knight in April of 1993 and returned in March of 1998 as Vice President and Director of Architecture.

Gene Schnair, who was born on May 15, 1951, is a registered architect in the States of California, Illinois, New York, New Jersey, Connecticut, Virginia, and Nevada. He earned Master of Architecture and Master of Business Administration degrees from Washington University in St. Louis. He joined Knight as a Vice President and, in April of 1992, was promoted to the position of Senior Vice President and Director of Operations of Division 21 (Knight's Architectural and Engineering division).

Turning back to Peterson, in January of 1992, Hendrickson, who was acting as the manager of the architecture department at the time, instructed Peterson to work on a Veteran's Hospital project for Keller & Gannon in California. It was a customary practice for Knight's subsidiaries to "loan" its employees to each other on a temporary basis. Upon completion of the project, during Knight's quarterly breakfast meeting, Keller & Gannon's President congratulated Peterson for his outstanding work on the hospital project. At his deposition, Hendrickson also praised Peterson for his work on this project, commenting that he had done a "terrific job."

When Peterson returned to Knight in March of 1992, Robert Mellott, the project manager for the APS project, told him that he was being removed from that project because Argonne had requested a new design team. Knight claims it removed the entire design team after a conversation with Argonne, but the record does not contain admissible evidence supporting this alleged conversation. Peterson was ultimately the only person removed from the design team. Mellott retained the title of project manager, although he no longer worked on the project, and Riojas assumed Peterson's position as director of design. The rest of the original design

team continued to work on the APS project.

After being removed from the APS project, Peterson was instructed to work with Hendrickson on a proposal for a Fire Fighting Training Center for the U.S. Navy in Great Lakes, Illinois. Peterson had been the project architect and designer for the first fire fighting training center that Knight had built in 1985 and was the only architect employed by Knight who had prior experience designing this type of facility. In April of 1992, Peterson accompanied Hendrickson and two other Vice Presidents to present Knight's proposal to the U.S. Navy. The proposal was successful, and the U.S. Navy selected Knight to work on the project, which was scheduled to begin in September of 1992.

**\*5** In its project award announcement, Knight identified five members of a "project team" to work on this project. Peterson was listed in this five-person group, and was the group's only architect. Knight, however, did not invite Peterson to the project orientation meeting or to work on the project. The attendees of the meeting, including Hendrickson and a younger architect, Curt Finfrock, were designated to complete the work. At his deposition, Hendrickson could not explain why Peterson had been excluded from the Great Lakes project meeting and architectural design team.

In late April of 1992, Mellott told Peterson that Argonne had asked that he return to the APS project's design team. According to Peterson, Riojas, who was supervising this project, was furious about Peterson's return to the project. [FN2] When Peterson returned to the project, Riojas gave him the title of "programmer," rather than his original title as "Project Designer/Architect." On May 13, 1992, Peterson met with Mellott to discuss his demotion to programmer and Riojas' hostility towards him. Mellott told Peterson that Riojas was " just abrupt" with some people.

> FN2. It is unclear whether this purported fact is admissible, as the portions of Peterson's deposition provided to the court do not reflect whether Peterson had personal knowledge regarding Riojas'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

comments on this subject. Thus, the court will not consider this "fact" as substantive evidence.

On June 3, 1992, Peterson attended a design meeting for the APS project with Riojas and Knight's President, Robert Barnes. During the meeting, Argonne personnel spoke primarily with Peterson, as they had worked with him for seven years. After the meeting, Barnes told Peterson that he was not invited to any future design meetings as Riojas was now the Director of Design on the Argonne project. Hendrickson subsequently told Peterson that Riojas was going to conduct his performance review. The promised review, however, never took place.

At this time, Argonne decided to reconfigure portions of the APS project and advised Knight that it wanted to hold a competition for new designs and wanted Peterson to lead one of the teams. Accordingly, Knight staged a design competition featuring Peterson and Finfrock as team leaders and Riojas as the competition's moderator. Riojas, Hendrickson, and Barnes selected the staff to be assigned to each team. Peterson's team consisted of Peterson, Cengiz Yetkin, an architect who worked for Knight as an independent contractor and who did not want to take any instruction from Peterson, and a new summer intern who was assigned to build models and who had never worked in an architectural office before. On the other hand, Finfrock's team consisted of Finfrock, Marc Supinger, an experienced architectural designer who had previously worked with Peterson as a designer on the APS project, and Eric Gabriel, a designer who the parties agree was an extremely proficient model builder.

When Knight announced the teams, Peterson was uneasy about the qualifications of his team's members. As the competition unfolded, Peterson became increasingly concerned about their qualifications as well as their progress. According to Peterson, Yetkin, with Riojas' encouragement, refused to work under him and insisted on developing his own designs. Peterson discussed the situation with Riojas, who was unresponsive, and then went to Mellott, who replaced Yetkin with

Karen Hellman, an architect. Neither Hellman nor the extern, however, were willing to work extra hours to catch up on work that needed to be completed for the deadline. In contrast, Finfrock's team, which was already ahead, worked many overtime hours as a group.

**\*6** In his capacity as the contest's moderator, Riojas critiqued the teams' designs. He did not allow Peterson's team to depart from the contest's guidelines, but allowed Finfrock's team to do so. When the teams ultimately presented their projects, Finfrock's team had an innovative design supported by two complete models, one partial model, and thirteen presentation boards. Despite Peterson's many hours of overtime, his team had only six presentation boards and no models. Argonne ultimately selected Finfrock's design, although it did incorporate some of Peterson's ideas.

After the competition ended, the APS project team moved to a different floor of Knight's building. At this time, Peterson noticed that his name was missing from the floor plan for the new space. Mellott told Peterson to remain in the old space and organize the project's drawing files. Knight placed Peterson on leave of absence three weeks later.

### 4. Peterson's Requests for a Promotion

While Peterson was employed with Knight, Knight's management was not static. Initially, Mellott was responsible for managing Knight's architecture department. When Hendrickson joined Knight, he assumed some administrative duties and was responsible for evaluating the architects' performance until April of 1992, when Riojas was promoted to Vice President and was appointed Design Manager of Architectural Division 21 under Hendrickson. At that time, Riojas became the supervisor of all of the architects, including Peterson.

There are five classifications of architects at Knight: Architect I to Architect V. The higher levels have correspondingly higher responsibilities and salaries. Each job level has three possible job titles: Project Designer, Project Architect, and Project Manager.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

As noted above, the Project Designer (who can also act as the Project Architect), works directly with the client to develop projects' overall design and aesthetics. The Project Architect also works directly with the client and is responsible for a project's technical aspects. Finally, the Project Manager is responsible for scheduling and reviewing project costs. The next promotion after Architect V is to the position of Associate.[FN3]

> FN3. For purposes of the summary judgment motion, because the parties appear to agree that the next step up from Associate is Architect V, the court will assume that Architect V was the highest level to achieve before the level of Associate. The court notes, however, that the record is unclear whether the level of Architect VI existed, as some documents before the court (such as Peterson's Ex. M to his statement of additional facts) refer to an Architect VI.

Peterson worked at Knight for approximately 10 years without being promoted from a Level V Architect to an Associate. After his success assisting Knight to secure the APS project at Argonne, he approached Mellott, his supervisor at the time, and asked why he had not received a promotion. Mellott told him that problems with upper management had caused Peterson's lack of recognition, and assured him that this issue would be addressed at his next performance evaluation.

When it was time for Peterson's next evaluation, Hendrickson was Peterson's supervisor. During Peterson's evaluation, Hendrickson claimed he was unaware of Mellott's prior comments regarding a promotion. Peterson spoke again with Mellott about his promotion in early 1991, and asked Mellott why new, younger staff members were being promoted while he was not. Mellott again told him that this issue would be addressed at his next evaluation.

**\*7** During his next annual performance review in January of 1992, Hendrickson told Peterson that Riojas would evaluate him in June of 1992 and that the promotion issue would be resolved at that time.

On July 28, 1992, Riojas met with Peterson. According to Peterson, Riojas was extremely angry, accused him of causing problems with the Argonne project, said Peterson had a "hidden agenda," and called Peterson an "old timer", a "lifer," and "dead wood." On the other hand, Riojas adamantly denies that he made the derogatory comments about Peterson's age. Peterson's promotion was not discussed during this meeting.

In addition to his claims regarding Knight's failure to promote him, Peterson also asserts that Knight gave preferential treatment to younger employees in the following ways. First, Finfrock, Hendrickson, and Riojas (all of whom were born in 1955, unlike Peterson, who was born in 1941), regularly conversed and had lunch together but excluded Peterson. Peterson also claims that he tried to converse and lunch with Hendrickson, but that Hendrickson was always too busy for him, although he was always accessible to Finfrock and Riojas.

Second, according to Peterson, Mellott and Hendrickson refused to allow Peterson to attend seminars to keep current with his skills, but allowed younger architects to do so. Peterson also notes that, on one occasion, Finfrock was assigned to attend a seminar that Peterson had unsuccessfully tried to attend.

### 5. Knight's Reduction in Force

According to Knight, beginning in 1992, many of its projects were starting to enter the construction phase, leaving less work for the architects and designers. Thus, it claims that its revenues began to decrease, which caused it to begin to place many employees on leaves of absence. Between 1992 and 1993, Knight reduced its staff size by approximately 100 employees.

Peterson disputes Knight's explanation for its actions, contending there were other projects and buildings still in the design phase that were not going to be ready for construction until 1994. Peterson also asserts that approximately 25% of the terminated employees were temporary workers who were meant to be terminated first according to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

cyclical shifts in Knight's work load, and that these employees are not comparable to him. In contrast, Knight claims that it used leaves of absences or terminations according to its need for particular skills and the presence or absence of appropriate work. The parties do not dispute, however, that a number of employees of various ages were terminated or placed on leave of absence.

The court also notes that the record regarding Knight's specific revenue loss at this time is unclear. At his deposition, Hitchcock stated that Knight had been approved for a $1,250,000 increase in its line of credit, but the record does not indicate whether Knight used this line of credit. Knight's position statement filed with the Illinois Department of Human Rights states that its overall per month revenue dropped from $1.5 million per month in February of 1992 to $855,000 per month in February of 1993. Its financial records, however, show that its overall gross monthly revenue as of February of 1993 was $1,313,087.

*8 In addition, Knight does not dispute that, as of December of 1992, it had a backlog of work totaling $10,450,000, which could have kept all of the architects busy for 10 months even if no additional work came in. It also does not dispute that, during 1993, new projects resulted in an expansion of the architectural group, and that Knight brought in new architects in 1993. With this background in mind, the court turns to the chain of events which eventually led to Peterson's termination.

According to Peterson, on September 17, 1992, James Turner, Vice President of Human Resources, and Gene Schnair, the Director of Operations for Peterson's division, placed Peterson on a one-month leave of absence and told him that he would be recalled as soon as business increased. Turner denies that he was involved in the decision to place Peterson on leave and testified at his deposition that he was not in a position to determine whether Peterson's skills were suited to any particular ongoing projects. At his deposition, Schnair acknowledged that he was in charge of making recommendations to, among others, Mellott or Hitchcock, regarding leaves of absence and

terminations. However, he could not recall recommending Peterson's leave of absence or any reasons why Peterson would have been placed on a leave of absence.

Knight's general policy was to release its part-time and temporary employees first when it needed to reduce staff. Nevertheless, after Peterson was placed on his leave of absence, many of those employees continued to work for Knight. Peterson also points out, without specifying their ages, that two temporary architects, Cengiz Yetkin and Larra Anderson, continued to be employed by Knight after Peterson was placed on a leave of absence.

On October 30, 1992, Peterson received a letter informing him that his leave of absence had been extended until January 2, 1993, and that Knight was continuing to try to find a project that could utilize his "special skills." Peterson was puzzled by this, opining (without a specific comparison to other employees) that his "skill set" consisted of deeper and broader experience than Knight's other designers.

At Knight, the term "skill set" encompasses an employee's experience in a particular discipline, ability to work with a client, project experience, and the ability to work with other Knight employees as a team. Peterson agrees that particular skills and experience can influence whether a leave of absence is justified, but notes that he was Knight's only architectural designer placed on leave of absence in 1992 or 1993, and was the most senior architectural designer, in both age and experience.

On January 8, 1993, Peterson sent Mellott a letter detailing his experience as an architect and stating that he would be willing to accept any job assignment, regardless of the rate of pay. On February 25, 1993, Peterson received a letter dated February 22, 1993, stating that his employment with Knight had been terminated and enclosing a check for one week of severance pay. Peterson immediately faxed a letter to Mellott objecting to his discharge and the amount of severance pay.

*9 Knight claims that Mellott and Schnair were the decision-makers responsible for the decisions to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

place Peterson on a leave of absence and to terminate him. Neither Mellott nor Schnair, however, can recall why Peterson was placed on a leave of absence or terminated. They also cannot recall why Peterson was selected for a leave or absence or termination, why his skills were allegedly obsolete, or what skills he lacked. In addition, Schnair testified at his deposition that he did not recollect any need for staff reductions in February of 1993, when Knight terminated Peterson.

Knight also appears to be claiming that Peterson was terminated because Turner determined that Knight's work load had not turned around. *See* Knight's 12(M) at ¶ 61. This assertion is unsupported by the record, as Turner testified at his deposition that he was not involved in decisions regarding Peterson's employment status, was not responsible for assigning architects to projects, and was not in a position to know whether Peterson's skills were suited to particular projects. The court also notes that Turner testified at his deposition that Hendrickson, Mellott, and Hitchcock were the decision-makers responsible for Peterson's leave of absence. This is obviously inconsistent with Knight's position that Mellott and Schnair were the decision-makers.

Mellott acknowledged that Peterson's job performance was fully satisfactory throughout his employment with Knight and that performance was not the reason for his termination. Peterson recognizes that fourteen other architects (but no other architectural designers, like Peterson) were terminated from 1992 to 1993. Seven of these architects were Architect I to III, and were not similarly situated to Peterson as they could not perform work at his level. The other architects at the level of Architect IV or V who were terminated were all over 40 years old. All but one of the eleven Architect IV and Vs who survived the RIF and were still employed in February of 1993 were at least 10 years younger than Peterson.

Between April and December of 1993, Knight's overall staff size increased from 170 to 207. Between June of 1993 and December of 1993, Knight hired at least fifteen additional full time architects as regular employees, as well as additional architects as temporary employees.

In May of 1993, Knight placed an advertisement in the newspaper seeking architects with Peterson's qualifications (advanced technology facility design experience plus familiarity with hazardous production materials codes) to work in its Albuquerque office. James Turner, the contact person for this position, and Mellott, supervisor of the new office, were both aware of Peterson's desire to continue working for Knight, but did not contact Peterson to see if he wanted to return to Knight. Peterson was aware of the opening but did not contact Knight to discuss this position.

On August 13, 1993, Peterson submitted a pro se complaint to the Illinois Department of Human Rights alleging that Knight terminated him due to lack of work, even though work was available for him on existing projects. In addition, Peterson claimed that Knight failed to promote him to the Associate level but promoted younger employees. On August 18, 1993, Peterson signed a second version of his claims typed and prepared by the Illinois Department of Human Rights, which omitted his failure to promote claim.

*10 This second claim, which was filed with the Illinois Department of Human Rights and the EEOC, provided in full that:
I. On February 19, 1993, I was discharged from my position as architect. I was hired on October 12, 1982.
II. James Turner (40's), Director of Human Resources, told me I was discharged due to lack of work.
III. I believe I have been discriminated against because of my age, 51, in that:
A. I had a good work performance record.
B. There was no reduction in the volume of Respondet's [sic] business.
C. Respondent's reason is pretextual, there was work available in that, in December, 1992, I had been requested to do a number of new projects by Respondent's West Coast Office. It has been Respondent's practice to loan personnel bank and forth between offices.
D. I was replaced by Steve Riojas (36), Architect.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

(Plaintiff's Ex. A). In support of this claim, Peterson subsequently submitted an affidavit which contained allegations relating to his failure to promote claim. (Plaintiff's Ex. B).

In his federal complaint, Peterson claims that Knight discriminated against him by failing to promote him and terminating him. Knight contends that Peterson's failure to promote claim is time-barred and unexhausted, and that Peterson has failed to carry his burden of proof with respect to his wrongful termination claim. For the following reasons, Knight's motion for summary judgment is denied.

## II. DISCUSSION

### A. Standard on a Motion for Summary Judgment:

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion " may not rest upon the mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e). Instead, it must respond with "specific facts showing that there is a genuine issue for trial." *Id.*

Moreover, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.,* 970 F.2d 363, 365 (7th Cir.1992), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The court, however, is "not required to draw every conceivable inference from the record-only those inferences that are reasonable." *Bank Leumi Le-Israel, M.B. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.,* 970 F.2d at 365; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Thus, a party opposing summary judgment must

ultimately do more than present some " metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*11** The determination as to what facts are "material " in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Elec., Inc.,* 856 F.2d 920, 922 (7th Cir.1988). In making the determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, and thus cannot be properly determined in connection with a motion for summary judgment. *Id.* This is especially true in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

### B. Peterson's ADEA Claims

Peterson claims that Knight violated the ADEA by basing its decisions regarding his promotion and termination on his age, and seeks to establish discrimination using the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green,* 411 U.S. 792 (1973). This requires him to create an inference of discrimination by offering sufficient evidence to establish a prima facie case. *See id.* at 802-05. For his failure to promote claim, this means he must establish that: (1) he is a member of the protected class (age 40 or over); (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) a younger individual received the promotion. *Rabinovitz v. Pena,* 89 F.3d 482, 486 (7th Cir.1996). For his wrongful termination claim, it means that he must establish that: (1) he was a member of the ADEA protected class (age 40 or over); (2) he met his employer's legitimate expectations; (3) in spite of his performance, he was discharged; and (4) younger employees were treated more favorably. *See, e.g.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Oxman v. WLS-TV,* 846 F.2d 448, 452-53 (7th Cir.1988); *see also Collier v. Budd Co.,* 66 F.3d 886, 889 (7th Cir.1995).

By establishing a prima facie case, Peterson creates a presumption of age-based discrimination and shifts the burden of proof to Knight, which then must rebut the presumption by articulating a legitimate non-discriminatory basis for its employment decisions. *Oxman v. WLS-TV,* 846 F.2d at 453. If Knight carries its burden, Peterson then must persuade the court that the proffered reason for the adverse employment decisions was pretextual and that the actual reason for that action was his age. *See id.* Success on this front means, in turn, that Peterson is entitled to proceed to trial. *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1123 (7th Cir.1998).

Peterson can establish pretext by pointing to direct or circumstantial evidence indicating that Knight's decisions were motivated by discriminatory animus or are "unworthy of credence." *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1145 (7th Cir.1994). Suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in a protected group, and other "bits and pieces from which an inference of discriminatory intent might be drawn" can support a claim of pretext. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734 (7th Cir.1994). In addition, "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic on which an employer is forbidden to base a difference in treatment, received systematically better treatment" and "evidence that the plaintiff was qualified for the job in question but passed over in favor (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason is unworthy of belief, a mere pretext for discrimination" can support a claim of pretext. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-08 (1993). With these standards in mind, the court turns to Knight's motion for summary judgment.

### 1. ADEA-Failure to Promote

#### a. Is Peterson's Failure to Promote Claim Exhausted?

**\*12** Knight contends that Peterson's failure to promote claim is barred because he failed to raise it before the Equal Employment Opportunity Commission and the Illinois Department of Human Resources. *See* 29 U.S.C. §§ 626(d) and 633(b). As noted above, Peterson included his failure to promote in his original agency charge but signed a second charge prepared by the Illinois Department of Human Rights which omitted this claim.

It is well established that only claims that are fairly encompassed within an agency charge may be the subject of a subsequent federal lawsuit. *See, e.g., Jenkins v. Blue Cross Mutual Hospital Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.1976) (en banc). Nevertheless, because most agency charges are prepared by laypeople, not lawyers, a plaintiff need not allege each and every fact supporting the basis of each and every claim. *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir.1994). Instead, the test for determining whether an agency charge incorporates the claims in a complaint is whether the claims in the complaint are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mutual Hospital Ins., Inc.,* 538 F.2d at 167.

In other words, claims in a complaint are not barred, even if they did not formally appear in the underlying agency charge, if they are reasonably related to the claims in the charge and "can reasonably be expected to grow out of an [agency] investigation of the allegations in the charge." *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d at 500. The Seventh Circuit has remarked that the second prong of this test can be difficult to apply, as it requires the court to speculate about what the agency might or might not discover during the course of an investigation. *Id.* Here, there is no need to speculate, as Peterson unequivocally raised his failure to promote claims in his affidavit submitted in support of his claims of discrimination.

In addition, in assessing the scope of an agency

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

charge, the Seventh Circuit directs us to consider the charging party's statements in sworn affidavits filed in support of a charge, if it is clear that the charging party intended the agency to investigate the allegations in the affidavits. *Id.* at 502; *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110-11 (7th Cir.1992). Thus, the Seventh Circuit has found that a plaintiff's wrongful termination and failure to promote charges did not fairly include a claim of sex discrimination, where the plaintiff only made glancing references to the facts underlying the sex discrimination claim in post-charge materials submitted to the EEOC. *Cheek v. Western and Southern Life Ins. Co.,* 31 F.2d at 501-02. In contrast, the Seventh Circuit has held that the plaintiff's claims of racial discrimination and wrongful termination included a failure to promote claim where a post-charge affidavit submitted to the EEOC explicitly referred to the employer's failure to promote her. *Rush v. McDonald's Corp.,* 966 F.2d at 1108-11.

*13 Here, Peterson's affidavit unequivocally states that he "believed that [he] was being passed over for promotion while new, younger staff members who had less experience and qualifications ... were receiving promotions." (Peterson Affidavit at ¶ 11; Plaintiff's Ex. B). This clear reference to Knight's alleged failure to promote Peterson supplements his agency charge and makes it clear that the deletion of the failure to promote claim in the charge typed by the Illinois Department of Human Rights was not an intentional omission. *See Egan v. Paolos Community Hospital,* 889 F.Supp. 331, 338-39 (N.D.Ill.1995). Accordingly, the court finds that Peterson's failure to promote claim is not barred for failure to exhaust.

b. Has Peterson Carried His Burden?

With respect to Peterson's failure to promote, Knight has put most of its eggs in the "failure to exhaust" basket as its motion focuses on this issue, while its reply brief claims, for the first time, that Peterson has failed to establish that he applied for a promotion or that a younger employee got the job he wanted. Raising an issue for the first time in reply is improper, as it deprives the opposing party

of a meaningful chance to respond. *See Edwards v. Honeywell, Inc.,* 960 F.2d 673, 674 (7th Cir.1992) (a court may not grant summary judgment on a ground raised for the first time in reply). Nevertheless, because Peterson carries the burden of proving that he is entitled to go to trial, the court will consider whether Peterson has pointed to evidence sufficient to allow him to survive summary judgment.

As noted above, to establish a prima facie case for failure to promote, Peterson must establish that he is 40 years of age or older, applied for and was qualified for the position he sought, and was rejected in favor of someone younger and equally or less qualified. Knight contends that Peterson's failure to promote claim must fail because he never applied for or was denied a promotion and there were no available higher positions to which he could have been promoted. The court disagrees.

First, the record clearly reflects Peterson's repeated inquiries regarding a promotion to the level of Associate. Each time Peterson asked, his superiors (Mellott and Hendrickson) told him-incorrectly, as things turned out-that the matter would be addressed later. Given that Knight repeatedly put Peterson off, rather than advising him, for example, that he had to take certain steps to obtain a promotion, it cannot take the absence of a formal, written application as the absence of a request for a promotion.

Second, Peterson has pointed to evidence in the record which supports his claim that he was qualified for a promotion to the level of Associate. Both Mellott and Hendrickson acknowledged that Peterson was highly regarded by Knight and its clients. For example, Argonne thought that Peterson was an integral part of the APS team, and Keller & Gannon praised Peterson for his outstanding work on the Veteran's Hospital. In addition, while Peterson's level of education is not as high as other Associates, the record does not indicate that Knight had a policy requiring a certain level of education to obtain a promotion to the level of Associate.

*14 Moreover, Peterson's numerous designations as project manager, designer, and architect are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

inconsistent with a claim that Peterson's skill set was not up to par or that he was less qualified than, for example, Finfrock (who was 36 when he was hired as an Associate in 1991). In short, Peterson has come forward with evidence suggesting that he was qualified at the time he began to ask for a promotion, while Knight has failed to articulate any specific requirement for a promotion which Peterson failed to possess.

Third, Peterson has established that Knight rejected his attempts to secure a promotion. It is true that, as Knight stresses, it never explicitly refused to promote Peterson. It is also true, however, that Knight managed to avoid officially rejecting Peterson by rebuffing his repeated attempts to address the subject. It also never told Peterson that his requests for a promotion were doomed because there were no open spots. Instead, it strung him along by refusing to discuss this matter with him. Knight cannot use its refusal to discuss Peterson's promotion as a shield against his failure to promote claim.

Fourth, Peterson has directed the court to evidence showing that Knight promoted younger persons with equal or less qualifications than Peterson to the position of Associate. For purposes of illustration, the court will focus on the parties' claims regarding Finfrock. Knight stresses that Finfrock is not comparable to Peterson because his level of education was higher than Peterson's. Since Knight has not pointed to evidence showing that it conditioned the position of Associate on the possession of certain educational degrees, however, the court cannot conclude that Finfrock and Peterson are not comparable based on the disparity in Finfrock and Peterson's educational levels.

Finally, the record does not support Knight's apparent claim that there were a finite number of Associate slots, and that no slots were open when Peterson asked about a promotion. At the very least, Peterson attempted to discuss the promotion issue before and around the time that Knight brought Finfrock in as an Associate. Thus, the finder of fact could conclude that Knight passed Peterson over in favor of Finfrock.

Accordingly, the court finds that Peterson has successfully established the elements of a prima facie case for failure to promote. This means that it is Knight's turn to rebut the presumption of discrimination by articulating a legitimate non-discriminatory basis for its decision not to promote Peterson. As Knight focuses exclusively on Peterson's prima facie case, it does not reach this issue. This means that it has failed to hit the ball back into Peterson's side of the court. Accordingly, it is not entitled to summary judgment on Peterson's failure to promote claim.

### 2. Peterson's Termination and Knight's Reduction in Force

Knight concedes that Peterson has established three of the four elements of a prima facie case for wrongful termination: that he was in a protected age group, was meeting Knight's legitimate expectations, and was discharged. It nevertheless contends that Peterson has failed to point to any evidence showing that a similarly situated and substantially younger (*i.e,* more than ten years younger) employee was treated more favorably. *See Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1141 (7th Cir.1998) (an age difference of less than ten years is presumptively insubstantial).

*15 RIFs, however, are different, as they generally require a company to shift work to other existing employees and restructure its workforce, rather than simply hiring a new person to fill the discharged employee's position. *Collier v. Budd Co.,* 66 F.3d at 890-91. This is what happened in this case, as Knight concedes that it shifted its remaining employees to assume the terminated employees' duties, rather than hiring replacements. When considering whether the employer gave preferential treatment to younger employees during a RIF, courts must consider the terminated employee's " fungibility" or usefulness to the employer in comparison to other employees. *Miller v. Borden,* 168 F.3d 308, 313 (7th Cir.1999).

This requires the discharged employee to establish that he was treated less favorably than a similarly situated employee. *Id.* The similarly situated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 13
Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

employee need not be outside the protected class, but must be more than ten years younger than the discharged employee. *Id.* In other words, to carry his burden, Peterson must show that Knight treated him less favorably than the substantially younger employees who absorbed his work and that these employees were similarly situated to himself. *Id.* If he can do this, the burden shifts to Knight to show that its reasons for terminating Peterson were legitimate. *Id.*

According to Peterson, the comparable, substantially younger employees are: Riojas (Vice-President), Finfrock (Associate), Krasnopolsky (Architect V), Hellman (Architect IV), Supinger (Architect IV), and Rumsa (Architect III). Peterson claims that these employees absorbed his responsibilities on the Argonne APS and Great Lakes projects after Peterson was placed on a leave of absence in September of 1992. In support, Peterson points to paragraphs 61 and 79 of his supplemental statement of facts, which Knight did not dispute.

Paragraph 61 (which is unopposed) summarizes evidence supporting an inference that Finfrock worked on the Argonne project until mid-October of 1992 and then worked on the Great Lakes project, while Riojas, Rumsa, and others continued on the Argonne project, and that Riojas, Krasnopolsky, Supinger, Rumsa, and Hellman worked on the Argonne project for "substantial periods of time between August, 1992, ... and the end of 1993." In turn, paragraph 79 (which is also unopposed) summarizes evidence supporting an inference that after Peterson's lay-off and termination, other architectural designers continued to work on the Argonne project.

Knight's view of events post-leave of absence, however, is starkly different. Despite its failure to contest any of Peterson's supplemental facts, it presently appears to be taking the position that none of the allegedly comparable employees completed an appreciable amount of work on the Argonne or Great Lakes projects after September of 1992. This clearly creates a material issue of disputed fact regarding absorption of Peterson's responsibilities, and means that the court's consideration of Knight's

summary judgment motion must come to a grinding halt.

**\*16** In the interests of completeness, however, the court notes that this is not the only material issue of disputed fact. If the court had been able to move to the next stage of its analysis-whether Knight's proffered reason for Peterson's discharge was legitimate and nondiscriminatory-it would have reached a similar impasse as Knight's proffered reason for Peterson's termination is not fairly supported by the present record. Specifically, Knight claims that a general lack of work led to Peterson's termination. The problem with this proffered reason is that the evidence regarding the reasons for Peterson's termination is, to say the least, scanty.

According to Knight, Mellott and Schnair were responsible for the decisions to place Peterson on a leave of absence and to terminate him. Neither Mellott nor Schnair, however, can recall why Peterson was placed on a leave of absence or terminated, why Peterson was selected for a leave or absence or termination, why his skills were allegedly obsolete, or what skills he lacked. Indeed, Schnair testified at his deposition that he did not recollect any need for staff reductions in February of 1993, when Knight terminated Peterson. Thus, the legitimacy of Knight's proffered reason is up for grabs, as Knight insists its decisions were based on economics, while Peterson insists they were based on his age.

This is not the stuff of which summary judgment decisions are made. A proffered reason, such as lack of work, the need to reduce costs, or the fact that a particular job is not essential to continued operations, must be supported by sufficient supporting admissible evidence. *Driskell v. Continental Casualty Co.,* 961 F.Supp. 1184, 1188 (N.D.Ill.1997). Here, Knight appears to be contending that, by definition, it must have terminated Peterson due to lack of work as it was in the middle of a RIF caused by lack of work. While a finder of fact might ultimately accept this rationale, it is not enough to satisfy Knight's burden for summary judgment purposes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                            Page 14

Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

### IV. CONCLUSION

For the above reasons, Knight's motion for summary judgment as to Peterson's failure to promote and wrongful termination claims is denied. Trial is set for January 10, 1999.

N.D.Ill.,1999.
Peterson v. Knight Architects, Engineers, Planners, Inc.
Not Reported in F.Supp.2d, 1999 WL 1313696 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:97CV01439 (Docket) (Mar. 03, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                  Page 1

Not Reported in F.Supp., 1991 WL 236591 (E.D.Tenn.), 56 Fair Empl.Prac.Cas. (BNA) 1486
**(Cite as: Not Reported in F.Supp.)**

H

United States District Court, E.D. Tennessee,
Northern Division.
Sarah D. PHELPS,
v.
YALE SECURITY, INC.
**No. Civ-3-90-595.**

June 26, 1991.
Order Aug. 12, 1991.

*ORDER*

HULL, Chief Judge.
**\*1** This action under the federal Age Discrimination
in Employment Act (ADEA), 29 U.S.C. § 621, *et
seq.,* is now before the Court on the defendant's
motion for summary judgment. Rule 56(b), Federal
Rules of Civil Procedure. [Doc. 11].

Plaintiff Sarah D. Phelps was hired by the defendant
Yale Security, Inc. in June of 1977, when she was
44 years old. She was discharged on July 8, 1988,
at age 55, in what the defendant claims was a
reduction in force. In order for her to make out a
*prima facia* case of age discrimination in a
reduction in force case, she must show the
following: (1) that she was over 40 at the time of
her discharge; (2) that she was qualified to perform
her job; (3) that she was discharged; and (4) that
there is additional, direct, circumstantial, or
statistical evidence tending to indicate that the
employer singled her out for discharge for
impermissible reasons. *See Barnes v. Gencorp Inc.,*
896 F.2d 1457 (6th Cir.1990).

There is no question that the plaintiff has satisfied
the first three prongs of the test. In moving for
summary judgment, the defendant contends that she
has offered no evidence to satisfy the fourth prong.

Plaintiff Phelps can prove that for the first 9 years

of her employment, she worked as secretary to plant
manager Charles Cox. When Mr. Cox was
transferred to the corporate headquarters in
Charlotte in early 1987, she became secretary to his
successor, Mr. Avery Petty. Mr. Petty was having
some sort of illicit relationship with younger women
in the plant and apparently needed a personal
secretary who would wink at his indiscretions and
lie about his whereabouts. Mrs. Phelps did not fill
the bill. After about three months in his office, in
June of 1987, she was transferred to another
location where she did not answer his phone. She
continued to do most of her secretarial work as well
as some additional work for another department.
She was not given any indication that this was any
kind of demotion and, in fact, was told that she was
being assigned her new work because she was the
only one who could do it. Not long after her
transfer, she received a 7% raise in pay. However,
in September of 1987, Mr. Petty did replace Mrs.
Phelps by hiring Sarah Lemmons, an attractive
woman then aged 39, to be the plant manager's
secretary. Although Mrs. Phelps was not notified
of the change, and although her pay was not
reduced, on November 16, 1987, she was
reclassified from secretary to stenographer. Mrs.
Phelps has some evidence that Mr. Avery was
anxious to get her discharged-possibly because she
knew too much about her extracurricular activities.
There is no question that the reclassification made
Mrs. Phelps more vulnerable to a lay-off in the
event of a reduction in force.

On July 8, 1988, Mrs. Phelps was advised that she
was being discharged as part of a reduction in force.
Yale claims it was under a directive from the home
office to decrease its ratio of "indirect" salaried,
administrative workers to its "direct", hourly staff.
The defendant claims that in the July 1988 RIF, it
improved its ratio of hourly workers to salaried
workers from 2.9 to 3.2. It is by no means clear to
the Court how the defendant arrived at these
figures. The plaintiffs' proof is that at the time of
her termination, 12 hourly workers were discharged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1991 WL 236591 (E.D.Tenn.), 56 Fair Empl.Prac.Cas. (BNA) 1486
**(Cite as: Not Reported in F.Supp.)**

and only five salaried workers. However, the hourly workers were later recalled and one out of the four salaried workers (the only one who was under 40!) was also brought back to work. The following month, in August of 1988, five new salaried workers were hired and only one of them was over 40.

**\*2** The Court does not believe the plaintiff's transfer out of Mr. Petty's office and her reclassification to the position of stenographer offers any independent basis for recovery under the ADEA. However, the plaintiff has some evidence which tends to indicate that the reason given for her termination was pretextural and that Yale was using its reduction in force as a mechanism to weed out older workers. Under these circumstances summary judgment is inappropriate. Accordingly, the defendant's motion is hereby DENIED.

The Court has been advised, informally, that the plaintiff is in the process of changing attorneys. Accordingly, this action is not RESCHEDULED FOR TRIAL until Friday November 8, 1991.

### ORDER

This is an action under the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* It is now before the Court on the plaintiff's motion to amend the pretrial order. [Doc. 23].

This case was originally filed by attorney Dorothy B. Stulberg and assigned to the Honorable James H. Jarvis. On May 9, 1991, the parties submitted an agreed pretrial order stating the parties' positions and setting the case to be tried without the intervention of a jury.

Since that time, Judge Jarvis has recused himself; the case has been reassigned; and attorneys David A. Burkhalter, II and Perry H. Windle, III have been substituted for Mrs. Stulberg as counsel for the plaintiff. It is these new attorneys who would amend the pretrial order.

The first part of the proposed amendment restates

and somewhat broadens the plaintiff's allegations. For example, it alleges that, when Yale Security, Inc. terminated the plaintiff's employment, it failed to follow its unwritten policy of "bumping" employees with less seniority. The proposed amendment also alleges that, after the plaintiff's discharge, Yale hired other, younger workers into positions the plaintiff could have performed. The second part of the proposed amendment is a belated demand for a jury trial.

Yale opposes the plaintiff's attempt to amend the agreed pretrial order at this late date-after all discovery has been taken, witness lists have been filed, and a summary judgment motion has been made and ruled upon. It argues that, pursuant to Rule 16(e), Federal Rules of Civil Procedure, a pretrial order should only be modified to prevent manifest injustice. The plaintiff has made no showing of manifest injustice. Moreover, Yale insists that the plaintiff is now broadening her complaint to add a claim for failure to rehire which was never addressed in the administrative proceedings.

The Court has the discretion to allow modifications of the pretrial order. *Daniels v. Board of Education of Ravenna City School District,* 805 F.2d 203, 210 (6th Cir.1986). It also has the discretion to grant a late motion for a jury trial. Rule 39(b), Federal Rules of Civil Procedure.

In light of the fact that age discrimination cases are typically tried to juries, the Court will allow this belated amendment to the pretrial order. The Court will also allow the plaintiff's restated position. However, while the plaintiff may present evidence that younger people were hired after she left, etc., because it is relevant to whether or not the reduction in force was a pretext for eliminating an older employee, she may not expand her complaint to add failure to rehire as a separate basis for recovery.

**\*3** Accordingly, the plaintiff's motion to amend the pretrial order is GRANTED IN PART.

E.D.Tenn.,1991.
Phelps v. Yale Sec., Inc.
Not Reported in F.Supp., 1991 WL 236591

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3

Not Reported in F.Supp., 1991 WL 236591 (E.D.Tenn.), 56 Fair Empl.Prac.Cas. (BNA) 1486
**(Cite as: Not Reported in F.Supp.)**

(E.D.Tenn.), 56 Fair Empl.Prac.Cas. (BNA) 1486

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Eugene M. SCHIWALL, Plaintiff,
v.
AMERICAN PACKAGING CORPORATION,
Defendant.
**No. CIV. A. 95-7190.**

Jan. 30, 1997.

*MEMORANDUM*
R.F. KELLY, J.
**\*1** Plaintiff Eugene M. Schiwall ("Schiwall") brought this action against his former employer, American Packaging Corporation ("APC"), alleging age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"). FN1 Schiwall maintains that the proffered reason for his termination was merely a pretext for age discrimination. Presently before the Court is APC's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, APC's Motion will be granted.

> FN1. Schiwall has also brought a state law claim of age discrimination under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"). Since the PHRA utilizes the same analytical framework as cases brought under Title VII and the ADEA, the federal and state law claims will be discussed together. *See Kelly v. Drexel Univ.,* 907 F.Supp. 864, 871 (E.D.Pa.1995) (noting that PHRA age discrimination claims properly evaluated under federal law interpreting ADEA).

I. *BACKGROUND*

APC is a Pennsylvania Corporation which manufactures various forms of commercial paper packaging for consumer use. Schiwall began working for APC as an Electrical Supervisor in 1977 at the age of 47. In 1990, Schiwall was promoted to Maintenance Supervisor and held that position until January 26, 1994 when he was terminated. As Maintenance Supervisor, one of Schiwall's duties was to maintain the plant's fire and sprinkler system. In addition, Schiwall was an authorized contact person with APC's alarm company, Robinson Alarm Company of Philadelphia ("Robinson Alarm"). Whenever a portion of the plant's fire alarm system was to be shut down, Schiwall was responsible for calling Robinson and informing them of such.

On December 13, 1993, a portion of the sprinkler system located in APC's plant developed a leak. Schiwall discussed the leak with Jack White of Robinson Alarm who was present at APC's plant that day. It was decided that Robinson Alarm would be notified so that they would not monitor that portion of the system while repairs were made. A ticket from Robinson bearing the letters "OTSV" was placed on the pipe that day.FN2 It was Robinson Alarm's practice to shut down the entire system for a subscriber who had called in an impairment unless the subscriber specifically indicated that only a portion of the system should be shut down. On December 16, 1993, January 4, 1994, and January 12, 1994, Jack White of Robinson Alarm contacted Schiwall and asked if the repairs had been completed so that the alarm could be reactivated.

> FN2. The letters "OTSV" denote "Out of Service-Entire System," which means that Robinson would not monitor any portion of the sprinkler system at APC until further notice from Schiwall.

On January 14, 1994, a representative of APC's insurance carrier was inspecting the plant with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Schiwall's supervisor, Joe Polcino ("Polcino"), and noticed that a portion of the sprinkler system was shut down and that a red tag which should have been placed on the broken pipe was missing. Polcino immediately instructed Schiwall to place a tag on the pipe and contacted a subcontractor to come in and make the repairs. The subcontractor agreed to complete the repairs on Monday, January 17, 1994. At approximately 12:00 a.m. on January 16, 1994, APC's night supervisor, Frank Friel ("Friel "), arrived at the APC plant to begin his shift. Upon arriving at the plant, Friel discovered that a pipe had burst and flooded the plant. The portion of the pipe which had burst was in a different section from the one that Schiwall was to have repaired. Friel immediately shut off the water that fed the broken pipe and opened the doors to release the approximately 10,000 gallons of water that had accumulated inside the plant to avoid any potential electrical hazards. Friel then contacted Polcino who arrived at the plant shortly thereafter.

**\*2** Polcino immediately contacted Robinson Alarm to determine why the alarm system failed to detect the water flow problem and automatically dispatch the fire department. Polcino was told that the system did not activate because Schiwall had called Robinson Alarm on December 13, 1993 and ordered the system shut down. Polcino was also told that since Schiwall did not specify a particular portion of the system that was to be shut down, the entire plant had not been monitored for over a month. On Monday, January 17, 1994, Polcino met with Schiwall to discuss the situation and Schiwall denied having contacted Robinson Alarm. Polcino then spoke with Bob Coleman, APC's Vice President of Manufacturing, who told Polcino that Schiwall could no longer be responsible for the sprinkler system since APC could not afford to risk a recurrence of what Schiwall had done. Next, Polcino met with David Howley, the General Manager of the Division, who instructed Polcino to investigate the matter with Mary McKeon (" McKeon"), the Division's Human Resource Administrator and report back to him.

Polcino then called Robinson Alarm and was again told that it was Schiwall who had ordered the entire system shut down on December 13, 1993. Polcino

was also told that Robinson's inspector contacted Schiwall on December 16, 1993, January 4, 1994 and January 12, 1994 to inform Schiwall the entire system was still down because the leaking pipe had yet to be repaired. Polcino and McKeon met with Schiwall later in the day and informed him that he was suspended with pay pending further investigation. After Polcino met with David Howley and his staff, it was agreed that Schiwall's employment with APC should be terminated. APC has a policy that the decision to terminate an employee with five or more years of seniority is to be made by the company's president, Steven Schottland. After reviewing the facts surrounding the investigation, Schottland approved Schiwall's termination.

## II. *STANDARD*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Celotex,* 477 U.S. at 322; *Wisniewski v. Johns-Manville Corp.,* 812 F.2d 81; 83 (3d Cir.1987).

## III. *DISCUSSION*

**\*3** The ADEA provides that "[i]t shall be unlawful for an employer to ... discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or provisions of employment because of such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

individual's age." *See* 29 U.S.C. § 623(a). In general, a plaintiff seeking to establish a violation under the ADEA may do so in one of two ways. First, a plaintiff may present direct evidence of discriminatory animus under the "mixed-motives" framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In the absence of such direct evidence, a plaintiff may produce circumstantial evidence of discrimination under the pretext framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) , and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In the present action, Schiwall is proceeding under both theories.[FN3]

> FN3. The analysis used in describing the evidentiary burdens in Title VII cases is also used in ADEA cases. *Armbruster v. Unisys,* 32 F.3d 768, 777 n. 10 (3rd Cir.1994); *Seman v. Coplay Cement Co.,* 26 F.3d 428, 432 n. 7 (3d Cir.1994).

### A. "MIXED-MOTIVES" ANALYSIS

Under a "mixed-motives" case, the plaintiff ultimately seeks to prove that the adverse employment decision resulted from a mixture of legitimate and discriminatory motives. *Miller v. CIGNA Corp.,* 47 F.3d 586, 594 (3d Cir.1995). To proceed under this theory, the plaintiff must first produce evidence which is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). Once the plaintiff presents such evidence, the burden shifts to the employer to show that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of any discriminatory animus. *See Price Waterhouse,* 490 U.S. at 246 ("[T]he employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and the employer, if it wishes to prevail, must persuade it on another.").

In the present action, Schiwall points to four comments made by his supervisor, Joe Polcino, between one and six months before Schiwall's termination in January of 1994. Schiwall alleges that these comments constitute direct evidence of age discrimination. First, Schiwall alleges that, between July and September of 1993, Polcino continually asked him when he was going to retire. Second, Schiwall was again asked by Polcino when he was going to retire, this time in December of 1993. Third, Schiwall alleges that Polcino stated that Schiwall was the oldest person Polcino had ever supervised. Lastly, Schiwall alleges that in December of 1993, Polcino asked Schiwall whether the work was too physically demanding for him after Schiwall complained of a sore back.

**\*4** In her concurrence in *Price Waterhouse,* Justice O'Connor provided guidance on the type of evidence needed to make out a "mixed-motives" case:
[S]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.... What is required is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

*Price Waterhouse,* 490 U.S. at 277 (O'Connor, J., concurring) (internal citation omitted). APC argues that the four stray remarks allegedly uttered by Polcino were in no way related to the decision to terminate him and are insufficient to constitute direct evidence to support Schiwall's discrimination claim. In support of this argument, APC cites the case of *Sosky v. International Mill Service, Inc.,* 1996 WL 32139 (E.D.Pa. Jan.25, 1996), *aff'd,* 103 F.3d 114 (3d Cir.1996).

In *Sosky,* the plaintiff alleged that his discharge was the result of age discrimination. In support of his claim, the plaintiff argued that various comments made by the supervisor who discharged him constituted direct evidence of age discrimination.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

The plaintiff's supervisor had stated that "it's time to give the young a chance" because "the company needs to get some enthusiasm and drive" and also stated that the plaintiff had "been around for a bunch of years." In addition, the plaintiff's supervisor wrote "are you going into semi-retirement?" on plaintiff's vacation request and asked plaintiff "how many birthdays do you have?" in front of other employees. *Id.* at \*2.

The court, in applying the *Price Waterhouse* framework, held that the comments did not constitute direct evidence that the plaintiff was terminated as a result of age discrimination:

[The supervisor's] comments which could possibly be construed as ageist were made months before plaintiff was terminated and, at most, reflect [the supervisor's] knowledge of plaintiff's age and years of experience with [the company] and so are insufficient to constitute direct evidence of age discrimination.

...

More importantly, plaintiff has failed to demonstrate how these comments ... were so strongly linked to the decision to eliminate his position that they could constitute direct evidence that discriminatory animus lay behind the decision to terminate plaintiff. As a result, this Court concludes that plaintiff has failed to produce direct evidence of age discrimination in connection with his termination.

**\*5** *Sosky* 1996 WL 32139, at \*4. In the present action, there is no evidence to show that the four comments Polcino allegedly made were in any way linked to the decision to terminate Schiwall's employment after the fire sprinkler and alarm incident. At his deposition, Schiwall was asked whether he knew of any additional facts to support his opinion that the alleged comments were somehow related to the decision to discharge him. Schiwall merely repeated the comments and stated that he had a "feeling" that they were linked to his termination.[FN4] (Schiwall Dep. at 431).

> FN4. Schiwall also stated in his deposition that he had no reason to believe that Mary McKeon, David Howley, Bob Coleman or

Steven Schottland, who made the ultimate decision to terminate him, had any discriminatory animus towards him and that he did not decide to sue APC until after he had read an article about a person who had sued his employer for age discrimination. (Schiwall Dep. at 454-55).

In short, this Court finds that Schiwall has failed to produce any direct evidence of age discrimination within the *Price Waterhouse* framework. *See Hook v. Ernst & Young,* 28 F.3d 366 (3d Cir.1994) (holding that decisionmaker's stray remarks relating to plaintiff's protected class status insufficient to support discrimination claim in absence of evidence that remarks were related to adverse employment decision).

### B. PRETEXT ANALYSIS

Where there is no direct evidence of age discrimination, a plaintiff may still prevail by presenting circumstantial evidence under the burden shifting analysis set forth in *McDonnell Douglas.*

Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing that (1) he or she belongs to a protected class; (2) is qualified for the position in question; (3) suffered from an adverse employment decision; and (4) the employer has treated similarly situated employees more favorably. *See McDonnell Douglas,* 411 U.S. at 802. APC does not dispute that Schiwall has established a prima facie case of age discrimination.

Once the plaintiff has made a prima facie showing of discrimination, the burden then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 253. At that point, a plaintiff may defeat a motion for summary judgment based on the defendant's proffered nondiscriminatory reason by showing evidence, directly or circumstantially, that either (1) discredits the proffered reason for termination, so that the factfinder could reasonably conclude that it was a fabrication; or (2) permits the factfinder to infer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

that discrimination was more likely than not a motivating or determinative cause of the adverse action. *Fuentes v. Perskie,* 32 F.3d 759, 764-65 (3d Cir.1994); *Lawrence v. National Westminster Bank N.J.,* 98 F.3d 61, 65-66 (3d Cir.1996).

The plaintiff cannot simply show that the adverse employment decision was wrong or mistaken, because the factual dispute at issue is not whether the defendant made a correct decision in terminating plaintiff but whether unlawful discrimination motivated that decision. *Fuentes,* 32 F.3d at 765. Rather, a plaintiff must be able to show evidence of inconsistencies or implausibilities that support an inference that defendant did not act for its stated reasons. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993). Furthermore, the plaintiff need not cast doubt on each and every articulated reason that the defendant proffers. *Fuentes,* 32 F.3d at 764. For example,
**\*6** when the defendant proffers a "bagful" of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*Id.* at 764-65, n. 7.

As discussed above, Schiwall was terminated from employment for shutting down the entire alarm system of APC's plant for a month. Other than the four comments made by Polcino relating to his retirement or age, Schiwall has produced no evidence to show that APC's stated reason for his discharge was a pretext for discrimination. Furthermore, Schiwall's deposition testimony indicates that he believed that the bursting pipe and resulting flood were the reasons for his discharge:
Q. Why don't you tell me what happened from that date forward?
A. Well, Monday I got called into the office, [Polcino] was there and [McKeon] was there, and they had a bunch of paperwork on their desk. And

it was unusual that Mary McKeon would be in [Polcino's] office like that. And they were-they were prepared to fire me because a pipe had broken, a main sprinkler riser had broken in the coating department and water leaked out all over the pavement and there was just ice and everything all over. And they had called me in the first thing in the morning and they were ready to fire me. That's what my impression, you know, because Mary McKeon and all being there.
Q. Okay. I don't want to know your impressions so much as what was stated to you.
A. Okay.
Q. Okay. What did Mrs. McKeon say to you? Did she say to you that you were being fired at that point or that you were being suspended in the initial meeting?
A. I don't remember specifically.
Q. Okay. But you weren't fired at that point, were you, you were suspended; is that correct?
A. I wasn't suspended at that point either. That was in the morning.
Q. Okay.
A. And then they asked me-apparently the alarm-Robinson hadn't reported the alarm, the pressure drop alarm on that system to the fire department, so that the fire department didn't come which they should have come if the alarm was on....

(Schiwall Dep. at 327-328). Simply put, Schiwall has failed to prove that the nondiscriminatory reason proffered for his discharge was a pretext for age discrimination.

In addition, the Court finds that the stray remarks made by Polcino do not demonstrate such " weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" so that a reasonable factfinder could rationally find APC's stated reason for Schiwall's discharge (Schiwall's disarming the alarm system) to be unworthy of credence, and hence, infer "that [APC] did not act for [the stated] nondiscriminatory reasons." *Fuentes,* 32 F.3d at 764.; *see also Duvall v. Polymer Corp.,* 1995 WL 581910, at \*10 (E.D.Pa.1995) (holding repeated "young turks" comments by decisionmaker lacked sufficient nexus with decision to eliminate plaintiff's position to defeat summary judgment); *Tighe v. All Brand*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

*Importers, Inc.,* 814 F.Supp. 237, 239 (D.Conn.1992) (finding statements regarding a " youthful and aggressive" sales force legally inadequate to prove defendant's cited reason for discharge was a pretext for discrimination); *Perry v. Prudential-Bache Sec., Inc.,* 738 F.Supp. 843, 851 (D.N.J.1989) (finding statements describing plaintiff as a "stupid old bastard" and "burned out and forgetful" were insufficient evidence of age discrimination), *aff'd,* 904 F.2d 696 (3d Cir.), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990).

### IV. *CONCLUSION*

**\*7** Since Schiwall has produced no direct evidence of discriminatory animus on the part of APC, he has failed to establish age discrimination under the " mixed-motives" *McDonnell Douglas* framework. In addition, although Schiwall has established a prima facie case of age discrimination, he has produced no evidence to discredit APC's proffered reason for his discharge. Accordingly, summary judgment will be entered in favor of APC and against Schiwall.

Based on the foregoing discussion, I shall enter the following Order:

### *ORDER*

AND NOW, this 29th day of January, 1997, upon consideration of Defendant American Packaging Corporation's Motion for Summary Judgment, and the response thereto, it is hereby ORDERED that said Motion is GRANTED. Judgment is entered in favor of Defendant and against Plaintiff.

E.D.Pa.,1997.
Schiwall v. American Packaging Corp.
Not Reported in F.Supp., 1997 WL 36971 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:95cv07190 (Docket) (Nov. 15, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                        Page 1

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

▷
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Lawrence T. ZIELONKA, Plaintiff,
v.
The FIRST NATIONAL BANK OF CHICAGO,
Defendant.
**No. 92 C 1875.**

Oct. 12, 1994.

MEMORANDUM OPINION AND ORDER
PLUNKETT, District Judge.
*1 This an age discrimination case is before us on
Defendant First National Bank Of Chicago's Motion
For Summary Judgment. Plaintiff Lawrence T.
Zielonka asserts three claims under the Age
Discrimination in Employment Act ("ADEA"). FN1
Plaintiff claims that his position should not have
been eliminated, that he should have been
promoted, and that he should have been offered
another position. Defendant responds that Plaintiff
was terminated pursuant to a business-motivated
reduction in force motivated by a reorganization of
Defendant's Systems Risk Management Division.
Defendant claims there is no evidence to support
any of Plaintiff's claims of discrimination. For the
reasons specified within this opinion, Defendant's
motion for summary judgment is denied.FN2

*Background* FN3

Plaintiff was hired by Defendant on December 18,
1978. (Ex. 1 ¶ 4.) For the last several years of
his employment, Plaintiff was employed in the
Systems Risk Management Division ("SRM
Division") of Defendant's Data Processing
Department. (Ex. 2 at 187.) The SRM Division
was responsible for the development,
implementation, and administration of data security
plans and disaster recovery plans. (Ex. 3 ¶ 3.)

Disaster recovery plans are designed to ensure that
in the event of a flood, power loss or other disaster
affecting Defendant's data processing systems or
business operations, Defendant will be able to
recover its systems and resume operations with
minimal interruption. (*Id.* ¶ 5.) Data security
plans are designed to control access to the data of
business units. (*Id.*)

Prior to a reorganization in April 1991, the SRM
Division was comprised of three units: (1) Security
Access Management; (2) Change and Problem
Management/Disaster Recovery; and (3) SRM
Consulting. (Ex. 3 ¶ 5.) The Security Access
Management Unit was responsible for the
implementation and administration of security for
Defendant's computer operating systems. (*Id.*)
The Change and Problem Management/Disaster
Recovery Unit had responsibility for managing
changes to, and addressing problems in, Defendant's
data processing systems and also was responsible
for disaster recovery for Defendant's computer
systems and business operations. (*Id.*)

The third unit comprising the SRM Division, and
the unit in which Plaintiff was employed, was SRM
Consulting. This unit was responsible for
consulting with various sectors of Defendant on the
development and testing of disaster recovery plans
and data security plans. (Ex. 3 ¶ 5.) In April
1991, there were six consultants in the SRM
Consulting Unit: Edmonia Cannon (age 54);
William Dykstra (age 44); Carole Greer (age 48);
Joan Macijunas (age 32); Ravenna Oakes (age 53);
and Plaintiff (age 49). (Ex. 1 ¶ 5.)

Plaintiff's role in the SRM Consulting Unit was that
of disaster recovery oversight and consulting. (Ex.
2 at 187; Ex. 3 ¶ 8.) He had oversight
responsibilities that included maintaining a file of
disaster recovery plans and plan assessments (*id.*
249, 253-54); maintaining lists of Defendant
employees who had disaster recovery or other key
responsibilities (*id.* 260-65); and reminding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

business units to compile plans to correct deficiencies identified in disaster recovery tests (*id.* 253). He also was "a feeder of information" to Defendant's Crisis Management Committee and the Office of the Comptroller of Currency with respect to Defendant's disaster recovery program. (*Id.* 256-58.) In addition, Plaintiff had consulting responsibilities for disaster recovery that included providing advice, that could be followed or not as the business units chose, with respect to: (1) scheduling disaster recovery tests; (2) establishing priorities in the event of a disaster affecting multiple business units; (3) conducting risk assessments; and (4) developing disaster recovery plans. (Ex. 2 at 207, 210, 214, 245, 249) The other five employees in the SRM Consulting Unit consulted with various business units of the bank primarily to develop and maintain data security plans. (Ex. 3 ¶ 9.) Some of these employees also consulted with their assigned business units on disaster recovery.

In 1990, Defendant's Audit Department conducted an examination of the SRM Division. (Ex. 4 ¶ 2.) That examination disclosed serious deficiencies in the division's performance. (*Id.* ¶¶ 4-7; Ex. 5 at 29.) First, the auditors found control problems in data security plans, as a result of which the data of various business units were not secure. (Ex. 4 ¶ 6.) Second, the auditors found that disaster recovery plans were incomplete, that reporting concerning disaster recovery testing was inadequate, and that, generally, "SRM's oversight and coordination of the Bank's disaster recovery program lacks effective direction and monitoring." (*Id.* ¶ 7.) These deficiencies, among others, resulted in a marginal rating for the SRM Division, a rating indicating serious problems that placed Defendant at financial risk. (*Id.* ¶ 4.)

**\*2** In November 1990, about the time the marginal audit report was issued, Andrew Lynch (age 45), senior vice president, was appointed to head the Data Processing Department. (Ex. 5 at 3, 9.) Immediately after assuming the job, Mr. Lynch was advised by James Carey (age 42), senior vice president and head of the Audit Department, and Gloria Chord (age 44), vice president and unit head in the Audit Department, that the SRM Division had serious problems disclosed in an audit report and that immediate corrective action was needed. (Ex.

5 at 29, 32, 43; Ex. 4 ¶ 9; Ex. 1 ¶ 16.) Mr. Lynch asked the division's manager, Kenneth Wilfinger, for an explanation for the division's poor rating. (Ex. 5 at 45.) Mr. Wilfinger responded that he thought his division was doing an excellent job and that the Audit Department simply was being too strict. (*Id.* at 48.)

Based on his discussions with Mr. Wilfinger and continued meetings with the Audit Department, Mr. Lynch concluded that the SRM Division needed a different manager to turn around the division's performance and correct the problems disclosed in the audit. (Ex. 5 at 45, 50, 55-56.) He offered the position of Manager of the SRM Division to Judith Kadubec, vice president, who assumed the position on January 16, 1991. (Ex. 6 at 21; Ex. 3 ¶ 2.) Ms Kadubec was 45 years old. (Ex. 3 ¶ 1.)

During 1990-1991 there was a Bank-wide initiative to undertake cutbacks to reduce expenses, as a result of which department heads were instructed to downsize their departments. (Ex. 5 at 98-99.) Thus, Mr. Lynch gave Ms Kadubec a two-fold agenda for the SRM Division: (1) to take immediate steps to correct the problems disclosed by the audit; and (2) to reduce the number of employees in the division. (Ex. 6 at 43-44.) Subsequently, in February 1991, Mr. Lynch said that Ms Kadubec needed to reduce the number of employees in her division by four. (*Id.* at 50-51.) Mr. Lynch did not specify which particular employees' positions should be eliminated. (Ex. 5 at 123.) Rather, he instructed Ms Kadubec to review the division's responsibilities and decide which positions were least critical and should be eliminated. (*Id.* at 51.)

Ms Kadubec asked employees of the SRM Division to provide her with briefings detailing their responsibilities and current projects. (Ex. 2 at 195; Ex. 3 ¶ 7.) She then held a series of one-on-one and group meetings to discuss SRM employees' activities and responsibilities. (*Id.* at 190.) Based on her review, Ms Kadubec determined that the SRM Consulting Unit was neither performing a cost-effective function nor one that would enable the division to correct control deficiencies identified by the audit. (Ex. 6 at 83-84; Ex. 3 ¶ 11.) First,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 3

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

as the 1990 audit revealed, a consulting function had not been effective to ensure that Defendant's data security plans provided adequate access controls. (Ex. 3 ¶ 11.) Second, the disaster recovery consulting function had not been effective to ensure reliable disaster recovery plans. (*Id.* ¶¶ 11-12.) And third, given the centralization of disaster recovery responsibilities in the Change and Problem Management/Disaster Recovery Unit, it was not cost-effective to have a position dedicated to disaster recovery oversight. (*Id.* ¶¶ 12-13.) For these reasons, Ms Kadubec believed that the SRM Consulting Unit was the appropriate area to select for the required reduction in force. (*Id.* ¶ 11.)

**\*3** Ms Kadubec thus decided to eliminate the SRM Consulting Unit and reorganize the SRM Division. (Ex. 3 ¶ 14.) She proposed a new unit, called Security Specialists/Support, to engage in a technical analysis of data security plans and security software options. (*Id.;* Ex. 6 at 83.) Ms Kadubec selected for the new unit two employees from the SRM Consulting Unit, Joan Macijunas (age 32) and William Dykstra (age 44) because of their technical and business operations experience. (Ex. 6 at 90, 93-94; Ex. 3 ¶ 15.) She decided to assign Ms Macijunas to manage the new unit on the basis of her demonstrated technical expertise. (Ex. 3 ¶ 15.) This assignment was a lateral transfer for Ms Macijunas, who was a grade level 17 employee both before and after the assignment. (Ex. 1 ¶ 13.)

Ms Kadubec discussed the proposed reduction in force and reorganization with Gloria Chord, who concurred that these actions were appropriate to address the control problems identified in the Audit Department's audit. (Ex. 4 ¶ 10; Ex. 3 ¶ 16.) Ms Kadubec also discussed the reduction in force and reorganization with Mr. Lynch and Jeremy Farmer (age 41), Vice President and Human Resources Manager, who approved her decisions. (Ex. 7 at 13, 15, 38; Ex. 3 ¶ 16; Ex. 1 ¶ 6.) Thereafter, the reduction in force and reorganization were implemented, and on April 3, 1991, Plaintiff was advised that his position was being eliminated. (Ex. 2 at 311.) Plaintiff received all staff reduction benefits for which he was eligible, including continuation of his salary for four

months and an additional twelve weeks of severance pay. (Ex. 1 ¶ 10.)

William Baker, who was manager of the Change and Problem Management/Disaster Recovery Unit, left Defendant's employment under a separation agreement dated May 30, 1991. (Ex. 1 ¶ 15.) Ms Kadubec decided to divide Mr. Baker's responsibilities between two units: (1) Change and Problem Management, and (2) Disaster Recovery. (Ex. 7 at 44.) On July 18, 1991, a job bulletin was posted at Defendant for the position of manager of the new Disaster Recovery Unit. (Ex. 1 ¶ 14.) Plaintiff applied for the position. (Ex. 2 at 318.) Ms Kadubec interviewed Plaintiff and six other applicants, all of whom she had worked with. (Ex. 3 ¶ 19; Ex. 6 at 147.) She selected Brian Ericson (age 35) for the position. (Ex. 1 ¶ 16; Ex. 3 ¶ 19.)

Mr. Ericson was an assistant vice president and Audit Manager who engaged in audits of disaster recovery plans, among other duties. (Ex. 3 ¶ 20.) He had nine years' experience as an auditor of disaster recovery tests for the MVS, VM and Tandem computer operating systems, the same operating systems for which the Disaster Recovery Unit manager would be responsible. (*Id.*) Mr. Ericson also was the auditor with whom Ms Kadubec worked to address referrals from the 1990 audit of the SRM Division. She was impressed with his "excellent follow through" in addressing the audit referrals, as well as with his communication skills. (Ex. 7 at 8-10.) As Mr. Ericson was the candidate who satisfied more of the job qualifications than any other candidate, he was the person to whom Ms Kadubec offered the position. (Ex. 3 ¶ 19.)

**\*4** After initiating proceedings in the Illinois Department of Human Rights, Plaintiff filed this lawsuit claiming that Defendant violated the ADEA when it eliminated his position, did not promote him, and did not offer him the position given to Mr. Ericson.

*Summary Judgment Standard*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

A party is not entitled to summary judgment unless " the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We do not weigh evidence or determine the truth of asserted matters, but simply determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). We apply the summary judgment standard "with added rigor in employment discrimination cases, where intent and credibility are crucial issues. " *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993) (citing *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370-71 (7th Cir.1992); *McMillian v. Svetanoff,* 878 F.2d 186, 188 (7th Cir.1989)). "Summary judgment is only appropriate when no reasonable jury could find for the moving party." *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991). We view all evidence and all inferences therefrom in the light most favorable to the nonmovant. *Karazanos,* 948 F.2d at 335 (citing *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990) ). However, if that party bears the burden of proof at trial on a dispositive issue, that party is required " to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate ' specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(e)). " ' Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.' " *Darnell v. Target Stores,* 16 F.3d 174, 177 (7th Cir.1994) (quoting *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993)).

## Discussion

The ADEA promotes "employment of older persons [ages 40 to 70] based on their ability rather than their age...." 29 U.S.C. § 621. To establish a violation of the ADEA, a plaintiff must prove that an adverse employment decision, such as discharge, was made because of his age. *LaMontagne v. American Convenience Prod., Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). Plaintiff must come forward with either direct or circumstantial evidence "that age was the determining factor" in the employment decision he now challenges. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994).

Plaintiff claims discrimination in three instances: [FN4] that Defendant discharged him because of his age; that Defendant at the time of the discharge gave a promotion to a younger employee instead of to him; and that Defendant subsequently hired a younger man to fulfill Plaintiff's old job instead of rehiring Plaintiff.

**\*5** Plaintiff contends there is direct evidence of discriminatory animus underlying Defendant's decision to discharge him. The direct method of proof was established by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989). In a direct evidence case, plaintiff initially must prove " through direct evidence that the employment decision at issue was based upon an impermissible factor." *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568 (7th Cir.1989). Once the prima facie case has been made, "the defendant must respond, by proving by a preponderance of the evidence, that it would have made the same employment decision even if it had not taken the impermissible factor into account." *Id.* at 569. " Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686-87 (7th Cir.1991).

Plaintiff alleges Mr. Andrew Lynch, the senior vice president newly appointed to head the Data Processing Department, made the following remarks: "I've got to get rid of these old-timers. This is ridiculous. They are not willing to change." Further, it is alleged that Lynch felt there was a need to bring "fresh blood" into the department; and that he intended to change the data processing Department from an "old bank mentality" to a "new bank mentality." It is alleged that Mr. Lynch referred to an older employee as the "old boy" and upon that employee's termination, Lynch allegedly said, "we finally got the 'Silver Fox.' "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Defendant responds that Ms. Kadubec, Plaintiff's direct supervisor, neither heard Mr. Lynch make any of the above comments nor led her to believe that he wanted her to terminate the employment of older employees. Defendant thus concludes there is no causal relationship between Lynch's remarks and Kadubec's decision to terminate Plaintiff's employment. Based upon the evidence submitted by the parties, however, we cannot definitively state that Lynch's alleged utterances were merely stray remarks that had nothing to do with Plaintiff's termination. *See, Price Waterhouse,* 490 U.S. at 277.

The number and nature of the statements attributed to Lynch certainly permits an inference of an underlying desire not to retain older employees. *See, Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1165 (7th Cir.1994). During the relevant time period, Lynch was the newly appointed head of Data Processing. He had just appointed Kadubec to her position as manager of the SRM group. Kadubec's mandate from Lynch was to respond to the marginal rating of the internal audit and at the same time reduce costs. While Ms Kadubec states that Lynch never led her to believe that he wanted her to terminate the employment of older employees, Plaintiff has introduced enough evidence to place the actual boundaries of Kadubec's independent decision-making authority at issue. (Pl.'s Rule 12(n) Stmt. Exhs. 3, 6, 18.) At this stage of the proceedings, we must grant Plaintiff the benefit of every reasonable inference. We believe that a factfinder could infer, from this evidence, that age played a role in Plaintiff's discharge.

**\*6** Plaintiff relies upon circumstantial evidence of age discrimination to support the balance of his claims. All three of Plaintiff's claims may be analyzed in the same manner when relying upon indirect, circumstantial evidence. *See Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150 (7th Cir.1994); *Von Zuckerstien v. Argonne Nat'l Lab.,* 984 F.2d 1467 (7th Cir.1993).

The indirect, burden-shifting method of proof was originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and later adapted to

age discrimination claims under the ADEA. *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 (7th Cir.1992) (quoting *Oxman v. WLS-TV,* 846 F.2d 448, 452 (7th Cir.1988) (Oxman III)). Under the *McDonnell-Douglas* burden-shifting approach, Plaintiff must initially establish a prima facie case of discrimination. In order to establish a prima facie case for age discrimination Plaintiff must show that (1) he fell within the protected class of persons between the ages of 40 and 70; (2) he was meeting his employer's legitimate expectations; (3) he was discharged or demoted; and (4) that younger employees were treated more favorably. *McCoy,* 957 F.2d at 371; *Oxman·III,* 846 F.2d at 455. If Plaintiff succeeds in establishing a prima facie case, this creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for age discrimination. *Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 426-427 (7th Cir.1989).

In this Circuit, "[i]f the employer offers a pretext, a phony reason, for why it fired the employee, then the trier of fact is permitted, although not compelled, to infer that the real reason was age." *Visser v. Packer Eng'g Assoc.,* 924 F.2d 655, 657 (7th Cir.1991) (en banc) (citing *Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990)). A Plaintiff is not required to "uncover what is difficult to uncover-evidence of discriminatory intent." *Robinson,* 23 F.3d at 1162, (quoting *Oxman III, 846 F.2d at 454-55* ). The Seventh Circuit recently clarified the burden of proof with respect to pretext: [Plaintiff] ] may therefore satisfy the pretext prong of the McDonnell Douglas analysis by offering evidence 'either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.'

*Robinson* 23 F.3d at 1162, (quoting *La Montagne v. American Convenience Prod., Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984).[F]or summary judgment purposes, the non-moving party, in this case Plaintiff, has a lesser burden. He must only '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

produce evidence from which a rational factfinder could infer that the company lied' about its proffered reasons for his dismissal.

**\*7** *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994) (quoting *Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990).

Plaintiff has met his initial burden of setting forth a prima facie case of age discrimination. The record shows that Plaintiff was forty-nine years old at the time he was terminated. Plaintiff's affidavit and deposition testimony indicate his belief that he was meeting his employer's legitimate business expectations at the time he was terminated. This evidence satisfies the first two prongs of the test. *See Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 n. 7 (7th Cir.1988) Finally, Plaintiff presents evidence that his duties were assumed by an employee younger than he.

We turn now to the question of whether Plaintiff has presented a jury question with regard to Defendant's motivation in terminating him. Defendant contends that Plaintiff was terminated pursuant to a business-motivated reduction in force motivated by a reorganization of Defendant's Systems Risk Management Division and a bankwide initiative designed to reduce costs. Defendant further contends that the reassignment of Joan Macijunas was not a promotion but a lateral transfer. Defendant responds to Plaintiff's final claim by pointing to Ms. Kadubec's statement that Mr. Ericson was the candidate that satisfied more of the job qualifications that any other candidate. Defendant states its actions were all based on sound business judgments.

Plaintiff spends much time challenging the efficacy of Defendant's business judgment. Plaintiff attacks the validity of the internal audit and the credibility of Kadubec's decision making process. Plaintiff further argues that Kadubec's decisions were subjective. These arguments, however, do not save the day for the Plaintiff.

Plaintiff may not defeat summary judgment by raising issues regarding the validity of Defendant's business judgments. We are mindful of the fact that we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.), *cert. denied,* 479 U.S. 1066 (1987). We do not inquire into the efficacy of the employer's decision-making process or its managers judgment. *Weihaupt,* 874 F.2d at 429 (citing *Dale,* 797 F.2d at 464).

However, "the ADEA does create a cause of action against business decisions that merge with age discrimination." *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987), *overruled on other grounds, Coston v. Plitt Theatres, Inc.,* 860 F.2d 834, 836 (7th Cir.1988), (overruling jury instruction given to determine a willful violation of the ADEA). In *Graefenhain,* the Seventh Circuit commented on the ADEA in a factual context similar to our present case:

Congress enacted the ADEA precisely because many employers or younger business executives act as if they believe that there are good business reasons for discriminating against older employees. Retention of senior employees who can be replaced by younger, lower-paid persons frequently competes with other values, such as profits or conceptions of economic efficiency.

**\*8** *Id.*

Plaintiff correctly suggests that we must consider each piece of circumstantial evidence cumulatively and view it in its totality. The outcome of Defendant's actions in response to its internal audit include: (1) The firing of an older, competent employee, fulfilling the requirements of a specific job description; (2) the hiring of a younger, allegedly less credentialed and experienced individual, in preference to the older employee, to perform similar functions. These actions occurring under the auspices of a newly appointed, high level manager who allegedly makes comments which could be interpreted to reveal an age bias.

Plaintiff contends the many isolated items of evidence proffered, if viewed together, make up a mosaic sufficient to lead a jury to conclude that age was the reason for his discharge. *See Price v. Marshall Erdman & Assoc.,* 966 F.2d 320, 323 (7th

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Cir.1992). While this a close and difficult case, we agree with Plaintiff.

### Conclusion

Defendant has submitted substantial evidence rebutting the presumptions of discrimination raised by Plaintiff. However, under the three-step *McDonnell-Douglas* test, as interpreted by the Seventh Circuit, the court believes that Plaintiff has produced enough circumstantial evidence which, when viewed as a whole and in the light most favorable to the Plaintiff, would allow a rational factfinder to infer that Defendant's reasons for firing, not promoting and not re-hiring Plaintiff are pretextual. If found to be pretextual, the jury might conclude that Defendant intended to and did discriminate against Plaintiff because of his age.

Defendant's Motion For Summary Judgment is denied in its entirety.

FN1. 29 U.S.C. §§ 621 et seq.

FN2. Defendant filed a Motion To Strike Plaintiff's Rule 12(n) Statement Of Material Facts and To Deem Plaintiff's Responses As Admissions Of Fact. Defendant's motion is denied. While Plaintiff's assertions are often anything but concise, and do include many meaningless, often petty responses, the court rejects Defendant's invitation to deem each improper response an admission of Defendant's original statement. However, Plaintiff's counsel is cautioned that such responses are not within the letter or spirit of the Rule and will, in future, be deemed admitted for failure to comply with Local General Rule 12(n). *See Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990).

FN3. Citations refer to Defendant's Statement of Facts filed pursuant to Local General Rule 12(m).

FN4. Plaintiff filed one charge with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. That charge initially asserted only two claims of age discrimination based on Plaintiff's discharge from employment and his lack of a promotion. Plaintiff did not initially file a separate charge with respect to his being denied a subsequent position. Defendants argue that this claim constitutes an entirely separate charge which is outside the scope of the charge Plaintiff filed. *Oxman v. WLS-TV,* 12 F.3d 652, 660 (7th Cir.1993) (plaintiff's charge asserting termination claim did not encompass a subsequent failure to re-hire claim). Defendant contends Plaintiff's failure to file the separate charge constitutes an independent ground for this court to dismiss the claim. We reject Defendant's argument. Further we strongly caution Defendant's counsel for citing *Oxman* as support for said argument. In *Oxman* the Seventh Circuit upheld a Magistrate Judge's decision to dismiss a failure to re-hire claim because it was not reasonably related to the termination claim originally filed. *Oxman* 12 F.3d at 660. In the case *sub judice,* it is obvious the claim is reasonably related. Moreover, Plaintiff amended his charge with the Illinois Department of Human Rights immediately after the new position was posted and Defendant chose not to hire Plaintiff.

N.D.Ill. 1994
Zielonka v. First Nat. Bank of Chicago
Not Reported in F.Supp., 1994 WL 568696 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.