# EXHIBIT 4

(Unreported Cases)

LEXSEE 2002 U. S. DIST. LEXIS 6832

**DARRELL J. ANDREWS, Plaintiff, v. ABBOTT LABORATORIES, Defendant.**

**C.A. No. 00-901 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 6832; 82 Empl. Prac. Dec. (CCH) P41,102*

**April 18, 2002, Decided**

**DISPOSITION:** Defendant's motion for summary judgment GRANTED. Judgment entered in favor of defendant.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Prior to filing suit, plaintiff employee filed a claim with the Equal Employment Opportunity Commission. A right to sue letter was issued. The employee then sued defendant employer alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., and *42 U.S.C.S. § 1981,* with regard to the employer's promotion policy The employer moved for summary judgment.

**OVERVIEW:** In addition to the five claims the employee brought before the Equal Employment Opportunity Commission (EEOC), he also alleged two additional claims. Since the two additional claims were not raised with the EEOC, the employer maintained that the employee had not exhausted his administrative remedies with regard to them. The court found that the two claims were fairly within the scope of the prior EEOC charge. The employer then argued that the employee's claims were barred by the statute of limitations. The court determined that the continuing violation exception to the statutes of limitations applied. For the exception to apply, one incident had to fall within the statute of limitations period. The court found that two incidents fell within the limitations period. However, the employee failed to meet his evidentiary burden with respect to both of the incidents. In regards to the first incident, while the employee established the first three prongs of his prima facie case, he failed to establish the fourth one. In regards to the second incident, the employee failed to meet his McDonnell Douglas burden on two counts.

**OUTCOME:** The employer's summary judgment motion was granted, as was its motion to strike.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN1] The court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] A court may grant summary judgment only if the moving party shows that there are no genuine issues of

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

material fact that would permit a reasonable jury to find for the non-moving party.


*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN3] In the context of a summary judgment motion, a fact is material if it might affect the outcome of the suit. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue.


*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN4] In deciding a summary judgment motion, the court must construe all facts and inferences in the light most favorable to the non-moving party.


*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
[HN5] A plaintiff cannot change theories after a motion for summary judgment has been filed.


*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*
[HN6] The United States Court of Appeals for the Third Circuit recognizes that there are limitations on the presentation of new claims in the trial court that were not included in the Equal Employment Opportunity Commission (EEOC) charge. Specifically, a trial court may assume jurisdiction over claims not included in the EEOC charge only if the acts alleged in the subsequent Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., suit are fairly within the scope of the prior EEOC charge or the investigation arising therefrom.


*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN7] In Delaware, a claim of employment discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., must be filed with the Equal Employment Opportunity Commission within 300 days of the last alleged discriminatory act. *42 U.S.C.S. § 2000e-5*(e). Failure to file a charge of discrimination within the applicable period constitutes a ground for dismissal of the claim.


*Civil Rights Law > Practice & Procedure > Limitation Periods*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN8] Typically, a claim of employment discrimination under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., must be filed with the Equal Employment Opportunity Commission (EEOC) within 180 days of the last alleged discriminatory act. *42 U.S.C.S. § 2000e-5*(e). However, Delaware allows claimants who file either with the EEOC or the Delaware Department of Labor to rely on the 300 day statute of limitations.


*Civil Rights Law > General Overview*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN9] The statute of limitations applicable to a *42 U.S.C.S. § 1981* claims is the Delaware two-year personal injury statute of limitations.

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

*Civil Rights Law > Practice & Procedure > Continuing Violations*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Amendments*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations >*
*Continuing Violations*
[HN10] Under the continuing violation exception to the application of the limitations periods under Title VII of the
Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., and *42 U.S.C.S. § 1981,* a plaintiff may pursue a claim for
discriminatory conduct that began prior to the filing period if he or she can demonstrate that the act is part of an ongoing
pattern or practice of discrimination. However, before this doctrine applies, the plaintiff must show that at least one
discriminatory act occurred within the limitations period.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations >*
*Continuing Violations*
[HN11] Although recognizing the vitality of the continuing violation doctrine, the United States Court of Appeals for
the Third Circuit cautions against allowing stale claims to proceed under the rubric of a continuing violation.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN12] When there is no direct evidence of racial discrimination in the record, a court will utilize the McDonnell
Douglas burden-shifting framework.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN13] In order to establish a prima facie case under the McDonnell Douglas test, a plaintiff must prove that (1) he
belongs to a racial minority, (2) he applied, and was qualified, for a job for which the employer was seeking applicants,
(3) despite his qualifications, he was rejected, and (4) after his rejection, the position remained open and the employer
continued to seek applicants from persons of his qualifications.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN14] Although the McDonnell Douglas prima facie test is not inflexible, the plaintiff must nonetheless produce
evidence sufficient to create an inference that the employment decision was based on impermissible criteria.

**COUNSEL:** [*1] For DARRELL J. ANDREWS, plaintiff: Lance J. Nelson, MacElree, Harvey, Gallagher,
Featherman & Sebastian, Ltd., West Chester, PA.

For ABBOTT LABORATORIES, defendant: Darryl K. Fountain, Darryl K. Fountain, Esq., Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

## I. INTRODUCTION

On October 17, 2000, the plaintiff, Darrell J. Andrews ("Andrews"), filed the above-captioned action against his
former employer, Abbott Laboratories ("Abbott"), alleging race discrimination in violation of Title VII of the Civil
Rights Act of 1964, *42 U.S.C. § 2000e et seq.* and *42 U.S.C. § 1981.* Specifically, Andrews alleges discrimination with

2002 U.S. Dist. LEXIS 6832, *1; 82 Empl. Prac. Dec. (CCH) P41,102

regard to Abbott's promotion policies.

Presently before the court is Abbott's motion for summary judgment. For the following reasons, the court will grant this motion.

## II. STANDARD OF REVIEW

[HN1] The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [*2] the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998)*. Thus, [HN2] the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle, 139 F.3d at 392*. [HN3] A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* [HN4] In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999)*.

With these standards in mind, the court will describe the facts that led to the motions presently before the court.

## III. BACKGROUND

Andrews began his employment with Abbott on or about March 29, 1993 as a sales trainee in Abbott's [*3] Diagnostics Division ("ADD"). On October 11, 1993, he was promoted to the position of Area Account Manager II. n1

      n1 On or about November 6, 1995, he was further promoted to the position of Area Account Manager I.

A. The Transfer to PPD

In October 1995, Andrews sought a transfer from ADD to a sales representative position in Abbott's Pharmaceutical Products Division ("PPD"). At his deposition, Andrews acknowledged that transferring to a sales representative position in PPD would not have constituted a promotion or a salary increase.

When Andrews requested a transfer to PPD, Dave Kruger, his regional manager, told him that he could not transfer out of ADD. Sometime thereafter, Andrews contacted Abbott's human resources department to complain about not being permitted to transfer. Specifically, he complained that four of his Caucasian counterparts were allowed to transfer out of ADD and into PPD, while he was denied an opportunity to do the same. At that time, he believed that he was being discriminated against [*4] based upon his race, and he communicated that belief to Abbott's human resources department. Andrews admits to having been aware at that time that it was unlawful for an employer to discriminate against an employee based on his race.

In December 1995, Abbott's human resources department informed Andrews that he could transfer to PPD. His transfer became effective on January 15, 1996.

B. The "Air Force" Position

In September 1996, Andrews learned about an open position in a division within PPD known as the "Air Force." Soon thereafter, he discussed the Air Force position with his district manager, John Villeneau ("Villeneau"). Andrews alleges that Villeneau informed him that he was not eligible for the Air Force position because he did not have enough

2002 U.S. Dist. LEXIS 6832, *4; 82 Empl. Prac. Dec. (CCH) P41,102

time in his current position. Abbott subsequently hired an African American female to fill the Air Force position in question.

Abbott maintains that regional managers had various philosophies on how long a subordinate should remain in a position before seeking a promotion. Generally, Abbott expected employees to stay in a position for two years before moving to another sales position or being considered for a promotion. However, Abbott [*5] admits that there was no written policy governing how long a person had to remain in a position before seeking a promotion.

Andrews believes that he suffered discrimination with regard to the Air Force position because two Caucasian employees who had begun working for PPD at the same time as he had were allegedly promoted in 1996 to specialty positions. Abbott maintains that, in fact, one of the employees in question was promoted to a specialty sales position in a different sales region from Andrews. Abbott further maintains that the other employee in question did not work in Andrews' sale region, nor did she report to his regional manager. Further, both individuals were not promoted to specialty positions until May and June 1997, respectively.

Although Andrews testified that he believes the denial of an opportunity to interview for the Air Force position was an act of discrimination, he did not complain to Abbott's human resources department about this. Moreover, he testified that there was "no reason in particular" that he did not complain to human resources.

C. The SR Position

In March 1997, Andrews approached Villeneau about interviewing for a specialty sales position known [*6] as the "SR position." Villeneau informed Andrews that he would relay that request to Park Lamberton ("Lamberton"), Andrews' regional manager and Villeneau's boss. Villeneau later informed Andrews that Lamberton would not allow him to interview for that position because he needed to have served at least two years in his current position to be eligible for an interview.

With regard to this position, Andrews argues that he suffered discrimination because a Caucasian employee was granted an interview for a specialty sales position, while he was not. He further alleges that this individual also had less than two years in his current position. Abbott contends that, in fact, that employee had been at his current position from October 15, 1995 to December 15, 1997 - two years and two months - at the time of his promotion.

Although Andrews believes that the denial of an opportunity to interview for the SR position in March 1997 was an act of discrimination, he once again failed to report this concern to Abbott's human resources department.

D. The HIV Institutional Representative Position

In August 1997, Andrews interviewed for an HIV institutional representative position. The representative's [*7] job duties included acting as a liaison between Abbott and various hospitals and medical schools and marketing the drug Norvir to those institutions. Both the original HIV institutional position and the HIV specialist position were considered promotions from a primary care sales representative position. Furthermore, both positions were at the same grade level and had equal opportunities for bonuses and increased base salaries. The HIV institutional position reported to Joseph Mosso ("Mosso"), the HIV district sales manager.

Mosso interviewed two candidates for the HIV institutional position, Andrews and Marc Marrone ("Marrone"), a Caucasian. Both Andrews and Marrone were primary care sales representatives, although they were in different districts, had slightly different titles, and reported to different district managers. Specifically, Andrews was a Professional Products Representative ("PPR") and reported to Villeneau. Marrone was a Professional Marketing Representative ("PMR") and reported to Bill Craney.

Mosso ultimately selected Marrone for the position. At his deposition, Mosso gave two reasons for his decision. First, Marrone displayed an enthusiasm and passion for the HIV [*8] institutional position that was lacking in Andrews.

2002 U.S. Dist. LEXIS 6832, *8; 82 Empl. Prac. Dec. (CCH) P41,102

Second, Marrone resided in Philadelphia, Pennsylvania, whereas Andrews lived in Bear, Delaware. Mosso further testified that, if possible, Abbott tries to locate qualified people who live in the territory in which they will work.

Andrews again believed that his rejection was discriminatory. However, he failed to report this complaint to Abbott's human resources department.

In November 1997, an HIV specialist position became available in Mosso's district. The position was located in Delaware, where Andrews still lived. Mosso called Andrews and offered him the position, without considering anyone else and without requiring that Andrews appear for a second interview. Andrews admits that he accepted this promotion without interviewing for the position.

E. The District Manager Position in the Long Term Care Division

In June 1998, Andrews sought to be promoted to a district manager position in a new division known as the Long Term Care Division. Andrews feels that Abbott discriminated against him because he was not allowed to interview for the district manager position. However, Andrews is not aware of any HIV specialist who was allowed [*9] to interview for the position. In fact, Abbott maintains that it created this division to market a new product. Accordingly, it intended to fill the Long Term Care district manager positions with employees who had previous experience as district managers. The four individuals who ultimately filled the available positions were experienced district managers.

Andrews again felt that Abbott was discriminating against him. However, he failed to file a complaint with Abbott's human resources department, and he did not include this allegation in his letter of resignation. He further failed to include this allegation in his charge of discrimination.

F. The Regional Training Specialist Position

Andrews alleges that, on or about September 1998, he sought a regional training specialist position, but was denied an opportunity to interview for the position. Douglas Woolley ("Woolley"), the regional sales manager, made the hiring decision for the regional training specialist position at issue. He testified that he does not recall Andrews contacting him or leaving any messages about his interest in the regional training specialist position. In fact, Woolley testified that the position was not [*10] available in 1998. From June 16, 1997 to approximately February or March 1999, Ben Naparstek ("Naparstek") held that position.

In the summer or fall of 1998, Naparstek was scheduled to be promoted to a district manager position. Around that time, Abbott made the decision to eliminate one of its sales divisions, known as the Air Force. Abbott then gave the district manager position that Naparstek was scheduled to receive to one of the Air Force district managers. Naparstek returned to his regional training specialist position within a day or two of leaving that position. During the brief period of time that Naparstek was a district manager, Woolley testified that he did not solicit any candidates for the regional training specialist position, nor did he consider any candidates for that position.

Andrews believes that he was discriminated against because when he called Woolley to inquire about the regional training specialist position, Woolley did not return his telephone call. Andrews further maintains that Woolley did not contact him when the position finally became available in 1999. Andrews never reported this allegedly discriminatory incident to Abbott's human resources department, [*11] nor did he include this allegation in his letter of resignation. Finally, Andrews failed to include the regional training specialist position in his EEOC complaint.

G. The Clinical Liaison Position

In February 1999, Abbott converted the HIV institutional representative position into a newly created position known as a clinical liaison. The two HIV institutional representatives in Andrews' district were Marrone and Se Se Yennes ("Yennes"). Accordingly, when the HIV institutional representative position was converted into the clinical liaison position, Marrone and Yennes accepted the clinic liaison positions.

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 8 of 31

Page 7

2002 U.S. Dist. LEXIS 6832, *11; 82 Empl. Prac. Dec. (CCH) P41,102

Andrews was an HIV specialist, but not an HIV institutional representative at the time that the clinical liaison position was created. He admits that he knows of no person who became a clinical liaison who did not hold the position of HIV institutional representative at the time the clinical liaison position was created.

Andrews did not file a complaint about this allegedly discriminatory act with Abbott's human resources department.

H. Andrews' Resignation and Initiation of Suit

On March 22, 1999, Andrews forwarded his letter of resignation to Mosso. In that letter, Andrews [*12] alleged that he had suffered discrimination with regard to promotional opportunities at Abbott. Mosso testified that the letter of resignation was the first time that Andrews had expressed this view to him.

On May 27, 1999, Andrews filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The charge lists the following allegations: (1) Andrews was initially not allowed to transfer from ADD to PPD; (2) he was not allowed to interview for a specialty sale position in September 1996; (3) he was not allowed to interview for a specialty sales position in March 1997; (4) he was denied the promotion to HIV institutional representative in July 1997; and (5) he was not informed about or considered for the clinical liaison position in February 1999.

On July 21, 2000, the EEOC issued a Notice of Right to Sue Letter to Andrews. On October 17, 2000, he filed a complaint against Abbott, which was subsequently amended in February 2001.

**IV. DISCUSSION** n2

> n2 Andrews alleges a disparate impact claim for the first time in his Answer Brief. However, having pursued this case solely on a disparate treatment theory, [HN5] he cannot now change theories after a motion for summary judgment has been filed. *See  Bulkoski v. Bacharach, Inc., 1 F. Supp. 2d 484, 487 (W.D. Pa 1997)* (denying a change in legal theory after a motion for summary judgment had been filed). Accordingly, the court will disregard Andrews' disparate impact argument.

[*13]

A. Exhaustion of Administrative Remedies

In addition to the five claims Andrews brought before the EEOC, Andrews has also alleged two additional claims in his complaint: (1) in June 1998, Abbott denied him the opportunity to interview for the position of district manager in the Long Term Care division and (2) in September 1998, Abbott refused to consider him for the position of Regional Training Specialist. Because these two additional claims were not raised with the EEOC, Abbott maintains that Andrews did not exhaust his administrative remedies with regard to them.

[HN6] The Third Circuit has recognized that there are limitations on the presentation of new claims in the trial court that were not included in the EEOC charge. *See  Howze v. Jones & Laughlin Steel, Corp., 750 F.2d 1208, 1212 (3d Cir. 1984)*. Specifically, a trial court may assume jurisdiction over claims not included in the EEOC charge only if the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC charge or the investigation arising therefrom. *See  Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)*.

On the present facts, the court recognizes that Andrews' [*14] EEOC complaint listed certain specific allegedly discriminatory acts. However, in the "additional text" pages attached to the Charge of Discrimination, Andrews ends by stating "I believe Respondent systematically discriminates against blacks in that they are kept in non-mangement [sic] positions and denied promotional opportunities to higher ranking field and internal positions." Further, in his opposition brief to the present motion, Andrews states that he is claiming racial discrimination arising out of "the repeated failures

2002 U.S. Dist. LEXIS 6832, *14; 82 Empl. Prac. Dec. (CCH) P41,102

of Abbott to inform or allow him, as a minority, of promotional opportunities within the organization. [sic]" The court therefore concludes that the two additional instances of alleged promotion discrimination, falling within the same time period as the specifically alleged acts, are fairly within the scope of the prior EEOC charge.

B. Statute of Limitations

Abbott next argues that the majority of Andrews' claims are barred by the statutes of limitations applicable to Title VII claims and Section 1981 claims. The court will address each type of claim in turn.

1. Title VII Statute of Limitations

[HN7] In this jurisdiction, a claim of employment discrimination [*15] under Title VII must be filed with the EEOC within 300 days of the last alleged discriminatory act. n3 *See 42 U.S.C. § 2000e-5*(e); *see also Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476 (D. Del. 2001).* Failure to file a charge of discrimination within the applicable period constitutes a ground for dismissal of the claim. *See Parker v. State of Delaware Department of Public Safety, 11 F. Supp. 2d 467, 472 (D. Del. 1998).*

> n3 [HN8] Typically, a claim of employment discrimination under Title VII must be filed with the EEOC within 180 days of the last alleged discriminatory act. *See 42 U.S.C. § 2000e-5*(e). However, Delaware allows claimants who file either with the EEOC or the Delaware Department of Labor to rely on the 300 day statute of limitations. *See Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476, 490 (D. Del. 2001).*

In the present case, Andrews filed a charge of discrimination with the [*16] EEOC on May 27, 1999. Thus, for an alleged unlawful employment practice to have been within 300 days of the EEOC charge filing date, it would have had to occur on or after July 31, 1998. Andrews, however, alleges discrimination in October 1995, September 1996, March 1997, August 1997, June 1998, September 1998 and February 1999. Accordingly, absent the application of the continuing violation doctrine, the only claims that Andrews is not barred from pursuing are the September 1998 claim concerning the regional training specialist position and the February 1999 claim concerning the clinical liaison position.

2. Section 1981 Statute of Limitations

[HN9] The statute of limitations applicable to Section 1981 claims is the Delaware two-year personal injury statute of limitations. *See Cuffy v. Getty Refining & Marketing Co., 648 F. Supp. 802, 807 (D. Del. 1986).* Accordingly, Andrews' Section 1981 claims will be barred unless they were filed within two years of his sustaining injury due to Abbott's alleged discrimination. *See id.* Andrews filed suit on October 17, 2000. Thus, any claim that occurred before October 17, 1998 is time barred. Applying the law to the present facts, [*17] all of Andrews' Section 1981 claims, except the February 1999 claim, are barred absent the application of the continuing violation doctrine.

C. Continuing Violation Doctrine

As alluded to above, the Third Circuit recognizes an exception to the strict application of the limitations periods under Title VII and *42 U.S.C. § 1981.* This exception is known as the "continuing violation doctrine." *See West v. Philadelphia Elec. Co., 45 F.3d 744, 756 (3d Cir. 1995).* [HN10] Under this exception, a plaintiff may pursue a claim for discriminatory conduct that began prior to the filing period if he or she can demonstrate that the act is part of an ongoing pattern or practice of discrimination. *See Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997)* (following the Fifth Circuit's leading approach in *Berry v. Board of Supervisors Louisiana State Univ., 715 F.2d 971 (5th Cir. 1983)).* However, before this doctrine applies, the plaintiff must show that at least one discriminatory act occurred within the limitations period. *See id.*

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 10 of 31

Page 9

2002 U.S. Dist. LEXIS 6832, *17; 82 Empl. Prac. Dec. (CCH) P41,102

[HN11] Although recognizing the vitality of this doctrine, the Third Circuit cautions [*18] against allowing stale claims to proceed under the rubric of a continuing violation. *See id.* Specifically, the *Rush* court noted that to allow stale claims to proceed would be inconsistent with the administrative procedure established by Title VII which contemplates the prompt filing of charges. *See id.*

Furthermore, the Fifth Circuit has held that a one-time employment event such as a failure to promote is the sort of "discrete and salient even that should put the employee on notice that a cause of action has accrued." *See Huckabay v. Moore, 142 F.3d 233, 240 (5th Cir. 1998).* Similarly, in a more recent Fifth Circuit opinion, the court stated that an employee who claims to be the victim of a racially motivated failure to promote is put on notice that his rights have been violated at the time the adverse employment decision occurs. That employee must therefore bring the claim within 180 days of the adverse decision. *See Celestine v. Petroleos De Venezuella SA, 266 F.3d 243, 354 (5th Cir. 2001); see also West, 45 F.3d at 756* (noting in dicta that there is no continuing violation for discrete events, such as a denial of a [*19] promotion, because such events trigger the duty to assert the lost right caused by the deprivation.). The Seventh Circuit takes a similar approach. *See Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis, 42 F.3d 1054, 1058 (7th Cir. 1994)* (holding that "if the plaintiff knew or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations.").

However, the court recognizes that there is case law from courts within this circuit, and other circuits, which concludes otherwise. Specifically, in *Wright v. ICI Americas, Inc.*, the Delaware District Court held, on similar facts, that allegations of numerous failures to promote were allegations of a "broad policy of discrimination and for purposes of a summary judgment motion should not be broken down into discrete acts of discrimination." *813 F. Supp. 1083, 1088 (D. Del. 1993); see also, Tyson v. Sun Refining and Marketing Co., 599 F. Supp. 136, 139 (E.D. Pa. 1984)* (denying summary judgment as to alleged discrimination which had occurred twelve years earlier [*20] because the plaintiff alleged a broad policy of discrimination); *Reed v. Lockheed Aircraft Corp., 613 F.2d 757, 760 (9th Cir. 1980).*

Andrews began his employment at Abbott in 1993 as a sales trainee in Abbott's Diagnostics Division ("ADD"). In 1995, he sought a transfer to a sales representative position in Abbott's Pharmaceutical Products Division ("PPD"). He alleges, however, that his regional manager would not allow him to transfer to PPD. Because Andrews was aware that several of his white colleagues had been allowed to transfer to PPD, he filed a discrimination complaint with Abbott's human resources department. He further testified at his deposition that he understood it was against the law for an employer to discrimination against an employee based on that employee's race. As a result of this complaint, Andrews received his transfer.

On these facts, it is clear that, as early as 1995, Andrews was fully aware that race discrimination in employment is illegal, he was convinced that he was the victim of such illegal discrimination, and he made an internal complaint. However, he chose not to pursue his rights through the EEOC's enforcement process - presumably [*21] because he achieved his desired result through Abbott's human resources department. His remaining failure to promote claims follow the same pattern, although he curiously never again sought the assistance of Abbott's human resources department.

Specifically, in September 1996, he learned of an open position in a division known as the Air Force. His manager told him he was not eligible for that position because he did not have enough time in his current position. As with his failure to be transferred to PPD when he first requested it, he believed that the denial of an opportunity to interview for this position was an act of illegal discrimination. However, "for no reason in particular," he chose not to file a complaint with Abbott's human resources department.

Likewise, Andrews testified that at the time of the March 1997, August 1997 and June 1998 incidents, he felt that he had suffered discrimination, but that he nonetheless failed to file a complaint with Abbott's human resources department, the EEOC, or the court. Thus, in each of the above instances of alleged discrimination, he knew of the alleged violation at the time it occurred, he believed that he was the victim of the discrimination, [*22] and he knew

2002 U.S. Dist. LEXIS 6832, *22; 82 Empl. Prac. Dec. (CCH) P41,102

that race discrimination was illegal. Based on these facts, the court has doubts as to whether the continuing violation doctrine should operate to save these claims. However, out of an abundance of caution in light of the important issue at stake, the court concludes that Andrews' allegations are eligible for continuing violation status because it is feasible to read them as alleging an on-going, broad policy of discrimination.

D. The September 1998 and February 1999 Claims

Assuming, as the court will, that the October 1995, September 1996, March 1997, August 1997, and June 1998 incidents can be included as continuing violations, at least one act of discrimination must nevertheless have occurred during the limitations period. *See Rush, 113 F.3d at 481.* As the court stated above, the September 1998 and February 1999 incidents fall within the 300 day statute of limitations for Title VII claims, and the February 1999 incident falls within Section 1981's two-year statute of limitations. However, the court concludes that Andrews has failed to meet his evidentiary burden with respect to both of us these incidents.

[HN12] There is no direct evidence of racial discrimination [*23] in the record. Therefore, the court will utilize the burden-shifting framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* [HN13] In order to establish a *prima facie* case under the *McDonnell Douglas* test, Andrews must prove the following elements: (1) he belongs to a racial minority; (2) he applied, and was qualified, for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons of his qualifications. *See Equal Employment Opportunity Commission v. Metal Service Co., 892 F.2d 341, 347, n.7 (3d Cir. 1990).*

1. The September 1998 Incident

Based on his complaint, Andrews' claim of discrimination as to the September 1998 incident appears to rest on his belief that the position became open at that time. n4 Andrews then abandons the allegations in his complaint, and instead argues that when the position did become open in March 1999, Abbott should have sought him out for the position. As Andrews no longer disputes that the position was never [*24] open in September 1998, the court will address only his later allegation.

n4 Abbott maintains that the position was never open.

Andrews maintains that he had heard that the Regional Training Specialist position would be opening in September 1998 due to Naperstec's anticipated promotion. As he was interested in pursuing this job opportunity, he testified to having left several telephone messages with the Regional Manager Doug Woolley ("Woolley"). Andrews alleges that Woolley had previously met with Andrews and was aware of his interest in moving forward in the company. Andrews further alleges that Woolley knew that he worked as a Regional Field Trainer, a voluntary position similar to the position of Regional Training Specialist.

Although Abbott strongly contests that Woolley was "well aware" of Andrews' career aspirations, the court must assume that he was aware of these aspirations for purposes of deciding this motion. However, even making that assumption, the court concludes that Andrews has failed to carry [*25] his *prima facie* burden with regard to this incident.

Andrews has supplied sufficient evidence to meet the first three prongs of his *prima facie* test. First, there is no dispute that he is a member of a racial minority. Second, it is well-settled that an employee need not actually apply for the position so long as he or she reasonably informed management of an interest in the open position. *See EEOC, 892 F.2d at 348.* Andrews further alleges that his work experience was comparable to that required for the new position. These allegations are sufficient to create a genuine issue of material fact with regard to the second prong. Third, he clearly did not receive the job. However, with regard to the fourth prong, he provides no evidence as to who was invited

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 12 of 31

Page 11

2002 U.S. Dist. LEXIS 6832, *25; 82 Empl. Prac. Dec. (CCH) P41,102

to interview for the position, what those individual's credentials were, or whether the position was ever filled, and if so, by whom.

Moreover, Andrews' argument that Abbott should have actively sought him out to offer him a chance at this job opportunity is insufficient to establish his *prima facie* case. Aside from this conclusory allegation, he has offered no supporting evidence on this point. n5 Absent [*26] such evidence, it would be unreasonable to infer that, without an explanation, the employer's actions were more likely than not based on discrimination. *See EEOC, 892 F.2d at 348* (noting that, [HN14] although the *McDonnell Douglas prima facie* test is not inflexible, the plaintiff must nonetheless produce evidence sufficient to create an inference that the employment decision was based on impermissible criteria.) On this record, no reasonable factfinder could conclude that Abbott's management was discriminating against Andrews solely because Abbott failed to actively seek him out for a position that he had expressed an interest in six months earlier, before the position had even became available.

> n5 Instead, Andrews engages in a lengthy discussion of the lack of procedure governing internal transfers. While the court recognizes that a lack of procedure may indeed be relevant in the context of alleged discrimination, such allegations alone cannot establish Andrews' *prima facie* case.

2. The February [*27]  1999 Incident

Andrews next alleges that, in February 1999, Abbott failed to promote him to a newly-created position known as a clinical liaison. The court concludes, however, that Andrews has failed to meet his *McDonnell Douglas* burden on two counts. n6

> n6 In defense of this claim, Andrews attempts to rely on evidence produced in an unrelated lawsuit against Abbott. *See* Plaintiff's Appendix Exhibits 6, 7, and 8. Abbott has moved to strike these exhibits because they fail to comply with *Federal Rule of Civil Procedure 56(e)*. The court agrees. The exhibits in question have not been identified by a sworn affidavit, nor have they otherwise been made admissible into evidence. Instead, Andrews' counsel has submitted a signed, but unsworn, statement in which he purports to certify the authenticity of the exhibits. This clearly runs afoul of the Rule 56(e) requirements. Additionally troubling is the fact that Andrews candidly admits that these exhibits were not produced during discovery in the present case. For these reasons, the court will disregard this evidence for purposes of deciding the present motion.

[*28]

First, Andrews has not provided any evidence demonstrating that he was qualified for the clinical liaison position. Abbott maintains that the relevant qualification for becoming a clinical liaison was that the applicant must, at that time, have held the position of HIV institutional representative. Andrews has offered no contrary evidence. Moreover, Andrews acknowledges that he was not an HIV institutional representative, nor is he aware of any person who became a clinical liaison who was not previously an HIV institutional representative. Finally, there is no dispute that the two individuals in Andrews' district who became clinical liaisons were, in fact, HIV institutional representatives. Accordingly, Andrews has brought forth no evidence that he was qualified for this position.

Additionally, Andrews has failed to establish that another similarly situated employee (i.e., a non-HIV institutional representative) had an opportunity to interview for the position of clinical liaison. Thus, he cannot meet the fourth element of his *prima facie* case, namely, that, after his rejection, Abbott continued to seek applications from individuals of his qualification.

Because Andrews has [*29]  failed to meet his evidentiary burden with respect to the only incidents to have

2002 U.S. Dist. LEXIS 6832, *29; 82 Empl. Prac. Dec. (CCH) P41,102

allegedly occurred within either the Title VII or Section 1981 statute of limitations, the court will grant summary judgment on these claims. As there remain no incidents which occurred within the statute of limitations period for either Title VII or Section 1981, a "continuing violation" theory cannot save Andrews' remaining time-barred claims. *See Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997).*

## V. CONCLUSION

The court concludes that each of Andrews' claims must fail as being untimely or for lack of any supporting evidence of discrimination.

For these reasons, IT IS HEREBY ORDERED that:

1. Abbott's motion for summary judgment (D.I. 25) is GRANTED.

2. Judgment BE AND IS HEREBY ENTERED in favor of Abbott.

3. Abbott's motion to strike (D.I. 34) is GRANTED.

Date: April 18, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 2006 U.S. APP. LEXIS 10833

**ROBERT V. BAER, Appellant v. DAVID CHASE; CHASE FILMS, INC., A
Delaware Corporation; DC ENTERPRISES, INC.**

**No. 05-2425**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*177 Fed. Appx. 261; 2006 U.S. App. LEXIS 10833*

**March 7, 2006, Argued
May 1, 2006, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS
FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No.
02-cv-02334). District Judge: Honorable Joel A. Pisano.  *Baer v. Chase, 392 F.3d 609, 2004 U.S. App. LEXIS 26539
(3d Cir. N.J., 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff script consultant filed a suit against defendants, a producer, his production
company, and another company, alleging that he was entitled to be compensated for the services that he had provided to
defendants. The suit was remanded back to the United States District Court for the District of New Jersey for
consideration of the consultant's quasi-contract claim. He appealed again after summary judgment was entered for the
producer.

**OVERVIEW:** The consultant alleged that he was not properly paid for the services that he rendered in connection with
one of the producer's hit television series. The district court initially granted summary judgment to the producer as to all
of the consultant's claims. That judgment was affirmed on appeal except as to the consultant's quantum meruit claim.
The consultant appealed a second time after the district court, on remand, again concluded that his quasi-contract claim
was time-barred. The court found that the district court had misconstrued its prior opinion and had improperly evaluated
a 1997 letter that the consultant had sent, providing feedback on a script, based on whether the letter had provided a
benefit to the producer rather than on whether the letter constituted the last service performed for statute of limitations
purposes. The consultant's quasi contract claim was not time-barred under the applicable six-year statute of limitations
because the letter constituted the last date on which the consultant rendered services to the producer. The evidence
showed that the producer received the letter just as he was reworking the script that was the subject of the letter.

**OUTCOME:** The court reversed the district court's grant of summary judgment to the producer, granted summary
judgment to the consultant on his quantum meruit claim, and remanded the case back for further proceedings consistent
with the court's opinion.

**LexisNexis(R) Headnotes**

177 Fed. Appx. 261, *; 2006 U.S. App. LEXIS 10833, **1

*Contracts Law > Defenses > Statutes of Limitations*
*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN1] Although a service must confer value to be compensable under a quantum meruit theory, examining the benefit conferred by the last act tests the merits of the claim, not the date that the cause of action accrues for purposes of the statute of limitations. The issue for statute of limitations purposes is when the last service--regardless of its value--was rendered or performed in good faith.


*Civil Procedure > Appeals > Remands*
[HN2] The United States Court of Appeals for the Third Circuit expects its views to be heeded on remand.


*Contracts Law > Defenses > Statutes of Limitations*
*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN3] The value of a service is the measure for purposes of proving a prima facie quantum meruit claim. However, value is not determinative of whether, or when, a service was rendered, and therefore has no place in the analysis of when a quantum meruit claim accrues for purposes of the statute of limitations.

**COUNSEL:** Michael S. Kasanoff, Red Bank, NJ; Harley D. Breite, Wayne, NJ; Robert V. Baer [ARGUED ], Wayne, NJ, Counsel for Appellant.

Peter L. Skolnik, Lowenstein Sandler, Roseland, NJ, Counsel for Appellees.

**JUDGES:** Before: RENDELL and AMBRO, Circuit Judges, and SHAPIRO, District Judge *.

      * Honorable Norma L Shapiro, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** RENDELL

**OPINION:**

   [*262]  OPINION OF THE COURT

RENDELL, *Circuit Judge*.

    Plaintiff Robert Baer claims that he is entitled to compensation for suggestions and advice that he gave to defendant David Chase on a project that ultimately became the television series *The Sopranos*. We first heard this case in 2004, after the District Court had granted Chase summary judgment on all of Baer's claims. We affirmed in part, but reversed and [**2]  remanded the order as to Baer's *quantum meruit*, or quasi-contract, claim. On remand, the District Court again granted summary judgment in Chase's favor. Baer now appeals. Because we conclude that the District Court misconstrued our 2004 opinion, we will reverse, grant summary judgment to Baer on the narrow issue before us, and remand.

    **I.**

    The District Court originally concluded that Baer's quasi-contract claim was time-barred. *Baer v. Chase, 2004 U.S. Dist. LEXIS 3954, No. 02-CV-2334, 2004 WL 350050, at *9 (D.N.J. Feb. 20, 2004).* Baer filed his complaint on May

15, 2002. *Id. at *1*. The parties agreed that, under New Jersey law, a six-year statute of limitations applied, and that Baer's "quasi-contract claim accrued, if at all, when his final services were rendered." *Id. at *9*. Baer testified in a deposition that all of his services were rendered by the end of October 1995. In a later certification accompanying his opposition to Chase's motion for summary judgment, however, Baer claimed that his deposition testimony was "mistaken," and that the last service that he rendered was a letter, dated February 10, 1997, offering Chase feedback on a draft *Sopranos* script. n1 *Id.* [**3] [*263] The District Court declined to consider Baer's certification because it conflicted with sworn testimony, and was thus a "sham affidavit." *See id. at *9* (citing *Martin v. Merrell Dow Pharms., Inc., 851 F.2d 703, 705-06 (3d Cir. 1988)* (holding that a district court may disregard a subsequent affidavit where the changed testimony regards subject of "considerable importance" and is "the subject of repeated questioning")). It accordingly concluded that Baer's services were last rendered as of October 1995, and granted summary judgment to Chase. *Baer, 2004 U.S. Dist. LEXIS 3954, 2004 WL 350050, at *9*.

> n1 Chase had sent the draft script to Baer for comments fourteen months earlier, in December 1995. Baer's letter was fourteen paragraphs long, with seven paragraphs devoted to commentary on Chase's draft script. Baer offered mostly positive feedback, commending Chase for "'transforming an innovative idea into a marvelous screenplay.'" *Baer v. Chase*, No. Civ. A. 02-2334, 2005 WL 1106487, at *8 (D.N.J. Apr. 29, 2005) (quoting Baer's February 10, 1997 letter). He discussed various aspects of the draft script, including the narrative device, the characters, the dialogue between "Tommy Soprano" and "Melfi" and the alliance between Soprano's mother and uncle. Baer expressed some initial reservations, but ultimately concluded that the script was well done and praised Chase for his efforts. *Id.* The remaining paragraphs of the letter described events in Baer's life over the fourteen months since he and Chase had last communicated, mentioned a script that Baer was planning to send Chase for critique, and noted Baer's hope that he and Chase might meet up for a meal if Baer returned to Los Angeles. *Id.* at *7.

[**4]

On appeal, we disagreed with the District Court's refusal to consider the February 10, 1997 letter, believing that the situation was distinguishable from that presented in *Martin*, and held that the District Court "should have analyzed the letter and the circumstances surrounding it and Baer's certification when ruling on the summary judgment motion on the statute of limitations issue." *Baer v. Chase, 392 F.3d 609, 626 (3d Cir. 2004)*. We reversed the grant of summary judgment on this claim, and remanded "the question of whether Baer presented a timely and otherwise valid quasi-contract claim." *Id.*

Along the way, however, we provided additional commentary on the parties' arguments and instructions to the District Court in two footnotes. n2 In footnote 5, we addressed Chase's alternative arguments. Chase argued that the letter could not be considered a compensable service as a matter of law because it "had no value" to him; according to Chase, "it contained only cursory observations and laudatory phrases about his work." *Id.* at n.5. We disagreed, and cautioned the District Court not to view the letter in isolation in analyzing whether it was the "last service [**5] rendered" for statute of limitations purposes:

> Chase premises his argument on the assumption that in analyzing the statute of limitations for *quantum meruit* purposes we should dissect the last service rendered to deem if it provided value to the opposing party.

> We will not affirm the summary judgment on that basis. First, Baer's letter describes the aspects of the screenplay that he believes were successful, the parts to which he related personally, and what humor worked, and provided encouragement to continue with the project. . . . We will not write these contributions off, as Chase attempts to do, as "empty flattery."

> Additionally, we will not dissect each interaction between litigants to quantify the precise value of

each correspondence or service rendered. *The exchange of ideas and services should not be viewed as incremental, segregable interactions that we can assess individually for purposes of the statute of limitations.* A separate issue would arise if a litigant sent a correspondence or rendered a "sham service" in an attempt to avoid the statute. That situation, however, does not describe the circumstances before us. We will not engage in Chase's request [**6] to judge whether the February letter, taken in isolation, was a "compensable service." We are satisfied that Baer sent the letter and Chase received it, and thus at least at this time it will serve as the "last service rendered" for purposes of the statute of limitations calculus.

*Id.* (emphasis added).

> n2 We note at the outset that our dissenting colleague disagrees as to the meaning and import of these footnotes, and we recognize that reasonable minds could easily do so.

In footnote 6, we declined to order the District Court to enter summary judgment [*264] on the timeliness issue in Baer's favor. We noted that Baer had not moved for summary judgment in the District Court, and explained our ruling as follows:

> We go no further with respect to the statute of limitations issue than to hold that the district court should not have disregarded Baer's certification and it should have considered the February 10, 1997 letter. Therefore our analysis in *supra* note 5, will not preclude the district [**7] court on a fuller examination of the facts from coming to a conclusion contrary to ours as we write on the point merely for the limited purpose of addressing Chase's argument that we should affirm the summary judgment on a different basis than that of the district court.

*Id.* at n.6.

On remand, the District Court concluded that we had instructed it to reconsider the timeliness of Baer's claim, although it noted that the footnotes in our opinion had "confused the matter." *Baer v. Chase*, No. Civ. A. 02-2334, 2005 WL 1106487, at *4 (D.N.J. Apr. 29, 2005). In addressing this issue, the District Court found that the "basic question to be answered" was "whether the February 10, 1997 letter amounts to a rendition of services." *Id.* at *8. The Court analyzed the contents of the letter and found that it did not amount to a "service" because it did not "confer a benefit" to Chase. *Id.* at *9. Accordingly, it once again concluded that Baer's cause of action accrued no later than October 1995, and that it was time-barred. The District Court again granted summary judgment in Chase's favor. *Id.*

## II.

We believe that the District Court misunderstood [**8] our last opinion. While we remanded "the question of whether Baer presented a timely and otherwise valid quasi-contract claim," *Baer, 392 F.3d at 626*, we did so with a clear admonition that the District Court was not to consider the value of the letter in isolation. n3 On remand, however, it did just that. The District Court focused solely on whether the February 10, 1997 letter itself provided something of value, rather than considering whether there was some factual basis for concluding that it should not constitute the last service rendered. This approach distorts the statute of limitations analysis. [HN1] Although a service must confer value to be compensable under a *quantum meruit* theory, examining the benefit conferred by the last act tests the *merits* of the claim, not the date that the cause of action accrued for purposes of the statute of limitations. The issue for statute of limitations purposes is *when* the last service-regardless of its value-was rendered or performed in good faith. n4

> n3 The dissent takes us to task for assuming that our reference to "we" in footnote 5 was a directive to the District Court. The footnote did convey our view of how the letter should be analyzed, but [HN2]

177 Fed. Appx. 261, *264; 2006 U.S. App. LEXIS 10833, **8

we would expect our view to be heeded on remand.

[**9]

n4 The dissent contends that the "measure" of a service is whether it confers "value." We agree; [HN3] value is the *measure* for purposes of proving a *prima facie* claim. However, value is *not* determinative of whether, or when, a service was rendered, and therefore has no place in the analysis of when a claim accrued for purposes of the statute of limitations.

In footnote 5 of our last opinion, we examined and rejected Chase's argument that the letter was not a "service" as a matter of law. *Id.* at n.5. In footnote 6, we stated that our analysis in footnote 5 would "not preclude the district court *on a fuller examination of the facts* from coming to a conclusion contrary to ours." *Id.* at n.6 (emphasis added). By this we left open the possibility that different facts might come to light demonstrating that the letter was not a service rendered. We [*265] simply made it possible for the District Court to consider facts or alternative theories that were not before us. n5

n5 We allowed that "a separate issue would arise" if Chase had produced evidence on remand that Baer had sent the letter "in an attempt to avoid the statute." *Baer, 392 F.3d at 626 n.5.* For example, Chase might have shown that he had specifically told Baer not to respond to the script, but that Baer wrote the 1997 letter anyway to bring his claim within the statute of limitations. Under such circumstances, the District Court could have granted summary judgment to Chase in keeping with our opinion.

[**10]

Having reviewed the record, however, we conclude that the parties did not adduce any new facts on remand that would undermine the view that February 10, 1997 was the date of the last service rendered by Baer. The three new certifications that Chase introduced did little more than establish a timeline of events surrounding Chase's receipt of Baer's letter. *See* App. 1225-56. These events speak only to the *value* or *usefulness* of the letter to Chase, not to its status as part of the services rendered. n6 As we noted in our last opinion, "we will not dissect each interaction between litigants to quantify the precise value of each correspondence or service rendered." *Baer, 392 F.3d at 626 n.5.* Examining Baer's course of conduct as a whole, we see no reason why the February 10, 1997 letter should not be considered the last step taken in the services that he rendered. Thus, we once again conclude that the February 10, 1997 letter was the "last service rendered" for purposes of the statute of limitations, and that Baer's quasi-contract claim was timely.

n6 In connection with its assessment of the potential usefulness of the letter to Chase, the District Court concluded that the letter arrived "too late." However, the evidence establishes that the letter arrived just as Chase was re-working his script to submit it to HBO.

[**11]

**III.**

In light of the foregoing, we will reverse the District Court's order granting summary judgment to Chase, direct the Court to enter summary judgment in favor of Baer on the statute of limitations issue, and remand for further proceedings consistent with this opinion.

177 Fed. Appx. 261, *265; 2006 U.S. App. LEXIS 10833, **11

**DISSENT BY:** AMBRO

**DISSENT:** AMBRO, Circuit Judge, dissenting

I empathize with Judge Pisano's predicament (and soon to be frustration). To review, on summary judgment Judge Pisano ruled against Baer on each of his claims--ten in all. Our Court affirmed all that Judge Pisano did except for the quasi-contract claim. We remanded that issue to the District Court for consideration of the February 10, 1997 letter that Baer wrote to Chase fourteen months after Chase sent Baer a script that, by 1997, was several stages more developed. In so doing, our Court (per another panel) told Judge Pisano to "analyze[] the [February 10, 1997] letter and the circumstances surrounding it . . . when ruling on the summary judgment motion on the statute of limitations issue." *Baer v. Chase, 392 F.3d 609, 626 (3d Cir. 2004)* ("Baer I"). Our Court then added two footnotes (5 and 6) that "confused the matter. [**12] " Baer v. Chase, 2005 WL 1106487, at *4 (D.N.J. 2005) ("Baer II"). As the District Court noted,

> the Court of Appeals, in Note 5, declines to address the merits of Chase's substantive defenses raised in the alternative to the quasi-contract claim. However, in doing so the Court appears to discuss and dismiss those very arguments. Moreover, when the Court of Appeals writes that "at least at this time [the February [*266] 10, 1997 letter] will serve as the 'last service rendered' for purposes of the statute of limitations calculus," it appears to conclude that this [District] Court need not determine whether the quasi-contract claim was timely. In light of Note 6, however, it is apparent that the Court of Appeals made no such conclusion. . . . [It] clarifies that it did not intend to rule on Chase's alternative arguments [as to the statute of limitations barring Baer's quantum meruit claim even with the February 10, 1997 letter in evidence] because they were not the subject of . . . [the District] Court's prior opinion. Moreover, the Court of Appeals acknowledges that this Court is free to accept Chase's alternative arguments upon fuller examination [**13] "with respect to the statute of limitations issue."

Id. at *5-6 (emphasis in original).

I agree with this reading of our troublesome footnotes. In note 5 of our prior opinion, we stated (in the context of arguments that had never been presented to the District Court) that "we will not dissect each interaction between litigants to quantify the precise value of each correspondence or service rendered" because "the exchange of ideas and services should not be viewed as incremental, segregable interactions that we can assess individually for purposes of the statute of limitations," and thus since "Baer sent the letter and Chase received it, . . . at least at this time it will serve as the "last service rendered" for purposes of the statute of limitations calculus." *Baer I, 392 F.3d at 626 n.5* (emphases added). We then made clear in note 6 that our analysis was limited solely to our consideration of these arguments "for the limited purpose of addressing Chase's argument that we should affirm the summary judgment on a different basis than that of the district court." *Id. at 626 n.6*. We went out of our way to state that our [**14] holding went "no further with respect to the statute of limitations issue than to hold that the district court should not have disregarded Baer's certification and it should have considered the February 10, 1997 letter," but that the District Court was, upon "a fuller examination of the facts," free to reach "a conclusion contrary to ours" on the issue of whether the letter was the last service rendered. Id.

I think the District Court's interpretation of these convoluted instructions--that our dicta regarding whether the letter was the last service rendered was tentative, intended solely to dispose of the arguments prematurely raised on appeal, and that, upon a proper motion for summary judgment on remand, the District Court could consider the factual record and come to its own conclusion--is both entirely reasonable and fully consistent with what it did. Alas, my colleagues in the majority do not agree. They believe that what our Court did in its prior opinion was to "conclude that the February 10, 1997 letter was the 'last service rendered' for purposes of the statute of limitations, and that Baer's quasi-contract claim was timely."

177 Fed. Appx. 261, *266; 2006 U.S. App. LEXIS 10833, **14

In reaching this conclusion, my majority [**15] colleagues decide that the District Court should not have "examined" the benefit conferred by the last act" because to do so "tests the merits of the claim, not the date that the cause of action accrued for purposes of the statute of limitations" (emphasis in original). This is the second source of my disagreement with the majority opinion. In my view, determining whether an act is the last service rendered for purposes of the statute of limitations requires some consideration of the "merits" of the claim. This analysis is consistent with the limited nature of the statute of limitations inquiry and does not impermissibly intrude on the plaintiff's case-in-chief.

To recover on a quasi-contract theory under New Jersey law, a plaintiff must [*267] prove that: (1) he performed services in good faith; (2) the intended beneficiary accepted the services; (3) he had a reasonable expectation of compensation for the services rendered; and (4) the value of the services is reasonable. *Goldberger, Seligsohn & Shinrod, P.A. v. Baumgarten, 378 N.J. Super. 244, 875 A.2d 958, 964 (N.J. App. Div. 2005).* As noted in our first opinion in this case, New Jersey's six-year statute of limitations [**16] for recovery in quantum meruit runs from the date of the "last rendition of services." *Baer I, 392 F.3d at 622-23* (citing cases). A "service" in this context is not simply any action that one party directs at another. Rather, in New Jersey and elsewhere, the measure of a "service" is whether the act confers "value" on the intended beneficiary. See *Friedlander v. Gross, 63 N.J. Super. 470, 164 A.2d 761, 763 (N.J. App. Div. 1960)* (noting that it was "elementary that plaintiff was not entitled to recover [in quantum meruit] the fair value of the work done . . . since the work . . . had no value to the defendant"); see also *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp., 907 F.2d 732, 745 (7th Cir. 1990)* ("The correct measure for quantum meruit recovery is expressed by the amount which the court considers defendant has been unjustly enriched at the expense of plaintiff. . . . [This] is generally the lower of these two: the economic cost to plaintiff of providing a benefit or the economic enrichment of defendant in receiving it.").

The majority relies on our statements in Baer I--that "we will not dissect each interaction [**17] between litigants to quantify the precise value of each correspondence or service rendered" because "the exchange of ideas and services should not be viewed as incremental, segregable interactions that we can assess individually for purposes of the statute of limitations," and thus since "Baer sent the letter and Chase received it, . . . at least at this time it will serve as the 'last service rendered' for purposes of the statute of limitations calculus," *392 F.3d at 626 n.5*--for its holding that the District Court was constrained (absent some new evidence that Baer's letter was a sham or, perhaps, never sent at all) to find that the letter was the last service rendered. But not only were our statements in Baer I dicta (since none of these arguments had been presented to the District Court), they were not supported by citations to New Jersey law.

As I read New Jersey law, the statute of limitations runs from the date of the last rendition of services, and this requires some consideration of whether an act was a "service" as that term in understood in the context of quasi-contracts. I thus do not agree with the majority's statement that "the issue for statute of limitations [**18] purposes is when the last service-- regardless of its value--was rendered or performed in good faith" (emphasis in original), because in New Jersey an act is not a "service" unless there was some value to begin with. n7

n7 Obviously, I disagree with the majority's statement that "value is not determinative of whether, or when, a service was rendered, and therefore has no place in the analysis of when a claim accrued for purposes of the statute of limitations" (emphasis in original). To be sure, as I explain below, consideration of whether the value conveyed by a service resulted in unjust enrichment is only relevant when considering the merits of a claim for quantum meruit recovery. But in deciding whether an act is a "service" in the first place, the existence of some value is (I think) the determinative factor.

To be sure, our dicta in Baer I that the determination of whether an act qualifies as a "service" for purposes of the statute of limitations cannot be made in isolation is, [**19] to some extent, correct. But in my view the statement merely establishes the unremarkable, common-sense proposition that one cannot isolate a particular act (in [*268] this case, Baer's February 1997 letter) and determine whether it conveyed some value on the recipient without reference to

anything that came before in the parties' relationship. It would be wrong, for example, if the District Court treated the two parties as strangers and the letter as a segregable act devoid of context. The District Court did not commit such an error. It merely (and properly, I submit) looked to the substance of the letter and the circumstances surrounding its receipt to determine whether, in light of all that came before in the parties' relationship, it constituted a "service" that had some "value" to Chase such that it could be counted as the start of the limitations period. The District Court certainly did not, as Baer suggests in his brief, treat the letter "as though Baer was a stranger to Chase who had lifted the script out of a trash can and sent out an unsolicited critique." Appellant's Br. at 53.

Yet the majority faults the District Court nonetheless, and in doing so takes our dicta in Baer  [**20]  I a step further than I would. In the majority's view, because Baer and Chase had some prior relationship, it makes no difference at this stage whether Chase obtained any value from the letter (and thus whether it was a "service" rendered to Chase); such an inquiry, we are told, would pre-judge the "merits" of this case. This is, I think, more akin to a "last act" test than a "last service rendered" test. Indeed, under the majority's reasoning, I find it difficult to conceive of an act that would not serve as the "last service rendered" for statute of limitations purposes, as long as, at some time over the course of the parties' dealings, one performed a service for the other.

I do not, of course, mean to suggest that the full merits of Baer's claim must be litigated for a court to determine whether his claim is timely. We do not need to know, for example, whether the value Chase received, if any, caused unjust enrichment, which is the touchstone of quantum meruit recovery. See *Weichert Co. Realtors v. Ryan, 128 N.J. 427, 608 A.2d 280, 285-86 (N.J. 1992)*. But that is far from saying we do not need to know if Baer's final alleged act was a "service" at all.  [**21]  The District Court appropriately analyzed this question, and I do not read Baer I to foreclose such consideration.

I am persuaded that the District Court was entitled to consider the value of the letter to Chase in order to determine whether the limitations period began in February 1997 or earlier. The Court concluded that Baer's February 1997 letter to Chase was not the last service rendered; indeed, it was not a "service" at all because it arrived far too late to be of any use to Chase. In keeping with our instruction that the District Court could reach such a conclusion "on a fuller examination of the facts," *Baer I, 392 F.3d at 626 n.6*, it considered additional certifications by Chase, and Baer submitted no new facts. Upon that record, I do not see how the Court could have avoided denying Baer's motion for partial summary judgment on the statute of limitations issue--especially since, on consideration of such a motion by Baer, all facts were to be viewed in the light most favorable to Chase. I surely do not think the Court's "fuller examination of the facts" was so deficient as to merit reversal. For these reasons, I respectfully dissent.

LEXSEE 1998 BANKR. LEXIS 984

**In Re: BIG WHEEL HOLDING COMPANY, INC., et al., Debtors. BIG WHEEL
HOLDING COMPANY, INC., et al., Plaintiff, v. FEDERAL WHOLESALE CO.,
Defendant. BIG WHEEL HOLDING COMPANY, INC., et al., Plaintiff, v.
FEDERAL WHOLESALE CO. EAST, Defendant.**

**Chapter 11, Case No. 93-796 Jointly Administered, Adversary No. A-95-67,
Adversary No. A-95-66**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

*223 B.R. 669; 1998 Bankr. LEXIS 984*

**May 29, 1998, Decided**

**DISPOSITION:** [**1] Federal Wholesale's, Federal East's motions to strike GRANTED with respect to. Paragraphs 10 and 11 of the affidavit of Albert Agostinelli and Paragraphs 2, 3, 6, 7 of the affidavit of Richard Jones, and with respect to the language of paragraph 8. Motions for summary judgment of the defendants Federal Wholesale, Federal Wholesale East GRANTED. Complaint DISMISSED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In adversary proceedings plaintiff post-confirmation committee of unsecured creditors (committee) brought preference actions under *11 U.S.C.S. § 547* against defendant debtors. The committee filed motions for partial summary judgment in each action, and the respective debtors filed motions for summary judgment based upon the ordinary course of business defense and brought motions to strike the committee's supporting affidavits.

**OVERVIEW:** The committee argued that the debtors could not assert the ordinary course of business defense, *11 U.S.C.S. § 547*(c), with respect to transfers made after a creditor sent reclamation notices and stopped shipments of goods. The debtors claimed the affidavits contradicted deposition testimony and lacked a proper foundation. The court refused to give any weight to conclusory and unsupported allegations in the affidavits, struck paragraphs that contradicted the affiants' deposition testimony, and struck reports of payment prepared in anticipation of litigation because they were not business records. The court held that the debtors' evidence provided the proof for the committee's prima facie cases for preference under *11 U.S.C.S. § 547*(b). The debtors proved their defense because (1) late payment did not preclude a finding that payment was made in the ordinary course, (2) the payments were consistent with past practices, and (3) the parties' dealings did not fall outside the range of terms that encompassed practices in which similar creditors engaged. The court refused to add a requirement that the defense was only available when creditors continued to deal with distressed debtors.

**OUTCOME:** The court granted both of the debtors' motions for summary judgment and dismissed the committee's complaints. The court granted the debtors' motions to strike with respect to paragraphs that contradicted the affiants' deposition testimony and the report of payments.

**LexisNexis(R) Headnotes**

223 B.R. 669, *; 1998 Bankr. LEXIS 984, **1

**Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies**
**Civil Procedure > Summary Judgment > Standards > Legal Entitlement**
**Civil Procedure > Summary Judgment > Standards > Materiality**
[HN1] In considering motions for summary judgment in an adversary proceeding in the bankruptcy court, the court will view the record and the inferences therefrom in the light most favorable to the non-movant committee. *Fed. R. Bankr. P. 7056(c)*. If the record shows no genuine issue as to any material fact, and that the respective defendant is entitled to judgment as a matter of law, then summary judgment shall be granted.

**Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview**
**Civil Procedure > Justiciability > Ripeness > General Overview**
**Civil Procedure > Summary Judgment > Evidence**
[HN2] In an adversary proceeding in the bankruptcy court, where the movant has produced evidence in support of summary judgment, the committee may not rest on the allegations set forth in its pleadings, but must counter with evidence that demonstrates a genuine issue of fact.

**Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > General Overview**
**Evidence > Hearsay > Exceptions > Business Records > General Overview**
[HN3] A report prepared in anticipation of filing an adversary proceeding is not a business record.

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers**
[HN4] See *11 U.S.C.S. § 547*.

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers**
**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers > Exemptions >**
**Ordinary Course Payments**
[HN5] See *11 U.S.C.S. § 547*(c)(2).

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers**
**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers > Exemptions >**
**Ordinary Course Payments**
[HN6] With respect to *11 U.S.C.S. § 547*(c)(2)(B), lateness of payment does not preclude a finding that the payment was made in the ordinary course, and indeed a pattern of late payments can establish an ordinary course between the parties.

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers**
**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers > Exemptions >**
**Ordinary Course Payments**
[HN7] With respect to *11 U.S.C.S. § 547*(c)(2)(C), ordinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so unusual as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of § 547(c)(2)(C).

**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers**
**Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers > Exemptions >**
**Ordinary Course Payments**
[HN8] The court declines to create a requirement that .the ordinary course exception to the preference rule is available

223 B.R. 669, *; 1998 Bankr. LEXIS 984, **1

only where the creditor continues dealing with a distressed debtor so as to kindle its chances of survival without costly detour through bankruptcy.

***Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Preferential Transfers > Exemptions > Ordinary Course Payments***
***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Governments > Legislation > Interpretation***
[HN9] The court's role is to rule upon whether the requirements of *11 U.S.C.S. § 547*(c)(2) have been satisfied on the basis of the statutory language and upon relevant case law interpreting that language.

**COUNSEL:** Kevin Gross, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, for Plaintiff.

James W. Owen, Esquire, Wilmington, DE, for Defendant.

**JUDGES:** HONORABLE M. BRUCE MCCULLOUGH, United States Bankruptcy Judge.

**OPINION BY:** M. BRUCE MCCULLOUGH

**OPINION:** [*670] Counsel:

This is the Court's decision on dispositive motions in each of two related adversaries proceedings, A95-66 and A95-67. Each adversary is a preference action brought by the Official Post-Confirmation Committee of Unsecured Creditors of Big Wheel (the "Committee") and against Federal Wholesale Co. East ("Federal East") for $ 626,215.84 in A95-66, and against Federal Wholesale Co. for $ 287,162.25 in A95-67. In each action, the Committee has moved for partial summary judgment, and the respective defendant has moved for summary judgment. The central question these [**2] motions raise is whether a creditor can assert the ordinary course affirmative defense contained within the preference statute of the Bankruptcy Code with respect to transfers made after that creditor sends a reclamation notice and terminates shipments of goods to a Debtor. These are core matters. *28 U.S.C. § 157*(b)(2)(F).

I. Legal Standard

In each of these adversaries, the record consists of undisputed facts, admissions in the pleadings, exhibits attached to the briefing, and affidavits. The Court will consider the issues in the context of each defendant's motion for summary judgment. [HN1] In considering those motions, the Court will view the [*671] record and the inferences therefrom in the light most favorable to the non-movant Committee. Fed. R. Bankr. P. 7056(c). If this record shows no genuine issue as to any material fact, and that the respective defendant is entitled to judgment as a matter of law, then summary judgment shall be granted. *Hon v. Stroh Brewery Co., 835 F.2d 510, 512 (3d Cir. 1987).* [HN2] Where the movant has produced evidence in support of summary judgment, the Committee may not rest on the allegations set forth in its pleadings, but must counter with evidence that [**3] demonstrates a genuine issue of fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358 (3d Cir. 1994),* cert. denied, *507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993).* The Court agrees with the parties that the material facts here are undisputed, and that the dispositive legal issues raised are ripe for Court decision. The following facts are appropriate to consider.

II. Facts

Prepetition, the Debtor operated a chain of discount department stores in the Northeastern United States. Commencing in 1992, and through April 1994, the defendant Federal East has operated as a wholesale distributor of consumer merchandise to retailers. The defendant Federal Wholesale is in the same business as Federal East, and has been in existence since 1980. The Debtor was a customer of both Federal Wholesale and Federal East, and the Debtor had conducted business with each entity for more than one year prepetition.

223 B.R. 669, *671; 1998 Bankr. LEXIS 984, **3

A. Facts Concerning Federal East

The remainder of the discussion of the facts and law in the action against Federal Wholesale is contained in section IV. below. With respect to Federal East, the Debtor ordinarily purchased goods on 30 day terms. The [**4] Debtor's practice was to pay multiple invoices owed to Federal East with one payment. During the 90 days prior to its petition, the Debtor made 12 payments to Federal East ranging from $ 22,000 to $ 78,000, and according to the complaint, totaling $ 626,215.84. The payments were made during the time period April 14, 1993 through June 30, 1993. Each payment satisfied the obligation for numerous previously submitted invoices from Federal East to the Debtor. The 12 payments paid a total of 1338 invoices. The Committee concedes that the timeliness of payments made to Federal East during the 90 days prior to the filing of Debtor's petition for relief was generally consistent with the Debtor's past payment practices. There were no intensified or heightened collection activities by Federal East during the 90 days preceding the bankruptcy filings.

On June 11, 1993, Federal East served a letter notice of reclamation on Albert Agostinelli, chief financial officer for the Debtor pursuant to *section 2-702 of the Uniform Commercial Code*. The letter, dated June 11, demanded the return of all goods delivered to the Debtor within the last 10 days. The letter did not demand any payments. Federal East [**5] stopped shipping goods to the Debtor on June 11.

The last three payments from the Debtor to Federal East occurred after June 11 ($ 44,215.11 on June 15, $ 78,030.98 on June 23, and $ 51,943.15 on June 30) and totaled $ 174,189.24. There is no evidence that the Debtor paid these invoices because of the reclamation notice of Federal East. The Debtor and related Big Wheel companies filed their Chapter 11 petitions on July 8, 1993.

The Committee's complaint against Federal East alleges these circumstances, and seeks to avoid the 12 prepetition transfers during the 90 days prior to its petition in a total amount of $ 626,215.84. The answer of Federal East challenges the Committee's prima facie case, and raises three affirmative defenses: *11 U.S.C. § 547*(c)(1) (contemporaneous exchange for new value), § 547(c)(2) (ordinary course of business), and § 547(c)(4) (new value).

The Committee has moved for summary judgment for $ 173,558.24, which is the sum of the last three transfers ($ 44,215.11, $ 78,030.98, and $ 51,943.15) minus $ 631.00 in conceded new value. As to the remainder of the transfers, the Committee's position is not clear. At best, it believes that there are disputed [**6] issues of fact in connection with the affirmative defenses. As the discussion below will show, however, there are no issues of [*672] material fact that prevent this Court from ruling upon the legal issues.

Federal East has moved for summary judgment as to all 12 transfers and the entire $ 626,215.84 amount claimed by the Committee in the complaint. Federal East argues it is entitled to judgment on the prima facie case of the Committee, and on its affirmative defenses under subsections 547(c)(2) and 547(c)(4).

III. Discussion of Federal East's Summary Judgment Motion in A95-66

A. The Motion to Strike

The Committee has attached two affidavits in support of its motion for partial summary judgment and in opposition to the summary judgment motion of Federal East. Both affidavits were created after the close of discovery. Federal East moves to strike each affidavit.

The first affidavit is that of Albert Agostinelli. According to his affidavit, during the relevant time period, he was chief financial officer of the Debtor and supervised the accounts payable operations. In the 11 paragraphs of the affidavit, Agostinelli testifies to certain background information, and to [**7] certain practices of the Debtor, in general and with respect to Federal East. In its answering brief to the Committee's summary judgment motion, Federal East has

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 26 of 31

Page 5

223 B.R. 669, *672; 1998 Bankr. LEXIS 984, **7

moved to strike this affidavit, for two reasons: (1) that the affidavit does not provide sufficient foundation for it to be admissible pursuant to Rule 56(e); and (2) that the conclusory testimony contained in the affidavit is contradicted by much more specific deposition testimony of Agostinelli (attached to the motion papers of Federal East).

According to this deposition testimony, Agostinelli had no personal knowledge of the challenged transfers, or the credit terms that existed between the parties. In its reply brief, the Committee's only response to the motion to strike is that during the deposition Agostinelli was intentionally denied access to the relevant documents. This conclusory and unsupported allegation will not be given any weight. Agostinelli's deposition testimony was very clear that he was not involved in payment terms with Federal East. Rather, the Debtor's buyers, merchandise managers, and two vice-presidents of merchandise were involved in the credit terms. Deposition of Albert Agostinelli, docket no.  [**8] 29, tab 2, pages 49-52. Upon review of the affidavit and the deposition testimony brought to the Court's attention by Federal East, the background testimony of Agostinelli survives the motion to strike of Federal East. However, paragraphs 10 and 11 of the affidavit contradict Agostinelli's deposition testimony and are stricken. *Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 705-06 (3d Cir. 1988).*

Federal East has also moved to strike the affidavit of Richard Jones, controller of Fishers Big Wheel. In his affidavit, Jones states he personally reviewed the Debtor's records of payments made and shipments received during the relevant time period, and testifies as to payments made to Federal East, and other details. Upon review of the affidavit and the deposition testimony brought to the Court's attention by Federal East, paragraphs 2, 3, 6, 7 of the affidavit contradict Jones' deposition testimony and are stricken. The language of paragraph 8 that states "and involved in responding to" contradicts his deposition testimony, and is stricken. n1

> n1 In his deposition, Jones testified that he was not involved in responding to the reclamation demand of Federal East, other than to pass it on to legal counsel in New York, who then dealt with the demand. Deposition of Richard L. Jones, docket no. 29, tab 3, pages 83-85.

[**9]

Jones prepared a report of payments made to, and shipments received from Federal East. Jones admitted at his deposition that [HN3] the report, attached to his affidavit as Exhibit A, was prepared in anticipation of filing the adversary proceeding. Thus, the report is not a business record. The report is stricken.

B. The Prima Facie Case has Been Proved.

The first two elements of the Committee's prima facie case are stated in section 547(b):

[HN4]
*11 U.S.C. § 547* **Preferences**
(b) Except as provided in subsection (c) of this section, the trustee may avoid any  [*673]  transfer of an interest of the debtor in property--
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

To satisfy its burden on the elements of section 547(b), the Committee relies upon the Jones' affidavit, portions of which have been stricken. The portion of Jones' affidavit that remains does not prove the 12 transfers were made. The Committee also refers to checks and check registers, however, these documents were not attached to the Committee's papers. If the affidavit of Jones were the only evidence germane [**10] to the Committee's prima facie case, Federal East would be correct that the Committee has not met its burden on the elements of section 547(b).

Fortunately for the Committee, however, Federal East's own Rule 7056 evidence supplies the testimony needed to

223 B.R. 669, *673; 1998 Bankr. LEXIS 984, **10

meet the Debtor's burden on these elements. The affidavit of Robert Greenwald, C.P.A., J.D., C.F.E., contains a detailed report of transfers between the Debtor and Federal East, and includes the three transfers at issue, and corresponding invoices. For each transfer, the invoice date precedes the transfer date. The Committee has proved a prima facie case, except that the total of the transfers within the 90 day preference period is only $ 625,585.92 (the Committee's complaint alleged the total of the transfers was $ 626,215.84).

C. Federal East has Proved the Affirmative Defense of Ordinary Course Payments.

In this summary judgment motion, Federal East argues two of the affirmative defenses it raised in its answer entitle it to judgment as a matter of law. Only the affirmative defense pursuant to section 547(c)(2) need be considered. That subsection states:

[HN5]
(c) The trustee may not avoid under this section [**11] a transfer--

***

(2) to the extent that such transfer was--
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms.

Federal East asserts this defense as to each of the 12 transfers. The Committee concedes section 547(c)(2)(A) is satisfied; but argues section 547(c)(2)(B) and section 547(c)(2)(C) are not satisfied.

In support of its burden to prove the section 547(c)(2) defense, Federal East has presented the affidavits of Thomas P. Bianco, Richard F. Henry, and Robert M. Greenwald. Greenwald is an accountant. He analyzed the payment patterns from the Debtor to Federal East during the time period January 1, 1993 through April 8, 1993, and during the time period April 9, 1992 through July 8, 1993. With respect to this last time period, Greenwald found that $ 569,088.22 of the transfers paid the invoices of Federal East within the range of 30 to 45 days from the date of invoice. For $ 56,497.70 of the transfers, the delay was longer. [**12] The longest payment delay of the 1338 invoices paid by the 12 relevant transfers was 133 days. Report of Greenwald, docket no. 29, tab 5.

Thomas P. Bianco was and is president and chief executive officer of Federal East. According to Bianco, the credit terms between the parties remained consistent throughout the business relationship. Bianco explained that longer payment delays of the type present here do occur, and are caused when the invoice was misplaced or misdelivered, or where there was a billing question that the parties were attempting to resolve. Usually, when such a late payment is tendered, it is remitted as part of a larger payment encompassing numerous other invoices. This practice occurred with the Debtor throughout the relationship with Federal East, and has occurred with other customers of Federal East. Affidavit of Bianco, docket no. 29, tab 1, page 2-4.

Richard F. Henry is the executive vice-president and chief financial officer of Professional [*674] Housewares Distributors. He testified as to the practices in the wholesale consumer merchandising business involving sales to large discount retail stores industry. In his view, when an invoice is stated due "net 30 days" [**13] it is and was in 1993 considered ordinary and normal for those invoices to be actually paid 30-50 days from invoice date. He also opined that further delays were common and not unusual when invoices were lost or missing, or when intermediaries were involved. Affidavit of Henry, docket no. 29, tab 6, page 2-3.

[HN6] With respect to subsection 547(c)(2)(B), lateness of payment does not preclude a finding that the payment was made in the ordinary course, and indeed a pattern of late payments can establish an ordinary course between the

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 28 of 31

Page 7

223 B.R. 669, *674; 1998 Bankr. LEXIS 984, **13

parties. E.g., *In re Parkline Corporation, 185 B.R. 164, 169 (Bankr. D.N.J. 1994)*. The unrebutted testimony in this proceeding establishes that the late payments were the ordinary course of business between the parties. Indeed, the Committee "concedes that the timeliness of payments made to Defendant during the 90 days prior to the filing of Debtor's petition for relief was generally consistent with past practices." Answering Brief, Docket no. 36 at 2. See also *In re Rave Communications, Inc., 128 B.R. 369 (Bankr. S.D.N.Y. 1991)* (where invoice stated "net 30 days," payments made from 55 to 146 days past invoice date held within ordinary course of business). [HN7] [**14]

With respect to subsection 547(c)(2)(C), ordinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so unusual as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C. *In re Molded Acoustical Products, Inc., 18 F.3d 217 (3d Cir. 1994)* (citing *In re Tolona Pizza Products Corp., 3 F.3d 1029 (7th Cir. 1993)* (discussing the meaning of the phrase "ordinary business terms" as used in subsection 547(c)(2)(C)). The Committee does not argue that the terms of the transfers in and of themselves were in some way so unusual as to fail the standard of the Molded Acoustical Products case.

Indeed, as to the nine transfers made before June 11, the Committee has presented no argument as to why judgment should not be entered in favor of Federal East upon its affirmative defense of section 547(c)(2).

In reference to the three transfers made after June 11, the Committee's sole argument that Federal East has not satisfied section 547(c)(2)(B) and section 547(c)(2)(C) focuses upon the fact that Federal East [**15] served a reclamation notice and stopped all shipments of goods at that time. The Committee argues that this conduct qualifies as a dramatic and radical change from the past course of dealing of the Debtor and Federal East, and that therefore, Federal East departed from the ordinary course of business. The Committee latches onto language of the Third Circuit Court of Appeals in the Molded Acoustical Products case that "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed Debtor so as to kindle its chances of survival without a costly detour through . . . bankruptcy." *18 F.3d at 219*. Because Federal East did not continue to deal with the Debtor, the Committee concludes that the purpose of the ordinary course exception is not satisfied and that the affirmative defense of section 547(c)(2) should not be available as a matter of law.

The problem with this argument is that it relies upon a stated purpose of a statutory section taken out of context, and not the language of the section. The quote from the Molded Acoustical Products case was in the context of a general discussion by the Third Circuit Court of Appeals [**16] of the competing policies of the preference statute, and in an attempt to give subsection 547(c)(2)(C) meaning independent from that of subsection 547(c)(2)(B). The Molded Acoustical Products case does not require Federal East to continue to do business with the Debtor after receiving ordinary course payments from the Debtor to avail itself of the affirmative defense of section 547(c)(2). The Committee has not cited any other case law that supports its legal theory. That theory would effectively engraft a fourth and [*675] conjunctive requirement onto section 547(c)(2), that the ordinary course exception to the preference rule is available only where the creditor "continues dealing with a distressed Debtor so as to kindle its chances of survival without a costly detour through bankruptcy." [HN8] The Court declines to create such a requirement.

[HN9] This Court's role is to rule upon whether the requirements of section 547(c)(2) has been satisfied on the basis of the statutory language and upon relevant case law interpreting that language. Federal East has presented evidence in this summary judgment motion that satisfies the language of section 547(c)(2). The Court holds as a matter of law that all [**17] 12 transfers were made in the ordinary course of business of the Debtor and Federal East within the meaning of section 547(c)(2)(B); and that the transfers were made according to ordinary business terms within the meaning of section 547(c)(2)(C).

IV. Federal Wholesale Proceeding, A95-67

A. Facts Concerning Federal Wholesale

Case 1:05-cv-00697-MPT    Document 55-5    Filed 10/04/2006    Page 29 of 31

Page 8

223 B.R. 669, *675; 1998 Bankr. LEXIS 984, **17

With respect to Federal Wholesale, the material facts are almost identical. The Debtor ordinarily purchased goods from Federal Wholesale on 30 day terms. During the 90 days prior to its petition, the Debtor made 13 payments to Federal Wholesale ranging from $ 7,000 to $ 185,000. Each payment satisfied the obligation for numerous previously submitted invoices from Federal Wholesale to the Debtor (a total of 2337 invoices). The Committee concedes that the timeliness of payments made to Federal Wholesale during the 90 days prior to the filing of Debtor's petition for relief was generally consistent with past practices.

On June 11, 1993, Federal Wholesale served a letter notice of reclamation on Agostinelli. The letter, dated June 11, demanded the return of all goods delivered to the Debtor within the last 10 days. The letter did not demand any payments.  [**18]  Federal Wholesale stopped shipping goods to the Debtor on June 11.

The last four payments from the Debtor to Federal Wholesale totaled $ 287,162.25--checks were issued for $ 152,024.94 on June 9, for $ 78,518.70 on June 9, for $ 50,015.65 on June 11, and for $ 7,090.03 on June 18. There is no evidence that the Debtor paid these invoices because of the conduct of Federal Wholesale, and indeed, two of these payments were issued before the reclamation notice was received by the Debtor.

The Committee's complaint against Federal Wholesale alleges these circumstances, and seeks to avoid the 13 prepetition transfers in a total amount of $ 1,085,163.81. The answer of Federal Wholesale challenges the Committee's prima facie case, and raises the same three affirmative defenses Federal East raised.

The Committee has moved for summary judgment for $ 287,162.25, which is the sum of the last four transfers ($ 50,015.65, $ 7,090.03, $ 152,024.94, $ 78,518.70), minus $ 487.07 in conceded new value. As to the remainder of the transfers, the Committee's position is not clear. At best, it believes that there are disputed issues of fact in connection with the affirmative defenses. Once again, however,  [**19]  there are no issues of material fact that prevent this Court from ruling upon the legal issues.

Federal Wholesale has moved for summary judgment as to all 13 transfers and the entire $ 1,085,163.81 amount claimed by the Committee in the complaint. Federal Wholesale argues it is entitled to judgment on the prima facie case of the Committee, and on its affirmative defenses under subsections 547(c)(2) and 547(c)(4).

B. Discussion

The Committee has attached affidavits of Agostinelli and Jones in support of its motion and in opposition to the motion of Federal Wholesale. The contents of these affidavits are almost identical to the affidavits in the other adversary proceeding. Federal Wholesale moves to strike these affidavits.

The analysis and result is the same as discussed in section III.A. of this letter opinion. Paragraphs 10 and 11 of Agostinelli's affidavit are stricken. Paragraphs 2, 3, 6, 7 of Jones' affidavit are stricken. The language of Jones' affidavit of paragraph 8 that  [*676]  states "and involved in responding to" is stricken. Exhibit A attached to the affidavit of Jones is stricken. However, as in the other adversary proceeding, the Committee has proved a prima  [**20]  facie case, except that the total of the transfers within the 90 day preference period is only $ 1,047,576.18 (the Committee's complaint alleged the total of the transfers was $ 1,085,163.81).

With respect to the affirmative defense of section 547(c)(2)(B), the Committee asserts in its opening brief that the Debtor's normal payment procedure was to automatically issue checks, and that it deviated from this procedure when it issued two manual checks for $ 152,024.94 and $ 78,518.70, both dated June 9 and payable to Federal Wholesale. The portion of the affidavits providing the basis for these factual assertions have been stricken. Moreover, even if the Court had not struck those portions of the affidavits, the Committee's argument with respect to section 547(c)(2)(B) would fail. The payments issued before the reclamation notice. n2 Only two of the four challenged payments were alleged to have been issued manually. Finally, the Committee has not cited any case law that holds a payment was not made in the ordinary course of business of the Debtor solely because a check was issued manually rather than automatically.

Case 1:05-cv-00697-MPT     Document 55-5     Filed 10/04/2006     Page 30 of 31

Page 9

223 B.R. 669, *676; 1998 Bankr. LEXIS 984, **20

n2 In this regard, the Committee's reliance on *Barnhill v. Johnson, 503 U.S. 393, 118 L. Ed. 2d 39, 112 S. Ct. 1386 (1992)* is misplaced.

[**21]

The Committee concedes that the timeliness of payments made to Defendant during the 90 days prior to the filing of Debtor's petition for relief was generally consistent with past practices. Answering Brief, docket no. 37 at 2. Nonetheless, the Committee argues that Federal Wholesale has not satisfied section 547(c)(2)(B) and section 547(c)(2)(C) because of the fact that Federal Wholesale served a reclamation notice and stopped all shipments of goods at that time. This argument has already been held to be without merit. The Court holds as a matter of law that the transfers were made in the ordinary course of business of the Debtor and Federal Wholesale within the meaning of section 547(c)(2)(B); and that the transfers were made according to ordinary business terms within the meaning of section 547(c)(2)(C).

V. Conclusion

Two separate orders are attached in accordance with this letter opinion.

Sincerely,

M. Bruce McCullough

ORDER

For the reasons stated in the attached letter opinion,

1. Federal Wholesale's motion to strike is **GRANTED** with respect to:

> a. Paragraphs 10 and 11 of the affidavit of Albert Agostinelli.
> b. Paragraphs 2, 3, 6, 7 of [**22] the affidavit of Richard Jones, and with respect to the language of paragraph 8 that states "and involved in responding to."
> c. Exhibit A attached to the affidavit of Jones.

[*677] 2. The motion for summary judgment of the defendant Federal Wholesale is **GRANTED**. The complaint is **DISMISSED**.

Dated: 5/29/98

THE HONORABLE M. BRUCE MCCULLOUGH

United States Bankruptcy Judge

ORDER

For the reasons stated in the attached letter opinion,

1. Federal East's motion to strike is **GRANTED** with respect to:

> a. Paragraphs 10 and 11 of the affidavit of Albert Agostinelli.
> b. Paragraphs 2, 3, 6, 7 of the affidavit of Richard Jones, and with respect to the language of paragraph 8 that states " and involved in responding to."

223 B.R. 669, *677; 1998 Bankr. LEXIS 984, **22

     c. Exhibit A attached to the affidavit of Jones.

2. The motion for summary judgment of the defendant Federal Wholesale East is **GRANTED**. The complaint is **DISMISSED**.

DATED: 5/29/98

     THE HONORABLE M. BRUCE MCCULLOUGH

     United States Bankruptcy Judge