# **EXHIBIT 9**

Westlaw.

Not Reported in B.R.

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

**H**
In re RossBkrtcy.E.D.Pa.,1998.Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Pennsylvania.
In re Robert J. ROSS, Debtor.
James F. BLANCHARD, Plaintiff,
v.
Robert J. ROSS, Defendant.
**No. 97-19956 DWS.**

Sept. 11, 1998.

Arsen Kashkashian, Kashkashian & Associates, Bristol, PA, for Debtor/Defendant.
Jeffrey J. Lippincott, Robert L. White, Law Office, Langhorne, PA, for Plaintiff.
Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, for United States Trustee.

*MEMORANDUM OPINION*
SIGMUND, Bankruptcy J.
*1 Before the Court is the Motion for Summary Judgment (the "Motion") of James F. Blanchard (" Plaintiff") filed in connection with a Complaint to Deny Discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(4).[FN1] Accompanying the Motion was the unsworn "Certification" of James Blanchard (the " Certification") and certain documents marked as Exhibits A thorough C. [FN2] The Debtor/Defendant filed a Response to the Motion to which it appended Exhibits D-1 and D-2.[FN3]

> FN1. The Motion seeks grounds to deny the discharge under § 727(a)(2). However, the Complaint has not pled such grounds. Since, for the reasons stated below, I do not grant summary judgment on the Complaint as pled, the Plaintiff will need to amend his pleading if he intends to pursue the (a)(2) grounds. However, were I to consider these grounds, my resolution of the Motion would be the same. *See*

footnote 16 *infra.*

> FN2. Exhibit A is a copy of the Articles of Incorporation of C & R Oil Ltd ("C & R"). Exhibit B is an unsigned 1996 corporate tax return for C & R dated April 2, 1997. Exhibit C is Debtor's unsigned 1996 personal income tax return dated April 8, 1997.

> FN3. Exhibit D-1 are two stock certificates dated August 14, 1998 signed by Robert Ross and issued to Francine Case (550 shares) and Robert Ross (450 shares). Exhibit D-2 is the signed 1996 and 1997 corporate tax returns of C & R dated August 18, 1998 and appended Schedules K-1 issued to Robert Ross and Francine Case in connection with each.

BACKGROUND

The following are the facts gleaned from the pleadings and the docket of the Debtor's Chapter 7 bankruptcy case.[FN4] On March 1, 1996 C & R was incorporated. Complaint ¶ 10, Answer ¶ 10. The ownership of C & R is at issue. [FN5] Debtor contends that he is a minority stockholder and that his daughter Francine Case ("Case") "has a 50% interest or better." Answer ¶ 8. He cannot remember whether shares of stock were issued. Answer ¶ 10.[FN6]

> FN4. I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201 , incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                     Page 2

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

*Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

FN5. Plaintiff's position in the Motion is that Debtor owns 100% of C & R. However, he has failed to explicitly plead that fact. Rather he avers that Debtor has failed to disclose a different "valuable" asset, *i.e.,* the fictitious name C & R Oil Burner Service. This contention appears to have been abandoned in the Motion in favor of the stock ownership dispute. Since Debtor has put ownership in issue, I will consider the defect in the Complaint to have been waived. It appears undisputed, however, that Debtor and Case are co-owners of a fictitious name, C & R Oil & Oil Burner Service filed with the Commonwealth of Pennsylvania on February 9, 1990. Complaint ¶ 4, Answer ¶ 4. The record is silent as to whether C & R uses the fictitious name in its business operations.

FN6. One of the documents Debtor now seeks to introduce are those shares. However, as Plaintiff pointed out in argument, the shares were issued on August 14, 1998, *after* this litigation was commenced. Absent an affidavit by Debtor explaining the recent issuance of the shares, it is hard to understand why Debtor believes that this documentary evidence controverts Plaintiff's contention the Debtor made a false oath about the ownership interests in C & R.

On August 14, 1997 Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Michael Kaliner was appointed and continues to serve as the Chapter 7 trustee. On August 28, 1997 Debtor filed his Schedules. They failed to disclose his interest in C & R or the fictitious name. Following the § 341 meeting, the Debtor filed Amended Schedules on October 17, 1997 disclosing a 45% interest in C & R but failed to place any value on it.[FN7] On January 16, 1998 I approved a Stipulation extending the time the Chapter 7 trustee and Plaintiff would have to file a

Complaint objecting to discharge until 20 days after the satisfactory production of information requested relating to C & R. On February 24, 1998 Plaintiff filed a Motion to Compel Debtor to Adequately Disclose Assets, Income and Expenses. After a hearing thereon, the Motion was granted, and Debtor was ordered to further amend his Schedules I and B.[FN8] He did so on April 15, 1998 reiterating the ownership of a 45% stock interest in C & R which he stated has a negative net worth and therefore no market value. On May 8, 1998 the Complaint was filed. On June 10, 1998 the Trustee filed a Report of No Assets.

FN7. The fact that the Debtor failed to disclose his stock interest in C & R in his original Schedules is insufficient, without more, to conclude on summary judgment that there has been a concealment of assets.

FN8. This part of the history is not recited by Plaintiff in the Motion, and I was not reminded of it until I reviewed the docket after the hearing. Had I been aware of the prior Motion to Compel at the hearing on this Motion, I would have better understood the position he was advancing.

DISCUSSION

I.

The motion before me is governed by Rule 56 of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Summary judgment, " shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

The party moving for summary judgment has the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 3

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

initial burden of producing evidence which demonstrates the absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant bears the burden of proof at trial and the motion does not establish that there is no genuine issue of material fact, the court should deny summary judgment even if no opposing evidentiary matter is presented. *Resolution Trust Corp. v. Gill,* 960 F.2d 336, 341 (3d Cir.1992). As to materiality, the substantive law will identify which facts are material, and only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The absence of a genuine issue of fact is evident where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Mashusita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Id.*

**\*2** At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is genuine issue for trial." *Anderson* at 249. The Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

Plaintiff seeks summary judgment based on the pleadings and the Certification with attached documentary exhibits. However, the Certification does not fulfill the requirements of Rule 56(e) that affidavits and other materials submitted in support of a summary judgment motion be sworn or certified. Matters which are not sworn or certified should ordinarily be stricken. *Tukesbrey v. Midwest Transit, Inc.,* 822 F.Supp. 1192, 1198 (W.D.Pa.1993). However, where an unsworn written declaration has the characteristics described

in 28 U.S.C. § 1746,[FN9] it may have the same force and effect as a sworn declaration. It requires the maker's signed and dated statement that he does "declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing [facts he has averred] is true and correct." The Certification is not made under penalty of perjury. Accordingly, it does not contain the requisite assurance of reliability and veracity to allow its consideration in lieu of an affidavit, and it cannot be considered as part of the record of this Motion. On this record, the Motion must be denied. [FN10] However, in the interests of the economic administration of justice so as to prevent the Plaintiff from merely refiling these papers with a sworn verification of the facts contained in the Certification, I will address the merits of the Motion as if the facts presented had been properly sworn by both parties.[FN11]

> FN9. Section 1746 provides:
> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same ..., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
> (1) If executed without the United States: " I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
> (Signature)".

> FN10. As I find the Motion insufficient considering the Certification and documents for the reasons set forth in Part

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 4

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

II, I rely on that explanation for supporting my denial of the Motion absent the additional, but unsworn, facts.

FN11. Plaintiff points out that Debtor has failed to controvert the Motion by not placing any facts into the record. In so stating, Plaintiff does not acknowledge the documents attached to the Response. Plaintiff is correct that the mere attachment of documents to a pleading is not in conformity with the requirements of Rule 56. Thus, both parties have not properly made their record on this Motion. However, presumably if Plaintiff cured his procedural defect with a sworn affidavit, Debtor would do likewise. Thus for the purpose of addressing the Motion as if the procedural flaws were cured, I will assume an affidavit would be filed by both parties.

## II.

In rendering my decision herein, I am mindful that Plaintiff seeks to totally bar the Debtor from a discharge of his debts under § 727. It is well recognized that § 727 is to be construed liberally in favor of the debtor and that a total bar to discharge is an extreme penalty not lightly ordered. *Rozen v. Bezner*, 996 F.2d 1527, 1533 (3d Cir.1993).

Plaintiff seeks judgment pursuant to § 727(a)(3) contending that the discharge should not be granted because Debtor failed to keep or preserve any recorded information which would clearly indicate his ownership interest in C & R and/or would clearly indicate the value of C & R. Ownership of shares of stock can be evidenced in a number of ways. The most common is a certificate reflecting the shares owned. In response to this Motion, Debtor has produced the certificates that evidence ownership of the shares of C & R. They support his contention that he owns a minority interest in the corporation. Notably, however, they are dated *after* this litigation was commenced. If these are the first shares issued, albeit belatedly, there has been no failure to preserve recorded information indicating his ownership interest. If they replace any prior shares, he may have concealed or falsified such

recorded information. I cannot discern from this record which is the case. Debtor has also produced certain tax returns. As noted above, they are contradictory as to ownership. However, as they have been produced,[FN12] I cannot conclude on this record that the Debtor failed to preserve recorded information regarding his ownership in C & R.

FN12. In argument Plaintiff's counsel recited the efforts he has made to elicit information from the Debtor. While it may be true that these documents were only reluctantly produced by the Debtor, there is nothing in the record of this Motion that would allow me to conclude that the Debtor failed to preserve this information or refused to provide it to the trustee.

**\*3** The Plaintiff's contention that the Debtor should be denied a discharge because he failed to preserve documents reflecting the value of C & R assumes that the Debtor has a duty to preserve documents of the corporation in which he owns an interest and that such documents reflect the Debtor's financial condition.[FN13] Debtor states that he has produced all documents that relate to his property or financial condition. It is not clear to me what documents Plaintiff believes have been withheld. Therefore I cannot discern whether they relate to the Debtor's financial condition. Moreover, if the documents he believes have not been preserved are the corporation's books and records, I cannot on this record conclude that it was Debtor's duty to produce them.[FN14] The Debtor and C & R are separate entities. The corporation's business records do not belong to Debtor. It may be that Debtor has concealed information that would contradict the picture he paints of C & R from its tax return but that fact is not evident from the record to date.

FN13. Plaintiff acknowledges that Debtor has produced the 1996 corporate tax return. Certification ¶ 6 and Exhibit B. That document shows a net loss for that year. Plaintiff, however, does not believe that C & R is without value, primarily because it continues to pay Debtor's salary.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

If the stock has value that Debtor has concealed, the Plaintiff will have prove it by evidence, not speculation. This adversary case has been pending for four months and no discovery has apparently been taken. The corporate documents are clearly discoverable without regard to the issue of ownership. While the trustee may have requested Debtor "to provide any information, including books, documents, records, and papers, relating to the defendant's property or financial affairs," Certification ¶ 13, I find no evidence that he specifically requested the corporate documents, and the Debtor in his response to the very general statement contained in ¶ 13 stated that he provided the information.

FN14. As noted before, the tax return has been produced. If there are financial statements provided to Debtor as an owner, they should have been preserved and produced. However, as I can not tell on this record whether they were specifically requested, Debtor's response that he provided all information may mean there were none or he did not believe they reflected *his* financial condition. Whatever explanation there may be, the record as it presently exists does not support summary judgment.

Plaintiff also seeks judgment pursuant to § 727(a)(4) contending that Debtor knowingly and fraudulently withheld from the trustee recorded information relating to his property or financial affairs. My understanding of this argument again suffers from Plaintiff's failure to be clear as to what information relating to Debtor's property or financial condition he believes Debtor has withheld.[FN15] If the information that Plaintiff believes to have been concealed are the books and records of C & R, the record does not allow me to conclude that the withholding of that information has been knowing and fraudulent. A cause of action under § 727(a)(4) requires the moving party to prove not only that information has been withheld from the trustee but that the withholding of information has been

knowing and fraudulent. This provision requires me to determine the subjective intent of the Debtor. Significantly, the Motion (and the Complaint for that matter) do not even allege that Debtor's actions were knowing and fraudulent. As this record is void of any facts that demonstrate that Debtor's conduct in not producing the corporate books and records of C & R to the trustee was a knowing and fraudulent act on his part and as I have already noted the other possible explanations for the failure to do so which would not implicate § 727(a)(4), judgment cannot be granted on this ground either.[FN16]

FN15. I observe that the record is silent as to any statement by the trustee as to the Debtor's failure to produce any information.

FN16. As stated above, I do not rule as to a cause of action under § 727(a)(2) as the Complaint is silent as to such grounds. However, were I to do so, I would likewise find no basis for summary judgment. Plaintiff's contention that Debtor concealed his sole ownership of C & R as evidenced by the Articles of Incorporation, Exhibit A to Motion, is unsupported by that document which does not disclose stockholders but rather incorporators. The record does now demonstrate that shares of C & R were issued only recently, and they were issued in such amounts as to support Plaintiff's position. Whether these documents, attached to Debtor's Response as Exhibit D-1, are an accurate reflection of the ownership of C & R when the Chapter 7 petition was filed or merely self-serving documents created to bolster Debtor's litigation position is not clear on this record. Likewise the tax returns attached to the pleadings, Exhibit B to Motion and Exhibit D-2 to Response, create a factual question as ownership since the latest amended return prepared by a certified public accountant shows the loss being allocated between Debtor and Case, and the pre-litigation return shows the entire loss being taken by Debtor. While I find these documents somewhat

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                              Page 6

Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

        suspect, I cannot on summary judgment draw the inferences from them that Plaintiff seeks. *Id.*

Finally I would note that the outcome of this Motion is not to be perceived as an indication of the merits of Plaintiff's case but rather reflects the insufficiency of the record to support summary judgment barring the Debtor's discharge. In *Rozen, supra,* a case cited by Plaintiff, the Third Circuit Court of Appeals, reversing summary judgment against the debtor on § 727(a)(2) grounds, noted that while certain facts elicited on summary judgment "may support an inference and a factual finding that the debtor concealed property, such an inference is inappropriate on a motion for summary judgment." *Id.* at 1532 n. 5.[FN17] Plaintiff has raised certain inferences here which while inadequate to support summary judgment, presumably will be developed at the trial of this matter.

        FN17. Notably all cases cited by Plaintiff granting judgment against a debtor were after a full evidentiary hearing.

**\*4** An Order consistent with the foregoing memorandum opinion shall issue.

Bkrtcy.E.D.Pa.,1998.
In re Ross
Not Reported in B.R., 1998 WL 643095 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
Christiana Marine Service Corp. v. Seaboard
Shipping Corp.E.D.Pa.,1997.Only the Westlaw
citation is currently available.
United States District Court, E.D. Pennsylvania.
CHRISTIANA MARINE SERVICE
CORPORATION,
v.
SEABOARD SHIPPING CORPORATION, Moran
Towing Corporation, and Moran Services
Corporation
**No. Civ.A. 96-8705.**

Sept. 10, 1997.

John A. Lord, Hepburn, Willcox, Hamilton and
Putnam, Phila, PA, for Christiana Marine Service
Corp., plaintiff.
Daniel G. Lyons, Fox, Rothschild, Obrien &
Frankel, LLP, Phila, PA, Mary Elisa Reeves, Fox,
Rothschild, O'Brien and Frankel Phila, PA, for
Seaboard Shipping Corporation, defendant.
Daniel G. Lyons, Mary Elisa Reeves, (See above),
for Oran Towing Corporation, defendant.
Daniel G. Lyons, Mary Elisa Reeves, (See above),
for Moran Services Corporation, defendant.

**MEMORANDUM**
PADOVA, J.
*1 Plaintiff Christiana Marine Service Corporation (
"Plaintiff") was engaged in the business of
delivering oil to customers by barge in the ports of
Baltimore, Philadelphia, the Delaware River, and
the Chesapeake Bay. Pursuant to a written charter
party (hereinafter "Charter"), Defendant Seaboard
Shipping ("Seaboard") [FN1] chartered the oil tank
barge *New Jersey* to Plaintiff. Before the Court is
Defendants' Motion for Partial Summary Judgment
as to Plaintiff's claim for consequential damages.
For the reasons that follow, Defendants' Motion is
denied.

FN1. Defendant Seaboard Shipping is a
subsidiary of Defendant Moran Towing.
(Defendants' Answer at ¶ 7.) It is unclear
what the relationship is between Moran
Services Corporation and the other
Defendants.

II. *FACTS*

The following facts are undisputed. On or about
June 28, 1993, Plaintiff entered into a Charter with
Seaboard for the oil tank barge *New Jersey*. The
Charter provides as follows: "The barge shall be
delivered 'AS IS' without any representation or
warranty expressed or implied with respect to said
barge or her condition or that of her machinery,
equipment, tackle, fittings, outfits, appliances or
apparel, (hereinafter sometimes collectively referred
to as 'equipment')." (Charter at ¶ 1.) By the
terms of the Charter, Seaboard's liability was
limited as follows: "OWNER [Seaboard] shall be
responsible for the cost of repairs or renewals to the
barge occasioned by latent defects in the barge or
her equipment existing at the time of delivery under
the Charter, which defects are not discovered on the
[inspection] survey, but in no event shall the
OWNER be liable for consequential damage
flowing from such latent defects." (*Id.*) In August
1993, Plaintiff took delivery of the barge.

Plaintiff alleges that the pumps on the barge were
defective because the contents of the barge could
not be pumped out sufficiently. (Complaint at ¶
12.) Plaintiff seeks recovery of the costs of
repairing the allegedly defective pumps. (*Id.* at ¶
21 .) In addition, Plaintiff asserts a claim in excess
of $250,000 for "loss of business and business
opportunities." (*Id.* at ¶ 24.) The parties do not
dispute that damages for "loss of business and
business opportunities" constitute consequential
damages within the meaning of the Charter.

III. *LEGAL STANDARD*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 2

Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is "material" if it might affect the outcome of the case. *Id.* Upon a showing that there are no genuine-issues of material fact as to a particular claim or defense, the Court may grant summary judgment in the moving party's favor "upon all or any part thereof." Fed.R.Civ.P. 56(a) and (b).

**\*2** A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing " sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

### III. *DISCUSSION*

Defendants seek partial summary judgment on Plaintiff's claim for consequential damages. Defendants argue that all losses of business or business opportunities allegedly suffered by Plaintiff in connection with its loss of use of the

barge are barred by the express and unambiguous terms of the "as is" contract entered into between Plaintiff and Seaboard.

Plaintiff argues that Defendants knew that the pumps on the *New Jersey* were defective and knew the use that Plaintiff intended for the *New Jersey.* Plaintiff contends that despite this knowledge, Defendants both failed to inform Plaintiff of the defects in the pumps and made misrepresentations concerning the capabilities of the barge. Plaintiff argues that issues of fact exist as to whether Defendants acted in bad faith and are thereby estopped from enforcing the Charter's provision excluding recovery of consequential damages.

#### A. *New York Law Applies*

The Charter includes the following choice of law provision: "This Charter Party shall be subject to the laws of the State of New York." The Court finds, and the parties agree, that New York law governs the interpretation of the Charter.

#### B. *Under New York Law, Consequential Damages Can Be Contractually Limited*

New York law provides, and the parties agree, that consequential damages can be limited or excluded by contract; such a limitation or exclusion does not offend public policy. *Corinno Civetta Const. Corp. v. City of New York,* 67 N.Y.2d 297, 493 N.E.2d 905, 502 N.Y.S.2d 681 (1986); *Castagna & Son, Inc. v. Board of Educ. of City of New York,* 173 A.D.2d 405, 406, 570 N.Y.S.2d 286, 287 (1991).

#### C. *Under New York Law, a Defendant is Estopped from Enforcing a Damages Limitations Clause if the Defendant Acted in Bad Faith*

Although parties can freely contract to limit or exclude consequential damages, New York law also provides, and the parties agree, that such clauses will not be enforced if the defendant acted in bad faith. *See Long Island Lighting Co. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

*Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1458 (S.D.N.Y.1986) ("[a] defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith."). In *Castagna & Son,* the plaintiffs were contractors who brought suit against the New York City Board of Education to recover consequential damages resulting from alleged delays caused by changes made by the Board to the contract specifications for the construction of a high school. The plaintiffs alleged, *inter alia,* that the Board deliberately concealed from them the Board's knowledge that the plans and specifications for the project were defective and not in compliance with Board of Education standards and building codes. The Board sought to escape liability for consequential damages by relying on a no-damages-for-delay clause in the contract between the plaintiffs and the Board. The court denied the Board's motion for partial summary judgment barring delay damages because it found, *inter alia,* that the plaintiffs had "presented sufficient evidence to raise triable issues of fact as to whether the delay damages were caused by the Board's bad faith, or its wilful, malicious or grossly negligent conduct with respect to its performance under the parties' contract...." *Castagna & Son,* 173 A.D.2d at 406, 570 N.Y.S.2d at 287. Therefore, if Plaintiff can meet its burden by making a factual showing that Defendants acted in bad faith or engaged in willful, malicious or grossly negligent conduct, then Defendants' Motion must be denied.

### D. *Genuine Issues of Fact Exist as to Whether Defendants Acted in Bad Faith*

*3 As evidence of Defendants' bad faith, Plaintiff submits the affidavit of its president, William S. Bates,[FN2] the transcript of the deposition of Mr. Bates, the transcript of the deposition of James S. Dickey, and excerpts from the transcript of the deposition of Don Glenn. Defendants also have submitted excerpts from the Glenn deposition transcript.

> FN2. Defendants object to the Bates Affidavit as not being based on personal

knowledge or direct proof and as containing "unfounded hearsay and speculation." Reply at 2. Defendants fail to file **objections to specific** portions of the Bates **Affidavit,** but instead seek to have the Court disregard the entire **Affidavit.** The Court finds that the Affidavit contains statements that are not based on Mr. Bates' personal knowledge. For the purposes of this Motion, the Court has disregarded all statements contained in the Affidavit that are not based on Mr. Bates's personal knowledge. Fed.R.Evid. 602. Despite the inclusion of certain inadmissible statements, much of the Affidavit is based on Mr. Bates's personal knowledge and is relevant to Plaintiff's contention that Defendants acted in bad faith. With respect to Defendants' hearsay objection, although the Affidavit contains certain statements made by representatives of Moran to Mr. Bates before the Charter was signed, these statements are non-hearsay admissions by a party-opponent, pursuant to Fed.R.Evid. 801(d)(2) and are admissible. Therefore, Defendants' request that the Court disregard the Bates Affidavit in its entirety is denied.

According to Bates, prior to signing the Charter, he met with Moran representatives Bruce Richards and Malcolm MacLeod in June 1993 to discuss the possibility of chartering the barge *New Jersey* . (Bates Affidavit at ¶ 3.) During these discussions, he explained to Richards and MacLeod "the nature of the contemplated use of the barge." (*Id.* at 4.) Plaintiff needed a barge suitable for black oil, dock to dock work, and ship bunkering service. (Bates Deposition at 24 and 139.) Both Richards and MacLeod told Bates that the *New Jersey* was fit for the type of services that Bates had described to them. (Bates Affidavit at ¶ 4; Bates Deposition at 24 ("As a result of those discussions Bruce Richards in his responses indicated the barge was suitable for that work and that work was acceptable by Moran for the barge."); Bates Deposition at 138 ("[H]e [Bruce Richards] informed us that we would do very well with the barge, that the barge

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 4

Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

would do very well for the company, that it would be a very good piece of equipment for our business." ); Bates Deposition at 141.) Bates "knew that Moran was also in the business of transporting black oil by barge and that the Barge *New Jersey* had been used by Moran in that capacity for some time." (Bates Affidavit at ¶ 4; Bates Deposition at 139 ("Bruce Richards told me about the service that [sic] barge had been in [while Moran operated it], similar service doing bunker work in New York Harbor and doing dock-to-dock work ...."); Bates Deposition at 203.)

During Bates's discussions with Richards and MacLeod before the Charter was executed,

[n]othing was stated regarding any inadequacies of the barge or its equipment, including the pumps. In particular, no statements were made to the effect that steaming of the barge was required as part of its normal operation. If this information had been given to me, I would not have chartered the barge because of CMS's inability to meet the special requirements of the barge.

(Bates Affidavit at ¶ 5.) Bates states that he "knew Moran to be a reputable operator with whom we had dealt over the years." (*Id.* at ¶ 5, 570 N.Y.S.2d 286.) For this reason, he accepted the assertions of Richards and MacLeod that the barge would meet the needs of plaintiff and "agreed to accept the barge in 'as is' condition." (*Id.*) Bates identified the major problem with the barge as its " inability to strip its cargo and the abnormally long discharge time." (*Id.* at ¶ 7, 570 N.Y.S.2d 286.)

As problems with the barge began to appear and worsen, Bates complained to Richards. Richards told Bates that Moran never had had problems with the barge. (Bates Deposition at 97.) Bates later " learned that other Moran employee [sic] knew the barge has problems striping [sic] its cargo and had slow discharge rates. We also learned that the barge could not be striped [[sic] without the use of steam." (Bates Affidavit at ¶ 7.)[FN3]

FN3. Both parties have submitted excerpts from the transcript of the deposition of Don Glenn, who was employed at

Christiana Marine and who, along with William Bates, had discussions with representatives of Moran concerning the charter of *New Jersey.* The Court finds that, for the purposes of deciding Defendants' Motion for Partial Summary Judgment, the testimony of William Bates is sufficient to raise a triable issue of fact concerning the alleged misrepresentations made by Moran concerning the barge.

**\*4** The Court finds that there is sufficient circumstantial evidence contained in the submissions upon which the trier of fact could draw the inference that Defendants acted in bad faith. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (in deciding a summary judgment motion, all evidence and inferences to be drawn from the evidence must be considered in a light most favorable to the non-moving party). Genuine issues of material fact exist as to whether Defendants misrepresented and/or deliberately concealed the capabilities of the barge *New Jersey,* thereby estopping Defendants from enforcing the Charter provision excluding consequential damages. *Castagna & Son,* 173 A.D.2d at 406, 570 N.Y.S.2d at 287. For this reason, Defendants' Motion for Partial Summary Judgment will be denied.

An appropriate Order follows.

### ORDER

**AND NOW,** this 10th day of September, 1997, upon consideration of Defendants' Motion for Partial Summary Judgment (Doc. No. 10), Plaintiff's Response thereto (Doc. No. 11), and Defendants' Reply (Doc. No. 12), **IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment is **DENIED.**

E.D.Pa.,1997.
Christiana Marine Service Corp. v. Seaboard Shipping Corp.
Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5

Not Reported in F.Supp., 1997 WL 587292 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents (Back to top)

• 2:96cv08705 (Docket) (Dec. 31, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                 Page 1

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Seeber v. Williams Companies,
Inc.N.D.Okla.,2006.Only the Westlaw citation is
currently available.
United States District Court,N.D. Oklahoma.
Vonna M. SEEBER, an individual, Plaintiff,
v.
The WILLIAMS COMPANIES, INC., a Delaware
corporation, and Williams Energy Partners, L.P., a
Delaware Limited Partnership, Defendants.
**No. 04-CV-0451-CVE-PJC.**

Aug. 28, 2006.

N. Kay Bridger-Riley, Bridger-Riley & Associates
PC, Jenks, OK, Phillip Craig Bailey, P. Craig Bailey
, Tulsa, OK, for Plaintiff.
David Eugene Strecker, Jessica Colleen Lowrey,
Strecker & Assoc PC, Tulsa, OK, for Defendants.

*OPINION AND ORDER*
CLAIRE V. EAGAN, Chief District Judge.
*1 Now before the Court are the following motions:
Defendants' Motion for Summary Judgment and
Brief in Support Thereof (Dkt.# 59); Defendants'
Motion to Strike Affidavit of Vonna Seeber (Dkt.#
86); Plaintiff's Motion to Strike (Dkt. # 89);
Defendant's Motion in Limine to Exclude
Testimony and Evidence by Plaintiff's Expert
(Dkt.# 82). Defendants, The Williams Companies,
Inc. and Williams Energy Services, LLC
(collectively "Williams"),[FN1] move for summary
judgment on plaintiff Vonna Seeber's claims of age
discrimination in violation of the Age
Discrimination in Employment Act of 1967 ("ADEA
"), gender discrimination in violation of Title VII of
the Civil Rights Act of 1964 ("Title VII"),
retaliation in violation of Title VII, sexual
harassment in violation of Title VII, wrongful
discharge in violation of Oklahoma public policy,
and intentional infliction of emotional distress.
Defendants also ask the Court to exclude the

testimony of plaintiff's economic damages expert
under Fed.R.Evid. 702.

> FN1. Plaintiff was actually employed by
> Williams Energy Services, LLC, which
> was formerly Williams Energy Partners,
> L.P.

**I.**

Plaintiff began employment with Williams in March
1984 as a terminal operator. She performed that
work in Olathe, Kansas and Heyworth, Illinois. In
October 1984, plaintiff began work as a technician
in Omaha, Nebraska, but was later transferred to
Rosemont, Minnesota, and Des Moines, Iowa.
Although plaintiff denies having difficulties getting
along with the other employees while employed in
Des Moines, Iowa, her deposition testimony and
pleadings suggest that she struggled to develop an
amicable relationship with at least two other
employees, Alex Calder and Jim Davis. Plaintiff's
supervisor noted on a performance evaluation that
plaintiff's interpersonal skills could use "slight
improvement." Plaintiff did not disagree with that
assessment, because she admits that she had a poor
relationship with Calder. Plaintiff testified that
during her employment in Des Moines, she was not
subjected to sexual harassment.

In 1987, plaintiff requested, and was permitted to,
transfer from Des Moines to Sioux Falls, South
Dakota. While in Sioux Falls, plaintiff had several
supervisors, including Dennis Thebeau and Jay
Wiese. Plaintiff believed that Thebeau did not like
her and states that she disliked working under
Thebeau. In contrast, plaintiff got along well with
Wiese. Plaintiff admits that Wiese counseled
plaintiff regarding her ability to get along with
co-workers. Plaintiff claims that she had problems
with the workplace atmosphere is Sioux Falls,
because of the way her male coworkers treated her.
She was the only female technician and states that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
(Cite as: Slip Copy)

Page 2

other employees frequently made sexually explicit and obscene remarks that offended her. She states the she responded aggressively when male co-workers allegedly harassed her and attributes the perception that she had difficulties with interpersonal relationships to the sexually-charged nature of the work environment. From 1987 to 1993, she was consistently rated as a competent employee and her employment evaluations show that her supervisors believed her interpersonal skills were showing noticeable improvement.[FN2]

> FN2. Williams utilized a performance evaluation system assigning each employee a one to five rating in fourteen categories. The highest rating was a one, which was interpreted as outstanding job performance. The lowest rating was five, meaning that an employee needed significant improvement. A rating of three meant that the employee was competent, fully meeting the criteria or standards of performance for most aspects of their job.

*2 Plaintiff worked as a technician until August 1993, when she was granted a leave of absence to attend law school at the University of Notre Dame. She attempted to get an internship with Williams during law school, but was allegedly informed that Williams accepted only interns ranked in the top ten percent of their law school class. After graduating from law school in 1996, she did not apply for a position in Williams' legal department because she did not believe her class rank or grades were sufficient. Instead, plaintiff accepted employment as an environmental engineer at Williams. Her supervisor stated that plaintiff seemed oversensitive to workplace stress, but accomplished her work in a timely manner. She worked as an environmental engineer for approximately a year and a half before accepting a new position in the real estate department. Plaintiff does not allege that she suffered any discrimination while working in the real estate department.

In April 1998, plaintiff left the real estate department to accept the position of project manager in the independent terminals group. Her

supervisor in this job was Jay Weise, whom she knew from prior experience in the company and referred to as a mentor. She received a $5,000 yearly raise in her new position, bringing her annual salary to $60,000. As a project manager, an important component of her job was to maintain good personal relationships with other employees and customers. During 1999 and 2000, her supervisor was David Games. She complained that Games sexually harassed her by coming around her desk and sitting on her lap to work on her computer. At least once, she told Games to stop this behavior and she contacted the human resources department. [FN3] Weise preferred to resolve the matter within the department and asked plaintiff and Games to work things out themselves. In 2000, Games was transferred out of the department after two other project managers also complained that he was a poor supervisor.

> FN3. Although plaintiff sent an e-mail to Gail Campbell in the human resources department, she did not file a formal complaint. Human resources advised plaintiff to contact Wiese to resolve the matter.

Robert Barnes replaced Games as plaintiff's supervisor and completed her performance evaluation for 2000. Plaintiff received a performance evaluation critical of her personal skills, even though the evaluation suggests she was performing her job tasks at a high level. Plaintiff received marks ranging from A to A-for job performance, but received a D rating for her ability to work with peers and overall peer relationships. [FN4] In particular, the evaluation stated that:

> FN4. An "A" rating means that the employee met expectations for her position but did not exceed what was required. If an employee received a "D" rating, she did not meet the job expectations.

This is an area that Vonna needs to develop if she is to advance within Williams. Through Vonna's actions and body language she comes across as not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
(Cite as: Slip Copy)

being approachable by others. Vonna needs to understand that all aspects of her interaction with others reflects on the relationship. She needs to understand we are a team and working with and assisting others is necessary and expected.
Dkt. # 75, Ex. 15, Performance Appraisal, at 1. Plaintiff noted her objection to the evaluation before signing it. The evaluation also criticized plaintiff for her ability to deal with ambiguity, finding that plaintiff "is a very task oriented and if things don't go as planned she gets very frustrated and stressed. Vonna needs to control her emotions in a more manageable way. Vonna needs to focus on doing a good job and not worry about other things not specific to her area." *Id.* at 4. Otherwise, plaintiff's supervisor noted that she was a competent and hardworking employee but that her organizational skills might limit her ability to obtain a management position. In order to improve her interpersonal skills, plaintiff attended a course Williams offered to its employees on these issues.

**\*3** Several of plaintiff's co-workers have testified that it was difficult to work with plaintiff, but plaintiff disputes their characterization of her workplace demeanor. Bill Nelson stated that plaintiff refused to speak to him unless they needed to discuss business. Plaintiff claims that Nelson insulted her and she rebuked his attempts to resolve the matter. Nelson felt that this created a negative atmosphere in the workplace, but did not prevent him or plaintiff from completing their work. Chris Nalley testified that it seemed like "sometimes there was a black cloud in [plaintiff's] cubicle," but her mood swings did not seem to impact her work. Plaintiff states that the "black cloud" Nalley refers to related to her personal life, and did not affect her relationships with co-workers or her job performance. Gary Potacka stated that he did not have any difficulty working with plaintiff. On one occasion, plaintiff believed that Potacka insinuated that she was disorganized, but Potacka believed plaintiff was overreacting. Jon Lawrence testified that he overheard internal customers commenting that they had problems communicating with plaintiff. Specifically, Lawrence said that plaintiff had reputation for behaving unpleasantly in the morning and he recalls plaintiff treating him rudely on several occasions. Plaintiff insists that none of

these personally traits impaired her work performance.

Later in 2000, Weise created a cross-training program for project managers and schedulers in his department.[FN5] This program required project managers and schedulers to perform job duties. Plaintiff agreed to participate in the cross-training program, but was clear that she viewed scheduling as a demotion. The parties do not dispute that Williams did not reduce plaintiff's salary when it moved plaintiff into scheduling. Plaintiff claims that the cross-training program was an excuse to terminate her and another project manager, Selby, both of whom were older.[FN6] Plaintiff asserts that Nelson, also a project manager, did not have to move into scheduling, which is evidence of age and gender discrimination. Williams asserts that Nelson would eventually have to do a rotation in scheduling, but his rotation was delayed until he completed a large project.[FN7] Before moving into the scheduling department, plaintiff was informed that she needed to improve her "communication and people skills." Wiese allowed plaintiff to use one of his previously scheduled sessions with a management coaching consultant to work on her problem areas, and plaintiff admits that Wiese did this to encourage plaintiff to improve her attitude before starting in scheduling.

> FN5. At the time the program was created, there were three project managers-plaintiff, Nelson, and Lee Selby. There two members of the scheduling department taking part in the cross-training program were Nalley and Potacka.

> FN6. Plaintiff refers to Selby as older and female. The summary judgment record shows that the only employee named Selby in plaintiff's department was Roy L. Selby, a male. Defendants refer to Selby as Mr. Selby throughout their motion for summary judgment, and plaintiff also later refers to Selby as Mr. Selby.

> FN7. Nelson was promoted out of his position as a project manager before he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

had to take a rotation in the scheduling department.

Plaintiff's supervisor in scheduling was Mark Hoffman, and she admits that she had a good working relationship with Hoffman until she received her first evaluation. In his evaluation of plaintiff for 2001, Hoffman noted that customers and co-workers viewed plaintiff as confrontational. A necessary part of plaintiff's position in scheduling involved forming positive relationships with customers, and her review notes that customers often thought that plaintiff had a "chip on her shoulder." Plaintiff informed several customers that she did not like working in the scheduling department. Plaintiff does not deny making these statements, but claims that she performed the necessary functions of her job even if co-workers and customers knew she was unhappy working in the scheduling department. Plaintiff disagreed with Hoffman's review and refused to sign it.

**\*4** Wiese and Hoffman had a meeting with plaintiff, and she accused them of lying on her evaluation. Hoffman presented plaintiff with a memorandum discussing areas of her work performance that needed improvement, but she disagreed with the memorandum. Hoffman asked plaintiff to write her own performance improvement plan. Plaintiff claimed she did not understand the alleged performance deficiencies and she never drafted a plan. On December 24, 2001, Hoffman, Wiese, and a representative from the human resources office held a meeting with plaintiff and offered plaintiff the option of keeping her current job or seeking redeployment within the organization. Plaintiff still did not agree with Hoffman's assessment that she needed to improve her personal skills, and plaintiff decided to seek redeployment. Williams agreed to provide plaintiff full pay and benefits for 60 days while she looked for a new position within the company, but Williams did not agree to pay plaintiff the same salary after redeployment.

Plaintiff applied for many positions, but human resources informed her that many departments were experiencing layoffs and could not hire a new employee. Plaintiff claims that was merely an excuse, alleging that she was blacklisted because

she complained about her supervisor in the scheduling department. Due the delay in finding a new position, defendants extended plaintiff's redeployment period until March 31, 2002. If plaintiff did not find a new position by March 31, 2002, plaintiff would no longer be employed by Williams. Plaintiff was unable to locate a new position, and defendants formally terminated her employment on March 31, 2002. She was subsequently rehired on April 15, 2002 as a confirmation analyst for Williams Marketing and Energy Trading with a yearly salary of $43,000.

On January 21, 2003, plaintiff filled out an intake questionnaire providing the Equal Employment Opportunity Commission ("EEOC") information about her allegations of workplace discrimination against defendants. However, plaintiff did not file a formal EEOC charge until March 3, 2003. Plaintiff alleges that she was constructively discharged from her position in the independent terminals group because of the hostility exhibited by her supervisors and the alleged lies on her employment evaluations.

## II.

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir.1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kaul v.. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996). "Summary judgment will not lie if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Durham v. Xerox Corp.,* 18 F.3d 836, 838-39 (10th Cir.1994)

**\*5** "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker,* 164 F.3d 1249, 1251 (10th Cir.1998).

### III.

Defendants have filed a motion to strike plaintiff's affidavit, which is attached to her response to defendants' motion for summary judgment as exhibit 14 (Dkt.# 75, Ex. 14) because it is not based on plaintiff's personal knowledge. According to defendants, Fed.R.Civ.P. 56(e) prohibits plaintiff from opposing a motion for summary judgment with an affidavit that relies merely on her opinions and beliefs. Rule 56(e) provides that:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial.

The Tenth Circuit requires the nonmoving party to submit affidavits "based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). As a general rule, an affidavit may be submitted in response to a motion for summary judgment, as long as it is made on personal knowledge, contains facts that would be admissible in evidence, and demonstrates the affiant's competence to testify to the asserted facts. Plaintiff responds that the affidavit is based on her personal knowledge, and that the opinions she expresses in the affidavit constitute admissible opinion testimony under Fed.R.Evid. 701.

The primary focus of defendants' argument seems to be that plaintiff has submitted an affidavit merely stating her opinions but does not base the factual assertions in the affidavit on her personal knowledge. Plaintiff cites *Gossett v. Oklahoma ex rel. Board of Regents for Langston University,* 245 F.3d 1172 (10th Cir.2001), for the proposition that a lay witness may submit an affidavit containing opinion testimony in an employment discrimination case. In *Gossett,* the plaintiff sued Langston University for discriminating against male students in its nursing program. In opposition to a motion for summary judgment, plaintiff provided the affidavit of Deborah Guy, an instructor at the nursing school, who stated her opinion that the school engaged in a pattern of discrimination against male students. The district court excluded Guy's affidavit because the court found it was not based on the affiant's personal knowledge. The Tenth Circuit reversed the district court's decision to grant summary judgment, finding that Guy's affidavit should have been admitted and created a genuine issue of material fact. The Tenth Circuit stated that
**\*6** Ms. Guy's affidavit demonstrates that her position as an instructor in the Nursing School and on the Admissions Committee provided her with the opportunity to observe firsthand for several years the School's policies and practices with respect to its treatment of male students. Her opinion was a means of conveying her impression based on what

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection. Consequently, her affidavit was admissible under Rule 701, and the district court abused its discretion in refusing to consider it.

*Id.* at 1180.

Plaintiff also cites *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir .1986), for general guidelines for courts to consider when determining whether plaintiff has submitted a sham affidavit. In *Franks,* the plaintiff submitted an affidavit in support of his motion to reconsider the court's ruling that he was a probationary employee. However, this affidavit contradicted his deposition testimony and the district court refused to consider the affidavit as a basis for creating a genuine issue of material fact. *Id.* at 1237. The Tenth Circuit listed several factors that are useful when determining if an affidavit contradicts prior testimony and creates a sham factual issue, such as:

whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Id.* The Tenth Circuit found that plaintiff's deposition testimony was unequivocal and the affidavit was produced only after the district court granted defendants' motion for summary judgment, which justified a finding that the affidavit raised a sham factual issue. *Id.* at 1237-38.

Although defendants cite two instances where plaintiff's affidavit differs from her deposition testimony, the key issue is whether the affidavit is based on plaintiff's personal knowledge.[FN8] The Court finds that, even though many of the statements in plaintiff's affidavit are her opinions, the affidavit is admissible. Plaintiff's opinions about her co-workers and her perceptions about events in the office reflect her personal knowledge to the extent they are based on her experiences at Williams. As a practical matter, there may be no other way for plaintiff to convey this information

except in the form of an opinion. Her opinions would arguably be admissible at trial under Fed.R.Evid. 701. *See Gossett,* 245 F.3d at 1179 (" Courts generally hold admissible under Rule 701 evidence in the form of lay opinion testimony in discrimination cases when given by a person whose position with the defendant entity provides the opportunity to personally observe and experience the defendant's policies and practices."). There is no dispute that plaintiff is competent to provide an affidavit. The Court finds that plaintiff's affidavit should not be stricken as an exhibit to her response, but that does not mean the Court will treat plaintiff's opinions about defendants' conduct as a bar to summary judgment. Plaintiff will still have to present a *prima facie* case of employment discrimination, even if she holds the opinion that her employer engaged in discriminatory behavior. Therefore, Defendants' Motion to Strike Affidavit of Vonna Seeber (Dkt.# 86) is denied.

> FN8. Plaintiff's affidavit contains two additional statements regarding alleged discrimination that she could not recall in her deposition. In her deposition, she stated that she was basing her age discrimination claim on Williams' tendency to promote younger men and Lee Selby's termination. She did not remember any statements by Wiese referring to older workers in a disparaging manner. In her affidavit, she alleges that Wiese made negative comments about older workers. By itself, this additional statement is not enough to strike the affidavit under *Franks,* and the Court will focus on defendant's argument that plaintiff's affidavit contains self-serving or inadmissable opinion testimony.

## IV.

*7 Plaintiff brings claims for age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), retaliation in violation of Title VII, sexual harassment in violation of Title VII,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

wrongful discharge in violation of Oklahoma public policy, and intentional infliction of emotional distress. For different reasons, defendants are entitled to summary judgment on all of plaintiff's claims.

### Defendants' Use of Subjective Ranking Criteria

Plaintiff claims that Williams' use of subjective ranking criteria to determine salary increases and promotions precludes summary judgment on her Title VII and ADEA claims. Plaintiff relies on *Garrett v. Hewlett-Packard Company,* 305 F.3d 1210, 1218 (10th Cir.2002), for the proposition that use of subjective criteria in employment evaluations are undisputable evidence of pretext. *Id.* at 1218. In *Garrett,* the plaintiff's employer held meetings where supervisors would rank each employee from best to worst and promote employees based on these rankings. *Id.* at 1217. The employer admitted that the rankings could not be verified with objective evidence, other than the opinions of the supervisors. The Tenth Circuit stated that subjective evaluation methods are viewed with skepticism. *Id.* at 1218. Without evidence that the employer relies on objective criteria to support its evaluations, the employee can rely on subjective evaluation criteria alone to prove pretext to rebut the employer's proffered non-discriminatory reason supporting an adverse employment decision.

In this case, the key issue in dispute is plaintiff's allegedly poor interpersonal skills, which are difficult to evaluate with objective criteria. However, management personnel are allowed to exercise discretion in employment decisions and subjective evaluation criteria do not create an inference of discrimination. *Furr v. Seagate Technology,* 82 F.3d 980, 987-88 (10th Cir.1996). Although defendant's evaluation system may have some bearing on the issue of pretext, plaintiff must still make out a *prima facie* case of age discrimination. *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 978 (10th Cir.1996) ("Even if ' potential' is somewhat subjective, the use of subjective criteria does not suffice to prove intentional discrimination."); *Pitre v. Western Elec. Co ., Inc.,* 843 F.2d 1262, 1272 (10th Cir.1988) ("

We recognize that when management considers individuals for upper level positions, subjective factors must play some role. Their use does not per se constitute discrimination."). Defendant has presented affidavits, deposition testimony, and employment evaluations spanning eighteen years showing a pattern of complaints about plaintiff's interpersonal skills. On such an inherently subjective topic, plaintiff can introduce evidence that defendant lacked an objective reason to support any adverse employment action against her, but this certainly does not preclude the Court from ruling on defendant's motion for summary judgment.

### Statute of Limitations under Title VII and the ADEA

**\*8** Defendants initially argue that plaintiff's ADEA and Title VII claims are barred by the statute of limitations. Under Title VII and the ADEA, the aggrieved employee must file a charge with the EEOC within 300 days of the alleged unlawful discriminatory practice. 29 U.S.C. § 626(d)(2); 42 U.S.C. § 2000e-5(e)(1); *Duncan v. Manager, Dep't of Safety, City and County of Denver,* 397 F.3d 1300, 1310 (10th Cir.2005). Failure to comply with this procedural prerequisite will bar a plaintiff's employment discrimination claim. *Dartt v. Shell Oil Co.,* 539 F.2d 1256, 1260-61 (10th Cir.1976) (compliance with statutory time limitation for filing an EEOC charge is a condition precedent before an employee may sue his employer). Plaintiff admits that many of the acts she complains of occurred more than 300 days before she was discharged, but she raises two arguments that she claims would extend the statute of limitations: 1) the intake questionnaire she submitted to the EEOC on January 21, 2003 was sufficient to qualify as a formal charge; and 2) the continuing violation doctrine allows plaintiff to rely on acts more than 300 days before her alleged termination because defendant engaged in a pattern or practice of discriminatory conduct.

Plaintiff claims that she filled out a questionnaire to notify the EEOC of her claim on January 21, 2003, and that this should be treated as the date she filed her formal charge in this case. Defendant responds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

that even if the Court accepts plaintiff's argument, this will allow plaintiff to base her claim only on events occurring after March 28, 2002 (300 days prior to January 21, 2003). [FN9] The general rule is that if the plaintiff alleges a discrete retaliatory or discriminatory act, the party must file the EEOC charge within 300 days of the specific act. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110 (2002). Plaintiff relies on *Peterson v. City of Wichita,* 888 F.2d 1307 (10th Cir.1989), to support her argument that an informal "complaint" can be treated as a formal EEOC charge if later amended. EEOC regulations provide that:

> FN9. Even though plaintiff's redeployment period ended on March 31, 2002, she left the terminal group on December 24, 2001. Defendants assert that plaintiff should be deemed terminated from the date she quit her position with the terminal group, not at the end of the redeployment period.

a charge is sufficient when the Commissioner receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional facts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b). The Tenth Circuit found that a later verified charge could relate back to a prior, timely filed informal complaint. It would be inconsistent with the overall policy of Title VII to strictly construe the time limitation against *pro se* [FN10] claimants, because Title VII is remedial legislation that should be read "liberally rather than technically." *Peterson,* 888 F.2d at 1309. However, section 1601.12(b) will not apply if the defendant has alleged that it would be prejudiced under the circumstances or there is other evidence that shows the intake questionnaire was not intended to be

treated as a formal EEOC charge. *Id.*

> FN10. In *Peterson,* the Tenth Circuit found that many claimants were *pro se* when they filed their EEOC charge. This consideration is applicable in this case, because it appears that plaintiff was *pro se* when she initially filed her charge with the EEOC.

**\*9** Defendants have not made any allegations of prejudice, but argue that *Peterson* should not be applied in this case. In order for the *Peterson* rule to apply, plaintiff must show that her initial incomplete filing was timely. Plaintiff filed her questionnaire on January 21, 2003 and she alleges that the last discriminatory act by defendant occurred on March 31, 2002. After reviewing the information plaintiff provided in the questionnaire, the Court finds that it was sufficiently detailed to alert the EEOC and defendants to the identity of the parties and the nature of plaintiff's claims. The Court will treat the questionnaire as timely filed for any events giving rise to a claim after March 28, 2002. This does not automatically mean that plaintiff may rely on defendants' conduct before March 28, 2002 as a basis for her Title VII or ADEA claims, because the Tenth Circuit has interpreted *Morgan* to significantly limit the continuing violation doctrine if plaintiff complains of discrete acts of discrimination.

If plaintiff's EEOC charge refers to discrete acts of discrimination, plaintiff may not rely on the continuing violation doctrine to extend the limitations period. *Martinez v. Potter,* 347 F.3 d 1208, 1211 (10th Cir.2003). The Tenth Circuit has stated that "a continuing violation theory of discrimination is not permitted for claims against discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire." *Davidson v. America Online, Inc.,* 337 F.3d 1179, 1184 (10th Cir.2003). In this case, several of plaintiff's claims rely on constructive discharge and hostile work environment theories, because she voluntarily quit her job and accepted a lower paying position within the organization. The continuing violation doctrine has not been abolished for hostile

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

work environment claims, but the plaintiff must point to at least one discrete act that occurred with the 300 day limitations period for her claim to be timely. *Boyler v. Cordant Technologies, Inc.,* 316 F.3d 1137, 1140 (10th Cir.2003) (expressly overruling prior Tenth Circuit precedent "to the extent that these cases held that recovery on a Title VII hostile work environment claim is not available for acts taken outside the statutory time period where plaintiff knew or should have known the conduct was discriminatory when the acts occurred."). The Tenth Circuit did not overrule its prior holdings on what discriminatory acts may give rise to a "pattern-or-practice" claim, so the court's prior precedent on the continuing violation doctrine must still be considered. *Davidson,* 337 F.3d at 1186 n. 3.

There are two basic situations when a continuing violation theory is applicable: (1) when plaintiff shows that defendants engaged in a series of discriminatory acts, and at least one of the acts occurred within the 300 day period; or (2) the defendant maintained a discriminatory policy on an organizational basis both before and after the limitations period. *Bennett v. Quark,* 258 F.3d 1220, 1226-27 (10th Cir.2001). The Tenth Circuit has provided three factors to determine if defendant has engaged in a series of discriminatory actions, including
**\*10** (1) the subject matter of the acts-whether the violations constitute the same type of discrimination; (2) the frequency of the acts; and (3) the permanence of the acts-whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of an act would continue even in the absence of a continuing intent to discriminate.

*Id.* at 1227. The Court will consider plaintiff's statutory claims separately, because each is based on a different theory of discrimination and has a discrete factual basis.

Plaintiff may not rely on a pattern or practice theory for her age discrimination claim, because there is no evidence the defendants engaged in a series of acts based on age discrimination or had a company wide policy to treat employees differently because of their age. Plaintiff did not raise any allegations of

age discrimination until she left Williams and she has not produced any evidence of an organizational policy to discriminate against older workers. Plaintiff was moved into the scheduling department as part of a cross-training program in 2001 for all project managers and schedulers in the independent terminals group. Although plaintiff attempts to classify her age discrimination claim as a hostile work environment claim, the central thrust of her claim is that she was forced to move to the scheduling department while younger workers were exempt from this requirement. This is a discrete act which may not be used to form the basis of a pattern or practice claim. Thus, Plaintiff may not rely on any acts before March 28, 2002 to support her claim for age discrimination.

Plaintiff was aware of the facts supporting her gender discrimination claim for unequal pay before she left the independent terminals group in December 2001. Applying the third factor from *Bennett,* plaintiff was on notice that she needed to bring her claim for gender discrimination based on unequal pay long before March 2003, when she filed her formal EEOC charge. The continuing violation doctrine does not excuse tardiness in filing an EEOC charge, but allows a claimant to wait to file a claim until a reasonable person would be on notice that she has a claim. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1311 (10th Cir.1999). The Supreme Court has stated that each week an employer delivers an unequal paycheck on the basis of discriminatory classification is an adverse employment event giving rise to a claim. *Bazemore v. Friday,* 478 U.S. 385, 395 (1986). Plaintiff's EEOC charge clearly alleges that she was subject to unequal wages for three years before filing her claim and she may not belatedly rely on a continuing violation theory to assert a claim for gender discrimination.

Plaintiff's retaliation claim is based on her allegations that Williams refused to offer her a job with equivalent pay when she was eligible for redeployment because she complained about discriminatory behavior while working at the independent terminals group. A failure to hire, such Williams' alleged failure to rehire plaintiff during redeployment, is a discrete act for purposes of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

300 day limitation period. *See Morgan,* 536 U.S. at 111. Under *Morgan,* plaintiff's retaliation claim accrued on March 31, 2002, and this event falls within the 300 day limitation period. *Haynes,* 2006 WL 2258836 at *5. Plaintiff may use prior acts by defendants as background evidence, but such acts are "merely unfortunate event[s] in history which [have] no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977).

*11 Plaintiff may not rely on a pattern or practice theory for her sexual harassment/hostile work environment claim, because she cannot point to one discrete act that occurred within the statutory period. Under *Morgan,* the plaintiff may rely on time-barred acts in support of a hostile work environment claim as long as one discrete act occurred within the statute of limitations for filing an EEOC claim. *Boyler,* 316 F.3d at 1140. However, the alleged hostile work environment was within the independent terminals group and plaintiff left that employment on December 24, 2001. Even using the date plaintiff filed her intake questionnaire, plaintiff's hostile work environment claim is untimely, because plaintiff may rely only on events occurring after March 28, 2002. Nothing in plaintiff's response suggest that any events relevant to her hostile work environment claim occurred after December 24, 2001, and consequently, this claim is time barred under 42 U.S.C. § 2000e-5(e).

Plaintiff may not rely on a pattern or practice theory to use events occurring before March 28, 2002 as a basis for her statutory claims. Therefore, plaintiff's EEOC charge is untimely for any actions taken by defendants before that date. Because plaintiff alleges no acts of sexual harassment after that date, based on *Morgan* and *Boyler,* defendants' motion for summary judgment is granted as to plaintiff's claim for sexual harassment under Title VII.

### *Age Discrimination under the ADEA*

Defendants claim that, based on the undisputed facts, plaintiff can not prove a *prima facie* case for age discrimination under the ADEA. The ADEA provides, in relevant part: "It shall be unlawful for

an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). By statute, the protections of the ADEA extend only to individuals who are at least forty years of age. 29 U.S.C. § 631(a).

Age discrimination claims brought pursuant to the ADEA are analyzed under the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). *Branson v. Price River Coal Co.,* 853 F.2d 768, 770 (10th Cir.1988) ( "Cases brought under the ADEA are subject to the same indirect method of proof used in Title VII cases alleging discriminatory treatment."). Under this framework, a plaintiff must first make a *prima facie* showing of discrimination. Once plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the employer has the burden to produce a "legitimate, nondiscriminatory reason" for its actions. *Miller v. Eby Realty Group, L.L.C.,* 396 F.3d 1105, 1111 (10th Cir.2005). If the employer does so, the employee must prove that the employer's explanation is merely pretext for unlawful discrimination on the basis of age. *Id.*

*12 A plaintiff seeking to establish a *prima facie* case of age discrimination must establish four elements, the first three of which are relatively static across differing fact patterns. The plaintiff must demonstrate: (1) she was a member of the protected age group, over forty years of age; (2) she was performing satisfactorily; and (3) her employer terminated her employment. *See, e.g., id.* at 1111. As to the fourth element, a plaintiff may either show that she was replaced by a younger worker or " produce evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Creason v. Seaboard Corp.,* 263 F.Supp.2d 1297, 1307 (D.Kan.2003). Permitting this alternative showing of differential treatment, rather than replacement, accommodates plaintiffs who, in a reduction-in-force context, may not have been replaced because their position was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

eliminated. *See Branson,* 853 F.2d at 771 ("In reduction-in-force cases, plaintiffs are simply laid off and thus incapable of proving actual replacement by a younger employee."). There are, in effect, two theories of discrimination upon which a plaintiff may base her claim under the ADEA: the replacement theory or the differential treatment theory. Plaintiff has introduced no evidence that she was replaced by a younger worker, so plaintiff must produce evidence, either direct or circumstantial, that her employer intended to discriminate against her because of her age.

Plaintiff claims that she has enough evidence to prove a *prima facie* case of age discrimination; however, even if the Court considers discrete acts of discrimination occurring before March 28, 2002, there is a fundamental flaw with plaintiff's argument that bars her ADEA claim. The summary judgment record does not include any evidence that plaintiff suffered an adverse employment action, which is a necessary part of her *prima facie* case. Williams offered plaintiff a choice between keeping her job and complying with its request to complete a performance improvement plan ("PIP"), or seek redeployment within the company. Williams unequivocally did not guarantee that plaintiff would be given a position with equivalent pay, or any position at all, during redeployment. The Tenth Circuit has held that placing an employee on a PIP, standing alone, is not an adverse employment action. *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 2006 WL 2258836 (10th Cir.2006). In this case, plaintiff quit before she could be placed on a PIP. Therefore, she must rely on a constructive discharge theory in order to prove that she suffered an adverse employment action under the ADEA.

In order to prove that she was constructively discharged, plaintiff must establish that a reasonable person in the same circumstances would have felt compelled to resign. *MacKenzie v. City & County of Denver,* 414 F.3d 1266, 1281 (10th Cir.2005); *Exum v. United States Olympic Committee,* 389 F.3d 1130, 1136 (10th Cir.2004). The Tenth Circuit has established a high standard to survive summary judgment on a claim of constructive discharge, stating:

*13 Constructive discharge occurs when the

employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had *no other choice* but to quit. The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant.

*Sandoval v. City of Boulder,* 388 F.3d 1312, 1325 (10th Cir.2004) (quoting *Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir.1998)). This is an objective test, and a court may not consider the employee's or employer's subjective views of the working environment. *Tran v. Trustees of State Colleges in Colorado,* 355 F.3d 1263, 1270 (10th Cir.2004). It must be apparent that the working conditions would have been intolerable to a reasonable person, not simply that the employee was subjectively unhappy because of the actions of her employer. *See Baca v. Sklar,* 398 F.3d 1210, 1216 (10th Cir.2005). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998).

Plaintiff has not offered any evidence that would prove that a reasonable person would have felt she had no other choice but to resign her employment. In this case, plaintiff always had the option to keep her job in the scheduling department of the independent terminals group. She rejected the opportunity to participate in a PIP to improve her allegedly poor interpersonal skills. Plaintiff's disagreement with her supervisor's evaluation, while it may have made plaintiff subjectively uncomfortable, is not objective evidence that her working conditions were intolerable. Williams has presented many years of evaluations, dating back to 1987, showing that plaintiff has consistently been found to have poor interpersonal skills. However, the Court may not consider plaintiff's personal feelings about these evaluations. Although plaintiff has introduced evidence of one example when an older worker, Lee Selby, was allegedly terminated because of his age, plaintiff does not ever state Selby's age or produce any evidence that would support an inference that Selby was fired because of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.