# Exhibit 10

(Unreported Cases)

LEXSEE

**DARRELL J. ANDREWS, Plaintiff, v. ABBOTT LABORATORIES, Defendant.**

**C.A. No. 00-901 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 6832; 82 Empl. Prac. Dec. (CCH) P41,102**

**April 18, 2002, Decided**

**DISPOSITION:** Defendant's motion for summary judgment GRANTED. Judgment entered in favor of defendant.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Prior to filing suit, plaintiff employee filed a claim with the Equal Employment Opportunity Commission. A right to sue letter was issued. The employee then sued defendant employer alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and 42 U.S.C.S. § 1981, with regard to the employer's promotion policy The employer moved for summary judgment.

**OVERVIEW:** In addition to the five claims the employee brought before the Equal Employment Opportunity Commission (EEOC), he also alleged two additional claims. Since the two additional claims were not raised with the EEOC, the employer maintained that the employee had not exhausted his administrative remedies with regard to them. The court found that the two claims were fairly within the scope of the prior EEOC charge. The employer then argued that the employee's claims were barred by the statute of limitations. The court determined that the continuing violation exception to the statutes of limitations applied. For the exception to apply, one incident had to fall within the statute of limitations period. The court found that two incidents fell within the limitations period. However, the employee failed to meet his evidentiary burden with respect to both of the incidents. In regards to the first incident, while the employee established the first three prongs of his prima facie case, he failed to establish the fourth one. In regards to the second incident, the employee failed to meet his McDonnell Douglas burden on two counts.

**OUTCOME:** The employer's summary judgment motion was granted, as was its motion to strike.

**CORE TERMS:** manager, human resources, interview, liaison, regional, clinical, promotion, specialist, continuing violation, summary judgment, training, statute of limitations, specialty, promoted, sales position, admits, prima facie case, qualification, deposition, sales representative, discriminatory act, discriminatory, resignation, eligible, race discrimination, failed to meet, prima facie, non-moving, discrete, prong

**COUNSEL:** [*1] For DARRELL J. ANDREWS, plaintiff: Lance J. Nelson, MacElree, Harvey, Gallagher, Featherman & Sebastian, Ltd., West Chester, PA.

For ABBOTT LABORATORIES, defendant: Darryl K. Fountain, Darryl K. Fountain, Esq., Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On October 17, 2000, the plaintiff, Darrell J. Andrews ("Andrews"), filed the above-captioned action against his former employer, Abbott Laboratories ("Abbott"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981. Specifically, Andrews alleges discrimination with regard to Abbott's promotion policies.

Presently before the court is Abbott's motion for summary judgment. For the following reasons, the court will grant this motion.

Case 1:05-cv-00697-MPT    Document 63-11    Filed 11/06/2006    Page 3 of 83

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [*2] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir. 1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir. 1999).

With these standards in mind, the court will describe the facts that led to the motions presently before the court.

## III. BACKGROUND

Andrews began his employment with Abbott on or about March 29, 1993 as a sales trainee in Abbott's [*3] Diagnostics Division ("ADD"). On October 11, 1993, he was promoted to the position of Area Account Manager II. n1

n1 On or about November 6, 1995, he was further promoted to the position of Area Account Manager I.

### A. The Transfer to PPD

In October 1995, Andrews sought a transfer from ADD to a sales representative position in Abbott's Pharmaceutical Products Division ("PPD"). At his deposition, Andrews acknowledged that transferring to a sales representative position in PPD would not have constituted a promotion or a salary increase.

When Andrews requested a transfer to PPD, Dave Kruger, his regional manager, told him that he could not transfer out of ADD. Sometime thereafter, Andrews contacted Abbott's human resources department to complain about not being permitted to transfer. Specifically, he complained that four of his Caucasian counterparts were allowed to transfer out of ADD and into PPD, while he

was denied an opportunity to do the same. At that time, he believed that he was being discriminated against [*4] based upon his race, and he communicated that belief to Abbott's human resources department. Andrews admits to having been aware at that time that it was unlawful for an employer to discriminate against an employee based on his race.

In December 1995, Abbott's human resources department informed Andrews that he could transfer to PPD. His transfer became effective on January 15, 1996.

### B. The "Air Force" Position

In September 1996, Andrews learned about an open position in a division within PPD known as the "Air Force." Soon thereafter, he discussed the Air Force position with his district manager, John Villeneau ("Villeneau"). Andrews alleges that Villeneau informed him that he was not eligible for the Air Force position because he did not have enough time in his current position. Abbott subsequently hired an African American female to fill the Air Force position in question.

Abbott maintains that regional managers had various philosophies on how long a subordinate should remain in a position before seeking a promotion. Generally, Abbott expected employees to stay in a position for two years before moving to another sales position or being considered for a promotion. However, Abbott [*5] admits that there was no written policy governing how long a person had to remain in a position before seeking a promotion.

Andrews believes that he suffered discrimination with regard to the Air Force position because two Caucasian employees who had begun working for PPD at the same time as he had were allegedly promoted in 1996 to specialty positions. Abbott maintains that, in fact, one of the employees in question was promoted to a specialty sales position in a different sales region from Andrews. Abbott further maintains that the other employee in question did not work in Andrews' sale region, nor did she report to his regional manager. Further, both individuals were not promoted to specialty positions until May and June 1997, respectively.

Although Andrews testified that he believes the denial of an opportunity to interview for the Air Force position was an act of discrimination, he did not complain to Abbott's human resources department about this. Moreover, he testified that there was "no reason in particular" that he did not complain to human resources.

### C. The SR Position

In March 1997, Andrews approached Villeneau about interviewing for a specialty sales position known [*6] as the "SR position." Villeneau informed Andrews that he would relay that request to Park Lamberton

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

("Lamberton"), Andrews' regional manager and Villeneau's boss. Villeneau later informed Andrews that Lamberton would not allow him to interview for that position because he needed to have served at least two years in his current position to be eligible for an interview.

With regard to this position, Andrews argues that he suffered discrimination because a Caucasian employee was granted an interview for a specialty sales position, while he was not. He further alleges that this individual also had less than two years in his current position. Abbott contends that, in fact, that employee had been at his current position from October 15, 1995 to December 15, 1997 - two years and two months - at the time of his promotion.

Although Andrews believes that the denial of an opportunity to interview for the SR position in March 1997 was an act of discrimination, he once again failed to report this concern to Abbott's human resources department.

### D. The HIV Institutional Representative Position

In August 1997, Andrews interviewed for an HIV institutional representative position. The representative's [*7] job duties included acting as a liaison between Abbott and various hospitals and medical schools and marketing the drug Norvir to those institutions. Both the original HIV institutional position and the HIV specialist position were considered promotions from a primary care sales representative position. Furthermore, both positions were at the same grade level and had equal opportunities for bonuses and increased base salaries. The HIV institutional position reported to Joseph Mosso ("Mosso"), the HIV district sales manager.

Mosso interviewed two candidates for the HIV institutional position, Andrews and Marc Marrone ("Marrone"), a Caucasian. Both Andrews and Marrone were primary care sales representatives, although they were in different districts, had slightly different titles, and reported to different district managers. Specifically, Andrews was a Professional Products Representative ("PPR") and reported to Villeneau. Marrone was a Professional Marketing Representative ("PMR") and reported to Bill Craney.

Mosso ultimately selected Marrone for the position. At his deposition, Mosso gave two reasons for his decision. First, Marrone displayed an enthusiasm and passion for the HIV [*8] institutional position that was lacking in Andrews. Second, Marrone resided in Philadelphia, Pennsylvania, whereas Andrews lived in Bear, Delaware. Mosso further testified that, if possible, Abbott tries to locate qualified people who live in the territory in which they will work.

Andrews again believed that his rejection was discriminatory. However, he failed to report this complaint to Abbott's human resources department.

In November 1997, an HIV specialist position became available in Mosso's district. The position was located in Delaware, where Andrews still lived. Mosso called Andrews and offered him the position, without considering anyone else and without requiring that Andrews appear for a second interview. Andrews admits that he accepted this promotion without interviewing for the position.

### E. The District Manager Position in the Long Term Care Division

In June 1998, Andrews sought to be promoted to a district manager position in a new division known as the Long Term Care Division. Andrews feels that Abbott discriminated against him because he was not allowed to interview for the district manager position. However, Andrews is not aware of any HIV specialist who was allowed [*9] to interview for the position. In fact, Abbott maintains that it created this division to market a new product. Accordingly, it intended to fill the Long Term Care district manager positions with employees who had previous experience as district managers. The four individuals who ultimately filled the available positions were experienced district managers.

Andrews again felt that Abbott was discriminating against him. However, he failed to file a complaint with Abbott's human resources department, and he did not include this allegation in his letter of resignation. He further failed to include this allegation in his charge of discrimination.

### F. The Regional Training Specialist Position

Andrews alleges that, on or about September 1998, he sought a regional training specialist position, but was denied an opportunity to interview for the position. Douglas Woolley ("Woolley"), the regional sales manager, made the hiring decision for the regional training specialist position at issue. He testified that he does not recall Andrews contacting him or leaving any messages about his interest in the regional training specialist position. In fact, Woolley testified that the position was not [*10] available in 1998. From June 16, 1997 to approximately February or March 1999, Ben Naparstek ("Naparstek") held that position.

In the summer or fall of 1998, Naparstek was scheduled to be promoted to a district manager position. Around that time, Abbott made the decision to eliminate one of its sales divisions, known as the Air Force. Abbott then gave the district manager position that Naparstek was scheduled to receive to one of the Air Force district managers. Naparstek returned to his regional training

Case 1:05-cv-00697-MPT    Document 63-11    Filed 11/06/2006    Page 5 of 83

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

specialist position within a day or two of leaving that position. During the brief period of time that Naparstek was a district manager, Woolley testified that he did not solicit any candidates for the regional training specialist position, nor did he consider any candidates for that position.

Andrews believes that he was discriminated against because when he called Woolley to inquire about the regional training specialist position, Woolley did not return his telephone call. Andrews further maintains that Woolley did not contact him when the position finally became available in 1999. Andrews never reported this allegedly discriminatory incident to Abbott's human resources department, [*11] nor did he include this allegation in his letter of resignation. Finally, Andrews failed to include the regional training specialist position in his EEOC complaint.

### G. The Clinical Liaison Position

In February 1999, Abbott converted the HIV institutional representative position into a newly created position known as a clinical liaison. The two HIV institutional representatives in Andrews' district were Marrone and Se Se Yennes ("Yennes"). Accordingly, when the HIV institutional representative position was converted into the clinical liaison position, Marrone and Yennes accepted the clinic liaison positions.

Andrews was an HIV specialist, but not an HIV institutional representative at the time that the clinical liaison position was created. He admits that he knows of no person who became a clinical liaison who did not hold the position of HIV institutional representative at the time the clinical liaison position was created.

Andrews did not file a complaint about this allegedly discriminatory act with Abbott's human resources department.

### H. Andrews' Resignation and Initiation of Suit

On March 22, 1999, Andrews forwarded his letter of resignation to Mosso. In that letter, Andrews [*12] alleged that he had suffered discrimination with regard to promotional opportunities at Abbott. Mosso testified that the letter of resignation was the first time that Andrews had expressed this view to him.

On May 27, 1999, Andrews filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The charge lists the following allegations: (1) Andrews was initially not allowed to transfer from ADD to PPD; (2) he was not allowed to interview for a specialty sale position in September 1996; (3) he was not allowed to interview for a specialty sales position in March 1997; (4) he was denied the promotion to HIV institutional representative in July 1997;

and (5) he was not informed about or considered for the clinical liaison position in February 1999.

On July 21, 2000, the EEOC issued a Notice of Right to Sue Letter to Andrews. On October 17, 2000, he filed a complaint against Abbott, which was subsequently amended in February 2001.

## IV. DISCUSSION n2

> n2 Andrews alleges a disparate impact claim for the first time in his Answer Brief. However, having pursued this case solely on a disparate treatment theory, he cannot now change theories after a motion for summary judgment has been filed. *See Bulkoski v. Bacharach, Inc.*, 1 F. Supp. 2d 484, 487 (W.D. Pa 1997) (denying a change in legal theory after a motion for summary judgment had been filed). Accordingly, the court will disregard Andrews' disparate impact argument.

[*13]

### A. Exhaustion of Administrative Remedies

In addition to the five claims Andrews brought before the EEOC, Andrews has also alleged two additional claims in his complaint: (1) in June 1998, Abbott denied him the opportunity to interview for the position of district manager in the Long Term Care division and (2) in September 1998, Abbott refused to consider him for the position of Regional Training Specialist. Because these two additional claims were not raised with the EEOC, Abbott maintains that Andrews did not exhaust his administrative remedies with regard to them.

The Third Circuit has recognized that there are limitations on the presentation of new claims in the trial court that were not included in the EEOC charge. *See Howze v. Jones & Laughlin Steel, Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984). Specifically, a trial court may assume jurisdiction over claims not included in the EEOC charge only if the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC charge or the investigation arising therefrom. *See Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996).

On the present facts, the court recognizes that Andrews' [*14] EEOC complaint listed certain specific allegedly discriminatory acts. However, in the "additional text" pages attached to the Charge of Discrimination, Andrews ends by stating "I believe Respondent systematically discriminates against blacks in that they are kept in non-mangement [sic] positions and denied promotional opportunities to higher ranking field and internal positions." Further, in his opposition brief to the present motion, Andrews states that he is claiming racial

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

discrimination arising out of "the repeated failures of Abbott to inform or allow him, as a minority, of promotional opportunities within the organization. [sic]" The court therefore concludes that the two additional instances of alleged promotion discrimination, falling within the same time period as the specifically alleged acts, are fairly within the scope of the prior EEOC charge.

B. Statute of Limitations

Abbott next argues that the majority of Andrews' claims are barred by the statutes of limitations applicable to Title VII claims and Section 1981 claims. The court will address each type of claim in turn.

1. Title VII Statute of Limitations

In this jurisdiction, a claim of employment discrimination [*15] under Title VII must be filed with the EEOC within 300 days of the last alleged discriminatory act. n3 See 42 U.S.C. § 2000e-5(e); see also Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476 (D. Del. 2001). Failure to file a charge of discrimination within the applicable period constitutes a ground for dismissal of the claim. See Parker v. State of Delaware Department of Public Safety, 11 F. Supp. 2d 467, 472 (D. Del. 1998).

n3 Typically, a claim of employment discrimination under Title VII must be filed with the EEOC within 180 days of the last alleged discriminatory act. See 42 U.S.C. § 2000e-5(e). However, Delaware allows claimants who file either with the EEOC or the Delaware Department of Labor to rely on the 300 day statute of limitations. See Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476, 490 (D. Del. 2001).

In the present case, Andrews filed a charge of discrimination with the [*16] EEOC on May 27, 1999. Thus, for an alleged unlawful employment practice to have been within 300 days of the EEOC charge filing date, it would have had to occur on or after July 31, 1998. Andrews, however, alleges discrimination in October 1995, September 1996, March 1997, August 1997, June 1998, September 1998 and February 1999. Accordingly, absent the application of the continuing violation doctrine, the only claims that Andrews is not barred from pursuing are the September 1998 claim concerning the regional training specialist position and the February 1999 claim concerning the clinical liaison position.

2. Section 1981 Statute of Limitations

The statute of limitations applicable to Section 1981 claims is the Delaware two-year personal injury statute of limitations. See Cuffy v. Getty Refining & Marketing Co., 648 F. Supp. 802, 807 (D. Del. 1986). Accordingly, Andrews' Section 1981 claims will be barred unless they were filed within two years of his sustaining injury due to Abbott's alleged discrimination. See id. Andrews filed suit on October 17, 2000. Thus, any claim that occurred before October 17, 1998 is time barred. Applying the law to the present facts, [*17] all of Andrews' Section 1981 claims, except the February 1999 claim, are barred absent the application of the continuing violation doctrine.

C. Continuing Violation Doctrine

As alluded to above, the Third Circuit recognizes an exception to the strict application of the limitations periods under Title VII and 42 U.S.C. § 1981. This exception is known as the "continuing violation doctrine." See West v. Philadelphia Elec. Co., 45 F.3d 744, 756 (3d Cir. 1995). Under this exception, a plaintiff may pursue a claim for discriminatory conduct that began prior to the filing period if he or she can demonstrate that the act is part of an ongoing pattern or practice of discrimination. See Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997) (following the Fifth Circuit's leading approach in Berry v. Board of Supervisors Louisiana State Univ., 715 F.2d 971 (5th Cir. 1983)). However, before this doctrine applies, the plaintiff must show that at least one discriminatory act occurred within the limitations period. See id.

Although recognizing the vitality of this doctrine, the Third Circuit cautions [*18] against allowing stale claims to proceed under the rubric of a continuing violation. See id. Specifically, the Rush court noted that to allow stale claims to proceed would be inconsistent with the administrative procedure established by Title VII which contemplates the prompt filing of charges. See id.

Furthermore, the Fifth Circuit has held that a one-time employment event such as a failure to promote is the sort of "discrete and salient event that should put the employee on notice that a cause of action has accrued." See Huckabay v. Moore, 142 F.3d 233, 240 (5th Cir. 1998). Similarly, in a more recent Fifth Circuit opinion, the court stated that an employee who claims to be the victim of a racially motivated failure to promote is put on notice that his rights have been violated at the time the adverse employment decision occurs. That employee must therefore bring the claim within 180 days of the adverse decision. See Celestine v. Petroleos De Venezuella SA, 266 F.3d 243, 354 (5th Cir. 2001); see also West, 45 F.3d at 756 (noting in dicta that there is no continuing violation for discrete events, such as a denial of a [*19] promotion, because such events trigger the duty to assert the lost right caused by the deprivation.). The Seventh Circuit takes a similar approach. See Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis, 42 F.3d

1054, 1058 (7th Cir. 1994) (holding that "if the plaintiff knew or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations.").

However, the court recognizes that there is case law from courts within this circuit, and other circuits, which concludes otherwise. Specifically, in *Wright v. ICI Americas, Inc.*, the Delaware District Court held, on similar facts, that allegations of numerous failures to promote were allegations of a "broad policy of discrimination and for purposes of a summary judgment motion should not be broken down into discrete acts of discrimination." 813 F. Supp. 1083, 1088 (D. Del. 1993); *see also, Tyson v. Sun Refining and Marketing Co.*, 599 F. Supp. 136, 139 (E.D. Pa. 1984) (denying summary judgment as to alleged discrimination which had occurred twelve years earlier [*20]  because the plaintiff alleged a broad policy of discrimination); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760 (9th Cir. 1980).

Andrews began his employment at Abbott in 1993 as a sales trainee in Abbott's Diagnostics Division ("ADD"). In 1995, he sought a transfer to a sales representative position in Abbott's Pharmaceutical Products Division ("PPD"). He alleges, however, that his regional manager would not allow him to transfer to PPD. Because Andrews was aware that several of his white colleagues had been allowed to transfer to PPD, he filed a discrimination complaint with Abbott's human resources department. He further testified at his deposition that he understood it was against the law for an employer to discriminate against an employee based on that employee's race. As a result of this complaint, Andrews received his transfer.

On these facts, it is clear that, as early as 1995, Andrews was fully aware that race discrimination in employment is illegal, he was convinced that he was the victim of such illegal discrimination, and he made an internal complaint. However, he chose not to pursue his rights through the EEOC's enforcement process - presumably [*21]  because he achieved his desired result through Abbott's human resources department. His remaining failure to promote claims follow the same pattern, although he curiously never again sought the assistance of Abbott's human resources department.

Specifically, in September 1996, he learned of an open position in a division known as the Air Force. His manager told him he was not eligible for that position because he did not have enough time in his current position. As with his failure to be transferred to PPD when he first requested it, he believed that the denial of an opportunity to interview for this position was an act of illegal discrimination. However, "for no reason in particular," he chose not to file a complaint with Abbott's human resources department.

Likewise, Andrews testified that at the time of the March 1997, August 1997 and June 1998 incidents, he felt that he had suffered discrimination, but that he nonetheless failed to file a complaint with Abbott's human resources department, the EEOC, or the court. Thus, in each of the above instances of alleged discrimination, he knew of the alleged violation at the time it occurred, he believed that he was the victim of the discrimination, [*22]  and he knew that race discrimination was illegal. Based on these facts, the court has doubts as to whether the continuing violation doctrine should operate to save these claims. However, out of an abundance of caution in light of the important issue at stake, the court concludes that Andrews' allegations are eligible for continuing violation status because it is feasible to read them as alleging an on-going, broad policy of discrimination.

D. The September 1998 and February 1999 Claims

Assuming, as the court will, that the October 1995, September 1996, March 1997, August 1997, and June 1998 incidents can be included as continuing violations, at least one act of discrimination must nevertheless have occurred during the limitations period. *See Rush*, 113 F.3d at 481. As the court stated above, the September 1998 and February 1999 incidents fall within the 300 day statute of limitations for Title VII claims, and the February 1999 incident falls within Section 1981's two-year statute of limitations. However, the court concludes that Andrews has failed to meet his evidentiary burden with respect to both of us these incidents.

There is no direct evidence of racial discrimination [*23]  in the record. Therefore, the court will utilize the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). In order to establish a *prima facie* case under the *McDonnell Douglas* test, Andrews must prove the following elements: (1) he belongs to a racial minority; (2) he applied, and was qualified, for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons of his qualifications. *See Equal Employment Opportunity Commission v. Metal Service Co.*, 892 F.2d 341, 347, n.7 (3d Cir. 1990).

1. The September 1998 Incident

Based on his complaint, Andrews' claim of discrimination as to the September 1998 incident appears to rest on his belief that the position became open at that time. n4 Andrews then abandons the allegations in his complaint, and instead argues that when the position did be-

come open in March 1999, Abbott should have sought him out for the position. As Andrews no longer disputes that the position was never [*24] open in September 1998, the court will address only his later allegation.

> n4 Abbott maintains that the position was never open.

Andrews maintains that he had heard that the Regional Training Specialist position would be opening in September 1998 due to Naperstec's anticipated promotion. As he was interested in pursuing this job opportunity, he testified to having left several telephone messages with the Regional Manager Doug Woolley ("Woolley"). Andrews alleges that Woolley had previously met with Andrews and was aware of his interest in moving forward in the company. Andrews further alleges that Woolley knew that he worked as a Regional Field Trainer, a voluntary position similar to the position of Regional Training Specialist.

Although Abbott strongly contests that Woolley was "well aware" of Andrews' career aspirations, the court must assume that he was aware of these aspirations for purposes of deciding this motion. However, even making that assumption, the court concludes that Andrews has failed to carry [*25] his *prima facie* burden with regard to this incident.

Andrews has supplied sufficient evidence to meet the first three prongs of his *prima facie* test. First, there is no dispute that he is a member of a racial minority. Second, it is well-settled that an employee need not actually apply for the position so long as he or she reasonably informed management of an interest in the open position. *See EEOC, 892 F.2d at 348.* Andrews further alleges that his work experience was comparable to that required for the new position. These allegations are sufficient to create a genuine issue of material fact with regard to the second prong. Third, he clearly did not receive the job. However, with regard to the fourth prong, he provides no evidence as to who was invited to interview for the position, what those individual's credentials were, or whether the position was ever filled, and if so, by whom.

Moreover, Andrews' argument that Abbott should have actively sought him out to offer him a chance at this job opportunity is insufficient to establish his *prima facie* case. Aside from this conclusory allegation, he has offered no supporting evidence on this point. n5 Absent [*26] such evidence, it would be unreasonable to infer that, without an explanation, the employer's actions were more likely than not based on discrimination. *See EEOC, 892 F.2d at 348* (noting that, although the *McDonnell Douglas prima facie* test is not inflexible, the

plaintiff must nonetheless produce evidence sufficient to create an inference that the employment decision was based on impermissible criteria.) On this record, no reasonable factfinder could conclude that Abbott's management was discriminating against Andrews solely because Abbott failed to actively seek him out for a position that he had expressed an interest in six months earlier, before the position had even became available.

> n5 Instead, Andrews engages in a lengthy discussion of the lack of procedure governing internal transfers. While the court recognizes that a lack of procedure may indeed be relevant in the context of alleged discrimination, such allegations alone cannot establish Andrews' *prima facie* case.

### 2. The February [*27] 1999 Incident

Andrews next alleges that, in February 1999, Abbott failed to promote him to a newly-created position known as a clinical liaison. The court concludes, however, that Andrews has failed to meet his *McDonnell Douglas* burden on two counts. n6

> n6 In defense of this claim, Andrews attempts to rely on evidence produced in an unrelated lawsuit against Abbott. *See* Plaintiff's Appendix Exhibits 6, 7, and 8. Abbott has moved to strike these exhibits because they fail to comply with Federal Rule of Civil Procedure 56(e). The court agrees. The exhibits in question have not been identified by a sworn affidavit, nor have they otherwise been made admissible into evidence. Instead, Andrews' counsel has submitted a signed, but unsworn, statement in which he purports to certify the authenticity of the exhibits. This clearly runs afoul of the Rule 56(e) requirements. Additionally troubling is the fact that Andrews candidly admits that these exhibits were not produced during discovery in the present case. For these reasons, the court will disregard this evidence for purposes of deciding the present motion.

[*28]

First, Andrews has not provided any evidence demonstrating that he was qualified for the clinical liaison position. Abbott maintains that the relevant qualification for becoming a clinical liaison was that the applicant must, at that time, have held the position of HIV institutional representative. Andrews has offered no contrary evidence. Moreover, Andrews acknowledges that he was

2002 U.S. Dist. LEXIS 6832, *; 82 Empl. Prac. Dec. (CCH) P41,102

not an HIV institutional representative, nor is he aware of any person who became a clinical liaison who was not previously an HIV institutional representative. Finally, there is no dispute that the two individuals in Andrews' district who became clinical liaisons were, in fact, HIV institutional representatives. Accordingly, Andrews has brought forth no evidence that he was qualified for this position.

Additionally, Andrews has failed to establish that another similarly situated employee (i.e., a non-HIV institutional representative) had an opportunity to interview for the position of clinical liaison. Thus, he cannot meet the fourth element of his *prima facie* case, namely, that, after his rejection, Abbott continued to seek applications from individuals of his qualification.

Because Andrews has [*29] failed to meet his evidentiary burden with respect to the only incidents to have allegedly occurred within either the Title VII or Section 1981 statute of limitations, the court will grant summary judgment on these claims. As there remain no incidents which occurred within the statute of limitations period for either Title VII or Section 1981, a "continuing viola-

tion" theory cannot save Andrews' remaining time-barred claims. *See* Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997).

## V. CONCLUSION

The court concludes that each of Andrews' claims must fail as being untimely or for lack of any supporting evidence of discrimination.

For these reasons, IT IS HEREBY ORDERED that:

1. Abbott's motion for summary judgment (D.I. 25) is GRANTED.

2. Judgment BE AND IS HEREBY ENTERED in favor of Abbott.

3. Abbott's motion to strike (D.I. 34) is GRANTED.

Date: April 18, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE

**WILLIAM T. BROKENBAUGH, Appellant v. EXEL LOGISTICS NORTH AMERICA, INC., a corporation; JANE DOE, Individually; JOHN DOE**

**NO. 04-4106**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**174 Fed. Appx. 39; 2006 U.S. App. LEXIS 6015**

**January 25, 2006, Argued**
**March 9, 2006, Opinion Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the District of New Jersey. (D.C. Civil Action No. 01-cv-02273). District Judge: Hon. Robert B. Kugler. Brokenbaugh v. Exel Logistics N. Am., Inc., 2004 U.S. Dist. LEXIS 29429 (D.N.J., Sept. 27, 2004)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee sought review of a judgment from the United States District Court for the District of New Jersey, which granted summary judgment in favor of appellee employer with respect to the employee's claim that he was unlawfully fired because of his race, gender, and/or his age in violation of the New Jersey Law Against Discrimination (NJLAD) N.J. Stat. Ann. § 10:5-1 et seq., and 42 U.S.C.S. § 1981.

**OVERVIEW:** The employee was an African-American male who worked for his employer for 13 years as a forklift operator. His work record showed numerous problems, including repeated drug issues. He was terminated after an incident in which his superior believed that the employee had falsely told him that he was sick and left work to detail a car instead. The employee was 40 years old at the time. The district court granted summary judgment in favor of the employer after applying the three-part burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green. On review, the court agreed that the employer had satisfied its burden of offering a legitimate non-discriminatory reason for his firing, i.e., that the employee's dishonesty with his super-

visor was "the last straw"--the breaking point for the employee's heavy load of workplace infractions. It also agreed that the employee failed to demonstrate that the employer's proffered reasons were pretext for discrimination. According to the court, a reasonable factfinder could not conclude that an impermissible factor like race, gender, or age played a role in the employer's decision making process.

**OUTCOME:** The court affirmed the judgment in favor of the employer.

**CORE TERMS:** summary judgment, supervisor, pretext, warned, terminated, workplace, manual, gender, infractions, dishonesty, misconduct, cocaine, fired, personnel file, co-worker, personal knowledge, factfinder, motivating, termination, determinative, played, continued employment, drug rehabilitation, counseling, forklift, competent to testify, breach of contract, impermissible, tendered, firing

**COUNSEL:** Dennis K. Kuroishi (Argued), Mt. Ephraim, NJ, Attorney for Appellant.

Patricia A. Smith (Argued), Ballard, Spahr, Andrews & Ingersoll, Voorhees, NJ, Attorney for Appellee.

**JUDGES:** BEFORE: RENDELL and STAPLETON, Circuit Judges, and POLLAK, * District Judge.

     * Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** STAPLETON

**OPINION:**

174 Fed. Appx. 39, *; 2006 U.S. App. LEXIS 6015, **

[*40]  OPINION OF THE COURT

STAPLETON, Circuit Judge:

William Brokenbaugh is an African-American male who worked for Defendant Exel Logistics ("Exel") for 13 years as a forklift operator. On May 25, 2000, Exel terminated his employment. He was 40 years old at the time. Brokenbaugh claims that he was unlawfully fired because of his race, his gender, and/or his age. Exel claims that it reached its decision to fire Brokenbaugh because an incident of perceived [**2] dishonesty with a supervisor concluded a long story of persistent misconduct on the job. The District Court granted summary judgment in favor of the employer. We agree that summary judgment was appropriate.

In the years leading up to May 25, 2000, Exel recorded numerous incidents of workplace misconduct by Brokenbaugh. In October 1994, Brokenbaugh tested positive for cocaine while on the job. In October 1997, he received a warning for having threatened a co-worker. In August 1998, Brokenbaugh was involved in an accident with his forklift. While there was no property or personal damage, Exel tested Brokenbaugh for drugs and he again tested positive for cocaine. Two months later, in November 1998, Brokenbaugh for a third time tested positive for cocaine while on the job. In December 1998, Brokenbaugh and Exel's General Manager signed a document in which Brokenbaugh promised to participate in drug rehabilitation. In 1999, Brokenbaugh continued to receive warnings from Exel for misconduct -- once for having performed his duties in a careless manner and once for insubordination. In January 2000, he was again warned for performing substandard work. In May 2000 -- days before his termination [**3] -- he was warned for having threatened the same co-worker whom he had been warned for threatening in 1997. These instances were documented by written warnings that cite the company "work rule" that had been violated and that were signed and dated by Brokenbaugh and his supervisors.

Brokenbaugh is afflicted with glaucoma which caused him to suffer severe migraine headaches from time to time. He would relieve his headaches by taking aspirin, resting for a period of time, and engaging in relaxing activities. An activity he found relaxing was washing cars of his [*41] fellow employees. Early in the day on May 25, 2000, Brokenbaugh told a supervisor that he had a migraine headache and obtained permission to leave the workplace. As he was leaving, Brokenbaugh ran into a co-worker, Virginia Tighe, whose car he had an appointment to detail that evening. Instead of waiting until the evening, he drove the car to his home, rested for a couple of hours to allow the headache to subside, and then detailed Tighe's car. He returned to the job site at 4:00 p.m. to drop off the car. Brokenbaugh did not attempt to collect compensation for the time he took off.

During that day at Exel, Michelle Burden, Brokenbaugh's [**4] supervisor, received a complaint from a colleague that Brokenbaugh was not out sick, as he had claimed, but rather that he had left work in order to detail Tighe's car. After she confirmed with Tighe that Brokenbaugh was detailing her car, Burden wrote a memo to Exel's General Manager, Scott Dintiman, outlining the situation. Dintiman and Exel's Regional Human Resources Manager for the Northeast, Alan Schaefer, confirmed the facts with Burden and Tighe and discussed what action should be taken. Schaefer, who was not familiar with Brokenbaugh, reviewed his personnel record and concluded that he had a "very checkered past" at Exel. App. at 208a. In order to confirm what had happened before they took action, Schaefer and Dintiman decided to wait and see if Brokenbaugh returned with Tighe's car.

According to Brokenbaugh, when he returned to work with the car, Burden directed him to Dintiman's office. He was told that "because it appeared that Brokenbaugh had gone home to detail a car, Brokenbaugh was being suspended for dishonesty." Br. Appellant at 9. Brokenbaugh describes the meeting as one-sided -that "Dintiman did not allow Mr. Brokenbaugh to get a word in edgewise" which was not [**5] in accord with Exel's practice for dealing with infractions. Id. Exel describes the meeting similarly, but notes that Brokenbaugh admitted to Dintiman that he had detailed Tighe's car, and that Dintiman said that he believed that Brokenbaugh had deceived Burden in order to do this. In handwritten notes on the memo from Burden, Dintiman recorded that "I indicated that this was an issue with honesty & distrust. I informed him that he was being suspended & we would contact him when a decision was made." App. at 640. Brokenbaugh subsequently received a letter dated May 31, 2000, from Exel stating that his employment was being terminated for violating "work rule #1" which identifies as grounds for immediate discharge:

> Dishonesty of any kind, including, but not limited to, falsifying employment data, reports, timecards, or time records. Knowingly punching another associate's timecard is a violation of this rule.

District Ct. Op., App. at 10, App. at 632.

Brokenbaugh sued in the United States District Court in New Jersey claiming that he was terminated because of discrimination on account of his race, gender, and age in violation of the New Jersey Law Against Dis-

crimination [**6] ("NJLAD") and racial discrimination in violation of 42 U.S.C. § 1981. He also asserted claims based on common law wrongful discharge and breach of employment contract. After discovery, both Exel and Brokenbaugh moved for summary judgment.

The District Court granted summary judgment in favor of Exel on all claims. The Court applied the three-part burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to evaluate Brokenbaugh's discrimination [*42] claims under the NJLAD and § 1981. Applying the three-part, burden-shifting framework, the District Court either found or assumed with respect to each claim that Brokenbaugh had established his prima facie case of discrimination and that Exel had satisfied its burden of offering a legitimate non-discriminatory reason for his firing, *i.e.*, that Brokenbaugh's dishonesty with his supervisor on May 25, 2000, was "the last straw" -- the breaking point for Brokenbaugh's heavy load of workplace infractions. On the third step of the *McDonnell Douglas* framework, the District Court concluded that Brokenbaugh had not demonstrated that Exel's proffered [**7] reasons were pretext for discrimination. The Court granted summary judgment in favor of Exel on Brokenbaugh's discrimination claims, as well as his common law claim of wrongful discharge and his breach of contract claim. n1

> n1 Brokenbaugh does not appeal the District Court's decision regarding his common law wrongful discharge claim.

Brokenbaugh makes four arguments on appeal. With respect to his discrimination claims, he argues (1) that the District Court considered materials that under Federal Rule of Civil Procedure 56(e) could not be properly considered in support of a motion for summary judgment; (2) that the District Court misperceived the governing law; and (3) that -even assuming the District Court applied the correct legal standards -it misapplied that law. Brokenbaugh also claims (4) that the District Court improperly granted summary judgment on his breach of contract claim.

The District Court properly exercised jurisdiction under 28 U.S.C. § § 1331, [**8] 1367 and our appellate jurisdiction rests on 28 U.S.C. § 1291 as the grant of summary judgment was a final order of a District Court. Our review of grants of summary judgment is plenary and we "must apply the same test employed by the District Court under Federal Rule of Civil Procedure 56(c)." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 (3d Cir. 2005). "In reviewing the grant of a motion for summary judgment, we (i) resolve conflicting evidence in favor of

the nonmovant, (ii) do not engage in credibility determinations, and (iii) draw all reasonable inferences in favor of the nonmovant." *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

I.

Brokenbaugh argues that the District Court considered hearsay and otherwise inadmissible materials in violation of Federal Rule of Civil Procedure 56(e). The materials he challenges were before the court in an attachment to a sworn statement of Alan Schaefer. The materials are numerous documents from Brokenbaugh's personnel file chronicling his history of workplace misconduct. Brokenbaugh argues that Schaefer's [**9] sworn statement that these are "true and correct" copies of company documents is not sufficient because it "attempts to 'certify' as to information not within the personal knowledge of the putative affiant." Br. Appellant at 16.

In granting or denying a motion for summary judgment, courts consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" provided by the parties. Fed. R. Civ. P. 56(c). The Federal Rules instruct:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible [*43] in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed. R. Civ. P. 56(e). Brokenbaugh insists that Schaefer was not competent to testify to the matters within Brokenbaugh's personnel file because Schaefer lacked any personal knowledge of their truth.

Brokenbaugh is mistaken. Schaefer was competent to testify to the matters within the personnel file for the purpose of establishing Exel's motivation to discharge Brokenbaugh. [**10] When offered to show why Exel decided to fire Brokenbaugh, the out-of-court statements in Brokenbaugh's personnel file were not "offered in evidence to prove the truth of the matter asserted" and, thus, were not hearsay. *See* Fed. R. Evid. 801(c). Schaefer had the personal knowledge necessary to competently testify about the contents of Brokenbaugh's file and how they influenced Exel's decision. *See Capobianco v. City of New York*, 422 F.3d 47, 55-56 (2d Cir. 2005) (finding that a document in a personnel file of an ADA discrimination plaintiff was admissible to show the employer's state of mind in firing him and thus properly considered at summary judgment in accord with Rule 56(e)); *Aucutt*

174 Fed. Appx. 39, *; 2006 U.S. App. LEXIS 6015, **

*v. Six Flags over Mid-America, Inc.*, 85 F.3d 1311, 1317 (8th Cir. 1996) (finding an affidavit of a supervisor containing a third party's description of an incident involving a discrimination plaintiff was properly considered under Rule 56(e) because the affidavit "was based on [the supervisor's] personal knowledge of the reasons underlying the challenged employment decision"). n2

       n2 Brokenbaugh also contends that the affidavit provided by Alan Schaefer was defective because it "failed to include the jurat, acknowledgment, notarization or any other indication that Mr. Schaefer swore or affirmed the text of the affidavit before a person authorized to administer oaths." Br. Appellant at 16. In response, Exel points out that it resolved this issue by submitting a supplemental "Schaefer Declaration" that contained the same information as the affidavit in a form that complied with 28 U.S.C. § 1746. We agree with Exel. The supplemental "Schaeffer Declaration" satisfies the requirements of 28 U.S.C. § 1746 and thus is a valid affidavit for purposes of Rule 56. *See United States v. 225 Cartons, More or Less, of an Article or Drug*, 871 F.2d 409, 414 n.4 (3d Cir. 1989) ("These [declarations] were filed under penalty of perjury pursuant to 28 U.S.C. § 1746 (1982) and thus satisfy the affidavit requirement of Rule 56.").

[**11]

II.

Brokenbaugh contends that the District Court did not correctly understand what a plaintiff in his position must tender in order to survive summary judgment. Specifically, he contends that under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), and the 1991 Amendments to the Civil Rights Act as interpreted in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003), he needed only to tender evidence from which a factfinder could infer by a preponderance of the evidence that race, gender, and/or age was one factor that played a role in Exel's decision, *i.e.*, that it was a "motivating" factor and not necessarily the "determinative" one. Under these authorities, according to Brokenbaugh, once he tendered such evidence, Exel had the burden of showing that it would have made the same termination decision even in the absence of one or more of these motivating factors.

We may assume for present purposes that these Title VII authorities are generally applicable to discrimination claims based on 42 U.S.C. § 1981 and the NJLAD and that they are specifically applicable to the case reflected

in this [**12] record. While those propositions are by no means [*44] clear, n3 we may assume *arguendo* that they are because Brokenbaugh has not tendered evidence, direct or circumstantial, from which a factfinder could reasonably infer that race, gender, and/or age was even a "motivating" factor in Exel's decision. In short, both of the authorities Brokenbaugh invokes would require him to produce evidence from which a factfinder could reasonably conclude that an impermissible factor like race, gender, or age played at least some role in Exel's decision making process or evidence by which a factfinder could reasonably disbelieve Exel when it says it fired him for misconduct. Under either of the legal standards he invokes, his claim would still fail as the evidence he has presented would not allow a jury to reasonably reach either conclusion.

       n3 The 1991 Amendments to the Civil Rights Act by their terms are, of course, not applicable to § 1981, and *Desert Palace* does not suggest that they affect anything other than Title VII liability. The Supreme Court of New Jersey has not yet had occasion to address the issue of whether New Jersey law under the NJLAD will follow these Title VII amendments. *See Myers v. AT&T*, 380 N.J. Super. 443, 882 A.2d 961, 970-71 (N.J. Super. Ct. App. Div. 2005). ("The Third Circuit has not directly addressed the issue. Nor is there guidance from our own Supreme Court concerning how the decision in *Desert Palace* might alter its analysis . . . [in] mixed motive cases.") Finally, as we note hereafter, this record contains no "direct evidence" of discrimination as the kind necessary under *Price Waterhouse* to absolve a plaintiff of the duty to show "but for" cause -*i.e.*, that an impermissible consideration was a "determinative" cause.

[**13]

We note that the District Court's statement of the governing law gave Brokenbaugh the benefit of the rule he seeks:

       Where . . . the employer has proffered a legitimate nondiscriminatory reason for its action the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action.

District Ct. Op., App. at 28 (quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).* Under this statement of the governing rule, Brokenbaugh could escape summary judgment by tendering evidence of pretext (which would permit an inference satisfying either causation standard) or other evidence that would support an inference of *either* "a motivating cause" *or* "a determinative" one. Turning to the record, we find that Brokenbaugh tendered no such evidence.

III.

As we have indicated, Exel insists that Brokenbaugh was terminated because it believed that he had been dishonest with his supervisor on May 25, 2000, and that [**14] this was but one in a long line of other serious work infractions. The evidence regarding the information that Exel's decision makers, its General Manager and Regional Human Resources Manager, considered in making the discharge decision is undisputed both with respect to events of May 25th and with respect to Brokenbaugh's work history. With respect to the former, they were reliably advised or personally observed that Brokenbaugh had asked his superior if he could be excused from work because he was ill, that he had then taken a co-worker's car to detail with him as he left, and that he had returned the detailed car to the co-worker at the end of the day. With respect to Brokenbaugh's record, his personnel file disclosed the following:

8/19/94 - Brokenbaugh warned for testing positive for cocaine.

[*45]    10/3/97 - Brokenbaugh warned for threatening a co-worker.

8/3/98 - Brokenbaugh warned for forklift accident, testing positive for cocaine.

11/2/98 - Brokenbaugh tested positive for cocaine.

12/2/98 - Brokenbaugh signs agreement with company to get rehab to keep his job.

5/11/99 - Brokenbaugh warned for performing duties in a careless manner.

11/4/99 - Brokenbaugh warned for [**15] insubordination.

1/10/00 - Brokenbaugh warned for substandard work.

5/22/00 - Brokenbaugh warned for threatening the same employee as in 1997.

It is thus clear that from the perspective of Exel's decision makers there was ample cause for Brokenbaugh's discharge.

Brokenbaugh's principal response is that he did nothing wrong on May 25th because he did have a migraine headache that morning when he spoke to his supervisor and because there was no work rule requiring that he return to work that day so long as he did not ask to be paid for the day. There is evidence that would support such a finding. In the context of this record, however, that evidence does not speak to the pretext issue, or give rise to an inference of intentional discrimination. To show pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).* The pretext issue is not whether Exel had cause to terminate Brokenbaugh, but rather whether it believed [**16] it had such cause and acted upon that belief. The uncontradicted and contemporaneously documented evidence indicates that Exel's decision makers believed that he had a long history of misbehavior and that he had lied to his supervisor. Indeed, when Brokenbaugh was asked at his deposition whether he thought that Exel's General Manager Scott Dintiman believed that he had gone home in order to detail a car rather than because of sickness, Brokenbaugh acknowledged that he believed Dintiman had reached that conclusion; he argued only that Dintiman was wrong to have done so. In this context, evidence which supports only an inference that the employer was wrong will not support a finding of pretext.

Brokenbaugh also contends that pretext can be inferred from Exel's letter of May 31, 2000, which identified dishonesty as the reason for his discharge, but not his long history of workplace infractions. He points out that "if a plaintiff demonstrates that the reason given for [his] termination did not remain consistent . . . this may be viewed as evidence tending to show pretext." *See, eg., Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 284 (3d Cir. 2001).* [**17]  This is, of course, true, but, in context, a trier of fact could not reasonably conclude here that the difference between Exel's May 31, 2000, letter and its position in this suit was probative of whether its "last straw" explanation was a pretext for race, gender, and/or age discrimination. That letter informed Brokenbaugh that his employment was being terminated for dishonesty, and this was in fact the cause of his discharge even if it was viewed in light of

his prior offenses. His earlier offenses, though numerous and serious, had not resulted in his being fired, and he would not have been fired but for the perceived dishonesty. The letter was thus not inconsistent with Exel's explanation in this litigation regarding what motivated its decision, at least [*46] not in a way that would support an inference of pretext.

Finally, Brokenbaugh insists that an inference that race, gender, and/or age played a role in Exel's decision can be drawn from his evidence regarding "comparators" -- other employees not members of his race, gender or age group who he claims were treated more favorably. Brokenbaugh identifies 19 employees at Exel who he claims were similarly situated and had been treated [**18] with more leniency than Brokenbaugh. After reviewing the evidence, we find no evidence of an employee at Exel that had amassed a record so replete with workplace infractions that he or she might be considered similarly situated to Brokenbaugh. Nor did any of the employees Brokenbaugh identifies engage in misconduct for as long as he did. n4 The two employees whose records come the closest to Brokenbaugh's -- Patrick Beals and Gene Gurlin -were also discharged for their misconduct and do not appear to have been tolerated for as long as Brokenbaugh.

n4 Brokenbaugh points to several employees who had amassed certain levels of points in a system devised by Exel to track absences. However, Brokenbaugh was not terminated on the basis of his absences or the point level he achieved based on those absences. We evaluate the evidence only as it pertains to "the criteria identified by the employer, not the criteria only the plaintiff thinks are important." See *Simpson v. Kay Jewelers*, 142 F.3d 639, at 647-48.

This is a case [**19] in which the employee claiming discrimination worked for the employer for 13 years. He does not claim that any of his previous workplace infractions were the product of bias or, indeed, that anything else that happened in the workplace prior to May of his 13th year reflects impermissible discrimination at work. The only reasonable inference to be drawn from the evidence is that such discrimination played no role as well in the employer's discharge decision. Indeed, if Exel's managers had been burdened with the discriminatory animuses Brokenbaugh claims, one would expect that he would have been terminated long before he was as a result of one of his earlier infractions.

IV.

Finally, Brokenbaugh challenges the District Court's grant of summary judgment on his breach of contract claim. After his third positive test for cocaine on the job, Brokenbaugh and Exel signed a document dated 12/2/98 containing the following text:

Condition of Employment William Brokenbaugh . . .

This document is a mutual and binding agreement between William Brokenbaugh . . . and EXEL Logistics regarding Mr. Brokenbaugh['s] continued employment

WHEREAS, Mr. Brokenbaugh has expressed a [**20] desire to voluntarily participate in certified drug rehabilitation

WHEREAS, Exel has agreed to accept Brokenbaugh's desire effective November 6, 1998, and;

WHEREAS, Mr. Brokenbaugh and Exel want to formalize the terms of this November 6, 1998 condition of employment and to compromise any differences which may exist between them;

NOW, THEREFORE, in consideration of the mutually satisfactory promises set forth herein, the sufficiency of which is hereby mutually recognized, Mr. Brokenbaugh and Exel agree as follows:

1. Mr. Brokenbaugh must be evaluated by a certified counseling service and fully participate in a drug rehabilitation program. He will provide documentation of the recommended [*47] counseling program as well as documentation of the successful completion of such program.

2. Mr. Brokenbaugh's continued employment is conditional on strict compliance with the prescribed treatment plan. The counseling service will inform EXEL an on-ongoing account of his participation in the program. Failure to participate in a prescribed treatment plan will result in termination of employment.

3. EXEL Logistics will provide payment for the counseling service only as noted

[**21] in the EXEL logistics Medical Benefits Plan.

4. Mr. Brokenbaugh will be required to take another drug screen in approximately 90 days. If the results of the screen are "positive," Mr. Brokenbaugh's employment will be terminated.

App. at 626. This dispute is best summarized by the parties' dueling descriptions of that document: Exel dubs it Brokenbaugh's "last-chance agreement" and Brokenbaugh refers to it as his "long-term employment contract." Brokenbaugh argues that Exel violated the covenant of good faith and fair dealing when it terminated his employment in violation of the implied contractual obligation in this document: stay clean and you can keep your job.

In New Jersey, employees are presumed to be terminable at will unless they have a contract with their employer:

> In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine. An employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise.

*Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 643 A.2d 546, 552 (N.J. 1994) (citations [**22] omitted). However, New Jersey does recognize that employment manuals spelling out termination procedures can give rise to contractual obligations:

> If a plaintiff can prove that an employment manual containing job-security and termination procedures could reasonably be understood by an employee to create binding duties and obligations between the employer and its employees, the manual will constitute, in effect, a unilateral offer to contract that an employee may accept through continued employment.

*Id. at 552.* "The key consideration in determining whether an employment manual gives rise to contractual obligations is the reasonable expectations of the employees." *Id. at 550.* While there is no "categorical test" for determining if employment manuals give rise to such obligations, "certain factors . . . will generally be relevant . . . [such as] the manual's specific provisions and the context of its preparation and distribution." *Id.*

The document produced by the parties is similar to an employment manual in that it describes specific conditions for Brokenbaugh to avoid being fired. Like an employment manual, Brokenbaugh essentially argues that this document [**23] gives rise to an obligation: if the employee follows the rules, he or she will not be fired. Assuming New Jersey's doctrine is applicable to this kind of document, we find that this document cannot be read to create a *reasonable* expectation of continued employment. The "context of [this document's] preparation and distribution" to Brokenbaugh was his third positive test for cocaine use on the job. We agree with the District Court that "it would be illogical and would defy common sense to conclude that Exel, after discovering a third instance [*48] of drug abuse by this employee who operates a forklift, intended to ensure this employee's position." District Ct. Op., App. at 37. In addition, the "specific provisions" of the document seem consistent with Exel's description of this as a "last-chance agreement." It is entitled "Condition of Employment." Exel only "agrees" to "accept Brokenbaugh's desire" to obtain drug rehabilitation and to pay for drug counseling consistent with its benefits plan. Finally, it is difficult to understand how Brokenbaugh could expect that if he was dishonest with supervisors, abused another employee, had another accident, or violated numerous other company [**24] policies, Exel would be bound to continue his employment as long as he did not violate this agreement. Because this expectation would not have been reasonable in the context of this document's creation, there was no binding agreement, and he could be fired for "good reason, bad reason, or no reason at all." n5

> n5 The Court in *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 643 A.2d 546, 553 (N.J. 1994) (citations omitted), did note exceptions to this rule exist for employees whose firing violates "public policy" or the NJLAD. We have considered the NJLAD claim and we perceive no public policy problem with Brokenbaugh's discharge.

V.

The judgment of the District Court will be affirmed.

LEXSEE

**Harold M. CANNING, Plaintiff, v. STAR PUBLISHING COMPANY, a corporation of the State of Delaware, Alexis I. duPont Bayard, Erwin M. Budner and William E. Taylor, Jr., Defendants**

**Civ. A. No. 1647**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**19 F.R.D. 281; 1956 U.S. Dist. LEXIS 4252**

**June 20, 1956**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff employee filed an action sounding in breach of an employment contract against defendant employer, and the employer filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. The employee filed a motion to strike an affidavit in support of the employer's motion for summary judgment.

**OVERVIEW:** The parties had entered into a five-year employment contract and the employee was terminated prematurely. The employee executed a release of the employment agreement for valuable consideration but later filed suit, alleging that the release was fraudulently induced. The employer argued that the employee's termination amounted to nothing more than a breach of contract. The employee claimed that he was entitled to damages consistent with the terms of the contract. The court noted that there was a genuine issue of material fact and denied summary judgment. The court observed that the conflict was pointed up by the parties' interrogatories and answers, which, under Fed. R. Civ. P. 33, fell within the consideration of summary judgment. The court granted the motion to strike the affidavit that supported the employer's motion for summary judgment, noting that under Fed. R. Civ. P. 6(d), when a motion was supported by affidavit the affidavit should have been served with the motion.

**OUTCOME:** The court denied the employer's motion for summary judgment but granted the employee's motion to strike the supporting affidavit when the supporting affidavit was not filed at the same time as the motion.

**CORE TERMS:** summary judgment, notice, motion to strike, termination, terminate, termination of employment, employment contract, five-year, additional compensation, obligated to pay, written notice, genuine issue, material fact, gave rise, mitigation

## COUNSEL: [**1]

Daniel O. Hastings and Clarence W. Taylor (of Hastings, Lynch & Taylor), Wilmington, Del., for plaintiff.

William E. Taylor, Jr., Wilmington, Del., for defendants.

## JUDGES:

Leahy, Chief Judge.

## OPINION BY:

LEAHY

## OPINION:

[*282]

This matter arises from defendants' motion for summary judgment. No supporting or opposing affidavits were filed. n1

n1. See memorandum, on plaintiff's motion to strike, filed this day. 19 F.R.D. 283.

The facts of this litigation may be found in D.C.Del., 130 F.Supp. 697, denying defendants' motions to require plaintiff to post a cost bond and to dismiss the complaint; and in D.C.Del., 138 F.Supp. 843, denying plaintiff's motion to strike defendants' demand for jury trial. The main facts are plaintiff entered into a five-year employment contract with defendant corporation on June 30, 1952. On May 28, 1954, plaintiff executed a release of

this agreement in favor of defendants for consideration of $ 5,000. Plaintiff brought suit on September 28, 1954, alleging the release to [**2] have been fraudulently induced and claiming damages under Paragraph 3(b) of the contract. n2

       n2. Paragraph 3 provides:

       '3. Term: The term of employment shall be five years from the date hereof, subject to the following:

       '(a) If, during the effective period of this agreement, Canning violates the provisions of Paragraph 5, Star may immediately terminate this agreement and thereupon Star shall be obligated to pay Canning his compensation up to the date of termination.

       '(b) Without cause, Star may terminate this agreement at any time upon thirty days written notice to Canning and shall be obligated to pay Canning his compensation for the balance of the full term of this agreement plus additional compensation of Thirty-six Hundred Dollars ($ 3600).

       'Either party may terminate this agreement by notice in writing to the other party six months before the end of the term hereof, and if no notice of termination by given, then the agreement shall automatically renew for an additional period of five years upon the same terms set forth in this agreement unless Canning shall, by notice in writing, indicate to Star that he desires to renegotiate the compensation provided herein before the commencement of the renewed agreement.

       'If Canning shall terminate this agreement by notice in writing six months prior to the expiration of its term Star on notice in writing to Canning during said six-month period may require Canning to continue his employment for a period of Six months after the termination of this agreement at the same compensation specified herein, and if Canning shall refuse to continue for this period or such part thereof as required by Star, then he shall forfeit the additional compensation provided in Paragraph 3(b) hereof; otherwise, on termination of this agreement by notice in writing from Canning as specified above, Canning shall receive the additional compensation provided in Paragraph 3(b) as severance pay, even though Star shall not request any continuation of this employment as permitted by this paragraph.'

[**3]

    1. In support of their present motion, defendants contend the circumstances which gave rise to plaintiff's [*283] termination of employment form nothing more than a breach of the employment contract, a right every contracting party retains along with the duty to respond in damages if so exercised. The measure of recovery is then the difference between the amount due on the five-year term and, under the ordinary rule of damages applicable to breached employment contracts, the amount derived from plaintiff's obligation to mitigate within that period. Plaintiff, it is said, on this basis is not injured since his mitigation results in a substantial profit. Thus the amount in controversy, which must exceed $ 3,000 exclusive of interest and costs, is not only lacking to a legal certainty, but no cause of action exists on its face.

    2. Plaintiff in opposition, replies the circumstances which gave rise to his termination of employment invoke the provision found in Paragraph 3(b) of the contract (what plaintiff terms option contract or, in the alternative, a provision fixing liquidated damages), notwithstanding the absence of 30 days written notice by defendant Star Corporation. [**4] Formal notice, says plaintiff, is for the benefit of the recipient as a condition to his termination of employment and may be obviated by either actual discharge or oral notice clear and certain. Therefore, plaintiff is entitled to damages in the amount specified under 3(b) with no regard to the doctrine of mitigation. On this theory jurisdictional amount is present.

    3. Defendants state there is no genuine issue of any material fact. Since plaintiff does not refute this, I must pass on the question *sua sponte*.

    It is fundamental under the federal rules where there is a genuine issue of a material fact, summary judgment will not be granted. The Complaint, paragraphs 7 and 9, alleges facts which, if proved, indicate plaintiff's understanding of termination. Defendants, in respective paragraphs of their Answer, deny these allegations. The conflict is pointed up by plaintiff's and defendants' interrogatories and answers thereto under F.R. 33, 28 U.S.C., n3 and the Rodgers and O'Donnell depositions. This showing is more than sufficient for purposes of refusing summary judgment. n4

       n3. Professor Moore states that answers to interrogatories under F.R. 33 fall within the consideration of summary judgment. 6 Moore, Federal Practice, par. 56.11[5].

[**5]

n4.  See generally the pronouncement of the Court of Appeals in Frederick Hart & Co. v. Recordgraph Corp., 3 Cir., 169 F.2d 580, reversing D.C.Del., 73 F.Supp. 146; and dicta in Reynolds Metals Co. v. Metals Disintegrating Co., 3 Cir., 176 F.2d 90, 92; but criticized by Charles Alan Wright, 'Rule 56(e): A Case Study On The Need For Amending The Federal Rules', 69 Harv.L.Rev. 839 (March 1956).

I find the basic common ground essential to the disposition of this motion, i.e., the actual circumstances under which plaintiff's contract of employment was terminated, is undeniably woven into the texture of the release issue to be resolved at trial.  If the validity of the release is upheld, there is, of course, an end to the matter.  But should the release be struck down, sufficient facts under a special verdict would be then at my disposal by which I could reach an intelligent and informed decision on the legal issue here raised and charge the jury as to the legal rights of plaintiff to damages and the amount thereof.  Accordingly, defendants' motion for summary judgment will be denied.

Submit order.  [**6]

On Motion to Strike an Affidavit

This matter arises from plaintiff's motion to strike an affidavit in support of defendants' motion for summary judgment, filed April 2, 1956.  The affidavit was not filed until June 1, 1956, the day of the hearing on summary judgment.

Under F.R. 56(b) defendant has the election of filing supporting affidavits [*284] with his motion.  I observe F.R. 6(d), applicable to all motions: 'When a motion is supported by affidavit, the affidavit should be served with the motion.' This leaves no room for judicial discretion.  See 6 Moore, Federal Practice, par. 56.14[1].

Plaintiff's motion to strike is granted.  Submit order.

LEXSEE

**DONALD M. DURKIN CONTRACTING, INC., Plaintiff v. CITY OF NEWARK, et al., Defendants and CITY OF NEWARK, et al., Third-Party Plaintiff v. DONALD M. DURKIN CONTRACTING, INC., AND FEDERAL INSURANCE COMPANY, Third-Party Defendants**

**C.A. No. 04-163 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2006 U.S. Dist. LEXIS 68221**

**September 22, 2006, Decided
September 22, 2006, Filed**

**PRIOR HISTORY:** Donald M. Durkin Contr., Inc. v. City of Newark, 2006 U.S. Dist. LEXIS 17495 (D. Del., Apr. 7, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff construction contractor sued defendants, including a city, for claims arising from termination of a contract. The court denied a summary judgment motion filed by third-party defendant insurer and also denied the contractor's motion for partial summary judgment. The insurer moved for reconsideration. The insurer and the contractor also filed motions in limine.

**OVERVIEW:** The city entered into a contract with the contractor to construct a reservoir. The insurer issued a performance bond in connection with the contractor's work. The city subsequently terminated the contract. The court found that errata sheets for the deposition of the city's designated Fed. R. Civ. P. 30(b)(6) witness were an attempt to provide a substitute narrative for the witness's deposition and therefore exceeded the scope of revisions allowed under Rule 30(e). The errata sheets were therefore excluded. The city also was precluded under the doctrine of judicial admission from controverting its position that a letter sent on November 21, 2003, represented the seven-day termination notice required by the construction contract. As a result of the evidentiary rulings, reconsideration of the court's summary judgment rulings was warranted. No reasonable jury could have found that the November 21 letter constituted proper notice to the contractor and the insurer of the city's intent to terminate the construction contract; the letter did not formally declare the contractor in default and did not contain the word "terminate."

**OUTCOME:** The insurer's motion for reconsideration was granted, and the court's prior orders denying summary judgment were vacated. The insurer's and the contractor's motions in limine were granted. The insurer's summary judgment motion was granted. The contractor's motion for partial summary judgment was granted with respect to the failure to provide notice; the contractor's summary judgment motion was otherwise denied.

**CORE TERMS:** summary judgment, errata, sheet, deposition, reconsideration, terminate, seven-day, notice, deposition testimony, surety, judicial admission, partial, reasonable jury, limine, termination, default, sham, earlier testimony, binding, notice requirement, reconsider, genuine issue, non-movant, notice of termination, written notice, declaring, designee, declare, nonmoving party, notice required

**COUNSEL:** [*1] For Donald M. Durkin Contracting, Inc., Plaintiff: Katharine L. Mayer, McCarter & English, LLP, Wilmington, DE; Paul A. Logan, Powell, Trachtman, Logan, Carrle & Lombardo, P.C., King of Prussia, PA; David T. Bolger, Pro Hac Vice.

For St. Paul Fire & Marine Insurance Company, Intervenor Plaintiff: William J. Cattie, III, Rawle & Henderson, Wilmington, DE.

For City of Newark, Mayor Harold F. Godwin, City of Newark, Delaware, Council Member John H. Farrell, IV, City of Newark, Delaware, Council Member Jerry Clifton, City of Newark, Delaware, Council Member Karl G. Kalbacher, City of Newark, Delaware, Council Member David J. Athey, City of Newark, Delaware, Council Member Frank J. Osborne, Jr., City of Newark,

Delaware, Council Member Christina Rewa, City of Newark, Delaware, Defendants: Paul Cottrell, Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE.

For URS Corporation, Defendant: James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE.

For Federal Insurance Company, City of Newark, Mayor Harold F. Godwin, Council Member John H. Farrell, IV, Council Member Jerry Clifton, Council Member Karl G. Kalbacher, Council Member David J. Athey, [*2] Council Member Frank J. Osborne, Jr., Council Member Christina Rewa, ThirdParty Plaintiffs: Sheela P. Dattani, Stradley Ronon Stevens & Young, LLP, Wilmington, DE; Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE.

For Donald M. Durkin Contracting, Inc., Donald M. Durkin Contracting, Inc., ThirdParty Defendants: Paul A. Logan, Tighe, Cottrell & Logan, P.A., Wilmington, DE.

For Federal Insurance Company, ThirdParty Defendant: Kevin W. Goldstein, Sheela P. Dattani, Stradley Ronon Stevens & Young, LLP, Wilmington, DE; Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE.

For Mayor Harold F. Godwin, Council Member John H. Farrell, IV, Council Member Jerry Clifton, Council Member Karl G. Kalbacher, Council Member David J. Athey, Council Member Frank J. Osborne, Jr., Council Member Christina Rewa, Counter Claimants: Paul Cottrell, Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE.

For URS Corporation, ThirdParty Defendant: James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE.

For URS Corporation, Counter Claimant: James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE.

**JUDGES:** Gregory [*3] M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

Presently before the court is Federal Insurance Company's motion for reconsideration (D.I. 136) of the court's April 5, 2006 Order denying summary judgment. Also pending are several related motions in limine (D.I. 163, 165, 190). For the reasons that follow, the court will grant the motion for reconsideration and will reconsider, *sua sponte,* related aspects of its September 2, 2004 Order that denied the plaintiff's motion for partial summary judgment. In doing so, the court grants summary judgment to Federal Insurance Company ("Federal"). Durkin's motion for partial summary judgment is granted in part and denied in part.

**II. FACTUAL BACKGROUND**

In the summer of 2000, the City of Newark ("City") contracted with URS Corporation ("URS") "for professional services related to the design and construction administration" of a water-supply reservoir. (D.I. 98 P 1.) In April of 2002, the City also contracted with Durkin to perform the actual construction (hereinafter, the "Construction Contract"). Federal provided a Performance Bond (the "Bond") to [*4] the City in connection with work to be performed by Durkin. Everything was proceeding more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated Durkin by a letter dated February 3, 2004. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark City Council, and URS.

With respect to terminating Durkin, the City had contractual obligations under both the Bond and the Construction Contract. Under the terms of Section 15.2 of the Construction Contract between the City and Durkin, the City was required to provide Durkin and its surety, Federal, with seven days written notice of its intention to terminate Durkin for default. (D.I. 122, Ex. A, Att. B, Sec. 15.2.) The Bond also set forth a series of procedural steps that the City had to take before Federal became obligated under the Performance Bond:

> If there is no Owner Default, the Surety's obligation under the Bond shall arise after:
>
> 3.1 The Owner has notified the Contractor and the Surety [*5] ... that the Owner is considering declaring a Contractor Default and has requested and

2006 U.S. Dist. LEXIS 68221, *

attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Sub-paragraph 3.1 ...

(D.I. 122, Ex. A, Att. A.)

The City claims that its letter of November 21, 2003 satisfied the seven-day notice requirement of Section 15.2 of the Construction Contract, as well as its obligation under Paragraph 3.1 of the Bond. The pertinent portion of that letter reads:

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now [*6] considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

(D.I. 122, Ex. A, Att. C.)

After the November 21<st> letter, Durkin, Federal and the City had a series of communications and interactions, which failed to resolve the ongoing disputes. Finally, the City voted to terminate Durkin. It is undisputed that the City terminated Durkin via a letter dated February 3, 2004, which stated:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and [*7] Durkin as the Bond requires.

(D.I. 122, Ex. A, Att. F.)

The City of Newark sent another letter to Durkin and Federal, on February 4, 2004, offering to extend the effective date of termination for an additional seven days.

### III. PROCEDURAL BACKGROUND

Durkin moved for partial summary judgment on June 29, 2004 (D.I. 36). On September 2, 2004, the court issued an Order (D.I. 63) denying Durkin's motion for partial summary judgment (the "September 2<nd> Order"). On March 14, 2006, Federal filed a motion for summary judgment (D.I. 122). On March 22-23, 2006, Ms. Carol Houck was deposed as the 30(b)(6) designee of the City. On March 24, 2006, the City filed its Answer to Federal's motion for summary judgment (D.I. 126). Ms. Houck's deposition continued on March 28, 2006, and again on March 30, 2006. On March 31, 2006, Federal filed a Reply Brief to the City's March 24<th> Answer, relying for the first time on testimony from Ms. Houck's March 28<th> deposition. On April 5, 2006, the court issued a Memorandum and Order (D.I. 132) denying Federal's motion for summary judgment (the "April 5<th> Order"). On April 17, 2006, Federal filed a motion for reconsideration (D.I. 136) of [*8] the court's April 5<th> Order. Four days after Federal filed its motion for reconsideration, which expressly relies in part on the deposition testimony of Ms. Houck, Ms. Houck executed an errata sheet for her March 23<rd> deposition, "clarifying" statements she made under oath. On May 2, 2006, Ms. Houck executed an errata sheet for her March 28<th> deposition, further "clarifying" statements made

under oath. On May 3, 2006, the City filed its Answer to Federal's Motion for Reconsideration, in which it relied upon the errata sheets to rebut Federal's position.

In conjunction with the pretrial conference held before the court on September 5, 2006, Durkin and Federal filed motions in limine (D.I. 163, 165, 190), which have helped to bring into sharper focus the issues raised in the previous motions for summary judgment.

## IV. STANDARDS OF REVIEW

### A. Exclusion of Evidence

A court has broad discretion to admit or exclude evidence under the Federal Rules of Evidence. *Gumbs v. Int'l Harvester, Inc.,* 718 F.2d 88, 97 (3d Cir. 1983). Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir. 1994) [*9] (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

### B. Reconsideration

As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc., v. ICN Pharms., Inc.,* 313 F. Supp. 2d 405, 407 (D. Del. 2004); *Karr v. Castle,* 768 F. Supp. 1087, 1090 (D. Del. 1991). In this district, these types of motions are granted only if it appears that this court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Schering Corp. v. Amgen, Inc.,* 25 F. Supp. 2d 293, 295 (D. Del. 1998); [*10] *Brambles USA, Inc. v. Blocker,* 735 F. Supp. 1239, 1240 (D. Del. 1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99 (E.D. Va. 1983)); *see also Karr,* 768 F. Supp. at 1090 (citing same). Motions for reconsideration should not be used to rehash arguments already briefed. *See Quaker Alloy Casting v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D. Ill. 1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y. 1989).

A court may grant a motion for reconsideration "if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a manifest injustice." *Max's Seafood Cafe v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999).

### C. Summary Judgment

A grant of summary judgment [*11] is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Biener v. Calio,* 361 F.3d 206 (3d Cir. 2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland,* 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact-meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole-concerns regarding the credibility of witnesses [*12] cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby,* 477 U.S. at 256-57, 106 S.Ct. at 2514 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), 106 S.Ct. 1348, 1355-56, 89 L. Ed. 2d 538 (1986).

## V. DISCUSSION

### A. Motions In Limine

1. Federal's Motion In Limine to Exclude the Deposition Errata Sheets of Carol Houck

Federal moves to exclude from admission into evidence at trial the errata sheets for the deposition of Ms. Carol Houck, the City's designated 30(b)(6) witness. Federal argues that the errata sheets provide a narrative substitute for Ms. Houck's sworn testimony and are,

therefore, an attempt on the part of the City to create a sham fact issue. [*13] Specifically, Federal contends that Ms. Houck admitted in her March 28<st> deposition that the November 21<st> letter from the City to Durkin and Federal did not constitute notice under the terms of the Construction Contract. In her May 2<nd> errata sheet, Ms. Houck writes: "my reply on line 9 is incorrect if it suggests that the November 21, 2003 letter was not the seven-day notice letter."

In response, the City argues that Ms. Houck was deposed over four days "in a random and confusing manner...." In arguing that Ms. Houck's errata sheet clarifications were appropriate, the City quotes from Ms. Houck's errata sheet regarding her third day of testimony, in which she states:

> Once again during my deposition there were repeated references to various exhibits, out of order and with, I believe, the intent to confuse. I have now had the opportunity to review the deposition and further clarify that it is my belief that the letter of November 21, 2003 (Exhibit 20) served to ... provide notice of Default and termination to both the Surety (Bond) and Durkin (Contract) ...

(D.I. 137, Ex. A, Page 2.)

Corrections to deposition testimony are governed by Rule 30(e) of the Federal Rules of Civil Procedure. Rule 30(e) [*14] corrections are treated as affidavits. *Burns v. Board of County Comm'rs of Jackson County,* 330 F.3d 1275, 1282 (10th Cir. 2003). In *Franks v. Nimmo,* the Tenth Circuit set forth a test for analyzing whether a party's affidavit constitutes an attempt to create sham issues of fact. 796 F.2d 1230 (10th Cir. 1986)). Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during her earlier testimony, whether the affiant had access to the pertinent evidence at the time of her earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Franks,* 796 F.2d at 1237 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364-65 (8th Cir. 1983); *Perma Research & Dev. Co. v. The Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)).

Here, Ms. Houck's earlier testimony occurred during a deposition, at which counsel for both the City and Federal were present and able to question the witness. Ms. Houck was not just a fact witness testifying on her personal [*15] knowledge; she was also the City's 30(b)(6) designee, and as such, had an affirmative obligation to be

prepared on the noticed topics so that she could give complete, knowledgeable, and binding answers on behalf of the party. *See Ierardi v. Lorillard, Inc.,* 1991 U.S. Dist. LEXIS 11320, Civ. A. No. 90-7049, 1991 WL 158911, at *1 (E.D. Pa. Aug. 3, 1991). Ms. Houck's corrections were not based on new evidence, but concerned documents and actions about which she was obviously well acquainted. In her May 2<nd> errata sheet, Ms. Houck does take issue with the manner in which she was deposed and states that she felt that counsel intended to confuse her. Notably, however, she stops short of saying she was in fact confused. Instead, Ms. Houck, after further review of her testimony, "clarifies" her answers by providing a substitute narrative for an appreciable portion of her deposition. The court can find no indication of confusion in the deposition transcript. In addition, it does not appear that Ms. Houck's attorney recognized any either. There is nothing in the record that suggests any attempt to rehabilitate Ms. Houck during, or immediately after the deposition, or otherwise clarify her statements until [*16] after Federal filed its motion for reconsideration. n1 Moreover, not only do Ms. Houck's errata sheet "clarifications" after her answers on key issues in the case, they posit alternative theories and defenses that the City now appears to be preparing to advance at trial--an issue that the court will address below in a related motion in limine.

n1 In *Franks,* the Tenth Circuit also found noteworthy the timing of the disputed affidavit in concluding that the conflict between the earlier testimony and the affidavit raised only a sham issue. There, it was offered only after summary judgment had been granted against the party offering the conflicting affidavit. *Franks,* 796 F.2d at 1237.

The court recognizes that Fed. R. Civ. P. 30(e) allows a deponent to make changes to deposition testimony in form or substance. Nevertheless, the court finds that Ms. Houck's errata sheets exceed the scope of the type of revisions contemplated by the Rule and serve only [*17] to improperly alter what was testified under oath. As has been aptly acknowledged by the Tenth Circuit, a deposition is not a take home exam. *See Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1242 (10th Cir. 2002) (quoting *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D. La. 1992)). The errata sheet "clarifications" in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade. The

court is troubled by the timing of Ms. Houck's errata sheets as well as their use in the City's responsive briefing on Federal's motion for reconsideration. Nor can the court ignore the fact that Ms. Houck was the City's 30(b)(6) designee, intimately familiar with the facts and issues in this case. Accordingly, the court holds that the errata sheets constitute a sham fact issue under *Franks* and, as such, the errata sheets shall not be admitted as evidence at trial.

2. Durkin's Motion Regarding the Judicial Admission of the City of Newark Providing Prior Written Notice of Intent to Terminate the Contract

A party's [*18] assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc., 976 F.2d 58, 61 (1st Cir. 1992)* (quoting *Bellefonte Re Insurance Co. v. Argonaut Insurance Co., 757 F.2d 523, 528 (2d Cir.1985))*. If factual matters in issue have been judicially admitted, they are binding on the tendering party. *See, e.g., Parilla v. IAP Worldwide Services, VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004)* (internal citations omitted). An admission in a pleading is a judicial admission, which is binding on the litigant. *See, e.g., Consol. Rail Corp. v. Providence & Worcester Co., 540 F. Supp. 1210, 1220 n.12 (D. Del. 1982)* (citing *Giannone v. United States Steel Corp., 238 F.2d 544, 547 (3d Cir. 1956))*.

With this principle in mind, Durkin moves in limine to preclude the City from arguing or attempting to present any evidence that controverts the City's prior contentions in pleadings that its November 21, 2003 letter from Carl Luft to Durkin and Federal represented the required seven-day written notice [*19] to Durkin of the City's intention to terminate the Construction Contract. Durkin contends that the City has maintained throughout this litigation that the November 21<st> letter gave written notice of its intent to terminate Durkin as required by the Construction Contract. Durkin points to the City's Answer, Counterclaim, and responsive briefs to the following motions: Durkin's Motion for Declaratory Judgment, Durkin's Motion for Partial Summary Judgment, and Federal's Motion for Summary Judgment, as examples of this affirmative representation. The City does not dispute this contention. Durkin contends that this consistently pled position is a judicial admission to which the City must be held. The court agrees.

In response to Durkin's motion, the City states: "It is uncontested that Newark's position is that its November 21, 2003 letter provided the requisite seven-day notice required by the Construction Contract termination provision." As to why this consistently pled assertion would not be a judicial admission, the City suggests that the

doctrine of judicial admission conflicts with Rule 8(e)(2) of the Federal Rules of Civil Procedure. The [*20] City argues that Rule 8(e)(2) allows a party to set forth inconsistent, alternative and hypothetical pleadings. The City, however, did not **plead** the alternative defense it now seeks to be permitted to argue at trial. Additionally, in the City's Counterclaim, it admits that its November 21<st> letter constituted written notice of its intent to terminate Durkin. (D.I. 7, Counterclaim P 19.)

Although the City pleads that it "further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design," (D.I. 7, Counterclaim P 21), the court can not find an averment by the City that sets forth the contention that the letter dated February 4, 2004, could also satisfy the notice provision of Section 15 of the Construction Contract. Further, the City's reference to a suspension of Durkin's termination in its Counterclaim was not made in the context of an alternative or hypothetical pleading. *See Schott Motorcycle Supply, 976 F.2d at 61* (citing 5 Wright & Miller, *Federal Practice and Procedure* § 1282 at 525 (2d ed. 1990) (generally an alternative claim is drafted in the form of "either-or" [*21] and a hypothetical claim is in the form of "if-then")).

It would be patently unfair and judicially inefficient to allow the City's defense to be a moving target, after the parties and the Court have relied upon the City's admissions. *See Soo Line R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir.1997)* (holding that at summary judgment "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible."); *Keller v. U.S., 58 F.3d 1194, 1198 n.8 (7th Cir.1995)* ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention.'" (citations omitted)).

The notice requirement of the Construction Contract is one of the central issues in this case, and as a factual matter now judicially admitted by the City, it is binding. The court will, therefore, preclude the City from arguing or presenting evidence [*22] at trial that any other writing constituted the seven-day notice required by the Construction Contract. n2

n2 Federal also moves in limine to exclude the February 4<th> letter and any reference thereto (D.I. 165). Federal's argument appears to be most

concerned with the possibility that the City may try to use the February 4th letter as alternative proof that the City provided Durkin with a seven-day notice required by the Construction Contract, in the event that the November 21st letter is deemed insufficient to constitute notice under the Construction Contract. For the reasons stated above, the City is limited to the judicial admission that the November 21st letter constituted notice under the Construction Contract. The court, therefore, need not preclude *any* reference to the February 4th letter at trial to assuage Federal's concern. Simply put, it would be impermissible for the City to argue, in the alternative, that the February 4th letter satisfies the notice requirement under the Construction Contract in light of its judicial admission; however, the Court reserves judgment as to whether the letter may be admissible for some other purpose.

[*23]

### B. Motion for Reconsideration

Recognizing that motions for reconsideration are granted only sparingly, the court finds that Federal's motion presents one of those rare occasions. Because Ms. Houck's deposition had not commenced before Federal filed its opening brief in support of its motion for summary judgment, the substance of Ms. Houck's testimony was first introduced in Federal's reply brief. Since the City did not have an opportunity to respond to the use of Ms. Houck's deposition in Federal's reply brief, the court properly disregarded the deposition testimony in its initial consideration of Federal's motion for summary judgment. Accordingly, the court believes it appropriate to reconsider its April 5<th> Order, now that the issue has been fully briefed with all parties having the opportunity to address the import of Ms. Houck's deposition testimony. See *Chase Manhattan Bank v. Iridium Africa Corp., 2004 U.S. Dist. LEXIS 12709, No. Civ. A. 00-564 JJF, 2004 WL 1588295, at *1 (D. Del. July 08, 2004)* ("[A] court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result."); *see also Pell v. E.I. Dupont de Nemours & Co. Inc., 231 F.R.D. 186, 189 (D. Del. 2005)* [*24] (granting motion for reconsideration where evidence was not addressed in the parties' opening and answering briefs). The court's April 5<th> Order was premised, in part, on what appeared to be a factual dispute as to whether the City satisfied the provision of the Construction Contract that required the City to give notice of its intent to terminate the contract. That appearance of a factual dispute dissipates when considering the deposition testimony of the City's 30(b)(6) designee, along with

the court's rulings on the motions in limine, and the pleadings.

In addition, the court's September 2<nd> Order was premised, in part, on the conclusion that a genuine issue of material fact existed with respect to satisfaction of the seven-day notice requirement in the Construction Contract. Given the court's holding above concerning the Houck deposition, the court believes it appropriate to reconsider its September 2<nd> Order, *sua sponte*. The September 2<nd> Order was issued over a year prior to the April 5<th> Order, on similar grounds, and without the consideration of the deposition testimony of the City's 30(b)(6) witness.

### C. Motion for Summary Judgment on the Notice of Termination [*25]  Issue

The court concludes that, given the City's admission as to the date of the notice of termination, there is no evidentiary basis upon which a reasonable jury could find in favor of the City. Moreover, the City's own 30(b)(6) witness admitted that the November 21<st> letter was not the required seven-day notice to Durkin and Federal, of the City's intent to terminate.

The court is not persuaded by the City's argument that Ms. Houck's deposition testimony taken together with her errata sheets presents evidence of a genuine issue of material fact that should preclude summary judgment. Instead, the court is guided by the Tenth Circuit's reasoning in *Franks*. The Court of Appeals in *Franks* stated, "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks, 796 F.2d at 1237* (citing *Camfield Tires, 719 F.2d at 1365*).

The plain language of the Construction Contract, the Bond and the November 21<st> letter make clear that, even absent the sworn deposition testimony [*26] of Ms. Houck, a reasonable jury could not find in favor of the non-movant City. It appears that the City attempted to follow the conditions of the Bond almost to the letter, but ignored a critical requirement imposed by the Construction Contract. That requirement included an additional procedural step prior to termination that the Bond did not; that is, seven-day notice to Durkin and Federal of its intent to terminate. As Federal and Durkin separately point out in their briefs, the November 21<st> letter neither formally declares Durkin in default, nor does it contain the word "terminate." Indeed, it even states that it is a "precautionary letter."

The City argues that the November 21<st> letter simultaneously satisfied the conditions of the Bond and the conditions of the Construction Contract. Putting aside the

fact that the language of the November 21<st> letter is deficient on its face in declaring Durkin in default or providing a seven-day notice of termination, the City's position might be tenable if the parties to the two contracts were separate, non-overlapping and otherwise unaware of the obligations in both contracts. In this instance, however, it appears that Federal and [*27] Durkin were at all times aware of the obligations imposed in both the Construction Contract and the Bond. It is clear that the "considering declaring" provision of the Bond functions to initiate a conflict-resolution process that could potentially obviate a declaration of default. n3 Further, the parties proceeded to carry out these steps ostensibly to resolve the conflicts. For these reasons, it is unreasonable to suggest that the November 21<st> letter was notice under Paragraph 3.1 of the Bond, and at the same time, notice under Section 15.2 of the Construction Contract. The procedural requirements of Paragraph 3.1 are expressly before a declaration of default and the requirement of Section 15.2 of the Construction Contract must necessarily be a declaration of default or intent to terminate.

n3 This conclusion is supported by the last provision in paragraph 3.1: If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequent to declare a Contractor Default.

[*28]

Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Fed. Sav. & Loan, Ins. v. Krajl, 968 F.2d 500, 503 (5th Cir. 1992).* On the pleadings and exhibits alone, the court holds that it seems unlikely that a reasonable jury could find for the City on the notice of termination issue. Where there may have been some appearance of a genuine issue on the pleadings before, the deposition testimony of the City's 30(b)(6) witness puts the issue to rest. Thus, taking into consideration the judicial admissions, the admissions of the City's 30(b)(6) witness, and the written record of pleadings and exhibits, the court concludes that a reasonable jury could not find for the non-movant City on the notice issue.

As such, the court will vacate its September 2<nd> Order n4 and April 5<th> Order, and will grant summary judgment to Federal and partial summary judgment to

Durkin, with respect to the failure to provide seven-day notice to terminate as required by the Construction Contract.

n4 The City correctly notes in its Answer to Durkin's Motion for Partial Summary Judgment that Durkin also seeks summary judgment on the issue of whether Newark had actual cause to terminate the Construction Contract. The Court does not grant such relief in this Order. Partial summary judgment in favor of Durkin is limited to the allegation that the City did not satisfy the notice requirement of the Construction Contract before terminating Durkin. Summary judgment is not, however, granted as to the allegation that City lacked the proper legal and factual basis for terminating Durkin or, in the City's view, that Durkin failed to perform. That dispute is not appropriately resolved on summary judgment with this record.

[*29]

## VI. CONCLUSION

For the aforementioned reasons, the court will grant Federal's motion for summary judgment and will grant in part and deny in part Durkin's motion for partial summary judgment on the notice of termination issue.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: September 22, 2006

**ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. Federal's Motion for Reconsideration (D.I. 136) is GRANTED.

2. Federal's *Motion in Limine* (D.I. 163) to exclude the errata sheets of Ms. Carol Houck is GRANTED.

3. Federal's *Motion in Limine* (D.I. 165) to exclude the "February 4<th> Letter" is GRANTED in part and DENIED in part.

4. Durkin's *Motion in Limine* (D.I. 190) regarding the judicial admission of the City of Newark is GRANTED.

2006 U.S. Dist. LEXIS 68221, *

5. The Court's September 2, 2004 Order denying plaintiff's partial summary judgment (D.I. 63) is VACATED.

6. The Court's April 5, 2006 Order denying summary judgment (D.I. 132) is VACATED.

7. Federal's Motion for Summary Judgment (D.I. 122) is GRANTED.

8. Durkin's Motion for Partial Summary Judgment (D.I. 36) is GRANTED [*30] in part and DENIED in part.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: September 22, 2006

LEXSEE

**MINERVA MARINE, INC., Plaintiff, v. JAMES SPILIOTES, individually, and WORLDWIDE MARINE SERVICES, INC., Defendants. JAMES SPILIOTES, individually, and WORLDWIDE MARINE SERVICES, INC., Third-Party Plaintiffs v. ANDREAS MARTINOS, individually, Third-Party Defendant.**

**Civ. No. 02-2517 (WHW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2006 U.S. Dist. LEXIS 13922**

**March 13, 2006, Decided**
**March 13, 2006, Filed**

**NOTICE:** [*1] NOT FOR PUBLICATION

**PRIOR HISTORY:** Minerva Marine, Inc. v. Spiliotes, 2006 U.S. Dist. LEXIS 13939 (D.N.J., Mar. 13, 2006)

**CORE TERMS:** third-party, vessel, counterclaim, ship, summary judgment, cargo, captain, motion to strike, deposition testimony, mate, onboard, personal knowledge, deposition, port captain, port, independent contractor, stricken, terminal, invoice, inspection, tariff, sentence, weigh, surveyor, malicious use, self-serving, defamation, admissible, genuine issue, hearsay

**COUNSEL:** For MINERVA MARINE, INC., Plaintiff, ANDREAS MARTINOS, individually, ThirdParty Defendant: PAMELA LYNN SCHULTZ, FREEHILL HOGAN & MAHAR LLP, JERSEY CITY, NJ US; MICHAEL FERNANDEZM FREEHILL, HOGAN & MAHAR, NEW YORK, NY.

For JAMES SPILIOTES, individually, WORLDWIDE MARINE SERVICES, INC., Defendants: RONALD BETANCOURT, BETANCOURT, VAN HEMMEN & GRECO, RED BANK, NJ; TODD PATRICK KENYON, BETANCOURT, VAN HEMMEN, GRECO & KENYON, RED BANK, NJ.

For JAMES SPILIOTES, WORLDWIDE MARINE SERVICES, INC., ThirdParty Plaintiffs, Counter Claimants: RONALD BETANCOURT, BETANCOURT, VAN HEMMEN & GRECO, RED BANK, NJ,

**JUDGES:** William H. Walls, United States Senior District Judge.

**OPINION BY:** William H. Walls

**OPINION: Walls, District Judge**

Plaintiff Minerva Marine, Inc. ("Plaintiff" or "Minerva") moves for partial summary judgment on Defendants/Third-Party Plaintiffs James Spiliotes ("Spiliotes") and Worldwide Marine Services, Inc.'s ("WWM") (together, "Defendants/Third-Party Plaintiffs") counterclaims for: violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq., (first counterclaim); defamation (third counterclaim); tortious [*2] interference (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of emotional distress (sixth counterclaim); and negligent infliction of emotional distress (seventh counterclaim). Plaintiff and Defendants/Third-Party Plaintiffs have also filed several motions to strike in connection with the Plaintiff's motion for partial summary judgment. The motions are decided without oral argument pursuant to Fed.R.Civ.P. 78.

**FACTS AND PROCEDURAL BACKGROUND**

Some of the factual background in this matter has been set forth in this Court's April 5, 2005 Opinion, which granted in part and denied in part the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's first claim for defamation, and granted the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's second claim for injurious falsehood. Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 1 (D.N.J. April 4, 2005). For purposes of this motion, the Court will again present the circumstances of the case, incorporating those facts particularly relevant to the Plaintiff's present motion.

Minerva is a Liberian corporation, [*3] operating with an office and place of business in Voula, Greece. Minerva is in the business of managing ships that trans-

2006 U.S. Dist. LEXIS 13922, *

port materials and cargo to various ports. Andreas Martinos ("Martinos") is the managing director of Minerva. Before he formed Minerva, Martins operated, along with his family, Thenamaris Ship Management, Inc. ("Thenamaris"), a Greek ship operating company.

Captain James Spiliotes, a resident of Cliffside Park, New Jersey, is an officer and director of WWM, a New Jersey corporation with an office and place of business also located in Cliffside Park, New Jersey. WWM is a company formed by Spiliotes in 1985 for the purpose of providing surveying and other services to the marine industry. The corporation allows Spiliotes to offer his maritime skills in a shoreside capacity.

From 1998 to 2001, WWM was frequently retained by Minerva to protect Minerva's vessels and owner's interests while Minerva's vessels were in port. WWM was primarily hired to attend to Minerva's ships while docked in ports in the northeastern United States. The precise nature of the employment relationship between Spiliotes, WWM and Minerva, however, is one of the primary facts in dispute in this [*4] case, particularly with respect to the CEPA counterclaim (first counterclaim). Spiliotes contends that he was a "port captain" or employee of Minerva, while Minerva contends that he was a "vessel agent" or independent contractor.

This action arises from events that took place on September 26, 2001, on board the Plaintiff's vessel, the M/T Minerva Julie ("the "Minerva Julie"). On that day, just a few weeks after the September 11 terrorist attacks on the World Trade Center, the Minerva Julie was docked at the IMTT terminal in Bayonne, New Jersey. Spiliotes, acting in the scope of his employment and on behalf of WWM, was a vessel agent for the Plaintiff while the Minerva Julie was docked in Bayonne. n1 The vessel was discharging its cargo of unleaded gasoline. While Spiliotes was onboard the vessel, he asked Chief Officer Kyriakos Tsingis when the discharge would be completed. The parties dispute the substance of Tsingis's answer. Plaintiff contends that Tsingis said that the discharge would be completed between 1955 and 2000 hours and that he could not increase the pressure on the lines because some of the cargo might leak causing an explosion or fire. Spiliotes claims that Tsingis [*5] said that the discharge would be completed in 2000 hours unless he puts a bomb on the ship and blows it up.

n1 For purposes of this factual background, the Court has described Spiliotes as a "vessel agent" for Minerva, but this label bears no influence on this Court's determination of the actual relationship between Spiliotes and Minerva.

After Tsingis answered Spiliotes, there is some dispute over what happened next between Spiliotes and the Master of the vessel, Vasilios Kazepis. There is no dispute that after this, Spiliotes left the vessel and informed IMTT Port Security that Tsingis had threatened to blow up the ship. Port Security, in turn, informed the Federal Bureau of Investigations, the United States Coast Guard, and the Bayonne Police Department. Tsingis was arrested by the Bayonne Police, released later that night, and departed with the vessel. After Tsingis was arrested but before he returned to the vessel, the Master of the vessel fired Spiliotes.

Minerva filed suit in the District of New Jersey [*6] against Spiliotes and WWM, alleging claims of defamation and injurious falsehood. The basis for these claims was a statement made by Spiliotes to IMTT Port Security, that Tsingis had threatened to blow up the vessel with a bomb, and six additional statements contained in a letter from Spiliotes to the Coast Guard, suggesting that Minerva was employing "individuals with terrorist affiliations or who are terrorist sympathizers," and that Minerva should be punished for employing such people. Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 3 (D.N.J. April 4, 2005). On August 2, 2002, Defendants/Third-Party Plaintiffs filed their answer to the complaint, including counterclaims against Minerva and a third-party complaint against Martinos.

After Minerva filed its complaint against Spiliotes and WWM, Spiliotes and/or their agents proceeded to forward copies of the complaint to the *International Shipping Gazette TradeWinds* (" *TradeWinds*"). On August 16, 2002, *TradeWinds* published an article titled "US agent sues Martinos over bomb threat." The article states that Martinos was being sued by Spiliotes for $ 110 million, after Spiliotes had been fired for [*7] reporting a Minerva crew member's alleged anti-American threats. According to the article, Minerva said that Spiliotes's "account of what happened was fabricated." The article also states that, according to Minerva, Spiliotes came on board the Minerva Julie and started verbally abusing Tsingis and insisted that he speed up the discharge process. The article adds that when Tsingis refused to speed up the discharge process, Spiliotes maliciously filed a false report to terminal security. On October 18, 2002, *TradeWinds* published a second article titled "Minerva denies it is a Martinos company." The article stated, *inter alia*, that Spiliotes lied about the Chief Mate's comments.

Spiliotes alleges that Minerva and/or Martinos have engaged in conduct that has caused him harm. Primarily, Spiliotes alleges that Minerva retaliated against him by firing him for reporting threatening statements to IMTT Port Security. Additionally, Spiliotes alleges that Mi-

nerva has contacted other ship owners and instructed them not to hire him; threatened him with legal action to prevent him from cooperating in the criminal case against Tsingis; filed a baseless lawsuit against him; and defamed him [*8] in *TradeWinds*. According to Spiliotes, Minerva's conduct has had a severe negative effect on his emotional state and life, causing him to suffer from anxiety and depression, for which he has had to seek psychological treatment. These allegations are disputed by Minerva.

Spiliotes claims that since 2001, his work as a vessel's agent has significantly declined. Before September of 2001, he received seven jobs from UK P&I Club, but has only received one job since. He adds that he received one or two jobs a year from Ranger Marine before 2001, but has only received one job from them since September of 2001.

On August 7, 2003, Spiliotes and WWM filed a second amended answer with counterclaims against Minerva, and a third-party claim against Martinos. n2 The counterclaims against Minerva were for violation of the New Jersey Conscientious Employee Protection Act (first counterclaim); defamation (second counterclaim); defamation (third counterclaim); interference with perspective economic advantage (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of emotional distress (sixth counterclaim); negligent infliction of emotional distress (seventh [*9] counterclaim); breach of contract (eighth counterclaim); unjust enrichment (ninth counterclaim); quantum meruit (tenth counterclaim); and an alter ego claim against Martinos (eleventh counterclaim). n3 Plaintiff now moves for partial summary judgment on the first, third, fourth, fifth, sixth and seventh counterclaims, on the grounds that there are no genuine issues of material fact. Both parties have submitted motions to strike testimony in connection with the motion for summary judgment.

n2 A first amended answer with counterclaims and a third-party claim was filed on July 22, 2003.

n3 The second counterclaim was withdrawn with prejudice by the Defendants/Third-Party Plaintiffs on June 18, 2004.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only "if the evidence is such that [*10] a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit. Id. at 248.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id.

Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). [*11] The non-moving party must prove beyond a "mere scintilla" of evidence that a genuine issue of material fact exists. Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, "a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT&T, 161 F. Supp. 2d 323, 327 (D.N.J.2001) (citing Celotex Corp., 477 U.S. at 322-23). Nor may a party simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) (citing Anderson, 477 U.S. at 249).

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Serbin v. Bora Corp., 96 F.3d 66, 69 n. 2 (quoting Celotex, 477 U.S. at 322). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative, [*12] ' the court must enter summary judgment in favor of the moving party." Heffron v. Adamar of New Jersey, Inc., 270 F. Supp. 2d 562, 569 (D.N.J. 2003) (citing Anderson, 477 U.S. at 249-50).

The evidence need not be in a form that would be admissible at trial. Celotex, 477 U.S. at 324. But Fed.R.Civ.P. 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge," and hearsay within such affidavits or testimony may be considered, but only where the hearsay

declarant can be produced at trial to offer his or her statements in admissible form. E.g., Rossi v. Standard Roofing, Inc., 156 F.3d 452, 470 n. 13 (3d Cir. 1998); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1235 n. 9 (3d Cir. 1993).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly [*13] supported motion for summary judgment. Id. at 247-48. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to he drawn from the facts are to be viewed in the light most favorable to the nonmoving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

Before turning to the Plaintiff's motion for partial summary judgment, this Court must address the various motions to strike that have been filed by both parties.

**I. Motions to Strike**

Defendants/Third-Party Plaintiffs have moved to strike the depositions of Elias Katsaros and Andreas Spiridonakos, and the affidavit of Michael Fernandez concerning the Declaration of James Baker (the "Baker Declaration") from the Plaintiff's papers in support of its motion for summary judgment. Plaintiff has moved to strike the Baker Declaration and various sections of the "Declaration of James Spiliotes in Opposition to Plaintiff's Motion for Partial Summary Judgment" (the "Spiliotes Declaration").

**A. Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiffs Deposition of Elias Katsaros**

Defendants/Third-Party Plaintiffs [*14] move to strike the deposition testimony of Captain Elias Katsaros ("Katsaros"), submitted by the Plaintiff in support of its motion for summary judgment, on the grounds that Katsaros was never designated an expert witness under Rules 702, 703 and 705 of the Federal Rules of Evidence. According to Defendants/Third-Party Plaintiffs, the Plaintiff did not file an expert report for Katsaros by the November 3, 2003 deadline for submission of expert reports, as set by Magistrate Judge Wigenton.

Defendants/Third-Party Plaintiffs argue that Katsaros is clearly being used as an expert witness within the meaning of Fed.R.Evid. 702, not as a lay witness. Specifically, they argue that Katsaros never had any knowledge of the relationship between Spiliotes and Minerva, nor did he possess knowledge of the events on-board the Minerva Julie during the September 24 through

26, 2001 time period. Rather, they argue that Katsaros is being used to provide expert testimony on the general role of a protective agent for a vessel owner. They note that his testimony covers the following: Katsaros's qualifications and work history; the formation of his company, Maritime Endeavors; the definition of a protective [*15] agent; the services provided by such agents; the services provided by Maritime Endeavors as protective agent; the forms and lists Maritime Endeavors provides to owners; what is meant by the phrase "smooth and quick turn around" of the vessel; when Marine Endeavors stays onboard vessels; and special discounts Maritime Endeavors provides owners. (Plaintiff's Supplemental Local Rule 56.1 Statement of Undisputed Material Facts ("Supplemental SUMF") at PP170-84).

Plaintiff, on the other hand, argues that Katsaros's deposition testimony is that of a lay witness. According to Plaintiff, one of the issues in this case is the role Spiliotes performed for Minerva. Plaintiff contends that Spiliotes was a typical vessel agent, while Defendant/Third-Party Plaintiff argues that Spiliotes was a port captain. Plaintiff intends to use the deposition testimony of Katsaros, based on his own personal knowledge and experience, to show that the services Spiliotes provided to Minerva were merely those of a vessel agent, not of a port captain. Plaintiff notes that Katsaros has not been provided any facts, data or anything else upon which to render an opinion, and readily acknowledges that Katsaros [*16] had no knowledge of the events that took place on board the Minerva Julie in September of 2001. Rather, Katsaros is testifying as to his own personal knowledge concerning the role of a vessel agent.

Plaintiff argues that Katsaros's testimony is critical because it establishes that all of the functions provided by WWM to Minerva (which Spiliotes relies upon in arguing that he was a port captain or otherwise an integral part of Minerva) are commonplace for an owner's protective agent. In other words, Plaintiff wants to use Katsaros's testimony to show that there is nothing special and integral about the services WWM provided to Minerva that would have given rise to an employment relationship.

Having reviewed the testimony of Katsaros, this Court concludes that Katsaros is being used to testify as an expert in contravention of the requirements of Fed.R.Evid. 701. Rule 701 of the Federal Rules of Evidence contains the requirements for lay witness opinion testimony, and provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) ra-

2006 U.S. Dist. LEXIS 13922, *

tionally based on the perception [*17] of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701. The rule was amended in 2000 to include subsection (c), which states that lay opinions may "not [be] based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. The question here is whether Katsaros's testimony falls under Fed.R.Evid. 701(c)'s definition of "specialized knowledge," which would require this court to exclude his testimony on the grounds that it is expert testimony.

Since 2000, relatively few cases have construed the scope of subsection (c). One of the cases addressing this matter that has been cited by the Plaintiff is Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213 (11th Cir. 2003). That case involved a contract dispute over the amount due to a ship repair company for repairs that it made to a ship. At issue was whether the District Court properly permitted the ship repairer's employees to testify as lay witnesses. [*18] The employees testified that the charges were fair and reasonable and in line with similar services provided by similar operations. Following an extensive review of the 2000 amendment to Fed.R.Evid. 701 and the accompanying advisory committee notes, the Circuit concluded that the testimony was permissible, as it was of a type traditionally and properly considered lay witness testimony, and was not based on specialized knowledge subject to Fed.R.Evid. 702. 320 F.3d at 1223.

In permitting the evidence, the Circuit placed particular emphasis on the advisory committee's note to Rule 701, concerning testimony of business owners and officers. The relevant portion of the Committee notes reads:

most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiffs owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day [*19] affairs of the business). Such opinion testimony is admitted not *because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.*.

Fed.R.Evid. 701 advisory committee's note (emphasis added). The Circuit read this comment to mean that opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed.

There is an important distinction to be drawn between Tampa Bay and this case, however. In Tampa Bay, the issue was whether the Court could permit the testimony of witnesses who were all involved in the process of determining the final invoice price for the ship repairs. After offering their testimony as to how the charges were determined, each witness was asked whether the charges were fair and reasonable in the context of the ship industry. Tampa Bay, 320 F.3d at 1217-21. The Circuit found this testimony permissible because the testimony was of a type traditionally considered permissible lay witness testimony, [*20] not based on specialized knowledge subject to Rule 702. Unlike the employees in Tampa Bay, Katsaros has not perceived first-hand any of the events that are involved in this case. As a result, Katsaros is merely offering specialized knowledge that is within the scope of expert testimony. Because Katsaros has not been properly admitted as an expert witness, the motion to strike his testimony is granted.

## B. Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos

Defendants/Third-Party Plaintiffs have also moved to strike the deposition of Andreas Spiridonakos ("Spiridonakos") on the grounds that Plaintiff has failed to submit an expert disclosure report for this witness, in violation of Fed.R.Civ.P. 26. Defendants/Third-Party Plaintiffs contend that Spiridonakos had no knowledge of Spiliotes's relationship with Thenamaris or with Minerva, yet Plaintiff intends to use Spiridonakos's deposition testimony as expert testimony that covers: his work history and qualifications; the general role and duties of port captains; the general role of vessel and charterer's agent; the role of an owner's representative; the employment status of [*21] such representatives; special payment arrangements; the reporting requirements of an agent or representative; and the role of a representative with respect to cargo discharge. (Supplemental SUMF at PP157-163).

2006 U.S. Dist. LEXIS 13922, *

Plaintiff argues that Spiridonakos's deposition testimony is being used to rebut Spiliotes's argument that he was forced to create WWM by Thenamaris, and that WWM was basically a shell corporation for Thenamaris and Minerva. According to Plaintiff, Spiridonakos trained Spiliotes as a surveyor and employed him, and has knowledge of the formation of WWM. Spiridonakos has testified that he had various conversations with Spiliotes concerning the formation of WWM, and what type of work Spiliotes was performing, but at no point did Spiliotes ever tell Spiridonakos that he was a port captain for Thenamaris or that Spiliotes formed a shell company for Thenamaris. (Supplemental SUMF at PP166-67).

Having reviewed the testimony of Spiridonakos, the Court concludes that while the majority of his testimony objected to by Defendants/Third-Party Plaintiffs conforms with the requirements of lay opinion testimony under Fed.R.Evid. 701, some of his testimony more appropriately qualifies [*22] as expert testimony under Fed.R.Evid. 702. For example, in paragraph 163 of the Plaintiff's Supplemental Local Rule 56.1 Statement, Spiridonakos was asked a hypothetical question during his deposition, concerning what obligations an owner's representative has to the managers or owners of a ship if a vessel's chief officer is removed from a ship. (Spiridonakos Dep. at 192:6-9). Spiridonakos responded that the owner's representative has an obligation to inform the owner immediately. (Spiridonakos Dep. at 192:10-14). Spiridonakos also responded to a question about whether an owner's representative had any right to interfere in a vessel's discharge. (Spiridonakos Dep. at 192:15 - 193:19).

These questions and answers concerned hypothetical facts, not facts gleaned from Spiridonakos's personal perception. But a lay witness may not answer hypothetical questions. See Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 404 (3d Cir. 1980) (essential difference between lay testimony and expert testimony is that expert may answer hypothetical questions); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4][a], at 701-21 to 701-22 (2d [*23] ed. 2004) ("Lay witnesses are limited to testifying to opinions gleaned from factual information that they personally perceived."). As Defendants/Third-Party Plaintiffs have noted, Spiridonakos has not been admitted to testify as an expert in this case. For this reason, the Court will disregard Spiridonakos's statements referenced in paragraph 103 of the Plaintiff's Supplemental Local Rule 56.1 Statement, as well as any other statements that qualify as expert testimony under Fed.R.Evid. 702, but will permit statements that conform to the requirements of lay witness testimony under Fed.R.Evid. 701. Defendants/Third-Party Plaintiffs motion to strike the testi-

mony of Spiridonakos is granted in part, and denied in part.

### C. Plaintiff's Motion to Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker; Defendants/Third-Party Plaintiffs' Motion to Strike the Fernandez Affidavit Concerning James Baker

Defendants/Third-Party Plaintiffs have submitted the Baker Declaration in opposition to the Plaintiff's motion for summary judgment. James Baker was a claims adjuster for UK P&I Club from 1980 to 1994, and claims to have knowledge of Spiliotes's relationship with Thenamaris, [*24] the shipping company owned by the Martinos family before the formation of Minerva. The Baker Declaration supports the Defendants/Third-Party Plaintiffs' claim that Spiliotes was an employee of Minerva - an issue that is in dispute.

Plaintiff moves to strike Defendants/Third-Party Plaintiffs' Baker Declaration on the grounds that it fails to comply with Fed.R.Civ.P. 56(c)'s requirements for affidavits submitted in opposition to a motion for summary judgment. Fed.R.Civ.P. 56(e) provides that when affidavits are used to support or oppose a summary-judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters staled therein." Fed.R.Civ.P. 56(e). "These rules are mandatory." 10B Wright & Miller, Federal Practice & Procedure § 2738 at 328 (2005).

In support of its motion to strike the Baker Declaration, Plaintiff has submitted an affidavit of their attorney, Michael Fernandez (the "Fernandez Affidavit"). Paragraphs 5 through 7 of the Fernandez Affidavit recount Fernandez's version of a telephone conversation he allegedly had with Baker [*25] on June 14, 2004, and paragraphs 10 through 12 of the declaration recount a telephone conversation he allegedly had with Baker on July 19, 2005. Plaintiff wishes to use the statements made by Baker during these telephone conversations to support its argument that the Baker Declaration is not based on personal knowledge.

Defendants/Third-Party Plaintiffs contest the Fernandez Affidavit and have moved to strike it from the record on the grounds that the statements constitute hearsay, in violation of the requirement of Rule 56(c) that supporting affidavits "set forth facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). The Court finds, however, that the statements are admissible as statements against interest. Fed.R.Evid. 804(b)(3).

Returning to the Baker Declaration, Plaintiff argues that it should be stricken because Baker lacks personal

knowledge of Spiliotes's relationship with Thenamaris. In paragraph 4 of the Baker Declaration, Baker avers,

> I was aware that [Spiliotes] was primarily working for Thenamaris, a Greek shipowner, with whom I understood he had a special working relationship. Based on my conversations with Spiliotes during those years, I believed [*26] that James Spiliotes was Thenamaris' local port captain for their tankers calling on the North East Coast of the United States.

(Baker Declaration at P4). The first sentence violates the personal knowledge requirement of Fed.R.Civ.P. 56(c), as Baker merely states that he was "aware" that Spiliotes worked for Thenamaris. See Steelman v. Carper, 124 F.Supp.2d 219, 228 n.25 (D.Del. 2000) (court could not accept affiant's statement that was based on his "personal awareness" rather than upon personal knowledge). Baker fails to provide any basis for his knowledge that Spiliotes worked for Thenamaris or that they had a special working relationship, other than what he had heard directly from Spiliotes. See Visser v. Packer En'g Assoc., 924 F.2d 655, 659 (7th Cir. 1991) (inferences and opinions must be grounded in observation or other first-hand personal experience).

The second sentence also fails to satisfy the personal knowledge requirement of Fed.R.Civ.P. 56(e), as Baker's use of the word "believed" underscores his lack of personal knowledge concerning Spiliotes's relationship with Thenamaris. See Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 282 (3d Cir. 1988) [*27] (use of the word "believe" insufficient to aver personal knowledge); 10B Wright & Miller, Federal Practice & Procedure § 2738 at 350 (2005). Because these statements fail the personal knowledge requirements of Fed.R.Civ.P. 56(e), they must be stricken from the record. The remaining three paragraphs of the Declaration are irrelevant. Plaintiff's motion to strike the Baker Declaration is granted.

### D. Plaintiff's Motion to Strike Portions of Defendants/Third-Party Plaintiffs' Declaration of James Spiliotes

The Spiliotes Declaration contains 73 paragraphs, some of which are quite lengthy. Plaintiff has moved to dismiss 42 of the 73 paragraphs contained in the Spiliotes Declaration, and has offered three potential reasons as to why each paragraph should be dismissed. n4 First, Plaintiff claims the paragraphs violate the requirements of Fed.R.Civ.P. 56(e), that affidavits must be based on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show

that the affiant is competent to testify. Second, Plaintiff argues that the statements constitute self-serving conclusions "unsupported by specific facts in the record." Heffron, 270 F.Supp.2d at 574-75 [*28] ("in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on "vague", "self serving" statements which are unsupported by specific facts in the record.") (citations omitted). Third, Plaintiff argues that the statements are barred by the "sham affidavit" doctrine, in that Spiliotes's Declaration statements contradict his earlier deposition testimony. See Baer v. Chase, 392 F.3d 609, 625-26 (3d Cir. 2004) (trial court will disregard an affidavit submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's earlier testimony, unless there is a good faith basis for the contradiction).

> n4 Defendants/Third-Party Plaintiffs have mistakenly repeated numbers 32 through 37 in the Spiliotes Declaration. While the last numbered paragraph is 68, there are in fact 73 paragraphs. Defendants/Third-Party Plaintiffs have submitted an Amended Spiliotes Declaration to correct this error.

A careful review of the Spiliotes Declaration [*29] shows that it is also replete with inappropriate factual assertions and legal conclusions, in violation of Local Civil Rule 7.2(a). That rule provides in pertinent part: "Affidavits shall be restricted to statements of facts within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits." L.C.v.R. 7.2(a). "Such argumentative and speculative statements are limited to briefs, and should not be included in sworn submissions to this Court." Resolution Trust Co. v. Fidelity & Deposit Co., 1998 U.S. Dist. LEXIS 3431, at *4 (D.N.J. Jan. 27, 1998). This Court will not consider any argumentative or speculative portions of Captain Spiliotes's Declaration, nor will it consider any portions that violate the requirements of Fed.R.Civ.P. 56(e).

Because the Spiliotes Declaration contains 73 paragraphs that cover a broad range of subjects, the Court will neither attempt to summarize the declaration, nor engage at this point in a lengthy analysis to determine which paragraphs should and which should not be stricken from the declaration. To give some context to Spiliotes's Declaration statements, the Court will consider the motion [*30] to strike Spiliotes's statements, as the need arises, during the summary judgment analysis.

### II. Plaintiff's Motion for Partial Summary Judgment

#### A. First Counterclaim: Violation of CEPA

2006 U.S. Dist. LEXIS 13922, *

Defendants/Third-Party Plaintiffs have alleged in their rust counterclaim that Minerva violated CEPA, N.J.S.A. 34:19-1, et seq., by firing Spiliotes in retaliation for: disclosing the Chief Mate's threatening statements and behavior; cooperating with law enforcement authorities in their investigation into the Chief Mate's threatening statements and behavior; and complying with the official legal notices sent to Spiliotes by the Bayonne City Municipal Court. (Second Amended Answer with Counterclaim and Third-Party Claims ("Answer with Counterclaims") at P90). Plaintiff now moves for summary judgment on the first counterclaim.

### 1. Legal Standard

CEPA was "enacted in 1986 to encourage employees to notify authorities of any and all illegal or unethical work-place activities conducted by an employer." DaBronzo v. Roche Vitamins, Inc., 232 F.Supp.2d 306, 310 (D.N.J. 2002). N.J.S.A. 34:19-3 provides:

An employer shall not take any retaliatory action [*31] against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, ally shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into [*32] any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) is fraudulent or criminal, including [*33] any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3. "CEPA protects an employee who believing that the public interest overrides the interest of the organization he serves, publicly blows the whistle if the organization is involved in a corrupt, illegal, fraudu-

lent, or harmful activity." DaBronzo, 232 F.Supp.2d at 310-11 (citations omitted) (internal quotations omitted).

The issue here is whether Spiliotes is a protected employee within the definition of CEPA. Plaintiff contends, and has offered substantial evidence to prove, that Spiliotes was not employee of Minerva, but rather was an independent contractor serving as a vessel's agent and marine surveyor employed by his own company, WWM. Plaintiff argues that because independent contractors are not covered by CEPA, summary judgment [*34] must be granted against Defendants/Third-Party Plaintiffs on the first counterclaim. Defendants/Third-Party Plaintiffs acknowledge that independent contractors are not covered by CEPA, but argue that an application of the facts of this case to the case law on this subject shows that there are genuine issues of material facts concerning Minerva's and Spiliotes's working relationship that precludes summary judgment.

DaBronzo employed a twelve part test to determine if the plaintiff was an employee or an independent contractor of the defendant. There, both the plaintiff and the defendant agreed that Pukowsky v. Caruso, 312 N.J. Super. 171, 711 A.2d 398 (App. Div. 1998) provided the appropriate test for determining whether the plaintiff was an independent contractor. The Court noted that while there are several tests in the employment law context that address whether an individual is an employee or an independent contractor, "the Pukowsky factors largely encompass the factors enunciated in most settings." n5 DaBronzo, 232 F.Supp.2d at 316 n. 11. Under Pukowsky, the twelve factors for consideration are:

(1) the employer's right to [*35] control the means and manner of employee's performance; (2) the kind of occupation, supervised or unsupervised; (3) skill; (4) who furnishes equipment and workplace; (5) the length of time individual has worked for the company employer; (6) the method of payment; (7) manner of termination of the work relationship; (8) does the individual accrue annual leave; (9) is the work the individual performs an integral part of the "employer's" business; (10) does the individual accrue retirement benefits; (11) does the "employer" pay social security taxes; and (12) the intention of the parties.

Pukowsky, 312 N.J. Super. at 182-83 (citing Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528

(D.N.J. 1990)). These factors are based on common law agency principles. Id. at 182.

n5 The Pukowsky test was established by federal courts interpreting analogous federal statutes that do not adequately define the term "employee." Kounelis v. Sherrer, 396 F.Supp.2d 525, 532 (D.N.J. 2005) (citing Chrisanthis v. County of Atlantic, 361 N.J.Super. 448, 825 A.2d 1192 (App. Div. 2003). The test was formulated in the Third Circuit in E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32, 37 (3d Cir. 1983), where the Circuit defined the term "employee" in the context of the Federal Age Employment Discrimination Act.

[*36]

Defendants/Third-Party Plaintiffs challenge the use of the Pukowsky factors to determine whether Spiliotes was an employee of Minerva. Rather, they argue that MacDougall v. Weichert, 144 N.J. 380, 677 A.2d 162 (1996), a New Jersey Supreme Court decision, contains the appropriate test. In MacDougall, the plaintiff was engaged as a salesperson for the defendant real estate firm, Weichert. The plaintiff acknowledged that he was neither an employee nor a partner, but was a "Sales Associate with an independent contractor status, with no rights of [worker's] compensation, salary, pension, sick leave, sick pay, or other attributes of an employee relationship." 144 N.J. at 389. Plaintiff was also an elected member of the local municipal governing council. As a member of the council, plaintiff voted for a parking ordinance that was opposed by a client of Weichert. Plaintiff was then terminated by Weichert, and plaintiff sued Weichert under the tort of wrongful discharge.

At issue was whether MacDougall was an employee of Weichert for purposes of raising a wrongful discharge claim under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). [*37] On summary judgment, the trial court found that MacDougall was an independent contractor, meaning he was not protected under the wrongful discharge doctrine. On appeal, the Appellate Division affirmed the trial court's grant of summary judgment. 144 N.J. at 388.

The Supreme Court of New Jersey reversed and remanded the case, finding that there were material issues of subsidiary facts concerning the relationship between the parties that were unresolved by the record. n6 144 N.J. at 389. Specifically, the Court found several facts suggesting that Weichert exerted substantial control over MacDougall, including the fact that MacDougall worked in an office maintained by Weichert; a Weichert manager supervised MacDougall's work; Weichert required MacDougall to take its training program; and that Weichert

shared the commission profits. 144 N.J. at 389. The Supreme Court noted that "the categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined." 144 N.J. at 388-89. [*38] It added, "the critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status." 144 N.J. at 389.

> n6 The Supreme Court expressed concern that MacDougall did not present the issue of his employment status on appeal until he filed his reply brief, raising the possibility that the question of employment was not fully presented. 144 N.J. at 390.

Defendants/Third-Party Plaintiffs argue that MacDougall applies because " DaBronzo presents an overly formalistic traditional analysis and does not take account of the modern day realities of the employer-employee relationship." (Defendants/Third Party Plaintiffs' Opp. at 11). Specifically, Defendants/Third-Party Plaintiffs take issue with the factors that assess duration, payment method, annual leave, retirement benefits, social security tax, and workplace. n7 Instead, Defendants/Third-Party Plaintiffs want the focus [*39] on the elements of control and dependence.

> n7 Defendants/Third-Party Plaintiffs also suggest that public policy favors a finding that Spiliotes is an employee with a CFPA remedy. (Defendants/Third-Party Plaintiffs' Opposition to Plaintiff's Motion for Summary Judgment at p. 10). Defendants/Third-Party Plaintiffs have cited no cases, however, where a Court determined that a worker was an employee under CEPA for public policy reasons.

The basis for their argument is a New Jersey Superior Court case, cited by MacDougall, which states that "innovative variations on traditional employment relationships should not necessarily affect the consequences of the functional relationship between the parties." Crowe v. M&M/Mars, 242 N.J. Super. 592, 598, 577 A.2d 1278 (App. Div.), cert. denied 122 N.J. 387, 585 A.2d 389 (1990). However, MacDougall merely cited Crowe for the proposition that "whether or not a person is dubbed an employee can have many [legal] consequences... The answer to the employment [*40] question

properly varies with the varying consequences of the determination, and the public policies engaged." Crowe, 242 N.J. Super at 598.

The Court finds that MacDougall is not at odds with the Pukowsky factors, as applied by DaBronzo. MacDougall and Pukowsky both place a premium on assessing the employer's control, and both call for analysis of factors favoring independent contractor status. Moreover, the Pukowsky factors test incorporates most of the factors contained in other tests used for determining whether a worker is an employee or an independent contractor. DaBronzo, 232 F.Supp.2d at 316 n. 11. In spite of their argument to the contrary, Defendants/Third-Party Plaintiffs have not cited any case law suggesting that the factors of duration, payment method, annual leave, retirement benefits, social security tax, and workplace should not be taken into consideration. Nor does this Court find a compelling reason why those factors should not be considered. Indeed, the Pukowsky "test represents a 'hybrid' approach combining the traditional common law focus on the defendant's right to control the alleged employee's [*41] efforts with the more contemporary emphasis on the economic realities of the relationship between the parties." Kurdvia v. Pinkerton Sec., 197 F.R.D. 128, 133 (D.N.J. 2000).

Nor does this Court accept Defendants/Third-Party Plaintiffs attempt to distinguish DaBronzo. Although there are some factual discrepancies, they are immaterial to the point at issue. DaBronzo provides a useful framework under CEPA for determining when a worker is an employee, and when he is an independent contractor. MacDougall, on the other hand, addressed the issue of whether a real estate agent was an employee for purposes of a wrongful discharge claim. The issue here is whether Spiliotes was an employee under a CEPA claim, not under a wrongful discharge claim. For all these reasons, the Court finds that DaBronzo provides the appropriate framework for determining whether Spiliotes was an independent contractor of Minerva.

Having determined that DaBronzo provides the appropriate analysis, the next step is to apply the Pukowsky factors to determine if Spiliotes was an employee or independent contractor of Minerva. "Whether an individual is an employee or an independent contractor [*42] is a question of law to be determined by the court in the absence of a disputed issue of material fact." DaBronzo, 232 F.Supp.2d at 315-16 (citations omitted). Absolute and clear-cut unanimity of all twelve factors is not required in order to determine non-employee status. See Chrisanthis v. County of Atlantic, 361 N.J. Super. 448, 465, 825 A.2d 1192 (App. Div. 2003). Moreover, the presence or absence of some factors without a reasoned balance will not preclude the granting of summary judg-

ment. Id. (citing Carney v. Dexter Shoe Co., 701 F.Supp. 1093, 1098-99 (D.N.J. 1988).

### 2. Analysis under Pukowsky factors

a. Factor 1 - Employer's right to control the means and manner of employee's performance

#### i. Legal Standard

The first factor requires this Court to assess Minerva's right to control the means and manner of Spiliotes's performance. "The employer's right to control the 'means and manner' of the employee's performance is generally agreed to be one of the most probative factors." DaBronzo, 232 F.Supp.2d at 316 (citations omitted). "The first factor is entitled to this added weight because, [*43] under the common law of agency, an employer-employee relationship exists if the purported employee controls or has the right to control both the result to be accomplished and the manner and means by which the purported employee brings about that result." Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000) (citations omitted) (internal quotations omitted). In describing the distinction between a servant (employee) and an independent contractor, the Second Restatement of Agency states the following:

> The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results err to use care and skill in accomplishing results. Those rendering service but retaining control over the mariner of doing it are not servants.

Restatement (Second) of Agency § 220(1) cmt. a (1958).

#### ii. Plaintiff's Argument and Supporting Evidence

According to the Plaintiff, the evidence indicates that Spiliotes, not Minerva, possessed the right to control the means and manner of his performance. Plaintiff first notes that [*44] Spiliotes had no written employment contract that gave Minerva the right to control his performance, unlike other Minerva employees who had written contracts. (Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("PSUMF") at P105, 116). Additional probative evidence of Spiliotes's independent contractor status is that he was the principal of his own company WWM, that had its own office and employees, and provided surveying and other marine services as "Ships Agents & Brokers" and "Marine Technical &

Environmental Consultants/Surveyors. (PSUMF at PP4, 6-31). Moreover, WWM's holding itself out as an expert in the industry is evidenced by its advertising literature and reports offering WWM's "expert and professional opinion." (PSUMF at PP24-29; Supplemental SUMF at P189).

Plaintiff claims that Minerva's lack of control over Spiliotes is also evidenced by Spiliotes's testimony that he was an expert; he knew his job; no one ever told him how to perform his job; he did not have any guidelines, instruction manuals or operation manuals to follows; and that he could come and go from the vessels whenever he desired. (PSUMF at PP70-74, 115). Moreover, Spiliotes admitted that [*45] he had "managerial responsibility" over the allocation of work at WWM, and without any consultation with Minerva or any other shipowner, would hire on behalf of WWM: employees, outside contractors, and consultants. (PSUMF at PP11-13, 22-23). Spiliotes only received limited instructions from Minerva to cooperate for a "smooth transfer," and Spiliotes testified that such language provided him with the authority to observe "everybody" on board the vessel and to intervene or stop any action he saw that was wrong. (Supplemental SUMF at PP206-207).

Finally, Plaintiff rejects the argument by Spiliotes that because WWM acted "in accordance with [Minerva's] instructions," Spiliotes was controlled. (Spiliotes Declaration at P21). According to Plaintiff, Defendants/Third-Party Plaintiffs fail to mention that such language is identical to language that WWM routinely provides to other customers. (Supplemental SUMF at P186).

Viewed in its entirety, Plaintiff's evidence is sufficient for the Plaintiff to carry its burden to show that Minerva lacked control over Spiliotes. The evidence suggests that Spiliotes had the authority to control how his jobs were completed on Minerva's behalf, and does [*46] not indicate that Minerva controlled the "means and manner" of how he performed his tasks. The burden now shifts to Defendants/Third-Party Plaintiffs to show that there is a genuine issue of material fact concerning Minerva's lack of control over Spiliotes.

#### iii. Defendants/Third-Party Plaintiffs' Rebuttal

Defendants/Third-Party Plaintiffs dispute several paragraphs from the Plaintiffs Local Rule 56.1 Statement, offered to show that Minerva lacked control over Spiliotes. First, Defendants/Third-Party Plaintiffs dispute paragraph 105, which states that Spiliotes effectively admitted that he had no written contract with Minerva, and instead relied upon an "oral contract" formed with a dead man named Captain Selementas, an employee of Thenamaris. In response to paragraph 105 of the Plaintiff's Local Rule 56.1 Statement, Defendants/Third-Party Plaintiffs cite paragraphs 7 through 15 of the Spiliotes

2006 U.S. Dist. LEXIS 13922, *

Declaration, which describe why Spiliotes created WWM, how he moved from Thenamaris to Minerva, what his responsibilities were, and what his title was. However, it is unclear to this Court how paragraphs 7 through 15 of the Spiliotes Declaration dispute the Plaintiff's statement that [*47] Spiliotes had no written employment contract with Minerva. Indeed, there is no mention of any contract in paragraphs 7 through 15 whatsoever. Defendants/Third-Party Plaintiffs have failed to raise a genuine issue with respect to the fact that Spiliotes did not have an employment contract with Minerva. n8 The Court will also disregard Defendants/Third-Party Plaintiffs disputes of paragraphs 10, 18, 19, 20, 24, 27 and 74 of the Plaintiff's Local Rule 56.1 Statement, as those disputes are immaterial.

> n8 Plaintiff has also moved to strike paragraphs 7, 9, 10, 12, 13 and 15 of the Spiliotes Declaration. The Court will refrain from considering the motion to strike at this point, given that the paragraphs fail to create a genuine issue with respect to the fact that Spiliotes did not have a written employment contract with Minerva.

Defendants/Third-Party Plaintiffs dispute Plaintiff's general claims that Minerva lacked control over Spiliotes. On the contrary, they argue that Minerva exerted substantial control over [*48] Spiliotes, and that Spiliotes was completely dependent upon them. Defendants/Third-Party Plaintiffs claim that Spiliotes had standard assignments from Minerva that he was required to perform on every Minerva ship, and that Minerva's operations managers gave Spiliotes specific instructions to perform these tasks. Spiliotes reported back to Minerva that he performed his assigned duties "in accordance with [Minerva's] instructions." (Spiliotes Declaration at PP16-22). They also claim that Spiliotes received instructions from Minerva's operations department for additional assignments that periodically arose, and have provided examples of such situations. (Spiliotes Declaration at PP19-33).

Defendants/Third-Party Plaintiffs have provided evidence to show the extent to which Spiliotes relied on Minerva for his livelihood. As a result of this reliance, they contend that Minerva exerted a great deal of control over their relationship as well as over Spiliotes in performance of his job. This manifested itself in that: Minerva required Spiliotes to have his own company while working for Minerva; Minerva controlled how, when, and what they paid Spiliotes; and Minerva sometimes required that [*49] Spiliotes guarantee their local financial obligations. (Spiliotes Declaration at PP34-48).

Defendants/Third-Party Plaintiffs reiterate that merely because Spiliotes worked for Minerva through his company WWM, that alone is not evidence that he was an independent contractor. MacDougall, 144 N.J. at 388-89. Defendants/Third-Party Plaintiffs also argue that the various job descriptions Spiliotes used - ship's agent, owner's agent, owner's protective agent, surveyor, port captain, etc. - are in effect meaningless. (Spiliotes Declaration at PP22-23). In addition, they cite the testimony of Captain Vezyrtzis, a Minerva employee, and of James Baker, a claims adjuster with UK P&I Club, as additional evidence that Spiliotes had a special relationship with Minerva. n9 (Spiliotes Declaration at Exh. M; Baker Declaration at PP1-4). Finally, Defendants/Third-Party Plaintiffs argue that Minerva required Spiliotes to have his own company while working for its own benefit, in order to avoid United States regulations, to have the appearance of independence and objectivity when they used Spiliotes's reports in defending claims of third-parties, and to allow Minerva to submit part [*50] of the cost for Spiliotes's work to insurers for reimbursement. (Spiliotes Declaration at P12).

> n9 As discussed earlier, however, the Baker Declaration is stricken and will not be considered on this motion for summary judgment. (See Section I.C, supra).

As discussed in section I.B, supra, Plaintiffs have moved to strike several paragraphs from the Spiliotes Declaration, which underlie Defendants/Third-Party Plaintiffs contention that Spiliotes was controlled by Minerva. These motions to strike must be addressed before this Court can determine whether there is a genuine issue of material fact concerning Minerva's lack of control over Spiliotes.

*iv. Plaintiff's Motion to Stripe Spiliote's Declaration* n10

> n10 The cited paragraphs refer to the Amended Spiliotes Declaration, not the original Spiliotes Declaration. ( See fn. 4, supra).

[*51]

Plaintiff moves to strike several statements from the Spiliotes Declaration that Defendants/Third-Party Plaintiffs have cited to support their argument that Spiliotes was controlled by Minerva. The first group of statements are paragraphs 16 through 19 and 22, which Defendants/Third-Party Plaintiffs have cited to show that Spiliotes received specific instructions from Minerva. Those paragraphs read as follows:

2006 U.S. Dist. LEXIS 13922, *

P16 - Contrary to Minerva's assertion that I was a 'free agent' on their ships with discretion to do whatever I wanted, I had specific instructions and assignments from Minerva's operations department.

P17 - There were standard assignments that I had to accomplish for every Minerva ship I worked onboard. These assignments came from Minerva's operations department. They included assisting the captain, officers and crew with safe and efficient cargo operations; interacting with the terminal, cargo receivers, charterers and charterer's agents as necessary; ascertaining the quantity of cargo onboard prior to and at the completion of discharge; observing cargo discharge rates and rail pressures during the discharge; preventing the loss of the liquid cargo; recording [*52] all relevant times; protesting all discrepancies; and issuing proper certificates at completion of discharge of cargo.

P18 - Pursuant to my specific instructions from Minerva's operations department, my typical work onboard Minerva vessels either in port or at a lighterage anchorage consisted of the following: I met the ship on arrival and I immediately met with the master and chief mate. I assisted the master and chief mate with preliminary arrival issues, such as clearing the ship with U.S Customs and other port officials. After those issues were resolved, my primary duties concerning the discharge of the cargo began. I inspected and gauged the cargo tanks along with the vessel's chief mate and the terminal's and/or cargo receiver's surveyors ("cargo interests"). Along with the chief mate, I performed all necessary calculations to ascertain the quantity of cargo onboard to ensure the amount corresponded to the amount loaded at the load port. Once those figures were determined and agreed upon with cargo interests, I made a general inspection of the main deck prior to commencement of discharge. In particular, I inspected the mooring lines to determine they were secure; I ensured [*53] that all scuppers were plugged to prevent an acci-

dental spill; and, most importantly, I ensured that the cargo hose connection from the ship's manifold to the terminal was satisfactory. Also prior to the commencement of discharge, I checked with cargo interests to obtain their instructions concerning shore line displacement procedures. I then waited along with the chief mate for the terminal to instruct us to commence discharge and, when they did, I monitored the initial discharge to ensure it was proceeding safely and efficiently. During the initial discharge, I would monitor the cargo discharge pressure in the cargo control room as well as at the ship's manifold on deck. I also made another round on the main deck during the initial discharge to ensure everything was still in good order i.e. the mooring lines, cargo hose connection, scupper plugs, etc. Throughout the discharge, which could take anywhere from twenty-four hours or more, I was generally about on deck and in the cargo control room to ensure all aspects of the discharge went efficiently and safely. In this regard, I observed and recorded the discharge rates, rail pressures, relevant times, etc. and I attended to any cargo [*54] related issues that arose along with the chief mate and other deck officers. Those issues generally entailed switching shore cargo tanks, suspending the discharge (for the ship's and/or terminal's purposes), issuing protests, etc. As the completion of discharge neared, I assisted the chief mate with stripping the slip's tanks of cargo. Once that was accomplished, I inspected the cargo tanks with the cargo interests. We gauged each tank to determine whether any cargo was remaining onboard. I then assisted the master in making preparations to sail, including preparing proper certificates. I did not depart until the vessel's last mooring line was aboard the ship and the vessel actually sailed.

P19 - In no sense was I simply a vessel husbandry agent as Minerva would have this Court believe. What I did with my job for Minerva and what a husbandry agent does are simply not the same thing. As set forth above, I was **actually** an integral member of Minerva's operations department working aboard Minerva vessels

while they were discharging cargo in New Jersey and other ports in the North East. Everything I did onboard Minerva vessels was done pursuant to my specific instructions [*55] from Minerva's operations department. I was their eyes, ears, legs and arms in the North East and at terminals in New Jersey in particular.

P22 - In the beginning of my working for Minerva, I had numerous telephone calls with Captain Vezyrtzis concerning my standard assignments and instructions and what they expected of me when I worked as their representative onboard their vessels. As I testified at my deposition:

Q. But in the first instance Minerva told you what to do?

A. The first thing Minerva instruct me, told me what to do, and then after that they knew what I was doing and they didn't instruct me more. But the first couple of years I would say they would send from the telephone instructions what to do there on that ship.

* * *

Q. Right. Right. But when you're doing, you know, our job on board the ship, say like going aboard the Minerva Julie to do the protection job on the discharge -

A. Protection job, what's that?

Q. You know, to supervise the discharge of the ship.

A. Yes.

Q. All right. Minerva doesn't tell you how to do that, do they?

A. Well, Minerva knows that I know how to do that.

Q. Right.

A. However, [*56] they tell me be careful, they tell me what to do be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure.

The give me instructions. I didn't do it myself, no.

Q. Where did they give you these instructions, did they write them to you?

A. Most of it by phone.

Q. Most of it by phone. So you have nothing in writing about instructions like that?

A. I may have some. I don't know. I don't know. I may have some.

Q. All right. But your brochure says that you're an expert, that you know how to do all these things?

A. Yes, I know how to do all these things.

Q. So you don't need anybody to tell you how to do that?

A. But that's their ships and they tell me how to do it. That's their ships. They are careful what I was doing on the ship. I was their port captain but they would instruct me on how to do it, how to do things.

(Spiliotes Declaration at Exhibit A, 712, 722-24).

Plaintiff makes several arguments as to why paragraphs 16 through 19 and 22 should be stricken. First, Plaintiff argues that the statements contained [*57] in these paragraphs, are merely self-serving statements by Spiliotes not based on any evidence in the record." See Heffron, 270 F.Supp.2d at 574-75 ("in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on "vague," "self serving" statements which are unsupported by specific facts in the record.") (citations omitted). Specifically, Plaintiff argues that there is no evidence in the record to support Spiliotes's Declaration that he received specific instructions from Minerva's operations department.

Defendants/Third-Party Plaintiffs contest the motion to strike by arguing that Spiliotes did in fact testify that he received instructions from Minerva. (Spiliotes Deposition at pp. 711-712, 722-725). However, the cited deposition testimony is insufficient to support Spiliotes's statements contained in paragraphs 16 through 19, as the deposition testimony merely states that he received instructions from Minerva, but does not specify from whom within Minerva he received instructions. Para-

graphs 16 through 19, on the other hand, specify that he received instructions from Minerva's Operations Department.

The deposition testimony [*58] also lacks the specificity of the instructions described in paragraphs 17 and 18 of Spiliotes's declaration. For example, Spiliotes testified in his deposition that "they tell me what to be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure. They give me instructions." (Spiliotes Deposition at 722). He also testified that he was instructed on how to repair the radar. (Spiliotes Deposition at 722). By contrast, paragraph 18 of the declaration states that Spiliotes met the ship on arrival, and he immediately met the Master and Chief Mate; he assisted the Master and Chief mate with preliminary arrival issues, such as clearing the ship with U.S. Customs and other port officials; he inspected and gauged the cargo tanks along with the vessel's Chief Mate and the terminal's and/or cargo receiver's surveyors, etc. (Spiliotes Declaration at P19). Paragraph 17 of the Declaration contains even more detailed instructions. In short, the cited deposition testimony does not create a sufficient foundation for paragraphs 16 through 19 of the Spiliotes Declaration because [*59] the testimony does not identify who gave Spiliotes the instructions, what instructions he was given, when they were supposedly given, and under what circumstances they were given. Because paragraphs 16 through 19 lack the support of any evidence in the record, Plaintiff's motion to strike paragraphs 16 through 19 of the Spiliotes Declaration is granted.

Paragraph 22 of the Spiliotes Declaration states that Spiliotes had numerous calls with Captain Vezyrtzis concerning his assignments and instructions. While the deposition testimony included in paragraph 22 states that Spiliotes received instructions, it does not specify that he received instructions from Captain Vezyrtzis. Defendants/Third-Party Plaintiffs have not challenged the motion to strike paragraph 22 in their opposition to the motion to strike, and they have failed to cite any other testimony in support of the paragraph. Plaintiff's motion to strike paragraph 22 is granted.

Plaintiff next challenges the statements that are the basis for Defendants/Third-Party Plaintiffs' claim that Spiliotes received instructions from Minerva's operations department for additional assignments that periodically arose. (Spiliotes Declaration [*60] at PP19-33). Plaintiff moves to strike paragraphs 19, 22 through 26, and 28 through 30 of the Spiliotes Declaration. n11

P23 - In addition to receiving instructions for my standard assignments, I also re-

ceived instructions from Minerva's operations department for additional assignments that periodically arose.

P24 - For example, I would often be tasked with certain duties and assignments from the operations department when Minerva vessels had to he inspected by the United States Coast Guard to obtain what is known as a Tanker Vessel Examination Letter or TVEL. (Spiliotes Declaration at Exh. D).

P25 - I was instructed to meet with the vessel's master prior to the Coast Guard's inspection, and to review with him the status of various items that the Coast Guard was going to check. I was instructed to review with the master the status of various documents that had to be copied for the Coast Guard including the vessel's Certificate of Financial Responsibility, SOLAS documents, class certificates and ISM documents. I was instructed to review with the master the status of various logs, manuals and certificates that had to be made available including the ship's log, oil [*61] record books and SOLAS manuals. I was instructed to review with the master the status of publications that were required to be in the wheelhouse including the U.S. Coast Pilot, Tide-Tablcs and recent Notices to Mariners. I was instructed to discuss and ensure with the master that all pre-arrival tests and inspections had been performed and logged including the emergency steering gear tests and standby emergency generator test. I was instructed to discuss and ensure with the master that other testing was periodically performed and logged as part of the ship's normal policies and procedures, including pressure testing of cargo lines, cargo pump tests, fire pump tests and IGS tests. I was instructed to review with the master various vessels log books to make sure they were kept properly such as the vessel's log, dangerous cargo manifest and oil record book. And, I was instructed to review with the master what he should expect during the actual inspection - what documents the Coast Guard was likely going to review, what ship's equipment the Coast Guard was likely going to test and

what ship's equipment the Coast Guard was likely going to visually inspect.

P26 - Minerva also instructed [*62] me to be present during the Coast Guard's TVE inspections so I was available to report to the operations department any issues that arose and to address them in accordance with their instructions. For instance, I was aboard the Minerva vessel the AMPHITRITE in New York when it failed its initial Coast Guard TVE inspection in September, 2000. The vessel failed the initial inspection, among other reasons, because one of the lifeboat brakes was frozen and the boat could not be lowered. (Coast Guard's Vessel Boarding Reports - Exhibit E). I called Minerva to report the situation and to get their instructions on how to deal with it (including to report the vessel's master who had misinformed me before the inspection that he had recently successfully lowered the lifeboat when, in fact, it had not been lowered for six months). As I testified at my deposition:

Q. Can you tell us your involvement - well, did Minerva - did the U.S. Coast Guard perform any TVEs on Minerva vessels when they called on the East Coast of the U.S.?

A. Yes, they do that on a yearly basis.

Q. Did you have any involvement in those tanker vessel examinations or TVEs?

A. Yes.

Q. Can you describe [*63] for us the extent of the involvement you had?

A. I talk to the captain first, day before usually before the TVE, and I ask him if the lifeboats are okay to be lowered and if the motors are running, and if they don't, I always do it from the boat that time. I ask him also if all entries are made. He told me yes, yes. For example, this ship, on the AMPHITRITE, I'm talking about now, he said yes, we have everything under control, we lower the lifeboats a couple days ago, the lifeboats go down. I said you make entries in the logbook. Yes, of course, I did. So the next day the Coast Guard come aboard to perform a TVE and he started with the fire drill. The crew was very slow. And then after the fire drill, he went over to do the boat drill. He tried to lower one of the lifeboats, I think it was a starboard - port lifeboat or starboard, I don't remember which one, and the lifeboat did not go down. So I look at the captain, I said look, you told me that a couple of days ago you lowered. He says you know what, he says, these lifeboats haven't gone down for six months. So if he was telling me that night before I was going to have another fire [and boat drill] the night before, you know, [*64] I think the lifeboats go down. So when I see that, I call Minerva. That's what I was there for, that's what my job was for, that's what a port captain does. I didn't tell the captain anything. I called Minerva, I told Minerva. I talked to Captain Dallaris and I said the ship was detained...

(Spiliotes Declaration at Exh. A. 690-92)

P28 - At times, Minerva would call me to instruct me to contact the Coast Guard and get their permission to allow Minerva's vessels to enter port with an expired TVEL. For instance, in July, 2001, Minerva instructed me to obtain the Coast Guard's permission to allow the Minerva vessel the MINERVA ALEXANDRA to enter port and commence discharge with an expired TVEL. I did so and obtained the Coast Guard's approval. (Spiliotes Declaration at Exh. F.)

P29 - As another example, I would often receive instructions from Minerva concerning getting fuel, known as bunkers, or fresh water for Minerva ships. For instance, attached as Exhibit G hereto are fax instructions I received from the operations departments in September, 1998 concerning fuel and fresh water for the Minerva vessel SEAMUSIC III.

P30 - To the extent that problems arose [*65] onboard Minerva's ships, I would contact the operations department to re-

port the situation and to seek their instructions. As I testified at my deposition:

Q. Give me an example, a specific example of something that they instructed you specifically to do on board the Minerva Julie on September 24th - September 26th, 2001.

A. Well, we didn't have any problems there except the incident with the chief mate.

Q. All right.

A. So if you had any problem - excuse me, Mr. Russo, if we have any problem, I call them up and they tell me look, do this, do that, you know.

Q. If you have a problem you call them up.

(Spiliotes Declaration at Exh. A, 724-25).

n11 The Court will not revisit paragraphs 19 and 22, which have already been addressed.

Plaintiff argues that the statements contained in these paragraphs are merely self-serving statements by Spiliotes not based on any evidence in the record. Defendants/Third-Party Plaintiffs respond to this argument by stating that Spiliotes was [*66] on the receiving end of the instructions for many years, and as a result, has extensive firsthand personal knowledge to make these statements. According to Defendants/Third-Party Plaintiffs, "[Spiliotes] personally spoke to Minerva, he personally sent and received correspondence to and from them, and he personally performed the duties Minerva instructed him to undertake...." (Defendants' Opp. to Motion to Strike at p. 12). They add that Captain Vezyrtzis confirmed this in his deposition by stating, "Spiliotes was cooperative with the office to the extent that whatever were asked of him were - - were being asked of him, whatever job...." (Vezyrtzis Deposition at 178:23-25). Defendants/Third-Party Plaintiffs have also cited several passages from Spiliotes's own deposition testimony to show that he received specific instructions from Minerva - the same passages cited in support of paragraphs 16 through 19 of Spiliotes's Declaration.

Defendants/Third-Party Plaintiffs have failed to cite any testimony or evidence in support of paragraphs 23 and 25. Paragraph 24 states that Spiliotes was often

tasked with certain duties from the operations department. However, there is no testimony to [*67] support this statement, and the fax submitted as an exhibit in support of this statement merely indicates that WWM was asked on one occasion to arrange a Coast Guard inspection for the Minerva Zen. The second document submitted in support of paragraph 24 is an invoice for co-ordination of a Coast Guard inspection, but the document does not indicate that he was instructed to coordinate the inspection by Minerva. This evidence is insufficient to support Defendants/Third-Party Plaintiffs' claim that he was *often* tasked with certain duties and assignments from the operations department when Minerva vessels had to be inspected by the United States Coast Guard. Plaintiff's motion to strike paragraphs 23, 24, and 25 is granted.

Paragraph 26 of Spiliotes's Declaration includes Spiliotes's own deposition testimony as evidence to support the statement. The first sentence lacks the support of any evidence in the record, however. It is also based on inadmissible hearsay, as Spiliotes has not identified a declarant that instructed him to be present at the TVE inspections. The remainder of paragraph 26 is admissible, as it is supported by the evidence in the record. Plaintiff's motion to strike [*68] is granted with respect to the first sentence of paragraph 26, and denied with respect to the remainder.

Exhibit F, submitted in support of paragraph 28, contains a letter from the United States Coast Guard to WWM, granting permission for the Minerva Alexandra to enter the Port of New York with an expired Tank Vessel Examination letter and to commence cargo operations. This exhibit does not support the central tenet of his statement in paragraph 28 - that Minerva called him to instruct him to contact the Coast Guard to obtain the permission letter. Plaintiff's motion to strike paragraph 28 is granted.

Spiliotes declares in paragraph 29 that he would often receive instructions from Minerva requesting that he obtain fuel, known as bunkers, or fresh water for Minerva ships. In support of this statement, Defendants/Third-Party Plaintiffs include an exhibit containing a fax from Minerva to WWM with the request for these provisions. (Spiliotes Declaration at Exh. G). Again, this single fax is insufficient to support Spiliotes's claim that he "would *often* receive instructions from Minerva." (Spiliotes Declaration at P29) (emphasis added). Moreover, the fax is dated from August of [*69] 1998, presumably just after Spiliotes was asked to work for Minerva. (Spiliotes Declaration at PP10, 12). This is in line with Spiliotes's statement that for the first couple of years, Minerva would send him telephone instructions about what to do on the ship, but afterwards, Minerva knew what he was doing and "didn't instruct [Spiliotes]

more." (Spiliotes Deposition at 711-12). Plaintiff's motion to strike paragraph 29 is granted.

The Court does not accept the Plaintiff's argument that paragraph 30 of the Spiliotes Declaration lacks support in the record. Spiliotes has submitted deposition testimony to support his statement that if problems arose onboard the ship, he would contact the operations department to report the situation. The testimony merely suggests it hypothetical - that if a problem were to arise, Spiliotes would contact the operations department. Plaintiff's motion to strike paragraph 30 is denied.

In support of its claim that Minerva control led its relationship with Spiliotes, Defendants/Third Party Plaintiffs cite paragraphs 34 through 48 of the Spiliotes Declaration to show that Minerva required Spiliotes to have his own company while working for Minerva; to [*70] show that Minerva controlled how, when, and what they paid Spiliotes; and to show that Minerva sometimes required that Spilotes guarantee their local financial obligations. (Spiliotes Declaration at PP34-48). Plaintiff moves to strike paragraphs 34, 35, and 37 through 47 of the Spiliotes Declaration. n12 Those paragraphs are as follows:

P34 - I was extremely dependent on my job with Minerva for my livelihood. As can be seen from the above table listing my work onboard Minerva vessels in my area of responsibility, I was constantly working onboard Minerva vessels to make a living. During the winter months, my work onboard Minerva vessels would almost be non-stop apparently because of the need for home heating fuel oil in the Northeast - as can be seen from the above table for the months of December, 2000 through April, 2001.

P35 - I have read Minerva's Rule 56.1 Statement submitted with their motion and, in particular, paragraph 147 where they list my income. Minerva, however, did not list my income after 2002, which shows how dependent I was on my employment with Minerva to make a living - I have had virtually no income since being fired by Minerva in September, 2001. [*71]

P37 - To the extent I had income in 2002 after I was fired by Minerva in September, 2001, it was primarily due to money Minerva paid me after I was fired that had

been due me for some time. As I testified at my deposition:

Q. Okay. Okay. These are 1099s for Worldwide Marine for 2002. Now this is closer in time, right?

A. Yes, sir. Yes, sir.

  * * *

Q. The first page of this exhibit, the 1099 for Worldwide, Worldwide paid you $ 24,000 -

A. Right.

  * * *

Q. Well, what did they pay you $ 24,000 for?

A. For the work for - I did for them from before because Minerva own me a lot of money when they fire me. They give me 2001, at the end of 2001 they pay me.

(Spiliotes Declaration at Exhibit A, 505-06).

P38 - I did some on-the-side work for a couple of other shipowners sporadically at times. I also received work from a P&I club concerning marine insurance matters. However, I did not have the special working relationship with them that I had with Minerva. As I testified at my deposition (382):

Q. Right. So you were offering port captain services for everybody -

A. To supplement my income, yes.

Q. -correct, [*72] including Minerva and Thenamaris?

A. Minerva and Thenamaris I had a special deal with.

(Spiliotes Declaration at Exhibit A, 382, 410-16).

P39 - Minerva allowed me to do this side work to supplement my income from Minerva. Minerva, however, required that it not interfere with my work onboard their ships. If I had instructions to work on a Minerva vessel and another owner or the P&I club called and wanted me, I would have to turn them down so I could work the Minerva vessel.

P40 - As a result of my dependency on Minerva, Minerva exerted a great deal of control over our relationship in addition to the control they exercised over me in the performance of my job discussed above.

P41 - Minerva, like Thenamaris, required that I have my own company Worldwide while working for them.

P42 - Minerva controlled what they paid me. My list of rates on my brochure did not apply to Minerva. As Captain Vezyrtzis testified:

Q. And Worldwide Marine is a protective agent, is you position; correct?

A. Yes.

Q. And you were talking about these fees that the charterer's agents sometimes charged you and you talked about their tariff; is that right? [*73]

A. Yes, there are some tariffs.

Q. And what's your understanding of a tariff?

A. A tariff is a tariff?

Q. What is a tariff?

A. I writes the cost for - the service that they are providing.

Q. Now I'd like you to take a look at the document that we've marked as Exhibit E [(Worldwide Marine's tariff)], please.

A. Yes.

Q. And take a look at page 2.

A. Yes.

Q. And on page 2, what does it read at the very top of the left-hand column.

A. Schedule of agency fee, charges for vessels calling United States ports.

Q. And there are 15 items; is that right?

A. Yes.

Q. And in each of those items Worldwide Marine lists the fee for performing the specific duties described in those items?

A. Well, some of these, yes; some of these not. Anyway, he gives an idea of what we're going to pay.

Q. Okay. Well, the document speaks for itself, but he does on page 2 list the fees for various services; isn't that right?

A. Yes.

Okay.

Q. These fees listed on page 2 for the various services did not apply when Thenamaris and Minerva used Capt. Spiliotes' services; isn't that right?

A. Yes, we had [*74] a special agreement.

(Spiliotes Declaration at Exhibit B, 497-98).

P43 - Minerva controlled what they paid me. My list of rates on my brochure did not apply to Minerva. As Captain Vezyrtzis testified:

Q. And Worldwide Marine is a protective agent, is you position; correct?

A. Yes.

2006 U.S. Dist. LEXIS 13922, *

Q. And you were talking about these fees that the charterer's agents sometimes charged you and you talked about their tariff; is that right?

A. Yes, there are some tariffs.

Q. And what's your understanding of a tariff?

A. A tariff is a tariff?

Q. What is a tariff?

A. I writes the cost for - the service that they are providing.

Q. Now I'd like you to take a took at the document that we've marked as Exhibit E [(Worldwide Marine's tariff)], please.

A. Yes.

Q. And take a look at page 2.

A. Yes.

Q. And on page 2, what does it road at the very top of the left-hand column.

A. Schedule of agency fee, charges for vessels calling United States ports.

Q. And there are 15 items; is that right?

A. Yes.

Q. And in each of those items Worldwide Marine lists the fee for performing the specific duties described [*75] in those items?

A. Well, some of these, yes; some of these not. Anyway, he gives an idea of what we're going to pay.

Q. Okay. Well, the document speaks for itself, but he does on page 2 list the fees for various services; isn't that right?

A. Yes.

Okay.

Q. These fees listed on page 2 for the various services did not apply when Thenamaris and Minerva used Capt. Spiliotes' services; isn't that right?

A. Yes, we had a special agreement.

(Spiliotes Declaration at Exhibit B, 497-98).

P44 - Minerva controlled how much they paid me. In addition to not paying me for certain services at all, Minerva required I discount my attendance rate. That is, my normal daily rate of $ 750 was cut to $ 100 starting on the third day of my attendance onboard Minerva vessels. As I testified at my deposition:

> ...This is for two days or part thereof, $ 100. I was charging them $ 1,500 for two days or part thereof and after I would charge them $ 100 per day. Other companies I would charge them much more.

(Spiliotes Declaration at Exhibit A, 383-84).

P45 - Minerva controlled how I billed them. Captain Vezyrtzis required that in addition [*76] to an invoice for my attendance, I had to send Minerva a separate invoice for the ROB survey I would perform at the completion of discharge. Captain Vezyrtzis also told me to deduct the ROB survey fee from the attendance fee amount on the attendance invoice. As Captain Vezyrtzis, testified at his deposition:

Q. Are you now referring to TKR 1419 [(a Worldwide Marine's ROB survey fee invoice)]?

A. MIN 275. He has given these services for the ROB according to our agreement free of charge, as per his documents. And according to our agreement he was going

to issue this - this additional invoice for our own reasons, for Minerva Marine's own reasons, and he is not entitled to this amount of $ 688.90 as per invoice - invoice 1419A/2000.

* * * Q. And that was the agreement you had with Capt. Spiliotes, that the flat rate attendance fee would include the cost of an ROB survey; is that right?

A. Yes.

Q. Captain Spiliotes also sent you a separate invoice for the ROB survey; correct?

A. On our request and agreement.

Q. And you requested that he send you this separate ROB survey invoice; that's right?

A. Yes, this was our agreement. He agreed to it -  [*77] we asked him and he said yes, we will do it.

(Spiliotes Declaration at Exhibit B, 358-60).

P46 - Minerva controlled if they paid me at all. Many of my ROB survey fee charges were never paid by Minerva. Captain Vezyrtzis would always tell me once Minerva got paid from their P&I club, they would pay me. The few times I asked about the status of payment, Captain Vezyrtzis would tell me they were still waiting for the club to pay and to wait a little longer. I am claiming these outstanding ROB surveys fees in this lawsuit and I understand from what has been learned in discovery that the P&I club paid Minerva for these fees long ago, even when Captain Vezyrtzis was telling me otherwise. (Attached as Exhibit K hereto is one of my outstanding ROB surveys invoices obtained in discovery from Minerva, which Minerva stamped "PAID" (when it was not) and submitted to their P&I club for reimbursement.)

P47 - Those times they did pay me, Minerva controlled when they paid me. Minerva would normally pay me months after I worked onboard their vessels. All I could do to hope to get paid was to send them friendly reminders. (Attached as Exhibit L hereto is one such reminder I sent in [*78]  June, 2001).

     n12 Note that the referenced paragraphs are contained in the Amended Spiliotes Declaration.

Plaintiff argues that these paragraphs should be stricken for the following reasons: they are self-serving statements that lack any evidentiary support in the re-

cord; they violate Fed.R.Civ.P. 56(e); and they violate the sham affidavit doctrine. ( See section I.D, supra).

At the outset, the Court notes that paragraph 38 is directly supported by Spiliotes's deposition testimony, and will be permitted. Plaintiff's motion to strike paragraph 38 is denied.

Defendants/Third-Party Plaintiffs have failed to cite any facts that support paragraphs 39, 40 and 42, however. Plaintiff's motion to strike paragraphs 39, 40 and 42 is granted.

Plaintiff argues that paragraphs 34, 35 and 37 are self-serving conclusions unsupported by specific facts in the record. Defendant has not responded to this charge in their opposition to the motion to strike. The Court notes, however, that Defendants/Third-Party [*79]  Plaintiffs have submitted several tax returns of WWM covering the years 1998 to 2003. The tax returns due show a dramatic decline in income from 2001 to 2002. The tax returns do not indicate, however, what accounted for the loss in income, nor do they account from where WWM lost income. Without more, the tax returns are insufficient to support Spiliotes's statement that he was extremely dependent on Minerva for his livelihood. Plaintiff's motion to strike paragraphs 34, 35 and 37 is granted.

Plaintiff argues that paragraph 41 should be stricken because it is based on inadmissible hearsay, and would not be capable of being admitted at trial. Specifically, Plaintiff argues that the statement is based on Spiliotes's deposition testimony, concerning an alleged conversation he had in 1985 with a now deceased Thenamaris employee named Selementas, who allegedly hired Spiliotes secretly. The deposition testimony is as follows:

> The Captain Selementas, when he hire me, he told me that we used to have an office in New York and we close the office because we didn't pay the taxes to the IRS. Now we hire you and we don't want to make the same mistake like we did with Transworld, the previous [*80]  company. So, when I use the company, which is Worldwide Marine, as a shell company for us, you going to work for us as a port captain and you going to do everything on the ship, we want to use you on every ship comes to the states - - excuse me, I take that back. Every ship comes to the East Coast of the United States, but we can't give you no written contract because if we give you a written contract, maybe the same thing happen to use like before like Transworld. Okay.

I agree to it because I needed the job, it was a good job, you know, and I needed a job and agreed to it.

(Spiliotes Deposition at 407-408). Defendants/Third-Party Plaintiffs do not dispute that paragraph 41 is based on Spiliotes's deposition testimony concerning Selementas's statements, and even cite it to show that Spiliotes has consistently testified concerning this issue. Defendants/Third-Party Plaintiffs have not denied that Selementas is now deceased.

The issue here is whether paragraph 41 would be admissible at trial, as required by Fed.R.Civ.P. 56(c). Paragraph 41, standing alone, does not constitute hearsay, as it does not constitute an out of court statement offered to prove the truth of [*81] the matter asserted. See Fed.R.Evid. 801. The underlying deposition upon which paragraph 41 is based, however, does constitute hearsay. Fed.R.Evid. 801, 802. Because Spiliotes's deposition testimony serves as the basis for his statements in paragraph 41, that paragraph will only be admitted if Spiliotes's deposition testimony can be reduced to admissible evidence at trial.

Spiliotes's deposition testimony constitutes hearsay within hearsay, as Spiliotes has recounted what he was told by Captain Selementas. Captain Selementas allegedly made certain statements to Spiliotes, and those statements are now being offered by Spiliotes to prove the truth of the matter asserted: that Spiliotes was directly employed by the Martinos family. Spiliotes's deposition statements are not, as Defendants/Third-Party Plaintiffs argue, "operative facts," as the statements are being offered for their truth. Defendants/Third-Party Plaintiff have not proposed any other hearsay exceptions that may apply, nor has this Court been able to find any.

Inadmissible hearsay can be considered in an affidavit in opposition to summary judgment, however, if the hearsay declarant can be produced at trial to [*82] offer his or her statements in admissible form. See Rossi, 156 F.3d at 470 n. 13. Here, Plaintiff has alleged that Captain Selementas is now deceased. Defendants/Third-party Plaintiffs have not contested that Captain Selementas is deceased. Because he is dead, his statements cannot he admitted at trial.

It follows that paragraph 41 would be inadmissible at trial, as it is based on inadmissible hearsay, and the declarant cannot be produced to testify. Defendants/Third-Party Plaintiffs have not cited any other facts in the record to support his assertion that Minerva required him to have his own company Worldwide while

he worked for them. n13 Plaintiff's motion to strike paragraph 41 is granted.

> n13 Defendants/Third-Party Plaintiffs have cited additional deposition testimony by Spiliotes to show that Spiliotes has consistently testified that he was required to operate his own company while working for Thenamaris. (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("DSUMF") at P27). The statements contained in those excerpts of Spiliotes's deposition are too vague, however, to support the proposition that Thenamaris required Spiliotes to operate his own company while working for them.

[*83]

Several paragraphs contain only parts that must be stricken from the record. Specifically, the first sentence of paragraph 43, the first two sentences of paragraph 44, and the first sentence of paragraph 45 must all be stricken, as they constitute self-serving conclusions that are not supported by specific facts in the record. The remainder of the paragraphs are supported by the cited deposition testimony, however. Plaintiff's motion to strike paragraphs 43, 44 and 45 are granted in part and denied in part.

Plaintiff has also moved to strike paragraph 46 on the grounds that it contains self-serving conclusions to the effect that Minerva exerted "control" over Spiliotes, but is unsupported by specific facts in the record. The paragraph states that Minerva controlled if Spiliotes was paid at all. In support of this statement, Defendants/Third-Party Plaintiffs have submitted an exhibit, which contains an invoice submitted to Minerva, that was stamped "paid." Spiliotes contends that he was never, in fact, paid. (Spiliotes Declaration at Exh. K). This exhibit, standing alone, is insufficient to support the assertions made in paragraph 46. Plaintiff's motion to strike paragraph 46 is [*84] granted.

Plaintiff also moves to strike paragraph 47 on the grounds that it contains self-serving conclusions to the effect that Minerva exerted "control" over Spiliotes, but is unsupported by specific facts in the record. The paragraph states that Minerva controlled when Spiliotes was paid, and that all he could do to got paid was submit friendly reminders. In support of this paragraph, Defendants/Third-Party Plaintiffs have submitted one of those reminders that Spiliotes sent to Minerva. (Spiliotes Declaration at Exh. L). The exhibit, standing alone, is insufficient to support the assertions made in paragraph 47. Plaintiff's motion to strike paragraph 47 is granted.

Defendants/Third-Party Plaintiffs have also argued that Minerva forced Spiliotes to set up WWM. (Spiliotes Declaration at P12, Exh. 9). Plaintiff moves to strike paragraph 12, which reads as follows:

> P12 - After Minerva was set up, Captain Vezyrtzis called me on the telephone and offered me the same job I had with Thenamaris with Minerva. I agreed. As with Thenamaris, Minerva required that I operate my own company Worldwide while working for them. As I testified at my deposition:
>
> A. I do many things [*85] there. The Minerva mostly and Thenamaris, I do everything, just name it. I was their representative on the East Coast.
>
> Q. All right.
>
> A. Any time they need something they call me.
>
> Q. Whose representative?
>
> A. Minerva and Thenamaris.
>
> Q. Okay.
>
> A. Any time they needed something, was me. They didn't need nobody else here because they had - before they used to have an office here. I don't know if you're aware of that. Thenamaris used to have an office here before called Transworld. So because they didn't want to pay the taxes, the IRS was after them, the closed the office. I don't know if - excuse me, and then they got me.
>
> Q. You're going beyond my question.
>
> A. No, I'm not going. This is port captain job.
>
> Q. I want to know -
>
> A. I'm trying to answer you know. This is part of the port captain job. They hired me with my company to do their business.
>
> (Spiliotes Declaration at Exh. A, 372-73).

Plaintiff argues that paragraph 12 should be stricken because it is based on inadmissible hearsay. Moreover, Plaintiff claims that the only basis for the third sentences is that Spiliotes is relating back to the conversation he allegedly [*86] had with a man from Thenamaris in 1995 who is now deceased. Although Defendants/Third-Party Plaintiffs argue that these statements constitute "operative facts," it is clear that the statements are being offered to prove the truth of the matter asserted: that Spiliotes was directly employed by Minerva.

With regard to the first sentence, the statement may be admissible as a statement of a party-opponent under Fed.R.Evid. 801(d)(2)(D). That rule states that a statement is not hearsay if the statement is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). If the statement falls under any hearsay exceptions, then it should he considered at the summary judgment stage.

Captain Vezyrtzis testified that he was the Manager of the Operations Department at Minerva Marine. (Declaration of Ronald Betancourt in Opposition to Minerva's Motion for Summary Judgment at Exh.5, p.10). Moreover, Captain Vezyrtzis testified that he had appointed Worldwide Marine to attend Minerva vessels, and that he met with Spiliotes to discuss the terms [*87] of his retention by Minerva Marine. n14 ( Id. at Exh.5, pp. 68, 481). These statements are sufficient to find that Captain Vezyrtzis was an agent of Minerva, and that he made these statements concerning a matter within the scope of his employment, during the existence of the relationship. It is this Court's determination that Captain Vezyrtzis's statements would he admissible under the exception for admissions of a party opponent. The third sentence of paragraph 12, however, is inadmissible because it lacks the support of specific evidence in the record. Plaintiff's motion to strike paragraph 12 is granted in part and denied in part.

n14 This statement is also sufficient to defeat Plaintiff's argument that the paragraph should be stricken on the grounds that there is no evidence that Captain Vezyrtzis ever discussed what the terms of Spiliotes's agreement with Minerva were. (Plaintiff's Motion to Strike at p. 6).

*v. Analysis*

Having granted much of the Plaintiff's motion to strike, the Court must now [*88] determine whether the Defendants/Third-Party Plaintiffs' remaining arguments are sufficient to carry their burden to create a genuine

issue of material fact with respect to the issue of control. After striking multiple paragraphs from Spiliotes's Declaration, there is little left to support Defendants/Third-Party Plaintiffs argument that Spiliotes was controlled by Minerva.

Defendants/Third-Party Plaintiffs give several examples of times when unexpected problems arose with Minerva's ships that required Spiliotes to report to Minerva to seek instructions on how to resolve the problems. (Spiliotes Declaration at PP26, 30-33). They also provide an example of a time when Spiliotes was instructed to go to Maine to handle an inspection on board one of Minerva's ships. (Spiliotes Declaration at P27). That Spiliotes occasionally ran into problems that required him to contact Minerva to seek instructions, or that he was occasionally instructed to handle an inspection, however, is insufficient to create a genuine issue of fact that Spiliotes was not controlled. Indeed, Spiliotes's testimony indicates the contrary: for the most part, he was unsupervised. Spiliotes testified that he was an expert [*89] who knew his job, that no one ever told him how to perform his job, and that he was generally unsupervised by Minerva. (PSUMF at PP70-71, 73-74). Spiliotes's testimony that he occasionally received instructions from Minerva is insufficient for a reasonable jury to conclude that Minerva controlled the means and manner of his performance.

Defendants/Third-Party Plaintiffs also provide evidence to show that Spiliotes had a special relationship with Minerva, and that Spiliotes was dependent on Minerva for his livelihood. (Spiliotes Declaration at P36, 38, 48 excerpted portions of PP43-45; Vezyrtzis Deposition at pp. 32-33, 66-68). However, the fact that Spiliotes may have had a special relationship with Minerva, or that he was dependent upon Minerva for his livelihood, are insufficient to show that Minerva controlled Spiliotes. On the balance, the first factor weighs in favor of the Plaintiff.

b. Factor 2 - The kind of occupation, supervised or unsupervised

According to the Plaintiff, Spiliotes's testimony confirms that Spiliotes was neither directly nor indirectly supervised by Minerva, a factor that points to independent contractor status. (PSUMF at PP70-77). Moreover, Captain [*90] Vezyrtzis, a Minerva employee, testified that no one at Minerva supervised the way Spiliotes performed his services. (PSUMF at P75). Plaintiff also cites the geographical distance between Spiliotes in New Jersey and Minerva in Greece as evidence that he was not supervised. (PSUMF at P76). See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 752, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989) (a factor weighing against the determination that the defendant was an employee was the fact that the defendant was in Baltimore, and could not be supervised from Washington given the geographic distance).

Although Defendants/Third-Party Plaintiffs dispute paragraphs 74 through 76 of the Plaintiffs Local Rule 56.1 Statement, those disputes are immaterial. Moreover, the Court has granted the Plaintiff's motion to strike much of the evidence cited by Defendants/Third-Party Plaintiffs to show that Spiliotes was supervised. The remaining evidence merely indicates that Spiliotes was once instructed by Vezyrtzis to go to Maine, and was once instructed by Minerva to repair a radar, but provides no indication that Spiliotes's work was supervised by Minerva. (Spiliotes Declaration at PP27, 33). The [*91] second factor weighs in favor of the Plaintiff.

c. Factor 3 - Skill

According to Plaintiff, Spiliotes has admitted that while he didn't want to "brag," "[he] know[s] more things than a lot of experts out there." (PSUMF at P72). He adds, "Maybe I am an expert. You know, there are many experts but I don't want to brag." Id. Moreover, WWM held itself out as having "vast experience and knowledge" and offering a "full range of services" to the maritime industry. (PSUMF at PP24-29).

Defendants/Third-Party Plaintiffs argue that the question is not just whether Spiliotes was skilled - but rather, whether Minerva's employees lacked the skill that caused Minerva to go out and seek Spiliotes's services. They offer evidence to show that Minerva's crew was in fact capable of performing the services that were provided by Spiliotes.

The relevant inquiry, however, is where Spiliotes obtained his skills, not whether Minerva was capable of performing Spiliotes's services. See Mulzet v. R.L. Reppert, Inc., 54 Fed.Appx. 359, 360-61 (3d Cir. 2002) (businesses seek the assistance of independent contractors for many reasons; the question is from whom the employee acquired [*92] his skills). According to Vezyrtzis's testimony, Minerva did not train Spiliotes to perform his job. (PSUMF at P75). Factor three weighs in the Plaintiff's favor.

d. Factor 4 - Who furnishes the equipment and the workplace

Plaintiff argues that WWM had its own office in New Jersey and supplied its own furniture, fax machines, telephones, automobile, letterhead/stationery, business cards and similar items (PSUMF at 15-17). Defendants/Third-Party Plaintiffs argue that Spiliotes's workplace was predominantly onboard Minerva's vessels, and that while onboard, he had full access to and used much of Minerva's equipment. (PSUMF at PP34, 54-56).

2006 U.S. Dist. LEXIS 13922, *

Plaintiff has moved to strike paragraphs 54 and 55, which state that all the equipment Spiliotes used aboard the ships belonged to Minerva, and that Spiliotes even wore a Minerva uniform at times while on the ship's deck. Paragraphs 54 and 55 read:

P54 - Captain Gianniou also declared that "Minerva did not provide or pay WWM for any equipment." (See Affidavit of Michael Fernandez Exhibit 43 P17.) However, all the equipment I used aboard ship was Minerva's. I had full access to the Minerva's shipboard computers and I sued them [*93] for all my computer needs. I used the vessel's telephone and VHF radio. I used the vessel's ullage tapes and past to measure the cargo aboard. I do not even own an ullage tape. The surveyors/agents for the terminal, vessel charterers, cargo receivers, etc. were not allowed to use the ship's computer, telephone and VHF as I was, nor were they provided with the ship's equipment to measure and otherwise survey the cargo. They used their own equipment.

P55 - I even wore a Minerva uniform at times while on the ship's deck - Minerva's white company overall's used by their shipboard deck officers. Minerva did not provide the surveyors/agents for the terminal, vessel charterers, cargo receivers, etc. with their company overalls.

Plaintiff argues that the contents of paragraphs 54 and 55 should be stricken as self-serving and for failing to comply with Fed.R.Civ.P. 56(c). Specifically, Plaintiff argues that Spiliotes has no personal knowledge as to whether Minerva provided surveyors or agents for the terminal, vessel charterers, cargo receivers, etc. with uniforms or permitted them to use the ship's computer, telephone, VHF or other materials onboard.

The Court finds that Spiliotes [*94] has not made a satisfactory showing that he has personal knowledge with respect to who was given access to the ship's computer, telephone and VHF, as well as who was provided with company overalls. These decisions effectively amount to company policy, and Spiliotes has not made a showing that he has personal knowledge of management issues concerning Minerva. Plaintiff's motion to strike is granted with respect to the sixth and seventh sentence of paragraph 54, and the second sentence of paragraph 55.

The remaining parts of paragraphs 54 and 55, as well as paragraph 56, are sufficient, nevertheless, to show that Spiliotes was furnished his equipment and workplace by Minerva. Factor four weighs in the Defendants/Third-Party Plaintiffs' favor.

c. Factor 5 - Length of time the individual has worked for the company employer

Plaintiff argues that from 1998 to 2001, WWM was appointed only as needed, and was not engaged to attend on all of Minerva's vessels calling on the East Coast during that time frame, as alleged by Spiliotes. (PSUMF at P113). Spiliotes also provided services to other entities during this time frame. (PSUMF at P136). Moreover, Spiliotes admitted that ship's agents [*95] are appointed as necessary by vessel owners. (PSUMF at P102).

To contradict Plaintiff's claim that Spiliotes worked for Minerva on a limited basis, Defendants/Third-Party Plaintiffs argue that Spiliotes was employed by the Martinos family for over 15 years. (Spiliotes Declaration at PP6-14). Even if that is accepted as true, it still does not create an issue of the fact that Spiliotes worked non-exclusively for Minerva from 1998 to 2001, and even then, only on an as needed basis. n15 Factor five weighs in the Plaintiff's favor.

n15 The Court will not consider the Plaintiff's motion to strike the paragraphs cited by Defendants/Third-Party Plaintiffs. Even if those paragraphs are accepted as true, the outcome remains the same.

f. Factor 6 - Method of payment

Plaintiff argues that all payments from Minerva went directly to WWM, based upon WWM's submission of invoices. (PSUMF at PP58-62). Additionally, Spiliotes and other employees at WWM were paid by WWM based upon the amount of work they performed, and [*96] received 1099 forms from WWM. (PSUMF at PP10, 14, 21-23). Spiliotes never reported or claimed in his personal (state or federal) tax filings any wages, salary, or anything else from Minerva. (PSUMF at PP32-35).

Defendants/Third-Party Plaintiffs dispute several of these statements. First, Defendants/Third-Party Plaintiffs dispute paragraphs 58 and 59 of the Plaintiff's Local Rule 56.1 Statement. Paragraph 58 states that WWM was paid by Minerva based upon the handwritten rates offered by WWM to Minerva as trey appeared in WWM's advertising brochure. (PSUMF at P58). Paragraph 59 states that all services performed by WWM were paid consistent with the agreed rate schedule contaned in the Agency Tariff. (PSUMF at P59). To counter these paragraphs, Defendants/Third-Party Plaintiffs cite paragraph 40 of

the Spiliotes Declaration, which explains the billing practice between WWM and Minerva, based on their agreement. n16 (Spiliotes Declaration at P40). It is not clear to this Court how paragraph 40 of the Spiliotes Declaration disputes paragraphs 58 and 59 of the Plaintiff's Local Rule 56.1 Statement. The Court will consider paragraphs 58 and 59. Although Defendants/Third-Party Plaintiffs [*97] dispute paragraphs 10, 34 and 35 of the Plaintiffs' Rule 56.1 Statement as well, the Court does not find these disputes material.

> n16 As discussed earlier, the first sentence of paragraph 40 is stricken from the record. ( See section II.A.1.d, supra).

Defendants/Third-Party Plaintiffs agree that the monies paid to Spiliotes by Minerva were paid through WWM, but argue that Spiliotes was required to operate his own company. (Spiliotes Declaration at PP36-47). As previously mentioned, the Court will not consider Defendants/Third-Party Plaintiffs' conclusory assertions that Minerva controlled its relationship with Spiliotes, and required it to operate WWM. ( See section II.A.1.d, supra). Factor six weighs in Plaintiff's favor.

g. Factor 7 - Manner of termination of the work relationship

Plaintiff notes that Spiliotes never received a termination letter from Minerva. Rather, it argues that after September of 2001, Minerva was never again appointed as a protective ship agent or Remaining on Board [*98] (ROB) surveyor by Minerva, and there was no obligation to do so since WWM was only appointed on a cases by case basis. (PSUMF at P125). Plaintiff adds that this is consistent with Spiliotes's statement to the press that he and WWM were only hired on an as needed basis to represent a shipping company's interest in port and that he was a shipping agent. (PSUMF at P102). Although Defendants/Third-Prty Plaintiffs dispute the paraphrasing of the *Newark Star Ledger* article in paragraph 102, and the summary of Martinos's deposition testimony in paragraph 125, the Court finds those disputes to be immaterial.

Plaintiff also argues that WWM recognized that Minerva never guaranteed any future assignments, as evidenced by the following statement that appeared on the cover of reports created for Minerva by WWM:

> We are very appreciative of your continued business and if we may be of any further assistance regarding any aspect of the shipping industry we will be more than

happy to render our services. (PSUMF at P92)

Additionally, WWM invoices contain the printed language: "serving to serve again." (PSUMF at P8).

Defendants/Third-Party Plaintiffs argue that the Plaintiff has [*99] mischaracterized the circumstances of Spiliotes's termination. Specifically, they claim that Spiliotes returned to the Minerva Julie after going to the Bayonne Police station on the night in question, and he was met on the pier by the Master and fired on orders from Martinos. (Spiliotes Declaration at P58). The paragraph cited by Defendants/Third-Party Plaintiffs, however, does not dispute the fact that Spiliotes never received a termination letter, and was simply not retained on future assignments. Factor seven weighs in favor of the Plaintiff.

h. Factor 8 - Whether the worker accrues annual leave

Plaintiff cites Spitiotes's own testimony that he never received any vacation, insurance, disability or workers compensation benefits from Minerva. (PSUMF at P67). This factor is not disputed by Defendants/Third-Party Plaintiffs. Factor 8 weighs in the Plaintiff's favor.

i. Factor 9 - Is the work the individual performs an integral part of the employer's business

To show that Spiliotes's work was not integral to Minerva's business, Plaintiff first argues that Minerva routinely appointed ship agents such as WWM on a cases by case basis to ensure that their vessels were properly [*100] serviced and looked after in ports throughout the world. (PSUMF at PP50-56). Moreover, Plaintiff has statistics to show that WWM was appointed only 39% of the time for vessels calling on the east coast, and only 46% of the time for vessels calling in the northeast. Plaintiff also argues that Captain Katsaros, another port captain has readily admitted that he was simply a vessel's agent, and by no means a port captain employed by Minerva. (PSUMF at PP120-123). They also cite cases to show that it is a well-established principle of U.S. maritime law that work done by ship agents does not make them employees but rather that they are always regarded by courts as independent contractors.

Plaintiff's argument on this point confuses the issues, and fails to address the specific question of whether Spiliotes's work is integral to Minerva's business. The evidence, in fact, suggests that ship's agents are integral to Minerva's business, as ship owners need someone to protect their interests and the vessel's interests while their vessels are in port. (PSUMF at PP50-56). Cf. DaBronzo, 232 F.Supp.2d at 317 (removal of asbestos was a unique

skill unrelated to, and not an integral [*101] part of, the vitamin business). Factor 9 weighs in favor of the Defendants/Third-Party Plaintiffs.

j. Factor 10 - Does the individual accrue retirement benefits

There is no dispute that Spiliotes did not accrue retirement benefits from Minerva. Factor 10 weighs in Plaintiff's favor.

k. Factor 11 - Does the "employer" pay social security taxes

There is also no dispute that Minerva did not pay social security taxes for Spiliotes. Factor 11 weighs in Plaintiff's favor.

l. Factor 12 - The intention of the parties

Plaintiff argues that the evidence overwhelmingly establishes that the parties always intended that Spiliotes would be an independent contractor, and that Spiliotes consistently represented himself as an agent for WWM. Plaintiff cites a laundry list of evidence to support this claim: WWM advertised itself as a Ship's Agent and Marine Technical and Environmental Consultant/Surveyor (PSUMF at PP24-29); the sighed personal federal tax returns from Spiliotes indicating that he was either a pensioner, retired, or a ship's agent (PSUMF at PP32-35); certified statements made by Spiliotes to the U.S. Coast. Guard indicating that he was employed by WWM (PSUMF at PP36-38); [*102] sworn deposition testimony from Spiliotes, and a verified bill of particulars, from a lawsuit related to a car accident in 1998, indicating that he was employed by WWM (PSUMF at PP39-41); records of the Hellenic Chamber of Commerce indicating that Spiliotes was the Vice-President of WWM (PSUMF at P45); and a Credit Card application to Citibank indicating that Spiliotes was employed by WWM (PSUMF at P46). Additional evidence shows that Spiliotes was serving as a vessel's agent while employed by WWM: in a fax dated September 21, 2001 from Spiliotes, WWM confirmed, "We are please to attend as owners agent for the above named vessel." (PSUMF at P80); IMTT port in Bayonne listed Spiliotes as an owner's agent (PSUMF at P83); IMTT's gate log and visitors log contained handwritten entries by Spiliotes that he was a surveyor/agent for WWM (PSUMF at PP84-85); Spiliotes's business card stating that he was acting as "owners/vessels agent" for the call of the Minerva Julie at IMTT (PSUMF at P86); Spiliotes identified himself to others at IMTT as a ships agent for WWM (PSUMF at P87-88); the charterer's agent also understood that Spiliotes was acting as an owner's agent (PSUMF at P89); the Bayonne [*103] Police Department's report of September 26, 2001, identifying Spiliotes as a ships agent (PSUMF at P90); a signed statement by Spiliotes submit-

ted to the Bayonne Police department, dated September 26, 2001 representing himself as a "ships agent and broker" (PSUMF at P91); a cover letter and report issued to Minerva by WWM stating, "We are very appreciative of your continued business and if we may be of any further assistance regarding any aspect of the shipping industry we will be more than happy to render our services," and a report signed by Captain Spiliotes as "independent marine and cargo surveyor/consultant." (PSUMF at P92-93). Plaintiff cites additional evidence showing that Spiliotes has continuously portrayed himself as a ship's agent. (PSUMF at PP99-102). Plaintiff also cites evidence to show that Spiliotes never was a port captain, never held himself out as a port captain, and never suggested that he worked for Minerva. (PSUMF at PP71, 112, 114-115, 117, 118, 119, 124).

Plaintiff has again confused the issues. The issue is not whether Spiliotes held himself out as an employee or port captain of Minerva, but whether the parties intended that Spiliotes would he an employee [*104] of Minerva. Defendants/Third-Party Plaintiffs are correct in arguing that the label adopted by the parties is of nominal value in determining their relationship. MacDougall, 144 N.J. at 388 ("categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined."). Although Plaintiff's evidence adds some color to their argument, the labels used by Spiliotes tells this Court little about how he actually viewed his relationship with Minerva.

Defendants/Third-Party Plaintiffs, on the other hand, argue that the evidence shows that Spiliotes believed he had a special relationship with Minerva. (Spiliotes Declaration at PP12- 9, 50-56, 64). Taking into account their evidence that is not subject to the motion to strike, however, Defendants/Third-Party Plaintiffs' evidence is likewise insufficient in helping this Court determine the intent of the parties.

The Court finds that neither party's evidence is probative of the parties' intentions. On the balance, factor twelve does not weigh in favor of [*105] either party.

### 3. Conclusion

Assuming all of the factors of the Pukowsky test, and viewing the evidence in a light most favorable to the Defendants/Third-Party Plaintiffs, this Court finds as a matter of law that Spiliotes was an independent contractor of Minerva. It follows that Defendants/Third-Party Plaintiffs cannot sustain a claim against Minerva pursuant to CEPA. Although Plaintiff moves for attorney fees under section 34:19-6 of CEPA, the Court reserves judgment on this issue pending resolution of the case. Plaintiff's motion for summary judgment on Defen-

dants/Third-Party Plaintiffs' first counterclaim is granted. n17

> n17 Having found summary judgment in favor of Plaintiff on the first counterclaim, the Court need not consider Plaintiff's alternative argument for summary judgment of the CEPA claim under the doctrines of *In Pari Delicto*, Equitable Estoppel, or Unclean Hands.

### B. Third Counterclaim: Defamation

Defendants/Third-Party Plaintiffs have alleged that contrary to the results [*106] of their investigation of the incident on September 26, 2001, Minerva and/or their agents maliciously and falsely told a reporter for *TradeWinds* that Spiliotes's version of the events was fabricated, and that Spiliotes had insisted that the Chief Mate of the Minerva Julie "speed up the discharging process" dangerously and in violation of terminal regulations, and that Spiliotes later filed a false report to terminal security. (Answer with Counterclaims at PP106-107). Defendants/Third-Party Plaintiffs add that Minerva later falsely told a *TradeWinds* reporter that Spiliotes lied about the Chief Mate's comments. ( Id. at 108). To succeed on a defamation claim under New Jersey law, Defendants/Third-Party Plaintiffs must prove that a false and defamatory statement of fact about Spiliotes was made, that Plaintiffs knew or should have known it was false, and that it was communicated to third parties, causing damages. Arista Records, Inc. v. Flea World, Inc., 356 F.Supp.2d 411, 424 (D.N.J. 2005).

Plaintiff now moves for summary judgment on several grounds. First, Plaintiff argues that Defendants/Third-Party Plaintiffs and/or their agents forwarded copies of, [*107] *inter alia*, Minerva's complaint to *TradeWinds*, which led to the publication of the two articles. (Pl's Br. at p. 20; PSUMF at P128). This fact is undisputed by Defendants/Third-Party Plaintiffs. Plaintiff claims that Defendants/Third-Party Plaintiffs cannot now bring a claim of defamation when in fact they instigated the publication. Rogozinski v. Airstream by Angell, 152 N.J. Super. 133, 151, 377 A.2d 807 (Law Div. 1977) ("When the publication of defamatory matter has been invited, instigated or procured by one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury....particularly, when it is elicited for the purposes of predicating an action thereon....") (citations omitted).

The Court finds that by forwarding Minerva's complaint to *TradeWinds*, Defendants/Third-Party Plaintiffs both instigated and consented to the publication of the alleged defamatory material. Under the Restatement's definition of consent in defamation actions, a plaintiff consents to the making of defamatory statements if the plaintiff "knows the exact language" that the defendant will use in those statements or "has reason to [*108] know that" such language "may be defamatory." Restatement (Second) of Torts § 583 (1977).

To determine whether or not Defendants/Third-Party Plaintiffs consented to the publication, the Court must compare the allegations in the Plaintiff's complaint to the alleged defamatory statements published in *TradeWinds* that are cited as the basis for the defamation cause of action in the third counterclaim. The following are excerpts of paragraphs 15 and 16 of Minerva's complaint:

> 15. After continuing his abusive behavior and insisting that unsafe measures be taken during discharge, Spiliotes was asked by Chief Officer Tsingis to leave the vessel. Spiliotes then became infuriated, left the vessel and *falsely and maliciously* informed IMTT Port Security that Chief Officer Tsingis had threatened to blow up the vessel with a bomb.

> 16. As a result of the *false accusations* of Spiliotes, Chief Officer Tsingis was arrested on September 26, 2001...

(Pl's Complaint at PP15-16) (emphasis added). Plaintiff's complaint clearly alleges that Spiliotes lied. These statements must be compared to the third counterclaim, which alleges that Spiliotes was defamed because [*109] Minerva and/or their agents maliciously and falsely told a reporter for *TradeWinds* that Spiliotes's version of the events was fabricated (Counterclaim at P106); maliciously and falsely told a reporter for *TradeWinds* that Spiliotes insisted the Chief Mate "speed up the discharge process," and when the Chief Mate refused to do so, that Spiliotes maliciously filed a false report to terminal security (Counterclaim at P107); and that Minerva again later maliciously and falsely told a reporter for *TradeWinds* that Spiliotes lied about the Chief Mate's comments (Counterclaim at P108). The Court finds that the language in the complaint is sufficiently similar to the language of the alleged defamatory remarks cited in the counterclaims, such that by furnishing the complaint to *TradeWinds*, Defendants/Third-Party Plaintiffs "[knew] the exact language" that would be used or at the very least "had reason to know" that such language "may be defamatory." See Restatement (Second) of Torts § 583 (1977). In other words, Defendants/Third-Party Plaintiffs consented to the publication of these statement.

Defendants/Third-Party Plaintiffs now attempt to argue that there are additional [*110] statements made in the *TradeWinds* article that constitute defamation. Specifically, the October 22, 2002 *TradeWinds* article states, "Minerva maintains that Spiliotes lied about the chief mate's comments, possibly to settle an old score," and adds that Spiliotes had a history of disputes with crew members. (Pl's Br. at Exh. 70). The August 16, 2002 article states: "Minerva's lawyers said they believe Spiliotes had an old score to settle with Tsingis." (Pl's Br. at Exh. 70). Plaintiff argues that they could not have reasonably anticipated these statements being published because they are not in Minerva's complaint.

The problem with this argument is that the Defendants/Third-Party Plaintiffs did not specifically reference these statements in their third counterclaim, nor did they give any indication that there were additional defamatory statements apart from the ones they specifically referenced. To the extent that Defendants/Third-Party Plaintiffs seek to rely on statements not mentioned in the third counterclaim as the basis for its defamation claim, the Court will not now consider them. See Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 8 (D. N.J. April 4, 2005) [*111] (refusing to consider additional defamatory statements where Court was "not convinced that the allegations in the Complaint [were] sufficient to put defendants on notice that any and every defamatory statement that they may have made about plaintiff regarding the underlying incident at any point in time is now the subject of this action.").

Because the Court fords that Defendants/Third-Party Plaintiffs instigated and consented to publication, there is no need to consider the Plaintiff's alternative arguments for summary judgment on the third counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' third counterclaim is granted.

### C. Fourth Counterclaim: Tortious Interference with Prospective Economic Advantage

Plaintiff moves for summary judgment on the fourth counterclaim on the grounds that Defendants did not allege and cannot prove any reasonable expectation of, or interference with their business advantage. The Third Circuit has recognized that the Supreme Court of New Jersey has identified the four elements of a prima facie case for tortious interference with economic opportunities: (1) a reasonable expectation of [*112] economic advantage to plaintiff, (2) interference done intentionally and with malice, (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages. Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)). The Third Circuit noted that "although the New Jersey courts continue to read Printing Mart as setting out a four-part prima facie case . . . several panels of this court have read in a fifth element: defendant's knowledge of plaintiff's expected advantage." Varrallo, 94 F.3d at 848 n.9 (citations omitted).

Plaintiff's first argument is that Defendants/Third-Party Plaintiffs have failed to allege facts showing an existing or prospective economic or contractual relationship, as required to sustain a cause of action. See Eli Lilly & Co. v. Roussel Corp., 23 F.Supp.2d 460, 494 (D.N.J. 1998) ("a plaintiff asserting a tortious interference claim must allege facts that show an existing or prospective economic or contractual relationship."). The fourth counterclaim states, [*113] in relevant part, as follows:

> 112. Defendants had a protectable interest in their relationships with other ship owners and operators enuring to their commercial benefit.

> 113. Plaintiff wrongfully and unethically interfered with those relationships with malice and with the intent to inflict harm on defendants without justification or excuse.

(Answer with Counterclaims at PP112-1]3). By arguing that the fourth counterclaim fails to allege a cause of action, however, Plaintiff has effectively moved to dismiss the counterclaim under Fed.R.Civ.P. 12(b)(6). While the Court acknowledges that the fourth counterclaim fails to state a claim, see Storis v. GERS Retail Sys., 1995 U.S. Dist. LEXIS 7614, at *14-15 (D.N.J. 1995) (granting motion to dismiss because plaintiff failed to allege specific prospective contracts that were interfered with by the defendant), the Court declines to rule on the motion to dismiss at this time, and will instead rule on the merits.

Plaintiff argues that Defendants/Third-Party Plaintiffs have not created a genuine issue as to interference, damages, or causation. To show that Defendants/Third-Party Plaintiffs have no evidence [*114] to support the fourth counterclaim, Plaintiff argues the following: the fourth counterclaim is based in large part on the second counterclaim (defamation) which was voluntarily dismissed by defendants with prejudice after Minerva obtained an affidavit directly rebutting allegations made therein (PSUMF at PP132-135); during his deposition, Spiliotes testified that WWM performed work for com-

panies other than Minerva such as Thenamaris, Ranger Marine, and the U.K. P&I Club (PSUMF at P136); no specific computation as to damages has been provided or calculated by Defendants/Third-Party Plaintiffs (PSUMF at P137, 141-148); Thenamaris ceased appointing WWM before the incident on board the Minerva Julie based upon a communication forwarded by Spiliotes to that Company in July of 2001, stating in part, do not "bother calling me again for this vessel or any other vessel that you are the operator." (PSUMF at 138-139); and Minerva obtained affidavits from both Ranger Marine and Thomas Miller of the U.K. P&I Club that those companies have and will continue to appoint WWM and have not been influenced in any way not to appoint WWM. (PSUMF at 140-141). n18

> n18 Defendants/Third-Party Plaintiffs dispute paragraphs 135-137, 139, and 142-145 of the Plaintiffs Local Rule 56.1 Statement. The Court will not address these disputes, however, because even if those disputes are genuine, Defendants/Third-Party Plaintiffs' evidence is still insufficient to sustain a cause of action for tortious interference.

[*115]

Defendants/Third-Party Plaintiffs cite paragraphs 60 through 66 of the Spiliotes Declaration to support a cause of action for tortious interference with prospective economic advantage. n19 Generally, those paragraphs indicate that the number of jobs Spiliotes received from UK P&I Club and Ranger Marine diminished substantially after September of 2001. Plaintiff has moved to strike paragraph 63, however, which states the following:

> P63 - The timing of this work, the unusual circumstances surrounding the owner's request that I leave earlier than anticipated and Minerva's immediate knowledge and timely use of it in this lawsuit for their summary judgment motion, leaves me no doubt that Minerva and/or their agents were involved in its beginnings so Minerva could use it to attempt to defeat my claim for tortious interference.

(Spiliotes Declaration at P63). Plaintiff argues that paragraph 63 equates to self-serving speculation and opinion that is not based on personal knowledge and should be stricken. This Court agrees. The statements in this paragraph, pertaining to Spiliotes's discharge from his employment for the UK P&I Club, are purely speculative

and are insufficient [*116] to satisfy the personal knowledge requirement of Fed.R.Civ.P. 56(e). Moreover, Defendants/Third-Party Plaintiffs have cited nothing from the record to support these allegations. Plaintiff's motion to strike paragraph 63 is granted.

> n19 Paragraph 64, which contains a quotation from the Baker Declaration, has already been stricken.

The remaining paragraphs, 60 through 62 and 65 to 66, are insufficient to create a genuine issue as to the interference and causation requirements of tortious interference with prospective economic advantage. The paragraphs merely indicate that Spiliotes has received less work from two companies. Although Spiliotes's tax returns may be sufficient to give some indication of damage, there is nothing in the record to suggest that the Plaintiff intentionally interfered with Spiliotes's economic advantage, or that any such interference caused the decline. Contrary to Defendants/Third-Party Plaintiffs argument, it would not be reasonable for this Court to infer that Spiliotes's decline [*117] in employment was a result of Plaintiff's intentional interference with malice, or that any such interference caused the decline. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' fourth counterclaim is granted.

### D. Fifth Counterclaim: Malicious Use of Process

Plaintiff moves for summary judgment on the fifth counterclaim on the grounds that, *inter alia*, a malicious use of process claim cannot be asserted as a counterclaim. Defendants/Third-Party Plaintiffs' malicious use of process counterclaim alleges that Minerva maliciously filed its complaint, without any basis in fact or law, with the sole motivation to harass, embarrass and injure the Defendants/Third-Party Plaintiffs. n20 (Answer with Counterclaims at P21).

> n20 The Court will not entertain Defendants/Third-Party Plaintiffs' eleventh-hour attempt to recast their "malicious use of process" counterclaim as a "malicious abuse of process" claim. (Opp. Br. at pp. 21-24). The heading for the fifth counterclaim clearly states "malicious use of process," and the elements described therein suggest a malicious use of process claim. (Second Amended Answer with Counterclaims at pp. 21-22).

[*118]

To succeed on malicious use of process claim, a party must show the existence of a special grievance, that the suit complained of was brought without reasonable or probable cause, that it was actuated by malice, and that it terminated favorably to the party asserting the claim. Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F.Supp. 1035, 1054 (D.N.J. 1990) (citing Penwag Property Co. v. Landau, 76 N.J. 595, 598, 388 A.2d 1265 (1978)). If the primary suit has not been terminated, the party defending the malicious use of process claim is entitled to judgment as a matter of law. Id. A simple extension of these principles is that a claim for malicious use of process cannot be asserted as a counterclaim. Id. (citing Kotok Bldg. v. Charvine Co., 183 N.J. Super, 101, 107, 443 A.2d 260 (Law Div.1981)).

On April 4, 2005, this Court granted in part and denied in part the Defendants' Motion for Summary Judgment on the Plaintiff's first count, and granted the motion for summary judgment on the second count. The Plaintiff's suit is still pending. Since the Defendants/Third-Party Plaintiffs have asserted malicious use [*119] of process as a counterclaim while the primary suit is still pending, Plaintiff is entitled to judgment as a matter of law on the fifth counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' fifth counterclaim is granted.

### E. Sixth Counterclaim: Intentional Infliction of Emotional Distress

Defendants/Third-Party Plaintiffs' sixth counterclaim alleges that the lawsuit was filed to induce Spiliotes to refuse to cooperate with the criminal prosecution of Minerva's agent, and as a result, has inflicted severe emotional distress on Spiliotes. To prove a claim of intentional infliction of emotional distress under New Jersey law, a party must prove that the opposing party engaged in outrageous conduct that was the proximate cause of the claimant's severe distress. Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 366, 544 A.2d 857 (1988). The conduct in question must have been done with the intention both to do the act and to produce emotional distress, or it must have been done recklessly in deliberate disregard for the high probability that emotional distress would follow. Id. In addition, "the conduct must be 'so outrageous [*120] in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Restatement of Torts (Second) § 46, comment d (1965)). The touchstone of this tort is the extreme and uncommon nature of the actor's conduct. Major League Baseball Promotion Corp., 729 F.Supp. at 1054 (citations omitted). The conduct must have been so severe that no reasonable man could be expected to endure it. Id. (citations omitted).

In support of its motion for summary judgment on this counterclaim, Plaintiff cites Major League Baseball Promotion Corp., where this District held that mere evidence of the institution of legal proceedings is insufficient to support a finding that the resulting mental distress was so severe that no reasonable man could be expected to endure it. Major League Baseball Promotion Corp., 729 F.Supp. at 1054-55 (citing Buckley, 111 N.J. at 367-69, 544 A.2d 857; Figured v. Paralegal Tech Serves., 231 N.J.Super. 251, 254-56, 555 A.2d 663 (App. Div. 1989); Restatement of Torts (Second) § [*121] 46, comment g (1965) ("The actor is never liable ... where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.")). This case is distinguished, however, in that Defendants/Third-Party Plaintiffs have alleged that Minerva "threatened to file a baseless lawsuit" against Spiliotes to induce him to refuse to cooperate in a criminal prosecution of Minerva's agent. In other words, Defendants/Third-Party Plaintiffs have alleged that Minerva has done "more than" merely "insist upon his legal rights in a permissible way." The Court finds that an action for intentional infliction of emotional distress cannot lie where, as here, a party has merely threatened legal action against an individual to prevent them from cooperating in a criminal investigation. A party has the right to resort to the Court for alleged grievances.

Even if this Court were to permit such an action, apparently, a lawyer who did not represent Minerva but a different entity made the threat. To show that Minerva threatened Spiliotes with a lawsuit, Defendants/Third-Party Plaintiffs cite paragraph 73 of the Spiliotes [*122] Declaration, which Plaintiff has moved to strike. The paragraph reads as follows:

> P73 - Minerva's and/or Martinos' conduct has had a severe negative effect on my emotional state and life. Minerva and/or Martinos contacted other ship owners and instructed them not to hire me, threatened me with legal action in an effort to procure my refusal to cooperate further with the criminal case against the Chief Mate, filed a baseless lawsuit against me, and defamed me in *Tradewinds Magazine*. These actions ruined me professionally, financially and emotionally. I no longer work in the profession I love. Financially, I have earned virtually no income since these events. Further, I have been emotionally traumatized by plaintiff's actions. I suffer from depression and anxiety for

which I have had to seek psychological treatment.

(Spiliotes Declaration at P73). The Court finds, however, that this paragraph is replete with baseless, conclusory allegations that are not supported by the record. This paragraph is insufficient to support their claim for intentional infliction of emotional distress.

Alternatively, paragraph 142 of the Defendants/Third-Party Plaintiffs' Local Rule [*123] 56.1 Statement states that Tsingis' attorney, John Smith, informed Spiliotes at several hearings that a defamation claim and a criminal counterclaim would be filed against him. (DSUMF at P142). It adds that Captain Spiliotes understood these comments to be threats. Id. The Court notes, however, that the Defendants/Third-Party Plaintiffs' Local Rule 56.1 Statement, the Spiliotes Declaration, and the Declaration of John Smith all indicate that he was retained to represent Tsingis. (DSUMF at P143; Spiliotes Declaration at P173; Declaration of John Smith at P7). Defendants/Third-Party Plaintiffs have not offered any evidence which suggests that John Smith represented or was retained by Minerva. It goes without saying that there can be no claim of intentional infliction of emotional distress against Minerva unless there is some evidence that Minerva or its agents engaged in outrageous conduct that was the proximate cause of the claimant's severe distress. Defendants/Third-Party Plaintiffs, have proffered no such evidence. Accordingly, Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' sixth counterclaim is granted.

### F. Seventh Counterclaim: Negligent Infliction [*124]  of Emotional Distress

The seventh counterclaim asserts that by threatening to file a false and baseless lawsuit against Spiliotes to induce him to refuse to cooperate, it was foreseeable that Spiliotes would suffer severe emotional distress. "Negligent infliction of emotional distress is negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a duty to exercise reasonable care." Major League Baseball Promotion Corp., 729 F.Supp. at 1055 (citing Decker v. Princeton Packet, Inc., 116 N.J. 418, 420, 561 A.2d 1122 (1989)).

Plaintiff again argues that Dcfendants/Third-Party Plaintiffs have no evidence to show that Minerva threatened Spiliotes to prevent him from testifying against Tsingis. This Court agrees. For the same reasons this Court provided in granting summary judgment on the intentional infliction of emotional distress counterclaim (sixth counterclaim), the Court likewise finds that Defendants/Third-Party Plaintiffs have no evidence to cre-

ate a genuine issue of fact on the negligent infliction of emotional distress counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party [*125] Plaintiffs' seventh counterclaim is granted.

### CONCLSION

It is on this 13th day of March, 2006,

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Elias Katsaros is GRANTED; and it is further

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos is GRANTED in part, DENIED in part; and it is further

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike the Fernandez Affidavit concerning James Baker is DENIED; and it is further

ORDERED that Plaintiff's Motion to Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker is GRANTED; and it is further

ORDERED that Plaintiff's Motion to Strike the Declaration of James Spiliotes is GRANTED in part, DENIED in part, and DISMISSED in part as moot; and it is further ORDERED that Plaintiff's Motion for Summary Judgment with respect to the First, Third, Fourth, Fifth, Sixth and Seventh Counterclaims is GRANTED.

The Court reserves judgment on Plaintiff's motion for attorneys' fees under section 34:19-6 of CEPA pending resolution of the case.

s/William H. Walls

United States Senior District Judge

[*126]  **ORDER**

Walls, District Judge

It is on this 13th day of March, 2006,

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Elias Katsaros is GRANTED; and it is further

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos is GRANTED in part, DENIED in part; and it is further

ORDERED that Defendants/Third-Party Plaintiff's Motion to Strike the Fernandez Affidavit concerning James Baker is DENIED; and it is further

ORDERED that Plaintiff's Motion to Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker is GRANTED; and it is further

2006 U.S. Dist. LEXIS 13922, *

ORDERED that Plaintiff's Motion to Strike the Declaration of James Spiliotes is GRANTED in part, DENIED in part, and DISMISSED in part as moot; and it is further ORDERED that Plaintiff's Motion for Summary Judgment with respect to the First, Third, Fourth, Fifth, Sixth and Seventh Counterclaims is GRANTED.

The Court reserves judgment on Plaintiff's motion for attorneys' fees under section 34:19-6 of CEPA pending resolution of the case.

**s/William H. Walls**

United States Senior District [*127] Judge

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Seeber v. Williams Companies,
Inc.N.D.Okla.,2006.Only the Westlaw citation is
currently available.
United States District Court,N.D. Oklahoma.
Vonna M. SEEBER, an individual, Plaintiff,
v.
The WILLIAMS COMPANIES, INC., a Delaware
corporation, and Williams Energy Partners, L.P., a
Delaware Limited Partnership, Defendants.
**No. 04-CV-0451-CVE-PJC.**

Aug. 28, 2006.

N. Kay Bridger-Riley, Bridger-Riley & Associates
PC, Jenks, OK, Phillip Craig Bailey, P. Craig Bailey
, Tulsa, OK, for Plaintiff.
David Eugene Strecker, Jessica Colleen Lowrey,
Strecker & Assoc PC, Tulsa, OK, for Defendants.

**OPINION AND ORDER**
CLAIRE V. EAGAN, Chief District Judge.
*1 Now before the Court are the following motions:
Defendants' Motion for Summary Judgment and
Brief in Support Thereof (Dkt.# 59); Defendants'
Motion to Strike Affidavit of Vonna Seeber (Dkt.#
86); Plaintiff's Motion to Strike (Dkt. # 89);
Defendant's Motion in Limine to Exclude
Testimony and Evidence by Plaintiff's Expert
(Dkt.# 82). Defendants, The Williams Companies,
Inc. and Williams Energy Services, LLC
(collectively "Williams"),[FN1] move for summary
judgment on plaintiff Vonna Seeber's claims of age
discrimination in violation of the Age
Discrimination in Employment Act of 1967 ("ADEA
"), gender discrimination in violation of Title VII of
the Civil Rights Act of 1964 ("Title VII"),
retaliation in violation of Title VII, sexual
harassment in violation of Title VII, wrongful
discharge in violation of Oklahoma public policy,
and intentional infliction of emotional distress.
Defendants also ask the Court to exclude the

testimony of plaintiff's economic damages expert
under Fed.R.Evid. 702.

> FN1. Plaintiff was actually employed by
> Williams Energy Services, LLC, which
> was formerly Williams Energy Partners,
> L.P.

**I.**

Plaintiff began employment with Williams in March
1984 as a terminal operator. She performed that
work in Olathe, Kansas and Heyworth, Illinois. In
October 1984, plaintiff began work as a technician
in Omaha, Nebraska, but was later transferred to
Rosemont, Minnesota, and Des Moines, Iowa.
Although plaintiff denies having difficulties getting
along with the other employees while employed in
Des Moines, Iowa, her deposition testimony and
pleadings suggest that she struggled to develop an
amicable relationship with at least two other
employees, Alex Calder and Jim Davis. Plaintiff's
supervisor noted on a performance evaluation that
plaintiff's interpersonal skills could use "slight
improvement." Plaintiff did not disagree with that
assessment, because she admits that she had a poor
relationship with Calder. Plaintiff testified that
during her employment in Des Moines, she was not
subjected to sexual harassment.

In 1987, plaintiff requested, and was permitted to,
transfer from Des Moines to Sioux Falls, South
Dakota. While in Sioux Falls, plaintiff had several
supervisors, including Dennis Thebeau and Jay
Wiese. Plaintiff believed that Thebeau did not like
her and states that she disliked working under
Thebeau. In contrast, plaintiff got along well with
Wiese. Plaintiff admits that Wiese counseled
plaintiff regarding her ability to get along with
co-workers. Plaintiff claims that she had problems
with the workplace atmosphere is Sioux Falls,
because of the way her male coworkers treated her.
She was the only female technician and states that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

other employees frequently made sexually explicit and obscene remarks that offended her. She states the she responded aggressively when male co-workers allegedly harassed her and attributes the perception that she had difficulties with interpersonal relationships to the sexually-charged nature of the work environment. From 1987 to 1993, she was consistently rated as a competent employee and her employment evaluations show that her supervisors believed her interpersonal skills were showing noticeable improvement.[FN2]

> FN2. Williams utilized a performance evaluation system assigning each employee a one to five rating in fourteen categories. The highest rating was a one, which was interpreted as outstanding job performance. The lowest rating was five, meaning that an employee needed significant improvement. A rating of three meant that the employee was competent, fully meeting the criteria or standards of performance for most aspects of their job.

**\*2** Plaintiff worked as a technician until August 1993, when she was granted a leave of absence to attend law school at the University of Notre Dame. She attempted to get an internship with Williams during law school, but was allegedly informed that Williams accepted only interns ranked in the top ten percent of their law school class. After graduating from law school in 1996, she did not apply for a position in Williams' legal department because she did not believe her class rank or grades were sufficient. Instead, plaintiff accepted employment as an environmental engineer at Williams. Her supervisor stated that plaintiff seemed oversensitive to workplace stress, but accomplished her work in a timely manner. She worked as an environmental engineer for approximately a year and a half before accepting a new position in the real estate department. Plaintiff does not allege that she suffered any discrimination while working in the real estate department.

In April 1998, plaintiff left the real estate department to accept the position of project manager in the independent terminals group. Her supervisor in this job was Jay Weise, whom she knew from prior experience in the company and referred to as a mentor. She received a $5,000 yearly raise in her new position, bringing her annual salary to $60,000. As a project manager, an important component of her job was to maintain good personal relationships with other employees and customers. During 1999 and 2000, her supervisor was David Games. She complained that Games sexually harassed her by coming around her desk and sitting on her lap to work on her computer. At least once, she told Games to stop this behavior and she contacted the human resources department.[FN3] Weise preferred to resolve the matter within the department and asked plaintiff and Games to work things out themselves. In 2000, Games was transferred out of the department after two other project managers also complained that he was a poor supervisor.

> FN3. Although plaintiff sent an e-mail to Gail Campbell in the human resources department, she did not file a formal complaint. Human resources advised plaintiff to contact Wiese to resolve the matter.

Robert Barnes replaced Games as plaintiff's supervisor and completed her performance evaluation for 2000. Plaintiff received a performance evaluation critical of her personal skills, even though the evaluation suggests she was performing her job tasks at a high level. Plaintiff received marks ranging from A to A-for job performance, but received a D rating for her ability to work with peers and overall peer relationships.[FN4] In particular, the evaluation stated that:

> FN4. An "A" rating means that the employee met expectations for her position but did not exceed what was required. If an employee received a "D" rating, she did not meet the job expectations.

This is an area that Vonna needs to develop if she is to advance within Williams. Through Vonna's actions and body language she comes across as not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

being approachable by others. Vonna needs to understand that all aspects of her interaction with others reflects on the relationship. She needs to understand we are a team and working with and assisting others is necessary and expected.
Dkt. # 75, Ex. 15, Performance Appraisal, at 1. Plaintiff noted her objection to the evaluation before signing it. The evaluation also criticized plaintiff for her ability to deal with ambiguity, finding that plaintiff "is a very task oriented and if things don't go as planned she gets very frustrated and stressed. Vonna needs to control her emotions in a more manageable way. Vonna needs to focus on doing a good job and not worry about other things not specific to her area." *Id.* at 4. Otherwise, plaintiff's supervisor noted that she was a competent and hardworking employee but that her organizational skills might limit her ability to obtain a management position. In order to improve her interpersonal skills, plaintiff attended a course Williams offered to its employees on these issues.

**\*3** Several of plaintiff's co-workers have testified that it was difficult to work with plaintiff, but plaintiff disputes their characterization of her workplace demeanor. Bill Nelson stated that plaintiff refused to speak to him unless they needed to discuss business. Plaintiff claims that Nelson insulted her and she rebuked his attempts to resolve the matter. Nelson felt that this created a negative atmosphere in the workplace, but did not prevent him or plaintiff from completing their work. Chris Nalley testified that it seemed like "sometimes there was a black cloud in [plaintiff's] cubicle," but her mood swings did not seem to impact her work. Plaintiff states that the "black cloud" Nalley refers to related to her personal life, and did not affect her relationships with co-workers or her job performance. Gary Potacka stated that he did not have any difficulty working with plaintiff. On one occasion, plaintiff believed that Potacka insinuated that she was disorganized, but Potacka believed plaintiff was overreacting. Jon Lawrence testified that he overheard internal customers commenting that they had problems communicating with plaintiff. Specifically, Lawrence said that plaintiff had reputation for behaving unpleasantly in the morning and he recalls plaintiff treating him rudely on several occasions. Plaintiff insists that none of

these personally traits impaired her work performance.

Later in 2000, Weise created a cross-training program for project managers and schedulers in his department.[FN5] This program required project managers and schedulers to cross job duties. Plaintiff agreed to participate in the cross-training program, but was clear that she viewed scheduling as a demotion. The parties do not dispute that Williams did not reduce plaintiff's salary when it moved plaintiff into scheduling. Plaintiff claims that the cross-training program was an excuse to terminate her and another project manager, Selby, both of whom were older.[FN6] Plaintiff asserts that Nelson, also a project manager, did not have to move into scheduling, which is evidence of age and gender discrimination. Williams asserts that Nelson would eventually have to do a rotation in scheduling, but his rotation was delayed until he completed a large project.[FN7] Before moving into the scheduling department, plaintiff was informed that she needed to improve her "communication and people skills." Wiese allowed plaintiff to use one of his previously scheduled sessions with a management coaching consultant to work on her problem areas, and plaintiff admits that Wiese did this to encourage plaintiff to improve her attitude before starting in scheduling.

> FN5. At the time the program was created, there were three project managers-plaintiff, Nelson, and Lee Selby. There two members of the scheduling department taking part in the cross-training program were Nalley and Potacka.

> FN6. Plaintiff refers to Selby as older and female. The summary judgment record shows that the only employee named Selby in plaintiff's department was Roy L. Selby, a male. Defendants refer to Selby as Mr. Selby throughout their motion for summary judgment, and plaintiff also later refers to Selby as Mr. Selby.

> FN7. Nelson was promoted out of his position as a project manager before he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

had to take a rotation in the scheduling department.

Plaintiff's supervisor in scheduling was Mark Hoffman, and she admits that she had a good working relationship with Hoffman until she received her first evaluation. In his evaluation of plaintiff for 2001, Hoffman noted that customers and co-workers viewed plaintiff as confrontational. A necessary part of plaintiff's position in scheduling involved forming positive relationships with customers, and her review notes that customers often thought that plaintiff had a "chip on her shoulder." Plaintiff informed several customers that she did not like working in the scheduling department. Plaintiff does not deny making these statements, but claims that she performed the necessary functions of her job even if co-workers and customers knew she was unhappy working in the scheduling department. Plaintiff disagreed with Hoffman's review and refused to sign it.

**\*4** Wiese and Hoffman had a meeting with plaintiff, and she accused them of lying on her evaluation. Hoffman presented plaintiff with a memorandum discussing areas of her work performance that needed improvement, but she disagreed with the memorandum. Hoffman asked plaintiff to write her own performance improvement plan. Plaintiff claimed she did not understand the alleged performance deficiencies and she never drafted a plan. On December 24, 2001, Hoffman, Wiese, and a representative from the human resources office held a meeting with plaintiff and offered plaintiff the option of keeping her current job or seeking redeployment within the organization. Plaintiff still did not agree with Hoffman's assessment that she needed to improve her personal skills, and plaintiff decided to seek redeployment. Williams agreed to provide plaintiff full pay and benefits for 60 days while she looked for a new position within the company, but Williams did not agree to pay plaintiff the same salary after redeployment.

Plaintiff applied for many positions, but human resources informed her that many departments were experiencing layoffs and could not hire a new employee. Plaintiff claims that was merely an excuse, alleging that she was blacklisted because

she complained about her supervisor in the scheduling department. Due the delay in finding a new position, defendants extended plaintiff's redeployment period until March 31, 2002. If plaintiff did not find a new position by March 31, 2002, plaintiff would no longer be employed by Williams. Plaintiff was unable to locate a new position, and defendants formally terminated her employment on March 31, 2002. She was subsequently rehired on April 15, 2002 as a confirmation analyst for Williams Marketing and Energy Trading with a yearly salary of $43,000.

On January 21, 2003, plaintiff filled out an intake questionnaire providing the Equal Employment Opportunity Commission ("EEOC") information about her allegations of workplace discrimination against defendants. However, plaintiff did not file a formal EEOC charge until March 3, 2003. Plaintiff alleges that she was constructively discharged from her position in the independent terminals group because of the hostility exhibited by her supervisors and the alleged lies on her employment evaluations.

**II.**

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir.1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kaul v.. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996). "Summary judgment will not lie if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Durham v. Xerox Corp.,* 18 F.3d 836, 838-39 (10th Cir.1994)

**\*5** "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker,* 164 F.3d 1249, 1251 (10th Cir.1998).

### III.

Defendants have filed a motion to strike plaintiff's affidavit, which is attached to her response to defendants' motion for summary judgment as exhibit 14 (Dkt.# 75, Ex. 14) because it is not based on plaintiff's personal knowledge. According to defendants, Fed.R.Civ.P. 56(e) prohibits plaintiff from opposing a motion for summary judgment with an affidavit that relies merely on her opinions and beliefs. Rule 56(e) provides that:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial.

The Tenth Circuit requires the nonmoving party to submit affidavits "based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991). As a general rule, an affidavit may be submitted in response to a motion for summary judgment, as long as it is made on personal knowledge, contains facts that would be admissible in evidence, and demonstrates the affiant's competence to testify to the asserted facts. Plaintiff responds that the affidavit is based on her personal knowledge, and that the opinions she expresses in the affidavit constitute admissible opinion testimony under Fed.R.Evid. 701.

The primary focus of defendants' argument seems to be that plaintiff has submitted an affidavit merely stating her opinions but does not base the factual assertions in the affidavit on her personal knowledge. Plaintiff cites *Gossett v. Oklahoma ex rel. Board of Regents for Langston University,* 245 F.3d 1172 (10th Cir.2001), for the proposition that a lay witness may submit an affidavit containing opinion testimony in an employment discrimination case. In *Gossett,* the plaintiff sued Langston University for discriminating against male students in its nursing program. In opposition to a motion for summary judgment, plaintiff provided the affidavit of Deborah Guy, an instructor at the nursing school, who stated her opinion that the school engaged in a pattern of discrimination against male students. The district court excluded Guy's affidavit because the court found it was not based on the affiant's personal knowledge. The Tenth Circuit reversed the district court's decision to grant summary judgment, finding that Guy's affidavit should have been admitted and created a genuine issue of material fact. The Tenth Circuit stated that
**\*6** Ms. Guy's affidavit demonstrates that her position as an instructor in the Nursing School and on the Admissions Committee provided her with the opportunity to observe firsthand for several years the School's policies and practices with respect to its treatment of male students. Her opinion was a means of conveying her impression based on what

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 6

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection. Consequently, her affidavit was admissible under Rule 701, and the district court abused its discretion in refusing to consider it.

*Id.* at 1180.

Plaintiff also cites *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir .1986), for general guidelines for courts to consider when determining whether plaintiff has submitted a sham affidavit. In *Franks,* the plaintiff submitted an affidavit in support of his motion to reconsider the court's ruling that he was a probationary employee. However, this affidavit contradicted his deposition testimony and the district court refused to consider the affidavit as a basis for creating a genuine issue of material fact. *Id.* at 1237. The Tenth Circuit listed several factors that are useful when determining if an affidavit contradicts prior testimony and creates a sham factual issue, such as:
whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Id.* The Tenth Circuit found that plaintiff's deposition testimony was unequivocal and the affidavit was produced only after the district court granted defendants' motion for summary judgment, which justified a finding that the affidavit raised a sham factual issue. *Id.* at 1237-38.

Although defendants cite two instances where plaintiff's affidavit differs from her deposition testimony, the key issue is whether the affidavit is based on plaintiff's personal knowledge.[FN8] The Court finds that, even though many of the statements in plaintiff's affidavit are her opinions, the affidavit is admissible. Plaintiff's opinions about her co-workers and her perceptions about events in the office reflect her personal knowledge to the extent they are based on her experiences at Williams. As a practical matter, there may be no other way for plaintiff to convey this information

except in the form of an opinion. Her opinions would arguably be admissible at trial under Fed.R.Evid. 701. *See Gossett,* 245 F.3d at 1179 (" Courts generally hold admissible under Rule 701 evidence in the form of lay opinion testimony in discrimination cases when given by a person whose position with the defendant entity provides the opportunity to personally observe and experience the defendant's policies and practices."). There is no dispute that plaintiff is competent to provide an affidavit. The Court finds that plaintiff's affidavit should not be stricken as an exhibit to her response, but that does not mean the Court will treat plaintiff's opinions about defendants' conduct as a bar to summary judgment. Plaintiff will still have to present a *prima facie* case of employment discrimination, even if she holds the opinion that her employer engaged in discriminatory behavior. Therefore, Defendants' Motion to Strike Affidavit of Vonna Seeber (Dkt.# 86) is denied.

> FN8. Plaintiff's affidavit contains two additional statements regarding alleged discrimination that she could not recall in her deposition. In her deposition, she stated that she was basing her age discrimination claim on Williams' tendency to promote younger men and Lee Selby's termination. She did not remember any statements by Wiese referring to older workers in a disparaging manner. In her affidavit, she alleges that Wiese made negative comments about older workers. By itself, this additional statement is not enough to strike the affidavit under *Franks,* and the Court will focus on defendant's argument that plaintiff's affidavit contains self-serving or inadmissable opinion testimony.

### IV.

*7 Plaintiff brings claims for age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), retaliation in violation of Title VII, sexual harassment in violation of Title VII,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

wrongful discharge in violation of Oklahoma public policy, and intentional infliction of emotional distress. For different reasons, defendants are entitled to summary judgment on all of plaintiff's claims.

### Defendants' Use of Subjective Ranking Criteria

Plaintiff claims that Williams' use of subjective ranking criteria to determine salary increases and promotions precludes summary judgment on her Title VII and ADEA claims. Plaintiff relies on *Garrett v. Hewlett-Packard Company,* 305 F.3d 1210, 1218 (10th Cir.2002), for the proposition that use of subjective criteria in employment evaluations are undisputable evidence of pretext. *Id.* at 1218. In *Garrett,* the plaintiff's employer held meetings where supervisors would rank each employee from best to worst and promote employees based on these rankings. *Id.* at 1217. The employer admitted that the rankings could not be verified with objective evidence, other than the opinions of the supervisors. The Tenth Circuit stated that subjective evaluation methods are viewed with skepticism. *Id.* at 1218. Without evidence that the employer relies on objective criteria to support its evaluations, the employee can rely on subjective evaluation criteria alone to prove pretext to rebut the employer's proffered non-discriminatory reason supporting an adverse employment decision.

In this case, the key issue in dispute is plaintiff's allegedly poor interpersonal skills, which are difficult to evaluate with objective criteria. However, management personnel are allowed to exercise discretion in employment decisions and subjective evaluation criteria do not create an inference of discrimination. *Furr v. Seagate Technology,* 82 F.3d 980, 987-88 (10th Cir.1996). Although defendant's evaluation system may have some bearing on the issue of pretext, plaintiff must still make out a *prima facie* case of age discrimination. *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 978 (10th Cir.1996) ("Even if ' potential' is somewhat subjective, the use of subjective criteria does not suffice to prove intentional discrimination."); *Pitre v. Western Elec. Co ., Inc.,* 843 F.2d 1262, 1272 (10th Cir.1988) ("

We recognize that when management considers individuals for upper level positions, subjective factors must play some role. Their use does not per se constitute discrimination."). Defendant has presented affidavits, deposition testimony, and employment evaluations spanning eighteen years showing a pattern of complaints about plaintiff's interpersonal skills. On such an inherently subjective topic, plaintiff can introduce evidence that defendant lacked an objective reason to support any adverse employment action against her, but this certainly does not preclude the Court from ruling on defendant's motion for summary judgment.

### Statute of Limitations under Title VII and the ADEA

**\*8** Defendants initially argue that plaintiff's ADEA and Title VII claims are barred by the statute of limitations. Under Title VII and the ADEA, the aggrieved employee must file a charge with the EEOC within 300 days of the alleged unlawful discriminatory practice. 29 U.S.C. § 626(d)(2); 42 U.S.C. § 2000e-5(e)(1); *Duncan v. Manager, Dep't of Safety, City and County of Denver,* 397 F.3d 1300, 1310 (10th Cir.2005). Failure to comply with this procedural prerequisite will bar a plaintiff's employment discrimination claim. *Dartt v. Shell Oil Co.,* 539 F.2d 1256, 1260-61 (10th Cir.1976) (compliance with statutory time limitation for filing an EEOC charge is a condition precedent before an employee may sue his employer). Plaintiff admits that many of the acts she complains of occurred more than 300 days before she was discharged, but she raises two arguments that she claims would extend the statute of limitations: 1) the intake questionnaire she submitted to the EEOC on January 21, 2003 was sufficient to qualify as a formal charge; and 2) the continuing violation doctrine allows plaintiff to rely on acts more than 300 days before her alleged termination because defendant engaged in a pattern or practice of discriminatory conduct.

Plaintiff claims that she filled out a questionnaire to notify the EEOC of her claim on January 21, 2003, and that this should be treated as the date she filed her formal charge in this case. Defendant responds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

that even if the Court accepts plaintiff's argument, this will allow plaintiff to base her claim only on events occurring after March 28, 2002 (300 days prior to January 21, 2003). [FN9] The general rule is that if the plaintiff alleges a discrete retaliatory or discriminatory act, the party must file the EEOC charge within 300 days of the specific act. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110 (2002). Plaintiff relies on *Peterson v. City of Wichita,* 888 F.2d 1307 (10th Cir.1989), to support her argument that an informal "complaint" can be treated as a formal EEOC charge if later amended. EEOC regulations provide that:

> FN9. Even though plaintiff's redeployment period ended on March 31, 2002, she left the terminal group on December 24, 2001. Defendants assert that plaintiff should be deemed terminated from the date she quit her position with the terminal group, not at the end of the redeployment period.

a charge is sufficient when the Commissioner receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional facts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.
29 C.F.R. § 1601.12(b). The Tenth Circuit found that a later verified charge could relate back to a prior, timely filed informal complaint. It would be inconsistent with the overall policy of Title VII to strictly construe the time limitation against *pro se* [FN10] claimants, because Title VII is remedial legislation that should be read "liberally rather than technically." *Peterson,* 888 F.2d at 1309. However, section 1601.12(b) will not apply if the defendant has alleged that it would be prejudiced under the circumstances or there is other evidence that shows the intake questionnaire was not intended to be

treated as a formal EEOC charge. *Id.*

> FN10. In *Peterson,* the Tenth Circuit found that many claimants were *pro se* when they filed their EEOC charge. This consideration is applicable in this case, because it appears that plaintiff was *pro se* when she initially filed her charge with the EEOC.

**\*9** Defendants have not made any allegations of prejudice, but argue that *Peterson* should not be applied in this case. In order for the *Peterson* rule to apply, plaintiff must show that her initial incomplete filing was timely. Plaintiff filed her questionnaire on January 21, 2003 and she alleges that the last discriminatory act by defendant occurred on March 31, 2002. After reviewing the information plaintiff provided in the questionnaire, the Court finds that it was sufficiently detailed to alert the EEOC and defendants to the identity of the parties and the nature of plaintiff's claims. The Court will treat the questionnaire as timely filed for any events giving rise to a claim after March 28, 2002. This does not automatically mean that plaintiff may rely on defendants' conduct before March 28, 2002 as a basis for her Title VII or ADEA claims, because the Tenth Circuit has interpreted *Morgan* to significantly limit the continuing violation doctrine if plaintiff complains of discrete acts of discrimination.

If plaintiff's EEOC charge refers to discrete acts of discrimination, plaintiff may not rely on the continuing violation doctrine to extend the limitations period. *Martinez v. Potter,* 347 F.3 d 1208, 1211 (10th Cir.2003). The Tenth Circuit has stated that "a continuing violation theory of discrimination is not permitted for claims against discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire." *Davidson v. America Online, Inc.,* 337 F.3d 1179, 1184 (10th Cir.2003). In this case, several of plaintiff's claims rely on constructive discharge and hostile work environment theories, because she voluntarily quit her job and accepted a lower paying position within the organization. The continuing violation doctrine has not been abolished for hostile

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

work environment claims, but the plaintiff must point to at least one discrete act that occurred with the 300 day limitations period for her claim to be timely. *Boyler v. Cordant Technologies, Inc.,* 316 F.3d 1137, 1140 (10th Cir.2003) (expressly overruling prior Tenth Circuit precedent "to the extent that these cases held that recovery on a Title VII hostile work environment claim is not available for acts taken outside the statutory time period where plaintiff knew or should have known the conduct was discriminatory when the acts occurred." ). The Tenth Circuit did not overrule its prior holdings on what discriminatory acts may give rise to a "pattern-or-practice" claim, so the court's prior precedent on the continuing violation doctrine must still be considered. *Davidson,* 337 F.3d at 1186 n. 3.

There are two basic situations when a continuing violation theory is applicable: (1) when plaintiff shows that defendants engaged in a series of discriminatory acts, and at least one of the acts occurred within the 300 day period; or (2) the defendant maintained a discriminatory policy on an organizational basis both before and after the limitations period. *Bennett v. Quark,* 258 F.3d 1220, 1226-27 (10th Cir.2001). The Tenth Circuit has provided three factors to determine if defendant has engaged in a series of discriminatory actions, including **\*10** (1) the subject matter of the acts-whether the violations constitute the same type of discrimination; (2) the frequency of the acts; and (3) the permanence of the acts-whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of an act would continue even in the absence of a continuing intent to discriminate.

*Id.* at 1227. The Court will consider plaintiff's statutory claims separately, because each is based on a different theory of discrimination and has a discrete factual basis.

Plaintiff may not rely on a pattern or practice theory for her age discrimination claim, because there is no evidence the defendants engaged in a series of acts based on age discrimination or had a company wide policy to treat employees differently because of their age. Plaintiff did not raise any allegations of age discrimination until she left Williams and she has not produced any evidence of an organizational policy to discriminate against older workers. Plaintiff was moved into the scheduling department as part of a cross-training program in 2001 for all project managers and schedulers in the independent terminals group. Although plaintiff attempts to classify her age discrimination claim as a hostile work environment claim, the central thrust of her claim is that she was forced to move to the scheduling department while younger workers were exempt from this requirement. This is a discrete act which may not be used to form the basis of a pattern or practice claim. Thus, Plaintiff may not rely on any acts before March 28, 2002 to support her claim for age discrimination.

Plaintiff was aware of the facts supporting her gender discrimination claim for unequal pay before she left the independent terminals group in December 2001. Applying the third factor from *Bennett,* plaintiff was on notice that she needed to bring her claim for gender discrimination based on unequal pay long before March 2003, when she filed her formal EEOC charge. The continuing violation doctrine does not excuse tardiness in filing an EEOC charge, but allows a claimant to wait to file a claim until a reasonable person would be on notice that she has a claim. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1311 (10th Cir.1999). The Supreme Court has stated that each week an employer delivers an unequal paycheck on the basis of discriminatory classification is an adverse employment event giving rise to a claim. *Bazemore v. Friday,* 478 U.S. 385, 395 (1986). Plaintiff's EEOC charge clearly alleges that she was subject to unequal wages for three years before filing her claim and she may not belatedly rely on a continuing violation theory to assert a claim for gender discrimination.

Plaintiff's retaliation claim is based on her allegations that Williams refused to offer her a job with equivalent pay when she was eligible for redeployment because she complained about discriminatory behavior while working at the independent terminals group. A failure to hire, such Williams' alleged failure to rehire plaintiff during redeployment, is a discrete act for purposes of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 10

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

300 day limitation period. *See Morgan,* 536 U.S. at 111. Under *Morgan,* plaintiff's retaliation claim accrued on March 31, 2002, and this event falls within the 300 day limitation period. *Haynes,* 2006 WL 2258836 at *5. Plaintiff may use prior acts by defendants as background evidence, but such acts are "merely unfortunate event[s] in history which [have] no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558 (1977).

*11 Plaintiff may not rely on a pattern or practice theory for her sexual harassment/hostile work environment claim, because she cannot point to one discrete act that occurred within the statutory period. Under *Morgan,* the plaintiff may rely on time-barred acts in support of a hostile work environment claim as long as one discrete act occurred within the statute of limitations for filing an EEOC claim. *Boyler,* 316 F.3d at 1140. However, the alleged hostile work environment was within the independent terminals group and plaintiff left that employment on December 24, 2001. Even using the date plaintiff filed her intake questionnaire, plaintiff's hostile work environment claim is untimely, because plaintiff may rely only on events occurring after March 28, 2002. Nothing in plaintiff's response suggest that any events relevant to her hostile work environment claim occurred after December 24, 2001, and consequently, this claim is time barred under 42 U.S.C. § 2000e-5(e).

Plaintiff may not rely on a pattern or practice theory to use events occurring before March 28, 2002 as a basis for her statutory claims. Therefore, plaintiff's EEOC charge is untimely for any actions taken by defendants before that date. Because plaintiff alleges no acts of sexual harassment after that date, based on *Morgan* and *Boyler,* defendants' motion for summary judgment is granted as to plaintiff's claim for sexual harassment under Title VII.

### Age Discrimination under the ADEA

Defendants claim that, based on the undisputed facts, plaintiff can not prove a *prima facie* case for age discrimination under the ADEA. The ADEA provides, in relevant part: "It shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). By statute, the protections of the ADEA extend only to individuals who are at least forty years of age. 29 U.S.C. § 631(a).

Age discrimination claims brought pursuant to the ADEA are analyzed under the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). *Branson v. Price River Coal Co.,* 853 F.2d 768, 770 (10th Cir.1988) ( "Cases brought under the ADEA are subject to the same indirect method of proof used in Title VII cases alleging discriminatory treatment."). Under this framework, a plaintiff must first make a *prima facie* showing of discrimination. Once plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the employer has the burden to produce a "legitimate, nondiscriminatory reason" for its actions. *Miller v. Eby Realty Group, L.L.C.,* 396 F.3d 1105, 1111 (10th Cir.2005). If the employer does so, the employee must prove that the employer's explanation is merely pretext for unlawful discrimination on the basis of age. *Id.*

*12 A plaintiff seeking to establish a *prima facie* case of age discrimination must establish four elements, the first three of which are relatively static across differing fact patterns. The plaintiff must demonstrate: (1) she was a member of the protected age group, over forty years of age; (2) she was performing satisfactorily; and (3) her employer terminated her employment. *See, e.g., id.* at 1111. As to the fourth element, a plaintiff may either show that she was replaced by a younger worker or " produce evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Creason v. Seaboard Corp.,* 263 F.Supp.2d 1297, 1307 (D.Kan.2003). Permitting this alternative showing of differential treatment, rather than replacement, accommodates plaintiffs who, in a reduction-in-force context, may not have been replaced because their position was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

eliminated. *See Branson,* 853 F.2d at 771 ("In reduction-in-force cases, plaintiffs are simply laid off and thus incapable of proving actual replacement by a younger employee."). There are, in effect, two theories of discrimination upon which a plaintiff may base her claim under the ADEA: the replacement theory or the differential treatment theory. Plaintiff has introduced no evidence that she was replaced by a younger worker, so plaintiff must produce evidence, either direct or circumstantial, that her employer intended to discriminate against her because of her age.

Plaintiff claims that she has enough evidence to prove a *prima facie* case of age discrimination; however, even if the Court considers discrete acts of discrimination occurring before March 28, 2002, there is a fundamental flaw with plaintiff's argument that bars her ADEA claim. The summary judgment record does not include any evidence that plaintiff suffered an adverse employment action, which is a necessary part of her *prima facie* case. Williams offered plaintiff a choice between keeping her job and complying with its request to complete a performance improvement plan ("PIP"), or seek redeployment within the company. Williams unequivocally did not guarantee that plaintiff would be given a position with equivalent pay, or any position at all, during redeployment. The Tenth Circuit has held that placing an employee on a PIP, standing alone, is not an adverse employment action. *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 2006 WL 2258836 (10th Cir.2006). In this case, plaintiff quit before she could be placed on a PIP. Therefore, she must rely on a constructive discharge theory in order to prove that she suffered an adverse employment action under the ADEA.

In order to prove that she was constructively discharged, plaintiff must establish that a reasonable person in the same circumstances would have felt compelled to resign. *MacKenzie v. City & County of Denver,* 414 F.3d 1266, 1281 (10th Cir.2005); *Exum v. United States Olympic Committee,* 389 F.3d 1130, 1136 (10th Cir.2004). The Tenth Circuit has established a high standard to survive summary judgment on a claim of constructive discharge, stating:

**\*13** Constructive discharge occurs when the

employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had *no other choice* but to quit. The conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant.

*Sandoval v. City of Boulder,* 388 F.3d 1312, 1325 (10th Cir.2004) (quoting *Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir.1998)). This is an objective test, and a court may not consider the employee's or employer's subjective views of the working environment. *Tran v. Trustees of State Colleges in Colorado,* 355 F.3d 1263, 1270 (10th Cir.2004). It must be apparent that the working conditions would have been intolerable to a reasonable person, not simply that the employee was subjectively unhappy because of the actions of her employer. *See Baca v. Sklar,* 398 F.3d 1210, 1216 (10th Cir.2005). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998).

Plaintiff has not offered any evidence that would prove that a reasonable person would have felt she had no other choice but to resign her employment. In this case, plaintiff always had the option to keep her job in the scheduling department of the independent terminals group. She rejected the opportunity to participate in a PIP to improve her allegedly poor interpersonal skills. Plaintiff's disagreement with her supervisor's evaluation, while it may have made plaintiff subjectively uncomfortable, is not objective evidence that her working conditions were intolerable. Williams has presented many years of evaluations, dating back to 1987, showing that plaintiff has consistently been found to have poor interpersonal skills. However, the Court may not consider plaintiff's personal feelings about these evaluations. Although plaintiff has introduced evidence of one example when an older worker, Lee Selby, was allegedly terminated because of his age, plaintiff does not ever state Selby's age or produce any evidence that would support an inference that Selby was fired because of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 12

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

his age.[FN11] In an ADEA claim, plaintiff must show that she was constructively discharged " because of her age." *Bennett*, 258 F .3d at 1229. There is no evidence to support such a finding in this case and plaintiff may not proceed to a jury on a constructive discharge theory.

> FN11. Plaintiff merely states that Selby was an older worker. Selby was a project manager who was moved into the scheduling department as part of the cross training program initiated by Wiese. Plaintiff admits she does not have any evidence relating to Selby's job performance or that would create an inference that Selby was fired because of his age, other than the fact that Selby was " older."

Plaintiff can not prove a *prima facie* case of employment discrimination, because she did not suffer an adverse employment action. She voluntarily quit her position with no guarantee from Williams that she would be able to find a new job by seeking redeployment. In fact, plaintiff did find a new job within Williams even though the company was downsizing. Although she accepted a position with a lower salary, plaintiff offers no evidence from which the Court could infer the reduced salary was due to plaintiff's age. There is no evidence that the working conditions at Williams were objectively intolerable for older workers, and plaintiff may not seek relief under the ADEA when she elected to leave her job, rather than resolve alleged deficiencies with her job performance. Defendants' motion for summary judgment is granted as to plaintiff's ADEA claim.

### Gender Discrimination under Title VII-Unequal Pay

*14 Plaintiff claims that she was paid less than her male co-workers and that Williams failed to promote her because of her gender. Plaintiff asserts that if she produces any evidence that male employees received higher pay than female workers that she is entitled to present her claim for gender

discrimination at trial. *See Miller v. Automobile Club of New Mexico, Inc.,* 420 F.3d 1098, 1115 (10th Cir.2005). Defendants argue that the evidence shows that plaintiff received a salary equivalent, and in some cases, exceeding that of her male counterparts in the independent terminals group. The Court has already held that plaintiff was on notice of her claim well before filing her EEOC charge and may not rely on events before March 28, 2002, essentially barring her claim. However, even if the Court considers acts before March 28, 2002, plaintiff does not have a legitimate claim for gender discrimination under Title VII.

In this type of case, plaintiff can prove a *prima facie* case of discrimination under Title VII by "showing that she occupies a job similar to that of higher paid males." *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1363 (10th Cir.1997) (quoting *Meeks v. Computer Associates International,* 15 F.3d 1013, 1019 (11th Cir.1994)). If plaintiff comes forward with sufficient evidence to prove a *prima facie* case of gender discrimination, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for the disparity in pay. *Id.* If the employer meets this burden, plaintiff must show that the defendant's stated reason is pretextual. *Id.* Plaintiff bears the burden to show that similarly situated male employees received higher pay.

In *Miller,* the case most heavily relied upon by plaintiff to defeat summary judgment, the Tenth Circuit held that the employee did not prove a *prima facie* case of gender discrimination based on unequal pay. 420 F.3d at 1115. The plaintiff in *Miller* alleged that she performed more duties than her male co-workers but received the same pay. The facts showed that the plaintiff worked more hours that male employees but was also compensated at a higher rate. Plaintiff also argued that the person who replaced her was male and that he received a better salary than plaintiff. The court found that the new employee was hired for a newly created position, and focusing on the duties of the two positions, decided that the new employee was not similarly situated. *Id. Miller* shows the fact-intensive analysis required to survive summary judgment when a claimant alleges that she received unequal pay. *See also Sprague,* 129 F.3d at 1363

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 13

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

(holding that employee did not prove *prima facie* case of discrimination based on unequal pay, because job duties between employees differed and higher paid workers had more education and experience); *Tidwell v. Fort Howard Corp.*, 989 F.2d 406 (10th Cir.1993) (violation of Equal Pay Act, 29 U.S.C. § 206, did not require finding that employer intentionally discriminated against employees under Title VII because there was no evidence of intent to discriminate based on gender).

**\*15** Based on the evidence in the summary judgment record, plaintiff can not prove a *prima facie* case of gender discrimination based on unequal pay. The evidence submitted by plaintiff shows that employees in her department received a range of salaries, and that plaintiff received pay equal to or greater than some of her male colleagues. As a baseline, the Court will compare plaintiff's salary to other project managers and schedulers in December 2000. On December 12, 2000, plaintiff was receiving $67,906. At the same time, project managers Nelson and Selby were receiving $68,826 and $71,001 respectively. Plaintiff claims she was more qualified and experienced than her coworkers, but fails to cite to evidence that would support this claim. In the scheduling department, where plaintiff was actually working at the time she quit, Potacka was paid $58,968 in December 2000 and Nalley received an annual salary of $54,906.

The initial burden is on plaintiff to come forward with a *prima facie* case, such as to show which other workers were similarly situated to her and to introduce evidence of unequal pay. *Nulf v. International Paper Co.*, 656 F.2d 553, 557 (10th Cir.1981). Plaintiff has failed to do so. The evidence shows that plaintiff received pay equivalent to other project managers and significantly more than other employees in the scheduling department. This evidence does not prove a *prima facie* case for gender discrimination under Title VII and defendants' motion for summary judgment should be granted as to this claim.

### *Retaliation under Title VII and the ADEA*

Plaintiff claims that Willaims blacklisted plaintiff, preventing her from obtaining a desirable job during her period of redeployment, because she complained about management and made allegations that Williams discriminated against her. Defendants argue that plaintiff can not establish a causal connection between any protected behavior and plaintiff's difficulty in finding a new position during redeployment.

It is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). To prove a *prima facie* case of retaliation, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the opposition and the adverse action. *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir.2004). The law is clear that reporting workplace discrimination to the EEOC is protected behavior. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999); *McCue v. State of Kansas, Dep't of Human Resources*, 165 F.3d 784, 789 (10th Cir.1999). An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity. *Annett v. University of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir .2004); *Burrus v. United Tel. Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.1982). "Unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001).

**\*16** The Court has already ruled that plaintiff may not rely on events before March 28, 2002 to support her claim for retaliation, except to provide context for the alleged discriminatory acts after that date. Even if the Court were to consider events before March 28, 2002, there is no evidence that plaintiff complained about discriminatory conduct to management or filed an EEOC charge before she elected to seek redeployment on December 24, 2001. Plaintiff argues that Williams' failure to offer her a suitable position during her redeployment period constitutes retaliation for complaining to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

management. It is true that plaintiff complained about her dissatisfaction with her supervisors and her cross-training rotation in the scheduling department; however, it is not clear that she ever made any allegations that her supervisors discriminated against on the basis of age or gender. *Petersen v. Utah Dep't of Corrections,* 301 F.3d 1182, 1188-89 (10th Cir.2002) (employer can not be found liable for retaliation unless plaintiff shows that employer actually knew plaintiff was engaging in opposition to an unlawful practice under Title VII); *Williams v. Rice,* 983 F.2d 177, 181 (10th Cir.1993) (plaintiff must introduce evidence showing that employer knew of plaintiff's EEOC charge in order to prove *prima facie* case for retaliation).

Plaintiff has not presented any evidence that she engaged in protected opposition, such as complaints about unlawful behavior under Title VII, [FN12] or any evidence to substantiate her theory that she was blacklisted. In order to prevail based on events after March 28, 2002, plaintiff would have to produce evidence showing not only that the independent terminals group knew about her complaints, but essentially that the entire company was on notice that plaintiff had complained about gender and age discrimination. The only adverse employment action that would sustain a claim after March 28, 2002 is a failure to rehire plaintiff during redeployment. Plaintiff makes blanket allegations that she was blacklisted, but she may not rely on the unsubstantiated allegations of her complaint to survive summary judgment. Fed.R.Civ.P. 56(e); *Salehpoor v. Shahinpoor,* 358 F.3d 782, 786 (10th Cir.2004). Plaintiff has not shown that defendants were aware of her complaints, if she made any, or a causal connection between her complaints and defendants' failure to offer a satisfactory position during redeployment. Plaintiff may not proceed to a jury on her claim for retaliation, and defendants' motion for summary judgment should be granted as to this claim.

> FN12. Plaintiff notes that she informed Wiese that her supervisor, Games, came around plaintiff's desk and sat on her lap. Although plaintiff contacted the human

resources department, Wiese asked plaintiff and Games to informally resolve the matter, which they did. Plaintiff never filed a formal human resources complaint.

### *Wrongful Discharge in Violation of Public Policy*

Defendants claim that plaintiff's common law claim for wrongful discharge is barred because plaintiff has an adequate federal remedy. In *Clinton v. State ex rel. Logan County Election Bd.,* 29 P.3d 543 (Okla.2001), the Oklahoma Supreme Court held that "the existence of federal statutory remedy or a state statutory remedy that is sufficient to protect the identified Oklahoma public policy goal precludes the *Burk* tort." *Id.* at 546. This Court has interpreted *Clinton* to preclude a *Burk* claim when plaintiff also alleges claims under Title VII. *Bolin v. Oklahoma Conference of the United Methodist Church,* 397 F.Supp.2d 1293, 1300 (N.D.Okla.2005).

**\*17** However, the Oklahoma Supreme Court's recent decision in *Saint v. Data Exchange,* 2006 WL1891747 (Okla.2006), allows a plaintiff to pursue a *Burk* claim and an ADEA claim.[FN13] In response to a certified question from the Northern District of Oklahoma, the Oklahoma Supreme Court held that denying age discrimination claimants a common law remedy for wrongful discharge would violate Art. 5, § 46 of the Oklahoma Constitution. *Id.* at 2. The court relied on *Tate v. Browning-Ferris, Inc.,* 833 P.2d 1218 (Okla.1992), which held that denying racial discrimination victims a common law remedy would allow victims of disability discrimination a "more generous remedy." *Id.* The Oklahoma Constitution required the court to treat all employment discrimination victims as part of single class. The same rule applied to victims of age discrimination, who would be denied the more extensive common law remedies available to victims of disability discrimination. Plaintiff was allowed to bring a *Burk* claim for wrongful discharge alleging age discrimination.

> FN13. The defendant, Data Exchange, Inc., has filed a motion for rehearing. The Oklahoma Supreme Court's opinion will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

become binding precedent only if the court denies the motion for rehearing.

Based on *Saint,* plaintiff's claim for wrongful discharge under Oklahoma law is not precluded; however, plaintiff must still prove that she was actually or constructively discharged. There is no evidence that plaintiff was terminated from her position, because she elected to seek redeployment rather than continue as a project manager. In *Collier v. Insignia Financial Group,* 981 P.2d 321 (Okla.1999), the Oklahoma Supreme Court created the following test for constructive discharge in a *Burk* claim:

The test requires the trial court to inquire (1) whether the employer either knew or should have known of the "intolerable" work conditions and (2) if the permitted conditions were so intolerable that a reasonable person subject to them would resign. This imposes upon the trial court the obligation to survey the totality of the circumstances which allegedly prompted the constructive discharge, including (but not limited to) the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." If the employer's behavior is so objectively offensive as to alter the conditions of the plaintiff's employment (causing the employee to resign), a retaliatory constructive discharge can be said to have occurred....

*Id.* at 324. Oklahoma appellate courts have affirmed that *Burk* protects only those employees who have been discharged in violation of public policy. *McCrady v. Oklahoma Dep't of Public Safety,* 112 P.3d 473, 476 (Okla.2005); *Barker v. State Ins. Fund,* 40 P.3d 463, 467-68 (Okla.2001); *Mason v. State ex rel. Bd. of Regents of University of Oklahoma,* 23 P.3d 964, 968 (Okla.Civ .App.2000).

Plaintiff was not constructively discharged because of discrimination based on her age and gender. The evidence shows that plaintiff disagreed with an employment evaluation and refused to participate in a PIP to remedy areas of deficiency pointed out by her supervisors. However, there is no evidence in the summary judgment record that would support a

finding that the workplace was objectively intolerable to a reasonable person.[FN14] Plaintiff points out that Selby, an older male worker, was fired because of his age, but there is no evidence to support an inference that discrimination played a part in Selby's dismissal. Plaintiff's allegations of unequal pay are meritless, and also do not support an inference of workplace discrimination. The timing of plaintiff's decision to seek redeployment strongly suggests that plaintiff's unhappiness with criticism of her interpersonal skills was the motivating factor for her departure from the independent terminals group. This does not mean that a reasonable person would have found the workplace to be intolerable because of age or gender discrimination. No reasonable jury could conclude that plaintiff was discharged or constructively discharged due to discriminatory behavior in violation of public policy and defendants' motion for summary judgment is granted on this claim.

> FN14. Plaintiff complains that sexually explicit jokes and remarks were tolerated in the workplace, and that she informed her superiors that this behavior made her uncomfortable. However, she does not cite this as her basis for quitting the independent terminals group.

### Intentional Infliction of Emotional Distress

**\*18** Defendant argues that plaintiff's claim for intentional infliction of emotional distress is barred by the statute of limitations and the facts she has discovered do not rise to the level necessary to proceed to a jury under Oklahoma law. Plaintiff failed to respond to defendants' arguments on this issue. Plaintiff filed her lawsuit in state court on March 19, 2004, but most of the alleged acts of discrimination and harassment occurred before December 2001. The statute of limitations for intentional infliction of emotional distress claims is two years. Okla. Stat. tit. 12, § 95(3); *Green v. Johnson,* 977 F.2d 1383, 1388 (10th Cir.1992); *Williams v. Lee Way Motor Freight, Inc.,* 688 P.2d 1294, 1297 (Okla.1984). Therefore, plaintiff may rely only on events occurring after March 19, 2002

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                        Page 16

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

to show intentional infliction of emotional distress.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage. *See, e.g., Gaylord Entertainue Co. v. Thompson,* 958 P.2d 128, 149 (Okla.1998). The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. *Id.* In *Breeden v. League Services Corp.,* 575 P.2d 1374 (Okla.1978), the Oklahoma Supreme Court explained,
Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arounse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Id.* at 1376.

A plaintiff alleging intentional infliction of emotional distress must establish the following elements: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Trentadue v. United States,* 397 F.3d 840, 856 (10th Cir.2005) (applying Oklahoma law); *Computer Publications, Inc. v. Welton,* 49 P.3d 732, 735 (Okla.2002). Under Oklahoma law, the trial court must assume a " gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." *Trentadue,* 397 F.3d at 856 n. 7. If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the court should submit the claim to the jury to determine whether the defendant's conduct could result in liability. *Id.* The court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress. *Id.*

**\*19** Based on the evidence presented by defendants, it is clear that plaintiff has no evidence that would support a claim for intentional infliction of emotional distress. The summary judgment record does not show that defendants engaged in extreme or outrageous behavior, or that plaintiff suffered severe emotional distress. Case law sets a high standard for finding that the workplace is so severely contaminated with hostility that a defendant will be found liable for engaging in extreme and outrageous behavior. *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 432-33 (10th Cir.1990) ( "Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress. We hold that Roberts and Merrick were involved in an ordinary employer-employee conflict"); *Anderson v. Oklahoma Temp. Serv., Inc.,* 925 P.2d 574 (Okla.1996) (sexually explicit comments at work were not extreme and outrageous because they were tolerated by plaintiff and other employees within the office setting); *Eddy v. Brown,* 715 P.2d 74 (Okla.1986) (repeated insulting actions by other employees and supervisors that caused emotional harm were not so severe or pervasive in the setting in which they occurred to justify submitting claim to jury). Plaintiff relies on a pattern or practice she claims evidences sex and age discrimination, but there is no indication that this constitutes extreme or outrageous behavior. Plaintiff's employer was also entitled to honestly assess her work performance and her interpersonal skills without incurring liability for emotional distress. Her claim that she was subjected to cross-training because of her age and gender do not create an inference that her employer intended to inflict emotional harm. The record is completely lacking in evidence that plaintiff suffered severe emotional harm because of any actions by her employer. Therefore, defendants' motion for summary judgment should be granted as to plaintiff's claim for intentional infliction of emotional distress.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Brief in Support (Dkt.# 59) is **granted;** Defendants' Motion to Strike Affidavit of Vonna Seeber (Dkt.# 86) is **denied;** Plaintiff's Motion to Strike (Dkt.# 89) and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 17

Slip Copy, 2006 WL 2524249 (N.D.Okla.)
**(Cite as: Slip Copy)**

Defendants' Motion in Limine to Exclude Testimony and Evidence by Plaintiff's Expert (Dkt.# 82) are **deemed moot.**

N.D.Okla.,2006.
Seeber v. Williams Companies, Inc.
Slip Copy, 2006 WL 2524249 (N.D.Okla.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2915159 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion in Limine (Oct. 3, 2005) Original Image of this Document (PDF)
• 2005 WL 2915158 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment (Sep. 23, 2005) Original Image of this Document (PDF)
• 2005 WL 2915157 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine to Exclude Testimony and Evidence by Plaintiff's Expert (Sep. 13, 2005) Original Image of this Document (PDF)
• 2005 WL 3672200 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion for Summary Judgment (Sep. 6, 2005) Original Image of this Document (PDF)
• 2005 WL 2915156 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendants' Motion for Summary Judgment (Sep. 2, 2005) Original Image of this Document (PDF)
• 2005 WL 2414615 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for Summary Judgment and Brief in Support (Aug. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 3292085 () The Deposition of Terry J. Westemeir (Jun. 21, 2005) Original Image of this Document (PDF)
• 2004 WL 3340319 (Trial Pleading) Answer of Defendant the Williams Companies, Inc. (Jun. 24, 2004) Original Image of this Document (PDF)
• 2004 WL 3341838 (Trial Pleading) Answer Of Defendant Magellan Midstream Partners, L.P. (Jun. 24, 2004) Original Image of this Document (PDF)
• 4:04cv00451 (Docket) (Jun. 2, 2004)
• 2004 WL 3584293 () Expert Report of Terry J. Westemeir, C.P.A. (May 18, 2004) Original Image of this Document (PDF)
• 2004 WL 3584290 () (Report or Affidavit of

Terry J. Westemeir, C.P.A.) (May 17, 2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE

**MORRIS BILL TOLD, Plaintiff, and UNITED STATES OF AMERICA, for the use
and benefit of COMTROL, INC., Plaintiff-Counter-Defendant-Appellee, v. TIG
PREMIER INSURANCE COMPANY, Defendant, and M.T. ENTERPRISES, INC.,
Defendant-Counter- Claimant-Appellant, v. UNITED STATES FIDELITY AND
GUARANTY COMPANY, Third-Party-Defendant.**

No. 03-4113

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

149 Fed. Appx. 722; 2005 U.S. App. LEXIS 16946

**August 10, 2005, Filed**

**NOTICE:** [**1] RULES OF THE TENTH CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Related proceeding at
United States v. Comtrol, Inc., 2005 U.S. Dist. LEXIS
32749 (D. Utah, Sept. 6, 2005)

**PRIOR HISTORY:** (D.C. No. 2:97-CV-249-PC). (D.
Utah).

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Cross-defendant subcon-
tractor challenged the decision entered by the United
States District Court for the District of Wyoming that
struck the verification of plaintiff, the subcontractor's
president, and thereby granted cross-defendant contrac-
tor's motion for summary judgment. In the alternative,
the subcontractor argued that summary judgment was
improper.

**OVERVIEW:** The case arose from a contract dispute
between the contractor and the subcontractor. The con-
tractor eventually brought the action against the subcon-
tractor for damages, and the subcontractor counter-
claimed, believing itself to be the wronged party. A one-
page "verification" was presented by the subcontractor in
its supporting papers for a cross-motion for summary
judgment. The verification was from the president of the
subcontractor, which verified the factual allegations in
the subcontractor's response to the contractor's motion

for summary judgment and the subcontractor's cross-
motion for summary judgment. The district court struck
the verification on three alternative grounds: (1) as a
sanction against the subcontractor for failing to allow
previously ordered depositions; (2) the verification did
not comply with Fed. R. Civ. P. 56(e); and (3) a sanction
for the failure of the motion to comply with the district
court's orders. The appellate court held that the district
court properly disregarded the verification of the presi-
dent. The court found that it was impossible to tell for
certain of what facts the president did or did not have
personal knowledge.

**OUTCOME:** The court affirmed the district court's de-
cision.

**CORE TERMS:** summary judgment, verification, per-
sonal knowledge, markings, cross-motion, subcontract,
fee provision, genuine issue, struck, admissible, adverse
party, modification, depositions, initialed, ambiguous,
affidavit supporting, extrinsic evidence, oral argument,
disregarded, conclusory, binding, affiant, summary
judgment motion, construction project, documentary
evidence, accurately reflect, penalty of perjury, respon-
sive brief, parol evidence, parties agreed

**COUNSEL:** For UNITED STATES OF AMERICA, for
the use and benefit of COMTROL, INC., Plaintiff-
Counter-Defendant-Appellee: Cass C. Butler, Callister,
Nebeker & McCullough, Salt Lake City, UT.

For M.T. ENTERPRISES, INC., Defendant-Counter-
Claimant-Appellant: David C. Condie, Brian W. Steffen-
sen, Salt Lake City, UT.

**JUDGES:** Before HARTZ, and BALDOCK, Circuit Judges, and BRIMMER, ** District Judge.

      ** The Honorable Clarence A. Brimmer, District Judge, United States District Court for the District of Wyoming, sitting by designation.

**OPINION BY:** Bobby R. Baldock

**OPINION:**

    [*723] **ORDER AND JUDGMENT ***

      * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

  [**2]

    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

    This is a contract dispute between Comtrol, Inc. (Comtrol), a general contractor [*724] on a federal construction project, and M.T. Enterprises, Inc. (MT), one of its subcontractors. Because MT was unable to obtain a bond for the original amount of the written subcontract, Comtrol agreed to pay certain suppliers directly for a portion of the subcontract to allow a lower bond to be obtained. The relationship between the parties deteriorated due to disagreements over the scope of MT's duties, the compensation MT was to receive, and the amount of work MT was actually performing. According to Comtrol, it eventually had to perform many of MT's contractual duties.

    Comtrol eventually sued MT for damages and MT counter-claimed, believing itself to be the wronged party. Comtrol filed a motion for summary judgment to which MT responded and filed its own cross-motion for summary [**3] judgment. Comtrol's motion, supported by affidavits and documentary evidence, alleged a contract between the parties, breach of that contract by MT, damages to Comtrol from the breach, and that it was owed attorney's fees under the subcontract. MT's response and cross-motion, of course, presented a different story and were supported by documentary evidence and a one-page "Verification" by Morris Told, the president of MT,

which verified the factual allegations in MT's response to Comtrol's motion for summary judgment and MT's cross-motion for summary judgment. The district court struck Mr. Told's verification on three alternative bases, leaving Comtrol's motion for summary judgment essentially unopposed. The court then granted Comtrol's summary judgment motion and MT appeals

    On appeal, MT argues that striking the verification was error. In the alternative, it argues that even if the verification was properly struck, summary judgment was still improper because the subcontract between Comtrol and MT did not contain an attorney's fee provision and Comtrol's claim against MT, including any attorney's fees owed, was paid in full by the company holding MT's performance bond. Since we believe [**4] that the verification was properly struck and the attorney fee award was proper, we exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

    ANALYSIS

    Under Fed. R. Civ. P. 56(c), summary judgment shall be entered by the district court:

      if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Kinross v. Utah Ry. Co.*, 362 F.3d 658, 660 (10th Cir. 2004) (quotation omitted).

**I. The Striking of Morris Told's "Verification"**

    The district court struck Mr. Told's verification on three alternative grounds: (1) as a sanction against MT for failing to allow previously ordered depositions, (2) because the verification failed to comply with Fed. R. Civ. P. 56(e), and (3) as a sanction for the failure of the motion to comply with [**5] the district court's local rules. Because the district court was correct in its determination that the verification did not comply with Fed. R. Civ. P. 56(e), we affirm on that basis and do not reach the alternative holdings.

    The verification, signed by Mr. Told, read:

      I, MORRIS TOLD, have personal knowledge of the facts of the underlying [*725]

dispute herein, and of the depositions and documents which have been taken and/or prepared in connection herewith. I have reviewed the Statement of Disputed/Undisputed Facts in and Exhibits to MT Enterprises, Inc.'s Memorandum in Opposition to Comtrol's Motion for Summary Judgment and in Support of Cross- Motion for Summary Judgment, and hereby state that based upon my personal knowledge, said Facts are true and correct to the best of my knowledge and information, and that the copies of the documents in the Exhibits are true and correct copies of the originals thereof, that the excerpts of taped conversations accurately reflect the substance of conversations that I was personally a party to, and that the summaries and charts prepared also accurately reflect the underlying facts. I declare the foregoing [**6] to be true to the best of my knowledge, information and belief, and under the penalty of perjury.

App. Vol. V(a) at 1195. Under Fed. R. Civ. P. 56(e), affidavits supporting or opposing motions for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Here, Comtrol's motion for summary judgment was properly supported by affidavits of the president of Comtrol, the superintendent of the construction project, and even a former employee of MT. Further, Rule 56(e) also states that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

MT's response and cross-motion [**7] for summary judgment were supported only by Morris Told's verification. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)); *see also Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 94 L. Ed. 1312, 70 S. Ct. 894, 1950 Dec. Comm'r Pat. 608 (1950) (affidavit supporting motion for summary judgment made on information and belief does not comply with Rule 56); *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994) (Under Rule 56, statements supporting motion for summary judgment must be based on personal knowledge; "statements of mere belief must be disregarded.").

Here, Mr. Told's verification stated that he had "personal knowledge of the facts of the underlying dispute herein" but then stated only that the facts contained in MT's response and cross-motion for summary judgment were "true and correct to the best of my knowledge and information. [**8] " App. Vol. V(a) at 1195. Similarly, Mr. Told only "declared the foregoing [statements] to be true to the best of [his] knowledge, information and belief, and under the penalty of perjury." *Id.* Information and belief have no place in an affidavit supporting a motion for summary judgment or a response thereto. While generally Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge, *Barthelemy v. [*726] Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). That is not the case here. The verification consists merely of a blanket statement that the facts in the response and cross-motion were true to the best of Mr. Told's knowledge, information and belief; it is completely devoid of particularity and detail. This form of affidavit left it to the court to attempt to discern which level of certainty went with what fact, a chore that the district court refused to undertake. The court found that it was clear that Mr. Told could not have personal knowledge of all the facts in MT's response and cross-motion and that the response and [**9] cross-motion were "filled with items that are not admissible in evidence." App. Vol. I at 30-31. The court also found that M.T.'s response and cross-motion was "riddled with inadmissible hearsay, conclusory statements and arguments, and information that [was] clearly outside [Mr. Told's] personal knowledge" and that "sorting them out [was] an impossibility." *Id.* at 33. Although MT argues on appeal that "[Mr.] Told clearly had personal knowledge as to whether Comtrol was properly charging certain amounts back against MT's contract, whether MT had suffered delay damages, and the like," we agree with the district court that it is impossible to tell for certain of what facts he did or did not have personal knowledge. With the

verification, however, the district court was left to guess. Consequently, the verification did not comply with Rule 56(e) and, as a result, MT's response did not set forth specific facts showing a genuine issue for trial. Since, as the district court found, Comtrol's summary judgment motion was supported by affidavits and demonstrated that there was no genuine issue as to any material fact and that MT breached its subcontract agreement with Comtrol causing [**10] Comtrol damages, summary judgment for Comtrol was proper.

## II. Enforceability of Attorney's Fee Provision

MT also argued that the district court erred in granting attorney's fees on summary judgment. The court's grant of attorney's fees was based on a provision in the subcontract between MT and Comtrol that read in part:

> The Subcontractor shall indemnify the Contractor and the Owner against, and save them harmless from, any and all loss, damage, expenses, costs, and attorneys' fees incurred or suffered on account of any breach of the provisions or covenants of this contract.

App. Vol. IV(a) at 766. The dispute arose because this provision has lines drawn through it in the contract that was signed by the parties. In the supplemental briefing that the district court had the parties submit on the issue, Comtrol argued that the change was not initialed by the parties and was not part of the contract. They supported their argument with an affidavit of the secretary of Comtrol swearing that the handwritten markings on the contract were not part of the contract. They also submitted a letter that Comtrol's counsel appeared to have sent to counsel for the bond company in [**11] the course of settlement negotiations stating that:

> when Morris Told arrived, at Comtrol, with the subcontract, with markings on the contract, [a representative for Comtrol] specifically told Morris Told that Comtrol would not accept any changes or modifications to the contract, and would not permit or allow any provisions in the contract to be deleted from the Contract. . . . Morris Told stated that he would be willing to accept the contract as drafted . . . . [and] both parties agreed that they would not "initial" any of the markings on the document and would not accept any modifications or changes.

[*727] App. Vol. VII at 2348. MT's responsive brief argued that "Comtrol accepted and signed the subcontract Agreement with [the attorney fee] language scratched out" and, therefore, "the contract does not . . . contain an attorney's fee provision agreed to in writing by MT." *Id.* at 2405. MT's responsive brief was not supported by affidavits. Citing Utah case law, the district court held that a party may recover attorney's fees only when such fees are provided for by statute or contract. The court held the markings did not constitute a modification of the agreement and [**12] that the attorney fee provision was binding.

On appeal, MT presents a seven-line argument, bereft of authority and simply stating that since the attorney's fee provision had lines drawn through it the district court should have either ruled that the contract did not provide for attorney's fees, or should have determined that the markings raised an issue of material fact that precluded the award of attorney's fees by summary judgment.

We disagree. "We apply state law to interpret contractual obligations." *Corneveaux v. CUNA Mut. Ins. Group,* 76 F.3d 1498, 1506 (10th Cir. 1996). Under Utah law:

> If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law.

*Bakowski v. Mountain States Steel, Inc.,* 2002 UT 62, 52 P.3d 1179, 1184 (Utah 2002). Said another way, "a court will look to extrinsic evidence only when the contract language is ambiguous." *Id.* Here, the subcontract has lines drawn through the attorney's fee provision, but [**13] the markings are not initialed. n1 Therefore, on its face, the contract is ambiguous as to whether the parties agreed to the provision being marked out, or even when the provision was marked out. Parol evidence may therefore be introduced to ascertain the intent of the parties. Here, the parol evidence introduced by Comtrol explained that the parties had indeed signed the contract after the markings had been made, but that an oral agreement had been reached, as well, that the markings would have no meaning or effect on the original language of the contract and that the markings would therefore not be initialed. This parol evidence as to the intent

149 Fed. Appx. 722, *; 2005 U.S. App. LEXIS 16946, **

of the parties with regard to the ambiguous markings was unopposed by MT. Consequently, the district court was correct in finding that no genuine issue of material fact existed as to the enforceability of the attorney's fee provision.

n1 We express no opinion as to what, if any, legal effect initialing the documents would have had in this context.

CONCLUSION

We [**14] hold that the district court properly disregarded the verification of Morris Told and that summary judgement in favor of Comtrol. As to MT's assertion that the bond payment extinguished Comtrol's claims against MT, we affirm the district court's determination that Comtrol's claims were not extinguised for substantially the reasons set forth in its opinion. The judgment of the district court is AFFIRMED.

Entered for the Court

Bobby R. Baldock

Circuit Judge